James H.M. Sprayregen, P.C.
Jonathan S. Henes, P.C.
Christopher T. Greco
Anthony R. Grossi
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

- and -

Melissa N. Koss
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:     (415) 439-1400
Facsimile:      (415) 439-1500

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ANSWERS HOLDINGS, INC., *et al.*,[1] | ) | Case No. 17-10496 (SMB) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF INTERIM
AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS
TO (A) PAY PREPETITION WAGES, SALARIES, OTHER
COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE
EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF**

---

[1]    The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Answers Holdings, Inc. (4504); Answers Corporation (2855); Easy2 Technologies, Inc. (2839); ForeSee Results, Inc. (3125); ForeSee Session Replay, Inc. (2593); More Corn, LLC (6193); Multiply Media, LLC (8974); Redcan, LLC (7344); RSR Acquisition, LLC (2256); Upbolt, LLC (2839); and Webcollage Inc. (7771).  The location of Debtor Webcollage Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is:  11 Times Square, 11th Floor, New York, New York 10018.

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**")

respectfully state as follows in support of this Motion (this "***Motion***"):

**Relief Requested**

1.      By this Motion, the Debtors request entry of interim and final orders, substantially

in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "***Interim Order***" and

the "***Final Order***"),[2]

> (i)      authorizing, but not directing, the Debtors to (a) pay amounts owed in connection with Employee Compensation and Benefits Obligations, and (b) continue various employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto;
>
> (ii)     authorizing financial institutions to receive, process, honor, and pay checks presented for payment and electronic payment requests relating to prepetition Employee Compensation and Benefits Obligations provided that there are sufficient good funds standing to the Debtors' credit with such financial institutions;
>
> (iii)    scheduling a final hearing for April 7, 2017 (the "***Final Hearing***") to consider approval of this Motion on a final basis; and
>
> (iv)     granting related relief.

2.      The Debtors believe that all Employee Compensation and Benefits Obligations

are vital to the Debtors' businesses and seek authority to pay and honor all Employee

Compensation and Benefits Obligations that the Debtors believe are necessary to prevent

immediate and irreparable harm to the Debtors' businesses during the period between the

Petition Date and the Final Hearing.  The Debtors also seek the authority to continue all of their

Employee Compensation and Benefits Obligations in the ordinary course of business in

accordance with their stated policies and prepetition practices (as such policies may be modified

---

[2]    Capitalized terms used in this Motion and not immediately defined shall have the meanings ascribed to such terms elsewhere in this Motion.

from time to time) and, to pay, in accordance with the Debtors' prepetition policies and practices and in the Debtors' sole discretion, all Employee Compensation and Benefits Obligations on a postpetition basis.

3.      Additionally, for the vast majority of their Employees, the Debtors do not seek authority to pay prepetition accrued Employee compensation exceeding the cap set forth in section 507(a)(4) of the Bankruptcy Code (the "***Priority Cap***").  However, based on the nature, structure, and timing of the Employees' compensation, a small number of Employees are owed amounts for Sales Commissions in excess of the Priority Cap.  Accordingly, the Debtors also request authority, pursuant solely to entry of the Final Order, to pay prepetition accrued Sales Commissions in excess of the Priority Cap in the ordinary course of business.

4.      Importantly, no party in interest will be prejudiced by the relief requested herein because prepetition claims arising in connection with the Employee Compensation and Benefits Obligations are unimpaired under the *Joint Prepackaged Chapter 11 Plan of Reorganization for Answers Holdings, Inc. and Its Debtor Affiliates* (as amended, supplemented, or otherwise modified from time to time, the "***Plan***"), filed contemporaneously herewith, and Employee compensation will continue to be paid in the ordinary course of business.  Further, no party in interest will be prejudiced by the relief requested herein because all general unsecured claims are unimpaired under the Plan and will be paid in full.  The relief requested herein seeks to alter only the timing, not the amount or priority, of the payment of such claims.  In addition, the Consenting First Lien Secured Parties and the Consenting Second Lien Secured Parties (each as defined in the Plan) consent to and support the relief requested herein.

## Jurisdiction and Venue

5.      The United States Bankruptcy Court for the Southern District of New York (the "***Court***") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated December 1, 2016.  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The statutory bases for the relief requested herein are Sections 105(a), 362(d), 363(b), and 507(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "***Bankruptcy Code***"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rule 9013-1 of the Local Bankruptcy Rules for the Southern District of New York (the "***Local Bankruptcy Rules***").

## Background[3]

8.      The Debtors are leading global providers of high quality internet content and cloud-based customer solutions, operating in three divisions:  (a) "***Multiply***;" (b) "***ForeSee***;" and (c) "***Webcollage***" (collectively, the "***Company***").  The Company also has shared services departments, which perform certain finance, legal, human resource, and administrative support functions for all of the Company's operating units.  Multiply is an online content publisher that

---

[3]    A description of the Debtors' businesses, the reasons for commencing these chapter 11 cases, the relief sought from the Court to allow for a smooth transition into chapter 11, and the facts and circumstances supporting this Motion are set forth in the *Declaration of Justin P. Schmaltz, Chief Restructuring Officer, in Support of Chapter 11 Petitions and First Day Motions* (the "***First Day Declaration***"), filed contemporaneously herewith.

leverages relationships with Facebook, Inc., Yahoo! Inc., celebrities, and other partners to acquire traffic to owned and partner websites and generate advertising revenue from Google, Inc. and other partners.  ForeSee measures end customer/user satisfaction for its customers, which allows it to deliver insights on where its customers should prioritize improvements in their own customers' experiences.  Webcollage is the leading cloud-based platform for managing and publishing rich product information for syndication to retail partners' e-commerce websites.

9.      Prior to date hereof (the "***Petition Date***"), the Debtors commenced the solicitation of votes by the Debtors' prepetition first lien lenders and the Debtors' prepetition second lien lenders, the only voting classes of creditors with respect to the Plan, filed contemporaneously herewith.  As of March 2, 2017, holders of approximately 98% in amount of first lien claims against the Debtors and holders of approximately 98% in amount of second lien claims against the Debtors voted to accept the Plan.  The Plan, which has the support of the overwhelming majority of the holders of the Debtors' funded indebtedness, contemplates the Company's restructuring through a debt-to-equity conversion of a substantial majority of the Debtors' funded debt obligations.  Implementation of the restructuring transactions contemplated by the Plan will enable the Debtors to de-lever their balance sheet by more than $471.4 million[4]—***over 86%*** of their funded debt obligations—and position their businesses for stability and success after emergence from bankruptcy.  All allowed general unsecured claims will remain unimpaired under the Plan.

10.     On the Petition Date, each of the Debtors filed a petition for reorganization under chapter 11 of the Bankruptcy Code with the Court.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and

---

[4]     Inclusive of $7.4 million of secured swap settlement amounts that are discussed more fully in the First Day Declaration.

1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No party has requested the appointment of a trustee or examiner in these chapter 11 cases, and no committees have been appointed under section 1102 of the Bankruptcy Code.

### The Debtors' Workforce

11.     In order to facilitate their operations, as of the Petition Date, the Debtors' domestic operations currently employ approximately 484 Employees (the "*Employees*").[5] Approximately 474 of the Employees are full-time and approximately 10 are part-time.  The Debtors pay approximately 474 employees on a salaried basis (the "*Salaried Employees*") and approximately 10 employees on an hourly basis (the "*Hourly Employees*").

12.     In addition, the Debtors from time to time rely on specialized independent contractors (collectively, the "*Independent Contractors*") to complete discrete projects in furtherance of the Debtors' businesses.  The Independent Contractors are a critical supplement to the efforts of the Debtors' Employees.  Specifically, the Debtors currently utilize the services of approximately 35 Independent Contractors, who provide, among other things, software and product development, accounting, content writing, legal services, technical services, and other related tasks.[6]

---

[5]     Unless otherwise noted, the Debtors have limited the description of their workforce and Employee Compensation and Benefits Obligations to their U.S. operations.  The Debtors and their affiliated non-debtor entities' total workforce consists of approximately 562 employees across the United States, Canada, the United Kingdom, and Israel.

[6]     The Debtors also utilize temporary employees (the "*Temporary Employees*") on an ad hoc basis to fulfill administrative, legal, and other functions outside of the creative content context.  Due to the minimal amount of Temporary Employees at any given time, they, for the most part, are included within the Independent Contractors group.

13.    The Employees and Independent Contractors (collectively, the "***Debtors'
Workforce***") perform a wide variety of functions crucial to the Debtors' continued success,
including, but not limited to, functions related to purchasing and sales, software and product
development, marketing, legal, customer service, accounting, operations, technical and analytical
services, and other related tasks.  Their skills, knowledge, and understanding of the Debtors'
operations and infrastructure are essential to preserving operational stability and efficiency of the
Debtors' businesses.  The Debtors' Workforce includes highly trained personnel who cannot
easily be replaced.  Accordingly, without the continued, uninterrupted services of the Debtors'
Workforce, the Debtors' reorganization may be materially impaired to the detriment of all
stakeholders.

