James H.M. Sprayregen, P.C.
Jonathan S. Henes, P.C.
Christopher T. Greco
Anthony R. Grossi
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Melissa N. Koss
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ANSWERS HOLDINGS, INC., *et al.*,[1] | ) | Case No. 17-10496 (SMB) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF JUSTIN P. SCHMALTZ, CHIEF RESTRUCTURING**
**OFFICER, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Justin P. Schmaltz, hereby declare under penalty of perjury:

---

[1]    The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Answers Holdings, Inc. (4504); Answers Corporation (2855); Easy2 Technologies, Inc. (2839); ForeSee Results, Inc. (3125); ForeSee Session Replay, Inc. (2593); More Corn, LLC (6193); Multiply Media, LLC (8974); Redcan, LLC (7344); RSR Acquisition, LLC (2256); Upbolt, LLC (2839); and Webcollage Inc. (7771).  The location of Debtor Webcollage Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is:  11 Times Square, 11th Floor, New York, New York 10018.

1.      I am the Chief Restructuring Officer of Answers Holdings, Inc., a corporation organized under the laws of the State of Delaware and one of the above-captioned debtors and debtors in possession (collectively, the "***Debtors***," and together with their non-Debtor affiliates, the "***Company***"), as well as each of its domestic subsidiaries.  I have served in this role since October 24, 2016, and I am generally familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records.

2.      In addition to my role as the Company's Chief Restructuring Officer, I am a Managing Director at Alvarez & Marsal North America, LLC ("***A&M***").  I have 14 years of experience working exclusively in distressed situations and transactions.  My expertise includes in-and-out of court restructurings, operational turnarounds, assets sales, and refinancing transactions.

3.      A&M specializes in crisis management, turnaround consulting, operational due diligence, creditor advisory services, financial and operational restructuring, and interim management.  A&M's debtor advisory services have included a wide range of activities targeted at stabilizing and improving a company's financial position, including, among other things: (a) developing or validating business plans and related assessments of a business's strategic position; (b) monitoring and managing cash, cash flow, and supplier relationships; (c) assessing and recommending cost reduction strategies; (d) creating financial analyses and reporting for companies embarking on, or currently operating under, the protection of chapter 11; and (e) designing and negotiating financial restructuring packages.  Since its inception in 1983, A&M has been a global provider of turnaround advisory services to companies in crisis or those in need of performance improvement in specific financial and operational areas.

4.      To effectuate a restructuring and minimize the adverse effects of filing for chapter 11 on their businesses, on the date hereof (the "***Petition Date***"),[2] the Debtors have filed contemporaneously herewith a number of motions seeking various types of "first day" relief (collectively, the "***First Day Motions***").  The First Day Motions seek relief intended to allow the Debtors to perform and meet those obligations that are necessary to fulfill their duties as debtors in possession.  I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion is necessary to enable the Debtors to operate in chapter 11 with minimum disruption, loss of productivity, or value, and that each First Day Motion constitutes a critical element in achieving a successful and expeditious prepackaged reorganization of the Debtors' businesses, and best serves the interests of the Debtors' estates, their creditors, and all parties in interest.

5.      I submit this declaration to provide an overview of the Company, its businesses, and these Chapter 11 Cases, as well as to support the Debtors' chapter 11 petitions and the First Day Motions.  Except as otherwise indicated herein, all facts set forth in this declaration are based upon my personal knowledge of the Company's operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Company's management and the Company's advisors, or my opinion based on my experience, knowledge, and information concerning the Company's operations and financial condition.  I am authorized to submit this declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Joint Prepackaged Chapter 11 Plan of Reorganization for Answers Holdings, Inc. and Its Debtor Affiliates* (as may be amended, modified or supplemented from time to time, the "***Plan***"), filed contemporaneously herewith.

## Preliminary Statement

6.      As described more fully herein, the Debtors commenced these Chapter 11 Cases with a restructuring support agreement (the "*RSA*") signed by nearly their entire capital structure — including (a) holders of approximately 89.9% in amount of First Lien Claims, (b) holders of approximately 91.6% in amount of Second Lien Claims, and (c) the Sponsor Entities.  The RSA serves as the cornerstone of the prepackaged chapter 11 plan that has been accepted by every single creditor that voted during the prepetition solicitation period, representing holders of approximately 98% in amount of First Lien Claims and holders of approximately 98% in amount of Second Lien Claims.

7.      The Plan contemplates the Company's restructuring through a debt-to-equity conversion of a substantial majority of the Debtors' funded debt obligations.  In particular, implementation of the restructuring transactions contemplated by the Plan will enable the Debtors to de-lever their balance sheet by more than $471.4 million[3]—*over 86%* of their funded debt obligations—and position their businesses for stability and success after emergence from bankruptcy.  *Notably, all allowed general unsecured claims will remain unimpaired under the Plan.*  The Debtors believe that the Plan is in the best interests of these estates and should be confirmed.

8.      To familiarize the Court with the Debtors and the relief the Debtors seek on the first day of these Chapter 11 Cases, this declaration is divided into four sections.  *Section I* discusses the Company's businesses, including the various web- and cloud-based markets in which the Company competes.  *Section II* provides an overview of the Company's organizational and capital structure.  *Section III* describes the events leading to the filing of

---

[3]     Inclusive of $7.4 million of secured swap settlement amounts that are discussed more fully herein.

these Chapter 11 Cases and explains the Company's restructuring efforts before, and objectives during, these Chapter 11 Cases. **Section IV** summarizes the relief requested in, and the facts supporting, each of the First Day Motions.

## I.    Company Overview

9.    The Company is a leading global provider of high-quality internet content and cloud-based customer solutions.  The Company manages its operations from various locations throughout the United States and internationally.  As of the date hereof, the Company employs approximately 484 employees in the United States, and approximately 562 employees worldwide.

10.    The Debtors operate in three divisions:  (a) "*Multiply*;" (b) "*ForeSee*;" and (c) "*Webcollage*."[4]  The Company also has shared services departments, which perform certain finance, legal, human resource, and administrative support functions for all of the Company's operating units.  Multiply is an online content publisher that leverages relationships with Facebook, Inc. ("*Facebook*"), Yahoo!, Inc. ("*Yahoo*"), celebrities and other partners to acquire traffic to owned and partner websites and generate advertising revenue from Google, Inc. ("*Google*") and other partners.  ForeSee measures end customer/user satisfaction for its customers, which allows it to deliver insights on where its customers should prioritize improvements in their own customers' experiences.  Webcollage is the leading cloud-based platform for managing and publishing rich product information for syndication to retail partners' e-commerce websites.  For the fiscal year ended December 31, 2016, the Company generated revenue of approximately $177.4 million, of which approximately $73.8 million, $83.9 million, and $19.7 million were attributable to Multiply, ForeSee, and Webcollage, respectively.  For the

---

[4]    The Debtors commenced these chapter 11 cases in the Southern District of New York, which is the location of the headquarters, and the principal place of business of Debtor Webcollage Inc.

same period, the Company generated operating income of $8.1 million, excluding depreciation and amortization of $34.6 million.[5]

11.    The Company began in February 2006 as AFCV, a portfolio of e-commerce technologies, and launched its initial question and answer platform in June 2009.  In April 2011, the Company acquired the www.answers.com domain, which has since become its most trafficked website.  In an effort to provide a full suite of solutions that span the customer life cycle, the Company acquired Webcollage and ForeSee in May and December, 2013, respectively.  In October 2014, an investment fund managed by Apax Partners, L.P. ("**Apax**"), a global private equity firm, acquired the Company through a merger.  The purchase price consideration was $914 million, which included a cash equity contribution by an investment fund managed by Apax.

12.    The Multiply business is a traditional web-publishing business with a revenue model built around "click through" advertising in partnership with Google, Facebook, and other similar platforms.  Multiply's revenues are largely dependent on where its websites are "indexed"—*i.e.*, how far down the list of results they appear on a Google search, or how often Facebook pushes Multiply's content to its users.  Google and Facebook use complex algorithms to index websites and periodically adjust those algorithms.  These algorithm adjustments can have serious impacts on the Company's revenues if they result in a lower indexing of Multiply's websites.

13.    In contrast, the ForeSee and Webcollage businesses are subscription-based software-as-a-service businesses with generally more predictable and less seasonal revenue and costs than the Multiply business.  Prior to the fiscal year ended December 31, 2016, Multiply

---

[5]    Results for fiscal year 2016 are preliminary and subject to ongoing audit.

accounted for a majority of the Company's consolidated revenue, but since that time, its revenue has declined to less than ForeSee's revenue.  During the same period, Webcollage's revenue has increased overall and as a proportion of the Company's total revenue.

### A.    Multiply Business

14.    Multiply owns and publishes a portfolio of approximately 198 websites and regularly operates 25 websites that generate billions of page views annually.  The four largest sites, Answers.com, FashionBeans.com, Healthyway.com, and Ridiculously.com account for over 85% of total traffic.

15.    Multiply's original business, internally referred to as "*Wiki*," began as a purely informational service offered through the "www.answers.com" domain.  This service derives its revenues from advertising on the "www.answers.com" domain and has minimal variable costs.  Although Wiki is the Company's original business, visits to its site, and, accordingly, revenue, have declined, as the site generated only 9.5% of Multiply's revenue in the fiscal year ended December 31, 2016.

16.    Departing from its origins, the Multiply business created a new model starting in 2013, internally referred to as "*O&O*."  O&O provides web content, which users identify through key partners such as Google and Facebook.[6]  Specifically, the Company pays partners such as Google for the right to host ads on the Company's websites and then earns revenues as visitors "click through" to its sites.  Accordingly, the Company's revenue is highly dependent on how many users visit O&O's sites, which is in turn dependent on the favorability of those sites' "indexing."  Algorithm adjustments by Google and Facebook can result in significantly less favorable indexing for O&O's sites, with a severe impact to the Company's profitability.  Prior

---

[6]    In addition to Google and Facebook, the Company acquires traffic from, among others:  (i) Yahoo; (ii) Taboola Inc.; and (iii) Outbrain, Inc.

to October 2014, the Company derived the majority of its web traffic through visitors who found O&O's web pages through Google searches.  Since then, Facebook has become the dominant driver of visitors to O&O's web pages, driving approximately 67.7% of traffic in 2016.

17.    The latest evolution in the Multiply business model is the "***Partner Organic Platform***."  This evolved business model was created by the Company to drive revenue without relying on Google's and Facebook's indexing algorithms.  Under this initiative, the Company pays an "influencer," such as a musician, star athlete, actor, or other celebrity, for the use of their Facebook "fan page."  The Company can then use that fan page to drive traffic to the Company's and partners' websites.  Multiply as a whole accounted for approximately 42% of the Company's revenues for the fiscal year ended December 31, 2016.

### B.    ForeSee Business

18.    ForeSee is a customer experience analytics ("***CX***") platform that offers its clients, including some of the world's largest brands, information on how end consumers/users perceive and interact with their customer journey touch points.  Clients typically contract with ForeSee on an annual or multi-year basis, during which ForeSee collects and analyzes information on how the client's customers perceive the client's products or their experiences with the client.  ForeSee applies its technology across sales channels and customer touch points, including websites, contact centers, retail stores, mobile and tablet sites, apps, and social media initiatives.  ForeSee continuously collects data in order to measure customer satisfaction and deliver insights on where organizations should prioritize improvements in the customer journey to maximize end consumer/user satisfaction.

19.    Perhaps the most ubiquitous marker of ForeSee's business is the kind of survey pop-up pictured below, which represents a key customer touch point driving ForeSee's deeper analytics.



20.    ForeSee's CX platform is a proven predictor of revenue, market share, and stock price performance.  ForeSee pioneered the CX analytics market in 2001 and since then the industry has grown into an estimated $2-3 billion market, crowded with many competitors.  The Debtors expect that the CX market will continue to grow in the future, as surveys show that 89% of companies plan to compete primarily on the basis of CX and 88% of companies plan to increase their CX investments in the near future.  Accordingly, the Debtors are committed to ensuring that ForeSee remains a market leader, and in November 2016, ForeSee launched its newest CX suite, offering an improved range of products designed to keep ForeSee competitive well into the future.

21.    The Company also operates a smaller business, "***ResellerRatings***," under the ForeSee business unit.  ResellerRatings typically contracts with both online and brick-and-mortar retailers on an annual or month-to-month basis to gather and publicize end consumers'/users' feedback on their sales experiences.  ForeSee, including ResellerRatings, accounted for approximately 47% of the Company's revenue for the fiscal year ended December 31, 2016.