14.    Just as the Debtors depend on their Workforce to operate their businesses, the
Debtors' Workforce relies exclusively on their compensation and benefits to pay for their daily
living expenses and support their families.  The Debtors' Workforce will be exposed to
significant financial difficulties if the Debtors are not permitted to continue paying
compensation, providing benefits, and maintaining programs benefiting Employees in the
ordinary course of business.  To minimize the personal hardship that the Debtors' Workforce
would suffer if prepetition Employee-related obligations are not paid in the ordinary course and
to maintain morale and stability in the Workforce during this critical time, the Debtors seek
authority to pay and honor the Employee Compensation and Benefits Obligations in the normal
course of business.  Accordingly, the Debtors respectfully submit that the relief requested herein
is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

## Employee Compensation and Benefits Obligations

15.    By this Motion, the Debtors seek authority to pay and honor certain prepetition claims and to continue honoring Employee Compensation and Benefits Obligations, as applicable, relating to:  (a) Compensation and Withholding Obligations, including Wages, Sales Commissions, Independent Contractor Compensation, Payroll Taxes and other deductions, Payroll Processing Fees, and Referral Compensation; (b) Reimbursable Expenses; (c) Paid Time Off and Leaves of Absence; (e) certain Employee Benefits, including Health Insurance Benefits, Flexible Spending Plans, Health Savings Accounts, Life, Accidental Death, and Dismemberment Insurance, and Supplemental Insurance, Short- and Long-Term Disability Plans, and broker and administrator payments related thereto; (f) the Fringe Benefit Programs, including the Employee Assistance Program, Tuition Reimbursement Program, and Cell Phone Program; (g) the Severance Program; (h) the 401(k) Retirement Savings Plan; (i) the Workers' Compensation Program; and (j) the Postpetition Non-Employee Director Obligations, all of which the Debtors have historically provided to Employees and/or Independent Contractors (each obligation, program, or plan as defined and described herein, collectively, the "***Employee Compensation and Benefits Obligations***"),[7] as summarized in the following chart:

[*Remainder of page intentionally left blank.*]

---

[7]    The summary of the Debtors' various Employee Compensation and Benefits Obligations provided herein is qualified by the Debtors' official policies or other practices, programs, or agreements, whether written or unwritten, evidencing an arrangement among the Debtors and their Employees (each, an "***Official Policy***").  In the event of any inconsistency or ambiguity between the summary contained in this Motion and an Official Policy, the terms of such Official Policy shall govern.

8

| Employee Compensation and Benefits Obligations[8] | Approximate Amount Accrued as of Petition Date | Approximate Amount Due in First 21 Days |
|---|---|---|
| Unpaid Wages | $365,000 | $320,000 |
| Unpaid Sales Commissions | $520,000 | $0 |
| Unpaid Independent Contractor Compensation | $80,000 | $71,000 |
| Unpaid Withholding Obligations | $250,500 | $225,000 |
| Unpaid Payroll Fees | $22,000 | $22,000 |
| Unpaid Referral Compensation | $0 | $0 |
| Unpaid Reimbursable Expenses | $150,000 | $150,000 |
| Employee Paid Time Off and Leaves of Absence | $0 | $0 |
| Unpaid Health Insurance Benefits | $45,000 | $40,000 |
| Unremitted Flexible Spending | $220,000 | $220,000 |
| Health Savings Accounts | $1,500 | $1,500 |
| Life, AD&D, and Supplemental Insurance | $500 | $500 |
| Short- and Long-Term Disability | $1,500 | $1,500 |
| Unpaid Benefits Broker and Administrator Fees | $26,000 | $26,000 |
| Fringe Benefits Programs (Employee Assistance, Tuition Reimbursement, Cell Phone) | $57,000 | $38,000 |
| The Severance Program | $0 | $0 |
| Unpaid 401(k) Match Contributions | $11,000 | $11,000 |
| Workers' Compensation | $0 | $0 |
| Postpetition Non-Employee Director Obligations | $0 | $0 |
| TOTAL | $1,750,000 | $1,126,500 |

## I.     Compensation and Withholding Obligations

### A.     Wages

16.     In the ordinary course of business, the Debtors incur payroll obligations for base wages and salaries (the "*Wages*") for the Debtors' Workforce.  The Debtors' Employees are paid semi-monthly (*i.e.*, payments distributed on January 31, 2017 are for wages earned January 16, 2017, through January 31, 2017).[9]  On average, the Debtors pay approximately $3,000,000 per semi-monthly pay period (and $6,000,000 per month) to their Employees on account of Wages.

---

[8]     The amounts included herein represent prepetition amounts only.  The Debtors seek authority to maintain all of the Employee Compensation and Benefits Obligations, in their sole discretion, as set forth herein pursuant to the Interim and Final Order, as applicable.

[9]     In the ordinary course of business, the Debtors pay Wages to employees employed by two of the Debtors' non-debtor subsidiaries, ForeSee Results, Ltd and WebCollage Europe, LTD., both located in the United Kingdom (the "*UK Wages*").  These employees are paid monthly, current (*i.e.*, payments distributed on January 31, 2017 are for wages earned January 1, 2017, through January 31, 2017).  Of the total accrued Unpaid Wages (i.e., $365,000), the Debtors estimate they owe approximately $37,000 of that amount to 21 employees for

17.     As of the Petition Date, the Debtors estimate they owe approximately $365,000 on account of prepetition accrued and unpaid Wages (excluding Payroll Taxes, Sales Commissions, Deductions, Reimbursable Expenses, Vacation, and any payments provided under the additional compensation programs, the "***Unpaid Wages***").  Approximately $320,000 of the Unpaid Wages will become due and owing during the first 21 days of these chapter 11 cases, and the balance will become due and owing prior to the Final Hearing.  Unpaid Wages may also be due and owing as of the Petition Date because of, among other things, potential discrepancies between the amounts paid and the amounts that Employees believe should have been paid, which, upon resolution, may reveal that additional amounts are unpaid to such Employees.  Further, Wages will become due in the ordinary course during the immediate pay period after the Petition Date, which will become due and owing during the first 21 days of these chapter 11 cases.  By this Motion, the Debtors seek authority to pay all amounts for Unpaid Wages that become due prior to the Final Hearing and to continue paying Wages on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.  The payments of Unpaid Wages to each individual Employee will not exceed the Priority Cap.

**B.     Sales Commission**

18.     In addition to Wages, approximately 100 Employees at the Debtors' businesses ForeSee Results, Inc. ("***ForeSee***") and Webcollage are paid commissions (the "***Sales Commissions***"), which are paid based on, among other things: (a) new customer origination; (b) customer contract renewals; and (c) upselling new business to existing customers.  The amounts of Sales Commissions paid to Employees generally ranges from 1%-12% of contract value based on the contract type, contract duration, and overall attainment of specific sales targets.  Further,

---

prepetition accrued and unpaid UK Wages.  The UK Wages are included under the Wages definition and described herein and also included with any request or Order made in connection with Wages herein.

Sales Commissions are deemed earned either upon invoice to, or cash receipts from, a customer, and may be subject to a hold back for bad debt reserve. The Sales Commissions are paid monthly or quarterly, and may be paid in a stream of payments over the life of a contract, as governed by the Employee's commission plan.

19.     Failure to pay the Sales Commissions as and when due would produce a number of harmful consequences for the Debtors, including, among other things, (a) potential loss of valued sales staff members; (b) loss of customers; (c) reputational damage; and (d) creation of a disincentive for the sales staff to perform and exceed the Debtors' sales goals. Therefore, it is essential that the Debtors be able to continue paying such Sales Commissions in the ordinary course of business.

20.     As of the Petition Date, the Debtors estimate they owe approximately $520,000 on account of accrued and unpaid Sales Commissions (the "*Unpaid Sales Commissions*"), none of which will become due and owing during the first 21 days of these chapter 11 cases. However, the entirety of the Unpaid Sales Commissions will become due and owing prior to the Final Hearing. Due to the timing of the applicable internal reporting related to the payments, the number of Employees entitled to Sales Commissions and the level of Sales Commissions due to such Employees are not yet finalized. None of the Employees eligible to receive Sales Commissions are "insiders" within the meaning of the Bankruptcy Code.

21.     The importance of Sales Commissions to the Employees and Debtors cannot be understated. These payments serve as a vital source of income for eligible Employees and encourage them to maximize their respective sales for the Debtors' businesses, thereby benefitting the Debtors as a whole. Further, Sales Commissions comprise such a substantial share of an Employee's compensation (for those receiving it) that even a minimal disruption to

11

the payments of Sales Commissions would severely and adversely affect the livelihood of those Employees, not to mention the top-line revenues of the Debtors' businesses on a go-forward basis. Accordingly, by this Motion, the Debtors seek authority to pay all amounts for Unpaid Sales Commissions that become due prior to the Final Hearing, provided that no amounts shall exceed the Priority Cap as to each respective Employee upon entry of the Interim Order, and to continue paying Sales Commissions on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

### C.    Independent Contractor Compensation

22.    From time to time, the Debtors supplement their Workforce with Independent Contractors, who provide critical services for the Debtors. The Independent Contractors provide, among other things, software and product development, accounting, legal services, content writing, and technical services. Hiring Independent Contractors provides a strategic and financial advantage to the Debtors because they are able to obtain the services of these qualified individuals on a limited, cost-effective, and as-needed basis. As such, continued performance and contributions by the Independent Contractors are vital to the Debtors' operations and restructuring efforts. As of the Petition Date, the Debtors employ approximately 35 Independent Contractors.

23.    Generally, the Debtors enter into individual contracts with their Independent Contractors that set forth, among other things, the scope of work and payment terms. The Independent Contractors usually submit monthly invoices and the Debtors remit payments as they come due through their accounts payable system (the "***Independent Contractor Compensation***"). Due to the project-by-project nature of the arrangements with the Independent Contractors, it is difficult to determine the exact amounts due at any given time.