### C.    Webcollage Business

22.    Webcollage is a content-related product platform that clients use to publish interactive web pages and to provide them with analytics regarding customer interactions with

their products.  Webcollage typically contracts with clients on an annual basis.  Webcollage's products are used worldwide by over 650 manufacturers, large and small, to publish rich product information on retail partners' e-commerce sites.  Rich product information includes videos, interactive tours, and enhanced product descriptions, as shown below:

[*Remainder of page intentionally left blank.*]



23.     Webcollage operates in the approximately $3.6 trillion global ecommerce market, where recent progress has seen the barriers between online and brick-and-mortar retail dissolve. According to Webcollage's own research, approximately 82% of consumers check their phone before entering a store and two-thirds of all in-store purchases are a result of online product research.

24.     Webcollage is the only solution in the marketplace that offers automated real-time publishing to a large number of retailers, a broad set of tools for assembling rich product information, prominent responsive display of the information across the retail channel, and end-to-end shopper analytics.   Webcollage's analytics provide data on key content engagement metrics and predictive analysis opportunities in an easily understood visual format, complete with 24-7, password protected access.

25.     Due to the size of Webcollage's market, and the market's projected future growth, the Debtors believe that the Webcollage business is critical to their future success.   Webcollage accounted for approximately 11% of the Company's revenue for the fiscal year ended December 31, 2016.

**D.      Shared Services**

26.     The Company's shared services departments handle day-to-day business support and reporting functions across all of its business platforms.   The functions provided by these departments include finance and accounting, legal services, human resources, information technology operations, facilities management, and general administrative support.

**II.     Organizational and Capital Structure**

**A.      Organizational Structure**

27.     An organizational chart illustrating the corporate structure of the Company is annexed to this declaration as **Exhibit A**.

**B.      The Debtors' Prepetition Capital Structure.**

28.     As of the Petition Date, the Debtors outstanding funded debt obligations are in the aggregate amount of approximately $546.4 million.[7]  This amount consists of:

---

[7]     This amount excludes $1.3 million in undrawn letter of credit obligations.

- approximately $366.2 million in principal amount of secured borrowings under the Prepetition First Lien Credit Agreement (defined herein) consisting of approximately (i) revolving loans in the outstanding principal amount of $38.7 million, (ii) term loans in the outstanding principal amount of $320.1 million, and (iii) $7.4 million on account of termination of certain secured swap obligations, plus $1.3 million in undrawn letter of credit obligations; and

- approximately $180.2 million in amount of term loans under the Prepetition Second Lien Credit Agreement (defined herein).

29.    The Debtors have granted security interests and liens on all, or substantially all, of their assets to secure their obligations under the Prepetition First Lien Credit Agreement, and subordinated in all respects to the Prepetition First Lien Lenders  security interests and liens on all, or substantially all, of their assets to secure their obligations under the Prepetition Second Lien Credit Agreement.   As detailed below, the Prepetition First Lien Lenders and the Prepetition Second Lien Lenders are party to an intercreditor agreement that governs the respective priorities and rights of each party with respect to the shared collateral (defined below as the "Prepetition Intercreditor Agreement").

### 1.    First Lien Indebtedness

30.    On October 3, 2014, Debtor Answers Corporation ("***Answers***"), together with Debtor Answers Holdings, Inc. ("***Holdings***") and its domestic subsidiaries as guarantors, entered into that certain Credit Agreement with Credit Suisse AG, Cayman Islands Branch as the Administrative Agent and Collateral Agent (the "***Prepetition First Lien Agent***") and each lender from time to time party thereto (the "***Prepetition First Lien Lenders***" and, together with the Prepetition First Lien Agent, collectively, the "***Prepetition First Lien Secured Parties***") (as may be amended, restated, supplemented, or otherwise modified prior to the commencement of these Chapter 11 Cases, the "***Prepetition First Lien Credit Agreement***") providing the debtors with $325 million of term loans (the "***First Lien Term Loans***") and $40 million of revolving loan commitments (the "***First Lien Revolving Loans***").

13

31.    Pursuant to that certain First Lien Guaranty, dated as of October 3, 2014 (the "***First Lien Guarantee Agreement***"), each of the Debtors guaranteed the obligations of the Borrower pursuant to the Prepetition First Lien Credit Agreement and the other Prepetition First Lien Loan Documents (as defined below).

32.    Pursuant to, among other things, (a) that certain First Lien Security Agreement, dated as of October 3, 2014, and (b) that certain First Lien Intellectual Property Security Agreement, dated as of October 3, 2014 (together with all other pledge agreements or similar security documents entered into by any Debtor and the Prepetition First Lien Agent in respect of the Debtors' assets and all other documentation executed in connection with any of the foregoing, each as amended, restated, supplemented, or otherwise modified from time to time, the "***First Lien Security Documents***"), the Debtors have granted a first-priority lien and security interest (the "***Prepetition First Liens***") in, to, and against substantially all of the Debtors' assets described in the First Lien Security Documents, including, without limitation, the cash and non-cash proceeds thereof (collectively, the "***Prepetition Collateral***"), to the Prepetition First Lien Agent and the Prepetition First Lien Lenders (the Prepetition First Lien Credit Agreement, the First Lien Guarantee Agreement, the First Lien Security Documents, including, without limitation, the Prepetition Intercreditor Agreement (as defined below), the letter of credit documentation, and any other collateral and ancillary documents executed in connection therewith, in each case as amended, restated, supplemented or otherwise modified prior to the Petition Date, collectively, the "***Prepetition First Lien Loan Documents***").  Pursuant to the Prepetition First Lien Loan Documents, the Debtors are jointly and severally indebted and liable to the Prepetition First Lien Lenders for all First Lien Revolving Loans, the First Lien Term

Loans, letter of credit obligations, and other obligations described therein and payable thereunder (the "**Prepetition First Lien Indebtedness**").

33.     In accordance with the terms of the Prepetition First Lien Loan Documents, all amounts payable thereunder are now fully due and payable by the Debtors.  The Debtors are each jointly and severally indebted and liable to the Prepetition First Lien Agent and the Prepetition First Lien Lenders for such amounts.  As of the Petition Date, the Debtors were indebted and liable for all of the Prepetition First Lien Indebtedness in the aggregate principal amount of not less than $366.2 million under the Prepetition First Lien Credit Agreement plus accrued and unpaid interest, premiums, indemnification obligations, and fees and expenses (including, without limitation, the reasonable and documented fees and expenses of the Prepetition First Lien Secured Parties' attorneys, consultants, accountants, experts, and financial advisors) and other obligations incurred in connection therewith, in each case in accordance with the terms of the Prepetition First Lien Loan Documents.  Each of the Prepetition First Lien Loan Documents is valid, binding, and subject to applicable bankruptcy law, enforceable against the Debtors in accordance with its terms.

### 2.     Second Lien Indebtedness

34.     On October 3, 2014, Answers, together with Holdings and its domestic subsidiaries as guarantors, entered into that certain Prepetition Second Lien Credit Agreement with Wilmington Trust, National Association, as successor administrative agent and collateral agent (the "**Prepetition Second Lien Agent**" and, together with the Prepetition First Lien Agent, the "**Prepetition Agents**") and each lender from time to time party thereto (the "**Prepetition Second Lien Lenders**" and, together with the Prepetition First Lien Lenders, the "**Prepetition Secured Lenders**" and, together with the Prepetition Agents, the "**Prepetition Secured Parties**")

(as may be amended, restated, supplemented, or otherwise modified prior to the commencement of these Chapter 11 Cases, the "**Prepetition Second Lien Credit Agreement**") providing the debtors with approximately $180.2 million of second lien term loans (the "**Second Lien Term Loans**").

35.    Pursuant to that certain Second Lien Guaranty, dated as of October 3, 2014 (the "**Second Lien Guarantee Agreement**"), each of the Debtors guaranteed the obligations of the Borrower pursuant to the Prepetition Second Lien Credit Agreement and the other Prepetition Second Lien Loan Documents (as defined below).

36.    Pursuant to, among other things, (a) that certain Second Lien Security Agreement, dated as of October 3, 2014, and (b) that certain Second Lien Intellectual Property Security Agreement, dated as of October 3, 2014 (together with all other pledge agreements or similar security documents entered into by any Debtor and the Prepetition Second Lien Agent in respect of the Debtors' assets and all other documentation executed in connection with any of the foregoing, each as amended, restated, supplemented, or otherwise modified from time to time, the "**Second Lien Security Documents**"), the Debtors have granted a second-priority lien and security interest (the "**Prepetition Second Liens**," and together with the Prepetition First Liens, the "**Prepetition Liens**") in, to, and against the Prepetition Collateral, to the Prepetition Second Lien Agent and the Prepetition Second Lien Lenders (the Prepetition Second Lien Credit Agreement, the Second Lien Guarantee Agreement, the Second Lien Security Documents, including, without limitation, the Prepetition Intercreditor Agreement (as defined below), and any other collateral and ancillary documents executed in connection therewith, in each case as amended, restated, supplemented or otherwise modified prior to the Petition Date, collectively, the "**Prepetition Second Lien Loan Documents**," and collectively with the Prepetition First Lien

Loan Documents, the "***Prepetition Loan Documents***").  Pursuant to the Prepetition Second Lien Loan Documents, the Debtors are jointly and severally indebted and liable to the Prepetition Second Lien Agent and the Prepetition Second Lien Lenders for all loans, letter of credit obligations, and other obligations described therein and payable thereunder (the "***Prepetition Second Lien Indebtedness***," and together with the Prepetition First Lien Indebtedness, the "***Prepetition Secured Indebtedness***").

37.    In accordance with the terms of the Prepetition Second Lien Loan Documents, all amounts payable thereunder are now fully due and payable by the Debtors.  The Debtors are each jointly and severally indebted and liable to the Prepetition Second Lien Agent and the Prepetition Second Lien Lenders for such amounts.  As of the Petition Date, the Debtors were indebted for all of the Prepetition Second Lien Indebtedness in the aggregate principal amount of not less than $180.2 million under the Prepetition Second Lien Credit Agreement plus accrued and unpaid interest, premiums, indemnification obligations, and fees and expenses (including, without limitation, the reasonable and documented fees and expenses of the Prepetition Second Lien Agent's attorneys, consultants, accountants, experts, and financial advisors) and other obligations incurred in connection therewith, in each case in accordance with the terms of the Prepetition Second Lien Loan Documents.  Each of the Prepetition Second Lien Loan Documents is valid, binding, and subject to applicable bankruptcy law, enforceable against the Debtors in accordance with its terms.

### 3.    Prepetition Intercreditor Agreement

38.    Pursuant to that certain Junior Lien Intercreditor Agreement, dated as of October 3, 2014, by and among Answers, Holdings, and the Prepetition Agents (as amended, restated, or otherwise modified from time to time, the "***Prepetition Intercreditor Agreement***"), the

Prepetition First Liens have priority over and are senior in all respects to the Prepetition Second

Liens.  I am advised by counsel that, subject to certain limited exceptions detailed therein, the

Prepetition Intercreditor Agreement also provides that the Prepetition First Lien Secured Parties

have the exclusive right to enforce rights, exercise remedies (or forbear from enforcing such

rights or exercising such remedies), or dispose of the Prepetition Collateral.

39.     I am further advised by counsel that the Prepetition Intercreditor Agreement also

(a) provides that the Prepetition First Lien Secured Parties have the sole authority to approve of

debtor-in-possession financing and the use of cash collateral, and (b) prohibits the Prepetition

Second Lien Lenders and the Prepetition Second Lien Agent from objecting to the grant of

adequate protection in favor of the Prepetition Secured Parties.

### 4.    **Swap Agreements**

40.     The Company is party to two swaps (the "***Swaps***"), both of which are interest rate

swaps that help the Company manage interest rate exposure by achieving a desirable proportion

of variable and fixed rate debt.  I am advised by counsel that the counterparties to the Swaps are

collateralized under the First Lien Credit Agreement, but are unable to exercise remedies to

collateral independently.   On October 6, 2016, Credit Suisse International informed the

Company that due to an existing default, it would be terminating a Swap between Debtor

Answers Corporation and Credit Suisse International, dated as of December 5, 2014 (the "***Credit

Suisse Swap***"), effective on October 11, 2016.  The Termination Payment Amount (as defined in

the 1992 ISDA Master Agreement (Multicurrency-Cross Border), dated as of December 5, 2014,

by and between Answers Corporation and Credit Suisse International (as amended,

supplemented or otherwise modified)) was approximately $5.2 million, which will be added to

the aggregate amount of First Lien Indebtedness.  As of December 31, 2016, approximately $247

million notional amount was subject to the Credit Suisse Swap.