12

24.     As of the Petition Date, the Debtors estimate they owe approximately $80,000 on account of accrued and unpaid Independent Contractor Compensation (the "***Unpaid Independent Contractor Compensation***").   Approximately $71,000 of the Unpaid Independent Contractor Compensation will become due and owing during the first 21 days of these chapter 11 cases, and the balance will become due and owing prior to the Final Hearing.   By this Motion, the Debtors seek authority to pay all amounts for Unpaid Independent Contractor Compensation that become due prior to the Final Hearing and to continue paying Independent Contractor Compensation on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

### D.     Withholding Obligations

25.     The Debtors are required by federal and state laws to withhold from Employees' Wages amounts related to federal, state, and local income taxes, Medicare taxes, Social Security, and state-issued employment insurance (collectively, the "***Employee Payroll Taxes***") for remittance to the appropriate federal, state, or local taxing authority.   Moreover, the Debtors are required by applicable statutory authority to match from their own funds Social Security, Medicare taxes, and certain additional amounts for federal and state unemployment insurance and short-term disability insurance (the "***Employer Payroll Taxes***," and together with the Employee Payroll Taxes, the "***Payroll Taxes***").   On average, the Debtors remit approximately $800,000 per semi-monthly pay period (and $1.6 million per monthly pay period) on account of the Payroll Taxes.   The Debtors also routinely deduct from Employees' Wages items such as garnishments, child support and service charges, and other similar deductions (collectively, the "***Deductions***," and together with the Payroll Taxes, the "***Withholding Obligations***").   On

13

average, the Withholding Obligations equal approximately $1.1 million per semi-monthly pay period (and $2.2 million per monthly pay period).

26.     As of the Petition Date, the Debtors estimate they owe approximately $250,500 on account of accrued and unpaid Withholding Obligations (the "**Unpaid Withholding Obligations**").[10]  Approximately $225,000 of the Unpaid Withholding Obligations will become due and owing during the first 21 days of these chapter 11 cases, and the balance will become due and owing prior to the Final Hearing.  When Wages are paid, the Withholding Obligations are held in trust by the Debtors and are remitted to the appropriate third-party payees.  These Obligations are not property of the Debtors' estates.  As such, the Debtors do not believe they need authority to remit such payments to the appropriate third-parties; however, out of an abundance of caution, by this Motion, the Debtors seek authority to pay the Unpaid Withholding Obligations that become due prior to the Final Hearing and to continue paying Withholding Obligations on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

    **E.     Payroll Processing Fees**

27.     The Debtors utilize the services of Automatic Data Processing, Inc. ("**ADP**") to provide payroll processing, payroll tax calculations and filings, garnishment support and filings, check preparation, report writing support, and W-2 form processing (collectively, the "**Payroll Services**").  ADP calculates the amounts owed for Withholding Obligations each applicable payroll period.  Approximately three days before each payroll issuance, the Debtors transfer to ADP the amounts necessary to satisfy their Wages and Withholding Obligations and, in turn, ADP processes direct deposit transfers for the Wages to each Employee into the respective

---

[10]   Of the $250,500 due for Unpaid Withholding Obligations, approximately $500 of that amount is due and owing in connection with UK pension obligations to the Debtors' UK employees.

Employee's bank account. ADP also remits certain Withholding Obligations to the applicable taxing authority and third-party payee, respectively. On average, the Debtors pay ADP approximately $14,000 per month for the Payroll Services (the "***ADP Payroll Processing Fees***").

28.    In addition, the Debtors pay other payroll processing providers for payroll services provided to the Debtors' Canadian business and certain of their other non-debtor affiliates.[11] On average, the Debtors pay these providers in aggregate approximately $8,000 per month (the "***Miscellaneous Payroll Processing Fees***," and together with the ADP Payroll Processing Fees, the "***Payroll Processing Fees***"). The amount of the monthly Payroll Processing Fees depends on the amount of the Employees' Wages and Withholding Obligations that are processed during each payroll period. The services provided by ADP and these other payroll processing providers are crucial to the smooth functioning of the Debtors' payroll system because they ensure that Employees are paid on time, that Withholding Obligations are appropriately determined, and that those amounts are remitted to the appropriate taxing authorities and other third-party payees.

29.    As of the Petition Date, the Debtors estimate they owe approximately $22,000 on account of accrued and unpaid Payroll Processing Fees (the "***Unpaid Payroll Fees***"), all of which will become due and owing during the first 21 days of these chapter 11 cases. By this Motion, the Debtors seek authority to pay all amounts for Unpaid Payroll Fees that become due prior to the Final Hearing and to continue paying the Payroll Processing Fees on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

---

[11]    These other payroll processing providers are Payworks Inc., Fitzgerald & Law, ADP UK, and Baldwin and Co.

### F.    Referral Compensation

30.    The Debtors provide compensation to Employees who refer candidates to the Debtors that are ultimately hired to fill certain roles (the "***Referral Compensation***"). Specifically, Employees are eligible for Referral Compensation in the amount of $2,500 when they refer qualified candidates who are hired by the Debtors and remain employed and in good standing for six continuous months.   For those roles deemed 'difficult to fill,' Referral Compensation is increased to $5,000.

31.    As of the Petition Date, the Debtors estimate they do not any amounts on account of accrued and unpaid Referral Compensation (the "***Unpaid Referral Compensation***").  By this Motion, the Debtors seek authority to continue honoring their obligations and policies of the Referral Compensation program on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

## II.    Reimbursable Expenses[12]

32.    The Debtors reimburse Employees for business expenses and other qualifying expenses incurred in carrying out their employment responsibilities, including, but not limited to, expenses for meals, hotels, car rentals, flights, parking, fuel costs, and other qualifying expenses (collectively,  the "***Reimbursable   Expenses***").    Specifically,  the  Debtors  rely  on  certain Employees working in the field to travel weekly, and sometimes daily, between multiple sites within a specific geographic region.  Employees pay for Reimbursable Expenses up-front by using either a personal credit card or cash.  These Employees then submit paper or electronic

---

[12]    The Debtors also reimburse certain Employees under their purchase card program (the "***Purchase Card Program***"), but do not seek authority to continue their Purchase Card Program and to pay prepetition amounts related thereto under this Motion.  Rather, the Debtors request such authority as part of the *Debtors Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using the Cash Management System and (B) Maintain Existing Bank Accounts and Business Forms; (II) Authorizing Continued Intercompany Transactions; and (III) Granting Superpriority Administrative Expense Status to Intercompany Claims*, filed concurrently herewith.

receipts or an expense report through an online system to request reimbursement, and if in accordance with internal policies and procedures and approved, the Reimbursable Expenses are either processed through the Debtors' accounts payable system or processed through the Debtors' payroll and reimbursed via that Employee's Wages in the following pay period. Employees incur Reimbursable Expenses with the understanding that they will be reimbursed. Without continued reimbursement, Employees relying on these benefits would be saddled with additional costs that would cause personal financial hardship.

33.     As of the Petition Date, the Debtors estimate they owe approximately $150,000 to Employees on account of accrued and unpaid Reimbursable Expenses (the "*Unpaid Reimbursable Expenses*"), all of which will become due and owing during the first 21 days of these chapter 11 cases.[13]  By this Motion, the Debtors seek authority to pay all amounts for Unpaid Reimbursable Expenses that become due prior to the Final Hearing and to continue paying Reimbursable Expenses on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

### III.     Employee Paid Time Off and Leaves of Absence

34.     The Debtors offer their Employees several paid time-off benefits, including, among other things, vacation time ("*Vacation Time*"), sick leave ("*Sick Leave*"), holidays, parental leave, and other paid leave (collectively, the "*Paid Time Off*").  The amount of Paid Time Off available to a particular Employee and the rate at which such Paid Time Off accrues is generally determined by the Employee's length of employment and whether the Employee works full-time (*i.e.*, working at least 30 hours per week) or part-time.  Ordinarily, when an Employee elects to take Paid Time Off, such Employee is paid his or her regular hourly or salaried rate.

---

[13]   Although the Debtors ask that reimbursement requests be submitted promptly, sometimes delays occur that may result in certain prepetition reimbursement requests being submitted after the Petition Date.

Employees are required to use their Vacation Time and Sick Leave during the year in which they earn it and may not carry unused days into the next year.[14]  Vacation Time and Sick Leave are also not eligible to be paid out at the end of the calendar year, unless required by applicable law. If an Employee ceases to be employed by the Debtors, the Employee's final paycheck will not include any accrued unused Paid Time Off, except where required by state law.  By this Motion, the Debtors seek authority to continue honoring their Paid Time Off policy and to pay any amounts related thereto on a postpetition basis in the ordinary course of business and consistent with their prepetition practices, in each case upon entry of the Interim and Final Orders.

35.     The Debtors also allow Employees to take certain other leaves of absence for personal reasons, many of which are required by law, and includes family and medical leave, personal leave, maternity and paternity leaves, military duty, bereavement leave, jury duty, voting time, and disability leaves (collectively, the "*Leaves of Absence*").  By this Motion, the Debtors seek authority to continue honoring the Leaves of Absence policy and to pay any amounts related thereto on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

IV.     **Employee Benefit Programs**

36.     The Debtors offer Employees working more than 30 hours a week (collectively, the "*Eligible Employees*") the opportunity to participate in a number of insurance and benefit programs, including, among other things, medical, dental, and vision plans, participation in flexible spending accounts, life insurance, and short- and long-term disability insurance, as described below (collectively, the "*Employee Benefits*").

---

[14]   California Employees and certain non-debtor UK and Canada employees may carry over unused Vacation Time and Sick Leave.

A.    **Health Insurance Benefits**

37.    The Debtors offer Eligible Employees and their dependents the opportunity to participate in a variety of health benefit plans, including the medical plan (the "***Medical Plan***"), the dental plan (the "***Dental Plan***"), and the vision plan (the "***Vision Plan***," and together with the Medical Plan and Dental Plan, the "***Health Insurance Benefits***").  The Health Insurance Benefits are customary for similarly-sized companies and the participants and their dependents have come to rely on the Health Insurance Benefits.  Without the Health Insurance Benefits, participants would be forced to either forego health benefit coverage completely or obtain potentially expensive out-of-pocket insurance coverage, which would adversely affect Employee morale and potentially result in the loss of valuable Employees.