41.    Similarly, on October 11, 2016, Bank of America N.A. declared an event of

default under a Swap between Debtor Answers Corporation and Bank of America N.A., dated as

of December 9, 2014 (the "***Bank of America Swap***").  The Termination Payment Amount (as

defined in the 1992 ISDA Master Agreement (Multicurrency-Cross Border), dated as of

December 9, 2014, by and between Answers Corporation and Bank of America, N.A. (as

amended, supplemented or otherwise modified)) was approximately $2.2 million, which will be

added to the aggregate amount of First Lien Indebtedness.  As of December 31, 2016,

approximately $98 million notional amount was subject to the Bank of America Swap.

### III.    Events Leading to the Filing of these Chapter 11 Cases

####    A.    Algorithm Adjustments

42.    In addition to the substantial debt service obligations required under the

Prepetition Loan Documents, the Company faced a number of operational hurdles in the months

and years leading up to their decision to commence the Chapter 11 Cases.  In particular, in

March 2015, Google adjusted its search algorithm (the "***March 2015 Adjustment***") and, in May

2016, both Google and Facebook adjusted their respective algorithms (the "***May 2016***

***Adjustment***" and, together with the March 2015 Adjustment, the "***Algorithm Adjustments***").

The Algorithm Adjustments resulted in severely reduced traffic to the Company's websites.  In

response, the Company sought to insulate itself from the effects of future Algorithm Adjustments

by diversifying its revenue stream—namely by implementing the Partner Organic Platform and

investing in the ForeSee and Webcollage businesses.  The Company, however, could not sustain

its capital structure while simultaneously addressing the adverse operational consequences that

resulted from the Algorithm Adjustments.  In order to remain a viable, competitive enterprise,

the Company decided that it needs to substantially lower its debt load and increase its access to liquidity.

43.      As explained above, the Multiply business is largely dependent on how websites published by the Company are "indexed" or promulgated by search engines and social media platforms like Google and Facebook.  The March 2015 Adjustment resulted in a much lower index for the Company's web content.  Although the Company had been able to adjust its content to reduce the impact of previous similar algorithm changes, the sweeping nature of the March 2015 Adjustment was such that the Company was unable to mitigate meaningfully the consequences to its operations, resulting in a strain on the Company's revenues.  The May 2016 Adjustment had a similar detrimental effect on the Company's web traffic.  Collectively, the Algorithm Adjustments roughly coincided with an approximately 52% decline in Multiply revenue between the fiscal year ended December 31, 2014 and the fiscal year ended December 31, 2016, as well as a nearly 82% drop in Multiply's gross profit during the same periods.

44.      In the wake of the May 2016 Adjustment, the Multiply business was further impacted when Google threatened to drop Multiply as a partner, absent meaningful changes to the Company's mobile content.  Google's threat was predicated on alleged low "conversion rate," which measures the rate of "click throughs" from the Company's content to actual sales.

45.      Then, on November 11, 2016, Facebook informed the Company that it was suspending Multiply's master account through December 31, 2016, which eliminated Multiply's ability to direct traffic towards the Company's sites through paid traffic acquisition (the "***Facebook Suspension***").  As previously highlighted, Facebook is the most important source of the Company's web traffic, and the Facebook Suspension occurred during the holiday

season, which is the Multiply business's peak revenue season.    Accordingly, the Facebook

Suspension further accelerated the Company's liquidity troubles.    On January 1, 2017, due to the

Company's efforts to quickly remedy Facebook's concerns, the Facebook Suspension was

reversed and Multiply resumed its paid traffic acquisition activity with Facebook.    Despite this

fix, however, paid traffic resumed to a much lesser extent than it existed prior to the Facebook

Suspension due to seasonally lower advertising rates that typically occur in January each year

and the necessity that the Company promote higher quality content and user experiences than it

had historically promoted.

46.    The Algorithm Adjustments, Google's actions, and the Facebook Suspension all

contributed to the Company's current liquidity crisis.

### B.    A Pivot for Multiply

47.    Following the March 2015 Adjustment, the Company began implementing plans

to diversify the Multiply business away from its reliance on advertising revenues.    The

Company's new initiative, the Partner Organic Platform, was designed to more directly drive

traffic to the Company's websites and, consequently, ad revenue derived therefrom.

48.    Under the Partner Organic Platform, the Company pays an up-front fee or a

variable revenue share to certain celebrities for the rights to control or post content on those

celebrities' Facebook "fan pages" in order to direct traffic towards the Company's websites and,

in turn, generate advertising revenue.    The Company believed that the Partner Organic Platform

represented a path to a new source of traffic and mitigate the impact of the Algorithm

Adjustments by opening a new revenue stream independent of the Google or Facebook indexing

algorithms.

49.    The Company's initial launch of the Partner Organic Platform was less profitable

than originally projected.    In addition, the Company's ability to scale up the Partner Organic

Platform after its initial launch was impacted negatively by the May 2016 Adjustment. Since then, the Company has scaled back the Partner Organic Platform and shifted its focus from fixed monthly payments to influencers to a higher proportion of variable revenue share deals in order to preserve liquidity and mitigate downside risk. The Company continues to believe that the Partner Organic Platform represents a viable revenue stream in the near future. However, absent a restructuring, the Company lacks the necessary liquidity to build out the Partner Organic Platform to meaningfully impact Multiply's profitability in the near term. Thus, the Company's restructuring contemplated by the Plan is a key step towards enhancing the value of the Multiply business.

### C.    A Reinvestment in ForeSee and Webcollage Businesses

50.    As discussed in greater detail above, for much of the Company's history, Multiply was the primary source of revenue. However, beginning in late 2015, the Company made a strategic decision to reinvest in its ForeSee and Webcollage businesses in order to supplement the Company's revenue streams and diversify its portfolio of products.

51.    ForeSee and Webcollage derive their revenues from customer contracts of varying durations. Because the ForeSee and Webcollage businesses' revenues and costs are determined by these contracts, these businesses historically have been more stable and predictable than the revenues and costs associated with the Multiply business. However, after their acquisitions in 2013, both the ForeSee and Webcollage businesses experienced challenges to varying degrees, including leadership issues, increased competition, and a lack of product innovation. This situation persisted in part because of the Company's prior focus on the Multiply business.

52.    Following the March 2015 Adjustment, the Company began to reorganize and reinvest in the ForeSee and Webcollage businesses. The first step in this shift was a reduction in force in July 2015 of approximately 89 employees (the "*2015 RIF*"), in an attempt to right-size

22

these segments.  Following the 2015 RIF, the Company hired new leadership for ForeSee and Webcollage in November and December 2015.  This change in leadership was accompanied by an increase in investment in the ForeSee and Webcollage businesses.  These efforts and other measures resulted in an approximately 16% year-over-year decrease in adjusted EBITDA from these businesses for the fiscal year ended December 31, 2016.  Going forward, the Company expects to see stabilization of profitability of the ForeSee and Webcollage businesses in 2017 and growth in 2018.  However, the Algorithm Adjustments, Facebook Suspension, and overall decline in adjusted EBITDA have put a severe strain on the Company's liquidity, adversely affecting its ability to continue the necessary investment in the ForeSee and Webcollage businesses under its current capital constraints.`

      **D.**    **Changes in Management and the Board of Directors and Other Recent Developments**

53.    The decline in the Company's financial performance coincided with certain changes in the Company's management structure.  The Company's former chief financial officer voluntarily resigned in May 2016 and the former chief executive officer and chief strategy officer of Debtor Answers Corporation both voluntarily resigned in August 2016.[8]    In August 2016, the Company hired Brian Mulligan as chief financial officer (the "*CFO*").

54.    Anticipating the need for a potential restructuring in the near future given the Company's liquidity troubles, the Company's board of directors decided to appoint two independent directors to oversee any restructuring efforts.  Accordingly, on September 15, 2016, Neal Goldman and Eugene Davis were appointed to the board of directors of the Debtors' ultimate parent company, Clarity GP, LLC and to the boards of directors of each of the Debtors.

---

[8]    Each of the Company's businesses is led by its own chief executive officer.  Accordingly, the Company has not replaced the chief executive officer of Answers Corporation since the former chief executive officer's departure.

Concurrently with the appointments of Messrs. Goldman and Davis, Mr. Mulligan was also appointed as a director of each of the Debtors' boards of directors.

55.     To assist with a potential restructuring, the Debtors retained Rothschild, Inc. ("*Rothschild*") as their financial advisors, Kirkland & Ellis LLP ("*K&E*") as their legal advisors, and A&M in June 2016, August 2016, and September 2016, respectively.  On October 24, 2016, pursuant to the requirements of the Forbearance Agreements (as defined herein), I was appointed by each of the Debtors' respective boards of directors or members, as applicable, as Chief Restructuring Officer of the Debtors (the "*CRO*").

56.     Since their respective engagements, Rothschild and K&E have assisted the Company's management with organizing the Company's lender groups and negotiating the terms of Forbearance Agreements and assessing the Company's strategic restructuring options.  At the same time, myself and additional personnel from A&M, and the Company undertook a number of steps to preserve liquidity, including:  (a) the development of a 13-week cash flow forecast; (b) a hiring freeze on open positions with limited exceptions subject to the CFO's approval; (c) a daily review of disbursements by the CRO and A&M; (d) tighter enforcement of contractual language regarding returns, pushing process for timely renewals, and implementing heightened past due receivable collection efforts; (e) the deferral of non-critical disbursements; (f) the review and suspension of certain Company-issued credit cards and automatic debits and charges; (g) the utilization of traffic acquisition credit lines with Facebook, Yahoo, and others to combat the loss of credit line capacity; (h) the utilization of accrued airline award miles and hotel points for essential travel; (i) the deferral of payments to non-critical vendors; and (j) a further reduction in force in November 2016 of approximately 63 positions.  Ultimately, however, the implementation of these measures was not, by itself, sufficient to solve the Company's liquidity

problems without the need for a more extensive balance sheet restructuring of its funded debt obligations.

### E.    The Revolver Draw

57.    By September 2016 the Company's liquidity problems had become severe.  As of August 31, 2016, the Company estimated that it had only approximately $2.3 million of cash on hand, and the Company's advisors expected that it would run out of cash before the end of September.

58.    The Company did, however, have approximately $21.2 million available under its First Lien Revolving Credit Facility, which it determined in consultation with its advisors, to fully draw on September 7, 2016 (the "**Revolver Draw**").  The purpose of the Revolver Draw was to give the Company much-needed liquidity relief and allow it to pursue the negotiation of a potential consensual restructuring.  However, absent agreements with the Prepetition Secured Parties, the Revolver Draw only was a temporary solution to the Company's problems.  Indeed, the Company projected that it would run out of cash by early December 2016 if it continued to make debt service payments.

### F.    The September Payment, Forbearance Negotiations and the RSA

59.    On September 30, 2016, the Company was scheduled to pay approximately $4.6 million in debt service obligations (the "**September 30 Debt Payment**"), consisting of: (a) an approximately $1.7 million interest payment on the First Lien Term Loan Facility; (b) an approximately $0.8 million amortization payment on the First Lien Term Loan Facility; (c) an approximately $0.4 million interest payment on the First Lien Revolving Credit Facility; (d) an approximately $1.5 million interest payment on the Second Lien Term Loan Facility; and (e) an approximately $0.3 million interest swap payment.  The September 30 Debt Payment left the Company with the dilemma of either (a) making a payment to avoid defaulting under the

Prepetition Credit Facilities, but sacrificing nearly 20% of the proceeds of the Revolver Draw, liquidity that was critical to maintaining operations and implementing the Company's new business plan or (b) not making such payment and defaulting under the Prepetition Credit Facilities.

60.      Accordingly, at a meeting held on September 26, 2016, the Company's board of directors authorized K&E and Rothschild engage with the Prepetition Secured Parties on the terms of potential forbearance agreements and begin the first steps in furtherance of a restructuring framework.   Thereafter, on September 27, 2016, K&E and Rothschild sent a forbearance proposal to the First Lien Secured Parties.  On September 30, 2016, the Company and the First Lien Secured Parties reached an agreement for an initial forbearance period of two weeks with an eye toward continuing negotiations with respect to a longer forbearance period if the parties agreed on a viable timeline for evaluating and analyzing restructuring options while allowing the Company to continue to operate in the ordinary course and strategize on its business plan.  On October 5, 2016, the Company and the Second Lien Secured Parties entered into a substantially similar initial short-term forbearance agreement as the one agreed to by the Company with the First Lien Secured Parties.