38.    The Debtors recently began a self-funding plan for their Health Insurance Benefits.  As such, the Debtors directly pay any claims arising under the Health Insurance Benefits.  In order to maintain and control costs under the self-funding plan, the Debtors also pay for a stop-loss insurance policy provided by Anthem Blue Cross Blue Shield ("***Anthem***"), which carries a $125,000 deductible (*i.e.*, for a $200,000 claim, the Debtors will pay the first $125,000 and the remaining $75,000 will be paid by Anthem).  The Debtors estimate that this self-funding plan will result in savings to their businesses of approximately $500,000 on an annualized basis.

39.    Although the Debtors self-fund claims under the Health Insurance Benefits, they still use third-party administrators to assist with administering insurance coverage and claims. Specifically, Anthem administers the Debtors' Medical Plan and participants have the option to choose between a standard plan, premium plan, or high deductible plan.  The Medical Plan provides coverage for, among other things, outpatient and inpatient services, preventative care, and prescription drugs.  Approximately 455 Eligible Employees and certain former Eligible

Employees (*i.e.*, those receiving COBRA as discussed below) participate in the Medical Plan. The Debtors pay Anthem an administration fee and pay out any claims arising under the Medical Plan directly to the medical provider.

40.     The Debtors also use The Metropolitan Life Insurance Company of New York ("**MetLife**") to administer both the Dental Plan and Vision Plan.   Under the Dental Plan, participants have the option to choose between a standard and premium plan and it provides coverage for, among other things, preventative and diagnostic care, basic services, and major services.  Approximately 450 Eligible Employees and certain former Eligible Employees (*i.e.*, those receiving COBRA as discussed below) participate in the Dental Plan.  Under the Vision Plan, participants receive an annual exam and subsidies for contacts, eyeglasses, and lenses. Approximately 380 Eligible Employees and certain former Eligible Employees (*i.e.*, those receiving COBRA as discussed below) participate in the Vision Plan.  Similar to Anthem, the Debtors pay MetLife an administration fee and pay out any claims arising under the Dental and Vision Plans directly to the medical providers.

41.     In addition, the Debtors use The Manufacturers Life Insurance Company ("**Manulife**") to administer Health Insurance Benefits to the Debtors' Canadian employees.  The eligibility, participation requirements, and coverage for employees receiving Health Insurance Benefits from Manulife are substantially similar to those plans administered by Anthem and MetLife in the U.S.  The Debtors pay Manulife approximately $85,000 annually (approximately $7,000 on a monthly basis) in connection with Health Insurance Benefits for their Canadian employees.

42.     In lieu of paying premiums under a fully-insured plan, participating Employees contribute (via a deduction from their payroll) approximately $121,000 per month in aggregate

and the Debtors contribute approximately $355,000 per month in aggregate, all of which is deposited into a health care account that is used to pay out Health Insurance Benefits claims. Because the amount of actual claims can differ dramatically from month to month, it is difficult for the Debtors to determine the exact amount due and owing for the Health Insurance Benefits. The Debtors project that the average monthly healthcare spend is approximately $405,512.

43.    As of the Petition Date, the Debtors estimate they owe approximately $45,000 on account of accrued and unpaid Health Insurance Benefits, which include amounts due and owing for claims and administration fees (the "***Unpaid Health Insurance Benefits***"). Approximately $40,000 of the Unpaid Health Insurance Benefits will become due and owing during the first 21 days of these chapter 11 cases, and the balance will become due and owing prior to the Final Hearing. By this Motion, the Debtors seek authority to pay all amounts for Unpaid Health Insurance Benefits that become due prior to the Final Hearing and to continue honoring and paying the Health Insurance Benefits on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

**B.    Flexible Spending Accounts**

44.    The Debtors offer Eligible Employees the opportunity to contribute a portion of their pre-tax compensation to a flexible spending account ("***FSA***") up to $2,600 for eligible out-of-pocket health care, up to $5,000 for dependent daycare expenses per year as per the federal annual limit, and up to $3,060 for eligible transit and commuter expenses (the "***Flexible Spending Plan***"). The Debtors pay an administration, J.W. Terrill, to administer the Flexible Spending Plan. Approximately 145 Eligible Employees participate in the Flexible Spending Plan. There are approximately 170 FSAs because some Employees established multiple accounts for health care, transit, and dependent daycare. The Flexible Spending Plan is

fully funded by Employee contributions. The Debtors withhold these contributions from the Employees' paychecks and remit them to J.W. Terrill or another applicable third-party as necessary, and in turn those contributions are deposited into the FSAs.

45.     As of the Petition Date, the Debtors hold approximately $220,000 in Employee contributions under the Flexible Spending Plan (the "***Unremitted Flexible Spending Obligations***"), all of which must be remitted to the proper third-parties during the first 21 days of these chapter 11 cases. Because the amounts contributed pursuant to the Flexible Spending Plan are immediately passed on to a third-party administrator, the Debtors believe the Unremitted Flexible Spending Obligations are held in trust for the participating Employees and are not property of their estates. As such, the Debtors do not believe they need authority to distribute the Unremitted Flexible Spending Obligations to the appropriate third-party administrators. However, out of an abundance of caution, by this Motion, the Debtors seek authority to forward the Unremitted Flexible Spending Obligations to the appropriate third-party administrator(s) that become due prior to the Final Hearing and to continue paying any administrator fees in connection with the Flexible Spending Plan and honoring the obligations of the Flexible Spending Plan on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

### C.     Health Savings Accounts

46.     Eligible Employees who participate in the high deductible Medical Plan option also may contribute a portion of their Wages into a health savings account (the "***HSA***"), administered by Anthem. Employees may make pre-tax contributions up to $3,350 for single participants and $6,650 for family participants, with the unused balance rolled over to the next year, to their HSA through payroll deductions to cover reimbursements of amounts paid for

qualified medical expenses under the Employee Medical Plan.  Approximately 114 Salaried

Employees have a Debtor-sponsored HSA and approximately 90 of those individuals continue to

make regular contributions to their HSA.

47.    On average, Employees make monthly HSA contributions of roughly $200, which

is deducted from their Wages (the "***Employee HSA Deductions***").  The Debtors contribute

between $500 and $1,500 to each participating Employee's HSA on a yearly basis

(the "***Employer HSA Contributions***," and together with the Employee HSA Deductions,

the "***HSA Plan***").  The Employer HSA Contributions are funded each semi-monthly pay period.

48.    As of the Petition Date, the Debtors believe they are not holding any amounts on

account of Employee HSA Deductions.  However, as of the Petition Date, the Debtors estimate

they owe approximately $1,500 on account of accrued and unpaid Employer HSA Contributions,

all of which will become due and owing during the first 21 days of these chapter 11 cases.  By

this Motion, the Debtors seek authority to remit the unpaid Employer HSA Contributions that

become due prior to the Final Hearing and to continue honoring the obligations under the HSA

Plan on a postpetition basis in the ordinary course of business and consistent with their

prepetition practices.

### D.    Life, Accidental Death, Dismemberment, and Supplemental Insurance

49.    The Debtors offer Eligible Employees basic term life and accidental death and

dismemberment insurance (collectively, the "***Life and AD&D Insurance***"), which is

administered by MetLife.  In the event of a death or serious injury, many Employees' long-term

family planning consists solely of the Life and AD&D Insurance benefits.  The Life and AD&D

Insurance is fully funded by the Debtors and provides benefits under each policy in an amount

equal to an Employee's yearly base earnings, with a maximum benefit amount of up to $200,000.

The Debtors pay approximately $37,500 annually in premiums with respect to the Life and AD&D Insurance.

50.     In addition, Employees may also purchase voluntary life and voluntary accidental death and dismemberment insurance (the "***Supplemental Insurance***") through MetLife. Employees may purchase Supplemental Insurance in $10,000 increments up to the lesser of five times the Eligible Employees' annual salary or $500,000.  The Supplemental Insurance is fully funded by the participating Employees and $3,300 in premiums is withheld from the Employees' paychecks each month.[15]  The Debtors believe that continuing the Life and AD&D Insurance, and the Supplemental Insurance policies are essential to maintaining Employee morale and protecting their families from the impact of a death or serious injury.

51.     As of the Petition Date, the Debtors estimate that they owe approximately $500 on account of the Life and AD&D Insurance and Supplemental Insurance policies, all of which will become due and owing during the first 21 days of these chapter 11 cases.  By this Motion, the Debtors seek authority to pay prepetition obligations incurred on account of the Life and AD&D Insurance and Supplemental Insurance policies that become due prior to the Final Hearing and to continue honoring the obligations of the Life and AD&D Insurance and Supplemental Insurance policies on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

## E.    Short- and Long-Term Disability Plan

52.     The Debtors provide Eligible Employees with both short-term disability benefits (the "***Short-Term Disability Benefits***") and long-term disability benefits (the "***Long-Term***

---

[15]    The Debtors pay this $3,300 premium on behalf of the Employees and are fully reimbursed through applicable pay period deductions from participating Employees' Wages.  The Debtors also offer their Employees the opportunity to purchase life and AD&D insurance for their spouse/partner and qualifying dependent children in varying amounts that are also fully funded by the Employees themselves.

*Disability Benefits*," and together with the Short-Term Disability Benefits, the "*Disability Benefits*"). In the event of a short-term disability due to, among others, an illness, injury, or pregnancy-related condition, Eligible Employees may receive up to sixty-percent (60%) of their weekly base earnings and may continue to receive the Short-Term Disability Benefits up to a maximum of 11 weeks.

53. Following the termination of the Short-Term Disability Benefits, Employees are eligible to receive Long-Term Disability Benefits. The Long-Term Disability Benefits begin after an Employee is absent from work for 90 consecutive days following a covered disability and continue until either the Employee is able to return to work or the Employee reaches the established Social Security retirement age. Under the Long-Term Disability Benefits, eligible Employees are entitled to receive sixty-percent (60%) of their weekly base earnings.