61.      On October 14, 2016, the Debtors and the First Lien Secured Parties entered into a long-term forbearance agreement that contained the structure necessary for continued negotiations around the Company's consensual restructuring of its businesses and balance sheet, and on October 25, 2016, the Debtors and the Second Lien Secured Parties reached a substantially similar forbearance agreement as the one agreed to between the Company and the First Lien Secured Parties (together, each as amended, the "*Forbearance Agreements*").  The applicable forbearance period was later extended by agreement of the parties through

February 2, 2017, which enabled the Company and the First Lien Secured Parties and Second Lien Secured Parties to negotiate the prepackaged restructuring contemplated under the RSA (attached hereto **Exhibit B**).  To facilitate the negotiation and preparation of the prepackaged restructuring completed under the RSA, the agreed-to forbearance period has been further extended while the RSA remains in effect, which contains a milestone requiring the Debtors to commence the Chapter 11 Cases by no later than March 3, 2016.

62.    The RSA, which has the support of the overwhelming majority of the holders of the Debtors' funded indebtedness, contemplates the Company's restructuring through (a) a debt-to-equity conversion of the vast majority of the Debtors' funded debt obligations to 100% of the New Common Stock and 100% of the Warrants, as applicable, (b) conversion of the DIP Claims into First Lien Exit Loans and (c) the conversion of a certain amount of First Lien Claims into Second Lien Exit Loans.  Such restructuring pursuant to the RSA will enable the Debtors to de-lever their balance sheet by more than $471.4 million[9]—*over 86%* of their funded debt obligations—and position their businesses for stability and success after emergence from bankruptcy.  Importantly, implementation of the restructuring contemplated by the Plan and RSA ensures that all allowed general unsecured claims remain unimpaired.

### G.    Importance of Deleveraging

63.    As the Debtors' financial performance has deteriorated, their capital structure has become increasingly unsustainable, and debt-service obligations have consumed an increasing percentage of the Debtors' free cash flow.  Given recent performance, business plan projections, and the lack of free cash flow needed to make critical investments in their businesses, the Debtors have determined that deleveraging their capital structure is an absolute necessity.

---

[9]    Inclusive of $7.4 million of secured swap settlement amounts that are discussed more fully in the First Day Declaration.

Accordingly, the Debtors commenced these Chapter 11 Cases primarily to implement the prepackaged balance sheet restructuring contemplated under the RSA and to put themselves in a position to execute on their new business plan and capitalize on their growth opportunities.

64.     Significantly, this reorganization carries the support of each class of the Debtors' secured creditors, as the First Lien Agent, approximately 89.9% of its First Lien Lenders, the Second Lien Agent, approximately 91.6% of its Second Lien Lenders, and the Consenting Sponsors are signatories to the RSA, which requires the parties to support a reorganization contemplated under the Plan.   This level of consensus for a comprehensive reorganization reflects not only the enormous efforts undertaken by the Debtors and the Prepetition Secured Parties over recent months, but also the parties' belief in the Debtors' prospects as a reorganized enterprise.

### H.    Prepetition Solicitation of the Plan

65.     After execution of the RSA, the Debtors, the Consenting First Lien Secured Parties, the Consenting Second Lien Secured Parties, and the Sponsor Entities negotiated and documented the Plan and Disclosure Statement.  On February 16, 2016, the Debtors commenced solicitation of the Plan with the holders of First Lien Claims (Class 3) and Second Lien Claims (Class 4), the only classes of creditors entitled to vote on the Plan.   By March 2, 2017 (the "***Voting Deadline***") holders of approximately 98% in amount of First Lien Claims and holders of approximately 98% in amount of Second Lien Claims voted to accept the Plan.

66.     Given the overwhelming consensus among the Prepetition Secured Parties evidenced by the RSA and the votes accepting the Plan by the Voting Deadline, the Debtors are optimistic that they will emerge from chapter 11 expeditiously, and with an optimized balance sheet that will allow the Reorganized Debtors to thrive in a competitive industry.   Such an outcome is in the best interests of the Debtors and all of their stakeholders.

IV.    **First Day Motions**

67.    Contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking targeted relief intended to allow the Debtors to minimize the adverse effects of the commencement of the Chapter 11 Cases on their ongoing business operations.  The First Day Motions seek authority to, among other things, continue to pay employee compensation and benefits in order to maintain morale and retention during this critical juncture, ensure the continuation of the Company's cash management systems and other business operations without interruption, and request approval of debtor in possession financing that will provide critical liquidity necessary to fund the Debtors' operations.  Court approval of the relief requested in the First Day Motions is essential to providing the Debtors with an opportunity to successfully meet their creditor obligations in a manner that benefits all of the Debtors' constituents.

68.    I have reviewed each of the First Day Motions.  The facts and descriptions of the relief requested therein are detailed below and are true and correct to the best of my information and belief.  I believe that the relief sought in each of the First Day Motions is necessary:

- it will allow the Company to maintain baseline operations following the commencement of these Chapter 11 Cases;

- it will enable the Company to operate in chapter 11 with minimal disruption to its business operations; and

- it will minimize any loss of the Company's value.

69.    I believe that if the Court grants the relief requested in the First Day Motions, the prospect of achieving these objectives—to the maximum benefit of the Debtors' estates, creditors, and other parties in interest—will be substantially enhanced.  Accordingly, I believe that the Court should grant each of the First Day Motions.[10]

---

[10]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the respective First Day Motions, filed contemporaneously herein.

      A.      **Debtors' Motion for Entry of an Order Directing Joint Administration of the Debtors' Chapter 11 Cases (the "*Joint Administration Motion*").**

70.      Pursuant to the Joint Administration Motion, the Debtors request entry of an order directing procedural consolidation and joint administration of these Chapter 11 Cases and granting related relief.    Given the integrated nature of the Debtors' operations, joint administration of these Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest.

71.      Many of the motions, hearings, and orders in these Chapter 11 Cases will affect each and every Debtor entity, as the relief sought by the Debtors in the First Day Motions is sought on behalf of all of the Debtors.  The entry of an order directing joint administration of these Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections. Joint administration of these Chapter 11 Cases, for procedural purposes only, under a single docket, will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding instead of eleven independent chapter 11 cases.  The eleven Debtors in these Chapter 11 Cases are "affiliates" as that term is defined in section 101(2) of the Bankruptcy Code.  The Debtors also share significant debt obligations that they seek to restructure as part of these Chapter 11 Cases.

72.      I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. I respectfully submit that the Joint Administration Motion should be approved.

**B.** **Debtors' Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing; (II) Establishing a Plan and Disclosure Statement Objection Deadline and Related Procedures; (III) Approving the Solicitation Procedures; (IV) Approving the Combined Hearing Notice; (V) Directing that a Meeting of Creditors not be Convened; and (VI) Granting Related Relief (the "*Scheduling Motion*").**

73.     Pursuant to the Scheduling Motion, the Debtors request entry of an order: (a) scheduling a combined hearing on the adequacy of the Disclosure Statement and confirmation of the Plan; (b) establishing the Objection Deadline and approving related procedures; (c) establishing the Reply Deadline; (d) approving the Solicitation Procedures; (e) approving the form and manner of the Combined Hearing Notice; (f) directing that the U.S. Trustee not convene the Creditors' Meeting under section 341 of the Bankruptcy Code if Effective Date of the Plan occurs within 75 days after the Petition Date; (g) allowing the notice period for the Disclosure Statement and Combined Hearing to run simultaneously; (h) shortening the notice period for the Combined Hearing and Objection Deadline; and (h) granting related relief.

74.     In connection with the foregoing, the Debtors request that the Court approve the following Confirmation Schedule:

| Event | Date[11] |
|---|---|
| Voting Record Date | February 7, 2017 |
| Start of Solicitation | February 16, 2017 |
| Voting Deadline | March 2, 2017 |
| Petition Date | March 3, 2017 |
| Objection Deadline | March 28, 2017 |
| Reply Deadline | March 31, 2017 |
| Combined Hearing | April 4, 2017 |

---

[11]    Certain of the proposed dates are subject to the Court's availability.

75.     The Debtors commenced solicitation with respect to the Plan prior to the Petition

Date in accordance with the Solicitation Procedures described in the Scheduling Motion, the

Bankruptcy Code, the Local Bankruptcy Rules, and the Guidelines.  On February 16, 2017, the

Debtors caused their Solicitation Agent, Rust Consulting/Omni Bankruptcy, to distribute

Solicitation Packages to the Voting Classes.  The Solicitation Packages included the Debtors'

solicitation cover letter, the Disclosure Statement, the Plan, the exhibits to the Disclosure

Statement, and an appropriate Ballot.

76.     The Ballots substantially conform to the form of ballot attached to the Guidelines.

Holders that received the Solicitation Package were directed in the Disclosure Statement and

applicable Ballot to follow the instructions contained in the Ballot (and described in the

Disclosure Statement) to complete and submit the respective Ballots to cast a vote to accept or

reject the Plan.  Each holder was explicitly informed in the Disclosure Statement and applicable

Ballot that such holder needed to submit its Ballot so that it is actually received by the

Solicitation Agent on or before the Voting Deadline to be counted.  Certain holders of claims and

interests were not provided a Solicitation Package because such holders are:  (a) conclusively

presumed to accept the Plan, under section 1126(f) of the Bankruptcy Code, because such

holders are unimpaired; or (b) conclusively deemed to reject the Plan, under section 1126(g) of

the Bankruptcy Code, because such holders are impaired and entitled to receive no distribution

on account of its claims or interests.

77.     To maximize the value of the Debtors' businesses, which hinges largely on the

Debtors' ability to maintain existing business relationships, it is critical that the Debtors quickly

and expeditiously emerge from chapter 11 in a manner that preserves the Debtors' most valuable

asset—their customers.  At this critical juncture, any diminution in the Debtors' customer base

will negatively impact value for all stakeholders and may jeopardize the Debtors' restructuring efforts.

78.    I believe that the relief requested in the Scheduling Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption. Accordingly, I respectfully submit that the Scheduling Motion should be approved.

C.    **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using the Cash Management System and (B) Maintain Existing Bank Accounts and Business Forms; (II) Authorizing Continued Intercompany Transactions; and (III) Granting Superpriority Administrative Expense Status to Intercompany Claims (the "*Cash Management Motion*").**

79.    Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders: (a) authorizing, but not directing, continued use of the Cash Management System as well as honoring any prepetition obligations related to the use thereof;[12] (b) authorizing, but not directing, continued use of the: (i) Bank Accounts (as well as authorizing the Debtors to open and close new bank accounts as appropriate); (ii) Business Forms; and (iii) Books and Records; (c) authorizing and directing the Banks to continue to maintain, service, and administer the Bank Accounts and to debit the Bank Accounts in the ordinary course of business; and (d) authorizing, but not directing, continued intercompany funding through the Cash Management System, approving the Intercompany Transactions, and granting superpriority administrative expense status to all Intercompany Transactions among the Debtors.

80.    In the ordinary course of business, the Debtors and their Non-Debtor Affiliates use an integrated, centralized Cash Management System.  The Cash Management System

---

[12]    The Debtors will not honor prepetition checks outstanding as of the Petition Date except to the extent the payments relating to such checks are authorized and approved by the Bankruptcy Court.

facilitates cash monitoring, forecasting, and reporting and enables the Debtors and their Non-Debtor Affiliates to maintain control over the administration of approximately 32 Bank Accounts that are maintained with Banks, including those listed on **Exhibit 1** annexed to each of **Exhibit A** and **Exhibit B** attached to the Cash Management Motion.

81.    The Cash Management System is similar to those commonly employed by businesses comparable to those of the Debtors.  Indeed, large businesses use integrated systems to help control funds, ensure cash availability for each entity, and reduce administrative expenses by facilitating the movement of funds among multiple entities.  Any disruption of the Cash Management System would be extremely detrimental to the Debtors' operations, as their businesses require prompt access to cash and accurate cash tracking.  The Debtors' accounting department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds.

82.    As of the Petition Date, the Debtors have approximately $9.2 million in the Bank Accounts with approximately $934,000 in the Bank Accounts of the Non-Debtor Affiliates.  The Debtors incur periodic Bank Fees in connection with the maintenance of the Cash Management System, which average approximately $4,500 per month.[13]  The Bank Fees are paid in arrears and are automatically deducted from the Debtors' Bank Accounts as they are assessed by their respective Banks.