54. The Disability Benefits are administered by MetLife. Currently, there are no Employees receiving Short-Term or Long-Term Disability Benefits. The Disability Benefits are fully funded by the Debtors. The Debtors pay approximately $10,000 per month in premiums to MetLife in connection with the Disability Benefits (the "*Disability Benefit Obligations*"). Employees rely on the Disability Benefits as their sole form of wage-loss relief should they be unable to work in the future.

55. As of the Petition Date, the Debtors estimate they owe approximately $1,500 on account of accrued and unpaid Disability Benefits (the "*Unpaid Disability Benefit Obligations*"), all of which will become due and owing during the first 21 days of these chapter 11 cases. By this Motion, the Debtors seek authority to pay the Unpaid Disability Benefit Obligations that become due prior to the Final Hearing and to continue paying for and providing the Disability Benefits on a postpetition basis in the ordinary course of business and consistent

25

with their prepetition practices.

### F. Employee Benefits Broker and Benefits Administrator

56.    The Debtors obtain their Employee Benefits through their insurance broker, J.W. Terrill, and its various affiliates (the "***Benefits Broker***").    The Benefits Broker assists the Debtors in obtaining their comprehensive Employee Benefits and evaluating benefit plan offerings.    They also, among other things, help the Debtors with the procurement and negotiation of their Employee Benefits policies, enabling the Debtors to obtain Employee Benefits policies on advantageous terms and at competitive rates.    The Debtors pay their Benefits Broker a monthly fee for its service, which includes fees for COBRA administration.

57.    The Debtors also pay a benefits administrator, Hodges-Mace (the "***Benefits Administrator***"), to assist with payroll deductions and carrier connections related to Employee Benefits.    The Debtors pay the Benefits Administrator approximately $5,850 per month.    The Debtors currently owe implementation fees of $19,000 to the Benefits Administrator in connection with establishing new systems and processes.[16]    Paying the Benefits Broker and Benefits Administrator is of paramount importance because failure to do so may result in the interruption or cancellation of the Employee Benefits, including health care benefits.

58.    As of the Petition Date, the Debtors estimate they owe approximately $2,500 on account of accrued and unpaid fees to the Benefits Broker and $23,500 on account of accrued and unpaid fees to the Benefits Administrator (collectively, the "***Unpaid Broker and Administrator Fees***"), all of which will be due and owing during the first 21 days of these chapter 11 cases.    By this Motion, the Debtors seek authority to pay the Unpaid Broker and Administrator Fees that become due prior to the Final Hearing and to continue paying the

---

[16]    The Debtors anticipate that it will have to pay an additional $8,000 after the Final Hearing to the Benefits Administrator for implementation fees for the Month of May, 2017.

26

Benefits Broker and Benefits Administrator on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

## V.        The Fringe Benefits Programs

59.     The Debtors offer various other benefit programs (collectively, the "***Fringe Benefit Programs***") as part of the overall compensation package for its Employees.  The Fringe Benefit Programs include the Employee Assistance Program, the Tuition Reimbursement Program, and the Cell Phone Program (each as described below).  By this Motion, the Debtors seek authority to pay any outstanding prepetition amounts owed on account of the Fringe Benefit Programs and to continue the Fringe Benefit Programs on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

### A.        Employee Assistance Program

60.     The Debtors provide Eligible Employees with various benefits through their employee assistance program, including:  (i) financial advisory assistance to Eligible Employees or their dependents; (ii) in-person counseling and assistance with short term issues such as substance abuse; (iii) work/life services such as assistance with child care, finding movers, pet care, and vacation planning; and (iv) unlimited telephone access to legal, financial, and work-life services (the "***Employee Assistance Program***").  The Employee Assistance Program promotes the financial and personal welfare of the Debtors' Employees, which inures to the benefit of the Debtors.  As of the Petition Date, the Debtors believe that they do not any amounts on account of the Employee Assistance Program.  By this Motion, the Debtors seek the authority to continue the Employee Assistance Program on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

### B.    Tuition Reimbursement Program

61.    The Debtors maintain a tuition reimbursement program for undergraduate, graduate, and postgraduate studies established to aid and encourage Employee self-development and to assist in the advancement of Employees within the Debtors' businesses (the "***Tuition Reimbursement Program***").    The Debtors reimburse Employees for degree programs, career-related courses or even non-job-related courses up to an annual limit of $5,000.    Tuition reimbursements are paid directly to the Eligible Employee after proper documentation is submitted.    Currently, 15 Employees are receiving tuition reimbursements, and, as of the Petition Date, the Debtors estimate they owe approximately $19,000 under the Tuition Reimbursement Program, none of which will be due and owing during the first 21 days of these chapter 11 cases. However, approximately $19,000 will become due and owing prior to the Final Hearing.    By this Motion, the Debtors seek authority to pay all outstanding prepetition obligations on account of the Tuition Reimbursement Program that become due prior to the Final Hearing and to continue the Tuition Reimbursement Program on a postposition basis in the ordinary course of business and consistent with their prepetition practices.

### C.    Cell Phone Program

62.    The Debtors maintain a corporate cellular phone program for certain Employees (the "***Cell Phone Program***").    Pursuant to the Cell Phone Program, the Debtors provide certain Employees and their families with cellular phones that are paid for by the Debtors, or provide stipends for those Employees to use toward their cell phone costs.    As of the Petition Date, the Debtors estimate they owe approximately $38,000 on account of the Cell Phone Program, all of which will be due and owing during the first 21 days of these chapter 11 cases.    By this Motion, the Debtors seek authority to pay all outstanding prepetition obligations on account of the Cell

Phone Program that become due prior to the Final Hearing and to continue the Cell Phone Program on a postposition basis in the ordinary course of business and consistent with their prepetition practices.

## VI.      The Severance Program

63.      The Debtors' severance program is authorized and administered by the Board of Directors and payments made thereunder are at the discretion of the Board.   In the ordinary course of business, the Debtors maintain a policy of offering severance payments to Employees who have been involuntarily terminated in connection with a business decision or restructuring initiative (the "***Severance Program***").   The Debtors' standard practice for terminations without cause (*e.g.*, position eliminations, reductions-in-force) is that Employees receive severance payments for one week per year of service, with a minimum of two weeks paid.   On the other hand, for terminations with cause, the Debtors' human resources, legal, and executive teams jointly assess the potential risk of the termination and attempt to provide the minimal severance necessary to secure a signed release from the terminated Employee.   The Debtors believe they have received signed release agreements from substantially all of their involuntarily terminated Employees.

64.      Upon an Employee's severance, the Health Insurance Benefits and the Flexible Spending Plan are continued as a payroll deduction at the active Employee rate until the end of the month of the applicable severance period, or until the Debtors are notified that alternative coverage has been secured.   Following termination of this severance period, the Employee and his or her dependents have the right to continue (as defined by law) participation in these plans pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("***COBRA***") for approximately eighteen months following termination of employment.

65.     The Severance Program provides tangible benefits to the Debtors.  As a condition to receiving a severance payment, each Employee must execute either a non-compete or release agreement, whereby the terminated Employee agrees to, among other things:  (i) not work for a competitor for a discrete amount of time and within a discrete geographic area; (ii) release any claims held against the Debtors; (iii) not disclose confidential information; and (iv) not solicit the Debtors' Employees for a certain period of time or disparage the Debtors.  The Debtors believe that the Severance Program helps to reduce the time and expense in connection with defending potential claims by former Employees.  In the months leading up to the Petition Date, the Debtors implemented reductions in their workforce.  As such, by this Motion, the Debtors seek authority to continue honoring their obligations under the Severance Program on a postpetition basis in the ordinary course of business and consistent with their prepetition practices; *provided*, *however*, for the avoidance of doubt, the Debtors will not pay any amount for severance owing to a current or former officer of any of the Debtors, or pursuant to any employment agreement, without seeking further relief from the Court.

## VII.     The 401(k) Retirement Savings Plan

66.     The Debtors participate in a qualified 401(k) retirement savings plan (the "***401(k) Plan***") administered by Fidelity Investments ("***Fidelity***")[17] for full-time and part-time Employees[18] (collectively, the "***401(k) Eligible Employees***").  The Debtors do not pay Fidelity any amounts in administrative fees for the 401(k) Plan (the "***401(k) Fees***"). Approximately 360 Employees participate in the 401(k) Plan.

---

[17]   On March 1, 2017, Fidelity Investments took over the Debtors' 401(k) services from ADP.

[18]   Full-time and part-time Employees are eligible to participate in the 401(k) Plan immediately upon commencing employment.

67.     The 401(k) Plans are funded by participating 401(k) Eligible Employees and generally provide for pre-tax salary deductions up to limits set by the Internal Revenue Code. The Debtors deduct the participating Employees' 401(k) Plan contributions from the Employees' Wages and hold such amounts in trust until they are forwarded to Fidelity.   Approximately $235,000 is deducted from Employees' Wages in aggregate each monthly pay period on account of Employees' 401(k) contributions to the 401(k) Plan (the "**401(k) Deductions**").

68.     The Debtors also provide a company match equal to 50% of the Employees' contributions (the "**401(k) Match Contributions**"), subject to a maximum of 6% of the respective Employee's salary.  The 401(k) Match Contributions vesting period is based on years of service, not participation.  Many Employees' retirement savings consist solely of their 401(k) Plan and many Employees choose to participate in the Plan because of the 401(k) Match Contributions. Thus, the Debtors believe that continuing the 401(k) Plan and the 401(k) Match Contributions is essential to maintaining Employee morale and protecting Employee expectations.