83.    As part of the Cash Management System, the Debtors maintain a Purchase Card Program.  As of February 24, 2017, two (2) employees have been issued access to active Purchase Cards.  The Purchase Cards are corporate guarantee cards for which the relevant

---

[13]    The gross Bank Fees for October, November, and December of 2016 were approximately $4,542, $4,449, and $4,519, respectively.  Thus, the aggregate amount of Bank Fees may increase, and the Debtors' seek authority, to the extent necessary, to pay such Bank Fees in the ordinary course on a postpetition basis.

employees do not have personal liability. The employees use the Purchase Cards for approved and legitimate business expenses.  Using rough estimates, the vast majority of expenses incurred on the Purchase Cards include expenses related to promoted content and advertising, traffic acquisition, as well as supplies incurred on behalf of the Debtors in the ordinary course of business.  Approximately 30% of the monthly amounts incurred under the Purchase Card Program are related to employee travel expenses in the furtherance of the Debtors' business operations. The expenses incurred on the Purchase Cards are essential to the operation of the Debtors' businesses, especially the Multiply business. Costs incurred through use of the Purchase Cards are satisfied from the Debtors' Purchase Card Disbursement Accounts.

84.    On average, in the months leading up to the Petition Date, approximately $200,000 to $300,000 per month was debited from the Purchase Card Disbursement Accounts due to employees' use of the Purchase Cards, of which $190,000 is related to the America Express Account.  In addition, the Debtors pay minimal service fees of approximately $1,450 per year in the aggregate for the use of certain of the Purchase Cards issued under the Purchase Card Program.  As of the Petition Date, the Debtors estimate they owe approximately $235,000 on account of the Purchase Cards, of which $190,000 is related to the American Express Account.

85.    The Debtors use a variety of preprinted Business Forms (including checks, letterhead, correspondence forms, invoices, and other business forms in the ordinary course of business).  The Debtors also maintain Books and Records to document their financial results and a wide array of necessary operating information.  To avoid the significant distraction and delay in their business operations that would result from a disruption of the Cash Management System and to avoid unnecessary expense, the Debtors request authorization to continue using all of the Business Forms and Books and Records in use immediately before the Petition Date—without

reference to the Debtors' status as chapter 11 debtors in possession—rather than requiring the Debtors to incur the expense and delay of ordering new Business Forms and creating new Books and Records.

86.    In the ordinary course of business, various Debtors and the Non-Debtor Affiliates maintain business relationships with each other, resulting in Intercompany Claims.    In connection with the daily operation of the Cash Management System, at any given time there may be Intercompany Claims owing between Debtors or between a Debtor and a Non-Debtor Affiliate in connection with the receipt and disbursement of funds and there may be Intercompany Transactions between Debtors or between a Debtor and a Non-Debtor Affiliate.[14] The Intercompany Transactions are critical to ensuring that liquidity is available where and when needed by the Debtors and the Non-Debtor Affiliates, and enables the Debtors to maintain the operations of certain of their Non-Debtor Affiliates to ensure that the Debtors continue to realize the revenue generated by such Non-Debtor Affiliates' operations.

87.    With respect to their domestic and international affiliates, the Debtors track all fund transfers electronically in their accounting system and can ascertain, trace, and account for Intercompany Transactions.    The Debtors' Intercompany Transactions with their foreign Non-Debtor Affiliates are completely integrated within the Cash Management System.    If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the Debtors' detriment, because the Debtors'

---

[14]    Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises similar to the Debtors, the Debtors believe the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require the Court's approval.  Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a postpetition basis.  The continued performance of the ordinary course Intercompany Transactions is integral to ensuring the Debtors' ability to continue to operate their businesses.

ability to fund operations necessary to providing services to their customers would be disrupted, likely resulting in a decreased revenue streams.

88.    To ensure each individual Debtor will not permanently fund the operations of any affiliate, the Debtors respectfully request that, pursuant to sections 503(b)(1) and 364(c)(1) of the Bankruptcy Code, all Intercompany Claims against any Debtor arising after the Petition Date as a result of ordinary course Intercompany Transactions be accorded superpriority administrative expense status.  If Intercompany Claims are given superpriority administrative expense status, each entity utilizing funds flowing through the Cash Management System should continue to bear ultimate repayment responsibility for its ordinary course Intercompany Transactions, reducing the risk that these transactions would jeopardize the recoveries available to the Debtors' creditors.  Moreover, the Debtors request the authority to fund the postpetition payment of obligations to Non-Debtor Affiliates in a manner consistent with historical practice to enable the Debtors to smoothly transition into chapter 11 and ensure certain of the Debtors' revenue streams are not impacted.

89.    I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, I respectfully submit that the Cash Management Motion should be approved.

**D.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors (A) To Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (C) Granting Related Relief (the "*DIP Motion*")**

90.    Pursuant to the DIP Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to obtain (a) a secured super-priority postpetition credit facility in the form of a non-amortizing multiple-draw term loan facility in an aggregate principal amount of

$25 million plus prepetition  letter of credit obligations in the amount of approximately $1.3 million that will be converted into postpetition letter of credit obligations, (b) a bilateral letter of credit facility providing for up to $2 million of letters of credit incremental to both the aforementioned letters of credit that will be converted into the DIP Facility and the DIP Facility itself, and (c) the consensual use of the Cash Collateral of the Prepetition Secured Parties.  The Debtors further seek the Court's approval to grant the Prepetition Secured Parties the forms of Adequate Protection described in the DIP Motion and to modify the automatic stay to effect the terms of the proposed interim and final orders.

91.    The Plan is the centerpiece of a series of interdependent agreements, each one critical to the others and necessary for the Debtors' reorganization.  One such critical agreement is the DIP Credit Agreement, which will supply the Debtors with critical and necessary postpetition debtor-in-possession financing, consent to use the Prepetition Secured Parties' Cash Collateral, and a commitment for exit financing.  Obtaining access to the DIP Financing, including the use of Cash Collateral, on the first day of these Chapter 11 Cases is a prerequisite for the Debtors' major stakeholders to support the Plan and is critical for the success of the Debtors' reorganization efforts.  Furthermore, by having commitments for the Exit Credit Facilities at the very outset of these Chapter 11 Cases, including the DIP Lenders' agreement to convert their outstanding claims under the DIP Facility into claims under the First Lien Exit Facility (rather than seeking to be paid in cash in full), provide the Debtors at the outset of these Chapter 11 Cases with a clear and reliable path to emerge from the Chapter 11 Cases in an expeditious manner.

92.    In addition to being a critical component of the Plan and the related interdependent agreements, the DIP Financing, including use of Cash Collateral, is vital to the

Debtors' emergence from these Chapter 11 Cases as a reorganized business enterprise. The DIP Financing, including access to Cash Collateral, is necessary to provide working capital during the pendency of these Chapter 11 Cases. Without immediate access to the DIP Financing, the Debtors will not have sufficient cash on hand to maintain uninterrupted business operations, provide ongoing service to their customers, or pay their employees while they restructure their businesses. Such a disruption in operations would likely have a grave and immediate impact on the Debtors' businesses and negatively impact their restructuring efforts.

93.     To continue operating in the ordinary course and to effectuate an efficient and expeditious restructuring contemplated by the Plan, the Debtors need immediate to access liquidity. Based on the analyses of the Debtors and their advisors, the Debtors have determined that the additional postpetition financing being provided by the DIP Financing is necessary to provide working capital for the Debtors' businesses, fund adequate protection payments, and satisfy the costs associated with consummating the Plan and completing the Debtors' restructuring. As such, the DIP Financing is fundamental to the preservation and maintenance of the Debtors' going-concern value during these Chapter 11 Cases and critical for the Debtors' successful reorganization.

94.     Absent an ability to demonstrate that the Debtors have the means available to operate in the ordinary course and procure goods and services that are vital to ongoing business operations, customers may seek alternatives, and vendors and suppliers may require more stringent credit requirements and/or refuse to do business with the Debtors. Moreover, absent access to the funds available under the DIP Financing, the Debtors may not have sufficient liquidity to continue their business operations in the ordinary course to the material detriment of customers, creditors, employees, and other parties in interest, jeopardizing the success of the

Debtors' reorganization.  Finally, the DIP Financing will be a clear demonstration to its customers, creditors, and employees that the Debtors plan to operate in the normal course during the pendency on these Chapter 11 Cases.  Therefore, the Debtors have an immediate need to access the DIP Financing on an interim basis and throughout the pendency of these Chapter 11 Cases.

95.    As set forth more fully in the Augustine Declaration, the Debtors believe that the DIP Financing pending approval before the Court represents the Debtors best— and only — available financing option.  I believe that the relief requested in the DIP Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, I respectfully submit that the DIP Motion should be approved.

**E.    Debtors' Motion for Entry of an Order Authorizing the Debtors to (I) Prepare a List of Creditors in Lieu of Submitting a Formatted Mailing Matrix and (II) File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors (the "*Creditor Matrix Motion*").**

96.    Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order: (i) authorizing the Debtors to (a) prepare a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor and (b) file a consolidated list of the Debtors' 30 largest unsecured creditors, and (ii) granting related relief.

97.    As discussed above, the Debtors are pursuing confirmation of the prepackaged Plan that contemplates the satisfaction of all unsecured claims in full.  Given that these Chapter 11 Cases are anticipated to have minimal impact on general unsecured creditors, and in light of the Debtors' goal of emerging from chapter 11 as swiftly as possible, filing a creditor matrix as to each Debtor entity is an unnecessary use of estate resources.  Furthermore, because the Debtors have many hundreds of creditors and other parties in interest, converting the Debtors'

computerized information to a format compatible with the matrix requirements would be a burdensome task and would greatly increase the risk of error with respect to information already on computer systems maintained by the Debtors or their agents.

98.     The Debtors, working together with the Proposed Notice and Claims Agent already have prepared a single, consolidated list of the Debtors' creditors in electronic format. The Debtors are prepared to make that list available in electronic form to any party in interest who so requests (or in non-electronic form at such requesting party's sole cost and expense) in lieu of submitting a mailing matrix to the clerk of the Court.

99.     Compiling separate top 20 creditor lists for each individual Debtor would consume a substantial amount of the Debtors' time and resources.  Further, the Debtors believe a single, consolidated list of the Debtors' 30 largest unsecured, non-insider creditors will aid, to the extent necessary, the United States Trustee for the Southern District of New York in its efforts to communicate with these creditors.  As such, I believe that permitting the Debtors to maintain a single consolidated list of creditors, in lieu of filing a separate creditor matrix for each Debtor will maximize the value of the Debtors' estates.

100.     I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, I respectfully submit that the Creditor Matrix Motion should be approved.

   F.     **Debtors' Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, and Statements of Financial Affairs; (II) Waiving the Same Upon the Effective Date of the Debtors' Prepackaged Plan; and (III) Granting Related Relief (the "*SOFA Extension Motion*").**

101.     Pursuant to the SOFA Extension Motion, the Debtors seek entry of an order (a) extending the fourteen (14) day period by which the Debtors are required to file their

41

Schedules and Statements by 45 days, through and including the 59th day after the Petition Date, without prejudice to the Debtors' ability to request additional time for cause shown; (b) waiving the requirement to file the Schedules and Statements if the Plan is substantial consummated on or before the Deadline as the same may be extended; and (c) granting related relief.

102.    Collection of the necessary information will require a significant expenditure of time and effort on the part of the Debtors and their employees.  Additionally, because numerous invoices related to prepetition goods and services have not yet been received and entered into the Debtors' accounting system, it may be some time before the Debtors have access to all of the information required to prepare the Schedules and Statements.

103.    Moreover, the Debtors have books and records located at various locations throughout the United States.  Information will need to be gathered from many, if not all, of these locations.  Given the size and complexity of the Debtors' businesses and financial affairs and the critical matters that the Debtors' management and professionals were required to address prior to the commencement of these Chapter 11 Cases, the Debtors were not in a position to complete the Schedules and Statements as of the Petition Date.

104.    In the days leading up to the Petition Date, the Debtors' primary focus has been preparing for these Chapter 11 Cases and soliciting their creditor constituencies' acceptance of the Plan.  Focusing the attention of key personnel on critical operational and chapter 11 compliance issues during the early days of these Chapter 11 Cases will facilitate the Debtors' smooth transition into, and timely exit from, chapter 11, thereby maximizing value for their estates, their creditors, and other parties in interest.

105.    Moreover, an extension will not harm creditors or other parties in interest because, even under the extended deadline, the Debtors will file the Schedules and Statements in advance of any deadline for filing proofs of claim in these Chapter 11 Cases.

106.    The Debtors' business operations are complex, and preparing the Schedules and Statements accurately and in appropriate detail will require significant attention from the Debtors' personnel and the Debtors' advisors.  Engaging in such preparation immediately before or after the commencement of these Chapter 11 Cases would distract such personnel and advisors from the Debtors' business operations at a critical juncture.