69.     As of the Petition Date, the Debtors estimate they owe approximately $11,000 on account of accrued and unpaid 401(k) Match Contributions (the "**Unpaid 401(k) Match Contributions**"), all of which will become due and owing during the first 21 days of these chapter 11 cases.  By this Motion, the Debtors seek authority to remit the Unpaid 401(k) Match Contributions that become due prior to the Final Hearing and to continue funding and honoring the obligations of the 401(k) Plan on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

## VIII.     Workers' Compensation Program

70.     The Debtors maintain workers' compensation insurance at the level required by statute for each state in which the Debtors conduct business (the "**Workers' Compensation**

31

*Program*"). The Workers' Compensation Program is administered by The Hartford Group ("*Hartford*"), provides coverage up to $1 million per incident (bodily injury), and the Debtors maintain multiple general liability umbrella policies for any excess amounts. The Debtors are aware of no outstanding workers compensation claims under the Workers' Compensation Program.

71. The Debtors pay a premium to Hartford for the Workers' Compensation Program (the "*Workers' Compensation Premium*") on a monthly basis. The total yearly amount of premium paid is based on the Debtors' estimated gross payroll for the applicable policy year. The Workers' Compensation Premium is subject to a year-end adjustment following an audit of the Debtors' actual earnings for the applicable policy year. To ensure that the Debtors comply with U.S. workers' compensation laws and requirements, the Workers' Compensation Program must continue.

72. As of the Petition Date, the Debtors estimate they do not owe any amount on account of the Workers' Compensation Program.[19] However, out of an abundance of caution, by this Motion, the Debtors seek authority to pay any outstanding prepetition obligations in connection with the Workers' Compensation Program that become due prior to the Final Hearing and to continue the Workers' Compensation Program on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

## IX. Postpetition Non-Employee Director Obligations

73. The Debtors maintain a Board of Directors that includes two non-Employees (each, a "*Director*"). The Directors each receive a quarterly fee for their services as a Director,

---

[19] Although there are no amounts owing as of the Petition Date, the Debtors anticipate that it will owe, subject to an ongoing audit for 2016, $20,000 on account of the Workers' Compensation Program and $70,000 for the 2017 Workers' Compensation premium.

inclusive of amounts received for their services on any committees.  The Directors are paid at the

beginning of each term for which they serve and also are entitled to expense reimbursement for

reasonable out-of-pocket expenses in connection with board-related duties (the "***Director***

***Compensation***").  As of the Petition Date, the Debtors do not believe they owe any amounts on

account of Director Compensation and believe that they are authorized to pay any postpetition

Director Compensation in the ordinary course.  However, out of an abundance of caution, by this

Motion, the Debtors seek authority to continue to pay the Director Compensation on a

postpetition basis in the ordinary course of business and consistent with their prepetition

practices.

## Basis For Relief

## I.      Certain Employee Compensation and Benefits Obligations are Entitled to Priority Treatment

74.     Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of

the Employee Compensation and Benefits Obligations to priority treatment.  As priority claims,

the Debtors are required to pay these claims in full to confirm a chapter 11 plan.

*See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims, given

priority under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, for (a) wages, salaries or

commissions, including vacation, severance, and sick leave pay earned by an individual and

(b) contributions to an employee benefit plan).

75.     In addition, and as noted above, the Debtors are not seeking authority to pay

unpaid compensation in amounts that exceed the Priority Cap on an interim basis to any

individual, except with respect to obligations to certain Employees on account of Sales

Commissions pursuant to entry of the Final Order.  Given the prepackaged nature of these

chapter 11 cases and the unimpaired treatment of general unsecured claims under the Plan, the

relief requested herein is appropriate and only affects the timing of payments to Employees. Such relief does not have any negative impact on recoveries for general unsecured creditors.

76.    Indeed, the Debtors submit that payment of the Employee Compensation and Benefits Obligations to the Debtors' Employees will enhance value for the benefit of all stakeholders because it will help ensure that the Employees—the lifeblood of the Debtors' business operations—continue to provide vital services to the Debtors at this critical juncture. Should the Debtors be unable to honor the Employee Compensation and Benefits Obligations when due and payable, they believe that finding, attracting, and retaining qualified talent would be extremely difficult, and most likely would require higher salaries, guaranteed bonuses, and overall higher cost compensation packages than are currently provided to the Debtors' Employees.

## II.    Payment of Certain of the Employee Wages and Benefits Is Required by Law

77.    The Debtors seek authority to pay the Unpaid Withholding Obligations and Unremitted Flexible Spending Obligations to the appropriate third-party payees.  These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' Wages.  For instance, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from Employees' Wages on another party's behalf.  *See* 11 U.S.C. §§ 541(b)(1), (d). Further, federal and state laws require the Debtors to withhold certain tax payments from Employees' Wages and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment

of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Unpaid Withholding Obligations and Unremitted Flexible Spending Obligations may not be property of the Debtors' estates, the Debtors request authority to transmit these amounts to the proper parties in the ordinary course of business.

78.     Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all obligations related to the Workers' Compensation Program is therefore crucial to the Debtors' continued operations and the success of these chapter 11 cases.

### III.     The Debtors' Payments in Excess of the Priority Cap Upon Entry of the Final Order for Sales Commissions Are Warranted In These Chapter 11 Cases

79.     Paying the Sales Commissions in excess of the Priority Cap pursuant solely to entry of the Final Order is important to maintain Employee morale, retain critical Employees and Independent Contractors, and to ensure stability through an otherwise precarious situation of a chapter 11 filing. The Debtors' inability to make payments in excess of the Priority Cap to those Employees entitled to Sales Commissions would likely harm the Debtors' revenue and result in the loss of valuable customers and crucial members of the Debtors' Workforce. Importantly, the payments made in excess of the Priority Cap for Sales Commissions are a direct reflection of the manner in which the Debtors compensate these particular Employees in the ordinary course. In other words, it is unavoidable that the Debtors' Sales Commissions exceed the Priority Cap because they accumulate and are paid out monthly and/or quarterly, which are longer pay periods than ordinary bi-weekly wages. Moreover, given that Sales Commissions are tethered to performance, exceptional eligible Employees are invariably going to be due substantial amounts

of Sales Commissions—which they earned and ultimately benefits the Debtors' businesses—that exceed the Priority Cap. As such, payments for Sales Commissions in excess of the Priority Cap, subject to entry of the Final Order, are warranted in these chapter 11 cases.

80.     Further, no party in interest will be prejudiced by the relief requested herein because all general unsecured claims are unimpaired under the Plan and will be paid in full. The relief requested herein seeks to alter only the timing, not the amount or priority, of such payments. In addition, the Consenting First Lien Secured Parties and the Consenting Second Lien Secured Parties (each as defined in the Plan), the constituencies most affected by these payments and the proposed future shareholders of the Company, consent to and fully support the relief requested herein.

81.     Courts in this district have acknowledged that payments in excess of the Priority Cap may be authorized when appropriate. *See, e.g.*, *In re International Shipholding Corporation*, Case No. 16-12220 (SMB) (Bankr. S.D.N.Y. Aug. 5, 2016) (authorizing debtors' payment in excess of the $12,475 individual priority cap to certain prepetition employees); *In re Inversiones Alsacia S.A.*, Case No. 14-12896 (MG) (Bankr. S.D.N.Y. Oct. 16, 2014) (authorizing debtors' payment in excess of the $12,475 individual priority cap to certain employees); *In re AMR Corp.*, Case No. 11-15463 (SHL) (Bankr. S.D.N.Y. Nov. 29, 2011) (authorizing debtors' payment of approximately $18 million to employees in excess of priority cap under section 507(a)(4) of the Bankruptcy Code); *In re Delta Air Lines, Inc.*, Case No. 05-17923 (Bankr. S.D.N.Y. Sept. 16, 2005).

## IV.     Payment of the Employee Compensation and Benefits Obligations is Warranted Under Section 363(b)(1) of the Bankruptcy Code and the Doctrine of Necessity

82.     Courts have authorized payment of prepetition obligations under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so. *See In re Ionosphere*

*Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (granting authority to pay prepetition wages); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983) (granting authority to pay prepetition claims of suppliers); *see also In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (granting authority to pay prepetition claims to certain vendors).

83.     Further, the Court may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code.  Section 105(a), which codifies the inherent equitable powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Under section 105(a), courts may permit preplan payments of prepetition obligations when essential to the continued operation of a debtor's business.  Specifically, the Court may use its power under section 105(a) to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").

84.     The "necessity of payment" rule has long been recognized as precedent within the Second Circuit.  *See Ionosphere*, 98 B.R. at 175–76.  Today, the rationale for the necessity of payment rule—the rehabilitation of a debtor in reorganization cases—is "the paramount policy and goal of Chapter 11."  *Id.*; *see also In re Just For Feet*, 242 B.R. 821, 824–25 (D. Del. 1999) (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.)*, 829 F.2d 1484, 1490 (9th Cir. 1987) (recognizing that allowance of "unequal treatment of prepetition debts when necessary for rehabilitation" is appropriate); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 287

37

(S.D.N.Y. 1987) (authorizing payment of prepetition workers' compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately").

85.     The Debtors submit that the relief requested herein represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 6003.  Paying prepetition wages, employee benefits, and the other Employee Compensation and Benefits Obligations will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption.  The Debtors believe that without the relief requested herein, Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors.  Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to operate their businesses and, likely, diminishing stakeholder confidence in the Debtors' ability to successfully reorganize. The loss of valuable Employees and the resulting need to recruit new personnel (and the costs attendant thereto) would be distracting at this crucial time when the Debtors need to focus on stabilizing their business operations.  Accordingly, there can be no doubt that the Debtors must do their utmost to retain their Workforce by, among other things, continuing to honor and pay all Wages, benefits, and related obligations, including the other prepetition Employee Compensation and Benefits Obligations in the ordinary course.