107.    Furthermore, the request for a final waiver of the requirement to file the Schedules and Statements is appropriate given the prepackaged nature of the Plan.  The purpose of filing Schedules and Statements is to permit parties in interest to understand the Debtors' assets and liabilities to facilitate plan negotiations.  Here, the Debtors have already negotiated with, and solicited votes from, all stakeholders impaired under the Plan.  Additionally, much of the information that would be contained in the Schedules and Statements is already available in the Disclosure Statement, which was sent to creditors entitled to vote to accept or reject the Plan prior to the Petition Date.  Therefore, the primary justifications for filing Schedules and Statements do not exist here and requiring the filing of Schedules and Statements would impose an administrative burden on the Debtors' estates without any corresponding benefit to other parties in interest and would be duplicative and unnecessarily burdensome.

108.    I believe that the relief requested in the SOFA Extension Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, I respectfully submit that the SOFA Extension Motion should be approved.

43

G.    **Debtors' Motion for Entry of an Order Determining Adequate Assurance of Payment for Future Utility Services (the "*Utilities Motion*").**

109.    Pursuant to the Utilities Motion, the Debtors seek entry of an order (a) determining that the Debtors' Proposed Adequate Assurance provides Utility Providers with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) prohibiting the Utility Providers from altering, refusing, or discontinuing the Utility Services; (c) approving procedures for resolving any dispute concerning adequate assurance in the event that a Utility Provider is not satisfied with the Proposed Adequate Assurance; and (d) granting related relief.

110.    In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, data transport, recycling, telephone, internet, cable, and other similar services from a number of utility companies or brokers.  On average, the Debtors pay approximately $93,000 each month for the Utility Services, calculated as a historical average over the twelve months of 2016 (or where historical averages were not available, based on projected expenditures).[15]  Accordingly, the Debtors estimate that the cost for the Utility Services during the next two weeks (not including any deposits to be paid) will be approximately $46,450.  To the best of the Debtors' knowledge, none of the Utility Providers holds a deposit from the Debtors, nor do the Debtors have any existing prepayments with respect to any Utility Providers.

111.    To provide additional assurance of payment, the Debtors propose to deposit $46,450 into the Adequate Assurance Account within five business days after entry of an order granting the relief requested in the Utilities Motion.  The Adequate Assurance Deposit is equal to

---

[15]    In calculating the historical average over the twelve months of 2016 for purposes of this Motion, certain adjustments have been taken into account the Debtors' closure of certain facilities and the projected use of other facilities going forward.

the estimated aggregate cost that will be paid (prorated) to the Utility Providers for two weeks of

Utility Services, calculated as a historical average over the twelve months of 2016.    The

Adequate Assurance Deposit will be held in the Adequate Assurance Account for the duration of

these Chapter 11 Cases and may be applied to any postpetition defaults in payment to the Utility

Providers.

112.    Preserving Utility Services on an uninterrupted basis is essential to the Debtors'

ongoing operations and, therefore, to the success of their reorganization.    Indeed, any

interruption in Utility Services, even for a brief period of time, would disrupt the Debtors' ability

to continue operations, and such disruption would jeopardize the Debtors' ability to manage their

reorganization efforts.    It is critical, therefore, that Utility Services continue uninterrupted during

these Chapter 11 Cases.

113.    I believe that the relief requested in the Utilities Motion is in the best interests of

the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors

to continue to operate their businesses in chapter 11 without disruption.    Accordingly, I

respectfully submit that the Utilities Motion should be approved.

**H.    Debtors' Motion for Entry of Interim and Final Orders Authorizing the
Payments of Certain Prepetition Taxes and Fees (the "*Taxes and Fees
Motion*").**

114.    Pursuant to the Taxes and Fees Motion, the Debtors seek entry of interim and

final orders authorizing, but not directing, the Debtors to remit and pay Taxes and Fees (as

defined herein) accrued prior to the Petition Date (as defined herein) and that will become

payable during the Interim Period, including those obligations subsequently determined upon

audit or otherwise to be owed for periods prior to the Petition Date and granting related relief.

115.    In the ordinary course of business, the Debtors collect, withhold, and incur sales,

use, income, withholding, franchise, property, foreign taxes, as well as other fees and

assessments as more fully described in the Taxes and Fees Motion.  The Debtors estimate that approximately $312,000 in Taxes and Fees relate to the prepetition period that will become due and owing to the Authorities after the Petition Date, of which approximately $205,000 will come due within the Interim Period.   Payment of the Taxes and Fees is critical to the Debtors' continued and uninterrupted operations.  The Debtors' failure to pay the Taxes and Fees could disrupt materially the Debtors' business operations in several ways:  (a) the Authorities may initiate audits of the Debtors or their enterprise, which would unnecessarily divert the Debtors' attention from the reorganization process; (b) the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and/or pursue other remedies that will harm the estates; and/or (c) certain of the Debtors' directors and officers could be subject to claims of personal liability, which likely would distract those key employees from their duties related to the Debtors' restructuring.   In addition, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and these funds may not constitute property of the Debtors' estates.   Moreover, unpaid Taxes and Fees may result in penalties, the accrual of interest, or both.

116.   I believe that the relief requested in the Taxes and Fees Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, I respectfully submit that the Taxes and Fees Motion should be approved.

I.    **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, but not Directing, the Debtors to Pay Trade Claims, (II) Authorizing the Debtors to Satisfy Such Obligations in the Ordinary Course, and (III) Granting Related Relief (the "*Trade Claims Motion*").**

117.   Pursuant to the Trade Claims Motion the Debtors seek entry of interim and final orders, (a) authorizing, but not directing, the Debtors to pay, in full in the ordinary course of

business, the Trade Claims, in an amount not to exceed $3.5 million; (b) authorizing, but not directing, the Debtors to satisfy such obligations in the ordinary course of business; (c) scheduling a final hearing to consider approval of this Motion on a final basis; and (d) granting related relief.

118.    In the ordinary course of business, the Debtors incur various fixed, liquidated, and undisputed payment obligations to various Vendors who supply the necessary quality and types of services that the Debtors require in a timely fashion to enable the Debtors to provide top quality content and services to its customer base.  By the Trade Claims Motion, the Debtors request authority to pay the Trade Claims in the ordinary course of business in an amount not to exceed the Trade Claims Cap of $3.5 million.

119.    It is a sound exercise of the Debtors' business judgement to pay the Trade Claims as they become due in the ordinary course of business because doing so will avoid value-destructive business interruption and will not prejudice the Debtors' other stakeholders.  The Plan, which has the overwhelming support of the Prepetition Secured Parties, provides that claims arising from the provision of such goods and services are unimpaired and will be paid in full.  The goods and services provided by the Vendors are necessary for the continued, uninterrupted operation of the Debtors' businesses, and the Debtors anticipate that failure to pay the Trade Claims as they become due is likely to result in many Vendors refusing to (a) provide essential goods and services and/or (b) conditioning the delivery of such goods and services during these Chapter 11 Cases on compliance with onerous and commercially unreasonable terms.  Nonperformance by any Vendor could materially disrupt the Debtors' operations and jeopardize the swift and cost-efficient prepackaged restructuring of the Debtors' business to the detriment of all of the Debtors' stakeholders.

120.    Additionally, the Debtors may have received certain goods or equipment from various vendors within the 20-day period prior to the Petition Date, giving rise to claims under section 503(b)(9) of the Bankruptcy Code.  Many of the Debtors' relationships with the creditors holding such claims are not governed by long-term contracts.  Rather, the Debtors often obtain supplies on an order-by-order basis.  As a result, a Section 503(b)(9) Claimant may refuse to supply new orders without the payment of its prepetition claims.

121.    Finally, in the ordinary course of the Debtors' business, numerous vendors and service providers provide the Debtors with goods and services that are integral to the Debtors' ongoing business operations.  As of the Petition Date, the Debtors had outstanding prepetition purchase orders with numerous suppliers for such goods and services.  As a result of the commencement of these Chapter 11 Cases, the Suppliers may perceive a risk that they will be treated as prepetition general unsecured creditors for the cost of any shipments made or services provided after the Petition Date pursuant to the Outstanding Orders.  As a result, the Suppliers may refuse to ship such goods to the Debtors or provide such services to the Debtors unless the Debtors issue substitute postpetition purchase orders or provide other assurances of payment.  Issuing substitute purchase orders on a postpetition basis would be disruptive, administratively burdensome, time-consuming, and counterproductive to the Debtors' restructuring.

122.    The Debtors anticipate in the aggregate that approximately $3,060,000 of Trade Claims will become due and payable over the next four weeks in the ordinary course of business.  Accordingly, the Debtors seek interim and final authority, but not direction, to pay amounts owed on account of the Trade Claims, in each case, in the ordinary course of business, subject to the Trade Claims Cap.  In light of the prepackaged nature of these Chapter 11 Cases, the unimpaired treatment of General Unsecured Creditors under the Plan and the overwhelming

support of the Debtors' secured creditors of the Plan, I believe that the relief requested in the

Trade Claims Motion is in the best interests of the Debtors' estates, their creditors, and all other

parties in interest, and will enable the Debtors to continue to operate their businesses in chapter

11 without disruption.  Accordingly, I respectfully submit that the Trade Claims Motion should

be approved.

> **J.**    **Debtors' Motion for Entry of Interim and Final Orders Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock (the "*Equity Trading Motion*").**

123.    Pursuant to the Equity Trading Motion, the Debtors seek entry of interim and final

orders (a) approving certain notification and hearing procedures related to certain transfers of the

Debtors' existing common stock, evidenced by depositary shares, or any Beneficial Ownership

thereof; (b) directing that any purchase, sale, or other transfer of Common Stock in violation of

the Procedures shall be null and void *ab initio*; and (c) granting related relief.

124.    As of December 31, 2016, the Debtors believed that they had NOLs, and together

with certain other Tax Attributes, in the total amount of approximately $157 million, and

additional NOLs may be generated in 2017.  The Tax Attributes are of significant value to the

Debtors and their estates because the Debtors may be able to carry forward their Tax Attributes

to offset their future taxable income potentially for as long as 20 years, thereby reducing their

future aggregate tax obligations.

125.    The Procedures are the mechanism by which the Debtors will monitor and object

to certain transfers of and declarations of worthlessness with respect to the Common Stock to

ensure preservation of the NOLs.  The Debtors seek limited relief that will enable them to

closely monitor certain transfers of Common Stock and claims of worthless stock deductions in

accordance with the Procedures, so as to be in a position to act expeditiously to prevent such

transfers or claims of worthless deductions, if necessary, with the purpose of preserving the Tax Attributes.

126.    If no restrictions on trading or worthlessness deductions are imposed by the Court, such trading or deductions could severely limit or even eliminate the Debtors' ability to utilize their NOLs.  These NOLs could generate the potential for material future tax savings or other tax structuring possibilities in these Chapter 11 Cases.  Furthermore, the relief requested in the NOL Motion is narrowly tailored because it will affect only (a) holders of the equivalent of 4.5% or more of outstanding Common Stock; (b) parties who are interested in purchasing sufficient Common Stock to result in such party becoming a holder of 4.5% or more of outstanding Common Stock; and (c) any "50-percent shareholder" seeking to claim a worthless stock deduction.  Importantly, the only parties affected by the relief requested in the Equity Trading Motion — the Sponsor Entities — consent to and support such relief.  As such, I believe that the relief requested in the Equity Trading Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, I respectfully submit that the Equity Trading Motion should be approved.

### K.    Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses; (II) Continue Employee Benefits Programs; and (III) Granting Related Relief (the "*Wages Motion*").

127.    Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to (i) pay amounts owed in connection with Employee Compensation and Benefits Obligations, and (ii) continue various employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto and (b) authorizing financial institutions to receive, process, honor, and pay

checks presented for payment and electronic payment requests relating to prepetition Employee Compensation and Benefits Obligations provided that there are sufficient good funds standing to the Debtors' credit with such financial institutions.  On an interim basis, the Debtors do not seek authority to pay prepetition amounts accrued in excess of the Priority Cap set forth in section 507(a)(4) of the Bankruptcy Code.  However, based on the nature, structure, and timing of the Employees' compensation, a small number of Employees are owed amounts for Sales Commissions in excess of the Priority Cap, which the Debtors seek authority to pay only upon entry of a final order granting such relief.

128.    The Debtors believe that all Employee Compensation and Benefits Obligations are vital to the Debtors' businesses and seek authority to pay and honor all Employee Compensation and Benefits Obligations that the Debtors believe are necessary to prevent immediate and irreparable harm to the Debtors' businesses during the period between the Petition Date and the Final Hearing.  The Debtors also seek the authority to continue all of their Employee Compensation and Benefits Obligations in the ordinary course of business in accordance with their stated policies and prepetition practices (as such policies may be modified from time to time) and, to pay, in accordance with the Debtors' prepetition policies and practices and in the Debtors' sole discretion, all Employee Compensation and Benefits Obligations on a postpetition basis.