86.     In addition, the majority of Employees rely exclusively on the Employee Compensation and Benefits Obligations to satisfy their daily living expenses.  Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor these

38

Obligations.    Failure to satisfy the Employee Compensation and Benefits Obligations will jeopardize Employee morale and loyalty at a time when Employee support is critical to the Debtors' businesses.    Furthermore, if this Court does not authorize the Debtors to honor their various insurance programs described herein, Employees will not receive health coverage and, thus, may be obligated to pay certain health care claims that the Debtors have not satisfied.    The loss of health care coverage will result in considerable anxiety for Employees (and likely attrition) at a time when the Debtors need such Employees to perform their jobs at peak efficiency.    Additionally, as set forth above, Employee attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, severely disrupting the Debtors' operations at this critical juncture.

87.    Courts in this district have routinely granted relief similar to that requested herein. *See, e.g.*, *In re Int'l. Shipholding Corp.*, Case No. 16-12220 (SMB) (Bankr. S.D.N.Y. Oct. 24, 2016); *In re Breitburn Energy Partners LP*, Case No. 16-11390 (Bankr. S.D.N.Y. June 15, 2016); *In re Aeropostale, Inc.*, Case No. 16-11275 (SHL) (Bankr. S.D.N.Y. June 3, 2016); *In re Republic Airways Holdings Inc.*, Case No. 16-10429 (SHL) (Bankr. S.D.N.Y. Mar. 23, 2016); *In re Sabine Oil & Gas Corp.*, Case No. 15-11835 (SCC) (Bankr. S.D.N.Y. July 16, 2015); *In re Eagle Bulk Shipping Inc.*, No. 14-12303 (SHL) (Bankr. S.D.N.Y. Sept. 19, 2014).[20]

88.    Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay any prepetition amounts accrued and unpaid on account of the Employee Compensation and Benefits Obligations and to allow the Debtors to continue paying and honoring them on a postpetition basis in the ordinary course of business and consistent with prepetition practices.

---

[20]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

**V.        The Debtors Seek a Waiver of the Automatic Stay as It Applies to Workers'
Compensation Claims**

89.    Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or
> employment of process, of a judicial, administrative, or other
> action or proceeding against the debtor that was or could have been
> commenced before the commencement of the case under this title,
> or to recover a claim against the debtor that arose before the
> commencement of the case under this title[.]

90.    Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in
interest to request a modification or termination of the automatic stay for "cause."
11 U.S.C. § 362(d)(1).

91.    The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to
modify the automatic stay to permit Employees to proceed with their workers' compensation
claims in the appropriate judicial or administrative forum.  If the automatic stay is not modified,
Employee morale would potentially diminish and result in the departure of certain Employees
who are critical at this juncture.  Such departures could cause a severe disruption in the Debtors'
businesses to the detriment of all parties in interest.  As such, the Debtors assert that cause exists
to modify the automatic stay to permit workers' compensation claims during the pendency of this
chapter 11 proceeding.

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

92.    The Debtors have sufficient funds to pay the amounts described herein in the
ordinary course of business by virtue of expected cash flows from ongoing business operations
and anticipated access to cash collateral.   Also, under the Debtors' existing cash management
system, the Debtors can readily identify checks or wire transfer requests as relating to an
authorized payment in connection with the Employee Compensation and Benefits Obligations.

Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently and that this Court should authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested herein.

### The Requirements of Bankruptcy Rule 6003 Are Satisfied

93.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm."  Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).  For the reasons discussed above, authorizing the Debtors to pay the Employee Compensation and Benefits Obligations are vital to the Debtors' operations and the failure to satisfy these Obligations can severely disrupt the Debtors' operations at this critical juncture.  Accordingly, the Debtors submit they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

### Motion Practice

94.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this Motion.  Moreover, in addition to all entities otherwise entitled to receive notice, the Debtors have given notice of this Motion to all entities believed to have or be claiming an interest in the subject matter of the proposed order or who, it is believed, otherwise would be affected by the

proposed order.  Accordingly, the Debtors submit that this Motion satisfies Local Bankruptcy Rule 9013-1(a).

### **Waiver of Bankruptcy Rules Regarding Notice and Stay of an Order**

95.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### **Reservation of Rights**

96.     Nothing contained herein is intended, or should be construed, as an admission as to the validity or priority of any claim against the Debtors, a waiver of the Debtors' rights to object to or dispute any claim or its priority, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.  The Debtors expressly reserve their right to contest any claim (or the priority thereof) related to the relief sought herein.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended to be nor should it be construed as an admission as to the validity or priority of any claim or a waiver of the Debtors' rights to subsequently dispute such claim or priority.

### **Notice**

97.     The Debtors have provided notice of this Motion to:  (a) the United States Trustee for Region 2; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the agent under the Debtors' prepetition first lien credit facility; (d) counsel to the ad hoc group of holders of certain first lien debt; (e) counsel to the agent under the second lien credit facility; (f) counsel to the ad hoc group of holders of certain second lien debt; (g) counsel to the prepetition majority equity

42

holders; (h) the United States Attorney for the Southern District of New York; (i) the United

States Securities and Exchange Commission; (j) the state attorneys general for each state in

which the Debtors conduct business; (k) the Internal Revenue Service; and (l) any party that has

requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested,

the Debtors respectfully submit that no further notice is necessary.

### No Prior Request

98.     No prior request for the relief sought in the Motion has been made to this or any

other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, for the reasons set forth herein and in the First Day Declaration, the

Debtors respectfully request entry of an Interim Order and Final Order, substantially in the forms

attached hereto as **Exhibit A** and **Exhibit B**, granting the relief requested herein and granting

such other relief as is just and proper.

| | |
|---|---|
| New York, New York | */s/ Christopher T. Greco* |
| Dated:  March 3, 2017 | James H.M. Sprayregen, P.C. |
| | Jonathan S. Henes, P.C. |
| | Christopher T. Greco |
| | Anthony R. Grossi |
| | John T. Weber |
| | **KIRKLAND & ELLIS LLP** |
| | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| | 601 Lexington Avenue |
| | New York, New York 10022 |
| | Telephone:    (212) 446-4800 |
| | Facsimile:    (212) 446-4900 |
| | - and - |
| | Melissa N. Koss |
| | **KIRKLAND & ELLIS LLP** |
| | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| | 555 California Street |
| | San Francisco, California 94104 |
| | Telephone:    (415) 439-1400 |
| | Facsimile:    (415) 439-1500 |
| | *Proposed Counsel to the Debtors* |
| | *and Debtors in Possession* |

**<u>Exhibit A</u>**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ANSWERS HOLDINGS, INC., *et al.*,[1] | ) | Case No. 17-10496 (SMB) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF

Upon the Motion (the "***Motion***")[2] of the above-captioned debtors and debtors in possession (collectively, the "***Debtors***") for entry of an interim order (this "***Interim Order***"), (i) authorizing the Debtors to (a) pay amounts owed in connection with Employee Compensation and Benefits Obligations, and (b) continue various employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto; (ii) authorizing financial institutions to receive, process, honor, and pay checks presented for payment and electronic payment requests relating to prepetition Employee Compensation and Benefits Obligations provided that there are sufficient good funds standing to the Debtors' credit with such financial institutions; (iii) scheduling a final hearing (the "***Final Hearing***") to consider approval of this Motion on a final basis; and (iv) granting related relief; all as more fully set forth in the Motion; and upon the First Day Declaration, and this Court having jurisdiction over this

---

[1]    The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Answers Holdings, Inc. (4504); Answers Corporation (2855); Easy2 Technologies, Inc. (2839); ForeSee Results, Inc. (3125); ForeSee Session Replay, Inc. (2593); More Corn, LLC (6193); Multiply Media, LLC (8974); Redcan, LLC (7344); RSR Acquisition, LLC (2256); Upbolt, LLC (2839); and Webcollage Inc. (7771).  The location of Debtor Webcollage Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is:  11 Times Square, 11th Floor, New York, New York 10018.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated December 1, 2016; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors provided adequate notice of the Motion and the opportunity for a hearing under the circumstances; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "***Hearing***"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted on an interim basis as set forth herein.

2.      The final hearing (the "***Final Hearing***") on the Motion shall be held on _____, 2017, at__:__ _.m., prevailing Eastern Time.  Any objections or responses to the entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on _____, 2017, and shall be served on:  (a) the United States Trustee for Region 2; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the agent under the Debtors' prepetition first lien credit facility; (d) counsel to the ad hoc group of holders of certain first lien debt; (e) counsel to the agent under the second lien credit facility; (f) counsel to the ad hoc group

of holders of certain second lien debt; (g) counsel to the prepetition majority equity holders; (h) the United States Attorney for the Southern District of New York; (i) the United States Securities and Exchange Commission; (j) the state attorneys general for states in which the Debtors conduct business; (k) the Internal Revenue Service; (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.