129.    Specifically, the Debtors seek authority to pay prepetition amounts for the following Employee Compensation and Benefits Obligations:  (a) Wages, Sales Commissions, Independent Contractor Compensation, Payroll Taxes and other deductions, Payroll Processing Fees, and Referral Compensation; (b) Reimbursable Expenses; (c) Paid Time Off and Leaves of Absence; (d) certain Employee Benefits, including Health Insurance Benefits, Flexible Spending

Plans, Health Savings Accounts, Life, Accidental Death, and Dismemberment Insurance, and

Supplemental Insurance, Short- and Long-Term Disability Plans, and broker and administrator

payments related thereto; (e) the Fringe Benefit Programs, including the Employee Assistance

Program, Tuition Reimbursement Program, and Cell Phone Program; (f) the Severance Program;

(g) the 401(k) Retirement Savings Plan; (h) the Workers' Compensation Program; and (i) the

Postpetition Non-Employee Director Obligations (with summary of amounts below).

| Employee Compensation and Benefits Obligations[16] | Approximate Amount Accrued as of Petition Date | Approximate Amount Due in First 21 Days |
|---|---|---|
| Unpaid Wages | $365,000 | $320,000 |
| Unpaid Sales Commissions | $520,000 | $0 |
| Unpaid Independent Contractor Compensation | $80,000 | $71,000 |
| Unpaid Withholding Obligations | $250,500 | $225,000 |
| Unpaid Payroll Fees | $22,000 | $22,000 |
| Unpaid Referral Compensation | $0 | $0 |
| Unpaid Reimbursable Expenses | $150,000 | $150,000 |
| Employee Paid Time Off and Leaves of Absence | $0 | $0 |
| Unpaid Health Insurance Benefits | $45,000 | $40,000 |
| Unremitted Flexible Spending | $220,000 | $220,000 |
| Health Savings Accounts | $1,500 | $1,500 |
| Life, AD&D, and Supplemental Insurance | $500 | $500 |
| Short- and Long-Term Disability | $1,500 | $1,500 |
| Unpaid Benefits Broker and Administrator Fees | $26,000 | $26,000 |
| Fringe Benefits Programs (Employee Assistance, Tuition Reimbursement, Cell Phone) | $57,000 | $38,000 |
| The Severance Program | $0 | $0 |
| Unpaid 401(k) Match Contributions | $11,000 | $11,000 |
| Workers' Compensation | $0 | $0 |
| Postpetition Non-Employee Director Obligations | $0 | $0 |
| **TOTAL** | **$1,750,000** | **$1,126,500** |

130.    Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of

the Employee Compensation and Benefits Obligations to priority treatment.  As priority claims,

the Debtors are required to pay these claims in full to confirm a chapter 11 plan.  *See* 11 U.S.C.

---

[16]    The amounts included herein represent prepetition amounts only.  The Debtors seek authority to maintain all of the Employee Compensation and Benefits Obligations, in their sole discretion, as set forth herein pursuant to the Interim and Final Order, as applicable.

§ 1129(a)(9)(B).    Additionally, the Debtors should be authorized to pay certain withholding obligations amounts that governments, Employees, and judicial authorities have designated for deduction from Employees' Wages and that federal, state, and local government require the Debtors to remit.  *See* 11 U.S.C. §§ 541(b)(1), (d) & 26 U.S.C. §§ 6672, 7501(a).

131.    The relief requested in the Wages Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 6003.  The Debtors believe that without the relief requested in the Wages Motion, Employees may seek alternative employment opportunities, perhaps with the Debtors' competitor, which would deplete the Debtors' workforce and hinder the Debtors' ability to operate their businesses.  As such, I believe the relief requested in the Wages Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, I respectfully submit that the Wages Motion should be approved.

**L.    Debtors' Applications for Entry of Orders Authorizing and Approving Employment and Retention of Omni as Noticing and Claims Agent and Administrative Advisor for the Debtors and Debtors in Possession (the "*Omni Retention Applications*").**

132.    Pursuant to the Omni Retention Applications, the Debtors are seeking authority to retain Omni as their Noticing and Claims Agent and Administrative Advisor.  The Debtors have evaluated potential candidates to serve as their Noticing and Claims Agent and Administrative Advisor.  Following that review, and in consideration of the number of anticipated claimants and parties in interest, the nature of the Debtors' business, and the scope of tasks for which the Debtors will require the assistance of a Noticing and Claims Agent and Administrative Advisor,

I submit that the appointment of Omni as Noticing and Claims Agent and Administrative Advisor is both necessary and in the best interests of the Debtors' estates.

133.     Based on Omni's experience in providing similar services in large chapter 11 cases, I believe that Omni is eminently qualified to serve as Noticing and Claims Agent and Administrative Advisor in these Chapter 11 Cases.  A detailed description of the services that Omni has agreed to render and the compensation and other terms of the engagement are provided in the Omni Retention Applications.  I have reviewed the terms of the engagement and believe that Omni's retention will enable the Debtors to continue to operate their businesses in chapter 11 without disruption, and the Debtors' estates, creditors, parties in interest, and the Court will benefit as a result of Omni's experience and cost-effective methods.  Accordingly, I respectfully submit that the Omni Retention Applications should be approved.

*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge and belief.

New York, New York
Dated:  March 3, 2017

Justin P. Schmaltz
Chief Restructuring Officer
Answers Holdings, Inc. and each of its
Debtor affiliates

## Exhibit A

**Organizational Structure Chart**



Clarity GP, LLC
(Delaware)
Rollover Unit Holders (10.1%)
Holders of Class B and Class C Profits interests
Apax VIII funds (89.9%)
Clarity Holdco, L.P (Delaware)
Answers Holdings, Inc. (Delaware)
Answers Holding Corporation (Delaware)
Answers Corporation (Delaware)
Borrower of 1L and 2L credit facilities
Guarantor of 1L and 2L credit facilities
Domestic subsidiary
Foreign subsidiary
Inactive
Equity holders
Redcan LLC (California)
Mulitply Media, LLC (Delaware)
Upbolt, LLC (Delaware)
RSR Acquisition, LLC (Delaware)
More Corn, LLC (Delaware)
ForeSee Results, Inc. (Delaware)
Easy2 Technologies, Inc. (Delaware)
WebCollage, Inc. (Delaware)
BeansPublishing LTD (UK)
ForeSee Results, Ltd. (UK)
ForeSee Session Replay, Inc. (Delaware)
WebCollage Israel Ltd. (Israel)
WebCollage Europe, LTD (UK)

**Exhibit B**

**List of Committees Formed Before the Petition Date**

| Prepetition Committee | Counsel | Members |
|---|---|---|
| Ad Hoc First Lien Group | Jones Day<br>250 Vesey Street<br>New York, New York 10281 | Certain unaffiliated holders of First Lien Claims |
| Ad Hoc Second Lien Group | Akin, Gump, Strauss, Hauer & Feld LLP<br>1 Bryant Park<br>New York, New York 10036 | Certain unaffiliated holders of Second Lien Claims |

## <u>EXHIBIT C</u>

**Consolidated List of the Holders of the Debtors' 30 Largest Unsecured Claims**

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), the following is a consolidated list of the Debtors' creditors holding the 30 largest unsecured claims (the "<u>Consolidated Creditor List</u>") based on the Debtors' unaudited books and records as of the Petition Date. The Consolidated Creditor List has been prepared in accordance with Bankruptcy Rule 1007(d) and does not include (i) persons who come within the definition of "insider" set forth in section 101(31) of the Bankruptcy Code or (ii) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 30 largest unsecured claims.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | Yahoo, Inc. | Yahoo, Inc. Attn: Mike Simon 14010 FNB Parkway Omaha, NE 68154 Tel: 207-272-7213 mjsimon@yahoo-inc.com | Trade Payable | | | | $545,209.34 |
| 2 | Taboola, Inc. | Taboola, Inc. 28 West 23Rd Street New York, NY 10010 | Trade Payable | | | | $411,754.97 |
| 3 | Facebook | Facebook Attn: Colin S. Stretch 1601 Willow Road Mento Park, CA 94025 Tel: 650-618-7714 Fax: 302-636-5454 info@facebook.com | Trade Payable | | | | $295,000.00 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 4 | Don Morrison | Attn: Don Morrison 30768 Sudbury Court Farmington Hills, MI 48331 | Severance | | | | $217,000.00 |
| 5 | Amazon Web Services, Inc. | Amazon Web Services, Inc. Attn: Adam Perkins 410 Terry Ave. North Seattle, WA 98109 Tel: 206-413-4527 adperkins@amazon.com | Trade Payable | | | | $200,000.00 |
| 6 | Interior Investments Of St. Louis | Interior Investments Of St. Louis Attn: Elizabeth Zucker 9 Sunnen Dr. Suite 100 St. Louis, MO 63143 Tel: 314-300-5930 Fax: 314-644-5007 ezucker@interiorinvestments.com | Trade Payable | | | | $123,299.14 |
| 7 | Wescomm Technologies, Inc. | Wescomm Technologies, Inc. Attn: Wesley Kasperski 15091 Champaign Road Allen Park, MI 48101 Tel: 888-793-7266 info@wescommtech.com | Trade Payable | | | | $115,150.99 |
| 8 | American Express | American Express P.O. Box 360001 Ft. Lauderdale, FL 33336 Tel: 800-528-4800 | Trade Payable | | | | $112,173.86 |
| 9 | Silicon Valley Bank | Silicon Valley Bank Attn: Michael Zuckert 260 North Charles Linberg Dr. Salt Lake City, UT 84116 | Trade Payable | | | | $111,327.57 |

| | Name of creditor and complete mailing address, including zipcode | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 10 | Comscore Networks Inc. | Comscore Networks Inc. 14140 Collections Center Drive Chicago, IL 10018 | Trade Payable | | | | $109,438.98 |
| 11 | Seduka | Seduka 462 Seventh Avenue New York, NY 10018 Tel: 212-719-5500 | Security Deposit | | | | $104,000.00 |
| 12 | Techmarq Consultancy | Techmarq Consultancy BvReduitlaan 33Breda, Netherlands 4814DCTel: +31(0) 76 7630831 info@techmarq.eu | Trade Payable | | | | $100,000.00 |
| 13 | Magnet4 | Magnet4 1806 Woodfield Rd Martinsville, NJ 08836 | Trade Payable | | | | $91,825.00 |
| 14 | XO Communications | XO Communications Attn: Navid Haghighi 13865 Sunrise Valley Dr. Herndon, VA 20171 Tel: 703- 547-2000 | Trade Payable | | | | $91,043.58 |
| 15 | Cushman And Wakefield | Cushman And Wakefield 55 Westport Plaza, Ste 600 St. Louis, MO 63146 | Trade Payable | | | | $80,888.84 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If the claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 16 | Jinlin Wang | Attn: Jinlin Wang 30 Maynard Way Los Altos, CA 94022 Tel: 650-996-7318 jinlin.wang@gmail.com | Severance | | | | $77,511.31 |
| 17 | Suntrust Bank | Suntrust Bank Attn: Raymond D. Fortin 245 Peachtree Center Ave. Atlanta, GA 30303 Tel: 404-479-4936 Fax: 404-524-1085 | Trade Payable | | | | $66,740.32 |
| 18 | Moody's Investors Service, Inc | Moody's Investors Service, Inc Attn: Michel Madelain 7 World Trade Center 250 Greenwich Street Tel: 404-524-1085 | Trade Payable | | | | $65,000.00 |
| 19 | Intercontinental Capital Group | Intercontinental Capital Group 50 Jericho Quadrangle, Ste 210 Jericho, NY 11753 | Security Deposit | | | | $62,842.50 |
| 20 | Datapipe | Datapipe Attn: Bruce Katz P.O. Box 36477 Newark, NJ 07188 Tel: 877-773-3306 | Trade Payable | | | | $56,445.08 |
| 21 | Google, Inc. | Google, Inc. Attn: Bill Crawford & Kent Walker 1600 Amphitheatre Pkwy Mountain View, CA 94043 Tel: 650-253-0000 Fax: 302-636-5454 Billcrawford@Google.com | Trade Payable | | | | $55,000.00 |

| | Name of creditor and complete mailing address, including zipcode | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If the claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 22 | Oxford Property Management | Oxford Property Management 210 S. Fifth Avenue Ann Arbor, MI 48104 | Trade Payable | | | | $41,500.00 |
| 23 | Verascape, Inc. | Verascape, Inc. 155 W. Central Road Schaumburg, IL 60195 | Trade Payable | | | | $40,717.40 |
| 24 | Lucid Holdings, LLC | Lucid Holdings, LLC 365 Canal Street New Orleans, LA 70130 | Trade Payable | | | | $33,600.00 |
| 25 | Zarin Consulting, LLC | Zarin Consulting, LLC 20 Washington Terrace St. Louis, MO 63112 | Trade Payable | | | | $30,790.20 |
| 26 | Treats, Inc. | Treats, Inc. P.O. Box 14806 Tallahassee, FL 32317 | Trade Payable | | | | $21,000.00 |
| 27 | SB/LPC 7777 Bonhomme LLC | SB/LPC 7777 Bonhomme LLC Attn: P.O. Box 736 Bedford Park, IL 60499 | Trade Payable | | | | $15,200.58 |

| | Name of creditor and complete mailing address, including zipcode | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim. If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
|---|---|---|---|---|---|---|---|
| 28 | Adobe Systems, Inc. | Adobe Systems, Inc. 75 Remittance Drive, Suite 1025 Chicago, IL 60675 | Trade Payable | | | | $15,000.00 |
| 29 | Zoom Information Inc | Zoom Information Inc 307 Waverly Oaks Rd., Suite 405 Waltham, MA 02452 | Trade Payable | | | | $14,877.00 |
| 30 | Path to Scale LLC | Path to Scale LLC 1170 Alter Way Broomfield, CO 80020 | Trade Payable | | | | $14,400.00 |