3.        The Debtors are authorized, but not directed, in their discretion, to pay in the ordinary course of business and in accordance with the Debtors' prepetition policies and programs, prepetition amounts outstanding and that become due prior to the Final Hearing on account of the following Employee Compensation and Benefits Obligations: Unpaid Wages; Unpaid Sales Commissions; Unpaid Independent Contractor Compensation; Unpaid Withholding Obligations; Unpaid Payroll Fees; Unpaid Reimbursable Expenses; prepetition amounts due and owing under the Employee Benefits, including Unpaid Health Insurance Benefits, Unremitted Flexible Spending, Health Savings Accounts, Short- and Long-Term Disability, and the Unpaid Broker and Administrator Fees; prepetition amounts due and owing under the Fringe Benefits Programs, including Tuition Reimbursement and the Cell Phone Program; and the Unpaid 401(k) Match Contributions; provided, however, that with respect to each individual Employee (to the extent applicable), the Debtors shall not honor any Employee Compensation and Benefits Obligations that exceed the priority amounts set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

4.        The Debtors are authorized, but not directed, in their discretion, to continue to pay for and honor the obligations of all of the Employee Compensation and Benefits Obligations in the ordinary course of business and consistent with prepetition practices.  For the avoidance of doubt, the Debtors' Employee Compensation and Benefits Obligations includes:

(a) Compensation and Withholding Obligations, including Wages, Sales Commissions, Independent Contractor Compensation, Withholding Obligations, Payroll Processing Fees, and Referral Compensation; (b) Reimbursable Expenses; (c) Paid Time Off and Leaves of Absence; (e) certain Employee Benefits, including Health Insurance Benefits, Flexible Spending Plans, Health Savings Accounts, Life, Accidental Death, and Dismemberment Insurance, and Supplemental Insurance, Short- and Long-Term Disability Plans, and broker and administrator payments related thereto; (f) the Fringe Benefit Programs, including the Employee Assistance Program, Tuition Reimbursement Program, and Cell Phone Program; (g) the Severance Program; (h) the 401(k) Retirement Savings Plan; (i) the Workers' Compensation Program; and (j) the Postpetition Non-Employee Director Obligations, all of which the Debtors have historically provided to Employees and/or Independent Contractors; provided, however, the Debtors are not authorized to pay any amount for severance owing to a current or former officer of any of the Debtors, or pursuant to any employment agreement, without a further order of this Court.

5.      Nothing in this Interim Order authorizes the Debtors to accelerate any payments not otherwise due prior to the date of the Final Hearing.

6.      The Debtors are authorized to modify, change, and/or discontinue any of the Employee Compensation and Benefits Obligations, and policies related thereto, and implement any new Employee Compensation and Benefits Obligations in the ordinary course of business during the chapter 11 cases in their sole discretion without the need for further court approval; provided, however, that to the extent such modifications are material, the Debtors must seek the consent of the Required First Lien Lenders and the Required Second Lien Lenders.

7.      Nothing in the Motion or this Interim Order shall impair the Debtors' or any other party-in-interest's ability to contest the validity or amount of any payment made pursuant to this

Interim Order, or the priority of any claim.

8.      Notwithstanding the relief granted herein or any action taken hereunder, nothing contained in this Interim Order shall create any rights in favor of, or enhance the status of any claim held by, any Employee, Independent Contractor, or other person or entity.

9.      The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim Order.

10.     Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained in the Motion or this Interim Order or any payment made pursuant to this Interim Order shall constitute, nor is it intended to constitute, an admission as to the validity or priority of any claim or lien against the Debtors, a waiver of the Debtors' rights to subsequently dispute such claim or lien (or the priority thereof), or the assumption or adoption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.

11.     Pursuant to Section 362(d) of the Bankruptcy Code:  (a) Employees are authorized to proceed with their workers' compensation claims in the appropriate judicial or administrative forum under the Workers' Compensation Program and the Debtors are authorized to pay all prepetition amounts relating thereto in the ordinary course of business; and (b) the notice requirements pursuant to Bankruptcy Rule 4001(d) with respect to clause (a) of this paragraph 11 are waived.  This modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

12.     The Debtors are authorized to issue postpetition checks, or to affect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with any Employee Compensation and Benefits Obligations.

13.     Notwithstanding anything to the contrary contained in this Interim Order or the Motion, any payment, obligation or other relief authorized by this Interim Order shall be subject to and limited by the requirements imposed on the Debtors under the terms of any interim and/or final orders approving any postpetition financing and the use of cash collateral, or budget in connection therewith, entered by this Court in these chapter 11 cases.

14.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003.

15.     Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a).

16.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

17.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

18.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

New York, New York
Dated: _____, 2017                              _____
                                                     UNITED STATES BANKRUPTCY JUDGE

**Exhibit B**

**Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| ANSWERS HOLDINGS, INC., *et al.*,[1] | Case No. 17-10496 (SMB) |
| Debtors. | (Joint Administration Requested) |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS**
**TO (A) PAY PREPETITION WAGES, SALARIES, OTHER**
**COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE**
**EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF**

Upon the Motion (the "***Motion***")[2] of the Debtors for entry of a final order (this "***Final Order***") pursuant to sections 105(a), 363, 539(c), 507(a)(4)-(5), 1107(a), and 1108 of the Bankruptcy Code and Bankruptcy Rule 6003, (i) authorizing the Debtors to (a) pay amounts owed in connection with Employee Compensation and Benefits Obligations, and (b) continue various employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto; (ii) authorizing financial institutions to receive, process, honor, and pay checks presented for payment and electronic payment requests relating to prepetition Employee Compensation and Benefits Obligations provided that there are sufficient good funds standing to the Debtors' credit with such financial institutions; (iii) scheduling a final hearing (the "***Final Hearing***") to consider approval of this Motion on a final basis; and (iv) granting related relief; all as more fully set forth in the Motion; and upon the First

---

[1]    The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Answers Holdings, Inc. (4504); Answers Corporation (2855); Easy2 Technologies, Inc. (2839); ForeSee Results, Inc. (3125); ForeSee Session Replay, Inc. (2593); More Corn, LLC (6193); Multiply Media, LLC (8974); Redcan, LLC (7344); RSR Acquisition, LLC (2256); Upbolt, LLC (2839); and Webcollage Inc. (7771).  The location of Debtor Webcollage Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is:  11 Times Square, 11th Floor, New York, New York 10018.

[2]    All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

Day Declaration, and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334 and the *Amended Standing Order of Reference from the United States District Court*

*for the Southern District of New York*, dated December 1, 2016; and this Court having found that

this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that this Court may enter a final

order consistent with Article III of the United States Constitution; and this Court having found

that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C.

§§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the

best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court

having found that the Debtors provided adequate notice of the Motion and the opportunity for a

hearing under the circumstances; and this Court having reviewed the Motion and having heard

the statements in support of the relief requested therein at a hearing before this Court

(the "***Hearing***"); and this Court having determined that the legal and factual bases set forth in the

Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the

proceedings had before this Court; and after due deliberation and sufficient cause appearing

therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted on a final basis to the extent set forth herein.

2.      The relief provided in the Interim Order is approved on a final basis except as

modified herein.

3.      The Debtors are authorized, but not directed, to continue all of their Employee

Compensation and Benefits Obligations as described in the Motion in the ordinary course of

business and in accordance with their stated policies and prepetition practices (as such policies

may be modified from time to time) and, to pay, in accordance with the Debtors' prepetition

policies and practices and in the Debtors' sole discretion, all Employee Compensation and

Benefits Obligations on a postpetition basis. For the avoidance of doubt, the Debtors' Employee Compensation and Benefits Obligations includes: (a) Compensation and Withholding Obligations, including Wages, Sales Commissions, Independent Contractor Compensation, Withholding Obligations, Payroll Processing Fees, and Referral Compensation; (b) Reimbursable Expenses; (c) Paid Time Off and Leaves of Absence; (e) certain Employee Benefits, including Health Insurance Benefits, Flexible Spending Plans, Health Savings Accounts, Life, Accidental Death, and Dismemberment Insurance, and Supplemental Insurance, Short- and Long-Term Disability Plans, and broker and administrator payments related thereto; (f) the Fringe Benefit Programs, including the Employee Assistance Program, Tuition Reimbursement Program, and Cell Phone Program; (g) the Severance Program; (h) the 401(k) Retirement Savings Plan; (i) the Workers' Compensation Program; and (j) the Postpetition Non-Employee Director Obligations, all of which the Debtors have historically provided to Employees and/or Independent Contractors; provided, however, the Debtors are not authorized to pay any amount for severance owing to a current or former officer of any of the Debtors, or pursuant to any employment agreement, without a further order of this Court.

4.      The Debtors are authorized to pay unpaid prepetition Sales Commissions in excess of the Priority Cap.

5.      The Debtors are authorized to modify, change, and/or discontinue any of the Employee Compensation and Benefits Obligations, and policies related thereto, and implement any new Employee Compensation and Benefits Obligations in the ordinary course of business during the chapter 11 cases in their sole discretion without the need for further court approval; provided, however, that to the extent such modifications are material, the Debtors must seek the consent of the Required First Lien Lenders and the Required Second Lien Lenders.

3

6.      Nothing in this Final Order shall be deemed to authorize the Debtors to pay any amounts to Insiders under any incentive compensation program, and the Debtors shall seek authority to make any such payments to Insiders by separate Motion filed with this Court.

7.      Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained in the Motion or this Final Order or any payment made pursuant to this Final Order shall constitute, nor is it intended to constitute, an admission as to the validity or priority of any claim or lien against the Debtors, a waiver of the Debtors' rights to subsequently dispute such claim or lien (or the priority thereof), or the assumption or adoption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.

8.      Nothing in the Motion or this Final Order shall impair the Debtors' or any other party-in-interest's ability to contest the validity or amount of any payment made pursuant to the Interim Order or this Final Order (or the priority of any released claim).

9.      Notwithstanding the relief granted herein or any action taken hereunder, nothing contained in this Final Order shall create any rights in favor of, or enhance the status of any claim held by, any Employee, Independent Contractor, or other person or entity.

10.      The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Final Order.

11.      The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored

as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with any Employee Compensation and Benefits Obligations.

12.    Notwithstanding anything to the contrary contained in this Final Order or the Motion, any payment, obligation or other relief authorized by this Final Order shall be subject to and limited by the requirements imposed on the Debtors under the terms of any interim and/or final orders approving any postpetition financing and the use of cash collateral, or budget in connection therewith, entered by this Court in these chapter 11 cases.

13.    The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003.

14.    Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a).

15.    Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

16.    The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

17.    This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

New York, New York
Dated: _____, 2017                    UNITED STATES BANKRUPTCY JUDGE