## EXHIBIT D

### Consolidated List of the Holders of the Debtors' Five Largest Secured Claims

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following is a list of creditors holding the five largest secured claims against the Debtors, on a consolidated basis, as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| | Name of Creditor | Creditor Name, telephone number and complete mailing address, including zip code of employee, agents, or department of creditor familiar with claim who may be contacted | Amount of Claim | Collateral Description and Value |
|---|---|---|---|---|
| 1 | Credit Suisse AG, Cayman Islands Breanch | Kevin Johnson; 11 Madison Avenue, New York, NY 10010; 919-994-1618; kevin.johnson@credit-suisse.com | $358,815,000[17] | Substantially all assets |
| 2 | Wilmington Trust, National Association | Jeffery Rose; 50 South Sixth Street Suite 1290, Minneapolis, MN 55402; 612-217-5630; jrose@wilmingtontrust.com | $180,206,200[18] | Substantially all assets |
| 3 | Credit Suisse International | Kevin Johnson; 11 Madison Avenue, New York, NY 10010; 919-994-1618; kevin.johnson@credit-suisse.com | $5,163,000 | Substantially all assets |
| 4 | Bank of America, N.A. | Tony Liu; One Bryant Park, New York, NY 10036; 646-855-7101; tony.liu@baml.com | $2,190,000 | Substantially all assets |
| 5 | NFS Leasing, Inc. | David DePamphilis; 900 Cummings Center, Suite 226-U, Beverly, MA 01915; 978-564-3962; davidd@nfsleasing.com | $535,000 | Leased equipment |

---

[17]    Balance represents principal amount only.

[18]    Balance represents principal amount only.

## <u>EXHIBIT E</u>

### Summary of the Debtors' Assets and Liabilities

Pursuant to Local Bankruptcy Rule 1007-2(a)(6), the following are estimates of the Debtors' total assets and liabilities on a consolidated basis.  The following financial data is the latest available information and reflects the Debtors' financial condition, as consolidated with its affiliated Debtors and non-Debtors as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

| Assets and Liabilities | Amount |
|---|---|
| Total Assets (Book Value as of January 31, 2017) | $499,829,000 |
| Total Liabilities (Book Value as of January 31, 2017) | $614,194,000 |

## <u>EXHIBIT F</u>

### Summary of the Publicly Held Securities of the Debtors

Pursuant to Local Bankruptcy Rule 1007-2(a)(7), the following lists the number and classes of shares of stock, debentures, or other securities of the Debtors that are publicly held, and the number of holders thereof as of the Petition Date.

As of the Petition Date, the Debtors do not have any publicly held equity securities, debentures, or other securities.

## <u>EXHIBIT G</u>

### Summary of Debtors' Property Held by Third Parties

Pursuant to Local Rule 1007-2(a)(8), the following lists the Debtors' property, as of the Petition Date, that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.

Certain property of the Debtors is likely to be in the possession of various other persons, including maintenance providers, shippers, common carriers, materialmen, custodians, public officers, mortgagees, pledges, assignees of rents, secured creditors, or agents.  Through these arrangements, the Debtors' ownership interest is not affected.  In light of the movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting such property would be impractical.

## EXHIBIT H

**Summary of Debtors' Property From Which the Debtors' Operate Their Business**

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the location of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses as of the Petition Date.

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 11 Times Square, 11th Floor | New York | NY | United States of America | Leased |
| 6665 Delmar Boulevard, Suite 300 | St. Louis | MO | United States of America | Leased |
| 6677 Delmar Boulevard, Suite 250 | St. Louis | MO | United States of America | Leased |
| 6677 Delmar Boulevard, Suite 210 | St. Louis | MO | United States of America | Leased |
| 6677 Delmar Boulevard, Suite 300 | St. Louis | MO | United States of America | Leased |
| 900 Larkspur Landing Circle | Larkspur | CA | United States of America | Leased |
| 995 Market Street, Office 301 | San Francisco | CA | United States of America | Leased |
| 206-744 West Hastings Street | Vancouver | British Columbia | Canada | Leased |
| 1090 Homer Street, Suite 300[19] | Vancouver | British Columbia | Canada | Leased |
| 2500 Green Rd., Suite 400 | Ann Arbor | MI | United States of America | Leased |
| 1111 Chester Avenue, First Floor | Cleveland | OH | United States of America | Leased |

---

[19]    Temporary location.

## EXHIBIT I

**Location of the Debtors' Substantial Assets, Books and Records, and Nature and Location of Debtors' Assets Outside the United States**

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following provides the location of the Debtors' substantial assets, books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States as of the Petition Date.

| Debtors' Assets | Location |
| --- | --- |
| Books and records | 6665 Delmar Boulevard, Suite 3000, St. Louis, MO 63130 |
| Cash | United Kingdom |
| Cash | Israel |

## <u>EXHIBIT J</u>

### Summary of Legal Actions Against the Debtors

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), the following lists material actions and proceedings pending or threatened against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent as of the Petition Date.  This list reflects actions or proceedings considered material by the Debtors and, if necessary, will be supplemented in the corresponding schedules to be filed by the Debtors in these Chapter 11 Cases.

| Entity | Counterparty | Nature of the Claim | Status | Case No. | Court and Jurisdiction |
|--------|--------------|---------------------|--------|----------|------------------------|
| Answers Corp. | Kudelski SA | Patent Infringement | Threatened | N/A | N/A |

# EXHIBIT K

## Debtors' Senior Management

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who constitute the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their responsibilities and relevant experience as of the Petition Date.

| Name / Position | Relevant Experience / Responsibility | Tenure |
|---|---|---|
| Brian Mulligan<br><br>Chief Financial Officer<br><br>Answers Corporation | Brian is a global finance executive with expertise in building and leading highly effective teams.  He is an innovative leader and trusted business partner.  He excels at developing creative solutions to overcome complex challenges and consistently generates added value.    Brian comes to Answers most recently from Cengage Learning, a $2 billion entrepreneurial private equity owned education technology and services company.    Cengage had a complex and challenging capital structure with over $6 billion of debt.  Brian led the efforts to restructure the company's debt and place the business on a sound financial footing.  Brian has a strong foundation in all aspects of finance, with in-depth knowledge and experience in M&A, capital markets, cost reduction initiatives, debt restructurings and bankruptcy proceedings.    Prior to joining Cengage Learning, Brian had a long and successful career at two premier fast moving consumer goods companies – Kraft Foods and Philip Morris where he developed and honed his leadership and finance skills. | August 2016 |
| Justin P. Schmaltz<br><br>Chief Restructuring Officer<br><br>Answers Corporation and all of its domestic subsidiaries | Justin P. Schmaltz is a Managing Director with A&M and is based in Chicago, IL. For the past nine years at A&M, he has advised companies and creditors in distressed situations, including in-and-out of court restructurings and operational turnarounds. Mr. Schmaltz has worked with clients across a wide range of industries, including publishing, media, energy, mining, sports and entertainment, automotive parts manufacturing, retail, pharmaceuticals, banking, and financial services. He has advised several clients who have filed for chapter 11 bankruptcy protection, including Cengage Learning, The Tribune Company, Blockbuster, SandRidge Energy, Swift Energy, and Graceway Pharmaceuticals. Prior to joining A&M, Mr. Schmaltz spent over four years in the corporate and project workouts department of Prudential Capital Group. Mr. Schmaltz earned a bachelor's degree with concentrations in finance and accounting from The Wharton School at the University of Pennsylvania. He holds the Chartered Financial Analyst (CFA) designation and is a member of the CFA Society of Chicago, the American Bankruptcy Institute (ABI) and the Turnaround Management Association (TMA). | October 2016 |

| Name / Position | Relevant Experience / Responsibility | Tenure |
|---|---|---|
| Pete Daffern<br><br>Chief Executive Officer<br><br>ForeSee Results Inc. | Pete Daffern is the CEO of the ForeSee business.  Pete is a veteran enterprise software executive.  Prior to joining ForeSee, Pete served as (i) President of EMEA and vertical markets at NetSuite, (ii) the CEO of ClairMail prior to and during its acquisition by Monitise in 2012, and (iii) Chairman and CEO of Purisma (acquired by Dun & Bradstreet).  Pete has also held various leadership positions at Vitria Technology and Crystal Decisions, and serves as Chairman of the board at SynchHR.  Finally, Pete is also a board member at Amplience and ReeVoo as well as a Venture Partner for Octopus Ventures, and an Operating Partner for HG Capital. | August 2015 |
| Rich Dredge<br><br>Chief Executive Officer<br><br>Multiply Media | Rich Dredge is CEO of Multiply (Previously Answers.com), a digital media publishing platform which includes leading brands such as FashionBeans.com, HealthyWay.com, Answers.com.  Over his tenure at the company, Rich has served in the roles of Chief Operating Officer and Chief Revenue Officer.  Prior to joining Multiply, he was the Chief Architect for InterContinental Hotels Group's (IHG) $6 billion global sales channels, managing technology and operations for IHG's e-commerce, call center, and B2B platforms.  Rich has served on industry boards Open Travel Alliance and Hotel Technology Next Generation.  In 2000, Rich launched numerous Internet-based companies including an enterprise hosting firm, and has been deeply involved in internet commerce since 1995. | June 2007 |
| John Federman<br><br>Chief Executive Officer<br><br>Webcollage | John Federman is an online media and e-commerce executive with more than 25 years of experience driving revenue and profit through innovative media platforms designed to connect buyers and sellers.  Previous experience includes:  CEO of: Dailybreak, a consumer engagement platform; Searchandise Commerce, creators of paid search for retail sites (sold to RichRelevance); eStara, creators of the Click to Call technology powering the majority of the Internet Retailer 500 (ATG and then to Oracle); Dotomi, which introduced retargeting with personalized media to the marketplace (sold to ValueClick); and AdSmart.  He is a graduate of the University of Massachusetts and holds a Bachelor of Arts degree in Business and Art. | August 2015 |

## EXHIBIT L

**Debtors' Payroll for the 30 Day Period Following the Filing of the
Debtors' Chapter 11 Petitions**

      Pursuant to Local Rules 1007-2(b)(1)-(2)(A) and (C), the following provides, for the 30-day period following the Petition Date, the estimated amount of weekly payroll to the Debtors' employees (exclusive of officers, directors, and stockholders), the estimated amount paid and proposed to be paid to officers, stockholders, and directors, and the amount paid or proposed to be paid to financial and business consultants retained by Debtors.

| Payments | Payment Amount |
|---|---|
| Payments to employees (not including officers, directors, and stockholders) | $5,800,000 |
| Payments to officers, directors, and stockholders | $200,000 |
| Payments to financial and business consultants | $388,000 |

## EXHIBIT M

**Debtors' Estimated Cash Receipts and Disbursements for the Thirty (30) Day Period
Following the Filing of the Chapter 11 Petitions**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the Petition Date, the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| Type | Amount |
|------|--------|
| Cash Receipts | $12,362,300 |
| Cash Disbursements (excluding professional fees) | $10,230,700 |
| Net Cash Gain / (Loss) | $2,131,600 |
| Unpaid Obligations (excluding professional fees) | $4,830,300 |
| Unpaid Receivables | $9,350,000 |