James H.M. Sprayregen, P.C.
Jonathan S. Henes, P.C.
Christopher T. Greco
Anthony R. Grossi
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Melissa N. Koss
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ANSWERS HOLDINGS, INC., *et al.*,[1] | ) Case No. 17-10496 (SMB) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**NOTICE OF FILING PLAN SUPPLEMENT**

---

[1]    The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Answers Holdings, Inc. (4504); Answers Corporation (2855); Easy2 Technologies, Inc. (2839); ForeSee Results, Inc. (3125); ForeSee Session Replay, Inc. (2593); More Corn, LLC (6193); Multiply Media, LLC (8974); Redcan, LLC (7344); RSR Acquisition, LLC (2256); Upbolt, LLC (2839); and Webcollage Inc. (7771).  The location of Debtor Webcollage Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is:  11 Times Square, 11th Floor, New York, New York 10018.

**PLEASE TAKE NOTICE** that on March 28, 2017, the above-captioned debtors (collectively, the "Debtors") filed the *Plan Supplement for the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization for Answers Holdings, Inc. and Its Debtor Affiliates* (the "Plan Supplement"). The documents contained in the Plan Supplement are integral to, part of, and incorporated by reference into the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization for Answers Holdings, Inc. and Its Debtor Affiliates* [Docket No. 17] (as may be supplemented, amended, or otherwise modified from time to time, the "Plan")[2] and, if the Plan is confirmed, shall be approved.

**PLEASE TAKE FURTHER NOTICE** that the hearing to consider approval of the Disclosure Statement and confirmation of the Plan (the "Combined Hearing") will commence on **April 4, 2017, at 2:00 p.m. (prevailing Eastern Time)**, before the Honorable Stuart M. Bernstein, United States Bankruptcy Judge, in courtroom 723 of the United States Bankruptcy Court, located at One Bowling Green, New York, NY 10004. The Combined Hearing may be continued from time to time by the Court or the Debtors **without further notice** other than by such adjournment being announced in open court or by a notice of adjournment filed with the Court.

**PLEASE TAKE FURTHER NOTICE** that the deadline for filing objections to the Plan is **March 31, 2017, at 12:00 p.m. (prevailing Eastern Time)** (the "Plan Objection Deadline"), unless otherwise ordered by the Court or continued by a notice filed with the Court. Any objections to the approval of the Disclosure Statement, the Solicitation Procedures, or confirmation of the Plan must: (a) be in writing; (b) comply with the Bankruptcy Rules, the Local Bankruptcy Rules and other case management rules and orders of the Bankruptcy Court; (c) set forth the name of the objector, and the nature and amount of any claim or interest asserted by the objector against the estate or property of the Debtors; (d) state with particularity the legal and factual basis for such objection; and (e) be filed with the Court (contemporaneously with proof of service) and served upon the following parties so as to be **actually received** on or before the Plan Objection Deadline by: (i) the Debtors, 6665 Delmar Boulevard, Suite 3000, St. Louis, Missouri 63130, Attn.: Brian Mulligan, Chief Financial Officer and Treasurer; (ii) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.: Christopher T. Greco, Esq.; (iii) the Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014, Attn.: Richard Morrissey, Esq.; (iv) counsel to the First Lien Agent, Gibson, Dunn & Crutcher, 200 Park Avenue, New York, New York 10166, Attn.: David M. Feldman, Esq.; (v) counsel to the Ad Hoc First Lien Group, Jones Day, 250 Vesey Street, New York, New York 10281, Attn.: Scott J. Greenberg, Esq.; (vi) counsel to the Second Lien Agent, Alston & Bird LLP, Bank of America Plaza, 101 South Tryon Street, Suite 4000, Charlotte, North Carolina 28280, Attn.: Jason Solomon, Esq.; (vii) counsel to the Ad Hoc Second Lien Group, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, Bank of America Tower, New York, New York 10036, Attn.: David H. Botter, Esq.; (viii) counsel to the Sponsor Entities, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017,

---

[2]    Capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Plan.

Attn.: Elisha Graff, Esq.; and (ix) to the extent not listed herein those parties requesting notice pursuant to Bankruptcy Rule 2002.

**PLEASE TAKE FURTHER NOTICE** that the Plan Supplement includes the following documents, as may be modified, amended, or supplemented from time to time:

| | |
|---|---|
| **Exhibit A:** | First Lien Exit Credit Agreement |
| **Exhibit B:** | Second Lien Exit Credit Agreement |
| **Exhibit C:** | Exit L/C Facility Documents |
| **Exhibit D:** | New Organizational Documents |
| **Exhibit E:** | New Stockholders' Agreement |
| **Exhibit F:** | List of Retained Causes of Action |
| **Exhibit G:** | Identities of the Members of the New Board, the New OpCo Boards, and the Officers of the Reorganized Debtors |
| **Exhibit H:** | Warrant Agreement |
| **Exhibit I:** | Schedule of Rejected Executory Contracts and Unexpired Leases |
| **Exhibit J:** | Restructuring Transactions Exhibit |
| **Exhibit K:** | Summary Terms of Management Incentive Plans |

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to alter, amend, modify, or supplement any document in the Plan Supplement; *provided* that if any document in the Plan Supplement is altered, amended, modified or supplemented in any material respect prior to the hearing to consider confirmation of the Plan, the Debtors will file a blackline of such document with the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan, the Disclosure Statement, the Plan Supplement, as well as further information regarding the Chapter 11 Cases are available for inspection free of charge by visiting the website of Rust Consulting/Omni Bankruptcy at www.omnimgt.com/Answers or by calling (844) 580-9044.  You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

> ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION
> PROVISIONS, AND **SECTION 8.3 CONTAINS A THIRD-PARTY RELEASE**. THUS, YOU
> ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR
> RIGHTS MIGHT BE AFFECTED THEREUNDER.
>
> **THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY.
> IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN
> OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN
> ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.**

New York, New York             */s/ Christopher T. Greco*
Dated:  March 28, 2017         James H.M. Sprayregen, P.C.
                               Jonathan S. Henes, P.C.
                               Christopher T. Greco
                               Anthony R. Grossi
                               John T. Weber
                               **KIRKLAND & ELLIS LLP**
                               **KIRKLAND & ELLIS INTERNATIONAL LLP**
                               601 Lexington Avenue
                               New York, New York 10022
                               Telephone:    (212) 446-4800
                               Facsimile:    (212) 446-4900

                               *- and -*

                               Melissa N. Koss
                               **KIRKLAND & ELLIS LLP**
                               **KIRKLAND & ELLIS INTERNATIONAL LLP**
                               555 California Street
                               San Francisco, California 94104
                               Telephone:    (415) 439-1400
                               Facsimile:    (415) 439-1500

                               *Proposed Counsel to the Debtors
                               and Debtors in Possession*

James H.M. Sprayregen, P.C.
Jonathan S. Henes, P.C.
Christopher T. Greco
Anthony R. Grossi
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Melissa N. Koss
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ANSWERS HOLDINGS, INC., *et al.*,[1] | ) | Case No. 17-10496 (SMB) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**PLAN SUPPLEMENT FOR THE JOINT**
**PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION**
**FOR ANSWERS HOLDINGS, INC. AND ITS DEBTOR AFFILIATES**

---

[1]    The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Answers Holdings, Inc. (4504); Answers Corporation (2855); Easy2 Technologies, Inc. (2839); ForeSee Results, Inc. (3125); ForeSee Session Replay, Inc. (2593); More Corn, LLC (6193); Multiply Media, LLC (8974); Redcan, LLC (7344); RSR Acquisition, LLC (2256); Upbolt, LLC (2839); and Webcollage Inc. (7771). The location of Debtor Webcollage Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is: 11 Times Square, 11th Floor, New York, New York 10018.

**TABLE OF CONTENTS**

| **Exhibit** | **Description** |
|---|---|
| A | First Lien Exit Credit Agreement |
| B | Second Lien Exit Credit Agreement |
| C | Exit L/C Facility Documents |
| D | New Organizational Documents |
| E | New Stockholders' Agreement |
| F | List of Retained Causes of Action |
| G | Identities of the Members of the New Board, the New OpCo Boards, and the Officers of the Reorganized Debtors |
| H | Warrant Agreement |
| I | Schedule of Rejected Executory Contracts and Unexpired Leases |
| J | Restructuring Transactions Exhibit |
| K | Summary Terms of Management Incentive Plans |

**<u>Exhibit A</u>**

**First Lien Exit Credit Agreement**

Certain documents, or portions thereof, contained in this <u>Exhibit A</u> and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto. The Debtors reserve all rights, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

FIRST LIEN TERM LOAN AGREEMENT

Dated as of [      ], 2017

Among

ANSWERS HOLDINGS, INC., as Holdings,

[ANSWERS FINANCE, LLC], as the Borrower,

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,
as Administrative Agent and Collateral Agent,

and

THE OTHER LENDERS FROM TIME TO TIME PARTY HERETO

# TABLE OF CONTENTS

**Page**

Article I        Definitions and Accounting Terms ................................................................ 2

    Section 1.01    Defined Terms ........................................................... 2
    Section 1.02    Other Interpretive Provisions .................................... 46
    Section 1.03    Accounting Terms ....................................................... 47
    Section 1.04    Rounding ...................................................................... 47
    Section 1.05    References to Agreements, Laws, Etc ...................... 47
    Section 1.06    Times of Day ............................................................... 47
    Section 1.07    Timing of Payment or Performance ......................... 47
    Section 1.08    Currency Equivalents Generally .............................. 48
    Section 1.09    [Reserved] .................................................................... 48
    Section 1.10    Pro Forma and Other Calculations .......................... 48

Article II        The LOANS ................................................................................................ 50

    Section 2.01    The Loans ..................................................................... 50
    Section 2.02    Borrowings, Conversions and Continuations of Loans .......... 50
    Section 2.03    Letters of Credit .......................................................... 52
    Section 2.04    [Reserved] .................................................................... 55
    Section 2.05    Prepayments ................................................................ 55
    Section 2.06    Termination of Commitments .................................. 58
    Section 2.07    Repayment of Loans .................................................. 58
    Section 2.08    Interest .......................................................................... 59
    Section 2.09    Additional Payments ................................................. 59
    Section 2.10    Computation of Interest, Fees, and Other Payments .......... 60
    Section 2.11    Evidence of Indebtedness ......................................... 60
    Section 2.12    Payments Generally ................................................... 61
    Section 2.13    Sharing of Payments ................................................. 63
    Section 2.14    Defaulting Lenders ..................................................... 64

Article III        Taxes, Increased Costs Protection and Illegality ............................... 64

    Section 3.01    Taxes ............................................................................. 64
    Section 3.02    Illegality ....................................................................... 68
    Section 3.03    Inability to Determine Rates ..................................... 69
    Section 3.04    Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurocurrency Rate Loans ......... 69
    Section 3.05    Funding Losses ........................................................... 71
    Section 3.06    Matters Applicable to All Requests for Compensation .......... 71
    Section 3.07    Replacement of Lenders under Certain Circumstances ......... 72
    Section 3.08    Survival ......................................................................... 74

Article IV        Conditions Precedent to Credit Extensions ...................................... 74

    Section 4.01    Conditions Precedent to Effectiveness and the Closing Date ......... 74

# TABLE OF CONTENTS

(continued)

**Page**

Article V      Representations and Warranties..................................................... 77

    Section 5.01    Existence, Qualification and Power; Compliance with Laws.................. 77
    Section 5.02    Authorization; No Contravention ................................................. 77
    Section 5.03    Binding Effect.................................................................... 78
    Section 5.04    Financial Statements; No Material Adverse Effect ......................... 78
    Section 5.05    Litigation........................................................................ 79
    Section 5.06    Ownership of Property; Liens................................................. 79
    Section 5.07    Environmental Compliance ................................................... 79
    Section 5.08    Taxes............................................................................ 79
                        79
    Section 5.09    Compliance with ERISA and other Pension Laws; Labor Matters ......... 80
    Section 5.10    Subsidiaries; Equity Interests................................................. 80
    Section 5.11    Margin Regulations; Investment Company Act ........................... 81
    Section 5.12    Disclosure ...................................................................... 81
    Section 5.13    Intellectual Property; Licenses, Etc ......................................... 81
    Section 5.14    Solvency......................................................................... 82
    Section 5.15    Collateral Documents.......................................................... 82
    Section 5.16    Use of Proceeds................................................................. 82
    Section 5.17    Senior Indebtedness ........................................................... 82
    Section 5.18    Patriot Act ...................................................................... 82
    Section 5.19    FCPA............................................................................. 83
    Section 5.20    Sanctioned Persons ........................................................... 83

Article VI     Affirmative Covenants............................................................. 83

    Section 6.01    Financial Statements .......................................................... 83
    Section 6.02    Certificates; Other Information............................................... 84
    Section 6.03    Notices .......................................................................... 86
    Section 6.04    Maintenance of Existence..................................................... 86
    Section 6.05    Maintenance of Properties .................................................... 86
    Section 6.06    Maintenance of Insurance .................................................... 87
    Section 6.07    Compliance with Laws ........................................................ 87
    Section 6.08    Books and Records ............................................................ 87
    Section 6.09    Inspection Rights .............................................................. 87
    Section 6.10    Covenant to Guarantee Obligations and Give Security ................... 88
    Section 6.11    Use of Proceeds................................................................. 89
    Section 6.12    Further Assurances and Post-Closing Conditions.......................... 89
    Section 6.13    [Reserved] ...................................................................... 90
    Section 6.14    Payment of Taxes.............................................................. 90
    Section 6.15    Nature of Business ............................................................ 90
    Section 6.16    End of Fiscal Years; Fiscal Quarters ....................................... 90
    Section 6.17    Credit Ratings .................................................................. 91
    Section 6.18    Control Agreements; Cash Management ................................... 91

# TABLE OF CONTENTS

(continued)

**Page**

Article VII      Negative Covenants ........................................................................ 91

    Section 7.01     Liens............................................................................. 91
    Section 7.02     Investments ................................................................. 95
    Section 7.03     Indebtedness................................................................ 97
    Section 7.04     Fundamental Changes ................................................. 100
    Section 7.05     Dispositions................................................................. 101
    Section 7.06     Restricted Payments.................................................... 102
    Section 7.07     Transactions with Affiliates ....................................... 103
    Section 7.08     Prepayments, Etc., of Indebtedness ........................... 104
    Section 7.09     Financial Covenant ..................................................... 105
    Section 7.10     Passive Activity Covenants......................................... 105
    Section 7.11     Negative Pledge .......................................................... 107
    Section 7.12     Bank Accounts ............................................................ 108

Article VIII     Events of Default and Remedies....................................................... 109

    Section 8.01     Events of Default ........................................................ 109
    Section 8.02     Remedies Upon Event of Default ............................... 111
    Section 8.03     [Reserved].................................................................... 111
    Section 8.04     Application of Funds.................................................... 112
    Section 8.05     Permitted Holders' Right to Cure ............................... 112

Article IX      Administrative Agent and Other Agents........................................... 114

    Section 9.01     Appointment and Authorization of Agents............................ 114
    Section 9.02     Delegation of Duties ................................................... 115
    Section 9.03     Liability of Agents ...................................................... 115
    Section 9.04     Reliance by Agents ..................................................... 115
    Section 9.05     Notice of Default......................................................... 116
    Section 9.06     Credit Decision; Disclosure of Information by Agents ........ 116
    Section 9.07     Indemnification of Agents .......................................... 117
    Section 9.08     Agents in their Individual Capacities.......................... 117
    Section 9.09     Successor Agents ........................................................ 118
    Section 9.10     Administrative Agent May File Proofs of Claim.................... 118
    Section 9.11     Collateral and Guaranty Matters ................................ 119
    Section 9.12     No Fiduciary Relationship with Other Lenders .................... 119
    Section 9.13     Withholding Tax .......................................................... 119
    Section 9.14     Intercreditor Agreements ............................................ 120
    Section 9.15     Secured Hedge Agreements......................................... 120

Article X       Miscellaneous .................................................................................. 121

    Section 10.01    Amendments, Etc......................................................... 121
    Section 10.02    Notices and Other Communications; Facsimile Copies ...... 123
    Section 10.03    No Waiver; Cumulative Remedies .............................. 126

# TABLE OF CONTENTS
(continued)

**Page**

Section 10.04  Attorney Costs and Expenses.................................................................. 126
Section 10.05  Indemnification by the Borrower............................................................ 127
Section 10.06  Payments Set Aside................................................................................ 128
Section 10.07  Successors and Assigns.......................................................................... 129
Section 10.08  Confidentiality ....................................................................................... 133
Section 10.09  Setoff ...................................................................................................... 134
Section 10.10  Counterparts ........................................................................................... 135
Section 10.11  Integration .............................................................................................. 135
Section 10.12  Survival of Representations and Warranties........................................... 135
Section 10.13  Severability ............................................................................................ 135
Section 10.14  GOVERNING LAW............................................................................... 135
Section 10.15  WAIVER OF RIGHT TO TRIAL BY JURY...................................... 136
Section 10.16  Binding Effect........................................................................................ 136
Section 10.17  Judgment Currency ................................................................................ 137
Section 10.18  Lender Action ......................................................................................... 137
Section 10.19  USA PATRIOT Act................................................................................ 137
Section 10.20  Release of Collateral and Guarantee Obligations .................................. 137
Section 10.21  Conflicts with Other Loan Documents ................................................... 139

<u>SCHEDULES</u>

| | | |
|---|---|---|
| 1.01A | – | Certain Security Interests and Guarantees |
| 1.01D | – | Guarantors |
| 2.01 | – | Commitments |
| 2.03(a) | – | Existing Letters of Credit |
| 2.03(b) | – | L/C Participant Pro Rate Share |
| 5.11 | – | Subsidiaries |
| [6.12 | – | Post Closing] |
| 7.01(b) | – | Existing Liens |
| 7.03(c) | – | Existing Indebtedness |
| 7.07 | | Transactions with Affiliates |
| 7.11 | | Negative Pledge Clauses |
| 10.02 | – | Administrative Agent's Office, Certain Addresses for Notices |

<u>EXHIBITS</u>

Form of

| | | |
|---|---|---|
| A | – | Committed Loan Notice |
| B | – | Note |
| C | – | Compliance Certificate |
| D | – | Assignment and Assumption |
| E | – | Guaranty |
| F | – | Security Agreement |
| G | – | Intellectual Property Security Agreement |
| H | – | Officer's Certificate |
| I | – | US Tax Compliance Certificates |
| J | – | Subordinated Intercompany Note |
| K | – | Solvency Certificate |
| L | – | Mortgage |
| M | – | Junior Priority Intercreditor Agreement |
| N | – | Equal Priority Intercreditor Agreement |

## FIRST LIEN TERM LOAN AGREEMENT

     This FIRST LIEN TERM LOAN AGREEMENT is entered into as of [     ], 2017, among [ANSWERS FINANCE, LLC], a Delaware limited liability company ("Borrower"), ANSWERS HOLDINGS, INC., a Delaware corporation ("Holdings"), CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH ("CS"), as Administrative Agent, Collateral Agent and L/C Issuer, and each lender from time to time party hereto (collectively, the "Lenders" and, individually, a "Lender"; each as hereafter further defined).

## RECITALS

     WHEREAS, on March 3, 2017 (the "Petition Date"), Holdings, and Answers Corporation, a direct subsidiary of the Borrower (the "Pre-Petition Borrower") and each of the Guarantors (the "Debtors") commenced chapter 11 cases administratively consolidated as Chapter 11 Case No. 17-10496 (collectively, the "Chapter 11 Cases") by filing separate voluntary petitions for reorganization pursuant to chapter 11 of title 11 of the United States Code (such title, the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

     WHEREAS, prior to the Petition Date, financing was provided to the Pre-Petition Borrower pursuant to (i) that certain Credit Agreement dated as of October 3, 2014, among Holdings (as successor by merger to Clarity Merger Sub, Inc.), the Pre-Petition Borrower (as successor by merger to Clarity I, LLC., a Delaware limited liability company), the lenders party thereto and Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent (as amended, modified or supplemented through the Petition Date, the "Pre-Petition First Lien Credit Agreement") and (ii) that certain Second Lien Credit Agreement dated as of October 3, 2014, among Holdings (as successor by merger to Clarity Merger Sub, Inc.), the Pre-Petition Borrower (as successor by merger to Clarity I, LLC., a Delaware limited liability company), the lenders party thereto and Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent (as amended, modified or supplemented through the Petition Date, the "Pre-Petition Second Lien Credit Agreement");

     WHEREAS, the Pre-Petition Borrower and Holdings (each as a debtor and debtor in possession under Chapter 11 Cases) the lenders party thereto and Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent entered into a senior secured, super-priority term loan facility dated as of the Petition Date of up to $25,000,000 (the "DIP Credit Facility") in the aggregate principal amount and a letter of credit facility of $1,309,906.64 (the "DIP L/C Facility") in respect of existing letters of credit, to fund the working capital requirements, fees, costs and expenses of Holdings, the Pre-Petition Borrower and its Subsidiaries during the pendency of the Chapter 11 Cases, which DIP Credit Facility is being discharged on the Plan Effective Date (as defined herein);

     WHEREAS, on [April 4], 2017, the Bankruptcy Court entered the Confirmation Order (as defined herein);

     WHEREAS, in connection with the implementation and Consummation of the Plan of Reorganization (as defined herein), Holdings has agreed to issue, or to cause the

Borrower to issue, as applicable, the Loans and the Exit Commitment Equity (as defined in the Plan of Reorganization) on behalf of and as a contribution to the Pre-Petition Borrower in full satisfaction of the DIP Credit Facility, underlined provided that for administrative convenience only the Borrower may issue the Loans directly to the Lenders;

WHEREAS, in connection with the implementation and Consummation of the Plan of Reorganization (as defined herein), and subject to the terms and conditions set forth herein, in the other Loan Documents (as defined herein), in the Plan of Reorganization (including the Restructuring Transactions Exhibit) and in the Confirmation Order, the Lenders have agreed to enter into this Agreement and to provide a senior secured term loan to the Borrower on the date hereof to facilitate, in part, the effectiveness of the Plan of Reorganization; and

WHEREAS, upon the effectiveness of the Plan of Reorganization, (i) all DIP Credit Facility Obligations shall be converted into (and continue as) on a dollar-for-dollar basis Loans hereunder and each initial Lender shall be deemed to have made, in the aggregate, $[ ] of Loans (the "First Lien Term Facility"), (ii) the letters of credit existing under the DIP L/C Facility shall be deemed to be Existing Letters of Credit hereunder and (iii) an additional $[ ] consisting of converted First Lien Claims shall be converted into loans (the "Second Lien Term Facility") under the Second Lien Credit Agreement (as defined herein) in the amounts and manner set forth herein and in the Plan of Reorganization.

NOW, THEREFORE, in consideration of the premises, mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I

### DEFINITIONS AND ACCOUNTING TERMS

Section 1.01    Defined Terms. As used in this Agreement, the following terms shall have the meanings set forth below:

"Acquired EBITDA" means, with respect to any Acquired Entity or Business for any period, the amount for such period of Consolidated EBITDA of such Acquired Entity or Business (determined as if references to the Borrower and its Subsidiaries in the definition of the term "Consolidated EBITDA" were references to such Acquired Entity or Business and its subsidiaries that will become Subsidiaries), as determined on a consolidated basis for such Acquired Entity or Business in accordance with GAAP.

"Acquired Entity or Business" has the meaning specified in the definition of the term "Consolidated EBITDA."

"Adjusted Eurocurrency Rate" means, for any Interest Period with respect to any Eurocurrency Rate Loan, a rate per annum equal to the greater of (a) 1.00% and (b) the product of (i) the Eurocurrency Rate in effect for such Interest Period and (ii) the Statutory Reserves.

"Administrative Agent" means CS, in its capacity as administrative agent under the Loan Documents, or any successor administrative agent appointed in accordance with Section 9.09.

"Administrative Agent's Office" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by, or is under common Control with, the Person specified. "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Agent-Related Persons" means collectively, the Agents, together with their respective Affiliates, and the officers, directors, employees, agents, advisors and other representatives of such Persons and Affiliates. "Agent-Related Person" means any of such persons individually.

"Agents" means, collectively, the Administrative Agent and the Collateral Agent.

"Aggregate Commitments" means the Commitments of all the Lenders.

"Agreement" means this Credit Agreement.

"Agreement Currency" has the meaning specified in Section 10.17.

"Applicable Lending Office" means for any Lender, such Lender's office, branch or affiliate designated for Eurocurrency Rate Loans, Base Rate Loans, L/C Advances or Letters of Credit, as applicable, as notified to the Administrative Agent and the Borrower or as otherwise specified in the Assignment and Assumption pursuant to which such Lender became a party hereto, any of which offices may, subject to Section 3.01(e) and Section 3.02 be changed by such Lender upon ten (10) days' prior written notice to the Administrative Agent and the Borrower.

"Applicable Rate" means a percentage per annum equal to:

(a)    with respect to Loans, (i) for Loans that are Eurocurrency Rate Loans, 5.00% and (ii) for Loans that are Base Rate Loans, 4.00%.

(b)    with respect to Letter of Credit fees, 5.00% per annum.

"Approved Foreign Bank" has the meaning specified in the definition of "Cash Equivalents."

"Approved Fund" means any Person (other than a natural person) that is engaged or advises funds or other investment vehicles that are engaged in making, purchasing, holding or investing in commercial loans, bonds and similar extensions of credit or securities in the ordinary course of business and that is administered, advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages such Lender.

"Assignees" has the meaning specified in Section 10.07(b).

"Assignment and Assumption" means an Assignment and Assumption substantially in the form of Exhibit D or such other form as shall be reasonably acceptable to the Borrower and the Administrative Agent.

"Attorney Costs" means and includes all reasonable and documented or invoiced out-of-pocket fees, expenses and disbursements of attorneys engaged to advise in connection with this Agreement.

"Audited Financial Statements" means the audited consolidated balance sheets of Holdings and the Pre-Petition Borrower for the fiscal year ended December 31, 2016 and the related audited statements of income and cash flows of Holdings and the Pre-Petition Borrower for the fiscal year ended December 31, 2016.

"Available Amount" means, at any time (the "Available Amount Reference Time"), an amount equal at such time to (a) the sum (which shall not be less than zero) of, without duplication:

(i)     $25,000,000;

(ii)     the amount (which amount shall not be less than zero) equal to 50% of the Cumulative Consolidated Net Income of the Borrower and the Subsidiaries;

(iii)     to the extent not already included in the calculation of Consolidated Net Income, the aggregate amount of all dividends, returns, interest, profits, distributions, income and similar amounts (in each case, to the extent received in cash or Cash Equivalents (valued at the Fair Market Value of such Cash Equivalents at the time received)) received by the Borrower or any Subsidiary from any Investment to the extent such Investment was made by using the Available Amount during the period from and including the Business Day immediately following the Closing Date through and including the Available Amount Reference Time (other than the portion of any such dividends and other distributions that is used by the Borrower or any Subsidiary to pay taxes); and

(iv)     to the extent not already included in the calculation of Consolidated Net Income, the aggregate amount of all repayments made in cash or Cash Equivalents (valued at the Fair Market Value of such Cash Equivalents at the time received) of principal received by the Borrower or any Subsidiary from any Investment to the extent such Investment was made by using the Available Amount during the period, from and including the Business Day immediately following the Closing Date through and including the Available Amount Reference Time in respect of loans made by the Borrower or any Subsidiary and that constituted Investments;

minus (b) the sum of, without duplication and without taking into account the proposed portion of the amount calculated above to be used at the applicable Available Amount Reference Time:

4

(i)        the aggregate amount of any Investments made by the Borrower or any Subsidiary using the Available Amount pursuant to Section 7.02(p) after the Closing Date and prior to the Available Amount Reference Time; and

(ii)       the aggregate amount of any Restricted Payments made by the Borrower using the Available Amount pursuant to Section 7.06(f) after the Closing Date and prior to the Available Amount Reference Time.

"Available Amount Reference Time" has the meaning specified in the definition of the term "Available Amount".

"Bankruptcy Code" has the meaning assigned to such term in the recitals.

"Bankruptcy Court" has the meaning assigned to such term in the recitals.

"Base Rate" means a fluctuating interest rate per annum in effect from time to time, which rate per annum shall at all times be equal to the highest of:

(a)        the Prime Rate in effect on such day;

(b)        ½ of 1% per annum above the Federal Funds Rate in effect on such day; and

(c)        the Eurocurrency Rate for an Interest Period of one (1) month on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1%; provided that for the avoidance of doubt, for purposes of calculating the Eurocurrency Rate pursuant to this clause (c), the Eurocurrency Rate for any day shall be the rate per annum determined on such day at approximately 11:00 a.m. (London time) by reference to the ICE Benchmark Administration Interest Settlement Rates (or the successor thereto if the ICE Benchmark Administration is no longer making a Eurocurrency Rate available) for deposits in Dollars (as set forth by any service selected by the Administrative Agent that has been nominated by the ICE Benchmark Administration (or successor thereto if the ICE Benchmark Administration is no longer making a Eurocurrency Rate available) as an authorized vendor for the purposes of displaying such rates).  Any change in such rate due to a change in the Prime Rate, the Federal Funds Rate or the Eurocurrency Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Eurocurrency Rate, as the case may be.

Notwithstanding any provision to the contrary in this Agreement, the applicable Base Rate in respect of Loans shall at no time be less than 2.00% per annum.

"Base Rate Loan" means a Loan that bears interest at a rate based on the Base Rate.

"Basel III" means, collectively, those certain agreements on capital requirements, leverage ratios and liquidity standards contained in "Basel III: A Global Regulatory Framework for More Resilient Banks and Banking Systems," "Basel III:  International Framework for Liquidity Risk Measurement, Standards and Monitoring," and "Guidance for National

5

Authorities Operating the Countercyclical Capital Buffer," each as published by the Basel Committee on Banking Supervision in December 2010 (as revised from time to time).

"Board of Directors" means, with respect to any Person, (a) in the case of any corporation, the board of directors of such Person or any committee thereof duly authorized to act on behalf of such board, (b) in the case of any limited liability company, the board of managers or board of directors of such Person, (c) in the case of any partnership, the board of directors or board of managers of a general partner of such Person and (d) in any other case, the functional equivalent of the foregoing.

"Borrower" has the meaning specified in the introductory paragraph to this Agreement.

"Borrower Materials" has the meaning specified in Section 10.02(b)(i).

"Borrowing" means the Incurrence of Converted Loans on the Closing Date (or resulting from conversions on a given date after the Closing Date) having, in the case of Eurocurrency Loans, the same Interest Period or (b) the Incurrence of Loans on a given date (or resulting from conversions on a given date) having, in the case of Eurocurrency Loans, the same Interest Period.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, New York City; provided that if such day relates to any interest rate settings as to a Eurocurrency Rate Loan, any fundings, disbursements, settlements and payments in respect of any such Eurocurrency Rate Loan, or any other dealings in Dollars to be carried out pursuant to this Agreement in respect of any such Eurocurrency Rate Loan, Business Day also means any such day on which dealings in deposits in Dollars are conducted by and between banks in the London interbank eurocurrency market.

"Capitalized Lease Obligation" means, at the time any determination thereof is to be made, the amount of the liability in respect of a Capitalized Lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) prepared in accordance with GAAP.

"Capitalized Leases" means, as applied to any Person, all leases of property that have been or are required to be, in accordance with GAAP, recorded as capitalized leases of such Person.

"Capitalized Research and Development Costs" means research and development costs that have been, or are required to be, in accordance with GAAP, capitalized.

"Capitalized Software Expenditures" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by the Borrower and its Subsidiaries during such period in respect of purchased software or internally developed software and software enhancements that, in conformity with GAAP, are, or are required to be, reflected as capitalized costs on the consolidated balance sheet of the Borrower and its Subsidiaries.

NAI-1502411964v15

"Cash Equivalents" means any of the following types of Investments, to the extent owned by the Borrower or any Subsidiary:

(1)      (i) Dollars and (ii) with respect to any Foreign Subsidiaries, other currencies held by such Foreign Subsidiary in the ordinary course of business;

(2)      securities issued or directly and fully and unconditionally guaranteed or insured by the United States government or any agency or instrumentality of the foregoing the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 12 months or less from the date of acquisition;

(3)      certificates of deposit, bankers' acceptances, time deposits and eurocurrency time deposits with maturities of 12 months or less from the date of acquisition, with any United States or foreign commercial bank having capital and surplus of not less than $500,000,000 in the case of U.S. banks and $100,000,000 (or the equivalent in any local currency as of the date of determination) in the case of non-U.S. banks;

(4)      repurchase agreements with a term of not more than 30 days for underlying securities of the types described in clauses (2), (3) and (7) of this definition entered into with any financial institution meeting the qualifications specified in clause (3) above;

(5)      commercial paper or any variable or fixed rate note rated at least "P-2" by Moody's or at least "A-2" by S&P, and in each case maturing within 12 months after the date of creation thereof and Indebtedness or preferred stock issued by Persons with an Investment Grade Rating from Moody's or S&P (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower), with maturities of 12 months or less from the date of acquisition;

(6)      marketable short-term money market and similar securities having either (a) a rating of at least "P-2" or "A-2" from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower) or (b) having assets in excess of $1,000,000,000;

(7)      readily marketable direct obligations issued by any state, commonwealth, province or territory of the United States or any political subdivision or taxing authority thereof having an Investment Grade Rating from Moody's or S&P (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower);

(8)      readily marketable direct obligations issued by any foreign government or any political subdivision or public instrumentality thereof, in each case having an Investment Grade Rating from Moody's or S&P with maturities of 24 months or less from the date of acquisition (or, if at any time neither Moody's nor S&P shall be rating

7

such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower);

(9)    Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated within the top three ratings category by S&P or Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower);

(10)    with respect to any Foreign Subsidiary: (i) obligations of the national government of the country in which such Foreign Subsidiary maintains its chief executive office and principal place of business; <u>provided</u> that such country is a member of the Organization for Economic Cooperation and Development, in each case maturing within one year after the date of investment therein, (ii) certificates of deposit of, bankers acceptances of, or time deposits with, any commercial bank which is organized and existing under the laws of the country in which such Foreign Subsidiary maintains its chief executive office and principal place of business; <u>provided</u> such country is a member of the Organization for Economic Cooperation and Development, and whose short-term commercial paper rating from S&P is at least "A-2" or the equivalent thereof or from Moody's is at least "P-2" or the equivalent thereof (any such bank being an "<u>Approved Foreign Bank</u>"), and in each case with maturities of not more than 24 months from the date of acquisition and (iii) the equivalent of demand deposit accounts which are maintained with an Approved Foreign Bank;

(11)    in the case of investments by any Foreign Subsidiary, Cash Equivalents shall also include (i) investments of the type and maturity described in <u>clauses (1)</u> through <u>(10)</u> above of foreign obligors, which investments or obligors (or the parents of such obligors) have ratings, described in such clauses or equivalent ratings from comparable foreign rating agencies and (ii) other short-term investments utilized by Foreign Subsidiaries in accordance with normal investment practices for cash management in investments analogous to the foregoing investments described in <u>clauses (1)</u> through <u>(10)</u> of this paragraph.

(12)    investment funds investing 90% of their assets in securities of the types described in clauses (1) through (11) above.

"<u>Casualty Event</u>" means any event that gives rise to the receipt by the Borrower or any Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"<u>CFC</u>" means a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"<u>Change in Law</u>" means the occurrence, after the Closing Date, of any of the following: (a) the adoption of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration or interpretation thereof by any Governmental

Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) Basel III and all requests, rules, guidelines or directives thereunder or issued in connection therewith, shall, in each case, be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means the earlier to occur of:

(a)      any Person, entity or "group" (within the meaning of Section 13(d) or 14(d) of the Exchange Act, but excluding any employee benefit plan of such Person, entity or "group" and their respective Subsidiaries and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), other than the Permitted Holders (or any Parent Entity of Holdings owned directly or indirectly by the Permitted Holders), shall at any time have acquired direct or indirect beneficial ownership (as defined in SEC Rules 13(d)-3 and 13(d)-5 under the Exchange Act) of Equity Interests having the power to vote or direct the voting of such Equity Interests for the election of directors of Holdings having a majority of the ordinary voting power for the election of members of the Board of Directors of Holdings;

(b)      at any time Continuing Directors shall not constitute at least a majority of the Board of Directors of Holdings; and/or

(c)      the occurrence of a "Change of Control" (or similar event, however denominated), as defined in the Second Lien Credit Agreement (or any documentation governing any Permitted Refinancing Indebtedness in respect of any Refinancing thereof) or the documentation governing any other First Lien Obligations;

provided that, (i) at any time when at least a majority of the outstanding Voting Stock of Holdings is directly or indirectly owned by a Parent Entity, all references in clause (a) of this definition to "Holdings" (other than in this proviso) shall be deemed to refer to the ultimate Parent Entity that directly or indirectly owns such Voting Stock and (ii) for the purposes of clause (a) of this definition, the members of any Permitted Holder Group will be treated as individual "persons", and not as a "group".

"Chapter 11 Cases" has the meaning assigned to such term in the recitals.

"Closing Date" means the date on which the conditions precedent in Section 4.01 have been satisfied and the initial Borrowing is made.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Collateral" means any and all assets, whether real or personal, tangible or intangible, on which Liens are purported to be granted pursuant to the Collateral Documents as security for the Obligations.

"Collateral Agent" means CS, in its capacity as collateral agent under any of the Loan Documents, or any successor collateral agent appointed in accordance with Section 9.09.

"Collateral and Guarantee Requirement" means, at any time, the requirement that:

(a)    the Collateral Agent shall have received each Collateral Document required to be delivered on the Closing Date pursuant to Section 4.01(a)(ii) or, after the Closing Date, pursuant to Section 6.10 or Section 6.12 at such time required by such Collateral Documents or such section to be delivered in each case, duly executed by each Loan Party thereto;

(b)    all Obligations shall have been unconditionally guaranteed (the "Guarantees") by Holdings and each Subsidiary (other than any Excluded Subsidiary) and, other than in the case of Obligations incurred directly by it, the Borrower, including as of the Closing Date those that are listed on Schedule 1.01D (each, a "Guarantor");

(c)    the Obligations shall have been secured pursuant to the Security Agreement by a security interest in (i) all the Equity Interests of the Borrower and (ii) all Equity Interests (other than Excluded Equity Interests) held directly by the Borrower or any Guarantor in any Subsidiary (subject to any limitations on pledging such Equity Interests as set forth herein);

(d)    except to the extent otherwise provided hereunder or under any Collateral Document, the Obligations shall have been secured by a security interest on substantially all tangible and intangible assets of Holdings, the Borrower and each other Guarantor (including, without limitation, accounts receivable, inventory, equipment, investment property, intellectual property, other general intangibles, real property (limited to owned real property unless the Majority Lenders request security interests in leasehold interests) and proceeds of the foregoing), in each case, with the priority required by the Collateral Documents and, (i) when all appropriate filings or recordings are made in the appropriate offices as may be required under applicable Laws (which filings or recordings shall be made to the extent required by any Collateral Document) and (ii) upon the taking of possession or control by the Collateral Agent of such Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Collateral Agent to the extent required by any Collateral Document), such Collateral Document will constitute fully perfected Liens on, and security interests in, all right, title and interest of the Loan Parties in such Collateral;

(e)    none of the Collateral shall be subject to any Liens other than Liens permitted by Section 7.01;

(f)    the Collateral Agent shall have received (i) counterparts of a Mortgage with respect to each Material Real Property required to be delivered pursuant to Section 4.01(a)(ii) (if applicable), Section 6.10 and Section 6.12 (the "Mortgaged Properties") duly executed and delivered by the record owner of such property, (ii) a title insurance policy for such property or the equivalent or other form (if applicable) available in each applicable jurisdiction (the "Mortgage Policies") insuring the Lien of each such Mortgage as a valid Lien on the

10

property described therein, free of any other Liens except as expressly permitted by <u>Section 7.01</u>, together with such endorsements, coinsurance and reinsurance as the Collateral Agent may reasonably request, (iii) such existing surveys, existing abstracts, existing appraisals, legal opinions and other documents as the Collateral Agent may reasonably request with respect to any such Mortgaged Property and (iv) to the extent reasonably requested by the Administrative Agent, a completed "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination, and if any improvements on such Mortgaged Property are located in a special flood hazard area, (i) a notice about special flood hazard area status and flood disaster assistance duly executed by the applicable Loan Parties and (ii) certificates of insurance evidencing the insurance required by <u>Section 6.06</u> in form and substance reasonably satisfactory to the Administrative Agent;

        (g)      to the extent required by the Security Agreement, the Collateral Agent shall have received a Control Agreement satisfactory to the Collateral Agent with respect to each Deposit Account, Securities Account or Commodities Account (each as defined in the Guarantee and Collateral Agreement) of Holdings and its Subsidiaries that is maintained with a Person other than the Collateral Agent; and

        (h)      (i) except with respect to intercompany Indebtedness, if any Indebtedness for borrowed money in a principal amount in excess of $500,000 (individually) is owing to any Loan Party and such Indebtedness is evidenced by a promissory note, the Collateral Agent shall have received such promissory note, together with undated instruments of transfer with respect thereto endorsed in blank and (ii) with respect to intercompany Indebtedness, all Indebtedness of the Borrower and each of its Subsidiaries that is owing to any Loan Party (or Person required to become a Loan Party) shall be evidenced by the Subordinated Intercompany Note, and the Collateral Agent shall have received such Subordinated Intercompany Note duly executed by the Borrower, each such Subsidiary and each such other Loan Party, together with undated instruments of transfer with respect thereto endorsed in blank.

        The foregoing definition shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance or surveys with respect to, particular assets if and for so long as the Collateral Agent and the Borrower agree in writing that the cost of creating or perfecting such pledges or security interests in such assets or obtaining title insurance or surveys in respect of such assets shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom.

        The Collateral Agent may grant extensions of time for the provision or perfection of security interests in, or the obtaining of title insurance and surveys with respect to, particular assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Loan Parties on such date) where it reasonably determines, in consultation with the Borrower, that provision or perfection cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

        Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary, (a) with respect to leases of real property entered into by any Loan Party, such Loan Party shall not be required to take any action

to deliver landlord lien waivers, estoppels and collateral access letters), (b) Liens required to be granted from time to time pursuant to the Collateral and Guarantee Requirement shall be subject to exceptions and limitations set forth in the Collateral Documents and, to the extent appropriate in the applicable jurisdiction, as agreed between the Collateral Agent and the Borrower, (c) the Collateral and Guarantee Requirement shall not apply to any of the following assets: (i) any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest in any such licenses, franchise, charter or authorization would be prohibited or restricted thereby (including any legally effective prohibition or restriction), (ii) assets and personal property for which a pledge thereof or a security interest therein is prohibited by applicable Laws (including any legally effective requirement to obtain the consent of any Governmental Authority), (iii) any intent-to-use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, (iv) Excluded Equity Interests, (v) any contract, instrument, document, lease, license or other agreement to which a Loan Party or any of their property (including personal property) is subject with any Person on the Closing Date (in each case, to the extent not entered into in contemplation hereof) if, to the extent and for so long as the grant of a Lien thereon to secure the Obligations constitutes a breach of or a default under, or creates a right of termination in favor of any party (other than any Loan Party) to, such lease, license or other agreement (but only to the extent any of the foregoing is not rendered ineffective by, or is otherwise unenforceable under, the UCC or any applicable Law) and (vi) any lease, license, contract, instrument or other agreements or any property (including personal property) subject to a purchase money security interest, Capitalized Lease Obligation or similar arrangements, in each case to the extent permitted under the Loan Documents, to the extent that a pledge thereof or a security interest therein would violate or invalidate such lease, license, contract, instrument or agreement, purchase money, Capitalized Lease or similar arrangement, or create a right of termination in favor of any other party thereto (other than a Borrower or a Guarantor) after giving effect to the applicable anti-assignment clauses of the Uniform Commercial Code and applicable Laws, other than the proceeds and receivables thereof the assignment of which is expressly deemed effective under applicable Laws notwithstanding such prohibition (the assets excluded pursuant to this <u>clause (c)</u>, collectively, the "<u>Excluded Assets</u>"), (d) no perfection actions shall be required with respect to (i) motor vehicles and other assets and personal property subject to certificates of title and letter of credit rights, except to the extent constituting a supporting obligation for other Collateral as to which perfection is accomplished by the filing of a UCC financing statement or equivalent (it being understood that no actions shall be required to perfect a security interest in letter of credit rights, other than the filing of a UCC financing statement or equivalent) and (ii) commercial tort claims with an individual value of less than $500,000; and (e) no actions in any non-U.S. jurisdictions or required by the Laws of any non-U.S. jurisdictions shall be required to be taken to create any security interests in assets located or titled outside of the U.S. or to perfect or make enforceable any security interests in any assets (it being understood that there shall be no Collateral Document (or other security agreements or pledge agreements) governed under the laws of any non-U.S. jurisdiction).

"<u>Collateral Documents</u>" means, collectively, the Security Agreement, the Intellectual Property Security Agreements, the Mortgages, each Control Agreement, each of the mortgages, collateral assignments, Security Agreement Supplements, Intellectual Property Agreement Supplements, security agreements, pledge agreements or other similar agreements delivered to the Collateral Agent and the Lenders pursuant to <u>Section 4.01(a)(ii)</u>, <u>Section 6.10</u> or

Section 6.12 and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties.

"Commitment" means, with respect to each Lender or L/C Participant, the commitment, if any, of such Lender to make (or convert loans under the DIP Credit Facility into) Loans hereunder (or, with respect to participant in letters of credit under the DIP Credit Facility, to convert its DIP Credit Facility letter of credit obligation into Loans) on the Closing Date, expressed as an amount representing the maximum principal amount of Loans to be made by such Lender hereunder on the Closing Date or in the aggregate, as the context may require, as such commitment may be (a) reduced upon the making of Loans pursuant to Section 2.01, and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption.  The amount of each Lender's Commitment, in the aggregate, as of the Closing Date is set forth on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender shall have assumed its Commitment, as the case may be.  The aggregate principal amount of the Commitments hereunder as of the Closing Date is $[26,309,906.64].

"Committed Loan Notice" means a notice of (a) a Borrowing, (b) a conversion of Loans from one Type to the other, or (c) a continuation of Eurocurrency Rate Loans pursuant to Section 2.02(a), which, if in writing, shall be substantially in the form of Exhibit A (or such other form as shall be reasonably acceptable to the Borrower and the Administrative Agent).

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compensation Period" has the meaning specified in Section 2.12(c)(ii).

"Compliance Certificate" means a certificate substantially in the form of Exhibit C.

"Confirmation Order" means an order of the Bankruptcy Court, in form and substance acceptable to the Administrative Agent and the Lenders, to the extent such approvals are required pursuant to the Restructuring Support Agreement, confirming the Plan of Reorganization.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Depreciation and Amortization Expense" means, with respect to the Borrower and its Subsidiaries for any period, the total amount of depreciation and amortization expense, including the amortization of deferred financing fees or costs, Capitalized Software Expenditures and the amortization of original issue discount resulting from the issuance of Indebtedness at less than par, of the Borrower and its Subsidiaries for such period on a consolidated basis and otherwise as determined in accordance with GAAP.

"Consolidated EBITDA" means, the Consolidated Net Income of the Borrower and its Subsidiaries for such period, plus:

13

(a)    without duplication and to the extent already deducted (and not added back or excluded) or, in the case of clauses (viii) and (xiii), to the extent not included, in arriving at such Consolidated Net Income, the sum of the following amounts for such period:

(i)    provision for taxes based on income, revenues, profits or capital, including federal, foreign, state, franchise and similar taxes and foreign withholding taxes of such Person paid or accrued during such period (including in respect of repatriated funds and any penalties and interest related to such taxes or arising from any tax examinations); plus

(ii)    total interest expense and, to the extent not reflected in such total interest expense, any losses on Hedging Obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such Hedging Obligations or such derivative instruments, bank and letter of credit fees, amortization of deferred financing fees or costs and costs of surety bonds in connection with financing activities), plus

(iii)    Consolidated Depreciation and Amortization Expense for such; plus

(iv)    any expenses, fees, charges or losses (other than Consolidated Depreciation and Amortization Expense) related to any Investment, acquisition, Disposition, conveyance, Refinancing or recapitalization, in each case, permitted hereunder or the Incurrence of Indebtedness permitted to be Incurred hereunder (in each case, including any such transaction consummated prior to the Closing Date and any such transaction undertaken but not completed and/or not successful), including (A) fees, expenses or charges related to the Loan Documents and the Second Lien Credit Documents, (B) in fiscal year ending 2017, such fees, expenses or charges related to the Transactions and the Chapter 11 Cases in aggregate not to exceed $30,000,000 and (C) any amendment or other modification of the Loans or the Second Lien Loans; plus

(v)    any other non-cash charges, write-downs, write-offs, expenses, losses or items, including any impairment charges or the impact of purchase accounting or fresh start accounting, (excluding any such non-cash charge, write-off, write-down or item to the extent it represents an accrual or reserve for a cash expenditure for a future period) or other items classified by the Borrower as special items, operational restructuring expenses or reorganization items less other non-cash items of income increasing Consolidated Net Income (excluding any such non-cash item of income to the extent it represents a receipt of cash in any future period); plus

(vi)    any costs or expense incurred pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or shareholder agreement, to the extent that such cost or expenses are funded with cash proceeds contributed to the capital of

14

the Borrower or Net Proceeds of an issuance of Equity Interests of the Borrower (or Holdings) (other than Disqualified Equity Interests or any Cure Amount); plus

(vii)    cash receipts (or any netting arrangements resulting in reduced cash expenditures) not representing Consolidated EBITDA in any period to the extent non-cash gains relating to such income were deducted in the calculation of Consolidated EBITDA pursuant to paragraph (b) below for any previous period and not added back; plus

(viii)    (i) any expenses and charges that are reimbursed by indemnification or other reimbursement provisions in connection with any investment or any sale, conveyance, transfer or other Disposition of assets permitted hereunder and (ii) to the extent covered by insurance and actually reimbursed; plus

(ix)    the increase, if any, in the deferred revenue balance between the beginning and the ending of the Test Period; minus

(b)    without duplication, and to the extent included in arriving at Consolidated Net Income in such period:

(i)    non-cash gains increasing Consolidated Net Income of such Person for such period, excluding any non-cash gains to the extent they represent the reversal of an accrual or reserve for a potential cash item that reduced Consolidated EBITDA in the LTM Period and any non-cash gains with respect to cash actually received in the LTM Period so long as such cash did not increase Consolidated EBITDA in such prior period; plus

(ii)    realized foreign exchange income or gains resulting from the impact of foreign currency changes on the valuation of assets or liabilities on the balance sheet of the Borrower and its Subsidiaries; plus

(iii)    any non-cash gains attributable to the mark-to-market movement in the valuation of Hedging Obligations (to the extent the cash impact resulting from such gain has not been realized) or other derivative instruments pursuant to Accounting Standards Codification 815; plus

(iv)    the decrease, if any, in the deferred revenue balance between the beginning and the ending of the Test Period; and

in each case, as determined on a consolidated basis for the Borrower and its Subsidiaries in accordance with GAAP.

There shall be included in determining Consolidated EBITDA for any period, without duplication, the Acquired EBITDA of any Person, property, business or asset acquired by the Borrower or any Subsidiary during such period (but not the Acquired EBITDA of any related Person, property, business or assets to the extent not so acquired), to the extent not subsequently sold, transferred or otherwise Disposed of by the Borrower or such Subsidiary

15

during such period (each such Person, property, business or asset acquired (including pursuant to (i) a transaction consummated prior to the Closing Date and (ii) a Permitted Acquisition (or similar Investment)) and not subsequently so Disposed of, an "Acquired Entity or Business") based on the actual Acquired EBITDA of such Acquired Entity or Business for such period (including the portion thereof occurring prior to such acquisition) determined on a historical pro forma basis. There shall be excluded in determining Consolidated EBITDA for any period the Disposed EBITDA of any Person, property, business or asset  sold, transferred or otherwise Disposed of, closed or classified as discontinued operations by the Borrower or any Subsidiary during such period (each such Person, property, business or asset so sold or Disposed of, a "Sold Entity or Business") based on the actual Disposed EBITDA of such Sold Entity or Business for such period (including the portion thereof occurring prior to such sale, transfer or Disposition) determined on a historical pro forma basis; provided that for the avoidance of doubt, notwithstanding any classification under GAAP of any Person or business in respect of which a definitive agreement for the Disposition thereof has been entered into as discontinued operations, the Disposed EBITDA of such Person or business shall not be excluded pursuant to this paragraph until such Disposition shall have been consummated.

Notwithstanding anything to the contrary contained herein, Consolidated EBITDA shall be deemed to be $2,713,000, $(2,715,000), and $6,683,000, respectively, for the fiscal quarters ended June 30, 2016, September 30, 2016 and December 31, 2016, in each case and, without duplication, adjusted to reflect any pro forma adjustments for Acquired EBITDA or Disposed EBITDA, occurring or identified after the Closing Date and not otherwise included in the calculation of the foregoing amounts.

"Consolidated Net Income" means, for any period, the net income (loss) attributable to the Borrower and the Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, excluding, without duplication,

(1)      any net income (loss) of any Person if such Person is not the Borrower or a Subsidiary or that is accounted for by the equity method of accounting, except that the Borrower's or any Subsidiary's equity in the net income of any such Person for such period will be included in such Consolidated Net Income up to the aggregate amount of cash or Cash Equivalents actually distributed by such Person during such period to the Borrower or a Subsidiary as a dividend or other distribution or return on investment;

(2)      any net gain (or loss) realized upon the sale or other Disposition of any asset of the Borrower or any Subsidiaries (including pursuant to any sale/leaseback transaction) which is not sold or otherwise Disposed of in the ordinary course of business (as determined in good faith by a Responsible Officer or the Board of Directors of the Borrower);

(3)      extraordinary, non-recurring gains or losses (less all fees and expenses relating thereto) or expenses (including any non-recurring operating expenses directly attributable to the implementation of cost savings initiatives and any accruals or reserves in respect of any extraordinary, non-recurring items), retention, severance, recruiting costs, relocation costs, integration and facilities' opening costs and other restructuring charges, reorganization costs, shared services agreements, accruals or reserves (including

16

restructuring and integration costs related to acquisitions after the Closing Date and adjustments to existing reserves), whether or not classified as restructuring expense on the consolidated financial statements, signing costs, retention or completion bonuses, transition costs, costs related to closure/consolidation of facilities and curtailments or modifications to pension and post-retirement employee benefit plans (including any settlement of pension liabilities);

(4)     Transaction Expenses;

(5)     the cumulative effect of a change in accounting principles;

(6)     (i) stock-based, partnership interest-based and similar non-cash incentive-based compensation award or arrangement charges or expenses (including with respect to any profits interest relating to membership interests in any partnership or limited liability company and any non-cash charges or expenses arising from the grants of stock appreciation or similar rights, options, restricted stock or other rights or equity incentive programs) and any non-cash charges associated with the rollover, acceleration or payout of Equity Interests by, or to, officers, directors or employees of the Borrower or any of its Subsidiaries, or any of its Parent Entities, (ii) and any non-cash deemed finance charges in respect of any pension liabilities or other provisions and (iii) income (loss) attributable to deferred compensation plans or trusts,

(7)     all deferred financing costs written off and premiums paid or other expenses incurred directly in connection with any early extinguishment of Indebtedness and any net gain (loss) from any write-off or forgiveness of Indebtedness;

(8)     any unrealized foreign exchange gains or losses resulting from the impact of foreign currency changes on the valuation of assets and liabilities on the balance sheet of the Borrower;

(9)     any purchase accounting or fresh start accounting effects including, but not limited to, adjustments to inventory, property and equipment, software and other intangible assets and deferred revenue in component amounts required or permitted by GAAP and related authoritative pronouncements (including the effects of such adjustments pushed down to the Borrower and the Subsidiaries), as a result of any consummated acquisition (including any acquisition prior to the Closing Date), or the amortization or write-off of any amounts thereof (including any write-off in process research and development);

(10)     any goodwill or other intangible asset impairment charge or write-off;

(11)     any income (loss) from the early extinguishment or cancellation of Indebtedness;

(12)     any net unrealized gains and losses resulting from Swap Contracts or embedded derivatives that require similar accounting treatment and the application of FASB Accounting Standards Codification Topic 815 – Derivatives and Hedging and related pronouncements;

17

(13)    non-cash income or expense related to changes in the fair value of contingent liability in connection with earn-out obligations and similar liabilities in connection with any Permitted Acquisition or similar Investment; and

(14)    accruals and reserves that are established within twelve months after the Closing Date that are so required to be established as a result of the Transactions in accordance with GAAP or changes as a result of the adoption or modification of accounting policies during such period.

"Consolidated Total Debt" means, as of any date of determination, the aggregate principal amount of Indebtedness of the Borrower and its Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of purchase accounting in connection with the Transactions or any Permitted Acquisition (or any similar permitted Investment)), consisting of Indebtedness for borrowed money, unpaid drawings under letters of credit, Capitalized Lease Obligations and debt obligations evidenced by promissory notes or similar instruments.

"Consummation of the Plan of Reorganization" shall mean the occurrence of the Plan Effective Date and the substantial consummation of the Plan of Reorganization within the meaning of Section 1101(2) of the Bankruptcy Code.

"Continuing Director" shall mean, at any date, an individual (a) who is a member of the Board of Directors of Holdings on the Closing Date, (b) who, as at such date, has been a member of such Board of Directors for at least the 12 preceding months, (c) who has been nominated or designated to be a member of such Board of Directors, directly or indirectly, by the Permitted Holders or Persons nominated or designated by the Permitted Holders or (d) who has been nominated or designated to be, or designated as, a member of such Board of Directors by a majority of the other Continuing Directors then in office.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" has the meaning specified in the definition of "Affiliate."

"Control Agreement" has the meaning set forth in the Security Agreement.

"Converted Loan" shall have the meaning specified in Section 2.01(a).

"Credit Extension" means a Borrowing.

"Cumulative Consolidated Net Income" means, as at any date of determination, Consolidated Net Income for the period (taken as one accounting period) commencing on July 1, 2017 and ending on the last day of the most recent fiscal quarter for which Section 6.01 Financials have been delivered.

"Cure Amount" has the meaning specified in Section 8.05.

"Cure Deadline" has the meaning specified in Section 8.05.

"Cure Right" has the meaning specified in Section 8.05.

"Customary Intercreditor Agreement" means (a) to the extent executed in connection with the Incurrence of secured Indebtedness, the Liens on the Collateral of which are intended to rank equal in priority to the Liens on the Collateral securing the Obligations (but without regard to the control of remedies), at the option of the Borrower and the Administrative Agent acting together in good faith, either (i) any intercreditor agreement substantially in the form of the Equal Priority Intercreditor Agreement or (ii) a customary intercreditor agreement in form and substance reasonably acceptable to the Administrative Agent and the Borrower, which agreement shall provide that the Liens on the Collateral securing such Indebtedness shall rank equal in priority to the Liens on the Collateral securing the Obligations (but without regard to the control of remedies) and (b) to the extent executed in connection with the Incurrence of secured Indebtedness the Liens on the Collateral of which are intended to rank junior in priority to the Liens on the Collateral securing the Obligations, at the option of the Borrower and the Administrative Agent acting together in good faith, either (i) in the case of Liens on the Collateral of which are intended to rank equal in priority to the Liens on the Collateral securing the Second Lien Obligations (but without regard to the control of remedies), the Junior Priority Intercreditor Agreement or (ii) otherwise, either (x) an intercreditor agreement substantially in the form of the Junior Priority Intercreditor Agreement or (y) a customary intercreditor agreement in form and substance reasonably acceptable to the Administrative Agent and the Borrower, which agreement shall provide that the Liens on the Collateral securing such Indebtedness shall rank junior in priority to the Liens on the Collateral securing the Obligations.

"Debtors" has the meaning assigned to such term in the recitals.

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Declined Proceeds" has the meaning specified in Section 2.05(b)(ii).

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means an interest rate equal to (a) the Base Rate plus (b) the Applicable Rate applicable to Base Rate Loans plus (c) 2.0% per annum; provided that with respect to a Eurocurrency Rate Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan plus 2.0% per annum, in each case, to the fullest extent permitted by applicable Laws.

"Defaulting Lender" means any Lender whose acts or failure to act, whether directly or indirectly, cause it to meet any part of the definition of "Lender Default."

"DIP Credit Facility" has the meaning assigned to such term in the recitals.

19

"DIP Credit Facility Agreement" means that certain Senior Secured Super Priority Debtor In Possession Credit Agreement dated as of the Petition Date among Holdings, the Pre-Petition Borrower and Credit Suisse AG, Cayman Islands Branch, as administrative agent.

"DIP Credit Facility Obligations" means "Obligations" as defined in the DIP Credit Facility Agreement.

"DIP L/C Facility" has the meaning assigned to such term in the recitals.

"Disclosure Statement" means any disclosure statement that is filed in connection with the Plan of Reorganization, which disclosure statement is in form and substance reasonably acceptable to the Required Lenders.

"Disposed EBITDA" means, with respect to any Sold Entity or Business for any period, the amount for such period of Consolidated EBITDA of such Sold Entity or Business (determined as if references to the Borrower and its Subsidiaries in the definition of the term "Consolidated EBITDA" (and in the component financial definitions used therein) were references to such Sold Entity or Business and its Subsidiaries), all as determined on a consolidated basis for such Sold Entity or Business.

"Disposition" or "Dispose" means the sale, assignment, transfer, license, lease or other disposition (including any Sale Leaseback and any sale of Equity Interests) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith; provided that "Disposition" and "Dispose" shall not be deemed to include any issuance by Holdings of any of its Equity Interests to another Person.

"Disqualified Equity Interests" means any Equity Interest which, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition:

(a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests and cash in lieu of fractional shares of such Equity Interests) pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale or casualty or condemnation event so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale or casualty or condemnation event shall be subject to the prior repayment in full of the Loans and all other Obligations (other than Hedging Obligations under any Secured Hedge Agreement) that are accrued and payable and the termination of the Commitments and all outstanding Letters of Credit,

(b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests and cash in lieu of fractional shares of such Equity Interests), in whole or in part,

(c) provides for the scheduled payments of dividends in cash prior to the date that is ninety-one (91) days after the Maturity Date, or

20

(c) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the Maturity Date; provided that if such Equity Interests are issued pursuant to any plan for the benefit of employees of Holdings , the Borrower or any of its Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because it may be required to be repurchased by Holdings, the Borrower or any of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"Disqualified Lenders" means (i) such Persons that have been specified in writing to the Administrative Agent and the Lenders prior to the Closing Date as being "Disqualified Lenders", (ii) those Persons who are competitors of the Borrower and its Subsidiaries that are separately identified in writing by the Borrower from time to time and (iii) in the case of each of clauses (i) and (ii), any of their Affiliates that are identified in writing from the Borrower from time to time or (b) readily identifiable on the basis of such Affiliates name; provided that no permitted supplement or modification to the list of Disqualified Lenders shall apply retroactively to disqualify any persons that have previously acquired an assignment or participation in the Loans or Commitments.

"Distressed Person" has the meaning specified in the definition of "Lender-Related Distress Event."

"Dollar" and "$" mean lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States or any state thereof or the District of Columbia.

"Eligible Assignee" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund and (d) any other Person (other than a natural person) that becomes an Assignee in accordance with Section 10.07(b); provided, however, that in no event shall any Disqualified Lender be an Eligible Assignee.

"Environmental Laws" means any and all Laws relating to pollution or the protection of human health (as relating to exposure to Hazardous Materials) and the environment or natural resources.

"Equal Priority Intercreditor Agreement" means the Equal Priority Intercreditor Agreement substantially in the form of Exhibit N among the Administrative Agent and/or the Collateral Agent and one or more representatives for holders of one or more classes of Indebtedness, with such modifications thereto as the Administrative Agent and the Borrower may reasonably agree.

"Equity Interests" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that is under common control with any Loan Party and is treated as a single employer within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (b) the failure of any Loan Party or any ERISA Affiliate to make by its due date a required installment under Section 430(j) of the Internal Revenue Code with respect to any Pension Plan; (c) a failure to satisfy the minimum funding standard under Section 412 of the Code or Section 302 of ERISA, or the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard, in each case with respect to a Pension Plan, whether or not waived, or a failure to make any required contribution to a Multiemployer Plan; (d) a complete or partial withdrawal by any Loan Party or any ERISA Affiliate from a Multiemployer Plan, notification of any Loan Party or ERISA Affiliate concerning the imposition of Withdrawal Liability or notification that a Multiemployer Plan is insolvent or is in reorganization within the meaning of Title IV of ERISA or that is in endangered or critical status, within the meaning of Section 305 of ERISA; (e) any event or condition which constitutes grounds for a termination under Section 4041A of ERISA, the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (g) the imposition of any liability under Title IV of ERISA, including  the imposition of a lien under Section 412 or 430(k) of the Internal Revenue Code or Section 303 or 4068 of ERISA on any property (or rights to property, whether real or personal) of a Loan Party or any ERISA Affiliate, but excluding PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any ERISA Affiliate; (h) a determination that any Pension Plan is, or is expected to be, in "at-risk" status (within the meaning of Section 303(i)(4)(A) of ERISA or Section 430(i)(4)(A) of the Code) or (i) the occurrence of a non-exempt prohibited transaction with respect to any Pension Plan maintained or contributed to by any Loan Party (within the meaning of Section 4975 of the Code or Section 406 of ERISA), which could result in liability to any Loan Party.

"Eurocurrency Rate" means, for any Interest Period with respect to any Eurocurrency Rate Loan:

(a)      the rate per annum equal to the rate determined by the Administrative Agent to be the offered rate that appears on the Reuters Screen LIBOR01 (or any successor thereto) for deposits in Dollars (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period, determined as of approximately 11:00 a.m. (London time) two (2) Business Days prior to the first day of such Interest Period;

22

(b)      if the rates referenced in the preceding <u>subsection (a)</u> are not available, the rate which results from interpolating on a linear basis between: (i) the rate appearing on ICE Benchmark Administration page (or on any successor or substitute page of such service) for the longest period (for which that rate is available) which is less than the Interest Period and (ii) the rate appearing on the ICE Benchmark Administration page (or on any successor or substitute page of such service) for the shortest period (for which that rate is available) which exceeds the Interest Period, each as of approximately 11:00 A.M., London time, two Business Days prior to the commencement of such Interest Period; or

(c)      for Interest Periods where no interest rate corresponding to an interest period of the same duration as such Interest Period appears on any such page referenced in the preceding <u>subsections (i)</u> and <u>(ii)</u>, such rate shall be determined as provided for in <u>Section 3.03</u>;

<u>provided</u> that, notwithstanding the foregoing, the Eurocurrency Rate shall not be determined to be lower than 1.00%.

"<u>Eurocurrency Rate Loan</u>" means a Loan that bears interest at a rate based on the Adjusted Eurocurrency Rate.

"<u>Event of Default</u>" has the meaning specified in <u>Section 8.01</u>.

"<u>Exchange Act</u>" means the Securities Exchange Act of 1934, as amended and the rules and regulations promulgated thereunder.

"<u>Exchange Rate</u>" means, on any day with respect to any currency (other than Dollars), the rate at which such currency may be exchanged into any other currency (including Dollars), as set forth at approximately 11:00 a.m. (London time) on such day on the Reuters World Currency Page for such currency. In the event that such rate does not appear on any Reuters World Currency Page, the Exchange Rate shall be determined by reference to such other publicly available service for displaying exchange rates as may be agreed by the Administrative Agent and the Borrower, or, in the absence of such agreement, such Exchange Rate shall instead be the arithmetic average of the spot rates of exchange of the Administrative Agent in the market where its foreign currency exchange operations in respect of such currency are then being conducted, at or about 11:00 a.m., local time, on such date for the purchase of the relevant currency for delivery two Business Days later.

"<u>Excluded Accounts</u>" means (w) any disbursement deposit account (i) the funds in which are used solely for the payment of salaries and wages, employee benefits, workers' compensation and similar expenses or (ii) that is a zero balance account that sweeps to an account subject to a Control Agreement, (x) all Deposit Accounts established (or otherwise maintained) by Borrower or any of its Subsidiaries which are funded by, or on behalf or for the benefit of, employees of Borrower or any of its Subsidiaries and are to be maintained exclusively for the benefit, directly or indirectly, of such employees (including, without limitation, Deposit Accounts which are employer funded pension accounts for employees and accounts established to pay taxes for and on behalf of employee tax liabilities) and (y) all other Deposit Accounts established (or otherwise maintained) by Borrower or any of its Subsidiaries (excluding Deposit

Accounts subject to Control Agreements and the Collection Account) that do not have cash balances at any time exceeding $250,000 in the aggregate for all such other Deposit Accounts.

"Excluded Assets" has the meaning specified in the definition of "Collateral and Guarantee Requirement".

"Excluded Equity Interests" means:

(a)     solely in the case of any pledge of Equity Interests of any FSHCO or Foreign Subsidiary that is a CFC to secure the Obligations, any Equity Interests that are Voting Stock of such FSHCO or Foreign Subsidiary in excess of 65% of the outstanding Equity Interests that are Voting Stock of such FSHCO or Foreign Subsidiary;

(b)     any Equity Interests to the extent, and for so long as, the pledge thereof would be prohibited by any applicable Law (including any legally effective requirement to obtain the consent of any Governmental Authority unless such consent has been obtained; and

(c)     any "margin stock" and Equity Interests of any Person (other than any Wholly-Owned Subsidiary) to the extent, and for so long as, the pledge of such Equity Interests would be prohibited by, or would create an enforceable right of termination in favor of any other party thereto (other than Holdings, the Borrower or any Wholly-Owned Subsidiary) under, the terms of any Contractual Obligation, Organizational Document, joint venture agreement or shareholders' agreement applicable to such Person.

"Excluded Subsidiary" means:

(a)     any Subsidiary that is not a Wholly-Owned Subsidiary or is a joint venture on any date such Subsidiary would otherwise be required to become a Guarantor pursuant to the requirements of Section 6.10 (for so long as such Subsidiary remains a non-Wholly-Owned Subsidiary);

(b)     any Subsidiary that is prohibited by (x) applicable Law or (y) Contractual Obligation from guaranteeing the Obligations (and for so long as such restriction is in effect); provided that in the case of clause (y), such Contractual Obligation existed on the Closing Date or, with respect to any Subsidiary acquired by the Borrower or a Subsidiary after the Closing Date (and so long as such Contractual Obligation was not incurred in contemplation of such acquisition), on the date such Subsidiary is so acquired; and

(c)     any Subsidiary that is (i) a CFC, (ii) a FSHCO or (iii) a direct or indirect Subsidiary of a CFC.

"Excluded Swap Obligation" shall mean, with respect to any Guarantor, (a) any Swap Obligation if, and to the extent that, all or a portion of the guarantee of such Guarantor pursuant to the Guarantee of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guarantee pursuant to the Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation, or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) (i) by virtue of

24

such Guarantor's failure to constitute an "eligible contract participant," as defined in the Commodity Exchange Act and the regulations thereunder (determined after giving effect to any applicable keep well, support, or other agreement for the benefit of such Guarantor and any and all applicable guarantees of such Guarantor's Swap Obligations by other Loan Parties), at the time the guarantee of (or grant of such security interest by, as applicable) such Guarantor becomes or would become effective with respect to such Swap Obligation or (ii) in the case of a Swap Obligation that is subject to a clearing requirement pursuant to section 2(h) of the Commodity Exchange Act, because such Guarantor is a "financial entity," as defined in section 2(h)(7)(C) of the Commodity Exchange Act, at the time the guarantee of (or grant of such security interest by, as applicable) such Guarantor becomes or would become effective with respect to such Swap Obligation or (b) any other Swap Obligation designated as an "Excluded Swap Obligation" of such Guarantor as specified in any agreement between the relevant Loan Parties and Hedge Bank applicable to such Swap Obligations. If a Swap Obligation arises under a Master Agreement governing more than one Swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to the Swap for which such guarantee or security interest is or becomes excluded in accordance with the first sentence of this definition. As used herein, "Swap Obligation" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Agent or Lender or required to be withheld or deducted from a payment to any Agent or Lender, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Agent or Lender being organized under the laws of, or having its principal office or, in the case of any Lender, its Applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment requested by the Borrower under Section 3.07) or (ii) such Lender changes its Applicable Lending Office, except in each case to the extent that, pursuant to Section 3.01, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in a Loan or Commitment or to such Lender immediately before it changed its Applicable Lending Office, (c) Taxes attributable to such Agent's or Lender's failure to comply with Section 3.01(f) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Existing Letter of Credit" has the meaning specified in Section 2.03(a)(i).

"Exit L/C Agreement" means that certain Letter of Credit Reimbursement and Security Agreement dated the date hereof, between the Borrower and Credit Suisse AG, Cayman Islands Branch, as issuer.

"Exit L/C Facility" means that certain letter of credit facility under the Exit L/C Agreement.

"Exit L/C Guaranty" means that certain Guaranty dated the date hereof between the Borrower, Holdings, certain of their subsidiaries, and Credit Suisse AG, Cayman Islands Branch as L/C Issuer.

"Expected Cure Amount" has the meaning specified in Section 8.05.

"Fair Market Value" means with respect to any asset or group of assets on any date of determination, the value of the consideration obtainable in a sale of such asset at such date of determination assuming a sale by a willing seller to a willing purchaser dealing at arm's length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset, as determined in good faith by the Borrower.

"FATCA" means Sections 1471 through 1474 of the Code, as of the Closing Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations with respect thereto or official administrative interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any intergovernmental agreements (or related legislation or official administrative rules or practices) implementing the foregoing.

"FCPA" means the Foreign Corrupt Practices Act of 1977, as amended.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank on the Business Day next succeeding such day; provided that if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day.

"Fee Letter" means the Fee Letter, dated as of March [  ], 2017, among Credit Suisse AG, Cayman Islands Branch, Credit Suisse Securities (USA) LLC, and the Borrower.

"Financial Advisor Costs" means and includes all reasonable and documented or invoiced out-of-pocket fees, expenses and disbursements of financial advisors engaged to advise in connection with this Agreement.

"First Lien Claims" means all claims of the Lenders under the Pre-Petition First Lien Credit Agreement and all agreements and instruments relating thereto, to the extent allowed in the Chapter 11 Cases.

"Financial Officer" of any person shall mean the Chief Financial Officer, principal accounting officer, Treasurer, Assistant Treasurer, Vice President of Finance or Controller of such Person.

"First Lien Obligations" means (i) the Obligations and (ii) any other Indebtedness that is secured by Liens on the Collateral that rank on an equal priority basis (but without regard to the control of remedies) with the Liens on the Collateral securing the Obligations.

"First Lien Term Facility" has the meaning specified in the recitals hereto.

26

"Flood Insurance Laws" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto and (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto.

"Foreign Pension Event" means (a) a contribution or premium required to be paid to or in respect of each Foreign Plan is not paid in a timely fashion in accordance with the terms thereof and all applicable Law, or taxes, penalties or fees are owing or eligible under any Foreign Plan beyond the date permitted for payment of same; (b) the occurrence of an event respecting any Foreign Plan which would entitle any Person to wind-up or terminate any Foreign Plan, or which could reasonably be expected to adversely affect the tax status thereof; (c) the determination of a going concern unfunded actuarial liability, past service unfunded liability or solvency deficiency respecting any Foreign Plan or (d) the occurrence of an improper withdrawal or transfer of assets from any Foreign Plan.

"Foreign Plan" means any employee pension, retirement or other analogous plan, program, policy, arrangement or agreement maintained by, or contributed to or by, or entered into with, any Loan Party or any Subsidiary with respect to employees outside the United States providing for retirement income or benefits.

"Foreign Subsidiary" means any direct or indirect Subsidiary of the Borrower that is not a Domestic Subsidiary.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"FSHCO" means any direct or indirect Domestic Subsidiary substantially all the assets of which consist of Equity Interests and Indebtedness of one or more direct or indirect Foreign Subsidiaries that are CFCs.

"Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"Funded Debt" means all Indebtedness of the Borrower and its Subsidiaries for borrowed money that matures more than one year from the date of its creation or matures within one year from such date that is renewable or extendable, at the option of such Person, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year from such date, including Indebtedness in respect of the Loans.

"GAAP" means generally accepted accounting principles in the United States of America, as in effect from time to time; provided that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the

27

Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.  Notwithstanding anything herein to the contrary, it is understood and agreed that all obligations of any Person that are or would be characterized as operating lease obligations in accordance with GAAP on January 1, 2013 (whether or not such operating lease obligations were in effect on such date) shall continue to be accounted for as operating lease obligations (and not as Capitalized Lease Obligations or Capitalized Leases) for purposes of this Agreement regardless of any change in GAAP following the date that would otherwise require such obligations to be recharacterized as Capitalized Lease Obligations or Capitalized Leases.

"Governmental Authority" means any nation or government, any state, territorial or other political subdivision thereof, and any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Granting Lender" has the meaning specified in Section 10.07(h).

"Guarantee Obligations" means, as to any Person, without duplication, any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or the payment or performance of such Indebtedness, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part); provided that the term "Guarantee Obligations" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or Disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee Obligation shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.

"Guarantees" has the meaning specified in the definition of "Collateral and Guarantee Requirement."

"Guarantors" has the meaning specified in the definition of "Collateral and Guarantee Requirement."

"Guaranty" means, collectively, (a) the Guarantee substantially in the form of Exhibit E and (b) each other guaranty and guaranty supplement delivered pursuant to Section 6.10.

"Hazardous Materials" means all substances or wastes regulated as hazardous or toxic or other term of equivalent regulatory import pursuant to any Environmental Law, including petroleum or petroleum distillates, friable asbestos or friable asbestos containing materials and polychlorinated biphenyls.

"Hedge Bank" means any Person that is a counterparty to a Secured Hedge Agreement with a Loan Party or one of its Subsidiaries, in its capacity as such, and that either (i) is a Lender, an Agent, a Lead Arranger or an Affiliate of any of the foregoing at the time it enters into such a Secured Hedge Agreement, in its capacity as a party thereto or (ii) becomes a Lender or an Affiliate of a Lender or an Agent after it has entered into such a Secured Hedge Agreement; provided that no such Person (except an Agent) shall be considered a Hedge Bank until such time as it shall have delivered written notice to the Collateral Agent that such a transaction has been entered into and that such Person constitutes a Hedge Bank entitled to the benefits of the Collateral Documents. For the avoidance of doubt, each Agent shall constitute a Hedge Bank to the extent it has entered into a Secured Hedge Agreement.

"Hedging Obligations" means, with respect to any Person, the obligations of such Person under Swap Contracts.

"Holdings" has the meaning assigned to such term in the introductory paragraph to this Agreement.

"Honor Date" has the meaning specified in Section 2.03(b)(i).

"Incur" means, create, issue, assume, Guarantee, incur or otherwise become directly or indirectly liable for; provided, however, that any Indebtedness of a Person existing at the time such Person becomes a Subsidiary (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Person at the time it becomes a Subsidiary. The term "Incurrence" when used as a noun shall have a correlative meaning.  Solely for purposes of determining compliance with Section 7.03 with respect to any initial incurrence of Indebtedness:

(a)     amortization of debt discount or the accretion of principal with respect to a non-interest bearing or other discount security;

(b)     the payment of regularly scheduled interest in the form of additional Indebtedness of the same instrument or the payment of regularly scheduled dividends on Equity Interests in the form of additional Equity Interests of the same class and with the same terms; and

(c)     the obligation to pay a premium in respect of Indebtedness arising in connection with the issuance of a notice of prepayment or redemption or making of a mandatory offer to prepay, redeem or purchase such Indebtedness;

29

will, in each case, not be deemed to be the Incurrence of Indebtedness.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments (including, for the avoidance of doubt, the Loans and the Second Lien Loans);

(b)     the maximum amount (after giving effect to any prior drawings or reductions which may have been reimbursed) of all letters of credit (including standby and commercial), banker's acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c)     net obligations of such Person under any Swap Contract;

(d)     all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable, liabilities or accrued expenses in the ordinary course of business);

(e)     Indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such Indebtedness shall have been assumed by such Person or is limited in recourse;

(f)     all Capitalized Lease Obligation of such Person;

(g)     all obligations of such Person in respect of Disqualified Equity Interests; and

(h)     all Guarantee Obligations of such Person in respect of any of the foregoing;

provided that Indebtedness shall not include (i) prepaid or deferred revenue arising in the ordinary course of business, (ii) purchase price holdbacks arising in the ordinary course of business in respect of a portion of the purchase price of an asset to satisfy warrants or other unperformed obligations of the seller of such assets and (iii) Guarantee Obligations incurred in the ordinary course of business and not supporting or otherwise related to any Indebtedness for borrowed money.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness would be included in the calculation of Consolidated

30

Total Debt.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value of such Swap Contract as of such date. The amount of Indebtedness of any Person for purposes of <u>clause (e)</u> shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the Fair Market Value of the property encumbered thereby as determined by such Person in good faith.

"<u>Indemnified Liabilities</u>" has the meaning specified in <u>Section 10.05</u>.

"<u>Indemnified Taxes</u>" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in <u>clause (a)</u>, Other Taxes.

"<u>Indemnitees</u>" has the meaning specified in <u>Section 10.05</u>.

"<u>Information</u>" has the meaning specified in <u>Section 10.08</u>.

"<u>Intellectual Property Security Agreement</u>" means, collectively, (a) the Intellectual Property Security Agreement executed by certain Loan Parties in the form of <u>Exhibit G</u>, and (b) each other Intellectual Property Security Agreement Supplement executed and delivered pursuant to <u>Section 6.10</u>.

"<u>Intellectual Property Security Agreement Supplement</u>" has the meaning specified in the Intellectual Property Security Agreement.

"<u>Interest Payment Date</u>" means (a) as to any Loan other than a Base Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date of the Facility under which such Loan was made; <u>provided</u> that if any Interest Period for a Eurocurrency Rate Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall also be Interest Payment Dates; and (b) as to any Base Rate Loan, the last Business Day of each December, March, June and September and the Maturity Date of the Facility under which such Loan was made.

"<u>Interest Period</u>" means, as to each Eurocurrency Rate Loan, the period commencing on the date such Loan is disbursed or converted to or continued as a Eurocurrency Rate Loan and ending on the date one, two, three or six months thereafter, or to the extent available to each applicable Lender of such Eurocurrency Rate Loan, twelve months or a period shorter than one month, thereafter as selected by the Borrower in its Committed Loan Notice; <u>provided</u> that:

(a)    any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar

31

month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)    no Interest Period shall extend beyond the Maturity Date.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or Indebtedness or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee Obligation with respect to any obligation of, or purchase or other acquisition of any other Indebtedness or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person (excluding, in the case of the Borrower and its Subsidiaries, intercompany loans, advances, or Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business) or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person. The amount, as of any date of determination, of (i) any Investment in the form of a loan or an advance shall be the principal amount thereof outstanding on such date, minus any cash payments actually received by such investor representing interest in respect of such Investment (to the extent any such payment to be deducted does not exceed the remaining principal amount of such Investment), but without any adjustment for write-downs or write-offs (including as a result of forgiveness of any portion thereof) with respect to such loan or advance after the date thereof, (ii) any Investment in the form of a Guarantee shall be equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof, as determined in good faith by a Financial Officer, (iii) any Investment in the form of a transfer of Equity Interests or other non-cash property or services by the investor to the investee, including any such transfer in the form of a capital contribution, shall be the Fair Market Value of such Equity Interests or other property or services as of the time of the transfer, minus any payments actually received by such investor representing a return of capital of, or dividends or other distributions in respect of, such Investment (to the extent such payments do not exceed, in the aggregate, the original amount of such Investment), but without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the date of such Investment and (iv) any Investment (other than any Investment referred to in clause (i), (ii) or (iii) above) by the specified Person in the form of a purchase or other acquisition for value of any Equity Interests, evidences of Indebtedness or other securities of any other Person shall be the original cost of such Investment, minus (i) the amount of any portion of such Investment that has been repaid to the investor as a repayment of principal or a return of capital, and of any payments or other amounts actually received by such investor representing interest, dividends or other distributions or similar payments in respect of such Investment (to the extent the amounts referred to in clause (B) do not, in the aggregate, exceed the original cost of such Investment plus the costs of additions thereto and without duplication of amounts increasing the Available Amount), but without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the date of such Investment.  For purposes of Section 7.02, if an Investment involves the acquisition of more than one Person, the amount of such Investment shall be allocated among the acquired Persons in accordance with GAAP; provided

that pending the final determination of the amounts to be so allocated in accordance with GAAP, such allocation shall be as reasonably determined by a Financial Officer.

"Investment Grade Rating" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by Fitch, Inc.

"IP Rights" has the meaning specified in Section 5.14.

"Judgment Currency" has the meaning specified in Section 10.17.

"Junior Debt" means (a) Subordinated Debt, (b) the Second Lien Term Facility and (c) all other Indebtedness (other than any permitted intercompany Indebtedness owing to Holdings, the Borrower or any Subsidiary) that is secured by a Lien on the Collateral, which Lien is junior to the Lien securing the Obligations.

"Junior Debt Documents" means any agreement, indenture and instrument pursuant to which any Junior Debt is issued, in each case as amended to the extent permitted under the Loan Documents.

"Junior Priority Intercreditor Agreement" means the Junior Priority Intercreditor Agreement, dated as of the date hereof, among the Collateral Agent, the Second Lien Collateral Agent, Holdings, the Borrower and the other Loan Parties party thereto, the form of which is attached hereto as Exhibit M.

"KPIs" has the meaning specified in Section 6.02.

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, regulations, ordinances, codes and administrative or judicial precedents, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"L/C Advance" means, with respect to each L/C Participant, such L/C Participant's funding of its participation in any L/C Borrowing in accordance with its Pro Rata Share under this Agreement.

"L/C Borrowing" means an extension of credit resulting from a drawing under any Letter of Credit which has not been reimbursed on the applicable Honor Date.

"L/C Issuer" means Credit Suisse AG, Cayman Islands Branch or any of its Subsidiaries or Affiliates.

"L/C Obligation" means, as at any date of determination, the aggregate maximum amount then available to be drawn under all outstanding Letters of Credit plus the aggregate of all Unreimbursed Amounts in respect of Letters of Credit, including all L/C Borrowings.

33

"L/C Participant" means each "L/C Participant" under this Agreement, in each case in its capacity as a participant in an Existing Letter of Credit issued under this Agreement.

"L/C Participant Pro Rata Share" means, with respect to each L/C Participant at any time, the percentage set forth in Schedule 2.03(b).

"Lender" shall mean (a) the Persons listed on Schedule 2.01 and (b) any other Person that shall become a party hereto as a "lender" pursuant to Section 10.07, in each case other than a Person who ceases to hold any outstanding Loans, Letter of Credit or any Commitment.

"Lender Default" means (i) the refusal (in writing) or failure of any Lender to make available its portion of any Loan or other payment hereunder, or (ii) a Distressed Person has admitted in writing that it is insolvent or such Distressed Person becomes subject to a Lender-Related Distress Event.

"Lender-Related Distress Event" means, with respect to any Lender, that such Lender or any person that directly or indirectly controls such Lender (each, a "Distressed Person"), as the case may be, is or becomes subject to a voluntary or involuntary case with respect to such Distressed Person under any debt relief law, or a custodian, conservator, receiver or similar official is appointed for such Distressed Person or any substantial part of such Distressed Person's assets, or such Distressed Person or any person that directly or indirectly controls such Distressed Person is subject to a forced liquidation, or such Distressed Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Distressed Person or its assets to be, insolvent or bankrupt; provided that a Lender-Related Distress Event shall not be deemed to have occurred solely by virtue of the ownership or acquisition of any equity interests in any Lender or any person that directly or indirectly controls such Lender by a Governmental Authority or an instrumentality thereof.

"Letter of Credit" means the Existing Letters of Credit outstanding hereunder.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, deemed trust, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing); provided that in no event shall an operating lease be deemed to be a Lien.

"Loan" means any loan made by the Lenders to the Borrower pursuant to this Agreement.

"Loan Documents" means, collectively, (i) this Agreement, (ii) the Notes, (iii) the Collateral Documents, (iv) the Guaranty, (v) each Letter of Credit, (vi) the Junior Priority Intercreditor Agreement,(vii) the Exit L/C Agreement, (viii) the Exit L/C Guaranty, (ix) the Fee Letter, and (x) any other document related to this Agreement designated in writing by the Borrower and the Administrative Agent as a "Loan Document".

34

"Loan Parties" means, collectively, (i) the Borrower, (ii) Holdings and (iii) each other Guarantor.

"LTM Period" means, on any date of determination, the period of the prior twelve months.

"Management Stockholders" means the members of management of the Borrower or any of its Subsidiaries who are (directly or indirectly through one or more investment vehicles) investors in Holdings.

"Material Adverse Effect" means a circumstance or condition that would materially and adversely affect (a) the business or financial condition of the Borrower and its Subsidiaries, taken as a whole, (b) the ability of the Borrower and the other Loan Parties, taken as a whole, to perform their payment obligations under the Loan Documents to which it is a party or (c) the rights and remedies of the Agents and the Lenders under the Loan Documents.

"Material Real Property" means any real property with a book value (at the time of acquisition) in excess of $500,000 owned by any Loan Party.

"Maturity Date" means the earliest to occur of (i) [          ], 2021 and (ii) the date all Loans become due and payable under the Loan Documents, whether by acceleration or otherwise; provided that if any such day is not a Business Day, the Maturity Date shall be the Business Day immediately preceding such day.

"Monthly KPI Reports" has the meaning specified in Section 6.02.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgage" means, collectively, the deeds of trust, trust deeds, debentures, deeds to secure debt and mortgages creating and evidencing a Lien on a Mortgaged Property made by any Loan Party in favor or for the benefit of the Collateral Agent on behalf of the Secured Parties substantially in the form of Exhibit L, and any other mortgages executed and delivered pursuant to Section 4.01(a)(ii) (if applicable), Section 6.10 and Section 6.12.

"Mortgage Policies" has the meaning specified in paragraph (f) of the definition of "Collateral and Guarantee Requirement".

"Mortgaged Properties" has the meaning specified in paragraph (f) of the definition of "Collateral and Guarantee Requirement".

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA, to which any Loan Party or any ERISA Affiliate makes or is obligated to make contributions, or during the immediately preceding six (6) years, has made or been obligated to make contributions.

"Multiply Margin Ratio" means, for any given calendar month, the ratio of total "Gross Profit" for the Multiply business to "Revenues" for the Multiply business, in each case as reported as "monthly total" items in the Monthly KPI Report for such calendar month.

35

"<u>Necessary Cure Amount</u>" has the meaning specified in <u>Section 8.05</u>.

"<u>Net Proceeds</u>" means, with respect to any event, the proceeds received on an after-tax basis in respect of such event in cash, including (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment or earn-out, but excluding any interest payments), but only as and when received, (ii) in the case of a Casualty Event, insurance proceeds, and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, <u>minus</u> the reasonable fees and out-of-pocket expenses paid by Holdings, the Borrower and the Guarantors in connection with such event.

"<u>Note</u>" means a promissory note made by the Borrower in favor of a Lender and its registered assigns evidencing Loans made by such Lender, in substantially the form of Exhibit B.

"<u>Obligations</u>" means (x) all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan or Letter of Credit, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees and expenses that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees and expenses are allowed claims in such proceeding and (y) Hedging Obligations (other than with respect to any Loan Party's Hedging Obligations that constitute Excluded Swap Obligations solely and including all interest, fees and expenses that accrue after commencement by or against any Loan Party of any proceeding under Debtor Relief Laws, regardless of whether such interest, fees and expenses are allowed claims in such proceeding, with respect to such Loan Party) under each Secured Hedge Agreement. Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents include the obligation (including guarantee obligations) to pay principal, interest, Letter of Credit commissions, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document. Notwithstanding the foregoing, (i) unless otherwise agreed to by the Borrower and any Hedge Bank, the obligations of Holdings, the Borrower or any Subsidiary under any Secured Hedge Agreement shall be secured and guaranteed pursuant to the Collateral Documents and the Guarantees only to the extent that, and for so long as, the other Obligations are so secured and guaranteed and (ii) any release of Collateral or Guarantors effected in a manner permitted by this Agreement or any other Loan Document shall not require the consent of any counterparty to any Secured Hedge Agreement other than in their capacity as a Lender or an Agent.

"<u>OFAC</u>" means U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department or the U.S. Department of State.

"<u>Organization Documents</u>" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the

36

partnership, joint venture or other applicable agreement of formation or organization and any agreement, declaration, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Connection Taxes" means, with respect to any Agent or Lender, Taxes imposed as a result of a present or former connection between such Agent or Lender and the jurisdiction imposing such Tax (other than connections arising from such Agent or Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced, any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary Taxes and any other property, intangible, mortgage recording or similar Taxes which arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than pursuant to an assignment request by the Borrower under Section 3.07).

"Outstanding Amount" means (a) with respect to Loans on any date, the outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Loans (including any refinancing of outstanding Unreimbursed Amounts under Letters of Credit), as the case may be, occurring on such date; and (b) with respect to any L/C Obligations on any date, the outstanding amount thereof on such date and any other changes thereto as of such date, including as a result of any reimbursements of outstanding Unreimbursed Amounts under related Letters of Credit or any reductions in the maximum amount available for drawing under related Letters of Credit taking effect on such date.

"Parent Entity" means any Person that is a direct or indirect parent company (which may be organized as, among other things, a partnership) of Holdings and/or the Borrower, as applicable.

"Participant" has the meaning specified in Section 10.07(e).

"Participant Register" has the meaning specified in Section 10.07(e).

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA) other than a Multiemployer Plan, that is subject to Title IV of ERISA and in respect of which any Loan Party or any ERISA Affiliate of a Loan Party is (or, if such plan were terminated would under Section 4062 or Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Permitted Acquisition" has the meaning specified in Section 7.02(n).

37

"Permitted Holder Group" means any "group" (within the meaning of Rule 13d-5 of the Exchange Act) owning Equity Interests having the power to vote or direct the voting for the election of directors of Holdings if a majority of such Equity Interests owned by the group is owned by Permitted Holders.

"Permitted Holders" means any Person owning Equity Interests in Holdings on the Closing Date.

"Permitted Refinancing Indebtedness" means, with respect to any Indebtedness (the "Refinanced Indebtedness"), any Indebtedness Incurred in exchange for or as a replacement of (including by entering into alternative financing arrangements in respect of such exchange or replacement (in whole or in part), either by adding or replacing lenders, creditors, agents, borrowers and/or guarantors, or after the original instrument giving rise to such Indebtedness has been terminated and including, by entering into any new credit agreement, loan agreement, note purchase agreement, indenture or other agreement), or the net proceeds of which are Incurred for the purpose of modifying, extending, refinancing, renewing, replacing, redeeming, repurchasing, defeasing, amending, supplementing, restructuring, repaying or refunding (collectively to "Refinance" or a "Refinancing" or "Refinanced"), such Refinanced Indebtedness (or previous refinancing thereof constituting Permitted Refinancing Indebtedness); provided that (a) after giving effect to such Refinancing, the principal amount (or accreted value, if applicable) thereof will not exceed the principal amount (or accreted value, if applicable) of the Refinanced Indebtedness except by an amount equal to unpaid accrued interest and premium thereon, (b) other than with respect to a Refinancing in respect of Indebtedness permitted pursuant to Section 7.03(f), such Permitted Refinancing Indebtedness has a Weighted Average Life to Maturity and maturity date that is equal to or greater than the Weighted Average Life to Maturity and maturity date of the Refinanced Indebtedness and such Permitted Refinancing Indebtedness does not contain any mandatory prepayment, redemption or other similar requirements that are in excess of those provided for under the applicable Refinanced Indebtedness unless such requirements are customary and on market terms for the nature of the subject Refinancing Indebtedness at the time of its Incurrence, (c) (i) if such Refinanced Indebtedness is unsecured, such Permitted Refinancing Indebtedness shall be unsecured and (ii) if such Refinanced Indebtedness is secured, such Permitted Refinancing Indebtedness shall either be unsecured or secured by the same collateral, and with the same (or junior) lien priority, as exists with respect to the Refinanced Indebtedness, (d) each of the obligors with respect to such Permitted Refinancing Indebtedness are Guarantors, and each obligor with respect to such Permitted Refinancing Indebtedness was also an obligor with respect to the Refinanced Indebtedness, (e) no Default or Event of Default shall exist at the time of, or would result from, the Incurrence of such Permitted Refinancing Indebtedness, (f) is in compliance with the Financial Covenant, before and on a pro forma basis for the Incurrence of such Permitted Refinancing Indebtedness and (g) (i) to the extent such Refinanced Indebtedness is subordinated in right of payment to the Obligations, such Permitted Refinancing Indebtedness is subordinated in right of payment to the Obligations on terms at least as favorable to the Lenders, when taken as a whole, as those contained in the documentation governing the Indebtedness being so Refinanced and (ii) the terms and conditions (including, any financial covenants and, if applicable, as to collateral but excluding as to subordination, interest rates (including through fixed interest rates), interest rate margins, rate floors, fees, funding discounts, original issue discounts and redemption or prepayment terms and premiums) of any such Permitted Refinancing Indebtedness, taken as a whole, are not materially more restrictive

38

on the Borrower and its Subsidiaries, when taken as a whole, than the terms and conditions of the Refinancing Indebtedness.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning assigned to such term in the recitals.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) other than a Foreign Plan or a Multiemployer Plan, established or maintained by any Loan Party.

"Plan Effective Date" has the meaning assigned to the term "Effective Date" in the Plan of Reorganization.

"Plan of Reorganization" shall mean the Pre-Petition Borrower's Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated [          ], 2017 (as amended, supplemented or otherwise modified from time to time), as approved pursuant to the Confirmation Order, in accordance with section 1129 of the Bankruptcy Code, as amended, supplemented or otherwise modified from time to time (whether any such further amendment, supplement or other modification is effected through an amendment, supplement or other modification to the Plan of Reorganization itself or through the Confirmation Order), so long as any such further amendment, supplement or other modification does not adversely affect the Lenders.

"Platform" has the meaning specified in Section 10.02(b)(i).

"Pre-Petition Borrower" has the meaning specified in the recitals.

"Pre-Petition First Lien Credit Agreement" has the meaning assigned thereto in the recitals.

"Pre-Petition Second Lien Credit Agreement" has the meaning assigned thereto in the recitals.

"Prepayment Event" means:

(a) any sale, transfer or other disposition of any property or asset of the Borrower or any of its Subsidiaries permitted by Sections 7.05 (a), (i) , (k), (l) or (n);

(b) the receipt by any Loan Party of the proceeds of any Casualty Event, loss of property or assets or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding;

(c) the incurrence by the Borrower or any of its Subsidiaries of any Indebtedness, other than Indebtedness permitted under Section 7.03; or

NAI-1502411964v15

(d) any sale, transfer or other disposition of any property or asset of the Borrower or any of its Subsidiaries permitted by Section 7.05 (o).

"Prepayment Premium" has the meaning assigned to such term in Section 2.09(a).

"Present Fair Saleable Value" means the amount that could be obtained by an independent willing seller from an independent willing buyer if the assets (both tangible and intangible) of the applicable Person and its subsidiaries taken as a whole are sold on a going-concern basis with reasonable promptness in an arm's-length transaction under present conditions for the sale of comparable business enterprises insofar as such conditions can be reasonably evaluated.

"Prime Rate" means the rate of interest per annum announced from time to time by Credit Suisse (or any successor to Credit Suisse in its capacity as Administrative Agent) as its prime commercial lending rate in effect at its principal office in New York City.  The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer.

"Pro Rata Share" means, with respect to each Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Commitments of such Lender under the First Lien Term Facility at such time and the denominator of which is the amount of the Aggregate Commitments under the First Lien Term Facility at such time.

"Public Lender" has the meaning specified in Section 10.02(b)(i).

"Qualified Equity Interests" means any Equity Interests that are not Disqualified Equity Interests.

"Refinance, Refinanced and Refinancing" each has the meaning specified in the definition of the term "Permitted Refinancing Indebtedness".

"Refinanced Indebtedness" has the meaning specified in the definition of the term "Permitted Refinancing Indebtedness".

"Register" has the meaning specified in Section 10.07(d).

"Release" means any release, spill, leak, discharge, abandonment, disposal, pumping, pouring, emitting, emptying, injecting, leaching, dumping, depositing, dispersing, allowing to escape or migrate into or otherwise enter the environment (including ambient air, surface water, groundwater, wetlands, land, surface, and subsurface strata or within any building, structure, facility or fixture, subject in each case, to human occupation) of any Hazardous Materials.

"Reportable Event" means, with respect to any Plan, any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived.

40

"Required Lenders" means, as of any date of determination, Lenders having outstanding Loans and unused Commitments representing more than 50% of the sum of the aggregate outstanding Loans and unused Commitments at such time.

"Responsible Officer" means the chief executive officer, president, vice president, chief financial officer, treasurer or assistant treasurer or other similar officer of a Loan Party and, as to any document delivered on the Closing Date, any secretary or assistant secretary of a Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest in the Borrower or Holdings, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest of the Borrower or Holdings.

"Restructuring Support Agreement" means that certain Amended and Restated Restructuring Support Agreement, dated as of January 30, 2017 (as amended, to the extent permitted hereunder) by and among (a) the Pre-Petition Borrower, (b) Holdings, (c) all of the Pre-Petition Borrower's direct and indirect subsidiaries, (d) the holders of claims under the Existing First Lien Credit Agreement party thereto, (e) the holders of claims under the Existing Second Lien Credit Agreement party thereto, and (f) Clarity Holdco, L.P., a Delaware limited partnership, and Clarity GP, LLC, a Delaware limited liability company (solely in their capacity as holders of direct and/or indirect existing equity interests in the Debtors).

"S&P" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business, and any successor thereto.

"Sale Leaseback" means any transaction or series of related transactions pursuant to which the Borrower or any of its Subsidiaries (a) sells, transfers or otherwise Disposes of any property, real or personal, whether now owned or hereafter acquired, and (b) as part of such transaction, thereafter rents or leases such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold, transferred or Disposed.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Second Lien Administrative Agent" shall have the meaning assigned to the term "Administrative Agent" in the Second Lien Credit Agreement.

"Second Lien Credit Agreement" shall mean the Credit Agreement, dated as of the date hereof, among Holdings, the Borrower, the lenders party thereto, and the Second Lien Administrative Agent governing the Second Lien Term Facility.

41

"Second Lien Credit Documents" shall mean the Second Lien Credit Agreement and each other Loan Document (as defined in the Second Lien Credit Agreement) executed in connection therewith or pursuant thereto.

"Second Lien Term Facility" shall have the meaning provided in the recitals of this Agreement.

"Second Lien Loans" shall have the meaning assigned to the term "Second Lien Loans" in the Second Lien Credit Agreement.

"Section 6.01 Financials" means the financial statements delivered, or required to be delivered, pursuant to Section 6.01 together with the Compliance Certificate.

"Secured Hedge Agreement" means any agreement in respect of any Swap Contract agreement specified by the Borrower and permitted under Section 7.03(q) that (a) is entered into by and between any Loan Party or any Subsidiary and any Hedge Bank and (b) is specified in writing by the Borrower to the Administrative Agent as constituting a "Secured Hedge Agreement" hereunder.

"Secured Leverage Ratio" means, as of any date of determination, the ratio of (a) the sum of (x) the principal amount of Indebtedness hereunder, (y) the principal amount of Indebtedness under the Second Lien Credit Documents and (z) the principal amount of any Refinancing of any Indebtedness under clauses (x) and (y), in each case, as of the last day of the Test Period most recently ended on or prior to the date of determination to (b) Consolidated EBITDA for such Test Period.

"Secured Parties" means, collectively, the Administrative Agent, the Collateral Agent, the L/C Issuer, each L/C Participant, and each Lender, in each case with respect to the Facilities, each Hedge Bank that is party to any Secured Hedge Agreement, and each sub-agent pursuant to Section 9.01(c) appointed by the Administrative Agent with respect to matters relating to the Facilities or the Collateral Agent with respect to matters relating to any Collateral Document.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Security Agreement" means, collectively, (a) the Security Agreement executed by certain Loan Parties substantially in the form of Exhibit F and (b) each Security Agreement Supplement executed and delivered pursuant to Section 6.10.

"Security Agreement Supplement" has the meaning specified in the applicable Security Agreement.

"Sold Entity or Business" has the meaning specified in the definition of the term "Consolidated EBITDA."

"Solvent" means, with respect to any Person, at any date, that (a) the sum of such Person's debts (including contingent liabilities) do not exceed the Present Fair Saleable Value of

such Person's present assets, (b) such Person's capital is not unreasonably small in relation to its business as contemplated on such date and (c) such Person has not incurred and does not intend to incur, or believe that it will incur, debts (including current obligations) beyond its ability to pay such debts as they become due (whether at maturity or otherwise).  For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"SPC" has the meaning specified in Section 10.07(h).

"Specified Transaction" means, with respect to any period (including any period prior to the Closing Date), any Investment, Disposition, Incurrence of Indebtedness, Refinancing, prepayment or repayment of Indebtedness, Restricted Payment, restructuring, other strategic initiative (including cost saving initiative) or other action of the Borrower or any of its Subsidiaries after the Closing Date or other event that by the terms of the Loan Documents requires "pro forma compliance" with a test, ratio or covenant hereunder or requires such test or covenant to be calculated on a "pro forma basis" or after giving "pro forma effect" thereto, other than, for the avoidance of doubt, any such action or other event that constitutes a "Transaction" as set forth in the definition thereof.

"Statutory Reserves" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the FRB and any other banking authority, domestic or foreign, to which the Administrative Agent or any Lender (including any branch, Affiliate, or other fronting office making or holding a Loan) is subject for Eurocurrency Liabilities (as defined in Regulation D of the Board).  Eurodollar Loans shall be deemed to constitute Eurocurrency Liabilities (as defined in Regulation D of the Board) and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D.  Statutory Reserves shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subordinated Debt" means Indebtedness for borrowed money Incurred by a Loan Party that is subordinated in right of payment to the prior payment of the Obligations of such Loan Party under the Loan Documents.

"Subordinated Intercompany Note" means the Subordinated Intercompany Note, dated as of the Closing Date, substantially in the form of Exhibit K executed by Holdings, the Borrower and each other Subsidiary of the Borrower.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a

43

contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Subsidiary Guarantor" means, collectively, the Subsidiaries of the Borrower that are Guarantors.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark to market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Taxes" means all present or future taxes, duties, levies, imposts, deductions, assessments, fees, withholdings (including backup withholding) or similar charges and all liabilities (including additions to tax, penalties and interest) with respect thereto.

"Term Loan Repayment Amount" has the meaning specified in Section 2.07(a).

"Test Period" means, at any date of determination, the most recently completed four consecutive fiscal quarters of the Borrower ending on or prior to such date for which Section 6.01 Financials have been delivered; provided that prior to the first date the Section 6.01 Financials have been delivered, the Test Period in effect shall be the period of four consecutive fiscal quarters of the Borrower ended December 31, 2016. A Test Period may be designated by reference to the last day thereof (i.e. the December 31, 2016 Test Period refers to the period of four consecutive fiscal quarters of the Borrower ended December 31, 2016), and a Test Period shall be deemed to end on the last day thereof.

"Threshold Amount" means $1,000,000.

"Transaction Expenses" means any fees, costs or expenses Incurred or payable by Holdings, the Borrower, or any of their Subsidiaries in connection with the Transactions, this Agreement and the other Loan Documents and the transactions contemplated hereby and thereby.

"Transactions" means, collectively, (a) the execution, delivery and performance by each Loan Party of the Loan Documents to which it is to be a party, the borrowing of Loans and the use of the proceeds thereof, (b) the entry into the Second Lien Loan Documents and the making of the Second Lien Loans on the Closing Date, (c) the repayment of all amounts due or outstanding under or in respect of and the termination of, the DIP Facility, (d) the payment of the Transaction Expenses, and (e) the consummation of the other transactions contemplated by the Plan of Reorganization as of the Plan Effective Date.

"Type" means as to any Loan, its nature as a Base Rate Loan or a Eurocurrency Loan.

"Unaudited Financial Statements" means the unaudited consolidated balance sheets and related statements of income and cash flows of Holdings and the Borrower, for each fiscal quarter ended after the most recent fiscal year covered by the Audited Financial Statements and at least forty-five (45) days before the Closing Date.

"Uniform Commercial Code" or "UCC" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"United States" and "U.S." mean the United States of America.

"Unreimbursed Amount" has the meaning specified in Section 2.03(b)(i).

"Unrestricted Cash" means the aggregate amount of unrestricted cash subject to the Collateral Agent's Liens and held at such time by the Loan Parties in accounts subject to Control Agreements to which the Collateral Agent is a party.

"U.S. Trustee" shall mean the office of the United States Trustee for the Southern District of New York.

"USA PATRIOT Act" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)), as amended or modified from time to time.

"Voting Stock" means, with respect to any Person, shares of such Person's Equity Interests having the right to vote for the election of members of the Board of Directors of such Person under ordinary circumstances.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment by (ii) the then outstanding principal amount of such Indebtedness.

"Wholly-Owned" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly-owned Subsidiaries of such Person.

"Withdrawal Liability" means the liability of a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Withholding Agent" means any Loan Party and the Administrative Agent.

Section 1.02    Other Interpretive Provisions. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a) In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(b) The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(c) (i)    The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(i)    Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(ii)    The term "including" is by way of example and not limitation.

(iii)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(d) Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

NAI-1502411964v15

Section 1.03        Accounting Terms.

(a) All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

(b) [Reserved].

(c) [Reserved].

(d) Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under FASB Accounting Standards Codification 825-Financial Instruments, or any successor thereto (including pursuant to the FASB Accounting Standards Codification), to value any Indebtedness of the Borrower or any subsidiary at "fair value," as defined therein.

Section 1.04        Rounding. Any financial ratios required to be satisfied in order for a specific action to be permitted under this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding up if there is no nearest number).

Section 1.05        References to Agreements, Laws, Etc. Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are permitted by any Loan Document; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.06        Times of Day. Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.07        Timing of Payment or Performance. When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day.

47

Section 1.08      Currency Equivalents Generally.

(a)  For purposes of any determination under Section 6, Section 7 (other than Section 7.09) or Section 8 or any determination under any other provision of this Agreement requiring the use of a current exchange rate, all amounts Incurred, outstanding or proposed to be Incurred or outstanding in currencies other than Dollars shall be translated into Dollars at the Exchange Rate then in effect on the date of such determination; provided, however, that (x) for purposes of determining compliance with Section 7 with respect to the amount of any Indebtedness, Investment, Disposition, Restricted Payment or payment under Section 7.08 in a currency other than Dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Indebtedness or Investment is Incurred or Disposition, Restricted Payment or payment under Section 7.08 is made, (y) for purposes of determining compliance with any Dollar-denominated restriction on the Incurrence of Indebtedness, if such Indebtedness is Incurred to refinance other Indebtedness denominated in a foreign currency, and such Refinancing would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency Exchange Rate in effect on the date of such Refinancing, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinanced Indebtedness does not exceed the principal amount of such Indebtedness being Refinanced except by an amount equal to unpaid accrued interest and premium thereon plus other reasonable amounts paid, and fees and expenses reasonably Incurred, in connection with such Refinancing and (z) for the avoidance of doubt, the foregoing provisions of this Section 1.08 shall otherwise apply to such Sections, including with respect to determining whether any Indebtedness or Investment may be Incurred or Disposition, Restricted Payment or payment under Section 7.08 may be made at any time under such Sections.  For purposes of Section 7.09, amounts in currencies other than Dollars shall be translated into Dollars at the applicable Exchange Rates used in preparing the most recently delivered Section 6.01 Financials on or prior to such date.

Section 1.09      [Reserved].

Section 1.10      Pro Forma and Other Calculations.

(a)  Notwithstanding anything to the contrary herein, financial ratios and tests (including measurements of the Secured Leverage Ratio) shall be calculated in the manner prescribed by this Section 1.10.  In addition, whenever a financial ratio or test is to be calculated on a pro forma basis or requires pro forma compliance, the reference to "Test Period" for purposes of calculating such financial ratio or test shall be deemed to be a reference to, and shall be based on, the most recently ended Test Period for which Section 6.01 Financials have been delivered.

(b)  For purposes of calculating any financial ratio or test (including Consolidated EBITDA), Specified Transactions (with any Incurrence or Refinancing of any Indebtedness in connection therewith to be subject to clause (c) of this Section 1.10) that have been made (i) during the applicable Test Period or (ii) subsequent to

such Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made shall be calculated on a <u>pro forma</u> basis assuming that all such Specified Transactions (and any increase or decrease in Consolidated EBITDA and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day of the applicable Test Period.  If since the beginning of any applicable Test Period any Person was merged, amalgamated or consolidated with or into the Borrower or any Subsidiary since the beginning of such Test Period shall have made any Specified Transaction that would have required adjustment pursuant to this <u>Section 1.10</u>, then such financial ratio or test (including Consolidated EBITDA) shall be calculated to give pro forma effect thereto in accordance with this <u>Section 1.10</u>.

(c)  In the event that the Borrower or any Subsidiary Incurs (including by assumption or guarantee) or Refinances (including by redemption, repurchase, repayment, retirement or extinguishment) any Indebtedness (other than Indebtedness Incurred or Refinanced under any revolving credit facility or line of credit unless such Indebtedness has been permanently repaid and not replaced), in each case included in the calculations of any financial ratio or test, (i) during the applicable Test Period or (ii) subsequent to the end of the applicable Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, then such financial ratio or test shall be calculated giving pro forma effect to such Incurrence or Refinancing of Indebtedness, in each case to the extent required, as if the same had occurred on the last day of the applicable Test Period.

(d)  If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the date of the event for which the calculation is made had been the applicable rate for the entire period (taking into account any interest Swap Contracts applicable to such Indebtedness).  Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by an Authorized Officer of the Borrower to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.  Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen as the Borrower or applicable Subsidiary may designate. For purposes of making the computations referred to above, interest on any Indebtedness under a revolving credit facility computed on a <u>pro forma</u> basis shall be computed based upon the average daily balance of such Indebtedness during the applicable period.

49

# ARTICLE II

## THE LOANS

Section 2.01      The Loans

(a)  Subject to the terms and conditions set forth herein and to give effect to the conversion of the DIP Facility Obligations owing to each Lender, each Lender severally agrees to make and shall be deemed to have made, on the Closing Date, a term loan denominated in Dollars to the Borrowers (each such loan, a "Converted Loan") in a principal amount equal to the DIP Facility Obligations owing to such Lender on the Closing Date, and the DIP Facility Obligations owing to the Lenders under the DIP Facility Agreement shall be deemed repaid by the making of the Converted Loans. The principal amount of the Converted Loan of each Lender as of the Closing Date is set forth in Schedule 2.01. The Converted Loans deemed made pursuant this Section 2.01(a) shall be made without any actual funding. After giving effect to this Section 2.01(a), the aggregate principal amount of the Converted Loans on the Closing Date shall be $[        ].  Any Converted Loan shall be considered a "Loan" for all purposes hereunder.

(b)  Any Loans borrowed and subsequently repaid or prepaid, in whole or in part, may not be reborrowed.

Section 2.02      Borrowings, Conversions and Continuations of Loans.

(a)  Each Borrowing and each continuation of Eurocurrency Rate Loans shall be made upon the Borrower's notice (which shall be revocable for a Borrowing so long as the Borrower agrees to comply with the applicable provisions of Section 3.05 upon any such revocation) to the Administrative Agent, which may be given by telephone. Each such notice must be received by the Administrative Agent not later than 1:00 p.m. (i) three (3) Business Days prior to the requested date of any Borrowing or continuation of Eurocurrency Rate Loans or any conversion of Base Rate Loans to Eurocurrency Rate Loans, as applicable, and (ii) one (1) Business Day before the requested date of any Borrowing of Base Rate Loans or any conversion of Eurocurrency Rate Loans to Base Rate Loans, as applicable; provided that notwithstanding the foregoing, notice must only be given by 1:00 p.m. on the date of Borrowing in the case of any Borrowing on the Closing Date. Each telephonic notice by the Borrower pursuant to this Section 2.02(a) must be confirmed promptly by delivery to the Administrative Agent of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower. Each Borrowing of, conversion to or continuation of Eurocurrency Rate Loans shall be in a principal amount of $3,000,000 or greater.  Each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $3,000,000 or greater.  Each Committed Loan Notice (whether telephonic or written) shall specify (i) whether the Borrower is requesting a Borrowing, a conversion of Loans from one Type to the other, or a continuation of Eurocurrency Rate Loans, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii)

50

the principal amount of Loans to be borrowed, converted or continued, (iv) the Type of Loans to be borrowed or to which existing Loans are to be converted, and (v) if applicable, the duration of the Interest Period with respect thereto. If the Borrower fails to specify a Type of Loan in a Committed Loan Notice, then the applicable Loans shall be made as Eurocurrency Rate Loans with an Interest Period of one month.  If the Borrower fails to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made as the same Type of Loan, and if applicable, with the same Interest Period, as such Loans.  If the Borrower requests a Borrowing of, conversion to, or continuation of Eurocurrency Rate Loans in any such Committed Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one (1) month. For the avoidance of doubt, the Borrower and Lenders acknowledge and agree that any conversion or continuation of an existing Loan shall be deemed to be a continuation of that Loan with a converted interest rate methodology and not a new Loan.

(b) Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share of the Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Lender of the details of such Loans as described in Section 2.02(a). In the case of each Borrowing, each Lender shall make (or cause its Applicable Lending Office to make) the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Committed Loan Notice; provided that on the Closing Date, such funds may be made available at such earlier time as may be agreed among the relevant Lenders, the Borrower and the Administrative Agent for the purpose of consummating the Transactions. Upon satisfaction of the applicable conditions set forth in Section 4.01), the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent either by (i) crediting the account of the Borrower on the books of the Administrative Agent with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to the Administrative Agent by the Borrower; provided, further, that if, on the date the Committed Loan Notice with respect to such Borrowing is given by the Borrower, there are L/C Borrowings outstanding, then the proceeds of such Borrowing shall be applied first, to the payment in full of any such L/C Borrowings, and second, to the Borrower as provided above.

(c) Except as otherwise provided herein, a Eurocurrency Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurocurrency Rate Loan, unless the Borrower pays the amount due, if any, under Section 3.05 in connection therewith. During the existence of an Event of Default, the Administrative Agent or the Required Lenders may require that no Loans may be converted to or continued as Eurocurrency Rate Loans.

(d) The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for Eurocurrency Rate

51

Loans upon determination of such rate. The determination of the Eurocurrency Rate by the Administrative Agent shall be conclusive in the absence of manifest error.

(e)  Borrowings of more than one Type may be outstanding at the same time; provided that there shall not at any time be more than a total of four (4) Eurocurrency Borrowings outstanding.

Section 2.03    Letters of Credit.

(a)  The Letter of Credit Commitments.

(i)        It is hereby acknowledged and agreed that each of the letters of credit described in Schedule 2.03(a)(i) (the "Existing Letters of Credit") that are undrawn shall constitute a "Letter of Credit" for all purposes of this Agreement and shall be deemed issued under this Agreement on the Closing Date.

(ii)       Each L/C Participant has agreed to participate in such Letters of Credit pursuant to this Agreement.

(iii)      The L/C Issuer shall not issue any new Letters of Credit hereunder or renew or extend the expiry date of any Existing Letter of Credit.

(b)  Drawings and Reimbursements; Funding of Participations.

(i)        Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the L/C Issuer shall promptly notify the Borrower and the Administrative Agent in writing thereof. On the Business Day immediately following the Business Day on which the Borrower shall have received such notice of any payment by the L/C Issuer under a Letter of Credit (or, if the Borrower shall have received such notice later than 1:00 p.m. on any Business Day, on the second succeeding Business Day) (each such date, an "Honor Date"), the Borrower shall reimburse the L/C Issuer through the Administrative Agent in an amount equal to the amount of such drawing. If the Borrower fails to so reimburse the L/C Issuer, including any related accrued but unpaid fees, by such time, the Administrative Agent shall promptly notify each L/C Participant of the Honor Date, the amount of the unreimbursed drawing (the "Unreimbursed Amount"), and the amount of such L/C Participant's L/C Participant Pro Rata Share thereof.

(ii)       With respect to any Unreimbursed Amount in respect of a Letter of Credit that is not fully repaid as provided above, the Borrower shall be deemed to have Incurred from the L/C Issuer an L/C Borrowing in the amount of the Unreimbursed Amount that is not so refinanced, which L/C Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the Default Rate.

(iii)      Until each L/C Participant funds its Loan to reimburse the L/C Issuer for any amount drawn under any Letter of Credit, interest in respect of such

52

L/C Participant's share of such amount shall be solely for the account of the L/C Issuer.

(iv)         If, at any time after the L/C Issuer has paid a draw under any Letter of Credit and has received from any L/C Participant such L/C Participant's L/C Advance in respect of such draw, the Administrative Agent receives for the account of the L/C Issuer any payment in respect of the related Unreimbursed Amount or interest thereon (whether directly from the Borrower or otherwise), the Administrative Agent will distribute to each L/C Participant its L/C Participant Pro Rata Share thereof (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such L/C Participant's L/C Advance was outstanding) in the same funds as those received by the Administrative Agent.

(c) <u>Obligations Absolute</u>. The obligation of the Borrower to reimburse the L/C Issuer for each drawing under each Letter of Credit issued by it and to repay each L/C Borrowing shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:

(i)         any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other agreement or instrument relating thereto;

(ii)         the existence of any claim, counterclaim, setoff, defense or other right that any Loan Party may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the L/C Issuer or any other Person, whether in connection with this Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(iii)         any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(iv)         any payment by the L/C Issuer under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by the L/C Issuer under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law;

(v)         any exchange, release or nonperfection of any Collateral, or any release or amendment or waiver of or consent to departure from the Guaranty

NAI-1502411964v15

or any other guarantee, for all or any of the Obligations of any Loan Party in respect of such Letter of Credit; or

(vi)        any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Loan Party;

provided that the foregoing shall not excuse the L/C Issuer from liability to the Borrower to the extent of any direct damages (as opposed to consequential or exemplary damages) suffered by the Borrower that are caused by the L/C Issuer's gross negligence or willful misconduct when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.

(d)    Role of L/C Issuer.  Each Lender and the Borrower agree that, in paying any drawing under a Letter of Credit, the L/C Issuer shall not have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document. None of the L/C Issuer, any Agent-Related Person nor any of the respective correspondents, participants or assignees of the L/C Issuer shall be liable to any Lender for (i) any action taken or omitted in connection herewith at the request or with the approval of the Lenders or the Required Lenders, as applicable; (ii) any action taken or omitted in the absence of gross negligence or willful misconduct; or (iii) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit. The Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; provided that this assumption is not intended to, and shall not, preclude the Borrower's pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement. None of the L/C Issuer, any Agent-Related Person, nor any of the respective correspondents, participants or assignees of the L/C Issuer, shall be liable or responsible for any of the matters described in clauses (i) through (iii) of this Section 2.03(d); provided that anything in such clauses to the contrary notwithstanding, the Borrower may have a claim against the L/C Issuer, and the L/C Issuer may be liable to the Borrower, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Borrower caused by the L/C Issuer's gross negligence or willful misconduct or the L/C Issuer's willful or grossly negligent failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit. In furtherance and not in limitation of the foregoing, the L/C Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and the L/C Issuer shall not be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.

54

(e)  [Reserved].

(f)  Letter of Credit Fees.  The Borrower shall pay to the Administrative Agent for the account of each L/C Participant in accordance with its L/C Participant Pro Rata Share a Letter of Credit fee for each Letter of Credit issued pursuant to this Agreement equal to the product of (i) Applicable Rate for Letter of Credit fees and (ii) the daily maximum amount then available to be drawn under such Letter of Credit. Such letter of credit fees shall be computed on a quarterly basis in arrears. Such letter of credit fees shall be due and payable on the last Business Day each March, June, September and December, commencing with the first such date to occur after the issuance of such Letter of Credit and thereafter on demand. If there is any change in the Applicable Rate during any quarter, the daily maximum amount of each Letter of Credit shall be computed and multiplied by the Applicable Rate separately for each period during such quarter that such Applicable Rate was in effect.

(g)  Fronting Fee and Documentary and Processing Charges Payable to L/C Issuer.  The Borrower shall pay directly to the L/C Issuer for its own account a fronting fee (a "Fronting Fee") with respect to each Letter of Credit issued by it equal to 0.125% per annum (or such other percentage as may be separately agreed to between the L/C Issuer and the Borrower) of the daily maximum amount then available to be drawn under such Letter of Credit. Such fronting fees shall be computed on a quarterly basis in arrears. Such fronting fees shall be due and payable on the last Business Day of each March, June, September and December, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand. In addition, the Borrower shall pay directly to the L/C Issuer for its own account the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of the L/C Issuer relating to letters of credit as from time to time in effect. Such customary fees and standard costs and charges are due and payable within ten (10) Business Days of demand and are nonrefundable.

(h)  Conflict with Letter of Credit Application. Notwithstanding anything else to the contrary in any application or other document related to any Letter of Credit, in the event of any conflict between the terms hereof and the terms of any application or other document related to a letter of credit, the terms hereof shall control.

Section 2.04        [Reserved].

Section 2.05        Prepayments.

(a)  Optional Prepayments. Subject to Section 2.09(a), the Borrower may, upon notice to the Administrative Agent, at any time or from time to time voluntarily prepay Loans in whole or in part without premium or penalty; provided that (1) such notice must be received by the Administrative Agent not later than 1:00 p.m. (A) three (3) Business Days prior to any date of prepayment of Eurocurrency Rate Loans and (B) on the date of prepayment of Base Rate Loans; (2) any prepayment of Eurocurrency Rate Loans shall be in a principal amount of $1,000,000 or a whole

55

multiple of $500,000 in excess thereof; and (3) any prepayment of Base Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $100,000 in excess thereof or, in the case of each of <u>clauses (2)</u> and <u>(3)</u>, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment and the Type(s) of Loans to be prepaid. The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share of such prepayment.  Any prepayment of a Loan shall be accompanied by all accrued interest thereon, and any prepayment of a Eurocurrency Rate Loan shall be accompanied by any additional amounts required pursuant to <u>Section 3.05</u>.  Each prepayment of the Loans pursuant to this <u>Section 2.05(a)</u> shall be paid to the Lenders in accordance with <u>Section 8.04</u>.  At the Borrower's election in connection with any prepayment pursuant to this <u>Section 2.05(a)</u>, such prepayment shall not be applied to any Loan of a Defaulting Lender.

     (b) <u>Mandatory Prepayments</u>.

     (i)     In the event and on each occasion that any Net Proceeds are received by or on behalf of Holdings, the Borrower or any Subsidiary in respect of any Prepayment Event, due to a single transaction or a related series of transactions, exceed $1,000,000 and the Secured Leverage Ratio is greater than 5.50:1.00, the Borrower shall, within two (2) Business Days after such Net Proceeds are received (or, in the case of a Prepayment Event described in clause (c) of the definition of the term "Prepayment Event," on the date of such Prepayment Event), prepay Borrowings in an aggregate amount equal to 100% of the amount of such Net Proceeds (or to the extent the aggregate Net Proceeds exceed $50,000,000, (x) in the case of a Prepayment Event described in clauses (a) or (b) of such definition, 50% of such excess Net Proceeds and (y) in the case of a Prepayment Event described in clause (d) of such definition, 100% of such excess Net Proceeds) of the amount of such Net Proceeds; <u>provided that</u> (i) any Net Proceeds in respect of a Prepayment Event described in clause (a) of the definition of the term "Prepayment Event" shall not be required to be so applied to the extent that (A) such Net Proceeds are deposited with the L/C Issuer as cash collateral, in an aggregate amount not to exceed 105% of the L/C Obligation at such time, or (B) in the case of aggregate Net Proceeds less than $50,000,000, the Borrower invests such Net Proceeds in new or existing properties or assets used in the Loan Parties' business and constituting Collateral hereunder, within 90 days after such Net Proceeds are received (but in no event later than the Maturity Date); and (ii) any Net Proceeds in respect of a Prepayment Event described in clause (b) of the definition of the term "Prepayment Event" in an aggregate amount not to exceed $50,000,000 shall not be required to be so applied to the extent that the Borrower invests such Net Proceeds to repair or replace the assets for which such proceeds were received, to the extent constituting Collateral hereunder, within 90 days after such Net Proceeds are received (but in no event later than the Maturity Date).  In the event and on each occasion that any Net Proceeds are received by or on behalf of Holdings, the Borrower or any Subsidiary in respect of any Prepayment Event and the Secured Leverage Ratio is

less than or equal to 5.50:1.00, the Borrower may reinvest, or, in the case of a Subsidiary, cause to be reinvested, all or any portion of such Net Proceeds in its business within (x) twelve (12) months following receipt of such Net Proceeds or (y) if the Borrower enters into a legally binding commitment to reinvest such Net Proceeds within twelve (12) months following receipt thereof, within the later of (1) twelve (12) months following receipt thereof or (2) one hundred and eighty (180) days of the date of such legally binding commitment; provided that if any Net Cash Proceeds are not so reinvested by the deadline specified in clause (x) or (y) above, as applicable, an amount equal to the Net Proceeds shall be offered to the prepayment of the Term Loans as set forth in this Section 2.05(b).

(ii)     The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Term Loans required to be made pursuant to clause (i) of this Section 2.05(b) at least three (3) Business Days prior to 1:00 p.m. on the date of such prepayment. The Administrative Agent will promptly notify each Lender of the contents of the Borrower's prepayment notice and of such Lender's portion of each such prepayment pursuant to Section 8.04. Each Lender may reject all or a portion of any mandatory prepayment owed to such Lender (such declined amounts, the "Declined Proceeds") of Term Loans required to be made pursuant to clauses (i) and (ii), of this Section 2.05(b) by providing written notice (each, a "Rejection Notice") to the Administrative Agent and the Borrower no later than 9:00 a.m. one (1) Business Day after the date of such Lender's receipt of notice from the Administrative Agent regarding such prepayment. Each Rejection Notice from a given Lender shall specify the principal amount of the mandatory prepayment of Term Loans to be rejected by such Lender. If a Lender fails to deliver a Rejection Notice to the Administrative Agent within the time frame specified above or such Rejection Notice fails to specify the principal amount of the Term Loans to be rejected, any such failure will be deemed an acceptance of the total amount of such mandatory repayment of Term Loans. Any Declined Proceeds must be offered to prepay the Second Lien Loans in accordance with Section 2.05(b) of the Second Lien Term Facility and, if rejected by any holder of the Second Lien Term Loans, shall be returned to and be permitted to be retained by the Borrower.

(c)  Interest, Funding Losses, Etc. All prepayments under this Section 2.05 shall be accompanied by all accrued interest thereon, together with, in the case of any such prepayment of a Eurocurrency Rate Loan on a date other than the last day of an Interest Period therefor, any amounts owing in respect of such Eurocurrency Rate Loan pursuant to Section 3.05.

(d)  All prepayments of the Term Loans under this Section 2.05 shall be applied to the principal repayment installments thereof set forth in Section 2.07 in inverse chronological order.

NAI-1502411964v15

Section 2.06    Termination of Commitments.  The Commitments shall terminate on the Maturity Date.

Section 2.07    Repayment of Loans.

(a)    Subject to adjustment as a result of the application of prepayments in accordance with Section 2.05, in each case, solely to the extent of any such amounts applied to the prepayment of the First Lien Term Loans, the Borrower shall repay to the Administrative Agent for the ratable account of the First Lien Term Lenders on each date set forth below in the principal amount (each amount, a "Term Loan Repayment Amount") equal to (x) the outstanding principal amount of First Lien Term Loans made to the Borrower on the Closing Date multiplied by (y) the percentage set forth below opposite such date (and with a final installment due on the Maturity Date in an amount equal to the remaining unpaid principal balance of the First Lien Term Loans); provided that if such day is not a Business Day, such payments shall be made on the immediately preceding Business Day:

| Date | Term Loan Repayment Amount |
| --- | --- |
| June 30, 2017 .................................... | 0.25% |
| September 30, 2017........................... | 0.25% |
| December 31, 2017 ........................... | 0.25% |
| March 31, 2018 ................................. | 0.25% |
| June 30, 2018 .................................... | 0.25% |
| September 30, 2018........................... | 0.25% |
| December 31, 2018 ........................... | 0.25% |
| March 31, 2019 ................................. | 0.25% |
| June 30, 2019 .................................... | 0.25% |
| September 30, 2019........................... | 0.25% |
| December 31, 2019 ........................... | 0.25% |
| March 31, 2020 ................................. | 0.25% |
| June 30, 2020 .................................... | 0.25% |
| September 30, 2020........................... | 0.25% |
| December 31, 2020 ........................... | 0.25% |
| March 31, 2021 ................................. | 0.25% |
| Maturity Date .................................... | Remaining unpaid principal balance of the First Lien Term Loans |

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)    The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received

by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)     The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be conclusive evidence, absent manifest error, of the existence and amounts of the obligations recorded therein, provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to pay any amounts due hereunder in accordance with the terms of this Agreement. In the event of any inconsistency between the entries made pursuant to paragraphs (b) and (c) of this Section, the accounts maintained by the Administrative Agent pursuant to paragraph (c) of this Section shall control.

(e)     Any Lender may request through the Administrative Agent that Loans made by it be evidenced by a Note.  In such event, the Borrower shall execute and deliver to such Lender a Note payable to such Lender and its registered assigns and in a form provided by the Administrative Agent and approved by the Borrower.

Section 2.08     Interest.

(a) Subject to the provisions of Section 2.08(b), (i) each Eurocurrency Rate Loan shall bear interest on the Outstanding Amount thereof for each Interest Period at a rate per annum equal to the Adjusted Eurocurrency Rate for such Interest Period plus the Applicable Rate for Eurocurrency Loans then in effect for Eurocurrency Loans and (ii) each Base Rate Loan shall bear interest on the Outstanding Amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate then in effect for Base Rate Loans.

(b) After the occurrence and during the continuance of an Event of Default, the Borrower shall pay interest on the Outstanding Amount hereunder (plus any past due amounts not constituting principal) at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws. Accrued and unpaid interest on any amounts outstanding (including interest on past due interest) shall be due and payable upon demand.

(c) Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

Section 2.09     Additional Payments.

(a) Prepayment Premium. In the event that all or any portion of the Loans are repaid or prepaid for any reason (including as a result of any voluntary prepayments, payments made following acceleration of the Loans or after an Event of Default) prior to the first anniversary of the Closing Date, such repayments or prepayments will be made at 101.0% of the amount repaid or prepaid, if such repayment or

59

prepayment occurs on or prior to the first anniversary of the Closing Date, (the foregoing premiums, the "Prepayment Premium"); provided that the Prepayment Premium shall not apply to (x) mandatory prepayments by Borrower pursuant to Section 2.05(b) or (y) the Term Loan Repayment Amounts made by the Borrower pursuant to Section 2.07, in each case, unless such payments have been made following acceleration of the Loans or after an Event of Default.

(b) Other Payments. The Borrower shall pay to the Administrative Agent such payments and fees as shall have been separately agreed (including pursuant to the Fee Letter) upon in writing in the amounts and at the times so specified. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the applicable Agent).

Section 2.10    Computation of Interest, Fees, and Other Payments. All computations of interest on Base Rate Loans shall be made on the basis of a year of three hundred and sixty-five (365) days or three hundred and sixty-six (366) days, as the case may be, and actual days elapsed.  All other computations of fees, interest, and other payments shall be made on the basis of a three hundred and sixty (360) day year and actual days elapsed.  Interest shall accrue on each Loan for the day on which such Loan is made, and shall not accrue on such Loan, or any portion thereof, for the day on which such Loan or such portion is paid; provided that any such Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one (1) day. Each determination by the Administrative Agent of an interest rate or fee or other payment hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.11    Evidence of Indebtedness.

(a) The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for purposes of Treasury Regulation Section 5f.103-1(c), as agent for the Borrower, in each case in the ordinary course of business. The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive evidence absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note payable to such Lender and its registered assigns, which shall evidence such Lender's Loans in addition to such accounts or records. Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount, maturity and currency of its Loans and payments with respect thereto.

60

(b)  In addition to the accounts and records referred to in Section 2.11(c), each Lender and the Administrative Agent shall maintain in accordance with its usual practice accounts or records and, in the case of the Administrative Agent, entries in the Register, evidencing the purchases and sales by such Lender of participations in Letters of Credit. In the event of any conflict between the accounts and records maintained by the Administrative Agent and the accounts and records of any Lender in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

(c)  Entries made in good faith by the Administrative Agent in the Register pursuant to Section 2.11(a) and (b), and by each Lender in its account or accounts pursuant to Section 2.11(a) and (b), shall be conclusive evidence, absent manifest error, of the amount of principal and interest due and payable or to become account or accounts, such Lender, under this Agreement and the other Loan Documents; provided that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement and the other Loan Documents.

Section 2.12      Payments Generally.

(a)  All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office and in immediately available funds not later than 2:00 p.m. on the date specified herein or such later time as the Administrative Agent may otherwise determine in its reasonable discretion. The Administrative Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Applicable Lending Office. Unless otherwise agreed by the Administrative Agent, all payments received by the Administrative Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)  If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be; provided that if such extension would cause payment of interest on or principal of Eurocurrency Rate Loans to be made in the next succeeding calendar month, such payment shall be made on the immediately preceding Business Day.

(c)  Unless the Borrower or any Lender has notified the Administrative Agent, prior to the date any payment is required to be made by it to the Administrative Agent hereunder, that the Borrower or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that the Borrower or such Lender, as the case may be, has timely made such payment and may (but shall not be required

to), in reliance thereon, make available a corresponding amount to the Person entitled thereto. If and to the extent that such payment was not in fact made to the Administrative Agent in immediately available funds, then:

(i)         if the Borrower failed to make such payment, each Lender shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available to such Lender in immediately available funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender to the date such amount is repaid to the Administrative Agent in immediately available funds at the Federal Funds Rate; and

(ii)        if any Lender failed to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in immediately available funds, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to the Borrower to the date such amount is recovered by the Administrative Agent (the "Compensation Period") at a rate per annum equal to the Federal Funds Rate. When such Lender makes payment to the Administrative Agent (together with all accrued interest thereon), then such payment amount (excluding the amount of any interest which may have accrued and been paid in respect of such late payment) shall constitute such Lender's Loan included in the applicable Borrowing. If such Lender does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent may make a demand therefor upon the Borrower, and the Borrower shall pay such amount to the Administrative Agent, together with interest thereon for the Compensation Period at a rate per annum equal to the rate of Lender from its obligation to fulfill its Commitment or to prejudice any rights which the Administrative Agent or the Borrower may have against any Lender as a result of any default by such Lender hereunder.

Notwithstanding anything to the contrary in this Section 2.12(c), the Administrative Agent shall have no obligation to make available any payments or corresponding amounts to any Persons prior to the Administrative Agent's receipt of such payments from any Borrower or Lender, as applicable.  A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this Section 2.12(c) shall be conclusive, absent manifest error.

(d) If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

62

(e)  The obligations of the Lenders hereunder to make Loans and to fund participations in Letters of Credit are several and not joint. The failure of any Lender to make any Loan or to fund any such participation on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or purchase its participation.

(f)  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(g)  Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Administrative Agent and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the order of priority set forth in Section 8.04. If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may, but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's Pro Rata Share of the sum of (a) the Outstanding Amount of all Loans outstanding at such time and (b) the Outstanding Amount of all L/C Obligations outstanding at such time, in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender.

Section 2.13    Sharing of Payments. If, other than as provided elsewhere in this Agreement, any Lender shall obtain on account of the Loans made by it, or the participations in L/C Obligations held by it, any payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share that it is owed (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) purchase from the other Lenders such participations in the Loans made by them and/or such subparticipations in the participations in L/C Obligations held by them, as the case may be, as shall be necessary to cause such purchasing Lender to share the excess payment in respect of such Loans or such participations, as the case may be, pro rata with each of them; provided that (x) if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon, (y) the provisions of this Section 2.13 shall not be construed to apply to any payment made by the Borrower pursuant to and in

accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in L/C Obligations to any assignee or participant and (z) the provisions of this <u>Section 2.13</u> shall not be construed to apply to any disproportionate payment obtained by a Lender as a result of the extension by Lenders of the maturity date or expiration date of some but not all Loans or Commitments or any increase in the Applicable Rate (or other pricing term, including any fee, discount or premium) in respect of Loans or Commitments of Lenders that have consented to any such extension to the extent such transaction is permitted hereunder. The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this <u>Section 2.13</u> and will in each case notify the Lenders following any such purchases or repayments. Each Lender that purchases a participation pursuant to this <u>Section 2.13</u> shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

Section 2.14    <u>Defaulting Lenders</u>. Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then so long as such Lender is a Defaulting Lender, the Commitment and Outstanding Amount of Loans of such Defaulting Lender shall not be included in determining whether all Lenders or the Required Lenders have taken or may take any action hereunder (including any consent to any amendment, waiver or other modification pursuant to <u>Section 10.01</u>); <u>provided</u> that any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender which affects such Defaulting Lender disproportionately when compared to the other affected Lenders, or increases or extends the Commitment of such Defaulting Lender, shall require the consent of such Defaulting Lender.

## ARTICLE III

### TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

Section 3.01    <u>Taxes</u>.

(a) Except as required by Law, any and all payments by any Loan Party to or for the account of any Agent or any Lender under any Loan Document shall be made free and clear of and without deduction for any Taxes. If any applicable Withholding Agent shall be required by any Laws to deduct any Taxes from or in respect of any sum payable under any Loan Document to any Agent or any Lender (as determined in such Withholding Agent's good faith discretion), (i) if such Taxes are Indemnified Taxes, the sum payable by the applicable Loan Party shall be increased as necessary so that after all required deductions have been made (including deductions applicable to additional sums payable under this <u>Section 3.01</u>), each of such Agent and such Lender receives an amount equal to the sum such Agent or Lender would have received had no such deductions been made, (ii) such applicable Withholding Agent shall make such deductions, (iii) such applicable Withholding Agent shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Laws, and (iv) within thirty (30) days after the date of such payment by

64

such applicable Withholding Agent to the relevant Governmental Authority (or, if receipts or evidence are not available within thirty (30) days, as soon as possible thereafter), such applicable Withholding Agent shall furnish to the Borrower and the Administrative Agent, as applicable, the original or a facsimile copy of a receipt evidencing payment thereof to the extent such a receipt is issued therefor, or other evidence of payment thereof that is reasonably satisfactory to the Administrative Agent.

(b) In addition, the Loan Parties shall timely pay all Other Taxes to the relevant Governmental Authority in accordance with applicable Law, or at the option of the Administrative Agent in its sole discretion, timely reimburse it for the payment of any Other Taxes.

(c) Without duplication of any amounts payable pursuant to Section 3.01(a) or Section 3.01(b), the Loan Parties shall jointly and severally indemnify each Agent and each Lender for (i) the full amount of Indemnified Taxes (including any Indemnified Taxes imposed or asserted by any jurisdiction on amounts payable under this Section 3.01) payable or paid by such Agent and such Lender or required to be withheld from a payment to such Agent or such Lender and (ii) any reasonable expenses arising therefrom or with respect thereto, in each case whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf, shall be conclusive absent manifest error.  Payment under this Section 3.01(c) shall be made within ten (10) days after the date such Lender or such Agent makes a demand therefor.

(d) If any Lender or Agent determines, in its sole and reasonable discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 3.01, it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 3.01 with respect to the Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses (including Taxes) of the Lender or Agent, as the case may be and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that such indemnifying party, upon the request of the Lender or Agent, as the case may be, shall repay to such Lender or Agent the amount paid over pursuant to this paragraph (d) (plus penalties, interest or other charges imposed by the applicable Governmental Authority) in the event such Lender or Agent, as the case may be, is required to repay such refund to the relevant Governmental Authority. Such Lender or Agent, as the case may be, shall, at the indemnifying party's request, provide the applicable indemnifying party with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant Governmental Authority (provided that such Lender or Agent may delete any information therein that such Lender or Agent reasonably deems confidential). This paragraph shall not be construed to oblige any Lender or Agent to make available its tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying

NAI-1502411964v15

party or any other Person.  Notwithstanding anything to the contrary in this clause (d), in no event will an Agent or Lender be required to pay any amount to an indemnifying party pursuant to this clause (d) the payment of which would place such Agent or Lender in a less favorable net after-Tax position than such Agent or Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.

(e)  Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 3.01(a) or (c) with respect to such Lender it will, if requested by the Borrower, use commercially reasonable efforts (subject to legal and regulatory restrictions) to designate another Applicable Lending Office for any Loan or Letter of Credit affected by such event; provided that, in the judgment of such Lender, (i) such efforts are made on terms that cause such Lender and its Applicable Lending Office(s) to suffer no material economic, legal or regulatory disadvantage (including any unreimbursed costs or expenses) and would not otherwise be disadvantageous to such Lender, and (ii) such designation of another Applicable Lending Office would eliminate or reduce the amounts payable under Section 3.01(a) or (c); and provided, further, that nothing in this Section 3.01(e) shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Section 3.01(a) or (c). The Borrower shall pay all costs and expenses incurred by any Lender in connection with any such designation or assignment.

(f)  Each Lender shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with any documentation prescribed by Law, or reasonably requested by the Borrower or the Administrative Agent, certifying as to any entitlement of such Lender to an exemption from, or reduction in, any withholding Tax with respect to any payments to be made to such Lender under any Loan Document. In addition, each Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Laws or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Each such Lender shall, whenever a lapse in time or change in circumstances renders such documentation (including any documentation specifically referenced below) expired, obsolete or inaccurate in any material respect, deliver promptly to the Borrower and the Administrative Agent updated or other appropriate documentation or promptly notify the Borrower and the Administrative Agent in writing of its inability to do so. Notwithstanding any other provision of this clause (f), a Lender shall not be required to deliver any form that such Lender is not legally eligible to deliver. Notwithstanding anything to the contrary in this clause (f), the completion, execution and submission of such documentation (other than such documentation set forth in clauses (f)(i), (f)(ii) and (g) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

Without limiting the generality of the foregoing:

(i)        Each Lender that is a "United States person" (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement two duly completed copies of Internal Revenue Service Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. federal backup withholding; and

(ii)       Each Lender that is not a "United States person" (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter when required by law or upon the reasonable request of the Borrower or the Administrative Agent) the following, as applicable:

(A)    two duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E (or any successor forms) claiming eligibility for benefits of an income tax treaty to which the United States of America is a party,

(B)    two duly completed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(C)    in the case of a Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate, in substantially the form of Exhibit I-1 (any such certificate a "United States Tax Compliance Certificate"), or any other form approved by the Administrative Agent and the Borrower, to the effect that such Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of Holdings or the Borrower within the meaning of Section 881(c)(3)(B) of the Code or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code, and that no payments in connection with the Loan Documents are effectively connected with such Lender's conduct of a U.S. trade or business and (y) two duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E (or any successor forms), or

(D)    to the extent a Lender is not the beneficial owner (for example, where the Lender is a partnership, or is a Lender that has granted a participation), two duly completed copies of Internal Revenue Service Form W-8IMY (or any successor forms) of the Lender, accompanied by a Form W-8ECI, Form W-8BEN or W-8BEN-E (or any successor forms), United States Tax Compliance Certificate substantially in the form of Exhibit I-2 or Exhibit I-3 (as applicable), Form W-9, Form W-8IMY (or other successor forms) or any other required information from each beneficial owner, as applicable (provided that if the Lender is a

partnership (and not a participating Lender) and one or more beneficial owners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate substantially in the form of Exhibit I-4 shall be provided by such Lender on behalf of such beneficial owner(s)).

(iii)        If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (f)(iii), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(g) For the avoidance of doubt, the term "Lender" shall, for purposes of this Section 3.01, include the L/C Issuer, and the term "applicable Law" shall include FATCA.

Section 3.02        Illegality.

(a) If any Lender reasonably determines that due to any Change in Law after the Closing Date it is unlawful, or that any Governmental Authority that is a court, statutory board or commission has asserted that it is unlawful, for any Lender or its Applicable Lending Office to make, maintain or fund Eurocurrency Rate Loans, to determine or charge interest rates based upon the Adjusted Eurocurrency Rate as contemplated by this Agreement, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, in respect of Eurocurrency Rate Loans, (A) any obligation of such Lender to make or continue Eurocurrency Rate Loans or to convert Base Rate Loans to Eurocurrency Rate Loans, as applicable, shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist, (B) upon receipt of such notice, the Borrower shall upon demand from such Lender (with a copy to the Administrative Agent), prepay in the case of Eurocurrency Rate Loans, such Eurocurrency Rate Loans, that have become unlawful or, if applicable, convert all Eurocurrency Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurocurrency Rate Loans to such day, or promptly, if such Lender may not lawfully continue to maintain such Eurocurrency Rate Loans, (C) upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted and all amounts due, if any, in connection with such prepayment or

68

conversion under <u>Section 3.05</u>.  Each Lender agrees to designate a different Applicable Lending Office if such designation will avoid the need for any such notice and will not, in the good faith judgment of such Lender, otherwise be materially disadvantageous to such Lender.

(b) If any provision of this Agreement or any of the other Loan Documents would obligate the Borrower to make any payment of interest or other amount payable to any Secured Party in an amount or calculated at a rate which would be prohibited by law, then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by applicable law.

Section 3.03      <u>Inability to Determine Rates</u>. If the Required Lenders determine that for any reason adequate and reasonable means do not exist for determining the Eurocurrency Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan, or that the Eurocurrency Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, or that Dollar deposits are not being offered to banks in the London interbank eurocurrency market for the applicable amount and the Interest Period of such Eurocurrency Rate Loan, the Administrative Agent will promptly so notify the Borrower and each Lender. Thereafter, the obligation of the Lenders to make or maintain Eurocurrency Rate Loans shall be suspended until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurocurrency Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

Section 3.04      <u>Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurocurrency Rate Loans</u>.

(a) If any Lender determines that as a result of any Change in Law after the Closing Date, there shall be any actual increase in the cost to such Lender of agreeing to make or making, funding or maintaining any Eurocurrency Loan or issuing or participating in Letters of Credit, or a reduction in the amount received or receivable by such Lender in connection with any of the foregoing (excluding for purposes of this <u>Section 3.04(a)</u> any such increased costs or reduction in amount resulting from (i) Indemnified Taxes, (ii) Taxes described in <u>clauses (b)</u> through <u>(d)</u> of the definition of Excluded Taxes, (iii) Connection Income Taxes or (iv) reserve requirements contemplated by <u>Section 3.04(c)</u>), then from time to time within fifteen (15) Business Days after demand by such Lender setting forth in reasonable detail such actual increased costs (with a copy of such demand to the Administrative Agent given in accordance with <u>Section 3.06</u>), the Borrower shall pay to such Lender such additional amounts as will compensate such actual Lender for such increased cost or reduction.

(b) If any Lender determines that as a result of a Change in Law regarding capital adequacy after the Closing Date, has the effect of reducing the actual rate of return on the capital of such Lender or any corporation controlling such Lender as a

consequence of such Lender's obligations hereunder (taking into consideration its policies with respect to capital adequacy and such Lender's desired return on capital), then from time to time upon demand of such Lender setting forth in reasonable detail the charge and the calculation of such actual reduced rate of return (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such reduction within fifteen (15) days after receipt of such demand.

(c)  The Borrower shall pay to each Lender, (i) as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits, additional interest on the unpaid principal amount of each Eurocurrency Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive, absent manifest error), and (ii) as long as such Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any other central banking or financial regulatory authority imposed in respect of the maintenance of the Commitments or the funding of the Eurocurrency Rate Loans, such actual additional costs (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five decimal places) equal to the actual costs allocated to such Commitment or Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive absent manifest error) which in each case shall be due and payable on each date on which interest is payable on such Loan; provided the Borrower shall have received at least fifteen (15) days' prior notice (with a copy to the Administrative Agent) of such additional interest or cost from such Lender. If a Lender fails to give notice fifteen (15) days prior to the relevant Interest Payment Date, such additional interest or cost shall be due and payable fifteen (15) days after receipt of such notice.

(d)  Subject to Section 3.06(b), failure or delay on the part of any Lender to demand compensation pursuant to this Section 3.04 shall not constitute a waiver of such Lender's right to demand such compensation.

(e)  If any Lender requests compensation under this Section 3.04, then such Lender will, if requested by the Borrower, use commercially reasonable efforts to designate another Applicable Lending Office for any Loan or Letter of Credit affected by such event; provided that, in the judgment of such Lender, (i) such efforts are made on terms that cause such Lender and its Applicable Lending Office(s) to suffer no material economic, legal or regulatory disadvantage (including any unreimbursed costs or expenses) and would not otherwise be disadvantageous to such Lender, and (ii) such designation of another Applicable Lending Office would eliminate or reduce the amounts payable under Section 3.04 and provided, further, that nothing in this Section 3.04(e) shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Section 3.04(a), (b), (c) or (d).  The Borrower shall pay all costs and expenses incurred by any Lender in connection with any such designation or assignment.

Section 3.05    <u>Funding Losses</u>. Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any actual loss, cost or expense (but excluding, for the avoidance of doubt, any lost profits) incurred by it as a result of:

(a)  any continuation, conversion, payment or prepayment of any Eurocurrency Rate Loan on a day other than the last day of the Interest Period for such Loan; or

(b)  any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan (other than a Base Rate Loan) on the date or in the amount notified by the Borrower;

including any actual loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees actually paid to terminate the deposits from which such funds were obtained.

Section 3.06    <u>Matters Applicable to All Requests for Compensation</u>.

(a)    Any Agent or any Lender claiming compensation under this <u>Article III</u> shall deliver a certificate to the Borrower setting forth the additional amount or amounts to be paid to it hereunder which shall be conclusive in the absence of manifest error. In determining such amount, such Agent or such Lender may use any reasonable averaging and attribution methods.

(b)    With respect to any Lender's claim for compensation under <u>Section 3.02</u>, <u>Section 3.03</u> or <u>Section 3.04</u>, the Borrower shall not be required to compensate such Lender for any amount incurred more than one hundred and eighty (180) days prior to the date that such Lender becomes aware of the right to receive compensation; provided that if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof. If any Lender requests compensation by the Borrower under <u>Section 3.04</u>, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue Eurocurrency Rate Loans from one Interest Period to another, or to convert Base Rate Loans into Eurocurrency Rate Loans, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of <u>Section 3.06(c)</u> shall be applicable); provided that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(c)    If the obligation of any Lender to make or continue any Eurocurrency Rate Loan from one Interest Period to another, or to convert Base Rate Loans into Eurocurrency Rate Loans, shall be suspended pursuant to <u>Section 3.06(b)</u> hereof, such Lender's Eurocurrency Rate Loans shall be automatically converted into Base Rate Loans on the last day(s) of the then current Interest Period(s) for such Eurocurrency Rate Loans (or, in the case of an immediate conversion required by <u>Section 3.02</u>, on such earlier date as required by Law) and, unless and until such Lender gives notice as provided below that the circumstances specified in <u>Section 3.02</u>, <u>Section 3.03</u> or <u>Section</u>

71

3.04 hereof that gave rise to such conversion no longer exist:

>    (i)    to the extent that such Lender's Eurocurrency Rate Loans have been so converted, all payments and prepayments of principal that would otherwise be applied to such Lender's Eurocurrency Rate Loans shall be applied instead to its Base Rate Loans; and

>    (ii)    all Loans that would otherwise be made or continued from one Interest Period to another by such Lender as Eurocurrency Rate Loans shall be made or continued instead as Base Rate Loans, and all Base Rate Loans of such Lender that would otherwise be converted into Eurocurrency Rate Loans shall remain as Base Rate Loans.

>    (d)    If any Lender gives notice to the Borrower (with a copy to the Administrative Agent) that the circumstances specified in Section 3.02, Section 3.03 or Section 3.04 hereof that gave rise to the conversion of such Lender's Eurocurrency Rate Loans pursuant to this Section 3.06 no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Eurocurrency Rate Loans made by other Lenders are outstanding, such Lender's Base Rate Loans shall be automatically converted to Eurocurrency Rate Loans on the first day(s) of the next succeeding Interest Period(s) for such outstanding Eurocurrency Rate Loans to the extent necessary so that, after giving effect thereto, all Loans held by the Lenders holding Eurocurrency Rate Loans and by such Lender are held pro rata (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Commitments.

>    Section 3.07    Replacement of Lenders under Certain Circumstances.

>    (a) If any Lender requests compensation under Section 3.04, or requires the Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or Section 3.04, as the case may be, in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

>    (b) If any Lender requests compensation under Section 3.04, or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01 and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with Section 3.07(a), or if Lender becomes a Defaulting Lender, then the Borrower may, on prior written notice to the

Administrative Agent and such Lender, replace such Lender by requiring such Lender to (and such Lender shall be obligated to) assign pursuant to Section 10.07(b) (with the assignment fee to be waived by the Administrative Agent in such instance) all of its rights and obligations under this Agreement to one or more Eligible Assignees; provided that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender or other such Person; and provided, further, that in the case of any such assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable Eligible Assignees shall have agreed to the applicable departure, waiver or amendment of the Loan Documents.

(c)  Any Lender being replaced pursuant to Section 3.07(a) above shall (i) execute and deliver an Assignment and Assumption with respect to such Lender's Commitment and outstanding Loans and participations in L/C Obligations, as applicable; provided that the failure of any such Lender to execute an Assignment and Assumption shall not render such assignment invalid and such assignment shall be recorded in the Register and (ii) deliver Notes, if any, evidencing such Loans to the Borrower or Administrative Agent. Pursuant to such Assignment and Assumption, (A) the assignee Lender shall acquire all or a portion, as the case may be, of the assigning Lender's Commitment and outstanding Loans and participations in L/C Obligations, as applicable, (B) all obligations of the Borrower owing to the assigning Lender relating to the Loans and participations so assigned shall be paid in full by the assignee Lender to such assigning Lender concurrently with such assignment and assumption, and any amounts owing to the assigning Lender (other than a Defaulting Lender) under Section 3.05 as a consequence of such assignment shall have been paid by the Borrower to the assigning Lender and (C) upon such payment and, if so requested by the assignee Lender, the assignor Lender shall deliver to the assignee Lender the appropriate Note or Notes executed by the Borrower, the assignee Lender shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans, Commitments and participations, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender.

(d)  Notwithstanding anything to the contrary contained above, any Lender that acts as the L/C Issuer may not be replaced hereunder at any time that it has any Letter of Credit outstanding hereunder unless arrangements reasonably satisfactory to the L/C Issuer (including the furnishing of a back-up standby letter of credit in form and substance, and issued by an issuer, reasonably satisfactory to the L/C Issuer, or the depositing of cash collateral into a Cash Collateral Account in amounts and pursuant to arrangements reasonably satisfactory to the L/C Issuer) have been made with respect to each such outstanding Letter of Credit and the Lender that acts as the Administrative Agent may not be replaced hereunder except in accordance with the terms of Section 9.09.

(e)  Notwithstanding anything herein to the contrary, each party hereto agrees that any assignment pursuant to the terms of this Section 3.07 may be effected pursuant to an Assignment and Assumption executed by the Borrower, the

Administrative Agent and the assignee and that the Lender making such assignment need not be a party thereto.

Section 3.08    Survival.  All of the Borrower's obligations under Section 3.01, Section 3.04, Section 3.06 and Section 3.07 shall survive termination of the Aggregate Commitments and repayment of all other Obligations hereunder.

## ARTICLE IV

## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 4.01    Conditions Precedent to Effectiveness and the Closing Date. The obligation of each Lender to make its initial Credit Extension hereunder is subject to satisfaction of the following conditions precedent except as otherwise agreed between the Borrower and the Administrative Agent:

(a)  The Administrative Agent's receipt of the following, each of which shall be originals or facsimiles (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party (except as provided in Section 4.01(a)(iv)):

(i)        executed counterparts of this Agreement and the Guaranty;

(ii)       each Collateral Document set forth on Schedule 1.01A required to be executed on the Closing Date as indicated on such schedule, duly executed by each Loan Party thereto, together with (except as provided in such Collateral Documents);

(A)    certificates, if any, representing the pledged equity referred to therein for Wholly-Owned Subsidiaries (other than Excluded Subsidiaries) organized under the laws of the U.S. and accompanied by undated stock powers executed in blank and instruments evidencing the pledged debt referred to therein endorsed in blank;

(B)    evidence that all financing statements (or equivalent) under the Uniform Commercial Code have been filed or are otherwise in a form appropriate for filing;

(iii)      certificates substantially in the form of Exhibit H for each Guarantor which attach (A) resolutions or other action documentation, (B) incumbency certificates, (C) Organizational Documents and (D) good standing certificates;

(iv)      an opinion from Kirkland & Ellis LLP, counsel to the Loan Parties in form and substance reasonably acceptable to the Administrative Agent; and

NAI-1502411964v15

(v)         a Committed Loan Notice relating to the initial Credit Extensions.

(b)      The Administrative Agent and Lenders shall have received all fees and other amounts contemplated by the Loan Documents due and payable to the Administrative Agent or the Lenders on or prior to the Closing Date, including reimbursement or payment of all out-of-pocket expenses (including all reasonable fees, charges and disbursements of counsel and any financial advisor) required to be reimbursed or paid by any Loan Party and all fees and expenses required to be paid hereunder or pursuant to the Fee Letter.  In the case of expenses, such expenses shall have been invoiced at least one (1) Business Day prior to the Closing Date.

(c)  The Administrative Agent and, if applicable, the L/C Issuer shall have received a Committed Loan Notice in accordance with the requirements hereof.

(d)  No Default or Event of Default shall exist or would result from the extension or deemed extension of the Loans on the Closing Date.

(e)  The representations and warranties set forth in Article V shall be true and correct on and as of the Closing Date.

(f)  The Administrative Agent shall have received, at least three (3) Business Days prior to the Closing Date, all documentation and other information about the Loan Parties as shall have been reasonably requested by the Administrative Agent under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA Patriot Act.

(g)  The Administrative Agent shall have received reasonably satisfactory evidence that the principal of and interest on, and all other amounts owing in respect of, all Indebtedness under the DIP Credit Facility, shall have been paid in full or have been deemed to continue hereunder, that any commitments to extend credit under the DIP Credit Facility shall have been cancelled or terminated and that all Guarantees in respect of, and all Liens securing, any such Indebtedness shall have been released (or arrangements for such release satisfactory to the Administrative Agent and the Required Lenders shall have been made).

(h)  The Administrative Agent shall have received reasonably satisfactory evidence that the obligations under each of the Pre-Petition First Lien Credit Agreement and the Pre-Petition Second Lien Credit Agreement have been satisfied in the manner contemplated by the Plan of Reorganization and the Confirmation Order, together with a termination of security interest in intellectual property for each assignment for security recorded pursuant to the Pre-Petition First Lien Credit Agreement and the Pre-Petition Second Lien Credit Agreement, UCC-3 termination statements for all UCC-1 financing statements filed in connection with the Pre-Petition First Lien Credit Agreement and the Pre-Petition Second Lien Credit Agreement and covering any portion of the Collateral and termination of any control agreements covering any deposit account or security account subject to the Liens

75

under the Pre-Petition First Lien Credit Agreement and the Pre-Petition Second Lien Credit Agreement.

(i)  The Administrative Agent shall have received reasonably satisfactory evidence that each of (i) the Plan of Reorganization, (ii) the Disclosure Statement and (iii) the Confirmation Order shall be satisfactory to the Required Lenders (and with respect to any provisions that affect the rights and duties of the Administrative Agent, the Administrative Agent).

(j)  The Confirmation Order shall have been entered in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, any applicable orders of the Bankruptcy Court and any applicable local rules.

(k) The Confirmation Order shall be in full force and effect and shall not, without the consent of the Administrative Agent and the Required Lenders, have been stayed, reversed, modified or amended, shall not be subject to a motion to stay.

(l)  All conditions to the effectiveness of the Plan of Reorganization shall have been satisfied or waived (with any waiver thereof having been approved by the Required Lenders) and the Consummation of the Plan of Reorganization in accordance with its terms shall occur on the Closing Date, substantially simultaneously with the deemed making of the Loans pursuant to Section 2.01.

(m)The Administrative Agent shall be reasonably satisfied that, on the Closing Date, immediately after giving effect to the Consummation of the Plan of Reorganization, the making of the Loans on the Closing Date and any other transactions to occur on the Closing Date, the Loan Parties and their subsidiaries shall have outstanding no indebtedness other than Indebtedness outstanding under the Loan Documents, the Second Lien Credit Agreement, Indebtedness set forth on Schedule 7.03(c) and any additional indebtedness on terms and conditions (including as to amount) satisfactory to the Required Lenders.

(n) The Administrative Agent shall have received a funds flow memorandum with respect to the transactions contemplated hereby on the Closing Date in form, scope and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.

(o) The Administrative Agent and the Required Lenders shall be satisfied that since the Petition Date, there shall not have occurred any event, occurrence, development or state of circumstances or fact that has had or could reasonably be expected to have a Material Adverse Effect.

(p) The Administrative Agent shall have received such other assurances, certificates, documents, consents or opinions as the Administrative Agent or Required Lenders reasonably may require.

(q) Holdings shall have contributed, or caused to be contributed, the Exit Commitment Equity (as defined in the Plan of Reorganization) to the capital of the

Pre-Petition Borrower, and the Pre-Petition Borrower shall have distributed the Exit Commitment Equity (as defined in the Plan of Reorganization) to the Lenders on the Closing Date pursuant to the Plan of Reorganization.

(r)  The Administrative Agent shall have received reasonably satisfactory evidence that, after giving effect to the Transactions on the Closing, the Loan Parties will have a minimum of $15,000,000 of Unrestricted Cash on a consolidated basis.

(s)  All corporate and judicial proceedings and all instruments and agreements in connection with the Transactions among the Loan Parties and the Lenders contemplated by the Loan Documents shall be satisfactory in form and substance to the Administrative Agent and the Lenders, and the Lenders shall have received all information and copies of all documents or papers reasonably requested by any of them.

## ARTICLE V

### REPRESENTATIONS AND WARRANTIES

Holdings and the Borrower represent and warrant for themselves and on behalf of the Subsidiaries after giving effect to the Plan of Reorganization and the Confirmation Order to the Agents and the Lenders that:

Section 5.01      Existence, Qualification and Power; Compliance with Laws. Each Loan Party and each other Subsidiary (a) is a Person duly incorporated, organized or formed, and validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority to (i) own or lease its assets and carry on its business and (ii) in the case of each Loan Party, execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all Laws, orders, writs, injunctions and orders and (e) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; except in each case referred to in clause (b)(i), (c), (d) or (e), to the extent that failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.02      Authorization; No Contravention. The Transactions to be entered into by each Loan Party have been duly authorized by all necessary corporate or other action and, if required, action by the holders of such Loan Party's Equity Interests.  The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, are within such Loan Party's corporate or other powers, have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) conflict with or contravene the terms of any of such Person's Organization Documents, (b) result in any breach or contravention of, or the creation of any Lien under (other than under the Loan Documents), or require any payment to be made under (i) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to

77

which such Person or its property is subject; or (c) violate any Law; except with respect to any conflict, breach or contravention or payment or violation (but not creation of Liens) referred to in clauses (b) or (c), to the extent that such conflict, breach, contravention or payment or violation could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Governmental Authorization; Other Consents. No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, or (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents or the perfection of the Liens created under the Collateral Documents, except for (i) filings necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties, and (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect.

Section 5.03    Binding Effect. Each Loan Party has duly executed and delivered each Loan Document to which it is a party and each such Loan Document constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party and upon entry of the Interim Order or the Final Order, will constitute, a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization and other similar laws relating to or affecting creditors' rights generally and by general principles of equity (whether considered in a proceeding in equity or law).

Section 5.04    Financial Statements; No Material Adverse Effect.

(a) The Unaudited Financial Statements fairly present in all material respects the financial condition of Holdings and the Borrower as of the dates thereof and its results of operations for the periods covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, except (i) to the extent provided in the notes thereto subject, in the case of the Unaudited Financial Statements, to changes resulting from audit, normal year-end audit adjustments and to the absence of footnotes and (ii) as otherwise disclosed to the Administrative Agent prior to the Closing Date.

(b) Since the Closing Date, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

Each Lender and the Administrative Agent hereby acknowledges and agrees that the Borrower and its Subsidiaries may be required to restate historical financial statements as the result of the implementation of changes in GAAP or the interpretation thereof, and that such restatements will not result in a Default under the Loan Documents (including any effect on any conditions required to be satisfied on the Closing Date) to the extent that the restatements do not reveal any material omission, misstatement or other material inaccuracy in the reported information from actual results for any relevant prior period.

Section 5.05    Litigation. There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against the Borrower or any Subsidiary or against any of their properties or revenues that either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 5.06    Ownership of Property; Liens. Each Loan Party and each of its Subsidiaries has good and defensible title in fee simple to, or valid leasehold interests in, or easements or other limited property interests in, all property necessary in the ordinary conduct of its business, free and clear of all Liens except for minor defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes and Liens permitted under the Loan Documents and except where the failure to have such title or other interest could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.07    Environmental Compliance.

(a)  There are no actions, suits or proceedings pending or, to the knowledge of the Borrower, threatened in writing against the Borrower or any Subsidiary alleging violation of, or liability under, any applicable Environmental Law that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, there has been no Release of Hazardous Materials by the Borrower or any Subsidiary at, on, under or from any location in a manner which would reasonably be expected to give rise to liability under applicable Environmental Laws.

(c)  Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, the Borrower and its Subsidiaries are in compliance with all applicable Environmental Laws.

(d)  Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, to Borrower's knowledge, no conditions or facts exist that would reasonably be expected result in liability under, or impose an obligation with respect to, Environmental Law.

Section 5.08    Taxes. The Loan Parties and each Subsidiary have timely filed all federal, state, local, and foreign income and other material tax returns and reports required to be filed, and have timely paid all material Taxes levied or imposed upon them or their properties, income or assets otherwise due and payable, except, in each case, for any failures (a) which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP, or (b) to the extent excused or prohibited by the Bankruptcy Code or the Bankruptcy Court.  Other than the ongoing audit of the Loan Parties' 2013 consolidated U.S. federal income tax return, there are no material Tax audits, deficiencies, assessments or other claims with respect to the Loan Parties or any Subsidiary.

Section 5.09     Compliance with ERISA and other Pension Laws; Labor Matters.

(a) Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, (i) each Pension Plan is in compliance in with the applicable provisions of ERISA, the Code and other federal or state Laws, and (ii) each Foreign Plan established, sponsored or maintained by any Loan Party has been registered, established, invested, administered and maintained in compliance with all applicable Laws.

(b) (i) No ERISA Event with respect to a Pension Plan or Multiemployer Plan, has occurred; (ii) neither any Loan Party nor any ERISA Affiliate has incurred, any liability (an no event has occurred which, with the giving of notice under Section 4219 of ERISA would result in such liability) under Section 4201 et seq. or 4243 of ERISA with respect to a Multiemployer Plan; (iii) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA, except, with respect to each of the foregoing clauses of this Section 5.10(b), as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect; provided that with respect to Multiemployer Plans, the representations and warranties in this Section 5.10, other than with respect to liability under Sections 4201 and 4204 of ERISA, are made to the knowledge of the Loan Parties and (iv) no Foreign Pension Event has occurred or is reasonably expected to occur that as would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(c) Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, (i) there are no strikes or other labor disputes against the Borrower or any of its Subsidiaries pending or, to the knowledge of the Borrower, threatened, (ii) hours worked by and payment made to employees of the Borrower or any of its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Laws, (iii) the Borrower and the other Loan Parties have complied with all applicable labor laws including work authorization and immigration and (iv) all payments due from the Borrower or any of its Subsidiaries on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant party.

Section 5.10     Subsidiaries; Equity Interests. As of the Closing Date and after giving effect to the Transactions occurring on the Closing Date, neither the Borrower nor any other Loan Party has any Subsidiaries other than those specifically disclosed in Schedule 5.11, and all of the outstanding Equity Interests in the Borrower and its Subsidiaries have been validly issued, and to the extent such concepts exist with respect to such Equity Interests, are fully paid and nonassessable and all Equity Interests owned by Holdings or any other Loan Party are owned free and clear of all Liens except (i) those created under the Collateral Documents and (ii) any Lien that is permitted by Section 7.01.

As of the Closing Date and after giving effect to the Transactions occurring on the Closing Date, Schedule 5.11 sets forth (a) the name and jurisdiction of organization of each Subsidiary, (b) sets forth the ownership interest of Holdings, the Borrower and any of their

Subsidiaries in each of their Subsidiaries, including the percentage of such ownership and (c) identifies each Person the Equity Interests of which are required to be pledged on the Closing Date pursuant to the Collateral and Guarantee Requirement.

Section 5.11    Margin Regulations; Investment Company Act.

(a)  As of the Closing Date, none of the Collateral is comprised of any margin stock.  No Loan Party is engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Federal Reserve Board), or extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation U or Regulation X of FRB.

(b)  None of the Loan Parties is an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

Section 5.12    Disclosure.

(a)  None of the written factual information or written factual data (taken as a whole) heretofore or contemporaneously furnished by Holdings, the Borrower, any of their respective Subsidiaries or any of their respective authorized representatives in writing to any Agent or any Lender on or before the Closing Date for purposes of or in connection with this Agreement or any transaction contemplated herein contained any untrue statement of material fact or omitted to state any material fact necessary to make such information and data (taken as a whole) not materially misleading at such time (after giving effect to all supplements so furnished prior to such time) in light of the circumstances under which such information or data was furnished; it being understood and agreed that for purposes of this Section 5.13(a), such factual information and data shall not include projections (including financial estimates, forecasts and other forward-looking information), pro forma financial information or information of a general economic or general industry nature.

(b)  The projections contained in the information and data referred to in Section 5.13(a) were prepared in good faith based upon assumptions believed by Holdings and the Borrower to be reasonable at the time made; it being recognized by the Agents and the Lenders that such projections are as to future events and are not to be viewed as facts, the projections are subject to significant uncertainties and contingencies, many of which are beyond the control of Holdings, the Borrower and its Subsidiaries, that no assurance can be given that any particular projections will be realized and that actual results during the period or periods covered by any such projections may differ from the projected results and such differences may be material.

Section 5.13    Intellectual Property; Licenses, Etc. Each of the Loan Parties and the other Subsidiaries own, license or possess the right to use, all of the trademarks, service marks, trade names, domain names, copyrights, patents, patent rights, technology, software, know-how, database rights, design rights and other intellectual property rights (collectively, "IP

Rights") that are reasonably necessary for the operation of their respective businesses as currently conducted, and, to the knowledge of the Borrower, without violation of the rights of any Person, except to the extent such violations, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. To the knowledge of the Borrower, no such IP Rights infringe upon any rights held by any Person except for such infringements, individually or in the aggregate, which could not reasonably be expected to have a Material Adverse Effect. No claim or litigation regarding any such IP Rights is pending or, to the knowledge of the Borrower, threatened in writing against any Loan Party or Subsidiary, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 5.14    Solvency. On the Closing Date after giving effect to the Transactions occurring on the Closing Date, the Loan Parties and their Subsidiaries, on a consolidated basis, are Solvent.

Section 5.15    Collateral Documents. The Collateral Documents are effective to create in favor of the Collateral Agent for the benefit of the Secured Parties legal, valid and enforceable Liens on, and security interests in, the Collateral and, (i) when all appropriate filings or recordings are made in the appropriate offices as may be required under applicable Laws (which filings or recordings shall be made to the extent required by any Collateral Document) and (ii) upon the taking of possession or control by the Collateral Agent of such Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Collateral Agent to the extent required by any Collateral Document), such Collateral Document will constitute fully perfected Liens on, and security interests in, all right, title and interest of the Loan Parties in such Collateral, in each case subject to no Liens other than the applicable Liens permitted under the Loan Documents.

Section 5.16    Use of Proceeds. The proceeds of the Loans shall be used to repay in full all amounts outstanding under the DIP Credit Facility on the Closing Date.

Section 5.17    Senior Indebtedness. The Obligations constitute "Senior Indebtedness" (or similar or comparable term) of the Borrower any agreement, indenture or instrument pursuant to which any Subordinated Debt is Incurred. The Obligations constitute "First Lien Obligations" under, and as defined in, the Junior Priority Intercreditor Agreement.

Section 5.18    Patriot Act.

(a)  Neither the Borrower nor any other Loan Party is in material violation of any material laws relating to terrorism or money laundering, including Executive Order No. 13224 on Terrorist Financing, effective September 23, 2001 and the USA PATRIOT Act.

(b)  The use of proceeds of the Loans and the Letters of Credit will not violate in any material respect the Trading with the Enemy Act, as amended or any of the foreign asset control regulations of the United States Treasury Department (31 C.F.R. Subtitle B, Chapter V).

Section 5.19    FCPA. None of the Borrower or any other Loan Party will use the proceeds of the Loans or the Letters of Credit or otherwise make available such proceeds to any Person for the purposes of any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the FCPA.

Section 5.20    Sanctioned Persons.

(a) None of Holdings, the Borrower or any Subsidiary is currently the target of any U.S. sanctions administered by OFAC.

(b) None of the Borrower or any other Loan Party will use the proceeds of the Loans or the Letters of Credit or otherwise make available such proceeds to any Person for use in any manner that will result in a material violation by any Lender of any U.S. sanctions administered by OFAC or the U.S. Department of State.

## ARTICLE VI

## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation (other than Hedging Obligations and contingent indemnification obligations and other contingent obligations) hereunder which is accrued and payable shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding, the Borrower shall, and shall (except in the case of the covenants set forth in Section 6.01, Section 6.02 and Section 6.03) cause each Subsidiary to:

Section 6.01    Financial Statements. Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a) as soon as available, but in any event within one hundred fifty (150)days after the end of each fiscal year of the Borrower, an audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries, in each case as at the end of such fiscal year, and the related audited consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year (or, in lieu of such audited financial statements of the Borrower and its Subsidiaries, a detailed reconciliation, reflecting such financial information for the Borrower and its Subsidiaries, on the one hand, and the Borrower and its consolidated Subsidiaries, on the other hand), setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, and except with respect to any such reconciliation, audited and accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing, which report and opinion shall (i) be prepared in accordance with generally accepted auditing standards and (ii) not be subject to any "going concern" or like qualification or any qualification as to the scope of such audit;

(b) as soon as available, but in any event, within forty five (45) days after the end of each of the first three (3) fiscal quarters of each fiscal year of the Borrower, a consolidated balance sheet of the Borrower and its consolidated Subsidiaries, in each case as at the end of such fiscal quarter, and the related (i) consolidated statements of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and (ii) consolidated statements of cash flows for the portion of the fiscal year then ended (or in lieu of such financial statements of the Borrower and its Subsidiaries, a detailed reconciliation, reflecting such financial information for the Borrower and its Subsidiaries, on the one hand, and the Borrower and its consolidated Subsidiaries on the other hand), setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Borrower and its consolidated Subsidiaries (or, in the case of any reconciliation, the Borrower and its Subsidiaries) in accordance with GAAP, subject to changes resulting from audit and normal year-end audit adjustments and to the absence of footnotes; and

(c) on or before the date that is 30 days after the last calendar day of each month beginning with the first month after the Closing Date, monthly financial statements including an unaudited consolidated balance sheet and unaudited consolidated statements of operations and comprehensive income, stockholders' equity and cash flows as of the end of and for such preceding monthly period and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a financial officer as presenting fairly in all material respects the financial condition as of the end of and for such monthly period and such portion of the fiscal year and results of operations and cash flows of the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, year-end adjustments (which may be material, include restatements and take into account the status of the reporting systems of Holdings and its Subsidiaries), implementation of SOP 90-7 and the absence of footnotes.

Section 6.02    Certificates; Other Information. Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a) no later than five (5) days after the delivery of the financial statements referred to in Section 6.01(a) and (b), a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower, (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) setting forth reasonably detailed calculations demonstrating compliance with the covenants contained in Section 7.09, and (iii) setting forth a reasonably detailed calculation of the Net Proceeds received during the applicable period by or on behalf of Holdings, the Borrower or any of its Subsidiaries in respect of any event described in the definition of the term "Prepayment Event";

84

(b) promptly after the same are publicly available, copies of all annual, regular, periodic and special reports and registration statements which the Borrower files with the SEC or with any Governmental Authority that may be substituted therefor (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) and in any case not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(c) together with the delivery of the financial statements pursuant to Section 6.01(a) and each Compliance Certificate pursuant to Section 6.02(a), (i) a report setting forth the information required by Section 3.03 of the Security Agreement (or confirming that there has been no change in such information since the Closing Date or the date of the last Compliance Certificate), and (ii) such other information required by the Compliance Certificate;

(d) no later than one hundred five (105) days following the first day of each fiscal year of the Borrower (beginning with the fiscal year beginning January 1, 2018), an annual budget (on a quarterly basis) for such fiscal year in form customarily prepared by the Borrower;

(e) as promptly as reasonably practicable after delivery of the financial statements pursuant to Sections 6.01(a) and (b), hold a conference call with Lenders to discuss the results of operations for the relevant reporting period;

(f) not later than the seventh Business Day following the end of each calendar month, (i) monthly KPIs (the "Monthly KPI Reports") that provide detail on the monthly operating trends for the preceding calendar month for ForeSee and Webcollage and Multiply and, as reasonably available, (x) new, upsell and renewal bookings and (y) ACV churn rate, account churn rate, annual recurring revenue and net new customers, provided that such KPIs shall be reported consistent with past practices, and (ii) a reasonably detailed calculation of the Multiply Margin Ratio for the preceding calendar month; and

(g) promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of Holdings, the Borrower or any of its Subsidiaries, or compliance with the terms of any Loan Document, as the Administrative Agent on its own behalf or on behalf of any Lender may reasonably request.

Documents required to be delivered pursuant to Sections 6.01(a) and (b) and Sections 6.02(a) and (b) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which such documents are posted on the Borrower's behalf on any third-party website designated by the Administrative Agent); provided that: (i) upon written request by the Administrative Agent, the Borrower shall deliver paper copies of such documents to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the

Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.  Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

Section 6.03    Notices. Promptly after a Responsible Officer obtains actual knowledge thereof, notify the Administrative Agent in writing:

(a) of the occurrence of any Default or Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto;

(b) any litigation or governmental proceeding (including, without limitation, pursuant to any applicable Environmental Laws) pending against the Borrower or any of the Subsidiaries that could reasonably be expected to be determined adversely and, if so determined, to result in a Material Adverse Effect;

(c) of the occurrence of any ERISA Event with respect to a Pension Plan or a Foreign Pension Event with respect to a Foreign Plan, in each case, that would reasonably be expected to have a Material Adverse Effect;

(d)    of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect; and

(e)    of any material change in accounting policies or financial reporting practices by any Loan Party.

Each notice delivered under this Section 6.03 shall be accompanied by a written statement of a Responsible Officer of Holdings or the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 6.04    Maintenance of Existence.  (a)  Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization and (b) take all reasonable action to maintain all rights, privileges (including its good standing), permits, licenses and franchises necessary or desirable in the normal conduct of its business, except in the case of clauses (a) and (b), (i) to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect (other than with respect to the Borrower in clause (a)) or (ii) pursuant to a transaction permitted by Section 7.04 or Section 7.05.

Section 6.05    Maintenance of Properties. Except if the failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted, and (b) make all necessary renewals,

replacements, modifications, improvements, upgrades, extensions and additions thereof or thereto in accordance with prudent industry practice.

Section 6.06     Maintenance of Insurance. Maintain with financially sound and reputable insurance companies (in the good faith determination of the Borrower) insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and its Subsidiaries) as are customarily carried under similar circumstances by such other Persons (in the good faith determination of the Borrower). If any portion of any Mortgaged Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then, to the extent required by applicable Laws, the Borrower shall, or shall cause each Loan Party to, (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount reasonably satisfactory to the Administrative Agent and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent.

Section 6.07     Compliance with Laws. Comply in all respects with the requirements of all Laws and all orders, writs, injunctions, decrees and judgments applicable to it or to its business or property (including without limitation Environmental Laws, ERISA, FCPA, OFAC and the USA PATRIOT Act), except if the failure to comply therewith would not, individually or in the aggregate reasonably be expected to have a Material Adverse Effect.

Section 6.08     Books and Records. Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with GAAP consistently applied shall be made of all material financial transactions and matters involving the assets and business of the Borrower or such Subsidiary, as the case may be.

Section 6.09     Inspection Rights. Permit representatives and independent contractors of the Administrative Agent and each Lender to, at the Borrower's expense (subject to the limitations below) visit and inspect any of its properties and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; provided that excluding any such visits and inspections during the continuation of an Event of Default, then such rights shall not be exercised more often than one (1) time during any calendar year; provided, further, that when an Event of Default exists, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice.  The Administrative Agent and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants. Notwithstanding anything to the contrary in this Section 6.09, none of the Borrower or any Subsidiary will be required to disclose or permit the inspection or discussion of, any

87

document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (iii) that is subject to attorney client or similar privilege or constitutes attorney work product.

Section 6.10    Covenant to Guarantee Obligations and Give Security. At the Borrower's expense, take all action necessary or reasonably requested by the Administrative Agent to ensure that the Collateral and Guarantee Requirement (subject to the limitations set forth therein and in the Collateral Documents) continues to be satisfied such that upon the formation or acquisition of any new direct or indirect Subsidiary by any Loan Party or any Subsidiary ceasing to be an Excluded Subsidiary:

(a) within thirty (30) days after such formation, acquisition, designation or occurrence or such longer period as the Administrative Agent may agree in its reasonable discretion:

(i)    cause each such Subsidiary that is required to become a Guarantor under the Collateral and Guarantee Requirement to furnish to the Administrative Agent a description of the Material Real Properties owned by such Subsidiary in detail reasonably satisfactory to the Administrative Agent;

(ii)    cause each such Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to duly execute and deliver to the Administrative Agent or the Collateral Agent (as appropriate) Mortgages, pledges, assignments, the applicable Security Agreement Supplements, applicable Intellectual Property Security Agreement Supplements and other security agreements and documents or joinders or supplements thereto (including without limitation, with respect to Mortgages, and the Exit L/C Guaranty the documents listed in Section 6.12(b)), as reasonably requested by and in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent (consistent with the Mortgages, the applicable Security Agreement and other Collateral Documents in effect on the Closing Date), in each case granting Liens required by the Collateral and Guarantee Requirement;

(iii)    cause each such Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to deliver any and all certificates representing Equity Interests (only to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank (or any other documents customary under local Law) and instruments evidencing the Indebtedness held by such Subsidiary and required to be pledged pursuant to the Collateral and Guarantee Requirement (including the execution of the Subordinated Intercompany Note), indorsed in blank to the Collateral Agent;

88

(iv)        take and cause such Subsidiary and each direct or indirect parent of such Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to take whatever action (including the recording of Mortgages, the filing of financing statements and delivery of share and membership interest certificates, if any) may be necessary in the reasonable opinion of the Collateral Agent to vest in the Collateral Agent (or in any representative of the Collateral Agent designated by it) valid and perfected Liens required by the Collateral and Guarantee Requirement, enforceable against all third parties in accordance with their terms; and

(v)        deliver to the Collateral Agent with respect to each Material Real Property, upon the Administrative Agent's reasonable request, existing surveys, existing title reports, existing title insurance policies and existing environmental assessments.

If any Lender determines, acting reasonably, that any applicable Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender to hold or benefit from a Lien over real property pursuant to any Law of the United States or any State thereof, such Lender may notify the Administrative Agent and disclaim any benefit of such security interest to the extent of such illegality; provided, that such determination or disclaimer shall not invalidate or render unenforceable such Lien for the benefit of any other Lender or Secured Party.

Section 6.11        Use of Proceeds. The Borrower will, and will cause each Loan Party to, use the proceeds of the Loans in accordance with Section 5.16.

Section 6.12        Further Assurances and Post-Closing Conditions.

(a)        Subject to the limitations set forth in the definition of Collateral and Guarantee Requirement and in the Collateral Documents, promptly upon reasonable request by the Administrative Agent or the Collateral Agent (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent or the Collateral Agent may reasonably request from time to time in order to carry out more effectively the purposes of this Agreement and the Collateral Documents.

(b)        In the case of any Material Real Property (other than leasehold interests), provide the Collateral Agent with Mortgages and otherwise satisfy the applicable Collateral and Guarantee Requirement with respect to such owned real property within sixty (60) days (or such longer period as the Collateral Agent may agree in its sole discretion) of the acquisition of such real property in each case together with:

(i)        evidence that counterparts of the Mortgages have been duly executed, acknowledged and delivered and are in form suitable for filing or recording in all filing or recording offices that the Collateral Agent may deem

89

reasonably necessary or desirable in order to create a valid and subsisting perfected Lien on the property and/or rights described therein in favor of the Collateral Agent for the benefit of the Secured Parties and that all filing and recording taxes and fees have been paid or otherwise provided for in a manner reasonably satisfactory to the Collateral Agent;

(ii)    Mortgage Policies in form and substance, with endorsements and in amounts, reasonably acceptable to the Collateral Agent (not to exceed the value of the real properties covered thereby), issued, coinsured and reinsured by title insurers reasonably acceptable to the Collateral Agent, insuring the Mortgages to be valid subsisting Liens on the property described therein, free and clear of all defects and encumbrances, subject to Liens permitted by Section 7.01, and providing for such other affirmative insurance (including endorsements for future advances under the Loan Documents) and such coinsurance and direct access reinsurance as the Collateral Agent may reasonably request;

(iii)    opinions of local counsel for the Loan Parties in states or provinces in which the real properties are located, with respect to the enforceability and perfection of the Mortgages and any related fixture filings in form and substance reasonably satisfactory to the Collateral Agent; and

(iv)    execute and/or deliver the documents and/or complete the tasks set forth on Schedule 6.12, in each case within the time limits specified on such schedule (or such longer period as the Administrative Agent may agree in its sole discretion).

Section 6.13    [Reserved].

Section 6.14    Payment of Taxes.The Loan Parties will file, and will cause each of the Subsidiaries to file, all federal, state, local and foreign income and other material tax returns and reports required to be filed and will pay and discharge, and will cause each of the Subsidiaries to pay and discharge, all material Taxes,  in each case on a timely basis, and the Loan Parties will pay and discharge, and will cause each of the Subsidiaries to pay and discharge, all lawful Tax claims, which if unpaid, may reasonably be expected to become a lien or charge upon any properties of the Loan Parties or any of the Subsidiaries not otherwise permitted under this Agreement.

Section 6.15    Nature of Business. The Borrower and its Subsidiaries, taken as a whole, will not fundamentally and substantively alter the character of their business, taken as a whole, from the business conducted by the Borrower and its Subsidiaries, taken as a whole, on the Closing Date and other business activities incidental, related or ancillary to any of the foregoing.

Section 6.16    End of Fiscal Years; Fiscal Quarters.  The Borrower will not change its fiscal year from ending on December 31.

Section 6.17 <u>Credit Ratings</u>. Use best efforts to obtain and maintain the Borrower's corporate family credit rating first, from Moody's and if unsuccessful, S&P; <u>provided</u> that no specific rating shall be required.

Section 6.18 <u>Control Agreements; Cash Management</u>. On or prior to the 45th day following the Closing Date (or such later date as may be specified by the Administrative Agent in its sole discretion), the Loan Parties will enter into, and will maintain in effect, Control Agreements with respect to each Deposit Account and lock box account maintained by the Loan Parties, other than Excluded Accounts. Each Control Agreement shall be in form and substance reasonably satisfactory to the Administrative Agent. The Borrower shall also maintain a cash collateral account Silicon Valley Bank, which account shall be subject to an account control agreement with the Administrative Agent. No Loan Party shall open, maintain or permit to exist any bank account, unless such Loan Party shall have provided the Administrative Agent with five (5) Business Days' prior written notice thereof and, unless otherwise consented to in writing by the Administrative Agent, shall have provided a Control Agreement in form and substance satisfactory to the Administrative Agent over each such account.

## ARTICLE VII

## <u>NEGATIVE COVENANTS</u>

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation (other than Hedging Obligations and contingent indemnification obligations and other contingent obligations) hereunder which is accrued and payable shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding, the Borrower shall not, nor shall it permit any of its Subsidiaries to, directly or indirectly (and, in the case of <u>Section 7.10</u>, Holdings shall not):

Section 7.01 <u>Liens</u>. Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a) Liens created pursuant to the Loan Documents to secure the Obligations or permitted in respect of any Mortgaged Property by the terms of the applicable Mortgage;

(b) Liens existing on the Closing Date and set forth on <u>Schedule 7.01(b)</u>; <u>provided</u> that (i) any such Lien does not extend to any other property or asset of the Borrower or any Subsidiary other than (A) after acquired property that is affixed or incorporated into the property covered by any such Lien or financed with Indebtedness permitted by <u>Section 7.03</u> and (B) the proceeds and products thereof and (ii) such Lien shall secure only those obligations that it secures on the Closing Date and any Permitted Refinancing Indebtedness incurred to Refinance such Indebtedness permitted by <u>Section 7.03</u>;

(c) Liens for Taxes, assessments or governmental charges (i) not yet due and payable or which are being contested in good faith and by appropriate proceedings

91

diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person to the extent required in accordance with GAAP or (ii) with respect to which the failure to make payment could not reasonably be expected to have a Material Adverse Effect;

(d) inchoate, statutory or common law Liens of landlords, lessors, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens arising in the ordinary course of business (i) which secure amounts that are not overdue for a period of more than 30 days or if more than 30 days overdue, are unfiled (or if filed have been discharged or stayed) and no other action has been taken to enforce such Lien or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person to the extent required in accordance with GAAP or (ii) with respect to which the failure to make payment could not reasonably be expected to have a Material Adverse Effect;

(e)  (i) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any Subsidiary;

(f)  Liens incurred or deposits made to secure the performance of bids, trade contracts, governmental contracts and leases (other than Indebtedness for borrowed money and Capitalized Leases), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business;

(g) easements, rights-of-way, restrictions (including zoning restrictions), encroachments, protrusions and other similar encumbrances and minor title defects affecting real property which, in the aggregate, do not in any case materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries, taken as a whole, and any exception on the title polices issued in connection with any mortgaged property;

(h) Liens securing judgments for the payment of money not constituting an Event of Default under Section 8.01(g);

(i)  Liens securing Indebtedness permitted under Section 7.03(f); provided that (i) such Liens attach concurrently with or within one hundred and eighty (180) days after the acquisition, construction, repair, replacement, lease or improvement (as applicable) of the property subject to such Liens, (ii) such Liens do not at any time encumber any property other than the property financed by such Indebtedness, replacements thereof and additions and accessions to such property and the proceeds and the products thereof and customary security deposits, and (iii) with respect to

Capitalized Leases, such Liens do not at any time extend to or cover any assets (except for additions and accessions to such assets, replacements and products thereof and customary security deposits) other than the assets subject to such Capitalized Leases; provided that individual financings of equipment provided by one creditor may be cross-collateralized to other financings of equipment provided by such lender;

(j)  leases, licenses, subleases, ground leases, sublicenses or cross licenses and Liens on the property covered thereby (including Intellectual Property), in each case, granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of the Borrower and its Subsidiaries, taken as a whole, or (ii) secure any Indebtedness;

(k) Liens in favor of customs and revenue authorities arising as a matter of Law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(l)  Liens (i) of a collection bank (including those arising under Section 4-210 of the Uniform Commercial Code) on the items in the course of collection, (ii) in favor of a banking or other financial institution arising as a matter of law encumbering deposits or other funds maintained with a financial institution (including the right of set off) and which are within the general parameters customary in the banking industry and (iii) attaching to commodity trading accounts, or other commodity brokerage accounts incurred in the ordinary course of business;

(m)Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 7.02 to be applied against the purchase price for such Investment and (ii) consisting of an agreement to Dispose of any property in a Disposition permitted under Section 7.05, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(n) any interest or title of a lessor, licensor, sublessor or sublicensor under leases or subleases entered into by the Borrower or any of its Subsidiaries in the ordinary course of business;

(o) Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any of its Restricted Subsidiaries in the ordinary course of business;

(p) Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks or other financial institutions not given in connection with the Incurrence of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower or its Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any Subsidiary in the ordinary course of business;

(q) Liens arising from precautionary Uniform Commercial Code financing statement filings;

(r)  Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(s)  any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Borrower or any Subsidiary;

(t)  Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit issued for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods; or

(u) the modification, replacement, renewal or extension of any Lien permitted by clauses (b) and (i) of this Section 7.01; provided that (i) the Lien does not extend to any additional property other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien or financed by Indebtedness permitted under Section 7.03, and (B) proceeds and products thereof; and (ii) the renewal, extension or refinancing of the obligations secured or benefited by such Liens is permitted by Section 7.03;

(v) ground leases in respect of real property on which facilities owned or leased by the Borrower or any of its Subsidiaries are located;

(w) Liens solely on any cash earnest money deposits made by the Borrower or any of its Subsidiaries in connection with any letter of intent or purchase agreement permitted hereunder;

(x) Liens not otherwise permitted by this Section 7.01; provided that at the time of the incurrence thereof and after giving pro forma effect thereto securing amounts or obligations not in excess of $10,000,000 in the aggregate for all amounts so secured;

(y) Liens securing Swap Contracts submitted for clearing in accordance with applicable Law;

(z) Liens given to a public utility or any municipality or governmental or other public authority when required by such utility or other authority in connection with the ordinary conduct of the business of the Borrower or any Subsidiary; provided that such Liens do not materially interfere with the ordinary conduct of the business of the Borrower or any Subsidiary;

(aa)        Liens securing obligations under the Exit L/C Facility;

94

(bb)        Liens created pursuant to the Second Lien Credit Agreement and the other Loan Documents as defined in the Second Lien Credit Agreement;

(cc)        Liens securing Indebtedness permitted under Section 7.03(r); provided that to the extent any Liens are incurred under this clause (x) to secure any Indebtedness for borrowed money with any of the Collateral, such Indebtedness shall be subject to either an Equal Priority Intercreditor Agreement reasonably satisfactory to the Administrative Agent or execute a joinder to the Junior Priority Intercreditor Agreement, as applicable, providing for such Indebtedness to be secured with the applicable Obligations on, at the Borrower's option, (x) a pari passu (other than with respect to control of remedies) basis to the Liens securing such Obligations with Required Lender consent or (y) a junior basis to the Liens securing such Obligations; and

(dd)        the right reserved to or vested in any Governmental Authority by any statutory provision or by the terms of any lease, license, franchise, grant or permit of the Borrower or any Subsidiary, to terminate any such lease, license, franchise, grant or permit, or to require annual or other payments as a condition to the continuance thereof.

Section 7.02        Investments. Make any Investments, except:

(a)  Investments by the Borrower or a Subsidiary in assets that were Cash Equivalents when such Investment was made;

(b)  Investments in Swap Contracts permitted under Section 7.03(q);

(c)  Investments (i) by any Loan Party in any other Loan Party, (ii) by any Subsidiary in any Loan Party and (iii) by any Non-Loan Party in any other Non-Loan Party;

(d)  Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(e)  Investments consisting of Liens, Indebtedness, fundamental changes, Dispositions and Restricted Payments permitted under Section 7.01, Section 7.03, Section 7.04, Section 7.05 (other than Section 7.05(e)) and Section 7.06), respectively; provided, however, that no Investments may be made solely pursuant to this Section 7.02(e);

(f)   (i) Investments existing on the Closing Date and (ii) Investments consisting of any ordinary course modification, replacement, renewal, reinvestment or extension of any Investment existing on the Closing Date; provided that the aggregate amount of the Investments permitted pursuant to this Section 7.02(f) is not increased from the aggregate amount of such Investments on the Closing Date except pursuant

95

to the terms of such Investment as of the Closing Date or as otherwise permitted by this Section 7.02;

(g) Promissory notes and other noncash consideration received in connection with Dispositions permitted by Section 7.05;

(h) Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers consistent with past practices;

(i) Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(j) advances of payroll payments to employees, directors, consultants, independent contractors or other service providers or other advances of salaries or compensation to employees, directors, consultants, independent contractors or other service providers, in each case in the ordinary course of business;

(k) Guarantee Obligations of the Borrower or any Subsidiary in respect of leases (other than Capitalized Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

(l) Investments to the extent that payment for such Investments is made solely with Qualified Equity Interests (other than any Cure Amount) of Holdings (or of the Borrower or any Parent Entity);

(m) Guarantee Obligations of the Borrower or any Subsidiary in connection with the provision of credit card payment processing services;

(n) Investments in the ordinary course of business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Uniform Commercial Code Article 4 customary trade arrangements with customers consistent with past practices;

(o) the purchase or other acquisition of property and assets or businesses of any Person or of assets constituting a business unit, a line of business or division of such Person, or Equity Interests in a Person that, upon the consummation thereof, will become a Subsidiary Guarantor of the Borrower (including as a result of a merger or consolidation) (each, a "Permitted Acquisition"); provided that (i) immediately before and immediately after giving pro forma effect to any such purchase or other acquisition, no Event of Default has occurred and is continuing, (ii) the after giving pro forma effect to any such purchase or other acquisition, the Borrower shall be in compliance with Section 6.15, (iii) that at the time such Permitted Acquisition is consummated, the Borrower is in compliance with the applicable Secured Leverage

96

Ratio covenant under <u>Section 7.09</u> on a pro forma basis and (iv) that Investments in assets that are not owned by the Loan Parties or in Equity Interests in Persons that are not Loan Parties or do not become Loan Parties upon consummation of such acquisition shall not exceed $500,000 when combined with any amounts under <u>Section 7.02(o)(iii)</u>;

(p) additional Investments; <u>provided</u> that after giving pro forma effect thereto, (i) the Secured Leverage Ratio (calculated on a pro forma basis) would not exceed the ratio that is 0.50x below the applicable Secured Leverage Ratio covenant under <u>Section 7.09</u> at the time of such Investment, (ii) no Event of Default has occurred and is continuing and (iii) that Investments in assets that are not owned by the Loan Parties or in Equity Interests in Persons that are not Loan Parties or do not become Loan Parties upon consummation of such acquisition shall not exceed $500,000 when combined with any amounts under <u>Section 7.02(p)(iv)</u>;

(q) any additional Investments (including Investments in minority investments, Investments in joint ventures or similar entities that do not constitute Subsidiaries, Investments constituting Permitted Acquisitions and Investments in Subsidiaries that are not, and do not become, Subsidiary Guarantors), as valued at the Fair Market Value of such Investment at the time each such Investment is made; <u>provided</u> that the aggregate amount of such Investment shall not cause the aggregate amount of all such Investments made pursuant to this <u>Section 7.02(q)</u> measured (as valued at the Fair Market Value at such time that the Investment is made) at the time such Investment is made, to exceed, after giving effect to such Investment, the Available Amount at such time; and

(r)  Investments in property and/or equipment for WebCollage Israel in an aggregate amount not to exceed $1,000,000.

Section 7.03     <u>Indebtedness</u>. Incur any Indebtedness, except:

(a)  Indebtedness of the Borrower and any of its Subsidiaries under the Loan Documents;

(b)  Indebtedness represented by the Second Lien Term Facility and any guarantee thereof in an aggregate principal amount not to exceed $[      ] (together with any Permitted Refinancing Indebtedness in respect of the foregoing and all accrued interest, fees and expenses with respect thereto);

(c)  (i) Indebtedness outstanding on the date hereof and listed on <u>Schedule 7.03(c)</u>; <u>provided</u> that all such Indebtedness constituting intercompany Indebtedness shall be subordinated to the Obligations (but only to the extent permitted by applicable law and not giving rise to adverse tax consequences) on terms (x) at least as favorable to the Lenders as those set forth in the form of subordinated intercompany note attached as <u>Exhibit J</u> or (y) otherwise satisfactory to the Administrative Agent and (ii) any Permitted Refinancing Indebtedness thereof;

97

(d) Guarantee Obligations of the Borrower and its Subsidiaries in respect of Indebtedness of the Borrower or any Subsidiary otherwise permitted hereunder; provided that (i) if the Indebtedness being guaranteed is subordinated in right of payment to the Obligations, such Guarantee Obligation shall be subordinated in right of payment to the Guarantee of the Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness and (ii) no Guarantee by any Subsidiary of any Indebtedness of a Loan Party shall be permitted unless such Subsidiary shall have also provided a Guarantee of the Obligations;

(e) Indebtedness of the Borrower or any Subsidiary owing to the Borrower or any other Subsidiary to the extent constituting an Investment permitted by Section 7.02; provided that all such Indebtedness of any Loan Party owed to any Person that is not a Loan Party shall be subject to the Subordinated Intercompany Note;

(f) (i) Capitalized Lease Obligations and other Indebtedness (including Capitalized Leases) financing the acquisition, construction, repair, replacement, lease or improvement of fixed or capital assets; provided that (x) such Indebtedness is Incurred concurrently with or within one hundred and eighty (180) days after the applicable acquisition, construction, repair, replacement, lease or improvement, and (y) such Indebtedness is not Incurred to acquire the Equity Interests of any person, and (ii) Capitalized Lease Obligations arising out of Sale Leasebacks,  provided that, at the time of any such incurrence and after giving pro forma effect thereto and the use of the proceeds thereof, the aggregate principal amount of Indebtedness that is outstanding in reliance on either subclauses (i) or (ii) of this clause (f) shall not exceed $10,000,000 and (iii) any Permitted Refinancing Indebtedness set forth in the immediately preceding clauses (i) and (ii);

(g) Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections and similar arrangements in each case in connection with deposit accounts incurred in the ordinary course;

(h) Indebtedness consisting of (i) the financing of insurance premiums or (ii) take or pay obligations entered into in the ordinary course of business;

(i) Indebtedness Incurred by the Borrower or any of its Subsidiaries in respect of letters of credit, bank guarantees, banker's acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims;

(j) obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of its Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

98

(k) Indebtedness (other than Indebtedness for borrowed money) supported by a Letter of Credit in a principal amount not to exceed the face amount of such Letter of Credit;

(l)  unsecured Indebtedness in respect of obligations of the Borrower or any Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services; provided that such obligations are incurred in connection with open accounts extended by suppliers on customary trade terms in the ordinary course of business, consistent with past practices, and not in connection with the borrowing of money;

(m) additional Indebtedness in an aggregate principal amount, measured at the time of Incurrence and after giving pro forma effect thereto and the use of the proceeds thereof, not to exceed $10,000,000 so long as the Borrower is in compliance with the applicable Secured Leverage Ratio covenant under Section 7.09 on a pro forma basis;

(n) Guarantee Obligations of the Borrower or any Subsidiary in connection with the provision of credit card payment processing services;

(o) Indebtedness assumed in connection with any Permitted Acquisition (or similar Investment); provided that (A) the only obligors with respect to any Indebtedness Incurred pursuant to this clause (o) shall be those Persons who were obligors of such Indebtedness prior to such Permitted Acquisition (or in the case of a purchase of assets, the purchaser of such assets), (B) both immediately prior to and after giving effect thereto no Event of Default shall exist or result therefrom, (C) after giving pro forma effect to any such purchase or other acquisition, the Incurrence of any Indebtedness and the use of the proceeds thereof, the Borrower is in compliance with the applicable Secured Leverage Ratio covenant under Section 7.09 on a pro forma basis (D) the Borrower shall, and shall cause its Subsidiaries to, comply with the applicable Collateral and Guarantee Requirement and Sections 6.10 and 6.12, (E) such Indebtedness was not created in contemplation of such Permitted Acquisition, (F) such Indebtedness is only the obligation of the Person and/or Person's Subsidiaries that are acquired or that acquired the relevant assets and such Indebtedness and (G) to the extent such Indebtedness is secured by a Lien on any assets or property of the Borrower or any Subsidiary, it shall be subject to any applicable limitations set forth in Section 7.01;

(p) Indebtedness incurred under the Exit L/C Facility;

(q) Indebtedness in respect of Swap Contracts incurred in the ordinary course of business and not for speculative purposes;

(r)  Indebtedness arising from agreements of the Borrower or any Subsidiary providing for indemnification, adjustment of purchase price or similar obligations (including earn-outs), in each case entered into in connection with Permitted Acquisitions, other Investments and the Disposition of any business, assets or Equity

99

Interests permitted hereunder, other than Guarantee Obligations incurred by any Person acquiring all or any portion of such business, assets or Equity Interests for the purpose of financing such acquisition; and

(s)  other Indebtedness of the Borrower and its Subsidiaries; provided that (A) both immediately prior to and after giving effect thereto no Event of Default shall exist or result therefrom, (B) after giving pro forma effect to such Incurrence of any Indebtedness and the use of the proceeds thereof, the Borrower is in compliance with the applicable Secured Leverage Ratio covenant under <u>Section 7.09</u> on a pro forma basis and (C) the aggregate principal amount of Indebtedness permitted by this <u>clause (s)</u> shall not exceed $100,000,000.

Notwithstanding the foregoing provisions of <u>Section 7.03</u>, the Borrower will not, and will not permit any Subsidiary or Loan Party to, issue any preferred Equity Interests or any Disqualified Equity Interests.

Section 7.04    <u>Fundamental Changes</u>.  Merge, dissolve, liquidate, consolidate, amalgamate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired), taken as a whole, to or in favor of any Person, except:

(a)  any Non-Loan Party may Dispose of any or all of its assets (upon voluntary liquidation or otherwise) to the Borrower, a Guarantor or any other Subsidiary of the Borrower;

(b)  any Subsidiary Guarantor may (i) merge, amalgamate or consolidate with or into any other Subsidiary Guarantor or the Borrower, (ii) merge, amalgamate or consolidate with or into any Non-Loan Party; <u>provided</u> that if such Subsidiary Guarantor is not the surviving entity, such merger, amalgamation or consolidation shall be deemed to be an "Investment" and subject to the limitations set forth in <u>Section 7.02</u> and (iii) Dispose of any or all of its assets (upon voluntary liquidation or otherwise) to the Borrower or any other Subsidiary Guarantor;

(c)  any Subsidiary may liquidate or dissolve if (x) the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders and (y) to the extent such Subsidiary is a Subsidiary Guarantor, any assets or business not otherwise Disposed of or transferred in accordance with <u>Section 7.02</u> or <u>7.05</u>, or, in the case of any such business, discontinued, shall be transferred to, or otherwise owned or conducted by, the Borrower or another Guarantor after giving effect to such liquidation or dissolution;

(d)  any Subsidiary may merge, consolidate or amalgamate with any other Person in order to effect an Investment permitted pursuant to <u>Section 7.02</u>; <u>provided</u> that the continuing or surviving Person shall be a Subsidiary;

(e)  without limiting the foregoing in Section 7.04, the Pre-Petition Borrower may (i) convert to a limited liability company or (ii) merge, amalgamate or consolidate with or into the Borrower or a Subsidiary (other than an Excluded Subsidiary) of the Borrower; and

(f)  the Borrower or any Subsidiary may Dispose of any assets or business permitted by Sections 7.05(n) or (o).

Section 7.05    Dispositions. Make any Disposition, except:

(a)  Dispositions of obsolete, worn out or surplus property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful, or economically practicable to maintain, in the conduct of the business of the Borrower and its Subsidiaries;

(b)  Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property that is promptly purchased or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property (which replacement property is actually promptly purchased);

(c)  Dispositions of inventory and other assets in the ordinary course of business (including allowing any registrations or any applications for registration of any immaterial IP Rights to lapse or go abandoned in the ordinary course of business);

(d)  Dispositions of property to the Borrower or a Subsidiary; provided that if the transferor of such property is a Loan Party, (i) the transferee must be a Loan Party or (ii) to the extent such transaction constitutes an Investment, such transaction is permitted under Section 7.02;

(e)  Dispositions permitted by Section 7.02 (other than Section 7.02(e)), Section 7.04 and Section 7.06 and Liens permitted by Section 7.01;

(f)  leases, subleases, licenses or sublicenses, in each case in the ordinary course of business and which do not materially interfere with the business of the Borrower and its Subsidiaries, taken as a whole;

(g)  transfers of property subject to Casualty Events upon receipt of the Net Proceeds of such Casualty Event;

(h)  Dispositions of accounts receivable in the ordinary course of business in connection with the collection or compromise thereof;

(i)  dispositions of non-core assets acquired in connection with any Permitted Acquisition or Investment permitted hereunder;

(j)  Dispositions of Cash Equivalents for cash or other Cash Equivalents;

101

(k) The unwinding of any Swap Contract pursuant to its terms;

(l)  Dispositions of property to Persons other than Guarantors (including the sale or issuance of Equity Interests of a Guarantor) not otherwise permitted under this Section 7.05 in an aggregate amount not to exceed $500,000; provided that (i) no Default shall exist at the time of, or would result from, such Disposition (other than any such Disposition made pursuant to a legally binding commitment entered into at a time when no Default existed or would have resulted from such Disposition) and (ii) with respect to any Disposition pursuant to this clause (k), the Borrower or a Guarantor shall receive not less than 75% of such consideration in the form of cash;

(m) the Borrower and the Subsidiaries may (i) sell or discount without recourse accounts receivable arising in the ordinary course of business in connection with the compromise or collection thereof and (ii) sell or transfer accounts receivable so long as the Net Cash Proceeds of any sale or transfer pursuant to this clause (ii) are offered to prepay the Loans pursuant to Section 2.05;

(n) Disposition of, all or a portion of, the assets or equity interests that comprise (x) the online content publisher business commonly known as "Multiply" or (y) the platform for managing and publishing product information to e-commerce websites business commonly known as "Webcollage; and

(o) Disposition of, all or a portion of, the assets or equity interests that comprise the customer experience analytics platform business commonly known as "Foresee".

Section 7.06    Restricted Payments. Make, directly or indirectly, any Restricted Payment, except:

(a)  each Subsidiary may make Restricted Payments to the Borrower and to other Subsidiaries that are Loan Parties and each Subsidiary that is not a Loan Party may make Restricted Payments to any Subsidiary that is not a Loan Party;

(b) Restricted Payments made on or after the Closing Date to consummate the Transactions;

(c)  to the extent constituting Restricted Payments, the Borrower and its Subsidiaries may enter into and consummate transactions expressly permitted by any provision of Section 7.02 or Section 7.04;

(d) the Borrower and its Subsidiaries may make Restricted Payments to Holdings:

(i)      the proceeds of which shall be used to pay any federal, state, local or foreign Taxes of a consolidated, combined or similar tax group of which Holdings is the common parent, to the extent such Taxes are attributable to the income of the Borrower or its Subsidiaries; provided that (x) no such payments shall exceed the income tax liability that would have been imposed on the

Borrower and/or the applicable Subsidiaries had such entity(ies) filed on a stand-alone basis;

(ii)      the proceeds of which shall be used to pay Holdings' operating costs and expenses incurred in the ordinary course of business, other overhead costs and expenses and fees (including administrative, legal, accounting and similar expenses provided by third parties as well as trustee, directors and general partner fees) which are reasonable and customary and incurred in the ordinary course of business and attributable to the ownership or operations of the Borrower and its Subsidiaries (including any reasonable and customary indemnification claims made by directors or officers of Holdings attributable to the direct or indirect ownership or operations of the Borrower and its Subsidiaries) and fees and expenses otherwise due and payable by the Borrower or any Subsidiary and permitted to be paid by the Borrower or such Subsidiary under this Agreement not to exceed $1,500,000, in any fiscal year; and

(iii)      to the extent not duplicative of Section 7.06(d)(i) or (ii), the proceeds of which shall be used to pay franchise and excise taxes, and other similar fees, taxes and expenses, required to maintain Holdings' existence;

(e) the Borrower or any Subsidiary may pay any dividend or distribution within 60 days after the date of declaration thereof, if at the date of declaration such payment would have complied with the provisions of this Agreement;

(f) in addition to the foregoing Restricted Payments (i) so long as no Event of Default shall have occurred and be continuing or would result therefrom, the Borrower may make additional Restricted Payments, measured at the time made, in an aggregate amount not to exceed the greater of (x) $5,000,000 and (y) 5.0% of Consolidated EBITDA of the Borrower for the Test Period most recently ended on or prior to the date such Restricted Payment is made (measured as of such date) based upon the Section 6.01 Financials most recently delivered on or prior to such date, in any fiscal year; and (ii) the Borrower may make additional Restricted Payments so long as (x) no Event of Default shall have occurred and be continuing or would result therefrom and (y) the Secured Leverage Ratio (calculated on a pro forma basis) would not exceed the ratio that is 0.50x below the applicable Secured Leverage Ratio covenant under Section 7.09 at the time of such Restricted Payment;

(g) so long as no Event of Default shall have occurred and be continuing or would result therefrom, the Borrower may make additional Restricted Payments in an aggregate amount not to exceed an amount equal to the Available Amount at the time such Restricted Payments are paid; and

(h) the Borrower may make additional Restricted Payments for any sale under Section 7.05(n) up to the amount not required to be prepaid under Section 2.05(b).

Section 7.07      Transactions with Affiliates. Enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the ordinary course of business, other than:

103

(a)  transactions between or among Holdings, the Borrower or any Subsidiary that is a Loan Party;

(b)  transactions on terms substantially as favorable to the Borrower or such Subsidiary as would be obtainable by the Borrower or such Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate;

(c)  the Transactions and the payment of fees and expenses related to the Transactions;

(d)  Restricted Payments permitted under Section 7.06;

(e)  loans and other transactions by and among the Borrower and/or one or more Subsidiaries to the extent permitted under this Article VII;

(f)  any issuance of Equity Interests, or other payments, awards or grants in cash securities, Equity Interests or otherwise pursuant to, or the funding of, employment arrangements, stock options and stock ownership plans approved by the Board of Directors of any Parent Entity of the Borrower or the Borrower, as the case may be;

(g)  transactions pursuant to permitted agreements in existence on the Closing Date and set forth on Schedule 7.07 or any amendment thereto to the extent such an amendment, taken as a whole, is not adverse to the Lenders in any material respect; and

(h)  transactions with Wholly-Owned Subsidiaries for the purchase or sale of goods, products, parts and services entered into in the ordinary course of business in a manner consistent with prudent business practice followed by companies in the industry of the Borrower and its Subsidiaries.

Section 7.08      Prepayments, Etc., of Indebtedness.

(a)  Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Junior Debt (it being understood that any payments of regularly scheduled interest or mandatory prepayments under such Junior Debt Documents shall be permitted only in accordance with the terms of the Junior Priority Intercreditor Agreement), except for (i) the refinancing thereof with the Net Proceeds of any Indebtedness (to the extent such Indebtedness constitutes Permitted Refinancing Indebtedness) and (ii) the conversion thereof to Equity Interests (other than Disqualified Equity Interests) of Holdings or the Borrower or any Parent Entity;

(b)  Assert any right of subrogation or contribution against any other Loan Party until all Obligations have been indefeasibly paid in full;

(c) Amend, modify or change in any manner adverse to the interests of the Lenders any term or condition of any Junior Debt Documents without the consent of the Required Lenders; and

(d) Notwithstanding the foregoing and for the avoidance of doubt, nothing in this Section 7.08 shall prohibit (i) the repayment or prepayment of intercompany subordinated Indebtedness owed among the Borrower and/or the Subsidiaries, in either case unless an Event of Default has occurred and is continuing and the Borrower has received a notice from the Collateral Agent instructing it not to make or permit the Borrower and/or the Subsidiaries to make any such repayment or prepayment or (ii) substantially concurrent transfers of credit positions in connection with intercompany debt restructurings so long as such Indebtedness is permitted by Section 7.03 after giving effect to such transfer.

Section 7.09    Financial Covenant.

The Borrower shall not permit the Secured Leverage Ratio for any Test Period set forth below to be greater than the ratio set forth opposite such Test Period below:

| Test Period Date | Secured Leverage Ratio |
|---|---|
| January 1, 2018 through and including March 31, 2018 | 7.00:1.00 |
| April 1, 2018 through and including June 30, 2018 | 7.00:1.00 |
| July 1, 2018 through and including September 30, 2018 | 7.00:1.00 |
| October 1, 2018 through and including December 31, 2018 | 6.50:1.00 |
| January 1, 2019 through and including March 31, 2019 | 6.00:1.00 |
| April 1, 2019 and thereafter | 5.50:1.00 |

Notwithstanding the foregoing, this Section 7.09 shall be in effect (and shall only be in effect) on and after January 1, 2018.  Any provision of this Agreement that contains a requirement for the Borrower to be in compliance with the Financial Covenant prior to the time that it is otherwise applicable shall be deemed to require that the Secured Leverage Ratio for the applicable Test Period be no greater than 7.50:1.00.

Section 7.10    Passive Activity Covenants.

(a) Holdings shall not conduct, transact or otherwise engage in any business or operations other than (i) the ownership and/or acquisition of the Equity Interests (other than Disqualified Equity Interests) of the Borrower, (ii) the maintenance of its legal existence, including the ability to incur fees, costs and expenses relating to such maintenance, (iii) to the extent applicable, participating in tax, accounting and other administrative matters as a member of the consolidated group of Holdings and the

Borrower, (iv) the performance of its obligations under and in connection with the Loan Documents and any documents relating to other Indebtedness permitted under Section 7.03, (v) any transaction between Holdings and the Borrower or any Subsidiary permitted under this Article 7, (vi) incurring fees, costs and expenses relating to overhead and general operating including professional fees for legal, tax and accounting issues and paying Taxes, (vii) providing indemnification to officers and directors and as otherwise permitted in Section 7, (viii) activities incidental to the consummation of the Transactions, (ix) organizational activities incidental to Permitted Acquisitions or similar Investments consummated by the Borrower, including the formation of acquisition vehicle entities and intercompany loans and/or investments incidental to such Permitted Acquisitions or similar Investments in each case consummated substantially contemporaneously with the consummation of the applicable Permitted Acquisitions or similar Investments; provided that in no event shall any such activities include the incurrence of a Lien on any of the assets of Holdings, (x) the making of any loan to any officers or directors contemplated by Section 7.02, the making of any Investment in the Borrower or any Subsidiary Guarantor or, to the extent otherwise allowed under Section 7.02, a Subsidiary, (xi) activities incidental to the consummation of the Transactions, (xii) organizational activities incidental to Permitted Acquisitions or similar Investments consummated by the Borrower, including the formation of acquisition vehicle entities and intercompany loans and/or investments incidental to such Permitted Acquisitions or similar Investments in each case consummated substantially contemporaneously with the consummation of the applicable Permitted Acquisitions or similar Investments; provided that in no event shall any such activities include the incurrence of a Lien on any of the assets of Holdings, (xiii) activities required to comply with applicable Laws, (xiv) maintenance and administration of stock option and stock ownership plans and activities incidental thereto, (xv) the obtainment of, and the payment of any fees and expenses for, management, consulting, investment banking and advisory services to the extent otherwise permitted by this Agreement, and (xvi) activities incidental to the businesses or activities described in clauses (i) to (xv) of this Section 7.10(a).

(b) The Borrower shall not conduct, transact or otherwise engage in any business or operations other than (i) the ownership and/or acquisition of the Equity Interests (other than Disqualified Equity Interests) of the Pre-Petition Borrower, (ii) the maintenance of its legal existence, including the ability to incur fees, costs and expenses relating to such maintenance, (iii) to the extent applicable, participating in tax, accounting and other administrative matters as a member of the consolidated group of Holdings and the Pre-Petition Borrower, (iv) the performance of its obligations under and in connection with the Loan Documents and any documents relating to other Indebtedness permitted under Section 7.03, (v) any transaction between Holdings and the Pre-Petition Borrower or any Subsidiary permitted under this Article 7, (vi) incurring fees, costs and expenses relating to overhead and general operating including professional fees for legal, tax and accounting issues and paying Taxes, (vii) providing indemnification to officers and directors and as otherwise permitted in Section 7, (viii) activities incidental to the consummation of the Transactions, (ix) organizational activities incidental to Permitted Acquisitions or

106

similar Investments consummated by the Pre-Petition Borrower, including the formation of acquisition vehicle entities and intercompany loans and/or investments incidental to such Permitted Acquisitions or similar Investments in each case consummated substantially contemporaneously with the consummation of the applicable Permitted Acquisitions or similar Investments; provided that in no event shall any such activities include the incurrence of a Lien on any of the assets of the Borrower, (x) the making of any loan to any officers or directors contemplated by Section 7.02, the making of any Investment in the Pre-Petition Borrower or any Subsidiary Guarantor or, to the extent otherwise allowed under Section 7.02, a Subsidiary, (xi) activities incidental to the consummation of the Transactions, (xii) organizational activities incidental to Permitted Acquisitions or similar Investments consummated by the Pre-Petition Borrower, including the formation of acquisition vehicle entities and intercompany loans and/or investments incidental to such Permitted Acquisitions or similar Investments in each case consummated substantially contemporaneously with the consummation of the applicable Permitted Acquisitions or similar Investments; provided that in no event shall any such activities include the incurrence of a Lien on any of the assets of the Borrower, (xii) activities required to comply with applicable Laws, (xiv) maintenance and administration of stock option and stock ownership plans and activities incidental thereto, (xv) the obtainment of, and the payment of any fees and expenses for, management, consulting, investment banking and advisory services to the extent otherwise permitted by this Agreement, and (xvi) activities incidental to the businesses or activities described in clauses (i) to (xv) of this Section 7.10(b).

Section 7.11    Negative Pledge. Enter into any agreement, instrument, deed or lease that prohibits or limits the ability of any Loan Party to create, incur, assume or suffer to exist any Lien upon any of their respective properties or revenues, whether now owned or hereafter acquired, for the benefit of the Secured Parties with respect to the Obligations or under the Loan Documents; provided that the foregoing shall not apply to:

(a)  restrictions and conditions imposed by (A) Law, (B) any Loan Document, (C) the Second Lien Term Facility and Permitted Refinancing Indebtedness thereof, and (D) any documentation governing any Permitted Refinancing Indebtedness incurred to Refinance any such Indebtedness referenced in clauses (B) through (D) above;

(b)  customary restrictions and conditions existing on the Closing Date or to any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(c)  restrictions and conditions contained in agreements relating to the sale of a Subsidiary or any assets pending such sale; provided that such restrictions and conditions apply only to the Subsidiary or assets that is or are to be sold and such sale is permitted hereunder;

NAI-1502411964v15

(d) customary provisions in leases, licenses and other contracts restricting the assignment thereof;

(e) restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement to the extent such restriction applies only to the property securing such Indebtedness;

(f) any restrictions or conditions set forth in any agreement in effect at any time any Person becomes a Subsidiary (but not any modification or amendment expanding the scope of any such restriction or condition); <u>provided</u> that such agreement was not entered into in contemplation of such Person becoming a Subsidiary and the restriction or condition set forth in such agreement does not apply to the Borrower or any other Subsidiary;

(g) [Reserved];

(h) restrictions on cash or other deposits imposed by agreements entered into in the ordinary course of business (or other restrictions constituting Liens permitted hereunder);

(i) restrictions set forth on <u>Schedule 7.11</u> and any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(j) [Reserved];

(k) negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under <u>Sections 7.03(f)</u> , but solely to the extent any negative pledge relates to the property financed by or the subject of such Indebtedness;

(l) customary provisions restricting assignment of any agreement entered into in the ordinary course of business; and

(m) provisions restricting the granting of a security interest in intellectual property contained in licenses or sublicenses by the Borrower and its Subsidiaries of such intellectual property, which licenses and sublicenses were entered into in the ordinary course of business (in which case such restriction shall relate only to such intellectual property).

Section 7.12    <u>Bank Accounts</u>.  No Loan Party shall establish any new Deposit Accounts or Securities Accounts (as defined in the Security Agreement) unless the Administrative Agent and the depository institution at which the account is to be opened enter into a Control Agreement (except with respect to Excluded Accounts) pursuant to which such depository institution acknowledges the security interest of the Administrative Agent in such Deposit Account, agrees to comply with instructions originated by the Administrative Agent directing disposition of the funds in the Deposit Account without further consent from the Borrowers or such Loan Party, and agrees to subordinate and limit any security interest the bank

NAI-1502411964v15

may have in the Deposit Account and waive all rights of set-off with respect thereto (other than for customary fees and expenses) on terms satisfactory to the Administrative Agent.

## ARTICLE VIII

### EVENTS OF DEFAULT AND REMEDIES

Section 8.01    Events of Default. Any of the following events referred to in any of clauses (a) through (1) inclusive of this Section 8.01 shall constitute an "Event of Default":

(a) Non-Payment. Any Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan or (ii) within five (5) Business Days after the same becomes due, any interest on any Loan or any other amount payable hereunder or with respect to any other Loan Document; or

(b) Specific Covenants. The Borrower or any Subsidiary fails to perform or observe any term, covenant or agreement contained in (i) any of Section 6.03(a) or Section 6.04 or Article VII or (ii) Section 7.09; provided that in the case of this sub clause (ii), an Event of Default shall not occur until the Cure Deadline has occurred; or

(c) Other Defaults. Any Loan Party or any Subsidiary thereof fails to perform or observe any other covenant or agreement (not specified in Section 8.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for five (5) days after the earlier of (i) any Loan Party obtaining knowledge of such failure and (ii) any Loan Party receiving notice of such failure from the Administrative Agent or the Required Lenders; or

(d) Representations and Warranties. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Loan Party herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith shall be untrue in any material respect when made or deemed made; or

(e) Cross-Default. Any Loan Party or any Subsidiary (A) fails to make any payment beyond the applicable grace period with respect thereto, if any (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness (other than Indebtedness hereunder) having an aggregate principal amount of not less than the Threshold Amount or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts), the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, all such Indebtedness to become due or to be repurchased, prepaid, defeased

109

or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem all such Indebtedness to be made, prior to its stated maturity; or

(f) <u>Insolvency Proceedings, Etc</u>. Holdings, the Borrower or any of its Subsidiaries (other than any Immaterial Subsidiary) institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, interim receiver, receiver and manager, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, interim receiver, receiver and manager, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days; or an order for relief is entered in any such proceeding; or

(g) <u>Judgments</u>. There is entered against any Loan Party or any Subsidiary a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance or by an enforceable indemnity) and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of forty-five (45) consecutive days after the entry thereof; or

(h) <u>ERISA</u>. (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or would reasonably be expected to result in liability of any Loan Party under Title IV of ERISA in an aggregate amount which would reasonably be expected to result in a Material Adverse Effect or (ii) a Foreign Pension Event occurs with respect to a Foreign Plan that would reasonably be expected to result in a Material Adverse Effect; or

(i) <u>Invalidity of Collateral Documents</u>. (i) Any material provision of any Collateral Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under <u>Section 7.04</u> or <u>Section 7.05</u>) or as a result of acts or omissions by the Administrative Agent, the Collateral Agent or any Lender or the satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of any material provision of any Collateral Document; or any Loan Party denies in writing that it has any or further liability or obligation under any Collateral Document (other than as a result of repayment in full of the Obligations and termination of the Aggregate Commitments), or purports in writing to revoke or rescind any Collateral Document or (ii) a material part of the Liens purported to be created by the Collateral Documents cease to be valid and perfected first priority Liens in favor of the Collateral Agent on the

Collateral covered thereby other than as a result of a release of Collateral permitted under Section 10.20; or

(j) Invalidity of Loan Documents. Any Loan Document shall cease to be in full force and effect(other than pursuant to the terms hereof or thereof), or any Loan Party shall deny or disaffirm in writing the validity of any Loan Document or that it has any further liability under any such Loan Document (other than, in the case of a Guarantee, as a result of the discharge of a Guarantor in accordance with the terms of the Loan Documents) or otherwise attempt to invalidate or otherwise impair the Loans;

(k) Non-Subordination of Junior Indebtedness and Liens. The Indebtedness under or the Lien priority of any Second Lien Credit Document or any Junior Debt Documents shall cease (or any Loan Party or an Affiliate of any Loan Party shall so assert), for any reason, to be validly subordinated to the Obligations or the Liens of the Collateral Documents, respectively, as provided in the documents governing such Junior Debt or the applicable subordination or intercreditor agreement;or

(l) Change of Control. There occurs any Change of Control.

Section 8.02    Remedies Upon Event of Default.

(a) If any Event of Default occurs and is continuing, the Administrative Agent may and, at the request of the Required Lenders, shall, take any or all of the following actions:

(i)        declare the Commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligation shall be terminated;

(ii)        declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, any premium (including the Prepayment Premium)and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

(iii)        exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law.

provided that upon the occurrence of an Event of Default under Section 8.01(f) with respect to the Borrower, the unpaid principal amount of all outstanding Loans and all interest, applicable premiums (including, if applicable, the Prepayment Premium) and other amounts as aforesaid shall automatically become due and payable, and the obligation of the Borrower to Cash Collateralize the L/C Obligations as aforesaid shall automatically become effective, in each case without further act of the Administrative Agent or any Lender.

Section 8.03    [Reserved].

111

Section 8.04      Application of Funds. If the circumstances described in Section 2.12(g) have occurred, or after the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable and the L/C Obligations have automatically been required to be Cash Collateralized as set forth in the proviso to Section 8.02), including in any bankruptcy or insolvency proceeding, any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.04 and amounts payable under Article III) payable to each Agent in its capacity as such, ratably among them in proportion to the amounts described in this clause First payable to them;

Second, to payment of that portion of the Obligations constituting fees, premiums (including the Prepayment Premium) indemnities and other amounts (other than principal and interest) payable to the Lenders (including Attorney Costs payable under Section 10.04 and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Second payable to them;

Third, to payment of that portion of the Obligations constituting accrued and unpaid interest (including, but not limited to, post-petition interest), ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to payment of that portion of the Obligations constituting unpaid principal, Unreimbursed Amounts or face amounts of the Loans, Swap Termination Value under Secured Hedge Agreements, and L/C Borrowings, ratably among the Secured Parties in proportion to the respective amounts described in this clause Fourth held by them;

Fifth, to the payment of all other Obligations of the Loan Parties that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date;

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by Law.

Section 8.05      Permitted Holders' Right to Cure.

(a)      Notwithstanding anything to the contrary contained in Section 8.01(b), in the event that the Borrower fails to comply with the requirement of the Financial Covenant, any of the Permitted Holders, Holdings or any other Person designated by the Borrower shall have the right, during the period beginning at the start of the last fiscal quarter of the applicable Test Period and until on the tenth (10th) Business Day after the date on which financial statements with respect to the Test Period in which such covenant is being measured are required to be delivered pursuant to Section 6.01 (such date, the "Cure Deadline"), to make a direct or indirect equity investment in the Borrower in cash in the form of common Equity Interests (or other

112

Qualified Equity Interests reasonably acceptable to the Administrative Agent) (the "Cure Right"), and upon the receipt by the Borrower of Net Proceeds pursuant to the exercise of the Cure Right (the "Cure Amount"), the Financial Covenant shall be recalculated, giving effect to a pro forma increase to Consolidated EBITDA for such Test Period in an amount equal to such Cure Amount; provided that such pro forma adjustment to Consolidated EBITDA shall be given solely for the purpose of determining the existence of a Default or an Event of Default under the Financial Covenant with respect to any Test Period that includes the fiscal quarter for which such Cure Right was exercised and not for any other purpose under any Loan Document.

(b)    If, after the exercise of the Cure Right and the recalculations pursuant to clause (a) above, the Borrower shall then be in compliance with the requirements of the Financial Covenant during such Test Period, the Borrower shall be deemed to have satisfied the requirements of the Financial Covenant as of the relevant date of determination with the same effect as though there had been no failure to comply therewith at such date, and the applicable Default or Event of Default under Section 8.01 that had occurred shall be deemed cured; provided that (i) the Cure Right may be exercised on no more than three (3) occasions, (ii) in each four fiscal quarter period, there shall be at least two fiscal quarters in respect of which no Cure Right is exercised, (iii) with respect to any exercise of the Cure Right, the Cure Amount shall be no greater than the amount required to cause the Borrower to be in compliance with the Financial Covenant (such amount, the "Necessary Cure Amount") (provided that if the Cure Right is exercised prior to the date financial statements are required to be delivered for such fiscal quarter then the Cure Amount shall be equal to the amount reasonably determined by the Borrower in good faith that is required for purposes of complying with the Financial Covenant for such fiscal quarter (such amount, the "Expected Cure Amount"), (iv) subject to clause (c) below, all Cure Amounts shall be disregarded for purposes of determining the Applicable Rate or used for the purposes of determining any baskets with respect to the covenants contained in the Loan Documents or the usage of the Available Amount and (v) the Net Proceeds from the Cure Right may not reduce the amount of Consolidated Total Debt (including, without limitation, by means of "cash netting") for purposes of calculating compliance with the Financial Covenant for the fiscal quarter for which such Cure Right is deemed applied; provided the amount of Consolidated Total Debt may be reduced for purposes (i) other than determining compliance with the Financial Covenant and (ii) of determining compliance with the Financial Covenant in subsequent fiscal quarters, in each case, to the extent the Cure Amount is applied to prepay Indebtedness.

(c)    The parties hereby acknowledge that this Section 8.05 may not be relied on for purposes of calculating any financial ratios other than for determining actual compliance with the Financial Covenant; provided however, to the extent that the Expected Cure Amount is (i) greater than the Necessary Cure Amount, then such difference may be used for the purposes of determining any baskets (other than any previously contributed Cure Amounts), with respect to the covenants contained in the Loan Documents and the Available Amount and (ii) less than the Necessary Cure Amount, then not later than the applicable Cure Deadline, the Borrower must receive a direct or indirect equity investment in cash in the form of common Equity Interests (or other Qualified Equity Interests reasonably acceptable to the Administrative Agent), which cash proceeds received by Borrower shall be equal to the shortfall between such Expected Cure Amount and such Necessary Cure Amount.

113

# ARTICLE IX

## ADMINISTRATIVE AGENT AND OTHER AGENTS

Section 9.01    Appointment and Authorization of Agents.

(a) Each Lender hereby irrevocably appoints, designates and authorizes the Administrative Agent to take such action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary contained elsewhere herein or in any other Loan Document, the Administrative Agent shall have no duties or responsibilities, except those expressly set forth herein, nor shall the Administrative Agent have or be deemed to have any fiduciary relationship with any Lender or participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent. Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Loan Documents with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

(b) The L/C Issuer shall act on behalf of the L/C Participants with respect to any Letters of Credit issued by it and the documents associated therewith, and the L/C Issuer shall have all of the benefits and immunities (i) provided to the Agents in this Article IX with respect to any acts taken or omissions suffered by the L/C Issuer in connection with Letters of Credit issued by it or proposed to be issued by it and the applications and agreements for letters of credit pertaining to such Letters of Credit as fully as if the term "Agent" as used in this Article IX and in the definition of "Agent-Related Person" included the L/C Issuer with respect to such acts or omissions, and (ii) as additionally provided herein with respect to the L/C Issuer.

(c) The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders (in its capacities as a Lender, L/C Issuer (if applicable) and a potential Hedge Bank) hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of (and to hold any security interest, charge or other Lien created by the Collateral Documents for and on behalf of or on trust for) such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Administrative Agent, as "collateral agent" (and any co-agents, subagents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.02 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for

114

exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this <u>Article IX</u> (including <u>Section 9.07</u>, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

Section 9.02    <u>Delegation of Duties</u>. The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents or of exercising any rights and remedies thereunder) by or through Affiliates, agents, employees or attorneys-in-fact, such sub-agents as shall be deemed necessary by the Administrative Agent, and shall be entitled to advice of counsel, both internal and external, and other consultants or experts concerning all matters pertaining to such duties. The Administrative Agent shall not be responsible for the negligence or misconduct of any agent or sub-agent or attorney-in-fact that it selects in the absence of gross negligence, willful misconduct or bad faith.

Section 9.03    <u>Liability of Agents</u>. No Agent-Related Person shall (a) be liable to any Lender for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence, willful misconduct or bad faith, as determined by the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein), or (b) be responsible in any manner to any Lender or participant for any recital, statement, representation or warranty made by any Loan Party or any officer thereof, contained herein or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or the perfection or priority of any Lien or security interest created or purported to be created under the Collateral Documents, or for any failure of any Loan Party or any other party to any Loan Document to perform its obligations hereunder or thereunder. No Agent-Related Person shall be under any obligation to any Lender or participant to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party or any Affiliate thereof.

Section 9.04    <u>Reliance by Agents</u>.

(a) Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex or telephone message, electronic mail message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to any Loan Party), independent accountants and other experts selected by such Agent. Each Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Required

Lenders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders.

(b) For purposes of determining compliance with the conditions specified in Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 9.05    Notice of Default. The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default, except with respect to defaults in the payment of principal, interest and fees required to be paid to the Administrative Agent for the account of the Lenders, unless the Administrative Agent shall have received written notice from a Lender or the Borrower referring to this Agreement, describing such Default and stating that such notice is a "notice of default." The Administrative Agent will notify the Lenders of its receipt of any such notice. The Administrative Agent shall take such action with respect to any Event of Default as may be directed by the Required Lenders in accordance with Article VIII; provided that unless and until the Administrative Agent has received any such direction, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable or in the best interest of the Lenders.

Section 9.06    Credit Decision; Disclosure of Information by Agents. Each Lender acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by any Agent hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including whether Agent-Related Persons have disclosed material information in their possession. Each Lender represents to each Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and their respective Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower and the other Loan Parties hereunder. Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and

116

creditworthiness of the Borrower and the other Loan Parties. Except for notices, reports and other documents expressly required to be furnished to the Lenders by any Agent herein, such Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of any Agent-Related Person.

Section 9.07    Indemnification of Agents. Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand each Agent-Related Person (to the extent not reimbursed by or on behalf of any Loan Party and without limiting the obligation of any Loan Party to do so), pro rata, and hold harmless each Agent-Related Person from and against any and all Indemnified Liabilities incurred by it; provided that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting from such Agent-Related Person's own gross negligence, willful misconduct or bad faith, as determined by the final judgment of a court of competent jurisdiction; provided that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Loan Documents) shall be deemed to constitute gross negligence, willful misconduct or bad faith for purposes of this Section 9.07. In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 9.07 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent is not reimbursed for such expenses by or on behalf of the Borrower; provided that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto, if any. The undertaking in this Section 9.07 shall survive termination of the Aggregate Commitments, the payment of all other Obligations and the resignation of the Administrative Agent.

Section 9.08    Agents in their Individual Capacities. CS and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire Equity Interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with each of the Loan Parties and their respective Affiliates as though CS were not the Administrative Agent hereunder and without notice to or consent of the Lenders. The Lenders acknowledge that, pursuant to such activities, CS or its Affiliates may receive information regarding any Loan Party or any Affiliate of a Loan Party (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that the Administrative Agent shall be under no obligation to provide such information to them. With respect to its Loans, CS shall have the same rights and powers under this Agreement as any other Lender and may exercise such rights and powers as though it were not the Administrative Agent, and the terms "Lender" and "Lenders" include CS in its individual capacity.

117

Section 9.09      Successor Agents. The Administrative Agent may resign as the Administrative Agent upon thirty (30) days' notice to the Lenders and the Borrower. If the Administrative Agent and/or Collateral Agent becomes a Defaulting Lender, then such Administrative Agent or Collateral Agent, as the case may be, may be removed as the Administrative Agent or Collateral Agent, as the case may be, at the reasonable request of the Borrower and the Required Lenders.  If the Administrative Agent resigns or is removed under this Agreement, the Required Lenders shall appoint a successor agent for the Lenders, which appointment of a successor agent shall require the consent of the Borrower at all times other than during the existence of an Event of Default under Section 8.01(f) (which consent of the Borrower shall not be unreasonably withheld or delayed). If no successor agent is appointed prior to the effective date of the resignation (but not removal) of the Administrative Agent, the Administrative Agent may appoint, after consulting with the Borrower, a successor agent. Upon the acceptance of its appointment as successor agent hereunder, the Person acting as such successor agent shall succeed to all the rights, powers and duties of the retiring Administrative Agent and the term "Administrative Agent" shall mean such successor administrative agent (and the term "Collateral Agent" shall mean such successor collateral agent and/or supplemental agent, as described in Section 9.01(c)), and the retiring or removed Administrative Agent's appointment, powers and duties as the Administrative Agent shall be terminated. After the retiring or removed Administrative Agent's resignation hereunder as the Administrative Agent, the provisions of this Article IX and Section 10.04 and Section 10.05 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent under this Agreement. If no successor agent has accepted appointment as the Administrative Agent by the date which is 30 days following the retiring (but not removed) Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above or, in the absence of such an appointment, as the Administrative Agent shall appoint at or after the expiration of the 30 days following the Administrative Agent's notice of resignation. Upon the acceptance of any appointment as the Administrative Agent hereunder by a successor and upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to the Mortgages, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may reasonably request, in order to (a) continue the perfection of the Liens granted or purported to be granted by the Collateral Documents or (b) otherwise ensure that the Collateral and Guarantee Requirement is satisfied, the Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, discretion, privileges, and duties of the retiring Administrative Agent, and the retiring or removed Administrative Agent shall be discharged from its duties and obligations under the Loan Documents.

Section 9.10      Administrative Agent May File Proofs of Claim. In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan or L/C Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

118

(a) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, L/C Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Section 2.09 and Section 10.04) allowed in such judicial proceeding; and

(b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and

(c) any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their respective agents and counsel, and any other amounts due to the Administrative Agent under Section 2.09 and Section 10.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Section 9.11    Collateral and Guaranty Matters. The Lenders irrevocably agree that any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document may be released or subordinated in accordance with the provisions of Section 10.20 or any Collateral Document.

Upon request by the Administrative Agent at any time, the Required Lenders (or such other percentage of the Lenders whose consent may be required in accordance with Section 10.01) will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 9.11 and Section 10.20.

Section 9.12    No Fiduciary Relationship with Other Lenders. None of the Lenders or other Persons so identified shall have or be deemed to have any fiduciary relationship with any Lender. Each Lender acknowledges that it has not relied, and will not rely, on any of the Lenders or other Persons so identified in deciding to enter into this Agreement or in taking or not taking action hereunder.

Section 9.13    Withholding Tax. To the extent required by any applicable Law, the Administrative Agent may deduct or withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the Internal Revenue Service or any other

119

Governmental Authority asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender under any Loan Document (because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of, withholding Tax ineffective or for any other reason or any failure under any Loan Document by such Lender), such Lender shall indemnify and hold harmless the Administrative Agent fully for all amounts paid by the Administrative Agent as Tax together with all reasonable expenses incurred (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for any such Taxes or expenses incurred), whether or not such Tax was correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive, absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 9.13. The agreements in this Section 9.13 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement and the repayment, satisfaction or discharge of all other obligations. For the avoidance of doubt, (1) the term "Lender" shall, for purposes of this Section 9.13, include the L/C Issuer and (2) this Section 9.13 shall not limit or expand the obligations of the Borrower or any Guarantor under Section 3.01 or any other provision of this Agreement.

Section 9.14    Intercreditor Agreements. The Administrative Agent and the Collateral Agent are each hereby authorized to enter into any Customary Intercreditor Agreement to the extent contemplated by the terms hereof, and the parties hereto acknowledge that such Customary Intercreditor Agreement is binding upon them. Each Lender (a) hereby agrees that it will be bound by the provisions of the Customary Intercreditor Agreement as if it were a signatory thereto and will take no actions contrary to the provisions of the Customary Intercreditor Agreement and (b) hereby authorizes and instructs the Administrative Agent and/or Collateral Agent to enter into the Customary Intercreditor Agreement and to subject the Liens on the Collateral securing the Obligations to the provisions thereof. In addition, each Lender hereby authorizes the Administrative Agent and/or Collateral Agent to enter into (i) any amendments to any Customary Intercreditor Agreement, and (ii) any other intercreditor arrangements, in the case of clauses (i) and (ii) to the extent required to give effect to the establishment of intercreditor rights and privileges as contemplated and required by Section 7.01 of this Agreement, in each case, and without any further consent, authorization or other action by such Lender. Each Lender hereby agrees that no Lender shall have any right of action whatsoever against any Agent as a result of any action taken by such Agent pursuant to this Section or in accordance with the terms of any Customary Intercreditor Agreement. The foregoing provisions are intended as an inducement to the Secured Parties to extend credit to the Borrower and such Secured Parties are intended third-party beneficiaries of such provisions and the provisions of any Customary Intercreditor Agreement.

Section 9.15    Secured Hedge Agreements. Except as otherwise expressly set forth herein or in any Guarantee or any Collateral Document, no Hedge Bank that obtains the benefits of any Guarantee or any Collateral by virtue of the provisions hereof or of any Guarantee or any Collateral Document shall have any right to notice of any action or to consent

120

to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents.  Notwithstanding any other provision of this Section 9.15 to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Obligations arising under Secured Hedge Agreements unless the Administrative Agent has received written notice of such Obligations, together with such supporting documentation as the Administrative Agent may request, from the applicable Hedge Bank, as the case may be.

## ARTICLE X
## MISCELLANEOUS

Section 10.01    Amendments, Etc. Except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders (or the Administrative Agent on behalf of, and acting at the direction of, the Required Lenders) and the Borrower or the applicable Loan Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided that no such amendment, waiver or consent shall:

(a) extend or increase the Commitment of any Lender without the written consent of each Lender directly and adversely affected thereby (it being understood that a waiver of any condition precedent set forth in Section 4.01 or the waiver of any Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments or Loans shall not constitute an extension or increase of any Commitment of any Lender) (provided that any Lender, upon the request of the Borrower, may extend the maturity date of any of such Lender's Commitments without the consent of any other Lender, including the Required Lenders);

(b) postpone any date scheduled for, or reduce the amount of, any payment of principal or interest under Section 2.07 or Section 2.08 without the written consent of each Lender directly and adversely affected thereby (it being understood that a waiver of any condition precedent set forth in Section 4.01 or the waiver of any Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments or Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest (provided that any Lender, upon the request of the Borrower, may extend the maturity date of any Loans owing to such Lender without the consent of any other Lender, including the Required Lenders));

(c) reduce the principal of, or the rate of interest specified herein on, any Loan or L/C Borrowing (it being understood that a waiver of any condition precedent set forth in Section 4.01 or waiver of any Default, Event of Default or mandatory prepayment shall not constitute a reduction or forgiveness of principal), or (subject to clause (ii) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document without the written consent of

each Lender directly and adversely affected thereby (it being understood that any change to the definition of the Secured Leverage Ratio or in the component definitions thereof shall not constitute a reduction in the rate of interest; provided that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate);

(d) (i) amend, modify or waive any provision of this Section 10.01 that has the effect of lowering the number of Lenders that must approve any amendment, modification or waiver, in each case without the written consent of each Lender or (ii) reduce the percentages specified in the definition of the term "Required Lenders",

(e) other than in a transaction permitted under Section 7.04 or Section 7.05, release all or substantially all of the Collateral in any transaction or series of related transactions (except as expressly permitted by the Collateral Documents or this Agreement), without the written consent of each Lender; or

(f) other than in a transaction permitted under Section 7.04 or Section 7.05, release all or substantially all of the Guarantees in any transaction or series of related transactions (except as expressly permitted by the Collateral Documents or this Agreement), without the written consent of each Lender;

and provided, further, that (i) no amendment, waiver or consent shall, unless in writing and signed by the L/C Issuer in addition to the Lenders required above, adversely affect the rights or duties of the L/C Issuer under this Agreement relating to any Letter of Credit issued by it or any document related thereto, including any application; (ii) no amendment, waiver or consent shall, unless in writing and signed by each affected L/C Participant in addition to the Lenders required above, adversely affect the rights or duties of any L/C Participant in its capacity as such under this Agreement; (iii) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, adversely affect the rights or duties of, or any fees or other amounts payable to, the Administrative Agent under this Agreement or any other Loan Document; and (iv) no amendment, waiver or consent shall, unless in writing and signed by the Collateral Agent in addition to the Lenders required above, adversely affect the rights or duties of, or any fees or other amounts payable to, the Collateral Agent under this Agreement or any other Loan Document. Notwithstanding the foregoing, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Loans and the accrued interest and fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders and other definitions related to such new Loans.

Notwithstanding anything in this Agreement or any Collateral Document to the contrary, the Administrative Agent may, in its sole discretion, grant extensions of time for the satisfaction of any of the requirements under Sections 6.10 and Section 6.12 or any Collateral Documents in respect of any particular Collateral or any particular Subsidiary if it determines

that the satisfaction thereof with respect to such Collateral or such Subsidiary cannot be accomplished without undue expense or unreasonable effort or due to factors beyond the control of the Borrower and its Subsidiaries by the time or times at which it would otherwise be required to be satisfied under this Agreement or any Collateral Document.

Notwithstanding anything herein to the contrary, any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by the Borrower and the Administrative Agent to (x) cure any ambiguity, omission, mistake, defect or inconsistency (as reasonably determined by the Administrative Agent and the Borrower) and (y) effect administrative changes of a technical or immaterial nature (including to effect changes to the terms and conditions applicable solely to the L/C Issuer in respect of Letters of Credit and such amendment shall be deemed approved by the Lenders if the Lenders shall have received at least five (5) Business Days' prior written notice of such change and the Administrative Agent shall not have received, within five (5) Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment.

Notwithstanding anything to the contrary contained in this Section 10.01, any guarantees, collateral security documents (including Customary Intercreditor Agreements) and related documents executed by Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended, supplemented and waived with the consent of the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment, supplement or waiver is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to cure ambiguities, omissions, mistakes or defects, (iii) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents or (iv) add syndication or documentation agents and make customary changes and references related thereto.

Upon notice thereof by the Borrower to the Administrative Agent with respect to the inclusion of any Previously Absent Financial Maintenance Covenant, this Agreement shall be amended by an agreement in writing entered into by the Borrower and the Administrative Agent without the need to obtain the consent of any Lender to include such Previously Absent Financial Maintenance Covenant on the date of the incurrence of the applicable Indebtedness to the extent required by the terms of such definition or section.

Section 10.02    Notices and Other Communications; Facsimile Copies.

(a) General. Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Loan Document shall be in writing (including by facsimile transmission). All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

NAI-1502411964v15

        (i)        if to the Borrower, the Administrative Agent or the L/C Issuer, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 10.02 or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties; and

        (ii)        if to any other Lender, to the address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a written notice to the Borrower, the Administrative Agent and the L/C Issuer.

        All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, four (4) Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail (which form of delivery is subject to the provisions of Section 10.02(c)), when delivered; provided that notices and other communications to the Administrative Agent and the L/C Issuer pursuant to Article II shall not be effective until actually received by such Person during the person's normal business hours. In no event shall a voice mail message be effective as a notice, communication or confirmation hereunder.

        (b) Platform.

        (i)        The Borrower hereby acknowledges that (x) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, the "Borrower Materials") by posting the Borrower Materials on an electronic system designated by the Administrative Agent (the "Platform") and (y) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to Holdings (or any parent thereof) or the Borrower or any of their respective securities) (each, a "Public Lender"). The Borrower hereby agrees that (A) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to Holdings (or any parent thereof) or the Borrower or any of their respective securities for purposes of United States federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.08); (B) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Investor"; and (C) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "Public Investor." Notwithstanding the foregoing, the following Borrower Materials shall be deemed to be marked "PUBLIC" unless the Borrower notifies the Administrative Agent promptly that any such document contains material non-public information: (1) the Loan Documents, (2)

notification of changes in the terms of the Credit Facilities and (3) all information delivered pursuant to <u>Sections 6.01</u>.

(ii)        Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and Applicable Law, including United States Federal and state securities laws, to make reference to Communications that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to Holdings (or any parent thereof) or the Borrower or any of their respective securities for purposes of United States Federal or state securities laws.

(iii)        THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANTS THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(c)  <u>Effectiveness of Facsimile Documents and Signatures</u>. Loan Documents may be transmitted and/or signed by facsimile or other electronic communication. The effectiveness of any such documents and signatures shall, subject to applicable Law, have the same force and effect as manually signed originals and shall be binding on all Loan Parties, the Agents and the Lenders.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form,

125

each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(d) Reliance by Agents and Lenders. The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. All telephonic notices to the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

(e) Notice to other Loan Parties. The Borrower agrees that notices to be given to any other Loan Party under this Agreement or any other Loan Document may be given to the Borrower in accordance with the provisions of this Section 10.02 with the same effect as if given to such other Loan Party in accordance with the terms hereunder or thereunder.

Section 10.03    No Waiver; Cumulative Remedies. No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Section 10.04    Attorney Costs and Expenses. The Borrower agrees (a) to pay or reimburse the Administrative Agent, the Collateral Agent and the Lenders for all reasonable and documented or invoiced out-of-pocket costs and expenses associated with the syndication of the Loans and the preparation, execution and delivery of this Agreement and the other Loan Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), including all Financial Advisor Costs of Houlihan Lokey and all Attorney Costs of Gibson, Dunn & Crutcher LLP and Jones Day (and local counsel in each relevant jurisdiction or otherwise retained with the Borrower's consent (such consent not to be unreasonably withheld, conditioned or delayed)) and (b) to pay or reimburse (x) the Administrative Agent and the Collateral Agent for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the [administration], amendment, modification, waiver and/or enforcement of any rights or remedies under this Agreement or the other Loan Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), including Attorney Costs of one firm or

126

counsel to the Administrative Agent and the Collateral Agent (and, to the extent required, one firm or local counsel in each relevant local jurisdiction or otherwise retained with the Borrower's consent (such consent not to be unreasonably withheld, conditioned or delayed), which may include a single special counsel acting in multiple jurisdictions) and (y) the Lenders, as a group, for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the amendment, modification, waiver and/or enforcement of any rights or remedies under this Agreement or the other Loan Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), including Attorney Costs of one firm or counsel to the Lenders, as a group, (and, to the extent required, one firm or local counsel in each relevant local jurisdiction or otherwise retained with the Borrower's consent (such consent not to be unreasonably withheld, conditioned or delayed), which may include a single special counsel acting in multiple jurisdictions). Subject to the limitations above, the foregoing costs and expenses shall include all reasonable search, filing, recording and title insurance charges and fees related thereto, and other reasonable and documented or invoiced out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent or the Lenders. The agreements in this Section 10.04 shall survive the termination of the Aggregate Commitments and repayment of all other Obligations. All amounts due under this Section 10.04 shall be paid within ten (10) Business Days of receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail.

Section 10.05    Indemnification by the Borrower. The Borrower shall indemnify and hold harmless each Agent, each Lender (without duplication) and their respective Affiliates, directors, officers, employees, agents, advisors, and other representatives (collectively, the "Indemnitees") and hold them harmless from and against any and all losses, claims, damages and liabilities of any kind or nature and documented or invoiced out-of-pocket fees and expenses (and, in the case of Attorney Costs, reasonable Attorney Costs of one firm of counsel for all Indemnitees and, if necessary, one firm of local counsel in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for all Indemnitees taken as a whole (and, in the case of an actual or perceived conflict of interest, where the Indemnitee affected by such conflict informs the Borrower of such conflict and thereafter retains its own counsel, of such other firm of counsel for such affected Indemnitee)) (collectively, the "Losses") of any such Indemnitee arising out of or relating to any claim or any litigation or other proceeding (including any inquiry or investigation of the foregoing) (regardless of whether such Indemnitees is a party thereto and whether or not such proceedings are brought by the Borrower, its equity holders, its Affiliates, creditors or any other third person) that relates to the Transactions, including the financing contemplated hereby (collectively, the "Indemnified Liabilities") and any Losses that relate to any actual or alleged presence or Release or threatened Release of Hazardous Materials on or from any property currently or formerly owned or operated by the Borrower or any Subsidiary or any other liability arising under Environmental Law, in each case arising out of the activities or operations of the Borrower or any Subsidiary; provided that no Indemnitee will be indemnified for any Losses or related expenses to the extent it has resulted from (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or any of its Affiliates or any of the officers, directors, employees, advisors, agents or other representatives of any of the foregoing (as determined by a court of competent jurisdiction in a final and non-appealable decision; (y) a material breach of the obligations under the Loan Documents of such Indemnitee or any of such Indemnitee's Affiliates or any of the officers, directors, employees, advisors, agents or other representatives of any of the foregoing (as

127

determined by a court of competent jurisdiction in a final and non-appealable decision), or (z) any claim, litigation, investigation or other proceeding (other than a claim, litigation, investigation or other proceeding against any Agent or any Lead Arranger or any Person acting in a similar capacity, in each case, acting pursuant to the Loan Documents or in its capacity as such or of any of its Affiliates or its or their respective officers, directors, employees, agents, advisors and other representatives and the successors of each of the foregoing) solely between or among Indemnities that does not arise from any act or omission by the Borrower or any of its Affiliates; provided, further, that the Administrative Agent, the Collateral Agent and the L/C Issuer to the extent fulfilling their respective roles as an agent under the Facilities and in their capacities as such, shall remain indemnified in respect of such claim, litigation, investigation or other proceeding, to the extent that none of the exceptions set forth in clauses (x), (y) or (z) of the immediately preceding proviso apply to such person at such time. No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through information transmission systems designated by the Administrative Agent in connection with this Agreement except to the extent that such damages have resulted from the willful misconduct, bad faith or gross negligence of such Indemnitee or any of such Indemnitee's Affiliates or any of its or their respective officers, directors, employees, agents, advisors or other representatives (as determined by a court of competent jurisdiction in a final and non-appealable decision).  No Indemnitee and no Loan Party shall have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date); provided that nothing in this sentence shall limit the indemnification obligations of the Loan Parties set forth herein or in any other Loan Document.  All amounts due under this Section 10.05 shall be paid within ten (10) Business Days after demand therefor; provided, however, that such Indemnitee shall promptly refund such amount to the extent that there is a final judicial or arbitral determination that such Indemnitee was not entitled to indemnification or contribution rights with respect to such payment pursuant to the express terms of this Section 10.05.  The agreements in this Section 10.05 shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations. For the avoidance of doubt, this Section 10.05 shall not apply to Taxes other than Taxes that represent liabilities, obligations, losses, damages, etc., with respect to a non-Tax claim.

        Section 10.06    Payments Set Aside. To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate.

NAI-1502411964v15

Section 10.07    Successors and Assigns.

(a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that, except as otherwise provided herein (including without limitation as permitted under Section 7.04 and Section 7.10), neither Holdings nor the Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee, (ii) by way of participation in accordance with the provisions of Section 10.07(e), (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.07(g) or (iv) to an SPC in accordance with the provisions of Section 10.07(h) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 10.07(e) and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)  (i)  Subject to the conditions set forth in paragraph (b)(ii) below and acceptance and recording by the Administrative Agent pursuant to paragraph (d) of this Section 10.07, any Lender may assign to one or more assignees ("Assignees") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of the Administrative Agent; provided that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Loan to another Lender, an Affiliate of a Lender or an Approved Fund.

(ii)        Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than  $1,000,000 unless the Borrower and the Administrative Agent otherwise consents; provided that (1) no such consent of the Borrower shall be required if an Event of Default under Section 8.01(a) has occurred and is continuing and (2) such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

(B)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption;

129

(C)     the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent any documentation required by Section 3.01(f) and (g); and

(D)     the Assignee shall not be a Disqualified Lender.

This paragraph (b) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Facilities on a non-pro rata basis.

(c)  Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 10.07(d) and receipt by the Administrative Agent from the parties to each assignment of a processing and recordation fee of $3,500, which fee may be waived only by the Administrative Agent in its sole discretion (provided that it is understood and agreed that such fee shall not apply to assignments by Administrative Agent or any of its Affiliates), from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement (including the obligation to provide documentation pursuant to Section 3.01(f) and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment). Upon request, and the surrender by the assigning Lender of its Note (if any), the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this clause (c) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.07(e). For greater certainty, any assignment by a Lender pursuant to this Section 10.07 shall not in any way constitute or be deemed to constitute a novation, discharge, recession, extinguishment or substitution of the existing Indebtedness and any Indebtedness so assigned shall continue to be the same obligation and not a new obligation.

(d) The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and related stated interest amounts) of the Loans, L/C Obligations (specifying the Unreimbursed Amounts), L/C Borrowings and amounts due under Section 2.10, owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). No assignment shall be effective unless recorded in the Register. The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of

130

this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, any Agent and any Lender with respect to its own Loans and/or Commitments only, at any reasonable time and from time to time upon reasonable prior notice.  The parties hereto agree and intend that the Obligations shall be treated as being in "registered form" for the purposes of the Code (including Code Sections 163(f), 871(h)(2), and 881(c)(2)), and the Register shall be maintained in accordance with such intention.

(e) Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person or a Disqualified Lender) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (iv) any agreement or instrument pursuant to which a Lender sells such a participation shall provide that the Participant shall provide the documentation required under Section 3.01(f) as if it were a Lender.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or the other Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in Section 10.01(a), (b), (c), (e) or (f) that directly and adversely affects such Participant. Subject to Section 10.07(f), the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 (through the applicable Lender), subject to the requirements and limitations of such Sections (including Section 3.01(f)) and Sections 3.06 and 3.07, to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.07(b). To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.09 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.13 as though it were a Lender. Any Lender that sells participations shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and the address of each Participant and the principal amounts (and related stated interest amounts) of each Participant's participation interest in the Commitments and/or Loans (or other rights or obligations) held by it (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans, Letters of Credit or its other obligations under any Loan Document), except to the extent that such disclosure is necessary to establish that such Commitment, Loan, Letter of Credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive,

131

absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation interest as the owner thereof for all purposes notwithstanding any notice to the contrary. Notwithstanding anything to the contrary, no Lender, by maintaining the Participant Register, undertakes any duty, responsibility or obligation to the Borrower (including, without limitation, that in no event shall any such Lender be a fiduciary of the Borrower for any purpose, except that such Lender shall maintain the Participant Register).

(f)  A Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent or except to the extent such entitlement to a greater payment results from a Change in Law after the Participant became a Participant.

(g)  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any other central bank , and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.  In order to facilitate such pledge or assignment, the Borrower hereby agrees that, upon the request of any Lender at any time and from time to time after the Borrower has made its initial borrowing hereunder, the Borrower shall provide to such Lender, at the Borrower's own expense, a Note evidencing the Loan owing to such Lender.

(h)  Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "SPC") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. Each party hereto hereby agrees that (i) an SPC shall be entitled to the benefit of Sections 3.01, 3.04 and 3.05, subject to the requirements and limitations of such Sections (including Section 3.01(f)) and Sections 3.06 and 3.07, to the same extent as if such SPC were a Lender, but neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Section 3.01, 3.04 or 3.05) except to the extent any entitlement to greater amounts results from a Change in Law after the grant to the SPC occurred, (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable

132

and such liability shall remain with the Granting Lender, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder. The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent, assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee Obligation or credit or liquidity enhancement to such SPC.

(i)  Notwithstanding anything to the contrary contained herein, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it and (2) any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; provided that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 10.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

Section 10.08    Confidentiality. Each of the Agent and the Lenders agrees to maintain the confidentiality of the Information and to not disclose such information, except that Information may be disclosed (a) to its Affiliates and its and its Affiliates' directors, officers, employees, trustees, investment advisors and agents, including accountants, legal counsel and other advisors and any numbering, administration or settlement service providers (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); (b) to the extent requested by any Governmental Authority (in which case the Agents and the Lenders agree (except with respect to any audit or examination conducted by bank accountants or regulatory authority exercising examination or regulatory authority), to the extent practicable and not prohibited by applicable Law, to inform the Borrower promptly thereof prior to disclosure); (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process (in which case the Agents and the Lenders agree (except with respect to any subpoena issued by bank accountants or regulatory authority exercising examination or regulatory authority), to the extent practicable and not prohibited by applicable Law, to inform the Borrower promptly thereof prior to disclosure); (d) to any other party to this Agreement; (e) subject to an agreement containing provisions substantially the same as those of this Section 10.08 (or as may otherwise be reasonably acceptable to the Borrower), to any pledgee referred to in Section 10.07(g) or Section 10.07(i), Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or Participant in, any of its rights or obligations under this Agreement; (f) with the written consent of the Borrower; (g) to the extent such Information (i) becomes publicly

133

available other than as a result of a breach of this <u>Section 10.08</u> or similar obligation of confidentiality or (ii) becomes available to any Agent, any Lender, or any of their respective Affiliates on a nonconfidential basis from a source other than Holdings, the Borrower or any Subsidiary thereof, and which source is not known by such Agent or Lender to be subject to a confidentiality restriction in respect thereof in favor of the Borrower, any Permitted Holder or any of their respective Affiliates; and (h) to any Governmental Authority or examiner regulating any Lender (in which case the Agents and the Lenders agree (except with respect to any audit or examination conducted by bank accountants or regulatory authority exercising examination or regulatory authority), to the extent practicable and not prohibited by applicable Law, to inform the Borrower promptly thereof prior to disclosure).  For the purposes of this <u>Section 10.08</u>, "<u>Information</u>" means all information received from any Loan Party or its Affiliates or its Affiliates' directors, officers, employees, trustees, investment advisors or agents, relating to Holdings, the Borrower or any of their subsidiaries or their business, other than any such information that is publicly available to any Agent or any Lender prior to disclosure by any Loan Party other than as a result of a breach of this <u>Section 10.08</u> or similar obligation of confidentiality, including, without limitation, information delivered pursuant to <u>Section 6.01</u>, <u>6.02</u> or <u>6.03</u> hereof.

        Section 10.09    <u>Setoff</u>. In addition to any rights and remedies of the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, each Lender and the L/C Issuer is authorized at any time and from time to time, without prior notice to the Borrower or any other Loan Party, any such notice being waived by the Borrower (on its own behalf and on behalf of each Loan Party and its Subsidiaries) to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (other than deposits held in accounts established as escrow, payroll, trust or Tax accounts) at any time held by, and other Indebtedness at any time then due and owing by, such Lender or the L/C Issuer, as the case may be, to or for the credit or the account of the respective Loan Parties and their Subsidiaries against any and all Obligations then due and owing to such Lender or the L/C Issuer hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not such Agent or such Lender shall have made demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit or Indebtedness; <u>provided</u> that in the event that any Defaulting Lender shall exercise any such right of set-off, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of <u>Section 8.04</u> and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, the L/C Issuers and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations then due and owing to such Defaulting Lender as to which it exercised such right of set-off.  Each Lender and the L/C Issuer agrees promptly to notify the Borrower and the Administrative Agent after any such set off and application made by such Lender or the L/C Issuer, as the case may be; <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application. The rights of the Administrative Agent, each Lender and the L/C Issuer under this <u>Section 10.09</u> are in addition to other rights and remedies (including other rights of setoff) that the Administrative Agent, such Lender and the L/C Issuer may have.

Section 10.10    Counterparts. This Agreement and each other Loan Document may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Delivery by telecopier or other electronic means of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document. The Agents may also require that any such documents and signatures delivered by telecopier or other electronic means be confirmed by a manually signed original thereof; provided that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by telecopier or such other electronic means.

Section 10.11    Integration. This Agreement, together with the other Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter. In the event of any conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control; provided that the inclusion of supplemental rights or remedies in favor of the Agents or the Lenders in any other Loan Document shall not be deemed a conflict with this Agreement. Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

Section 10.12    Survival of Representations and Warranties. All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by each Agent and each Lender, regardless of any investigation made by any Agent or any Lender or on their behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding.

Section 10.13    Severability. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 10.14    GOVERNING LAW.

(a) THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b) ANY LEGAL ACTION OR PROCEEDING ARISING UNDER THIS AGREEMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW

135

EXISTING OR HEREAFTER ARISING, SHALL BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK (PROVIDED THAT IF NONE OF SUCH COURTS CAN AND WILL EXERCISE SUCH JURISDICTION, SUCH EXCLUSIVITY SHALL NOT APPLY), AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, THE BORROWER, HOLDINGS, EACH AGENT AND EACH LENDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THOSE COURTS. THE BORROWER, HOLDINGS, EACH AGENT AND EACH LENDER IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(c)  THE BORROWER IRREVOCABLY CONSENTS TO THE SERVICE OF ANY AND ALL PROCESS IN ANY SUCH ACTION OR PROCEEDING TO THE BORROWER AT THE ADDRESS PROVIDED FOR IT ON SCHEDULE 10.02. NOTHING IN THIS SECTION LIMITS THE RIGHT OF THE ADMINISTRATIVE AGENT OR ANY LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 10.15   WAIVER OF RIGHT TO TRIAL BY JURY. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 10.15 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

Section 10.16   Binding Effect. This Agreement shall become effective when it shall have been executed by the Borrower and Holdings and the Administrative Agent shall have been notified by each Lender and the L/C Issuer that each such Lender and the L/C Issuer have executed it and thereafter shall be binding upon and inure to the benefit of the Borrower, each Agent and each Lender and their respective successors and assigns, except that the Borrower

shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lenders except as permitted by Section 7.04.

Section 10.17    Judgment Currency. If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given. The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "Judgment Currency") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "Agreement Currency"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable Law).

Section 10.18    Lender Action. Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents or the Secured Hedge Agreements (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, without the prior written consent of the Administrative Agent. The provisions of this Section 10.18 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

Section 10.19    USA PATRIOT Act. Each Lender hereby notifies the Borrower that, pursuant to the requirements of the USA PATRIOT Act, it is or may be required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the USA PATRIOT Act.

Section 10.20    Release of Collateral and Guarantee Obligations.

(a) The Lenders hereby irrevocably agree that the Liens granted to the Secured Parties by the Loan Parties on any Collateral shall be automatically released (i) in full, as set forth in clause (b) below, (ii) upon the Disposition of such Collateral to any Person other than another Loan Party, to the extent such Disposition is permitted hereunder (and the Administrative Agent and the Collateral Agent may rely

137

conclusively on a certificate to that effect provided to it by any Loan Party upon its reasonable request without further inquiry), (iii) to the extent such Collateral is comprised of property leased to a Loan Party by a Person that is not a Loan Party, upon termination or expiration of such lease, (iv) if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders (or such other percentage of the Lenders whose consent may be required in accordance with Section 10.01), (v) to the extent the property constituting such Collateral is owned by any Guarantor, upon the release of such Guarantor from its obligations under the Guarantee (in accordance with the second succeeding sentence and Section 4.13 of the Guarantee), (vi) as required by the Administrative Agent or the Collateral Agent to effect any sale, transfer or other disposition of Collateral in connection with any exercise of remedies of the Administrative Agent or Collateral Agent pursuant to the Collateral Documents and (vii) to the extent such Collateral otherwise becomes an Excluded Equity Interest or an Excluded Asset.  Any such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those being released) upon (or obligations (other than those being released) of the Loan Parties in respect of) all interests retained by the Loan Parties, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral except to the extent otherwise released in accordance with the provisions of the Loan Documents.  Additionally, the Lenders hereby irrevocably agree that the Guarantors shall be released from the Guarantees upon consummation of any transaction permitted hereunder resulting in such Subsidiary ceasing to constitute a Subsidiary, or otherwise becoming an Excluded Subsidiary, in each case, solely to the extent such Subsidiary ceasing to constitute a Subsidiary or otherwise becoming an Excluded Subsidiary is not prohibited by this Agreement.  The Lenders hereby authorize the Administrative Agent and the Collateral Agent, as applicable, to execute and deliver any instruments, documents, and agreements necessary or desirable to evidence and confirm the release of any Guarantor or Collateral pursuant to the foregoing provisions of this paragraph, all without the further consent or joinder of any Lender. Any representation, warranty or covenant contained in any Loan Document relating to any such Collateral or Guarantor shall no longer be deemed to be repeated solely with respect to such Collateral or Guarantor.

(b)  Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Obligations (other than Hedging Obligations in respect of any Secured Hedge Agreements and contingent indemnification obligations and other contingent obligations) have been paid in full, all Commitments have terminated or expired and no Letter of Credit shall be outstanding that is not back-stopped in a manner reasonably satisfactory to the L/C Issuer, upon request of the Borrower, the Administrative Agent and/or Collateral Agent, as applicable, shall (without notice to, or vote or consent of, any Secured Party) take such actions as shall be required to release its security interest in all Collateral, and to release all obligations under any Loan Document, whether or not on the date of such release there may be any Hedging Obligations in respect of any Secured Hedge Agreements or contingent indemnification obligations and other contingent obligations.  Any such release of Obligations shall be deemed subject to the provision that such Obligations shall be reinstated if after such release any portion of any payment in respect of the

138

Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

(c)  Notwithstanding the foregoing or anything in the Loan Documents to the contrary, at the direction of the Required Lenders, the Administrative Agent may, in exercising remedies, take any and all necessary and appropriate action to effectuate a credit bid of all Loans (or any lesser amount thereof) for the Borrower's assets in a bankruptcy, foreclosure or other similar proceeding, forbear from exercising remedies upon an Event of Default, or in a bankruptcy proceeding, enter into a settlement agreement on behalf of all Lenders.

Section 10.21    Conflicts with Other Loan Documents. In the event there is a conflict or inconsistency between this Agreement and any other Loan Document, the terms of this Agreement shall control; provided that any provision of the Collateral Documents which imposes additional burdens on the Loan Parties or further restricts the rights of the Loan Parties or gives the Administrative Agent or Lenders additional rights, in each case, with respect to the Collateral, shall not be deemed to be in conflict or inconsistent with this Agreement and shall be given full force and effect.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]

NAI-1502411964v15

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

[ANSWERS FINANCE, LLC],
  as the Borrower


By: _____
    Name:
    Title:

ANSWERS HOLDINGS, INC.
as Holdings


By: _____

Name:
Title:

CREDIT SUISSE AG, CAYMAN ISLANDS
BRANCH,
as Administrative Agent and Collateral Agent


By: _____

     Name:
     Title:


By: _____

     Name:
     Title:

CREDIT SUISSE AG, CAYMAN ISLANDS
BRANCH
as L/C Issuer

By:    _____
      Name:
      Title:

By:    _____
      Name:
      Title:

CREDIT SUISSE AG, CAYMAN ISLANDS
BRANCH,
as a Lender


By: _____
Name:
Title:


By: _____
Name:
Title:

## **Exhibit B**

### **Second Lien Exit Credit Agreement**

Certain documents, or portions thereof, contained in this <u>Exhibit B</u> and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto. The Debtors reserve all rights, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

SECOND LIEN TERM LOAN AGREEMENT

Dated as of [        ], 2017

Among

ANSWERS HOLDINGS, INC., as Holdings,

[ANSWERS FINANCE, LLC], as the Borrower,

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,
as Administrative Agent and Collateral Agent,

and

THE OTHER LENDERS FROM TIME TO TIME PARTY HERETO

# TABLE OF CONTENTS

**Page**

Article I        Definitions and Accounting Terms ...................................................... 2
    Section 1.01    Defined Terms ...................................................... 2
    Section 1.02    Other Interpretive Provisions ...................................... 45
    Section 1.03    Accounting Terms .................................................... 46
    Section 1.04    Rounding ............................................................ 46
    Section 1.05    References to Agreements, Laws, Etc ................................. 46
    Section 1.06    Times of Day ....................................................... 46
    Section 1.07    Timing of Payment or Performance ................................... 46
    Section 1.08    Currency Equivalents Generally ..................................... 47
    Section 1.09    [Reserved] ......................................................... 47
    Section 1.10    Pro Forma and Other Calculations ................................... 47

Article II        The LOANS ............................................................. 49
    Section 2.01    The Loans .......................................................... 49
    Section 2.02    Borrowings, Conversions and Continuations of Loans ................. 49
    Section 2.03    [Reserved] ......................................................... 51
    Section 2.04    [Reserved] ......................................................... 51
    Section 2.05    Prepayments ........................................................ 51
    Section 2.06    Termination of Commitments ......................................... 53
    Section 2.07    Repayment of Loans ................................................. 53
    Section 2.08    Interest ........................................................... 54
    Section 2.09    Additional Payments ................................................ 55
    Section 2.10    Computation of Interest, Fees, and Other Payments .................. 55
    Section 2.11    Evidence of Indebtedness ........................................... 56
    Section 2.12    Payments Generally ................................................. 57
    Section 2.13    Sharing of Payments ................................................ 59
    Section 2.14    Defaulting Lenders ................................................. 59

Article III        Taxes, Increased Costs Protection and Illegality .................... 60
    Section 3.01    Taxes .............................................................. 60
    Section 3.02    Illegality ......................................................... 64
    Section 3.03    Inability to Determine Rates ....................................... 64
    Section 3.04    Increased Cost and Reduced Return; Capital Adequacy; Reserves
                    on Eurocurrency Rate Loans ......................................... 65
    Section 3.05    Funding Losses ..................................................... 66
    Section 3.06    Matters Applicable to All Requests for Compensation ................ 66
    Section 3.07    Replacement of Lenders under Certain Circumstances ................. 68
    Section 3.08    Survival ........................................................... 69

Article IV        Conditions Precedent to Credit Extensions ............................. 69
    Section 4.01    Conditions Precedent to Effectiveness and the Closing Date ......... 69

# TABLE OF CONTENTS

(continued)

**Page**

Article V        Representations and Warranties...................................................................... 72

    Section 5.01    Existence, Qualification and Power; Compliance with Laws................. 72
    Section 5.02    Authorization; No Contravention ...................................................... 73
    Section 5.03    Binding Effect.................................................................................. 73
    Section 5.04    Financial Statements; No Material Adverse Effect ............................... 73
    Section 5.05    Litigation......................................................................................... 74
    Section 5.06    Ownership of Property; Liens ........................................................... 74
    Section 5.07    Environmental Compliance ............................................................... 74
    Section 5.08    Taxes ............................................................................................... 75
                  75
    Section 5.09    Compliance with ERISA and other Pension Laws; Labor Matters ......... 75
    Section 5.10    Subsidiaries; Equity Interests............................................................ 76
    Section 5.11    Margin Regulations; Investment Company Act .................................... 76
    Section 5.12    Disclosure........................................................................................ 76
    Section 5.13    Intellectual Property; Licenses, Etc ................................................... 77
    Section 5.14    Solvency.......................................................................................... 77
    Section 5.15    Collateral Documents........................................................................ 77
    Section 5.16    Use of Proceeds................................................................................ 78
    Section 5.17    Senior Indebtedness .......................................................................... 78
    Section 5.18    Patriot Act ....................................................................................... 78
    Section 5.19    FCPA............................................................................................... 78
    Section 5.20    Sanctioned Persons .......................................................................... 78

Article VI        Affirmative Covenants............................................................................. 78

    Section 6.01    Financial Statements ........................................................................ 79
    Section 6.02    Certificates; Other Information.......................................................... 80
    Section 6.03    Notices ............................................................................................ 81
    Section 6.04    Maintenance of Existence ................................................................. 82
    Section 6.05    Maintenance of Properties ................................................................ 82
    Section 6.06    Maintenance of Insurance ................................................................. 82
    Section 6.07    Compliance with Laws ..................................................................... 82
    Section 6.08    Books and Records ........................................................................... 83
    Section 6.09    Inspection Rights ............................................................................. 83
    Section 6.10    Covenant to Guarantee Obligations and Give Security ......................... 83
    Section 6.11    Use of Proceeds................................................................................ 84
    Section 6.12    Further Assurances and Post-Closing Conditions................................. 85
    Section 6.13    [Reserved] ....................................................................................... 86
    Section 6.14    Payment of Taxes ............................................................................. 86
    Section 6.15    Nature of Business ........................................................................... 86
    Section 6.16    End of Fiscal Years; Fiscal Quarters .................................................. 86
    Section 6.17    Credit Ratings .................................................................................. 86
    Section 6.18    Control Agreements; Cash Management .............................................. 86

# TABLE OF CONTENTS

(continued)

**Page**

Article VII    Negative Covenants ............................................................... 86

    Section 7.01    Liens........................................................................ 87
    Section 7.02    Investments ............................................................ 90
    Section 7.03    Indebtedness........................................................... 93
    Section 7.04    Fundamental Changes ........................................... 95
    Section 7.05    Dispositions............................................................ 96
    Section 7.06    Restricted Payments.............................................. 97
    Section 7.07    Transactions with Affiliates ................................. 99
    Section 7.08    Prepayments, Etc., of Indebtedness ................... 100
    Section 7.09    Financial Covenant .............................................. 100
    Section 7.10    Passive Activity Covenants................................. 101
    Section 7.11    Negative Pledge ................................................... 102
    Section 7.12    Bank Accounts ..................................................... 104

Article VIII    Events of Default and Remedies.................................... 104

    Section 8.01    Events of Default ................................................. 104
    Section 8.02    Remedies Upon Event of Default ....................... 106
    Section 8.03    [Reserved] ............................................................ 107
    Section 8.04    Application of Funds............................................ 107
    Section 8.05    Permitted Holders' Right to Cure ...................... 108

Article IX    Administrative Agent and Other Agents........................ 109

    Section 9.01    Appointment and Authorization of Agents........... 109
    Section 9.02    Delegation of Duties ........................................... 110
    Section 9.03    Liability of Agents ............................................... 110
    Section 9.04    Reliance by Agents .............................................. 110
    Section 9.05    Notice of Default.................................................. 111
    Section 9.06    Credit Decision; Disclosure of Information by Agents ........ 111
    Section 9.07    Indemnification of Agents .................................. 112
    Section 9.08    Agents in their Individual Capacities................... 112
    Section 9.09    Successor Agents ................................................. 113
    Section 9.10    Administrative Agent May File Proofs of Claim................... 113
    Section 9.11    Collateral and Guaranty Matters ......................... 114
    Section 9.12    No Fiduciary Relationship with Other Lenders ................... 114
    Section 9.13    Withholding Tax ................................................... 115
    Section 9.14    Intercreditor Agreements .................................... 116

Article X    Miscellaneous ...................................................................... 116

    Section 10.01    Amendments, Etc................................................ 116
    Section 10.02    Notices and Other Communications; Facsimile Copies ....... 118
    Section 10.03    No Waiver; Cumulative Remedies ..................... 121
    Section 10.04    Attorney Costs and Expenses.............................. 121

# TABLE OF CONTENTS
(continued)

**Page**

Section 10.05  Indemnification by the Borrower............................................................ 122
Section 10.06  Payments Set Aside.................................................................................. 123
Section 10.07  Successors and Assigns........................................................................... 124
Section 10.08  Confidentiality ........................................................................................ 128
Section 10.09  Setoff ....................................................................................................... 129
Section 10.10  Counterparts ............................................................................................ 129
Section 10.11  Integration ............................................................................................... 130
Section 10.12  Survival of Representations and Warranties........................................... 130
Section 10.13  Severability ............................................................................................. 130
Section 10.14  GOVERNING LAW ............................................................................... 130
Section 10.15  WAIVER OF RIGHT TO TRIAL BY JURY......................................... 131
Section 10.16  Binding Effect......................................................................................... 131
Section 10.17  Judgment Currency ................................................................................. 131
Section 10.18  Lender Action ......................................................................................... 132
Section 10.19  USA PATRIOT Act ................................................................................ 132
Section 10.20  Release of Collateral and Guarantee Obligations .................................. 132
Section 10.21  Conflicts with Other Loan Documents ................................................... 134

## SCHEDULES

| | | |
|---|---|---|
| 1.01A | – | Certain Security Interests and Guarantees |
| 1.01D | – | Guarantors |
| 2.01 | – | Commitments |
| 5.11 | – | Subsidiaries |
| [6.12 | – | Post Closing] |
| 7.01(b) | – | Existing Liens |
| 7.03(c) | – | Existing Indebtedness |
| 7.07 | – | Transactions with Affiliates |
| 7.11 | – | Negative Pledge Clauses |
| 10.02 | – | Administrative Agent's Office, Certain Addresses for Notices |

## EXHIBITS

Form of

| | | |
|---|---|---|
| A | – | Committed Loan Notice |
| B | – | Note |
| C | – | Compliance Certificate |
| D | – | Assignment and Assumption |
| E | – | Guaranty |
| F | – | Security Agreement |
| G | – | Intellectual Property Security Agreement |
| H | – | Officer's Certificate |
| I | – | US Tax Compliance Certificates |
| J | – | Subordinated Intercompany Note |
| K | – | Solvency Certificate |
| L | – | Mortgage |
| M | – | Junior Priority Intercreditor Agreement |
| N | – | Equal Priority Intercreditor Agreement |

## SECOND LIEN TERM LOAN AGREEMENT

This SECOND LIEN TERM LOAN AGREEMENT is entered into as of [ ], 2017, among [ANSWERS FINANCE, LLC], a Delaware limited liability company ("Borrower"), ANSWERS HOLDINGS, INC., a Delaware corporation ("Holdings"), CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH ("CS"), as Administrative Agent and Collateral Agent and each lender from time to time party hereto (collectively, the "Lenders" and, individually, a "Lender"; each as hereafter further defined).

### RECITALS

WHEREAS, on March 3, 2017 (the "Petition Date"), Holdings, and Answers Corporation, a direct subsidiary of the Borrower (the "Pre-Petition Borrower") and each of the Guarantors (the "Debtors") commenced chapter 11 cases administratively consolidated as Chapter 11 Case No. 17-10496 (collectively, the "Chapter 11 Cases") by filing separate voluntary petitions for reorganization pursuant to chapter 11 of title 11 of the United States Code (such title, the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, prior to the Petition Date, financing was provided to the Pre-Petition Borrower pursuant to (i) that certain Credit Agreement dated as of October 3, 2014, among Holdings (as successor by merger to Clarity Merger Sub, Inc.), the Pre-Petition Borrower (as successor by merger to Clarity I, LLC., a Delaware limited liability company), the lenders party thereto and Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent (as amended, modified or supplemented through the Petition Date, the "Pre-Petition First Lien Credit Agreement") and (ii) that certain Second Lien Credit Agreement dated as of October 3, 2014, among Holdings (as successor by merger to Clarity Merger Sub, Inc.), the Pre-Petition Borrower (as successor by merger to Clarity I, LLC., a Delaware limited liability company), the lenders party thereto and Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent (as amended, modified or supplemented through the Petition Date, the "Pre-Petition Second Lien Credit Agreement");

WHEREAS, the Pre-Petition Borrower and Holdings (each as a debtor and debtor in possession under Chapter 11 Cases) the lenders party thereto and Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent entered into a senior secured, super-priority term loan facility dated as of the Petition Date of up to $25,000,000 (the "DIP Credit Facility") in the aggregate principal amount and a letter of credit facility of $1,309,906.64 (the "DIP L/C Facility") in respect of existing letters of credit, to fund the working capital requirements, fees, costs and expenses of Holdings, the Pre-Petition Borrower and its Subsidiaries during the pendency of the Chapter 11 Cases, which DIP Credit Facility is being discharged on the Plan Effective Date (as defined herein);

WHEREAS, on [April 4], 2017, the Bankruptcy Court entered the Confirmation Order (as defined herein);

WHEREAS, in connection with the implementation and Consummation of the Plan of Reorganization (as defined herein), Holdings has agreed to issue, or to cause the

Borrower to issue, as applicable, the Loans and the New Common Stock (as defined in the Plan of Reorganization) on behalf of and as a contribution to the Pre-Petition Borrower in full satisfaction of the First Lien Claims, provided that for administrative convenience only the Borrower may issue the Loans directly to the Lenders;

WHEREAS, in connection with the implementation and Consummation of the Plan of Reorganization (as defined herein), and subject to the terms and conditions set forth herein, in the other Loan Documents (as defined herein), in the Plan of Reorganization (including the Restructuring Transactions Exhibit) and in the Confirmation Order, the Lenders have agreed to enter into this Agreement and to provide a senior secured term loan to the Borrower on the date hereof to facilitate, in part, the effectiveness of the Plan of Reorganization; and

WHEREAS, upon the effectiveness of the Plan of Reorganization, (i) all DIP Credit Facility Obligations shall be converted into (and continue as) on a dollar-for-dollar basis First Lien Loans hereunder and each initial First Lien Lender shall be deemed to have made, in the aggregate, $[          ] of Loans (the "<u>First Lien Term Facility</u>"), (ii) the letters of credit existing under the DIP L/C Facility shall be deemed to be existing letters of credit under the First Lien Credit Agreement and (iii) an additional $[          ] consisting of converted First Lien Claims shall be converted into Loans (the "<u>Second Lien Term Facility</u>") under this Agreement in the amounts and manner set forth herein and in the Plan of Reorganization.

NOW, THEREFORE, in consideration of the premises, mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

Section 1.01    <u>Defined Terms</u>. As used in this Agreement, the following terms shall have the meanings set forth below:

"<u>Acquired EBITDA</u>" means, with respect to any Acquired Entity or Business for any period, the amount for such period of Consolidated EBITDA of such Acquired Entity or Business (determined as if references to the Borrower and its Subsidiaries in the definition of the term "Consolidated EBITDA" were references to such Acquired Entity or Business and its subsidiaries that will become Subsidiaries), as determined on a consolidated basis for such Acquired Entity or Business in accordance with GAAP.

"<u>Acquired Entity or Business</u>" has the meaning specified in the definition of the term "Consolidated EBITDA."

"<u>Adjusted Eurocurrency Rate</u>" means, for any Interest Period with respect to any Eurocurrency Rate Loan, a rate per annum equal to the greater of (a) 1.00% and (b) the product of (i) the Eurocurrency Rate in effect for such Interest Period and (ii) the Statutory Reserves.

"<u>Administrative Agent</u>" means CS, in its capacity as administrative agent under the Loan Documents, or any successor administrative agent appointed in accordance with <u>Section 9.09</u>.

2

"Administrative Agent's Office" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by, or is under common Control with, the Person specified. "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Agent-Related Persons" means collectively, the Agents, together with their respective Affiliates, and the officers, directors, employees, agents, advisors and other representatives of such Persons and Affiliates. "Agent-Related Person" means any of such persons individually.

"Agents" means, collectively, the Administrative Agent and the Collateral Agent.

"Aggregate Commitments" means the Commitments of all the Lenders.

"Agreement" means this Credit Agreement.

"Agreement Currency" has the meaning specified in Section 10.17.

"Applicable Lending Office" means for any Lender, such Lender's office, branch or affiliate designated for Eurocurrency Rate Loans, Base Rate Loans, as applicable, as notified to the Administrative Agent and the Borrower or as otherwise specified in the Assignment and Assumption pursuant to which such Lender became a party hereto, any of which offices may, subject to Section 3.01(e) and Section 3.02 be changed by such Lender upon ten (10) days' prior written notice to the Administrative Agent and the Borrower.

"Applicable Rate" means a percentage per annum equal to with respect to Loans, (i) for Loans that are Eurocurrency Rate Loans, 8.90% and (ii) for Loans that are Base Rate Loans, 7.90%.

"Approved Foreign Bank" has the meaning specified in the definition of "Cash Equivalents."

"Approved Fund" means any Person (other than a natural person) that is engaged or advises funds or other investment vehicles that are engaged in making, purchasing, holding or investing in commercial loans, bonds and similar extensions of credit or securities in the ordinary course of business and that is administered, advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages such Lender.

"Assignees" has the meaning specified in Section 10.07(b).

3

"Assignment and Assumption" means an Assignment and Assumption substantially in the form of Exhibit D or such other form as shall be reasonably acceptable to the Borrower and the Administrative Agent.

"Attorney Costs" means and includes all reasonable and documented or invoiced out-of-pocket fees, expenses and disbursements of attorneys engaged to advise in connection with this Agreement.

"Audited Financial Statements" means the audited consolidated balance sheets of Holdings and the Pre-Petition Borrower for the fiscal year ended December 31, 2016 and the related audited statements of income and cash flows of Holdings and the Pre-Petition Borrower for the fiscal year ended December 31, 2016.

"Available Amount" means, at any time (the "Available Amount Reference Time"), an amount equal at such time to (a) the sum (which shall not be less than zero) of, without duplication:

(i)      $25,000,000;

(ii)      the amount (which amount shall not be less than zero) equal to 50% of the Cumulative Consolidated Net Income of the Borrower and the Subsidiaries;

(iii)      to the extent not already included in the calculation of Consolidated Net Income, the aggregate amount of all dividends, returns, interest, profits, distributions, income and similar amounts (in each case, to the extent received in cash or Cash Equivalents (valued at the Fair Market Value of such Cash Equivalents at the time received)) received by the Borrower or any Subsidiary from any Investment to the extent such Investment was made by using the Available Amount during the period from and including the Business Day immediately following the Closing Date through and including the Available Amount Reference Time (other than the portion of any such dividends and other distributions that is used by the Borrower or any Subsidiary to pay taxes); and

(iv)      to the extent not already included in the calculation of Consolidated Net Income, the aggregate amount of all repayments made in cash or Cash Equivalents (valued at the Fair Market Value of such Cash Equivalents at the time received) of principal received by the Borrower or any Subsidiary from any Investment to the extent such Investment was made by using the Available Amount during the period, from and including the Business Day immediately following the Closing Date through and including the Available Amount Reference Time in respect of loans made by the Borrower or any Subsidiary and that constituted Investments;

minus (b) the sum of, without duplication and without taking into account the proposed portion of the amount calculated above to be used at the applicable Available Amount Reference Time:

(i)      the aggregate amount of any Investments made by the Borrower or any Subsidiary using the Available Amount pursuant to Section 7.02(p) after the Closing Date and prior to the Available Amount Reference Time; and

(ii)     the aggregate amount of any Restricted Payments made by the Borrower using the Available Amount pursuant to <u>Section 7.06(f)</u> after the Closing Date and prior to the Available Amount Reference Time.

"<u>Available Amount Reference Time</u>" has the meaning specified in the definition of the term "Available Amount".

"<u>Bankruptcy Code</u>" has the meaning assigned to such term in the recitals.

"<u>Bankruptcy Court</u>" has the meaning assigned to such term in the recitals.

"<u>Base Rate</u>" means a fluctuating interest rate per annum in effect from time to time, which rate per annum shall at all times be equal to the highest of:

(a)     the Prime Rate in effect on such day;

(b)     ½ of 1% per annum above the Federal Funds Rate in effect on such day; and

(c)     the Eurocurrency Rate for an Interest Period of one (1) month on such day (or if such day is not a Business Day, the immediately preceding Business Day) <u>plus</u> 1%; <u>provided</u> that for the avoidance of doubt, for purposes of calculating the Eurocurrency Rate pursuant to this <u>clause (c)</u>, the Eurocurrency Rate for any day shall be the rate per annum determined on such day at approximately 11:00 a.m. (London time) by reference to the ICE Benchmark Administration Interest Settlement Rates (or the successor thereto if the ICE Benchmark Administration is no longer making a Eurocurrency Rate available) for deposits in Dollars (as set forth by any service selected by the Administrative Agent that has been nominated by the ICE Benchmark Administration (or successor thereto if the ICE Benchmark Administration is no longer making a Eurocurrency Rate available) as an authorized vendor for the purposes of displaying such rates).  Any change in such rate due to a change in the Prime Rate, the Federal Funds Rate or the Eurocurrency Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Eurocurrency Rate, as the case may be.

Notwithstanding any provision to the contrary in this Agreement, the applicable Base Rate in respect of Loans shall at no time be higher than 1.10% per annum.

"<u>Base Rate Loan</u>" means a Loan that bears interest at a rate based on the Base Rate.

"<u>Basel III</u>" means, collectively, those certain agreements on capital requirements, leverage ratios and liquidity standards contained in "Basel III: A Global Regulatory Framework for More Resilient Banks and Banking Systems," "Basel III:  International Framework for Liquidity Risk Measurement, Standards and Monitoring," and "Guidance for National Authorities Operating the Countercyclical Capital Buffer," each as published by the Basel Committee on Banking Supervision in December 2010 (as revised from time to time).

NAI-1502591911v5

"Board of Directors" means, with respect to any Person, (a) in the case of any corporation, the board of directors of such Person or any committee thereof duly authorized to act on behalf of such board, (b) in the case of any limited liability company, the board of managers or board of directors of such Person, (c) in the case of any partnership, the board of directors or board of managers of a general partner of such Person and (d) in any other case, the functional equivalent of the foregoing.

"Borrower" has the meaning specified in the introductory paragraph to this Agreement.

"Borrower Materials" has the meaning specified in Section 10.02(b)(i).

"Borrowing" means the Incurrence of Converted Loans on the Closing Date (or resulting from conversions on a given date after the Closing Date) having, in the case of Eurocurrency Loans, the same Interest Period or (b) the Incurrence of Loans on a given date (or resulting from conversions on a given date) having, in the case of Eurocurrency Loans, the same Interest Period.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, New York City; provided that if such day relates to any interest rate settings as to a Eurocurrency Rate Loan, any fundings, disbursements, settlements and payments in respect of any such Eurocurrency Rate Loan, or any other dealings in Dollars to be carried out pursuant to this Agreement in respect of any such Eurocurrency Rate Loan, Business Day also means any such day on which dealings in deposits in Dollars are conducted by and between banks in the London interbank eurocurrency market.

"Capitalized Lease Obligation" means, at the time any determination thereof is to be made, the amount of the liability in respect of a Capitalized Lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) prepared in accordance with GAAP.

"Capitalized Leases" means, as applied to any Person, all leases of property that have been or are required to be, in accordance with GAAP, recorded as capitalized leases of such Person.

"Capitalized Research and Development Costs" means research and development costs that have been, or are required to be, in accordance with GAAP, capitalized.

"Capitalized Software Expenditures" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by the Borrower and its Subsidiaries during such period in respect of purchased software or internally developed software and software enhancements that, in conformity with GAAP, are, or are required to be, reflected as capitalized costs on the consolidated balance sheet of the Borrower and its Subsidiaries.

"Cash Equivalents" means any of the following types of Investments, to the extent owned by the Borrower or any Subsidiary:

6

(1)      (i) Dollars and (ii) with respect to any Foreign Subsidiaries, other currencies held by such Foreign Subsidiary in the ordinary course of business;

(2)      securities issued or directly and fully and unconditionally guaranteed or insured by the United States government or any agency or instrumentality of the foregoing the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 12 months or less from the date of acquisition;

(3)      certificates of deposit, bankers' acceptances, time deposits and eurocurrency time deposits with maturities of 12 months or less from the date of acquisition, with any United States or foreign commercial bank having capital and surplus of not less than $500,000,000 in the case of U.S. banks and $100,000,000 (or the equivalent in any local currency as of the date of determination) in the case of non-U.S. banks;

(4)      repurchase agreements with a term of not more than 30 days for underlying securities of the types described in clauses (2), (3) and (7) of this definition entered into with any financial institution meeting the qualifications specified in clause (3) above;

(5)      commercial paper or any variable or fixed rate note rated at least "P-2" by Moody's or at least "A-2" by S&P, and in each case maturing within 12 months after the date of creation thereof and Indebtedness or preferred stock issued by Persons with an Investment Grade Rating from Moody's or S&P (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower), with maturities of 12 months or less from the date of acquisition;

(6)      marketable short-term money market and similar securities having either (a) a rating of at least "P-2" or "A-2" from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower) or (b) having assets in excess of $1,000,000,000;

(7)      readily marketable direct obligations issued by any state, commonwealth, province or territory of the United States or any political subdivision or taxing authority thereof having an Investment Grade Rating from Moody's or S&P (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower);

(8)      readily marketable direct obligations issued by any foreign government or any political subdivision or public instrumentality thereof, in each case having an Investment Grade Rating from Moody's or S&P with maturities of 24 months or less from the date of acquisition (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower);

7

(9)      Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated within the top three ratings category by S&P or Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower);

(10)      with respect to any Foreign Subsidiary: (i) obligations of the national government of the country in which such Foreign Subsidiary maintains its chief executive office and principal place of business; <u>provided</u> that such country is a member of the Organization for Economic Cooperation and Development, in each case maturing within one year after the date of investment therein, (ii) certificates of deposit of, bankers acceptances of, or time deposits with, any commercial bank which is organized and existing under the laws of the country in which such Foreign Subsidiary maintains its chief executive office and principal place of business; <u>provided</u> such country is a member of the Organization for Economic Cooperation and Development, and whose short-term commercial paper rating from S&P is at least "A-2" or the equivalent thereof or from Moody's is at least "P-2" or the equivalent thereof (any such bank being an "<u>Approved Foreign Bank</u>"), and in each case with maturities of not more than 24 months from the date of acquisition and (iii) the equivalent of demand deposit accounts which are maintained with an Approved Foreign Bank;

(11)      in the case of investments by any Foreign Subsidiary, Cash Equivalents shall also include (i) investments of the type and maturity described in <u>clauses (1)</u> through <u>(10)</u> above of foreign obligors, which investments or obligors (or the parents of such obligors) have ratings, described in such clauses or equivalent ratings from comparable foreign rating agencies and (ii) other short-term investments utilized by Foreign Subsidiaries in accordance with normal investment practices for cash management in investments analogous to the foregoing investments described in <u>clauses (1)</u> through <u>(10)</u> of this paragraph.

(12)      investment funds investing 90% of their assets in securities of the types described in clauses (1) through (11) above.

"<u>Cash Pay Interest Rate Cap</u>" shall mean (x) the applicable Base Rate or Eurocurrency Rate applicable to such Loan plus (y) the portion of the "Applicable Rate" up to 4.40%.

"<u>Casualty Event</u>" means any event that gives rise to the receipt by the Borrower or any Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"<u>CFC</u>" means a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"<u>Change in Law</u>" means the occurrence, after the Closing Date, of any of the following: (a) the adoption of any law, rule, regulation or treaty, (b) any change in any law, rule,

regulation or treaty or in the administration or interpretation thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) Basel III and all requests, rules, guidelines or directives thereunder or issued in connection therewith, shall, in each case, be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means the earlier to occur of:

(a)    any Person, entity or "group" (within the meaning of Section 13(d) or 14(d) of the Exchange Act, but excluding any employee benefit plan of such Person, entity or "group" and their respective Subsidiaries and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), other than the Permitted Holders (or any Parent Entity of Holdings owned directly or indirectly by the Permitted Holders), shall at any time have acquired direct or indirect beneficial ownership (as defined in SEC Rules 13(d)-3 and 13(d)-5 under the Exchange Act) of Equity Interests having the power to vote or direct the voting of such Equity Interests for the election of directors of Holdings having a majority of the ordinary voting power for the election of members of the Board of Directors of Holdings;

(b)    at any time Continuing Directors shall not constitute at least a majority of the Board of Directors of Holdings; and/or

(c)    the occurrence of a "Change of Control" (or similar event, however denominated), as defined in the First Lien Credit Agreement (or any documentation governing any Permitted Refinancing Indebtedness in respect of any Refinancing thereof) or the documentation governing any other First Lien Obligations;

provided that, (i) at any time when at least a majority of the outstanding Voting Stock of Holdings is directly or indirectly owned by a Parent Entity, all references in clause (a) of this definition to "Holdings" (other than in this proviso) shall be deemed to refer to the ultimate Parent Entity that directly or indirectly owns such Voting Stock and (ii) for the purposes of clause (a) of this definition, the members of any Permitted Holder Group will be treated as individual "persons", and not as a "group".

"Chapter 11 Cases" has the meaning assigned to such term in the recitals.

"Closing Date" means the date on which the conditions precedent in Section 4.01 have been satisfied and the initial Borrowing is made.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Collateral" means any and all assets, whether real or personal, tangible or intangible, on which Liens are purported to be granted pursuant to the Collateral Documents as security for the Obligations.

9

"<u>Collateral Agent</u>" means CS, in its capacity as collateral agent under any of the Loan Documents, or any successor collateral agent appointed in accordance with <u>Section 9.09</u>.

"<u>Collateral and Guarantee Requirement</u>" means, at any time, the requirement that:

(a)     the Collateral Agent shall have received each Collateral Document required to be delivered on the Closing Date pursuant to <u>Section 4.01(a)(ii)</u> or, after the Closing Date, pursuant to <u>Section 6.10</u> or <u>Section 6.12</u> at such time required by such Collateral Documents or such section to be delivered in each case, duly executed by each Loan Party thereto;

(b)     all Obligations shall have been unconditionally guaranteed (the "<u>Guarantees</u>") by Holdings and each Subsidiary (other than any Excluded Subsidiary) and, other than in the case of Obligations incurred directly by it, the Borrower, including as of the Closing Date those that are listed on <u>Schedule 1.01D</u> (each, a "<u>Guarantor</u>");

(c)     the Obligations shall have been secured pursuant to the Security Agreement by a security interest in (i) all the Equity Interests of the Borrower and (ii) all Equity Interests (other than Excluded Equity Interests) held directly by the Borrower or any Guarantor in any Subsidiary (subject to any limitations on pledging such Equity Interests as set forth herein);

(d)     except to the extent otherwise provided hereunder or under any Collateral Document, the Obligations shall have been secured by a security interest on substantially all tangible and intangible assets of Holdings, the Borrower and each other Guarantor (including, without limitation, accounts receivable, inventory, equipment, investment property, intellectual property, other general intangibles, real property (limited to owned real property unless the First Lien Lenders request security interests in leasehold interests under the First Lien Credit Agreement) and proceeds of the foregoing), in each case, with the priority required by the Collateral Documents and, (i) when all appropriate filings or recordings are made in the appropriate offices as may be required under applicable Laws (which filings or recordings shall be made to the extent required by any Collateral Document) and (ii) upon the taking of possession or control by the Collateral Agent of such Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Collateral Agent to the extent required by any Collateral Document), such Collateral Document will constitute fully perfected Liens on, and security interests in, all right, title and interest of the Loan Parties in such Collateral;

(e)     none of the Collateral shall be subject to any Liens other than Liens permitted by <u>Section 7.01</u>;

(f)     the Collateral Agent shall have received (i) counterparts of a Mortgage with respect to each Material Real Property required to be delivered pursuant to <u>Section 4.01(a)(ii)</u> (if applicable), <u>Section 6.10</u> and <u>Section 6.12</u> (the "<u>Mortgaged Properties</u>") duly executed and delivered by the record owner of such property, (ii) a title insurance policy for such property or the equivalent or other form (if applicable) available in each applicable jurisdiction

(the "Mortgage Policies") insuring the Lien of each such Mortgage as a valid Lien on the property described therein, free of any other Liens except as expressly permitted by Section 7.01, together with such endorsements, coinsurance and reinsurance as the Collateral Agent may reasonably request, (iii) such existing surveys, existing abstracts, existing appraisals, legal opinions and other documents as the Collateral Agent may reasonably request with respect to any such Mortgaged Property and (iv) to the extent reasonably requested by the Administrative Agent, a completed "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination, and if any improvements on such Mortgaged Property are located in a special flood hazard area, (i) a notice about special flood hazard area status and flood disaster assistance duly executed by the applicable Loan Parties and (ii) certificates of insurance evidencing the insurance required by Section 6.06 in form and substance reasonably satisfactory to the Administrative Agent;

(g)     to the extent required by the Security Agreement, the Collateral Agent shall have received a Control Agreement satisfactory to the Collateral Agent with respect to each Deposit Account, Securities Account or Commodities Account (each as defined in the Guarantee and Collateral Agreement) of Holdings and its Subsidiaries that is maintained with a Person other than the Collateral Agent; and

(h)     (i) except with respect to intercompany Indebtedness, if any Indebtedness for borrowed money in a principal amount in excess of $500,000 (individually) is owing to any Loan Party and such Indebtedness is evidenced by a promissory note, the Collateral Agent shall have received such promissory note, together with undated instruments of transfer with respect thereto endorsed in blank and (ii) with respect to intercompany Indebtedness, all Indebtedness of the Borrower and each of its Subsidiaries that is owing to any Loan Party (or Person required to become a Loan Party) shall be evidenced by the Subordinated Intercompany Note, and the Collateral Agent shall have received such Subordinated Intercompany Note duly executed by the Borrower, each such Subsidiary and each such other Loan Party, together with undated instruments of transfer with respect thereto endorsed in blank.

The foregoing definition shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance or surveys with respect to, particular assets if and for so long as the Collateral Agent and the Borrower agree in writing that the cost of creating or perfecting such pledges or security interests in such assets or obtaining title insurance or surveys in respect of such assets shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom.

The Collateral Agent may grant extensions of time for the provision or perfection of security interests in, or the obtaining of title insurance and surveys with respect to, particular assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Loan Parties on such date) where it reasonably determines, in consultation with the Borrower, that provision or perfection cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary, (a) with respect to leases of real

11

property entered into by any Loan Party, such Loan Party shall not be required to take any action to deliver landlord lien waivers, estoppels and collateral access letters), (b) Liens required to be granted from time to time pursuant to the Collateral and Guarantee Requirement shall be subject to exceptions and limitations set forth in the Collateral Documents and, to the extent appropriate in the applicable jurisdiction, as agreed between the Collateral Agent and the Borrower, (c) the Collateral and Guarantee Requirement shall not apply to any of the following assets: (i) any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest in any such licenses, franchise, charter or authorization would be prohibited or restricted thereby (including any legally effective prohibition or restriction), (ii) assets and personal property for which a pledge thereof or a security interest therein is prohibited by applicable Laws (including any legally effective requirement to obtain the consent of any Governmental Authority), (iii) any intent-to-use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, (iv) Excluded Equity Interests, (v) any contract, instrument, document, lease, license or other agreement to which a Loan Party or any of their property (including personal property) is subject with any Person on the Closing Date (in each case, to the extent not entered into in contemplation hereof) if, to the extent and for so long as the grant of a Lien thereon to secure the Obligations constitutes a breach of or a default under, or creates a right of termination in favor of any party (other than any Loan Party) to, such lease, license or other agreement (but only to the extent any of the foregoing is not rendered ineffective by, or is otherwise unenforceable under, the UCC or any applicable Law) and (vi) any lease, license, contract, instrument or other agreements or any property (including personal property) subject to a purchase money security interest, Capitalized Lease Obligation or similar arrangements, in each case to the extent permitted under the Loan Documents, to the extent that a pledge thereof or a security interest therein would violate or invalidate such lease, license, contract, instrument or agreement, purchase money, Capitalized Lease or similar arrangement, or create a right of termination in favor of any other party thereto (other than a Borrower or a Guarantor) after giving effect to the applicable anti-assignment clauses of the Uniform Commercial Code and applicable Laws, other than the proceeds and receivables thereof the assignment of which is expressly deemed effective under applicable Laws notwithstanding such prohibition (the assets excluded pursuant to this clause (c), collectively, the "Excluded Assets"), (d) no perfection actions shall be required with respect to (i) motor vehicles and other assets and personal property subject to certificates of title and letter of credit rights, except to the extent constituting a supporting obligation for other Collateral as to which perfection is accomplished by the filing of a UCC financing statement or equivalent (it being understood that no actions shall be required to perfect a security interest in letter of credit rights, other than the filing of a UCC financing statement or equivalent) and (ii) commercial tort claims with an individual value of less than $500,000, and (e) no actions in any non-U.S. jurisdictions or required by the Laws of any non-U.S. jurisdictions shall be required to be taken to create any security interests in assets located or titled outside of the U.S. or to perfect or make enforceable any security interests in any assets (it being understood that there shall be no Collateral Document (or other security agreements or pledge agreements) governed under the laws of any non-U.S. jurisdiction).

"Collateral Documents" means, collectively, the Security Agreement, the Intellectual Property Security Agreements, the Mortgages, each Control Agreement, each of the mortgages, collateral assignments, Security Agreement Supplements, Intellectual Property Agreement Supplements, security agreements, pledge agreements or other similar agreements

delivered to the Collateral Agent and the Lenders pursuant to Section 4.01(a)(ii), Section 6.10 or Section 6.12 and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties.

"Commitment" means, with respect to each Lender, the commitment, if any, of such Lender to make (or convert loans under the DIP Credit Facility into) Loans hereunder (or, with respect to participant in letters of credit under the DIP Credit Facility, to convert its DIP Credit Facility letter of credit obligation into Loans) on the Closing Date, expressed as an amount representing the maximum principal amount of Loans to be made by such Lender hereunder on the Closing Date or in the aggregate, as the context may require, as such commitment may be (a) reduced upon the making of Loans pursuant to Section 2.01, and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption. The amount of each Lender's Commitment, in the aggregate, as of the Closing Date is set forth on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender shall have assumed its Commitment, as the case may be. The aggregate principal amount of the Commitments hereunder as of the Closing Date is $[      ].[1]

"Committed Loan Notice" means a notice of (a) a Borrowing, (b) a conversion of Loans from one Type to the other, or (c) a continuation of Eurocurrency Rate Loans pursuant to Section 2.02(a), which, if in writing, shall be substantially in the form of Exhibit A (or such other form as shall be reasonably acceptable to the Borrower and the Administrative Agent).

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compensation Period" has the meaning specified in Section 2.12(c)(ii).

"Compliance Certificate" means a certificate substantially in the form of Exhibit C.

"Confirmation Order" means an order of the Bankruptcy Court, in form and substance acceptable to the Administrative Agent and the Lenders, to the extent such approvals are required pursuant to the Restructuring Support Agreement, confirming the Plan of Reorganization.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Depreciation and Amortization Expense" means, with respect to the Borrower and its Subsidiaries for any period, the total amount of depreciation and amortization expense, including the amortization of deferred financing fees or costs, Capitalized Software Expenditures and the amortization of original issue discount resulting from the issuance of Indebtedness at less than par, of the Borrower and its Subsidiaries for such period on a consolidated basis and otherwise as determined in accordance with GAAP.

---

[1] To be set at $75M minus the principal amount of the First Lien Loans on the Closing Date.

"Consolidated EBITDA" means, the Consolidated Net Income of the Borrower and its Subsidiaries for such period, plus:

(a)        without duplication and to the extent already deducted (and not added back or excluded) or, in the case of clauses (viii) and (xiii), to the extent not included, in arriving at such Consolidated Net Income, the sum of the following amounts for such period:

(i)        provision for taxes based on income, revenues, profits or capital, including federal, foreign, state, franchise and similar taxes and foreign withholding taxes of such Person paid or accrued during such period (including in respect of repatriated funds and any penalties and interest related to such taxes or arising from any tax examinations); plus

(ii)        total interest expense and, to the extent not reflected in such total interest expense, any losses on Hedging Obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such Hedging Obligations or such derivative instruments, bank and letter of credit fees, amortization of deferred financing fees or costs and costs of surety bonds in connection with financing activities), plus

(iii)        Consolidated Depreciation and Amortization Expense for such; plus

(iv)        any expenses, fees, charges or losses (other than Consolidated Depreciation and Amortization Expense) related to any Investment, acquisition, Disposition, conveyance, Refinancing or recapitalization, in each case, permitted hereunder or the Incurrence of Indebtedness permitted to be Incurred hereunder (in each case, including any such transaction consummated prior to the Closing Date and any such transaction undertaken but not completed and/or not successful), including (A) fees, expenses or charges related to the Loan Documents and the First Lien Credit Documents, (B) in fiscal year ending 2017, such fees, expenses or charges related to the Transactions and the Chapter 11 Cases in aggregate not to exceed $30,000,000 and (C) any amendment or other modification of the First Lien Loans or the Loans; plus

(v)        any other non-cash charges, write-downs, write-offs, expenses, losses or items, including any impairment charges or the impact of purchase accounting or fresh start accounting, (excluding any such non-cash charge, write-off, write-down or item to the extent it represents an accrual or reserve for a cash expenditure for a future period) or other items classified by the Borrower as special items, operational restructuring expenses or reorganization items less other non-cash items of income increasing Consolidated Net Income (excluding any such non-cash item of income to the extent it represents a receipt of cash in any future period); plus

14

(vi)     any costs or expense incurred pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or shareholder agreement, to the extent that such cost or expenses are funded with cash proceeds contributed to the capital of the Borrower or Net Proceeds of an issuance of Equity Interests of the Borrower (or Holdings) (other than Disqualified Equity Interests or any Cure Amount); plus

(vii)     cash receipts (or any netting arrangements resulting in reduced cash expenditures) not representing Consolidated EBITDA in any period to the extent non-cash gains relating to such income were deducted in the calculation of Consolidated EBITDA pursuant to paragraph (b) below for any previous period and not added back; plus

(viii)     (i) any expenses and charges that are reimbursed by indemnification or other reimbursement provisions in connection with any investment or any sale, conveyance, transfer or other Disposition of assets permitted hereunder and (ii) to the extent covered by insurance and actually reimbursed; plus

(ix)     the increase, if any, in the deferred revenue balance between the beginning and the ending of the Test Period; minus

(b)     without duplication, and to the extent included in arriving at Consolidated Net Income in such period:

(i)     non-cash gains increasing Consolidated Net Income of such Person for such period, excluding any non-cash gains to the extent they represent the reversal of an accrual or reserve for a potential cash item that reduced Consolidated EBITDA in the LTM Period and any non-cash gains with respect to cash actually received in the LTM Period so long as such cash did not increase Consolidated EBITDA in such prior period; plus

(ii)     realized foreign exchange income or gains resulting from the impact of foreign currency changes on the valuation of assets or liabilities on the balance sheet of the Borrower and its Subsidiaries; plus

(iii)     any non-cash gains attributable to the mark-to-market movement in the valuation of Hedging Obligations (to the extent the cash impact resulting from such gain has not been realized) or other derivative instruments pursuant to Accounting Standards Codification 815; plus

(iv)     the decrease, if any, in the deferred revenue balance between the beginning and the ending of the Test Period; and

in each case, as determined on a consolidated basis for the Borrower and its Subsidiaries in accordance with GAAP.

15

There shall be included in determining Consolidated EBITDA for any period, without duplication, the Acquired EBITDA of any Person, property, business or asset acquired by the Borrower or any Subsidiary during such period (but not the Acquired EBITDA of any related Person, property, business or assets to the extent not so acquired), to the extent not subsequently sold, transferred or otherwise Disposed of by the Borrower or such Subsidiary during such period (each such Person, property, business or asset acquired (including pursuant to (i) a transaction consummated prior to the Closing Date and (ii) a Permitted Acquisition (or similar Investment)) and not subsequently so Disposed of, an "Acquired Entity or Business") based on the actual Acquired EBITDA of such Acquired Entity or Business for such period (including the portion thereof occurring prior to such acquisition) determined on a historical pro forma basis. There shall be excluded in determining Consolidated EBITDA for any period the Disposed EBITDA of any Person, property, business or asset  sold, transferred or otherwise Disposed of, closed or classified as discontinued operations by the Borrower or any Subsidiary during such period (each such Person, property, business or asset so sold or Disposed of, a "Sold Entity or Business") based on the actual Disposed EBITDA of such Sold Entity or Business for such period (including the portion thereof occurring prior to such sale, transfer or Disposition) determined on a historical pro forma basis; provided that for the avoidance of doubt, notwithstanding any classification under GAAP of any Person or business in respect of which a definitive agreement for the Disposition thereof has been entered into as discontinued operations, the Disposed EBITDA of such Person or business shall not be excluded pursuant to this paragraph until such Disposition shall have been consummated.

Notwithstanding anything to the contrary contained herein, Consolidated EBITDA shall be deemed to be $2,713,000, $(2,715,000), and $6,683,000, respectively, for the fiscal quarters ended June 30, 2016, September 30, 2016 and December 31, 2016, in each case and, without duplication, adjusted to reflect any pro forma adjustments for Acquired EBITDA or Disposed EBITDA, occurring or identified after the Closing Date and not otherwise included in the calculation of the foregoing amounts.

"Consolidated Net Income" means, for any period, the net income (loss) attributable to the Borrower and the Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, excluding, without duplication,

(1)    any net income (loss) of any Person if such Person is not the Borrower or a Subsidiary or that is accounted for by the equity method of accounting, except that the Borrower's or any Subsidiary's equity in the net income of any such Person for such period will be included in such Consolidated Net Income up to the aggregate amount of cash or Cash Equivalents actually distributed by such Person during such period to the Borrower or a Subsidiary as a dividend or other distribution or return on investment;

(2)    any net gain (or loss) realized upon the sale or other Disposition of any asset of the Borrower or any Subsidiaries (including pursuant to any sale/leaseback transaction) which is not sold or otherwise Disposed of in the ordinary course of business (as determined in good faith by a Responsible Officer or the Board of Directors of the Borrower);

16

(3)      extraordinary, non-recurring gains or losses (less all fees and expenses relating thereto) or expenses (including any non-recurring operating expenses directly attributable to the implementation of cost savings initiatives and any accruals or reserves in respect of any extraordinary, non-recurring items), retention, severance, recruiting costs, relocation costs, integration and facilities' opening costs and other restructuring charges, reorganization costs, shared services agreements, accruals or reserves (including restructuring and integration costs related to acquisitions after the Closing Date and adjustments to existing reserves), whether or not classified as restructuring expense on the consolidated financial statements, signing costs, retention or completion bonuses, transition costs, costs related to closure/consolidation of facilities and curtailments or modifications to pension and post-retirement employee benefit plans (including any settlement of pension liabilities);

(4)      Transaction Expenses;

(5)      the cumulative effect of a change in accounting principles;

(6)      (i) stock-based, partnership interest-based and similar non-cash incentive-based compensation award or arrangement charges or expenses (including with respect to any profits interest relating to membership interests in any partnership or limited liability company and any non-cash charges or expenses arising from the grants of stock appreciation or similar rights, options, restricted stock or other rights or equity incentive programs) and any non-cash charges associated with the rollover, acceleration or payout of Equity Interests by, or to, officers, directors or employees of the Borrower or any of its Subsidiaries, or any of its Parent Entities, (ii) and any non-cash deemed finance charges in respect of any pension liabilities or other provisions and (iii) income (loss) attributable to deferred compensation plans or trusts,

(7)      all deferred financing costs written off and premiums paid or other expenses incurred directly in connection with any early extinguishment of Indebtedness and any net gain (loss) from any write-off or forgiveness of Indebtedness;

(8)      any unrealized foreign exchange gains or losses resulting from the impact of foreign currency changes on the valuation of assets and liabilities on the balance sheet of the Borrower;

(9)      any purchase accounting or fresh start accounting effects including, but not limited to, adjustments to inventory, property and equipment, software and other intangible assets and deferred revenue in component amounts required or permitted by GAAP and related authoritative pronouncements (including the effects of such adjustments pushed down to the Borrower and the Subsidiaries), as a result of any consummated acquisition (including any acquisition prior to the Closing Date), or the amortization or write-off of any amounts thereof (including any write-off in process research and development);

(10 )    any goodwill or other intangible asset impairment charge or write-off;

17

(11)    any income (loss) from the early extinguishment or cancellation of Indebtedness;

(12)    any net unrealized gains and losses resulting from Swap Contracts or embedded derivatives that require similar accounting treatment and the application of FASB Accounting Standards Codification Topic 815 – Derivatives and Hedging and related pronouncements;

(13)    non-cash income or expense related to changes in the fair value of contingent liability for in connection with earn-out obligations and similar liabilities in connection with any Permitted Acquisition or similar Investment; and

(14)    accruals and reserves that are established within twelve months after the Closing Date that are so required to be established as a result of the Transactions in accordance with GAAP or changes as a result of the adoption or modification of accounting policies during such period.

"Consolidated Total Debt" means, as of any date of determination, the aggregate principal amount of Indebtedness of the Borrower and its Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of purchase accounting in connection with the Transactions or any Permitted Acquisition (or any similar permitted Investment)), consisting of Indebtedness for borrowed money, unpaid drawings under letters of credit, Capitalized Lease Obligations and debt obligations evidenced by promissory notes or similar instruments.

"Consummation of the Plan of Reorganization" shall mean the occurrence of the Plan Effective Date and the substantial consummation of the Plan of Reorganization within the meaning of Section 1101(2) of the Bankruptcy Code.

"Continuing Director" shall mean, at any date, an individual (a) who is a member of the Board of Directors of Holdings on the Closing Date, (b) who, as at such date, has been a member of such Board of Directors for at least the 12 preceding months, (c) who has been nominated or designated to be a member of such Board of Directors, directly or indirectly, by the Permitted Holders or Persons nominated or designated by the Permitted Holders or (d) who has been nominated or designated to be, or designated as, a member of such Board of Directors by a majority of the other Continuing Directors then in office.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" has the meaning specified in the definition of "Affiliate."

"Control Agreement" has the meaning set forth in the Security Agreement.

"Converted Loan" shall have the meaning specified in Section 2.01(a).

18

"Credit Extension" means a Borrowing.

"Cumulative Consolidated Net Income" means, as at any date of determination, Consolidated Net Income for the period (taken as one accounting period) commencing on July 1, 2017 and ending on the last day of the most recent fiscal quarter for which Section 6.01 Financials have been delivered.

"Cure Amount" has the meaning specified in Section 8.05.

"Cure Deadline" has the meaning specified in Section 8.05.

"Cure Right" has the meaning specified in Section 8.05.

"Customary Intercreditor Agreement" means (a) to the extent executed in connection with the Incurrence of secured Indebtedness, the Liens on the Collateral of which are intended to rank equal in priority to the Liens on the Collateral securing the Obligations (but without regard to the control of remedies), at the option of the Borrower and the Administrative Agent acting together in good faith, either (i) any intercreditor agreement substantially in the form of the Equal Priority Intercreditor Agreement or (ii) a customary intercreditor agreement in form and substance reasonably acceptable to the Administrative Agent and the Borrower, which agreement shall provide that the Liens on the Collateral securing such Indebtedness shall rank equal in priority to the Liens on the Collateral securing the Obligations (but without regard to the control of remedies) and (b) to the extent executed in connection with the Incurrence of secured Indebtedness the Liens on the Collateral of which are intended to rank junior in priority to the Liens on the Collateral securing the Obligations, at the option of the Borrower and the Administrative Agent acting together in good faith, either (i) in the case of Liens on the Collateral of which are intended to rank equal in priority to the Liens on the Collateral securing the Second Lien Obligations  (but without regard to the control of remedies), the Junior Priority Intercreditor Agreement or (ii) otherwise, either (x) an intercreditor agreement substantially in the form of the Junior Priority Intercreditor Agreement or (y) a customary intercreditor agreement in form and substance reasonably acceptable to the Administrative Agent and the Borrower, which agreement shall provide that the Liens on the Collateral securing such Indebtedness shall rank junior in priority to the Liens on the Collateral securing the Obligations.

"Debtors" has the meaning assigned to such term in the recitals.

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Declined Proceeds" has the meaning specified in Section 2.05(b)(ii).

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means an interest rate equal to (a) the Base Rate plus (b) the Applicable Rate applicable to Base Rate Loans plus (c) 2.0% per annum; provided that with respect to a Eurocurrency Rate Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan plus 2.0% per annum, in each case, to the fullest extent permitted by applicable Laws.

"Defaulting Lender" means any Lender whose acts or failure to act, whether directly or indirectly, cause it to meet any part of the definition of "Lender Default."

"DIP Credit Facility" has the meaning assigned to such term in the recitals.

"DIP Credit Facility Agreement" means that certain Senior Secured Super Priority Debtor In Possession Credit Agreement dated as of the Petition Date among Holdings, the Pre-Petition Borrower and Credit Suisse AG, Cayman Islands Branch, as administrative agent.

"DIP Credit Facility Obligations" means "Obligations" as defined in the DIP Credit Facility Agreement.

"DIP L/C Facility" has the meaning assigned to such term in the recitals.

"Disclosure Statement" means any disclosure statement that is filed in connection with the Plan of Reorganization, which disclosure statement is in form and substance reasonably acceptable to the Required Lenders.

"Disposed EBITDA" means, with respect to any Sold Entity or Business for any period, the amount for such period of Consolidated EBITDA of such Sold Entity or Business (determined as if references to the Borrower and its Subsidiaries in the definition of the term "Consolidated EBITDA" (and in the component financial definitions used therein) were references to such Sold Entity or Business and its Subsidiaries), all as determined on a consolidated basis for such Sold Entity or Business.

"Disposition" or "Dispose" means the sale, assignment, transfer, license, lease or other disposition (including any Sale Leaseback and any sale of Equity Interests) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith; provided that "Disposition" and "Dispose" shall not be deemed to include any issuance by Holdings of any of its Equity Interests to another Person.

"Disqualified Equity Interests" means any Equity Interest which, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition:

    (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests and cash in lieu of fractional shares of such Equity Interests) pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale or casualty or condemnation event so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale or casualty or condemnation event shall be subject to the prior repayment in full of the Loans and all other Obligations that

20

are accrued and payable and the termination of the Commitments and all outstanding Letters of Credit,

(b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests and cash in lieu of fractional shares of such Equity Interests), in whole or in part,

(c) provides for the scheduled payments of dividends in cash prior to the date that is ninety-one (91) days after the Maturity Date, or

(c) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the Maturity Date; provided that if such Equity Interests are issued pursuant to any plan for the benefit of employees of Holdings , the Borrower or any of its Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because it may be required to be repurchased by Holdings, the Borrower or any of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"Disqualified Lenders" means (i) such Persons that have been specified in writing to the Administrative Agent and the Lenders prior to the Closing Date as being "Disqualified Lenders", (ii) those Persons who are competitors of the Borrower and its Subsidiaries that are separately identified in writing by the Borrower from time to time and (iii) in the case of each of clauses (i) and (ii), any of their Affiliates that are identified in writing from the Borrower from time to time or (b) readily identifiable on the basis of such Affiliates name; provided that no permitted supplement or modification to the list of Disqualified Lenders shall apply retroactively to disqualify any persons that have previously acquired an assignment or participation in the Loans or Commitments.

"Distressed Person" has the meaning specified in the definition of "Lender-Related Distress Event."

"Dollar" and "$" mean lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States or any state thereof or the District of Columbia.

"Eligible Assignee" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund and (d) any other Person (other than a natural person) that becomes an Assignee in accordance with Section 10.07(b); provided, however, that in no event shall any Disqualified Lender be an Eligible Assignee.

"Environmental Laws" means any and all Laws relating to pollution or the protection of human health (as relating to exposure to Hazardous Materials) and the environment or natural resources.

"Equal Priority Intercreditor Agreement" means the Equal Priority Intercreditor Agreement substantially in the form of Exhibit N among the Administrative Agent and/or the

Collateral Agent and one or more representatives for holders of one or more classes of Indebtedness, with such modifications thereto as the Administrative Agent and the Borrower may reasonably agree.

"Equity Interests" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that is under common control with any Loan Party and is treated as a single employer within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (b) the failure of any Loan Party or any ERISA Affiliate to make by its due date a required installment under Section 430(j) of the Internal Revenue Code with respect to any Pension Plan; (c) a failure to satisfy the minimum funding standard under Section 412 of the Code or Section 302 of ERISA, or the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard, in each case with respect to a Pension Plan, whether or not waived, or a failure to make any required contribution to a Multiemployer Plan; (d) a complete or partial withdrawal by any Loan Party or any ERISA Affiliate from a Multiemployer Plan, notification of any Loan Party or ERISA Affiliate concerning the imposition of Withdrawal Liability or notification that a Multiemployer Plan is insolvent or is in reorganization within the meaning of Title IV of ERISA or that is in endangered or critical status, within the meaning of Section 305 of ERISA; (e) any event or condition which constitutes grounds for a termination under Section 4041A of ERISA, the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (g) the imposition of any liability under Title IV of ERISA, including the imposition of a lien under Section 412 or 430(k) of the Internal Revenue Code or Section 303 or 4068 of ERISA on any property (or rights to property, whether real or personal) of a Loan Party or any ERISA Affiliate, but excluding PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any ERISA Affiliate; (h) a determination that any Pension Plan is, or is expected to be, in "at-risk" status (within the meaning of Section 303(i)(4)(A) of ERISA or Section 430(i)(4)(A) of the Code) or (i) the occurrence of a non-exempt prohibited transaction with respect to any Pension Plan maintained or contributed to by any Loan Party (within the meaning of Section 4975 of the Code or Section 406 of ERISA), which could result in liability to any Loan Party.

22

"Eurocurrency Rate" means, for any Interest Period with respect to any Eurocurrency Rate Loan:

(a)        the rate per annum equal to the rate determined by the Administrative Agent to be the offered rate that appears on the Reuters Screen LIBOR01 (or any successor thereto) for deposits in Dollars (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period, determined as of approximately 11:00 a.m. (London time) two (2) Business Days prior to the first day of such Interest Period;

(b)        if the rates referenced in the preceding subsection (a) are not available, the rate which results from interpolating on a linear basis between: (i) the rate appearing on ICE Benchmark Administration page (or on any successor or substitute page of such service) for the longest period (for which that rate is available) which is less than the Interest Period and (ii) the rate appearing on the ICE Benchmark Administration page (or on any successor or substitute page of such service) for the shortest period (for which that rate is available) which exceeds the Interest Period, each as of approximately 11:00 A.M., London time, two Business Days prior to the commencement of such Interest Period; or

(c)        for Interest Periods where no interest rate corresponding to an interest period of the same duration as such Interest Period appears on any such page referenced in the preceding subsections (i) and (ii), such rate shall be determined as provided for in Section 3.03;

provided that, notwithstanding the foregoing, the Eurocurrency Rate shall not be determined to be higher than 0.10%.

"Eurocurrency Rate Loan" means a Loan that bears interest at a rate based on the Adjusted Eurocurrency Rate.

"Event of Default" has the meaning specified in Section 8.01.

 "Exchange Act" means the Securities Exchange Act of 1934, as amended and the rules and regulations promulgated thereunder.

"Exchange Rate" means, on any day with respect to any currency (other than Dollars), the rate at which such currency may be exchanged into any other currency (including Dollars), as set forth at approximately 11:00 a.m. (London time) on such day on the Reuters World Currency Page for such currency.  In the event that such rate does not appear on any Reuters World Currency Page, the Exchange Rate shall be determined by reference to such other publicly available service for displaying exchange rates as may be agreed by the Administrative Agent and the Borrower, or, in the absence of such agreement, such Exchange Rate shall instead be the arithmetic average of the spot rates of exchange of the Administrative Agent in the market where its foreign currency exchange operations in respect of such currency are then being conducted, at or about 11:00 a.m., local time, on such date for the purchase of the relevant currency for delivery two Business Days later.

"Excluded Accounts" means (w) any disbursement deposit account (i) the funds in which are used solely for the payment of salaries and wages, employee benefits, workers' compensation and similar expenses or (ii) that is a zero balance account that sweeps to an account subject to a Control Agreement, (x) all Deposit Accounts established (or otherwise maintained) by Borrower or any of its Subsidiaries which are funded by, or on behalf or for the benefit of, employees of Borrower or any of its Subsidiaries and are to be maintained exclusively for the benefit, directly or indirectly, of such employees (including, without limitation, Deposit Accounts which are employer funded pension accounts for employees and accounts established to pay taxes for and on behalf of employee tax liabilities) and (y) all other Deposit Accounts established (or otherwise maintained) by Borrower or any of its Subsidiaries (excluding Deposit Accounts subject to Control Agreements and the Collection Account) that do not have cash balances at any time exceeding $250,000 in the aggregate for all such other Deposit Accounts.

"Excluded Assets" has the meaning specified in the definition of "Collateral and Guarantee Requirement".

"Excluded Equity Interests" means:

(a)    solely in the case of any pledge of Equity Interests of any FSHCO or Foreign Subsidiary that is a CFC to secure the Obligations, any Equity Interests that are Voting Stock of such FSHCO or Foreign Subsidiary in excess of 65% of the outstanding Equity Interests that are Voting Stock of such FSHCO or Foreign Subsidiary;

(b)    any Equity Interests to the extent, and for so long as, the pledge thereof would be prohibited by any applicable Law (including any legally effective requirement to obtain the consent of any Governmental Authority unless such consent has been obtained; and

(c)    any "margin stock" and Equity Interests of any Person (other than any Wholly-Owned Subsidiary) to the extent, and for so long as, the pledge of such Equity Interests would be prohibited by, or would create an enforceable right of termination in favor of any other party thereto (other than Holdings, the Borrower or any Wholly-Owned Subsidiary) under, the terms of any Contractual Obligation, Organizational Document, joint venture agreement or shareholders' agreement applicable to such Person.

"Excluded Subsidiary" means:

(a)    any Subsidiary that is not a Wholly-Owned Subsidiary or is a joint venture on any date such Subsidiary would otherwise be required to become a Guarantor pursuant to the requirements of Section 6.10 (for so long as such Subsidiary remains a non-Wholly-Owned Subsidiary);

(b)    any Subsidiary that is prohibited by (x) applicable Law or (y) Contractual Obligation from guaranteeing the Obligations (and for so long as such restriction is in effect); provided that in the case of clause (y), such Contractual Obligation existed on the Closing Date or, with respect to any Subsidiary acquired by the Borrower or a Subsidiary

24

after the Closing Date (and so long as such Contractual Obligation was not incurred in contemplation of such acquisition), on the date such Subsidiary is so acquired; and

(c)    any Subsidiary that is (i) a CFC, (ii) a FSHCO or (iii) a direct or indirect Subsidiary of a CFC.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Agent or Lender or required to be withheld or deducted from a payment to any Agent or Lender, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Agent or Lender being organized under the laws of, or having its principal office or, in the case of any Lender, its Applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment requested by the Borrower under Section 3.07) or (ii) such Lender changes its Applicable Lending Office, except in each case to the extent that, pursuant to Section 3.01, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in a Loan or Commitment or to such Lender immediately before it changed its Applicable Lending Office, (c) Taxes attributable to such Agent's or Lender's failure to comply with Section 3.01(f) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Exit L/C Agreement" means that certain Letter of Credit Reimbursement and Security Agreement dated the date hereof, between the Borrower and Credit Suisse AG, Cayman Islands Branch, as issuer.

"Exit L/C Facility" means that certain letter of credit facility under the Exit L/C Agreement.

"Exit L/C Guaranty" means that certain Guaranty dated the date hereof between the Borrower, Holdings, certain of their subsidiaries, and Credit Suisse AG, Cayman Islands Branch as issuer.

"Expected Cure Amount" has the meaning specified in Section 8.05.

"Fair Market Value" means with respect to any asset or group of assets on any date of determination, the value of the consideration obtainable in a sale of such asset at such date of determination assuming a sale by a willing seller to a willing purchaser dealing at arm's length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset, as determined in good faith by the Borrower.

"FATCA" means Sections 1471 through 1474 of the Code, as of the Closing Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations with respect thereto or official administrative interpretations thereof, any agreements entered into pursuant to Section

25

1471(b)(1) of the Code and any intergovernmental agreements (or related legislation or official administrative rules or practices) implementing the foregoing.

"FCPA" means the Foreign Corrupt Practices Act of 1977, as amended.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank on the Business Day next succeeding such day; provided that if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day.

"Fee Letter" means the Fee Letter, dated as of March [   ], 2017, among Credit Suisse AG, Cayman Islands Branch, Credit Suisse Securities (USA) LLC, and the Borrower.

"Financial Advisor Costs" means and includes all reasonable and documented or invoiced out-of-pocket fees, expenses and disbursements of financial advisors engaged to advise in connection with this Agreement.

"Financial Officer" of any person shall mean the Chief Financial Officer, principal accounting officer, Treasurer, Assistant Treasurer, Vice President of Finance or Controller of such Person.

"First Lien Administrative Agent" shall have the meaning assigned to the term "Administrative Agent" in the First Lien Credit Agreement.

"First Lien Claims" means all claims of the Lenders under the Pre-Petition First Lien Credit Agreement and all agreements and instruments relating thereto, to the extent allowed in the Chapter 11 Cases.

"First Lien Collateral Agent" shall have the meaning assigned to the term "Collateral Agent" in the First Lien Credit Agreement.

"First Lien Credit Agreement" shall mean (i) that certain First Lien Term Loan Agreement dated as of the date hereof by and among the Borrower, the lenders party thereto and Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent and (ii) to the extent permitted by this Agreement and the Junior Priority Intercreditor Agreement, any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any Indebtedness or other financial accommodation that has been incurred to extend, replace, restructure, renew or refinance in whole or in part the indebtedness and other obligations outstanding under (x) the credit agreement referred to in clause (i) or (y) any subsequent First Lien Credit Agreement, unless such agreement or instrument expressly provides that it is not intended to be and is not a First Lien Credit Agreement hereunder. Any reference to the First Lien Credit Agreement hereunder shall be deemed a reference to any First Lien Credit Agreement then in existence.

"First Lien Credit Documents" shall mean the First Lien Credit Agreement and the other "Loan Documents"(as defined in the First Lien Credit Agreement, including each security document, guaranties and the notes issued thereunder.

"First Lien Lenders" shall mean a "Lender" as such term is defined in the First Lien Loan Documents.

"First Lien Loans" means any loan made by the First Lien Lenders to the Borrower pursuant to the First Lien Credit Agreement.

"First Lien Obligations" has the meaning specified in the First Lien Credit Agreement.

"First Lien Term Facility" has the meaning specified in the recitals hereto.

"Flood Insurance Laws" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto and (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto.

"Foreign Pension Event" means (a) a contribution or premium required to be paid to or in respect of each Foreign Plan is not paid in a timely fashion in accordance with the terms thereof and all applicable Law, or taxes, penalties or fees are owing or eligible under any Foreign Plan beyond the date permitted for payment of same; (b) the occurrence of an event respecting any Foreign Plan which would entitle any Person to wind-up or terminate any Foreign Plan, or which could reasonably be expected to adversely affect the tax status thereof; (c) the determination of a going concern unfunded actuarial liability, past service unfunded liability or solvency deficiency respecting any Foreign Plan or (d) the occurrence of an improper withdrawal or transfer of assets from any Foreign Plan.

"Foreign Plan" means any employee pension, retirement or other analogous plan, program, policy, arrangement or agreement maintained by, or contributed to or by, or entered into with, any Loan Party or any Subsidiary with respect to employees outside the United States providing for retirement income or benefits.

"Foreign Subsidiary" means any direct or indirect Subsidiary of the Borrower that is not a Domestic Subsidiary.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"FSHCO" means any direct or indirect Domestic Subsidiary substantially all the assets of which consist of Equity Interests and Indebtedness of one or more direct or indirect Foreign Subsidiaries that are CFCs.

"Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"Funded Debt" means all Indebtedness of the Borrower and its Subsidiaries for borrowed money that matures more than one year from the date of its creation or matures within one year from such date that is renewable or extendable, at the option of such Person, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year from such date, including Indebtedness in respect of the Loans.

"GAAP" means generally accepted accounting principles in the United States of America, as in effect from time to time; provided that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.  Notwithstanding anything herein to the contrary, it is understood and agreed that all obligations of any Person that are or would be characterized as operating lease obligations in accordance with GAAP on January 1, 2013 (whether or not such operating lease obligations were in effect on such date) shall continue to be accounted for as operating lease obligations (and not as Capitalized Lease Obligations or Capitalized Leases) for purposes of this Agreement regardless of any change in GAAP following the date that would otherwise require such obligations to be recharacterized as Capitalized Lease Obligations or Capitalized Leases.

"Governmental Authority" means any nation or government, any state, territorial or other political subdivision thereof, and any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Granting Lender" has the meaning specified in Section 10.07(h).

"Guarantee Obligations" means, as to any Person, without duplication, any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or the payment or performance of such Indebtedness, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or performance thereof or to protect such

28

obligee against loss in respect thereof (in whole or in part); <u>provided</u> that the term "Guarantee Obligations" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or Disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee Obligation shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.

"<u>Guarantees</u>" has the meaning specified in the definition of "Collateral and Guarantee Requirement."

"<u>Guarantors</u>" has the meaning specified in the definition of "Collateral and Guarantee Requirement."

"<u>Guaranty</u>" means, collectively, (a) the Guarantee substantially in the form of <u>Exhibit E</u> and (b) each other guaranty and guaranty supplement delivered pursuant to <u>Section 6.10</u>.

"<u>Hazardous Materials</u>" means all substances or wastes regulated as hazardous or toxic or other term of equivalent regulatory import pursuant to any Environmental Law, including petroleum or petroleum distillates, friable asbestos or friable asbestos containing materials and polychlorinated biphenyls.

"<u>Hedging Obligations</u>" means, with respect to any Person, the obligations of such Person under Swap Contracts.

"<u>Holdings</u>" has the meaning assigned to such term in the introductory paragraph to this Agreement.

"<u>Honor Date</u>" has the meaning specified in <u>Section 2.03(b)(i)</u>.

"<u>Incur</u>" means, create, issue, assume, Guarantee, incur or otherwise become directly or indirectly liable for; <u>provided</u>, <u>however</u>, that any Indebtedness of a Person existing at the time such Person becomes a Subsidiary (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Person at the time it becomes a Subsidiary. The term "<u>Incurrence</u>" when used as a noun shall have a correlative meaning.  Solely for purposes of determining compliance with <u>Section 7.03</u> with respect to any initial incurrence of Indebtedness:

(a)     amortization of debt discount or the accretion of principal with respect to a non-interest bearing or other discount security;

(b)     the payment of regularly scheduled interest in the form of additional Indebtedness of the same instrument or the payment of regularly scheduled dividends on Equity Interests in the form of additional Equity Interests of the same class and with the same terms; and

NAI-1502591911v5

(c)      the obligation to pay a premium in respect of Indebtedness arising in connection with the issuance of a notice of prepayment or redemption or making of a mandatory offer to prepay, redeem or purchase such Indebtedness;

will, in each case, not be deemed to be the Incurrence of Indebtedness.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)      all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments (including, for the avoidance of doubt, the Loans and the First Lien Loans);

(b)      the maximum amount (after giving effect to any prior drawings or reductions which may have been reimbursed) of all letters of credit (including standby and commercial), banker's acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c)      net obligations of such Person under any Swap Contract;

(d)      all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable, liabilities or accrued expenses in the ordinary course of business);

(e)      Indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such Indebtedness shall have been assumed by such Person or is limited in recourse;

(f)      all Capitalized Lease Obligation of such Person;

(g)      all obligations of such Person in respect of Disqualified Equity Interests; and

(h)      all Guarantee Obligations of such Person in respect of any of the foregoing;

provided that Indebtedness shall not include (i) prepaid or deferred revenue arising in the ordinary course of business, (ii) purchase price holdbacks arising in the ordinary course of business in respect of a portion of the purchase price of an asset to satisfy warrants or other unperformed obligations of the seller of such assets and (iii) Guarantee Obligations incurred in the ordinary course of business and not supporting or otherwise related to any Indebtedness for borrowed money.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or

30

limited liability company) in which such Person is a general partner or a joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness would be included in the calculation of Consolidated Total Debt. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value of such Swap Contract as of such date. The amount of Indebtedness of any Person for purposes of <u>clause (e)</u> shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the Fair Market Value of the property encumbered thereby as determined by such Person in good faith.

"<u>Indemnified Liabilities</u>" has the meaning specified in <u>Section 10.05</u>.

"<u>Indemnified Taxes</u>" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in <u>clause (a)</u>, Other Taxes.

"<u>Indemnitees</u>" has the meaning specified in <u>Section 10.05</u>.

"<u>Information</u>" has the meaning specified in <u>Section 10.08</u>.

"<u>Intellectual Property Security Agreement</u>" means, collectively, (a) the Intellectual Property Security Agreement executed by certain Loan Parties in the form of <u>Exhibit G</u>, and (b) each other Intellectual Property Security Agreement Supplement executed and delivered pursuant to <u>Section 6.10</u>.

"<u>Intellectual Property Security Agreement Supplement</u>" has the meaning specified in the Intellectual Property Security Agreement.

"<u>Interest Payment Date</u>" means (a) as to any Loan other than a Base Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date of the Facility under which such Loan was made; <u>provided</u> that if any Interest Period for a Eurocurrency Rate Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall also be Interest Payment Dates; and (b) as to any Base Rate Loan, the last Business Day of each December, March, June and September and the Maturity Date of the Facility under which such Loan was made.

"<u>Interest Period</u>" means, as to each Eurocurrency Rate Loan, the period commencing on the date such Loan is disbursed or converted to or continued as a Eurocurrency Rate Loan and ending on the date one, two, three or six months thereafter, or to the extent available to each applicable Lender of such Eurocurrency Rate Loan, twelve months or a period shorter than one month, thereafter as selected by the Borrower in its Committed Loan Notice; <u>provided</u> that:

      (a)     any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

31

(b)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)    no Interest Period shall extend beyond the Maturity Date.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or Indebtedness or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee Obligation with respect to any obligation of, or purchase or other acquisition of any other Indebtedness or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person (excluding, in the case of the Borrower and its Subsidiaries, intercompany loans, advances, or Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business) or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person. The amount, as of any date of determination, of (i) any Investment in the form of a loan or an advance shall be the principal amount thereof outstanding on such date, minus any cash payments actually received by such investor representing interest in respect of such Investment (to the extent any such payment to be deducted does not exceed the remaining principal amount of such Investment), but without any adjustment for write-downs or write-offs (including as a result of forgiveness of any portion thereof) with respect to such loan or advance after the date thereof, (ii) any Investment in the form of a Guarantee shall be equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof, as determined in good faith by a Financial Officer, (iii) any Investment in the form of a transfer of Equity Interests or other non-cash property or services by the investor to the investee, including any such transfer in the form of a capital contribution, shall be the Fair Market Value of such Equity Interests or other property or services as of the time of the transfer, minus any payments actually received by such investor representing a return of capital of, or dividends or other distributions in respect of, such Investment (to the extent such payments do not exceed, in the aggregate, the original amount of such Investment), but without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the date of such Investment and (iv) any Investment (other than any Investment referred to in clause (i), (ii) or (iii) above) by the specified Person in the form of a purchase or other acquisition for value of any Equity Interests, evidences of Indebtedness or other securities of any other Person shall be the original cost of such Investment, minus (i) the amount of any portion of such Investment that has been repaid to the investor as a repayment of principal or a return of capital, and of any payments or other amounts actually received by such investor representing interest, dividends or other distributions or similar payments in respect of such Investment (to the extent the amounts referred to in clause (B) do not, in the aggregate, exceed the original cost of such Investment plus the costs of additions thereto and without duplication of amounts increasing the Available Amount), but without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the date of such Investment.  For purposes of Section 7.02,

32

if an Investment involves the acquisition of more than one Person, the amount of such Investment shall be allocated among the acquired Persons in accordance with GAAP; provided that pending the final determination of the amounts to be so allocated in accordance with GAAP, such allocation shall be as reasonably determined by a Financial Officer.

"Investment Grade Rating" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by Fitch, Inc.

"IP Rights" has the meaning specified in Section 5.14.

"Judgment Currency" has the meaning specified in Section 10.17.

"Junior Debt" means (a) Subordinated Debt and (b) all other Indebtedness (other than any permitted intercompany Indebtedness owing to Holdings, the Borrower or any Subsidiary) that is secured by a Lien on the Collateral, which Lien is junior to the Lien securing the Obligations.

"Junior Debt Documents" means any agreement, indenture and instrument pursuant to which any Junior Debt is issued, in each case as amended to the extent permitted under the Loan Documents.

"Junior Priority Intercreditor Agreement" means the Junior Priority Intercreditor Agreement, dated as of the date hereof, among the Collateral Agent, the First Lien Collateral Agent, Holdings, the Borrower and the other Loan Parties party thereto, the form of which is attached hereto as Exhibit M.

"KPIs" has the meaning specified in Section 6.02.

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, regulations, ordinances, codes and administrative or judicial precedents, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"Lender" shall mean (a) the Persons listed on Schedule 2.01 and (b) any other Person that shall become a party hereto as a "lender" pursuant to Section 10.07, in each case other than a Person who ceases to hold any outstanding Loans or any Commitment.

"Lender Default" means (i) the refusal (in writing) or failure of any Lender to make available its portion of any Loan or other payment hereunder, or (ii) a Distressed Person has admitted in writing that it is insolvent or such Distressed Person becomes subject to a Lender-Related Distress Event.

"Lender-Related Distress Event" means, with respect to any Lender, that such Lender or any person that directly or indirectly controls such Lender (each, a "Distressed Person"), as the case may be, is or becomes subject to a voluntary or involuntary case with

33

respect to such Distressed Person under any debt relief law, or a custodian, conservator, receiver or similar official is appointed for such Distressed Person or any substantial part of such Distressed Person's assets, or such Distressed Person or any person that directly or indirectly controls such Distressed Person is subject to a forced liquidation, or such Distressed Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Distressed Person or its assets to be, insolvent or bankrupt; provided that a Lender-Related Distress Event shall not be deemed to have occurred solely by virtue of the ownership or acquisition of any equity interests in any Lender or any person that directly or indirectly controls such Lender by a Governmental Authority or an instrumentality thereof.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, deemed trust, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing); provided that in no event shall an operating lease be deemed to be a Lien.

"Loan" means any loan made by the Lenders to the Borrower pursuant to this Agreement.

"Loan Documents" means, collectively, (i) this Agreement, (ii) the Notes, (iii) the Collateral Documents, (iv) the Guaranty, (v) the Junior Priority Intercreditor Agreement, (vi) the Fee Letter, and (vii) any other document related to this Agreement designated in writing by the Borrower and the Administrative Agent as a "Loan Document".

"Loan Parties" means, collectively, (i) the Borrower, (ii) Holdings and (iii) each other Guarantor.

"LTM Period" means, on any date of determination, the period of the prior twelve months.

"Management Stockholders" means the members of management of the Borrower or any of its Subsidiaries who are (directly or indirectly through one or more investment vehicles) investors in Holdings.

"Material Adverse Effect" means a circumstance or condition that would materially and adversely affect (a) the business or financial condition of the Borrower and its Subsidiaries, taken as a whole, (b) the ability of the Borrower and the other Loan Parties, taken as a whole, to perform their payment obligations under the Loan Documents to which it is a party or (c) the rights and remedies of the Agents and the Lenders under the Loan Documents.

"Material Real Property" means any real property with a book value (at the time of acquisition) in excess of $500,000 owned by any Loan Party.

"Maturity Date" means the earliest to occur of (i) [          ], 2021[2] and (ii) the date all Loans become due and payable under the Loan Documents, whether by acceleration or otherwise; provided that if any such day is not a Business Day, the Maturity Date shall be the Business Day immediately preceding such day.

"Monthly KPI Reports" has the meaning specified in Section 6.02.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgage" means, collectively, the deeds of trust, trust deeds, debentures, deeds to secure debt and mortgages creating and evidencing a Lien on a Mortgaged Property made by any Loan Party in favor or for the benefit of the Collateral Agent on behalf of the Secured Parties substantially in the form of Exhibit L, and any other mortgages executed and delivered pursuant to Section 4.01(a)(ii) (if applicable), Section 6.10 and Section 6.12.

"Mortgage Policies" has the meaning specified in paragraph (f) of the definition of "Collateral and Guarantee Requirement".

"Mortgaged Properties" has the meaning specified in paragraph (f) of the definition of "Collateral and Guarantee Requirement".

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA, to which any Loan Party or any ERISA Affiliate makes or is obligated to make contributions, or during the immediately preceding six (6) years, has made or been obligated to make contributions.

"Multiply Margin Ratio" means, for any given calendar month, the ratio of total "Gross Profit" for the Multiply business to "Revenues" for the Multiply business, in each case as reported as "monthly total" items in the Monthly KPI Report for such calendar month.

"Necessary Cure Amount" has the meaning specified in Section 8.05.

"Net Proceeds" means, with respect to any event, the proceeds received on an after-tax basis in respect of such event in cash, including (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment or earn-out, but excluding any interest payments), but only as and when received, (ii) in the case of a Casualty Event, insurance proceeds, and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, minus the reasonable fees and out-of-pocket expenses paid by Holdings, the Borrower and the Guarantors in connection with such event.

"Note" means a promissory note made by the Borrower in favor of a Lender and its registered assigns evidencing Loans made by such Lender, in substantially the form of Exhibit B.

---

[2] To be four years and six months from the Closing Date.

"Obligations" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees and expenses that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees and expenses are allowed claims in such proceeding. Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents include the obligation (including guarantee obligations) to pay principal, interest, charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document.

"OFAC" means U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department or the U.S. Department of State.

"Organization Documents" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, declaration, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Connection Taxes" means, with respect to any Agent or Lender, Taxes imposed as a result of a present or former connection between such Agent or Lender and the jurisdiction imposing such Tax (other than connections arising from such Agent or Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced, any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary Taxes and any other property, intangible, mortgage recording or similar Taxes which arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than pursuant to an assignment request by the Borrower under Section 3.07).

"Outstanding Amount" means with respect to Loans on any date, the outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Loans (including any refinancing of outstanding Unreimbursed Amounts under Letters of Credit), as the case may be, occurring on such date.

"<u>Parent Entity</u>" means any Person that is a direct or indirect parent company (which may be organized as, among other things, a partnership) of Holdings and/or the Borrower, as applicable.

"<u>Participant</u>" has the meaning specified in <u>Section 10.07(e)</u>.

"<u>Participant Register</u>" has the meaning specified in <u>Section 10.07(e)</u>.

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation.

"<u>Pension Plan</u>" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA) other than a Multiemployer Plan, that is subject to Title IV of ERISA and in respect of which any Loan Party or any ERISA Affiliate of a Loan Party is (or, if such plan were terminated would under Section 4062 or Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"<u>Permitted Acquisition</u>" has the meaning specified in <u>Section 7.02(n)</u>.

"<u>Permitted Holder Group</u>" means any "group" (within the meaning of Rule 13d-5 of the Exchange Act) owning Equity Interests having the power to vote or direct the voting for the election of directors of Holdings if a majority of such Equity Interests owned by the group is owned by Permitted Holders.

"<u>Permitted Holders</u>" means any Person owning Equity Interests in Holdings on the Closing Date.

"<u>Permitted Refinancing Indebtedness</u>" means, with respect to any Indebtedness (the "<u>Refinanced Indebtedness</u>"), any Indebtedness Incurred in exchange for or as a replacement of (including by entering into alternative financing arrangements in respect of such exchange or replacement (in whole or in part), either by adding or replacing lenders, creditors, agents, borrowers and/or guarantors, or after the original instrument giving rise to such Indebtedness has been terminated and including, by entering into any new credit agreement, loan agreement, note purchase agreement, indenture or other agreement), or the net proceeds of which are Incurred for the purpose of modifying, extending, refinancing, renewing, replacing, redeeming, repurchasing, defeasing, amending, supplementing, restructuring, repaying or refunding (collectively to "<u>Refinance</u>" or a "<u>Refinancing</u>" or "<u>Refinanced</u>"), such Refinanced Indebtedness (or previous refinancing thereof constituting Permitted Refinancing Indebtedness); <u>provided</u> that (a) after giving effect to such Refinancing, the principal amount (or accreted value, if applicable) thereof will not exceed the principal amount (or accreted value, if applicable) of the Refinanced Indebtedness except by an amount equal to unpaid accrued interest and premium thereon, (b) other than with respect to a Refinancing in respect of Indebtedness permitted pursuant to <u>Section 7.03(f)</u>, such Permitted Refinancing Indebtedness has a Weighted Average Life to Maturity and maturity date that is equal to or greater than the Weighted Average Life to Maturity and maturity date of the Refinanced Indebtedness and such Permitted Refinancing Indebtedness does not contain any mandatory prepayment, redemption or other similar requirements that are in excess of those provided for under the applicable Refinanced Indebtedness unless such requirements are customary and on market terms for the nature of the subject Refinancing Indebtedness at the time of its Incurrence, (c) (i) if such Refinanced Indebtedness is unsecured, such Permitted

37

Refinancing Indebtedness shall be unsecured and (ii) if such Refinanced Indebtedness is secured, such Permitted Refinancing Indebtedness shall either be unsecured or secured by the same collateral, and with the same (or junior) lien priority, as exists with respect to the Refinanced Indebtedness, (d) each of the obligors with respect to such Permitted Refinancing Indebtedness are Guarantors, and each obligor with respect to such Permitted Refinancing Indebtedness was also an obligor with respect to the Refinanced Indebtedness, (e) no Default or Event of Default shall exist at the time of, or would result from, the Incurrence of such Permitted Refinancing Indebtedness, (f) is in compliance with the Financial Covenant, before and on a pro forma basis for the Incurrence of such Permitted Refinancing Indebtedness and (g) (i) to the extent such Refinanced Indebtedness is subordinated in right of payment to the Obligations, such Permitted Refinancing Indebtedness is subordinated in right of payment to the Obligations on terms at least as favorable to the Lenders, when taken as a whole, as those contained in the documentation governing the Indebtedness being so Refinanced and (ii) the terms and conditions (including, any financial covenants and, if applicable, as to collateral but excluding as to subordination, interest rates (including through fixed interest rates), interest rate margins, rate floors, fees, funding discounts, original issue discounts and redemption or prepayment terms and premiums) of any such Permitted Refinancing Indebtedness, taken as a whole, are not materially more restrictive on the Borrower and its Subsidiaries, when taken as a whole, than the terms and conditions of the Refinancing Indebtedness.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning assigned to such term in the recitals.

"PIK Interest" shall have the meaning assigned to such term  in Section 2.08(c)

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) other than a Foreign Plan or a Multiemployer Plan, established or maintained by any Loan Party.

"Plan Effective Date" has the meaning assigned to the term "Effective Date" in the Plan of Reorganization.

"Plan of Reorganization" shall mean the Pre-Petition Borrower's Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated [          ], 2017 (as amended, supplemented or otherwise modified from time to time), as approved pursuant to the Confirmation Order, in accordance with section 1129 of the Bankruptcy Code, as amended, supplemented or otherwise modified from time to time (whether any such further amendment, supplement or other modification is effected through an amendment, supplement or other modification to the Plan of Reorganization itself or through the Confirmation Order), so long as any such further amendment, supplement or other modification does not adversely affect the Lenders.

"Platform" has the meaning specified in Section 10.02(b)(i).

"Pre-Petition Borrower" has the meaning specified in the recitals.

"Pre-Petition First Lien Credit Agreement" has the meaning assigned thereto in the recitals.

"Pre-Petition Second Lien Credit Agreement" has the meaning assigned thereto in the recitals.

"Prepayment Event" means:

(a)  any sale, transfer or other disposition of any property or asset of the Borrower or any of its Subsidiaries permitted by Sections 7.05 (a), (i) , (k), (l), or (n);

(b)  the receipt by any Loan Party of the proceeds of any Casualty Event, loss of property or assets or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding;

(c)  the incurrence by the Borrower or any of its Subsidiaries of any Indebtedness, other than Indebtedness permitted under Section 7.03; or

(d)  any sale, transfer or other disposition of any property or asset of the Borrower or any of its Subsidiaries permitted by Sections 7.05(o).

"Prepayment Premium" has the meaning assigned to such term in Section 2.09(a).

"Present Fair Saleable Value" means the amount that could be obtained by an independent willing seller from an independent willing buyer if the assets (both tangible and intangible) of the applicable Person and its subsidiaries taken as a whole are sold on a going-concern basis with reasonable promptness in an arm's-length transaction under present conditions for the sale of comparable business enterprises insofar as such conditions can be reasonably evaluated.

"Prime Rate" means the rate of interest per annum announced from time to time by Credit Suisse (or any successor to Credit Suisse in its capacity as Administrative Agent) as its prime commercial lending rate in effect at its principal office in New York City.  The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer.

"Pro Rata Share" means, with respect to each Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Commitments of such Lender under the Second Lien Term Facility at such time and the denominator of which is the amount of the Aggregate Commitments under the Second Lien Term Facility at such time.

"Public Lender" has the meaning specified in Section 10.02(b)(i).

"Qualified Equity Interests" means any Equity Interests that are not Disqualified Equity Interests.

"Refinance, Refinanced and Refinancing" each has the meaning specified in the definition of the term "Permitted Refinancing Indebtedness".

"Refinanced Indebtedness" has the meaning specified in the definition of the term "Permitted Refinancing Indebtedness".

"Register" has the meaning specified in Section 10.07(d).

"Release" means any release, spill, leak, discharge, abandonment, disposal, pumping, pouring, emitting, emptying, injecting, leaching, dumping, depositing, dispersing, allowing to escape or migrate into or otherwise enter the environment (including ambient air, surface water, groundwater, wetlands, land, surface, and subsurface strata or within any building, structure, facility or fixture, subject in each case, to human occupation) of any Hazardous Materials.

"Reportable Event" means, with respect to any Plan, any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived.

"Required Lenders" means, as of any date of determination, Lenders having outstanding Loans and unused Commitments representing more than 50% of the sum of the aggregate outstanding Loans and unused Commitments at such time.

"Responsible Officer" means the chief executive officer, president, vice president, chief financial officer, treasurer or assistant treasurer or other similar officer of a Loan Party and, as to any document delivered on the Closing Date, any secretary or assistant secretary of a Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest in the Borrower or Holdings, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest of the Borrower or Holdings.

"Restructuring Support Agreement" means that certain Amended and Restated Restructuring Support Agreement, dated as of January 30, 2017 (as amended, to the extent permitted hereunder) by and among (a) the Pre-Petition Borrower, (b) Holdings, (c) all of the Pre-Petition Borrower's direct and indirect subsidiaries, (d) the holders of claims under the Existing First Lien Credit Agreement party thereto, (e) the holders of claims under the Existing Second Lien Credit Agreement party thereto, and (f) Clarity Holdco, L.P., a Delaware limited partnership, and Clarity GP, LLC, a Delaware limited liability company (solely in their capacity as holders of direct and/or indirect existing equity interests in the Debtors).

"S&P" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business, and any successor thereto.

40

"<u>Sale Leaseback</u>" means any transaction or series of related transactions pursuant to which the Borrower or any of its Subsidiaries (a) sells, transfers or otherwise Disposes of any property, real or personal, whether now owned or hereafter acquired, and (b) as part of such transaction, thereafter rents or leases such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold, transferred or Disposed.

"<u>SEC</u>" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"<u>Second Lien Obligations</u>" means (i) the Obligations and (ii) any other Indebtedness that is secured by Liens on the Collateral that rank on an equal priority basis (but without regard to the control of remedies) with the Liens on the Collateral securing the Obligations.

"<u>Second Lien Term Facility</u>" shall have the meaning provided in the recitals of this Agreement.

"<u>Section 6.01 Financials</u>" means the financial statements delivered, or required to be delivered, pursuant to <u>Section 6.01</u> together with the Compliance Certificate.

"<u>Secured Leverage Ratio</u>" means, as of any date of determination, the ratio of (a) the sum of (x) the principal amount of Indebtedness hereunder, (y) the principal amount of Indebtedness under the First Lien Credit Documents and (z) the principal amount of any Refinancing of any Indebtedness under clauses (x) and (y), in each case, as of the last day of the Test Period most recently ended on or prior to the date of determination to (b) Consolidated EBITDA for such Test Period.

"<u>Secured Parties</u>" means, collectively, the Administrative Agent, the Collateral Agent and each Lender, in each case with respect to the Facilities, and each sub-agent pursuant to <u>Section 9.01(c)</u> appointed by the Administrative Agent with respect to matters relating to the Facilities or the Collateral Agent with respect to matters relating to any Collateral Document.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"<u>Security Agreement</u>" means, collectively, (a) the Security Agreement executed by certain Loan Parties substantially in the form of <u>Exhibit F</u> and (b) each Security Agreement Supplement executed and delivered pursuant to <u>Section 6.10</u>.

"<u>Security Agreement Supplement</u>" has the meaning specified in the applicable Security Agreement.

"<u>Sold Entity or Business</u>" has the meaning specified in the definition of the term "Consolidated EBITDA."

"<u>Solvent</u>" means, with respect to any Person, at any date, that (a) the sum of such Person's debts (including contingent liabilities) do not exceed the Present Fair Saleable Value of such Person's present assets, (b) such Person's capital is not unreasonably small in relation to its

business as contemplated on such date and (c) such Person has not incurred and does not intend to incur, or believe that it will incur, debts (including current obligations) beyond its ability to pay such debts as they become due (whether at maturity or otherwise).  For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"SPC" has the meaning specified in Section 10.07(h).

"Specified Transaction" means, with respect to any period (including any period prior to the Closing Date), any Investment, Disposition, Incurrence of Indebtedness, Refinancing, prepayment or repayment of Indebtedness, Restricted Payment, restructuring, other strategic initiative (including cost saving initiative) or other action of the Borrower or any of its Subsidiaries after the Closing Date or other event that by the terms of the Loan Documents requires "pro forma compliance" with a test, ratio or covenant hereunder or requires such test or covenant to be calculated on a "pro forma basis" or after giving "pro forma effect" thereto, other than, for the avoidance of doubt, any such action or other event that constitutes a "Transaction" as set forth in the definition thereof.

"Statutory Reserves" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the FRB and any other banking authority, domestic or foreign, to which the Administrative Agent or any Lender (including any branch, Affiliate, or other fronting office making or holding a Loan) is subject for Eurocurrency Liabilities (as defined in Regulation D of the Board).  Eurodollar Loans shall be deemed to constitute Eurocurrency Liabilities (as defined in Regulation D of the Board) and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D.  Statutory Reserves shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subordinated Debt" means Indebtedness for borrowed money Incurred by a Loan Party that is subordinated in right of payment to the prior payment of the Obligations of such Loan Party under the Loan Documents.

"Subordinated Intercompany Note" means the Subordinated Intercompany Note, dated as of the Closing Date, substantially in the form of Exhibit K executed by Holdings, the Borrower and each other Subsidiary of the Borrower.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise

42

controlled, directly or indirectly, through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Subsidiary Guarantor" means, collectively, the Subsidiaries of the Borrower that are Guarantors.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark to market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Taxes" means all present or future taxes, duties, levies, imposts, deductions, assessments, fees, withholdings (including backup withholding) or similar charges and all liabilities (including additions to tax, penalties and interest) with respect thereto.

"Term Loan Repayment Amount" has the meaning specified in Section 2.07(a).

"Test Period" means, at any date of determination, the most recently completed four consecutive fiscal quarters of the Borrower ending on or prior to such date for which Section 6.01 Financials have been delivered; provided that prior to the first date the Section 6.01 Financials have been delivered, the Test Period in effect shall be the period of four consecutive fiscal quarters of the Borrower ended December 31, 2016. A Test Period may be designated by reference to the last day thereof (i.e. the December 31, 2016 Test Period refers to the period of four consecutive fiscal quarters of the Borrower ended December 31, 2016), and a Test Period shall be deemed to end on the last day thereof.

"Threshold Amount" means $1,150,000.

"Transaction Expenses" means any fees, costs or expenses Incurred or payable by Holdings, the Borrower, or any of their Subsidiaries in connection with the Transactions, this Agreement and the other Loan Documents and the transactions contemplated hereby and thereby.

"Transactions" means, collectively, (a) the execution, delivery and performance by each Loan Party of the Loan Documents to which it is to be a party, the borrowing of Loans and the use of the proceeds thereof, (b) the entry into the First Lien Loan Documents and the making of the First Lien Loans on the Closing Date, (c) the repayment of all amounts due or outstanding under or in respect of and the termination of, the DIP Facility, (d) the payment of the Transaction Expenses, and (e) the consummation of the other transactions contemplated by the Plan of Reorganization as of the Plan Effective Date.

"Type" means as to any Loan, its nature as a Base Rate Loan or a Eurocurrency Loan.

"Unaudited Financial Statements" means the unaudited consolidated balance sheets and related statements of income and cash flows of Holdings and the Borrower, for each fiscal quarter ended after the most recent fiscal year covered by the Audited Financial Statements and at least forty-five (45) days before the Closing Date.

"Uniform Commercial Code" or "UCC" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"United States" and "U.S." mean the United States of America.

"Unreimbursed Amount" has the meaning specified in Section 2.03(b)(i).

"Unrestricted Cash" means the aggregate amount of unrestricted cash subject to the Collateral Agent's Liens and held at such time by the Loan Parties in accounts subject to Control Agreements to which the Collateral Agent is a party.

"U.S. Trustee" shall mean the office of the United States Trustee for the Southern District of New York.

"USA PATRIOT Act" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)), as amended or modified from time to time.

"Voting Stock" means, with respect to any Person, shares of such Person's Equity Interests having the right to vote for the election of members of the Board of Directors of such Person under ordinary circumstances.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment by (ii) the then outstanding principal amount of such Indebtedness.

"Wholly-Owned" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly-owned Subsidiaries of such Person.

"Withdrawal Liability" means the liability of a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Withholding Agent" means any Loan Party and the Administrative Agent.

Section 1.02    Other Interpretive Provisions. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a) In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(b) The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(c) (i)    The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(i)    Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(ii)    The term "including" is by way of example and not limitation.

(iii)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(d) Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

45

Section 1.03        Accounting Terms.

(a) All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

(b) [Reserved].

(c) [Reserved].

(d) Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under FASB Accounting Standards Codification 825-Financial Instruments, or any successor thereto (including pursuant to the FASB Accounting Standards Codification), to value any Indebtedness of the Borrower or any subsidiary at "fair value," as defined therein.

Section 1.04        Rounding. Any financial ratios required to be satisfied in order for a specific action to be permitted under this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding up if there is no nearest number).

Section 1.05        References to Agreements, Laws, Etc. Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are permitted by any Loan Document; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.06        Times of Day. Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.07        Timing of Payment or Performance. When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day.

46

Section 1.08      Currency Equivalents Generally.

(a)  For purposes of any determination under Section 6, Section 7 (other than Section 7.09) or Section 8 or any determination under any other provision of this Agreement requiring the use of a current exchange rate, all amounts Incurred, outstanding or proposed to be Incurred or outstanding in currencies other than Dollars shall be translated into Dollars at the Exchange Rate then in effect on the date of such determination; provided, however, that (x) for purposes of determining compliance with Section 7 with respect to the amount of any Indebtedness, Investment, Disposition, Restricted Payment or payment under Section 7.08 in a currency other than Dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Indebtedness or Investment is Incurred or Disposition, Restricted Payment or payment under Section 7.08 is made, (y) for purposes of determining compliance with any Dollar-denominated restriction on the Incurrence of Indebtedness, if such Indebtedness is Incurred to refinance other Indebtedness denominated in a foreign currency, and such Refinancing would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency Exchange Rate in effect on the date of such Refinancing, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinanced Indebtedness does not exceed the principal amount of such Indebtedness being Refinanced except by an amount equal to unpaid accrued interest and premium thereon plus other reasonable amounts paid, and fees and expenses reasonably Incurred, in connection with such Refinancing and (z) for the avoidance of doubt, the foregoing provisions of this Section 1.08 shall otherwise apply to such Sections, including with respect to determining whether any Indebtedness or Investment may be Incurred or Disposition, Restricted Payment or payment under Section 7.08 may be made at any time under such Sections.  For purposes of Section 7.09, amounts in currencies other than Dollars shall be translated into Dollars at the applicable Exchange Rates used in preparing the most recently delivered Section 6.01 Financials on or prior to such date.

Section 1.09      [Reserved].

Section 1.10      Pro Forma and Other Calculations.

(a)  Notwithstanding anything to the contrary herein, financial ratios and tests (including measurements of the Secured Leverage Ratio) shall be calculated in the manner prescribed by this Section 1.10.  In addition, whenever a financial ratio or test is to be calculated on a pro forma basis or requires pro forma compliance, the reference to "Test Period" for purposes of calculating such financial ratio or test shall be deemed to be a reference to, and shall be based on, the most recently ended Test Period for which Section 6.01 Financials have been delivered.

(b)  For purposes of calculating any financial ratio or test (including Consolidated EBITDA), Specified Transactions (with any Incurrence or Refinancing of any Indebtedness in connection therewith to be subject to clause (c) of this Section 1.10) that have been made (i) during the applicable Test Period or (ii) subsequent to

such Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made shall be calculated on a <u>pro forma</u> basis assuming that all such Specified Transactions (and any increase or decrease in Consolidated EBITDA and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day of the applicable Test Period.  If since the beginning of any applicable Test Period any Person was merged, amalgamated or consolidated with or into the Borrower or any Subsidiary since the beginning of such Test Period shall have made any Specified Transaction that would have required adjustment pursuant to this <u>Section 1.10</u>, then such financial ratio or test (including Consolidated EBITDA) shall be calculated to give pro forma effect thereto in accordance with this <u>Section 1.10</u>.

(c)  In the event that the Borrower or any Subsidiary Incurs (including by assumption or guarantee) or Refinances (including by redemption, repurchase, repayment, retirement or extinguishment) any Indebtedness (other than Indebtedness Incurred or Refinanced under any revolving credit facility or line of credit unless such Indebtedness has been permanently repaid and not replaced), in each case included in the calculations of any financial ratio or test, (i) during the applicable Test Period or (ii) subsequent to the end of the applicable Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, then such financial ratio or test shall be calculated giving pro forma effect to such Incurrence or Refinancing of Indebtedness, in each case to the extent required, as if the same had occurred on the last day of the applicable Test Period.

(d)  If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the date of the event for which the calculation is made had been the applicable rate for the entire period (taking into account any interest Swap Contracts applicable to such Indebtedness).  Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by an Authorized Officer of the Borrower to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.  Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen as the Borrower or applicable Subsidiary may designate. For purposes of making the computations referred to above, interest on any Indebtedness under a revolving credit facility computed on a <u>pro forma</u> basis shall be computed based upon the average daily balance of such Indebtedness during the applicable period.

48

# ARTICLE II

## THE LOANS

Section 2.01        The Loans

(a)  Subject to the terms and conditions set forth herein and to give effect to the conversion of the First Lien Claims into Loans, each Lender severally agrees to make and shall be deemed to have made, on the Closing Date, a term loan denominated in Dollars to the Borrowers (each such loan, a "Converted Loan") in a principal amount equal to its pro rata percentage of $[___ ] based on such Lender's pro rata share of the allowed First Lien Claims set forth in Schedule 2.01. The principal amount of the Converted Loan of each Lender as of the Closing Date is set forth in Schedule 2.01. The Converted Loans deemed made pursuant this Section 2.01(a) shall be made without any actual funding. After giving effect to this Section 2.01(a), the aggregate principal amount of the Converted Loans on the Closing Date shall be $[          ].  Any Converted Loan shall be considered a "Loan" for all purposes hereunder.

(b)  Any Loans borrowed and subsequently repaid or prepaid, in whole or in part, may not be reborrowed.

Section 2.02        Borrowings, Conversions and Continuations of Loans.

(a)  Each Borrowing and each continuation of Eurocurrency Rate Loans shall be made upon the Borrower's notice (which shall be revocable for a Borrowing so long as the Borrower agrees to comply with the applicable provisions of Section 3.05 upon any such revocation) to the Administrative Agent, which may be given by telephone. Each such notice must be received by the Administrative Agent not later than 1:00 p.m. (i) three (3) Business Days prior to the requested date of any Borrowing or continuation of Eurocurrency Rate Loans or any conversion of Base Rate Loans to Eurocurrency Rate Loans, as applicable, and (ii) one (1) Business Day before the requested date of any Borrowing of Base Rate Loans or any conversion of Eurocurrency Rate Loans to Base Rate Loans, as applicable; provided that notwithstanding the foregoing, notice must only be given by 1:00 p.m. on the date of Borrowing in the case of any Borrowing on the Closing Date. Each telephonic notice by the Borrower pursuant to this Section 2.02(a) must be confirmed promptly by delivery to the Administrative Agent of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower. Each Borrowing of, conversion to or continuation of Eurocurrency Rate Loans shall be in a principal amount of $3,000,000 or greater.  Each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $3,000,000 or greater.  Each Committed Loan Notice (whether telephonic or written) shall specify (i) whether the Borrower is requesting a Borrowing, a conversion of Loans from one Type to the other, or a continuation of Eurocurrency Rate Loans, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) the Type

49

of Loans to be borrowed or to which existing Loans are to be converted, and (v) if applicable, the duration of the Interest Period with respect thereto. If the Borrower fails to specify a Type of Loan in a Committed Loan Notice, then the applicable Loans shall be made as Eurocurrency Rate Loans with an Interest Period of one month.  If the Borrower fails to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made as the same Type of Loan, and if applicable, with the same Interest Period, as such Loans.  If the Borrower requests a Borrowing of, conversion to, or continuation of Eurocurrency Rate Loans in any such Committed Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one (1) month. For the avoidance of doubt, the Borrower and Lenders acknowledge and agree that any conversion or continuation of an existing Loan shall be deemed to be a continuation of that Loan with a converted interest rate methodology and not a new Loan.

(b) Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share of the Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Lender of the details of such Loans as described in Section 2.02(a). In the case of each Borrowing, each Lender shall make (or cause its Applicable Lending Office to make) the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Committed Loan Notice; provided that on the Closing Date, such funds may be made available at such earlier time as may be agreed among the relevant Lenders, the Borrower and the Administrative Agent for the purpose of consummating the Transactions. Upon satisfaction of the applicable conditions set forth in Section 4.01), the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent either by (i) crediting the account of the Borrower on the books of the Administrative Agent with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to the Administrative Agent by the Borrower.

(c) Except as otherwise provided herein, a Eurocurrency Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurocurrency Rate Loan, unless the Borrower pays the amount due, if any, under Section 3.05 in connection therewith. During the existence of an Event of Default, the Administrative Agent or the Required Lenders may require that no Loans may be converted to or continued as Eurocurrency Rate Loans.

(d) The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for Eurocurrency Rate Loans upon determination of such rate. The determination of the Eurocurrency Rate by the Administrative Agent shall be conclusive in the absence of manifest error.

(e) Borrowings of more than one Type may be outstanding at the same time; provided that there shall not at any time be more than a total of four (4) Eurocurrency Borrowings outstanding.

Section 2.03      [Reserved].

Section 2.04      [Reserved].

Section 2.05      Prepayments.

(a) Optional Prepayments. Subject to Section 2.09(a), the Borrower may, upon notice to the Administrative Agent, at any time or from time to time voluntarily prepay Loans in whole or in part without premium or penalty; provided that (1) such notice must be received by the Administrative Agent not later than 1:00 p.m. (A) three (3) Business Days prior to any date of prepayment of Eurocurrency Rate Loans and (B) on the date of prepayment of Base Rate Loans; (2) any prepayment of Eurocurrency Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof; and (3) any prepayment of Base Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $100,000 in excess thereof or, in the case of each of clauses (2) and (3), the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment and the Type(s) of Loans to be prepaid. The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share of such prepayment.  Any prepayment of a Loan shall be accompanied by all accrued interest thereon, and any prepayment of a Eurocurrency Rate Loan shall be accompanied by any additional amounts required pursuant to Section 3.05.  Each prepayment of the Loans pursuant to this Section 2.05(a) shall be paid to the Lenders in accordance with Section 8.04.  At the Borrower's election in connection with any prepayment pursuant to this Section 2.05(a), such prepayment shall not be applied to any Loan of a Defaulting Lender.

(b) Mandatory Prepayments.

(i)      Subject to Section 2.05(e), in the event and on each occasion that any Net Proceeds are received by or on behalf of Holdings, the Borrower or any Subsidiary in respect of any Prepayment Event, due to a single transaction or a related series of transactions, exceed $1,000,000 and the Secured Leverage Ratio is greater than 6.3:1.00, the Borrower shall, within two (2) Business Days after such Net Proceeds are received (or, in the case of a Prepayment Event described in clause (c) of the definition of the term "Prepayment Event," on the date of such Prepayment Event), prepay Borrowings in an aggregate amount equal to 100% of the amount of such Net Proceeds (or to the extent the aggregate Net Proceeds exceed $50,000,000, (x) in the case of a Prepayment Event described in clauses (a) or (b) of such definition, 50% of such excess Net Proceeds and (y) in the case of a Prepayment Event described in clause (d) of such definition, 100% of such excess Net Proceeds) of the amount of such Net Proceeds; provided that (i) any Net Proceeds in respect of a Prepayment Event described in clause (a) of the definition of the term "Prepayment Event" shall not be required to be so applied to the extent that (A) such Net Proceeds are deposited with the L/C Issuer (as defined in the First Lien Credit Agreement) as cash collateral, in an aggregate

51

amount not to exceed 105% of the L/C Obligation at such time, or (B) in the case of aggregate Net Proceeds less than $50,000,000, the Borrower invests such Net Proceeds in new or existing properties or assets used in the Loan Parties' business and constituting Collateral hereunder, within 90 days after such Net Proceeds are received (but in no event later than the Maturity Date); and (ii) any Net Proceeds in respect of a Prepayment Event described in clause (b) of the definition of the term "Prepayment Event" in an aggregate amount not to exceed $50,000,000 shall not be required to be so applied to the extent that the Borrower invests such Net Proceeds to repair or replace the assets for which such proceeds were received, to the extent constituting Collateral hereunder, within 90 days after such Net Proceeds are received (but in no event later than the Maturity Date). In the event and on each occasion that any Net Proceeds are received by or on behalf of Holdings, the Borrower or any Subsidiary in respect of any Prepayment Event and the Secured Leverage Ratio is less than or equal to 6.3:1.00, the Borrower may reinvest, or, in the case of a Subsidiary, cause to be reinvested, all or any portion of such Net Proceeds in its business within (x) twelve (12) months following receipt of such Net Proceeds or (y) if the Borrower enters into a legally binding commitment to reinvest such Net Proceeds within twelve (12) months following receipt thereof, within the later of (1) twelve (12) months following receipt thereof or (2) one hundred and eighty (180) days of the date of such legally binding commitment; provided that if any Net Cash Proceeds are not so reinvested by the deadline specified in clause (x) or (y) above, as applicable, an amount equal to the Net Proceeds shall be offered to the prepayment of the Loans as set forth in this Section 2.05(b).

(ii)    Subject to Section 2.05(e), the Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Loans required to be made pursuant to clause (i) of this Section 2.05(b) at least three (3) Business Days prior to 1:00 p.m. on the date of such prepayment. The Administrative Agent will promptly notify each Lender of the contents of the Borrower's prepayment notice and of such Lender's portion of each such prepayment pursuant to Section 8.04. Each Lender may reject all or a portion of any mandatory prepayment owed to such Lender (such declined amounts, the "Declined Proceeds") of Loans required to be made pursuant to clauses (i) and (ii), of this Section 2.05(b) by providing written notice (each, a "Rejection Notice") to the Administrative Agent and the Borrower no later than 9:00 a.m. one (1) Business Day after the date of such Lender's receipt of notice from the Administrative Agent regarding such prepayment. Each Rejection Notice from a given Lender shall specify the principal amount of the mandatory prepayment of Loans to be rejected by such Lender. If a Lender fails to deliver a Rejection Notice to the Administrative Agent within the time frame specified above or such Rejection Notice fails to specify the principal amount of the Loans to be rejected, any such failure will be deemed an acceptance of the total amount of such mandatory repayment of the Loans. Any Declined Proceeds shall be returned to and be permitted to be retained by the Borrower.

(c)  Interest, Funding Losses, Etc. All prepayments under this Section 2.05 shall be accompanied by all accrued interest thereon, together with, in the case of any such prepayment of a Eurocurrency Rate Loan on a date other than the last day of an Interest Period therefor, any amounts owing in respect of such Eurocurrency Rate Loan pursuant to Section 3.05.

(d)  All prepayments of the Loans under this Section 2.05 shall be applied to the principal repayment installments thereof set forth in Section 2.07 in inverse chronological order.

(e)  Except as otherwise set forth herein, no prepayment of Loans shall be required or permitted to be made pursuant to this Section 2.05 if there are any Loans or commitments outstanding under the First Lien Credit Agreement except to the extent expressly permitted or required thereunder.

Section 2.06    Termination of Commitments.  The Commitments shall terminate on the Maturity Date.

Section 2.07    Repayment of Loans.

(a)    Subject to adjustment as a result of the application of prepayments in accordance with Section 2.05, in each case, solely to the extent of any such amounts applied to the prepayment of the Second Lien Term Loans, the Borrower shall repay to the Administrative Agent for the ratable account of the Second Lien Term Lenders on each date set forth below in the principal amount (each amount, a "Term Loan Repayment Amount") equal to (x) the outstanding principal amount of Second Lien Term Loans made to the Borrower on the Closing Date multiplied by (y) the percentage set forth below opposite such date (and with a final installment due on the Maturity Date in an amount equal to the remaining unpaid principal balance of the Second Lien Term Loans); provided that if such day is not a Business Day, such payments shall be made on the immediately preceding Business Day:

| Date | Term Loan Repayment Amount |
|---|---|
| June 30, 2017 ................................... | 0.25% |
| September 30, 2017............................ | 0.25% |
| December 31, 2017 ............................ | 0.25% |
| March 31, 2018 ................................. | 0.25% |
| June 30, 2018 ................................... | 0.25% |
| September 30, 2018............................ | 0.25% |
| December 31, 2018 ............................ | 0.25% |
| March 31, 2019 ................................. | 0.25% |
| June 30, 2019 ................................... | 0.25% |
| September 30, 2019............................ | 0.25% |
| December 31, 2019 ............................ | 0.25% |
| March 31, 2020 ................................. | 0.25% |
| June 30, 2020 ................................... | 0.25% |
| September 30, 2020............................ | 0.25% |

53

| Date | Term Loan Repayment Amount |
|------|---------------------------|
| December 31, 2020 ........................... | 0.25% |
| March 31, 2021 ................................ | 0.25% |
| Maturity Date .................................... | Remaining unpaid principal balance of the Second Lien Term Loans |

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)     The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)     The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be conclusive evidence, absent manifest error, of the existence and amounts of the obligations recorded therein, provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to pay any amounts due hereunder in accordance with the terms of this Agreement. In the event of any inconsistency between the entries made pursuant to paragraphs (b) and (c) of this Section, the accounts maintained by the Administrative Agent pursuant to paragraph (c) of this Section shall control.

(e)     Any Lender may request through the Administrative Agent that Loans made by it be evidenced by a Note.  In such event, the Borrower shall execute and deliver to such Lender a Note payable to such Lender and its registered assigns and in a form provided by the Administrative Agent and approved by the Borrower.

Section 2.08     Interest.

(a)  Subject to the provisions of Section 2.08(b), (i) each Eurocurrency Rate Loan shall bear interest on the Outstanding Amount thereof for each Interest Period at a rate per annum equal to the Adjusted Eurocurrency Rate for such Interest Period plus the Applicable Rate for Eurocurrency Loans then in effect for Eurocurrency Loans and (ii) each Base Rate Loan shall bear interest on the Outstanding Amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate then in effect for Base Rate Loans.

(b)  After the occurrence and during the continuance of an Event of Default, the Borrower shall pay interest on the Outstanding Amount hereunder (plus any past due amounts not constituting principal) at a fluctuating interest rate per annum at all

54

times equal to the Default Rate to the fullest extent permitted by applicable Laws. Accrued and unpaid interest on any amounts outstanding (including interest on past due interest) shall be due and payable upon demand.

(c)  Interest on each Loan shall be due and payable in arrears and in cash on each Interest Payment Date applicable thereto and at such other times as may be specified herein; provided that, any interest on each Loan in excess of the Cash Pay Interest Rate Cap shall be payable not in cash but in kind (all interest paid in kind, "PIK Interest") by adding the amount of such PIK Interest to the outstanding principal amount of such Loan on the applicable Interest Payment Date; provided further, that in the case of any prepayment or repayment of the principal amount of any Loans, including on the Maturity Date, all accrued and unpaid interest on the principal amount prepaid or repaid shall be payable in cash. The PIK Interest in respect of the Loans shall, upon being so added to principal on the relevant Interest Payment Date, become part of the principal of the Loans and shall accrue interest as provided herein. Notwithstanding anything in this Section 2.08(c) to the contrary, the Borrower may, in its sole discretion, on any Interest Payment Date, pay all or any portion of the PIK Interest on any Loan  in cash.

(d)  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

Section 2.09    Additional Payments.

(a)  Prepayment Premium. In the event that all or any portion of the Loans are repaid or prepaid for any reason (including as a result of any voluntary prepayments, payments made following acceleration of the Loans or after an Event of Default) prior to the first anniversary of the Closing Date, such repayments or prepayments will be made at 101.0% of the amount repaid or prepaid, if such repayment or prepayment occurs on or prior to the first anniversary of the Closing Date, (the foregoing premiums, the "Prepayment Premium"); provided that the Prepayment Premium shall not apply to (x) mandatory prepayments by Borrower pursuant to Section 2.05(b) or (y) the Term Loan Repayment Amounts made by the Borrower pursuant to Section 2.07, in each case, unless such payments have been made following acceleration of the Loans or after an Event of Default.

(b)  Other Payments. The Borrower shall pay to the Administrative Agent such payments and fees as shall have been separately agreed (including pursuant to the Fee Letter) upon in writing in the amounts and at the times so specified. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the applicable Agent).

Section 2.10    Computation of Interest, Fees, and Other Payments. All computations of interest on Base Rate Loans shall be made on the basis of a year of three hundred and sixty-five (365) days or three hundred and sixty-six (366) days, as the case may be, and actual days elapsed.  All other computations of fees, interest, and other payments shall be

55

made on the basis of a three hundred and sixty (360) day year and actual days elapsed. Interest shall accrue on each Loan for the day on which such Loan is made, and shall not accrue on such Loan, or any portion thereof, for the day on which such Loan or such portion is paid; provided that any such Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one (1) day. Each determination by the Administrative Agent of an interest rate or fee or other payment hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.11    Evidence of Indebtedness.

(a)  The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for purposes of Treasury Regulation Section 5f.103-1(c), as agent for the Borrower, in each case in the ordinary course of business. The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive evidence absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note payable to such Lender and its registered assigns, which shall evidence such Lender's Loans in addition to such accounts or records. Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount, maturity and currency of its Loans and payments with respect thereto.

(b)  In addition to the accounts and records referred to in Section 2.11(c), each Lender and the Administrative Agent shall maintain in accordance with its usual practice accounts or records and, in the case of the Administrative Agent, entries in the Register, evidencing the purchases and sales by such Lender of participations in Letters of Credit. In the event of any conflict between the accounts and records maintained by the Administrative Agent and the accounts and records of any Lender in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

(c)  Entries made in good faith by the Administrative Agent in the Register pursuant to Section 2.11(a) and (b), and by each Lender in its account or accounts pursuant to Section 2.11(a) and (b), shall be conclusive evidence, absent manifest error, of the amount of principal and interest due and payable or to become account or accounts, such Lender, under this Agreement and the other Loan Documents; provided that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or

56

accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement and the other Loan Documents.

Section 2.12    Payments Generally.

(a)  All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office and in immediately available funds not later than 2:00 p.m. on the date specified herein or such later time as the Administrative Agent may otherwise determine in its reasonable discretion. The Administrative Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Applicable Lending Office. Unless otherwise agreed by the Administrative Agent, all payments received by the Administrative Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)  If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be; provided that if such extension would cause payment of interest on or principal of Eurocurrency Rate Loans to be made in the next succeeding calendar month, such payment shall be made on the immediately preceding Business Day.

(c)  Unless the Borrower or any Lender has notified the Administrative Agent, prior to the date any payment is required to be made by it to the Administrative Agent hereunder, that the Borrower or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that the Borrower or such Lender, as the case may be, has timely made such payment and may (but shall not be required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto. If and to the extent that such payment was not in fact made to the Administrative Agent in immediately available funds, then:

(i)       if the Borrower failed to make such payment, each Lender shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available to such Lender in immediately available funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender to the date such amount is repaid to the Administrative Agent in immediately available funds at the Federal Funds Rate; and

(ii)      if any Lender failed to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in immediately available funds, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to the

Borrower to the date such amount is recovered by the Administrative Agent (the "Compensation Period") at a rate per annum equal to the Federal Funds Rate. When such Lender makes payment to the Administrative Agent (together with all accrued interest thereon), then such payment amount (excluding the amount of any interest which may have accrued and been paid in respect of such late payment) shall constitute such Lender's Loan included in the applicable Borrowing. If such Lender does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent may make a demand therefor upon the Borrower, and the Borrower shall pay such amount to the Administrative Agent, together with interest thereon for the Compensation Period at a rate per annum equal to the rate of Lender from its obligation to fulfill its Commitment or to prejudice any rights which the Administrative Agent or the Borrower may have against any Lender as a result of any default by such Lender hereunder.

Notwithstanding anything to the contrary in this Section 2.12(c), the Administrative Agent shall have no obligation to make available any payments or corresponding amounts to any Persons prior to the Administrative Agent's receipt of such payments from any Borrower or Lender, as applicable.  A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this Section 2.12(c) shall be conclusive, absent manifest error.

(d) If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(e) The obligations of the Lenders hereunder to make Loans and to fund participations in Letters of Credit are several and not joint. The failure of any Lender to make any Loan or to fund any such participation on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or purchase its participation.

(f) Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(g) Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Administrative Agent and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative

58

Agent and the Lenders in the order of priority set forth in <u>Section 8.04</u>. If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may, but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's Pro Rata Share of the sum of the Outstanding Amount of all Loans outstanding at such time in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender.

Section 2.13    <u>Sharing of Payments</u>. If, other than as provided elsewhere in this Agreement, any Lender shall obtain on account of the Loans made by it, any payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share that it is owed (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) purchase from the other Lenders such participations in the Loans made by them, as shall be necessary to cause such purchasing Lender to share the excess payment in respect of such Loans or such participations, as the case may be, <u>pro</u> <u>rata</u> with each of them; <u>provided</u> that (x) if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in <u>Section 10.06</u> (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon, (y) the provisions of this <u>Section 2.13</u> shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant and (z) the provisions of this <u>Section 2.13</u> shall not be construed to apply to any disproportionate payment obtained by a Lender as a result of the extension by Lenders of the maturity date or expiration date of some but not all Loans or Commitments or any increase in the Applicable Rate (or other pricing term, including any fee, discount or premium) in respect of Loans or Commitments of Lenders that have consented to any such extension to the extent such transaction is permitted hereunder. The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this <u>Section 2.13</u> and will in each case notify the Lenders following any such purchases or repayments. Each Lender that purchases a participation pursuant to this <u>Section 2.13</u> shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

Section 2.14    <u>Defaulting Lenders</u>. Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then so long as such Lender is a Defaulting Lender, the Commitment and Outstanding Amount of Loans of such Defaulting Lender shall not be included in determining whether all Lenders or the Required

59

Lenders have taken or may take any action hereunder (including any consent to any amendment, waiver or other modification pursuant to Section 10.01); provided that any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender which affects such Defaulting Lender disproportionately when compared to the other affected Lenders, or increases or extends the Commitment of such Defaulting Lender, shall require the consent of such Defaulting Lender.

## ARTICLE III

### TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

Section 3.01    Taxes.

(a)  Except as required by Law, any and all payments by any Loan Party to or for the account of any Agent or any Lender under any Loan Document shall be made free and clear of and without deduction for any Taxes. If any applicable Withholding Agent shall be required by any Laws to deduct any Taxes from or in respect of any sum payable under any Loan Document to any Agent or any Lender (as determined in such Withholding Agent's good faith discretion), (i) if such Taxes are Indemnified Taxes, the sum payable by the applicable Loan Party shall be increased as necessary so that after all required deductions have been made (including deductions applicable to additional sums payable under this Section 3.01), each of such Agent and such Lender receives an amount equal to the sum such Agent or Lender would have received had no such deductions been made, (ii) such applicable Withholding Agent shall make such deductions, (iii) such applicable Withholding Agent shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Laws, and (iv) within thirty (30) days after the date of such payment by such applicable Withholding Agent to the relevant Governmental Authority (or, if receipts or evidence are not available within thirty (30) days, as soon as possible thereafter), such applicable Withholding Agent shall furnish to the Borrower and the Administrative Agent, as applicable, the original or a facsimile copy of a receipt evidencing payment thereof to the extent such a receipt is issued therefor, or other evidence of payment thereof that is reasonably satisfactory to the Administrative Agent.

(b)  In addition, the Loan Parties shall timely pay all Other Taxes to the relevant Governmental Authority in accordance with applicable Law, or at the option of the Administrative Agent in its sole discretion, timely reimburse it for the payment of any Other Taxes.

(c)  Without duplication of any amounts payable pursuant to Section 3.01(a) or Section 3.01(b), the Loan Parties shall jointly and severally indemnify each Agent and each Lender for (i) the full amount of Indemnified Taxes (including any Indemnified Taxes imposed or asserted by any jurisdiction on amounts payable under this Section 3.01) payable or paid by such Agent and such Lender or required to be withheld from a payment to such Agent or such Lender and (ii) any reasonable expenses arising therefrom or with respect thereto, in each case whether or not such

NAI-1502591911v5

Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf, shall be conclusive absent manifest error.  Payment under this Section 3.01(c) shall be made within ten (10) days after the date such Lender or such Agent makes a demand therefor.

(d)  If any Lender or Agent determines, in its sole and reasonable discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 3.01, it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 3.01 with respect to the Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses (including Taxes) of the Lender or Agent, as the case may be and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that such indemnifying party, upon the request of the Lender or Agent, as the case may be, shall repay to such Lender or Agent the amount paid over pursuant to this paragraph (d) (plus penalties, interest or other charges imposed by the applicable Governmental Authority) in the event such Lender or Agent, as the case may be, is required to repay such refund to the relevant Governmental Authority. Such Lender or Agent, as the case may be, shall, at the indemnifying party's request, provide the applicable indemnifying party with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant Governmental Authority (provided that such Lender or Agent may delete any information therein that such Lender or Agent reasonably deems confidential). This paragraph shall not be construed to oblige any Lender or Agent to make available its tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.  Notwithstanding anything to the contrary in this clause (d), in no event will an Agent or Lender be required to pay any amount to an indemnifying party pursuant to this clause (d) the payment of which would place such Agent or Lender in a less favorable net after-Tax position than such Agent or Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.

(e)  Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 3.01(a) or (c) with respect to such Lender it will, if requested by the Borrower, use commercially reasonable efforts (subject to legal and regulatory restrictions) to designate another Applicable Lending Office for any Loan affected by such event; provided that, in the judgment of such Lender, (i) such efforts are made on terms that cause such Lender and its Applicable Lending Office(s) to suffer no material economic, legal or regulatory disadvantage (including any unreimbursed costs or expenses) and would not otherwise be disadvantageous to such Lender, and (ii) such designation of another Applicable Lending Office would eliminate or reduce the amounts payable under Section 3.01(a) or (c); and provided, further, that nothing in this Section 3.01(e) shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Section 3.01(a) or (c). The Borrower shall

61

pay all costs and expenses incurred by any Lender in connection with any such designation or assignment.

(f)  Each Lender shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with any documentation prescribed by Law, or reasonably requested by the Borrower or the Administrative Agent, certifying as to any entitlement of such Lender to an exemption from, or reduction in, any withholding Tax with respect to any payments to be made to such Lender under any Loan Document. In addition, each Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Laws or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Each such Lender shall, whenever a lapse in time or change in circumstances renders such documentation (including any documentation specifically referenced below) expired, obsolete or inaccurate in any material respect, deliver promptly to the Borrower and the Administrative Agent updated or other appropriate documentation or promptly notify the Borrower and the Administrative Agent in writing of its inability to do so. Notwithstanding any other provision of this clause (f), a Lender shall not be required to deliver any form that such Lender is not legally eligible to deliver. Notwithstanding anything to the contrary in this clause (f), the completion, execution and submission of such documentation (other than such documentation set forth in clauses (f)(i), (f)(ii) and (g) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

Without limiting the generality of the foregoing:

(i)      Each Lender that is a "United States person" (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement two duly completed copies of Internal Revenue Service Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. federal backup withholding; and

(ii)     Each Lender that is not a "United States person" (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter when required by law or upon the reasonable request of the Borrower or the Administrative Agent) the following, as applicable:

(A)     two duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E (or any successor forms) claiming

eligibility for benefits of an income tax treaty to which the United States of America is a party,

(B)        two duly completed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(C)        in the case of a Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate, in substantially the form of Exhibit I-1 (any such certificate a "United States Tax Compliance Certificate"), or any other form approved by the Administrative Agent and the Borrower, to the effect that such Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of Holdings or the Borrower within the meaning of Section 881(c)(3)(B) of the Code or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code, and that no payments in connection with the Loan Documents are effectively connected with such Lender's conduct of a U.S. trade or business and (y) two duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E (or any successor forms), or

(D)        to the extent a Lender is not the beneficial owner (for example, where the Lender is a partnership, or is a Lender that has granted a participation), two duly completed copies of Internal Revenue Service Form W-8IMY (or any successor forms) of the Lender, accompanied by a Form W-8ECI, Form W-8BEN or W-8BEN-E (or any successor forms), United States Tax Compliance Certificate substantially in the form of Exhibit I-2 or Exhibit I-3 (as applicable), Form W-9, Form W-8IMY (or other successor forms) or any other required information from each beneficial owner, as applicable (provided that if the Lender is a partnership (and not a participating Lender) and one or more beneficial owners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate substantially in the form of Exhibit I-4 shall be provided by such Lender on behalf of such beneficial owner(s)).

(iii)        If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.

63

Solely for purposes of this clause (f)(iii), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(g) For the avoidance of doubt, the term "applicable Law" shall include FATCA.

Section 3.02    Illegality.

(a) If any Lender reasonably determines that due to any Change in Law after the Closing Date it is unlawful, or that any Governmental Authority that is a court, statutory board or commission has asserted that it is unlawful, for any Lender or its Applicable Lending Office to make, maintain or fund Eurocurrency Rate Loans, to determine or charge interest rates based upon the Adjusted Eurocurrency Rate as contemplated by this Agreement, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, in respect of Eurocurrency Rate Loans, (A) any obligation of such Lender to make or continue Eurocurrency Rate Loans or to convert Base Rate Loans to Eurocurrency Rate Loans, as applicable, shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist, (B) upon receipt of such notice, the Borrower shall upon demand from such Lender (with a copy to the Administrative Agent), prepay in the case of Eurocurrency Rate Loans, such Eurocurrency Rate Loans, that have become unlawful or, if applicable, convert all Eurocurrency Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurocurrency Rate Loans to such day, or promptly, if such Lender may not lawfully continue to maintain such Eurocurrency Rate Loans, (C) upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted and all amounts due, if any, in connection with such prepayment or conversion under Section 3.05.  Each Lender agrees to designate a different Applicable Lending Office if such designation will avoid the need for any such notice and will not, in the good faith judgment of such Lender, otherwise be materially disadvantageous to such Lender.

(b) If any provision of this Agreement or any of the other Loan Documents would obligate the Borrower to make any payment of interest or other amount payable to any Secured Party in an amount or calculated at a rate which would be prohibited by law, then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by applicable law.

Section 3.03    Inability to Determine Rates. If the Required Lenders determine that for any reason adequate and reasonable means do not exist for determining the Eurocurrency Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan, or that the Eurocurrency Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, or that Dollar deposits are not being offered to banks in the London interbank eurocurrency market for the applicable amount and the Interest Period of such

Eurocurrency Rate Loan, the Administrative Agent will promptly so notify the Borrower and each Lender. Thereafter, the obligation of the Lenders to make or maintain Eurocurrency Rate Loans shall be suspended until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurocurrency Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

Section 3.04    Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurocurrency Rate Loans.

(a) If any Lender determines that as a result of any Change in Law after the Closing Date, there shall be any actual increase in the cost to such Lender of agreeing to make or making, funding or maintaining any Eurocurrency Loan or issuing or participating in Letters of Credit, or a reduction in the amount received or receivable by such Lender in connection with any of the foregoing (excluding for purposes of this Section 3.04(a) any such increased costs or reduction in amount resulting from (i) Indemnified Taxes, (ii) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes, (iii) Connection Income Taxes or (iv) reserve requirements contemplated by Section 3.04(c)), then from time to time within fifteen (15) Business Days after demand by such Lender setting forth in reasonable detail such actual increased costs (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrower shall pay to such Lender such additional amounts as will compensate such actual Lender for such increased cost or reduction.

(b) If any Lender determines that as a result of a Change in Law regarding capital adequacy after the Closing Date, has the effect of reducing the actual rate of return on the capital of such Lender or any corporation controlling such Lender as a consequence of such Lender's obligations hereunder (taking into consideration its policies with respect to capital adequacy and such Lender's desired return on capital), then from time to time upon demand of such Lender setting forth in reasonable detail the charge and the calculation of such actual reduced rate of return (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such reduction within fifteen (15) days after receipt of such demand.

(c) The Borrower shall pay to each Lender, (i) as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits, additional interest on the unpaid principal amount of each Eurocurrency Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive, absent manifest error), and (ii) as long as such Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any other central banking or financial regulatory authority imposed in respect of the maintenance of the Commitments or the funding of the Eurocurrency Rate Loans, such actual additional costs (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five decimal places) equal to

65

the actual costs allocated to such Commitment or Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive absent manifest error) which in each case shall be due and payable on each date on which interest is payable on such Loan; provided the Borrower shall have received at least fifteen (15) days' prior notice (with a copy to the Administrative Agent) of such additional interest or cost from such Lender. If a Lender fails to give notice fifteen (15) days prior to the relevant Interest Payment Date, such additional interest or cost shall be due and payable fifteen (15) days after receipt of such notice.

(d)  Subject to Section 3.06(b), failure or delay on the part of any Lender to demand compensation pursuant to this Section 3.04 shall not constitute a waiver of such Lender's right to demand such compensation.

(e)  If any Lender requests compensation under this Section 3.04, then such Lender will, if requested by the Borrower, use commercially reasonable efforts to designate another Applicable Lending Office for any Loan affected by such event; provided that, in the judgment of such Lender, (i) such efforts are made on terms that cause such Lender and its Applicable Lending Office(s) to suffer no material economic, legal or regulatory disadvantage (including any unreimbursed costs or expenses) and would not otherwise be disadvantageous to such Lender, and (ii) such designation of another Applicable Lending Office would eliminate or reduce the amounts payable under Section 3.04 and provided, further, that nothing in this Section 3.04(e) shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Section 3.04(a), (b), (c) or (d).  The Borrower shall pay all costs and expenses incurred by any Lender in connection with any such designation or assignment.

Section 3.05      Funding Losses. Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any actual loss, cost or expense (but excluding, for the avoidance of doubt, any lost profits) incurred by it as a result of:

(a)  any continuation, conversion, payment or prepayment of any Eurocurrency Rate Loan on a day other than the last day of the Interest Period for such Loan; or

(b)  any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan (other than a Base Rate Loan) on the date or in the amount notified by the Borrower;

including any actual loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees actually paid to terminate the deposits from which such funds were obtained.

Section 3.06      Matters Applicable to All Requests for Compensation.

(a)    Any Agent or any Lender claiming compensation under this Article III shall deliver a certificate to the Borrower setting forth the additional amount or amounts

66

to be paid to it hereunder which shall be conclusive in the absence of manifest error. In determining such amount, such Agent or such Lender may use any reasonable averaging and attribution methods.

(b)    With respect to any Lender's claim for compensation under Section 3.02, Section 3.03 or Section 3.04, the Borrower shall not be required to compensate such Lender for any amount incurred more than one hundred and eighty (180) days prior to the date that such Lender becomes aware of the right to receive compensation; provided that if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof. If any Lender requests compensation by the Borrower under Section 3.04, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue Eurocurrency Rate Loans from one Interest Period to another, or to convert Base Rate Loans into Eurocurrency Rate Loans, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 3.06(c) shall be applicable); provided that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(c)    If the obligation of any Lender to make or continue any Eurocurrency Rate Loan from one Interest Period to another, or to convert Base Rate Loans into Eurocurrency Rate Loans, shall be suspended pursuant to Section 3.06(b) hereof, such Lender's Eurocurrency Rate Loans shall be automatically converted into Base Rate Loans on the last day(s) of the then current Interest Period(s) for such Eurocurrency Rate Loans (or, in the case of an immediate conversion required by Section 3.02, on such earlier date as required by Law) and, unless and until such Lender gives notice as provided below that the circumstances specified in Section 3.02, Section 3.03 or Section 3.04 hereof that gave rise to such conversion no longer exist:

(i)    to the extent that such Lender's Eurocurrency Rate Loans have been so converted, all payments and prepayments of principal that would otherwise be applied to such Lender's Eurocurrency Rate Loans shall be applied instead to its Base Rate Loans; and

(ii)    all Loans that would otherwise be made or continued from one Interest Period to another by such Lender as Eurocurrency Rate Loans shall be made or continued instead as Base Rate Loans, and all Base Rate Loans of such Lender that would otherwise be converted into Eurocurrency Rate Loans shall remain as Base Rate Loans.

(d)    If any Lender gives notice to the Borrower (with a copy to the Administrative Agent) that the circumstances specified in Section 3.02, Section 3.03 or Section 3.04 hereof that gave rise to the conversion of such Lender's Eurocurrency Rate Loans pursuant to this Section 3.06 no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Eurocurrency Rate Loans made by other Lenders are outstanding, such Lender's Base Rate Loans shall be automatically converted to Eurocurrency Rate Loans on the first day(s) of the next succeeding Interest Period(s) for such outstanding Eurocurrency Rate Loans to the extent

necessary so that, after giving effect thereto, all Loans held by the Lenders holding Eurocurrency Rate Loans and by such Lender are held pro rata (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Commitments.

Section 3.07    Replacement of Lenders under Certain Circumstances.

(a) If any Lender requests compensation under Section 3.04, or requires the Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or Section 3.04, as the case may be, in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b) If any Lender requests compensation under Section 3.04, or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01 and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with Section 3.07(a), or if Lender becomes a Defaulting Lender, then the Borrower may, on prior written notice to the Administrative Agent and such Lender, replace such Lender by requiring such Lender to (and such Lender shall be obligated to) assign pursuant to Section 10.07(b) (with the assignment fee to be waived by the Administrative Agent in such instance) all of its rights and obligations under this Agreement to one or more Eligible Assignees; provided that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender or other such Person; and provided, further, that in the case of any such assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable Eligible Assignees shall have agreed to the applicable departure, waiver or amendment of the Loan Documents.

(c) Any Lender being replaced pursuant to Section 3.07(a) above shall (i) execute and deliver an Assignment and Assumption with respect to such Lender's Commitment and outstanding Loans; provided that the failure of any such Lender to execute an Assignment and Assumption shall not render such assignment invalid and such assignment shall be recorded in the Register and (ii) deliver Notes, if any, evidencing such Loans to the Borrower or Administrative Agent. Pursuant to such Assignment and Assumption, (A) the assignee Lender shall acquire all or a portion, as the case may be, of the assigning Lender's Commitment and outstanding Loans, (B) all obligations of the Borrower owing to the assigning Lender relating to the Loans and participations so assigned shall be paid in full by the assignee Lender to such assigning Lender concurrently with such assignment and assumption, and any

68

amounts owing to the assigning Lender (other than a Defaulting Lender) under <u>Section 3.05</u> as a consequence of such assignment shall have been paid by the Borrower to the assigning Lender and (C) upon such payment and, if so requested by the assignee Lender, the assignor Lender shall deliver to the assignee Lender the appropriate Note or Notes executed by the Borrower, the assignee Lender shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans, Commitments and participations, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender.

(d) [Reserved].

(e) Notwithstanding anything herein to the contrary, each party hereto agrees that any assignment pursuant to the terms of this <u>Section 3.07</u> may be effected pursuant to an Assignment and Assumption executed by the Borrower, the Administrative Agent and the assignee and that the Lender making such assignment need not be a party thereto.

Section 3.08      <u>Survival</u>.  All of the Borrower's obligations under <u>Section 3.01</u>, <u>Section 3.04</u>, <u>Section 3.06</u> and <u>Section 3.07</u> shall survive termination of the Aggregate Commitments and repayment of all other Obligations hereunder.

## ARTICLE IV

## <u>CONDITIONS PRECEDENT TO CREDIT EXTENSIONS</u>

Section 4.01      <u>Conditions Precedent to Effectiveness and the Closing Date</u>. The obligation of each Lender to make its initial Credit Extension hereunder is subject to satisfaction of the following conditions precedent except as otherwise agreed between the Borrower and the Administrative Agent:

(a) The Administrative Agent's receipt of the following, each of which shall be originals or facsimiles (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party (except as provided in <u>Section 4.01(a)(iv)</u>):

(i)           executed counterparts of this Agreement and the Guaranty;

(ii)          each Collateral Document set forth on <u>Schedule 1.01A</u> required to be executed on the Closing Date as indicated on such schedule, duly executed by each Loan Party thereto, together with (except as provided in such Collateral Documents);

(A)       certificates, if any, representing the pledged equity referred to therein for Wholly-Owned Subsidiaries (other than Excluded Subsidiaries) organized under the laws of the U.S. and accompanied by undated stock powers executed in blank and instruments evidencing the pledged debt referred to therein endorsed in blank;

69

(B)      evidence that all financing statements (or equivalent) under the Uniform Commercial Code have been filed or are otherwise in a form appropriate for filing;

(iii)      certificates substantially in the form of Exhibit H for each Guarantor which attach (A) resolutions or other action documentation, (B) incumbency certificates, (C) Organizational Documents and (D) good standing certificates;

(iv)      an opinion from Kirkland & Ellis LLP, counsel to the Loan Parties in form and substance reasonably acceptable to the Administrative Agent; and

(v)      a Committed Loan Notice relating to the initial Credit Extensions.

(b)      The Administrative Agent and Lenders shall have received all fees and other amounts contemplated by the Loan Documents due and payable to the Administrative Agent or the Lenders on or prior to the Closing Date, including reimbursement or payment of all out-of-pocket expenses (including all reasonable fees, charges and disbursements of counsel and any financial advisor) required to be reimbursed or paid by any Loan Party and all fees and expenses required to be paid hereunder or pursuant to the Fee Letter.  In the case of expenses, such expenses shall have been invoiced at least one (1) Business Day prior to the Closing Date.

(c)  The Administrative Agent shall have received a Committed Loan Notice in accordance with the requirements hereof.

(d)  No Default or Event of Default shall exist or would result from the extension or deemed extension of the Loans or the First Lien Loans on the Closing Date.

(e)  The representations and warranties set forth in Article V shall be true and correct on and as of the Closing Date.

(f)  The Administrative Agent shall have received, at least three (3) Business Days prior to the Closing Date, all documentation and other information about the Loan Parties as shall have been reasonably requested by the Administrative Agent under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA Patriot Act.

(g) The Administrative Agent shall have received reasonably satisfactory evidence that the principal of and interest on, and all other amounts owing in respect of, all Indebtedness under the DIP Credit Facility, shall have been paid in full or have been deemed to continue hereunder, that any commitments to extend credit under the DIP Credit Facility shall have been cancelled or terminated and that all Guarantees in respect of, and all Liens securing, any such Indebtedness shall have been released (or

70

arrangements for such release satisfactory to the Administrative Agent and the Required Lenders shall have been made).

(h)  The Administrative Agent shall have received reasonably satisfactory evidence that the obligations under each of the Pre-Petition First Lien Credit Agreement and the Pre-Petition Second Lien Credit Agreement have been satisfied in the manner contemplated by the Plan of Reorganization and the Confirmation Order, together with a termination of security interest in intellectual property for each assignment for security recorded pursuant to the Pre-Petition First Lien Credit Agreement and the Pre-Petition Second Lien Credit Agreement, UCC-3 termination statements for all UCC-1 financing statements filed in connection with the Pre-Petition First Lien Credit Agreement and the Pre-Petition Second Lien Credit Agreement and covering any portion of the Collateral and termination of any control agreements covering any deposit account or security account subject to the Liens under the Pre-Petition First Lien Credit Agreement and the Pre-Petition Second Lien Credit Agreement.

(i)  The Administrative Agent shall have received reasonably satisfactory evidence that each of (i) the Plan of Reorganization, (ii) the Disclosure Statement and (iii) the Confirmation Order shall be satisfactory to the Required Lenders (and with respect to any provisions that affect the rights and duties of the Administrative Agent, the Administrative Agent).

(j)  The Confirmation Order shall have been entered in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, any applicable orders of the Bankruptcy Court and any applicable local rules.

(k)  The Confirmation Order shall be in full force and effect and shall not, without the consent of the Administrative Agent and the Required Lenders, have been stayed, reversed, modified or amended, shall not be subject to a motion to stay.

(l)  All conditions to the effectiveness of the Plan of Reorganization shall have been satisfied or waived (with any waiver thereof having been approved by the Required Lenders) and the Consummation of the Plan of Reorganization in accordance with its terms shall occur on the Closing Date, substantially simultaneously with the deemed making of the Loans pursuant to Section 2.01.

(m) The Administrative Agent shall be reasonably satisfied that, on the Closing Date, immediately after giving effect to the Consummation of the Plan of Reorganization, the making of the Loans on the Closing Date and any other transactions to occur on the Closing Date, the Loan Parties and their subsidiaries shall have outstanding no indebtedness other than Indebtedness outstanding under the Loan Documents, the First Lien Credit Agreement, Indebtedness set forth on Schedule 7.03(c) and any additional indebtedness on terms and conditions (including as to amount) satisfactory to the Required Lenders.

(n) The Administrative Agent shall have received a funds flow memorandum with respect to the transactions contemplated hereby on the Closing Date in form, scope and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.[3]

(o) The Administrative Agent and the Required Lenders shall be satisfied that since the Petition Date, there shall not have occurred any event, occurrence, development or state of circumstances or fact that has had or could reasonably be expected to have a Material Adverse Effect.

(p) The Administrative Agent shall have received such other assurances, certificates, documents, consents or opinions as the Administrative Agent or Required Lenders reasonably may require.

(q) Holdings shall have contributed, or caused to be contributed, the Exit Commitment Equity (as defined in the Plan of Reorganization) to the capital of the Pre-Petition Borrower, and the Pre-Petition Borrower shall have distributed the Exit Commitment Equity (as defined in the Plan of Reorganization) to the Lenders on the Closing Date pursuant to the Plan of Reorganization.

(r) The Administrative Agent shall have received reasonably satisfactory evidence that, after giving effect to the Transactions on the Closing, the Loan Parties will have a minimum of $15,000,000 of Unrestricted Cash on a consolidated basis.

(s) All corporate and judicial proceedings and all instruments and agreements in connection with the Transactions among the Loan Parties and the Lenders contemplated by the Loan Documents shall be satisfactory in form and substance to the Administrative Agent and the Lenders, and the Lenders shall have received all information and copies of all documents or papers reasonably requested by any of them.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

Holdings and the Borrower represent and warrant for themselves and on behalf of the Subsidiaries after giving effect to the Plan of Reorganization and the Confirmation Order to the Agents and the Lenders that:

Section 5.01    Existence, Qualification and Power; Compliance with Laws. Each Loan Party and each other Subsidiary (a) is a Person duly incorporated, organized or formed, and validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority to (i) own or lease its assets and carry on its business and (ii) in the case of each Loan Party, execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and in good standing under

---

[3] [NTD: timing of obligation to be discussed.]

the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all Laws, orders, writs, injunctions and orders and (e) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; except in each case referred to in clause (b)(i), (c), (d) or (e), to the extent that failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.02    Authorization; No Contravention. The Transactions to be entered into by each Loan Party have been duly authorized by all necessary corporate or other action and, if required, action by the holders of such Loan Party's Equity Interests.  The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, are within such Loan Party's corporate or other powers, have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) conflict with or contravene the terms of any of such Person's Organization Documents, (b) result in any breach or contravention of, or the creation of any Lien under (other than under the Loan Documents), or require any payment to be made under (i) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (c) violate any Law; except with respect to any conflict, breach or contravention or payment or violation (but not creation of Liens) referred to in clauses (b) or (c), to the extent that such conflict, breach, contravention or payment or violation could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Governmental Authorization; Other Consents. No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, or (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents or the perfection of the Liens created under the Collateral Documents, except for (i) filings necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties, and (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect.

Section 5.03    Binding Effect. Each Loan Party has duly executed and delivered each Loan Document to which it is a party and each such Loan Document constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party and upon entry of the Interim Order or the Final Order, will constitute, a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization and other similar laws relating to or affecting creditors' rights generally and by general principles of equity (whether considered in a proceeding in equity or law).

Section 5.04    Financial Statements; No Material Adverse Effect.

(a) The Unaudited Financial Statements fairly present in all material respects the financial condition of Holdings and the Borrower as of the dates thereof and its results of operations for the periods covered thereby in accordance with GAAP

73

consistently applied throughout the periods covered thereby, except (i) to the extent provided in the notes thereto subject, in the case of the Unaudited Financial Statements, to changes resulting from audit, normal year-end audit adjustments and to the absence of footnotes and (ii) as otherwise disclosed to the Administrative Agent prior to the Closing Date.

(b) Since the Closing Date, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

Each Lender and the Administrative Agent hereby acknowledges and agrees that the Borrower and its Subsidiaries may be required to restate historical financial statements as the result of the implementation of changes in GAAP or the interpretation thereof, and that such restatements will not result in a Default under the Loan Documents (including any effect on any conditions required to be satisfied on the Closing Date) to the extent that the restatements do not reveal any material omission, misstatement or other material inaccuracy in the reported information from actual results for any relevant prior period.

Section 5.05    Litigation. There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against the Borrower or any Subsidiary or against any of their properties or revenues that either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 5.06    Ownership of Property; Liens. Each Loan Party and each of its Subsidiaries has good and defensible title in fee simple to, or valid leasehold interests in, or easements or other limited property interests in, all property necessary in the ordinary conduct of its business, free and clear of all Liens except for minor defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes and Liens permitted under the Loan Documents and except where the failure to have such title or other interest could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.07    Environmental Compliance.

(a) There are no actions, suits or proceedings pending or, to the knowledge of the Borrower, threatened in writing against the Borrower or any Subsidiary alleging violation of, or liability under, any applicable Environmental Law that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b) Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, there has been no Release of Hazardous Materials by the Borrower or any Subsidiary at, on, under or from any location in a manner which would reasonably be expected to give rise to liability under applicable Environmental Laws.

74

(c) Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, the Borrower and its Subsidiaries are in compliance with all applicable Environmental Laws.

(d) Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, to Borrower's knowledge, no conditions or facts exist that would reasonably be expected result in liability under, or impose an obligation with respect to, Environmental Law.

Section 5.08    Taxes. The Loan Parties and each Subsidiary have timely filed all federal, state, local, and foreign income and other material tax returns and reports required to be filed, and have timely paid all material Taxes levied or imposed upon them or their properties, income or assets otherwise due and payable, except, in each case, for any failures (a) which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP, or (b) to the extent excused or prohibited by the Bankruptcy Code or the Bankruptcy Court.  Other than the ongoing audit of the Loan Parties' 2013 consolidated U.S. federal income tax return, there are no material Tax audits, deficiencies, assessments or other claims with respect to the Loan Parties or any Subsidiary.

Section 5.09    Compliance with ERISA and other Pension Laws; Labor Matters.

(a) Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, (i) each Pension Plan is in compliance in with the applicable provisions of ERISA, the Code and other federal or state Laws, and (ii) each Foreign Plan established, sponsored or maintained by any Loan Party has been registered, established, invested, administered and maintained in compliance with all applicable Laws.

(b) (i) No ERISA Event with respect to a Pension Plan or Multiemployer Plan, has occurred; (ii) neither any Loan Party nor any ERISA Affiliate has incurred, any liability (an no event has occurred which, with the giving of notice under Section 4219 of ERISA would result in such liability) under Section 4201 et seq. or 4243 of ERISA with respect to a Multiemployer Plan; (iii) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA, except, with respect to each of the foregoing clauses of this Section 5.10(b), as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect; provided that with respect to Multiemployer Plans, the representations and warranties in this Section 5.10, other than with respect to liability under Sections 4201 and 4204 of ERISA, are made to the knowledge of the Loan Parties and (iv) no Foreign Pension Event has occurred or is reasonably expected to occur that as would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(c) Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, (i) there are no strikes or other labor disputes against the Borrower or any of its Subsidiaries pending or, to the knowledge of the Borrower, threatened, (ii) hours worked by and payment made to employees of

the Borrower or any of its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Laws, (iii) the Borrower and the other Loan Parties have complied with all applicable labor laws including work authorization and immigration and (iv) all payments due from the Borrower or any of its Subsidiaries on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant party.

Section 5.10    Subsidiaries; Equity Interests. As of the Closing Date and after giving effect to the Transactions occurring on the Closing Date, neither the Borrower nor any other Loan Party has any Subsidiaries other than those specifically disclosed in Schedule 5.11, and all of the outstanding Equity Interests in the Borrower and its Subsidiaries have been validly issued, and to the extent such concepts exist with respect to such Equity Interests, are fully paid and nonassessable and all Equity Interests owned by Holdings or any other Loan Party are owned free and clear of all Liens except (i) those created under the Collateral Documents and (ii) any Lien that is permitted by Section 7.01.

As of the Closing Date and after giving effect to the Transactions occurring on the Closing Date, Schedule 5.11 sets forth (a) the name and jurisdiction of organization of each Subsidiary, (b) sets forth the ownership interest of Holdings, the Borrower and any of their Subsidiaries in each of their Subsidiaries, including the percentage of such ownership and (c) identifies each Person the Equity Interests of which are required to be pledged on the Closing Date pursuant to the Collateral and Guarantee Requirement.

Section 5.11    Margin Regulations; Investment Company Act.

(a) As of the Closing Date, none of the Collateral is comprised of any margin stock. No Loan Party is engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Federal Reserve Board), or extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation U or Regulation X of FRB.

(b) None of the Loan Parties is an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

Section 5.12    Disclosure.

(a) None of the written factual information or written factual data (taken as a whole) heretofore or contemporaneously furnished by Holdings, the Borrower, any of their respective Subsidiaries or any of their respective authorized representatives in writing to any Agent or any Lender on or before the Closing Date for purposes of or in connection with this Agreement or any transaction contemplated herein contained any untrue statement of material fact or omitted to state any material fact necessary to make such information and data (taken as a whole) not materially misleading at such time (after giving effect to all supplements so furnished prior to such time) in light of the circumstances under which such information or data was furnished; it being understood and agreed that for purposes of this Section 5.13(a), such factual

NAI-1502591911v5

information and data shall not include projections (including financial estimates, forecasts and other forward-looking information), pro forma financial information or information of a general economic or general industry nature.

(b) The projections contained in the information and data referred to in Section 5.13(a) were prepared in good faith based upon assumptions believed by Holdings and the Borrower to be reasonable at the time made; it being recognized by the Agents and the Lenders that such projections are as to future events and are not to be viewed as facts, the projections are subject to significant uncertainties and contingencies, many of which are beyond the control of Holdings, the Borrower and its Subsidiaries, that no assurance can be given that any particular projections will be realized and that actual results during the period or periods covered by any such projections may differ from the projected results and such differences may be material.

Section 5.13    Intellectual Property; Licenses, Etc. Each of the Loan Parties and the other Subsidiaries own, license or possess the right to use, all of the trademarks, service marks, trade names, domain names, copyrights, patents, patent rights, technology, software, know-how, database rights, design rights and other intellectual property rights (collectively, "IP Rights") that are reasonably necessary for the operation of their respective businesses as currently conducted, and, to the knowledge of the Borrower, without violation of the rights of any Person, except to the extent such violations, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. To the knowledge of the Borrower, no such IP Rights infringe upon any rights held by any Person except for such infringements, individually or in the aggregate, which could not reasonably be expected to have a Material Adverse Effect. No claim or litigation regarding any such IP Rights is pending or, to the knowledge of the Borrower, threatened in writing against any Loan Party or Subsidiary, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 5.14    Solvency. On the Closing Date after giving effect to the Transactions occurring on the Closing Date, the Loan Parties and their Subsidiaries, on a consolidated basis, are Solvent.

Section 5.15    Collateral Documents. The Collateral Documents are effective to create in favor of the Collateral Agent for the benefit of the Secured Parties legal, valid and enforceable Liens on, and security interests in, the Collateral and, (i) when all appropriate filings or recordings are made in the appropriate offices as may be required under applicable Laws (which filings or recordings shall be made to the extent required by any Collateral Document) and (ii) upon the taking of possession or control by the Collateral Agent of such Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Collateral Agent to the extent required by any Collateral Document), such Collateral Document will constitute fully perfected Liens on, and security interests in, all right, title and interest of the Loan Parties in such Collateral, in each case subject to no Liens other than the applicable Liens permitted under the Loan Documents.

NAI-1502591911v5

Section 5.16    Use of Proceeds. The proceeds of the Loans shall be used to satisfy an aggregate amount of $[_____] of the allowed First Lien Claims in accordance with the Plan of Reorganization.

Section 5.17    Senior Indebtedness. The Obligations constitute "Senior Indebtedness" (or similar or comparable term) of the Borrower any agreement, indenture or instrument pursuant to which any Subordinated Debt is Incurred.

Section 5.18    Patriot Act.

(a) Neither the Borrower nor any other Loan Party is in material violation of any material laws relating to terrorism or money laundering, including Executive Order No. 13224 on Terrorist Financing, effective September 23, 2001 and the USA PATRIOT Act.

(b) The use of proceeds of the Loans and the Letters of Credit will not violate in any material respect the Trading with the Enemy Act, as amended or any of the foreign asset control regulations of the United States Treasury Department (31 C.F.R. Subtitle B, Chapter V).

Section 5.19    FCPA. None of the Borrower or any other Loan Party will use the proceeds of the Loans or the Letters of Credit or otherwise make available such proceeds to any Person for the purposes of any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the FCPA.

Section 5.20    Sanctioned Persons.

(a) None of Holdings, the Borrower or any Subsidiary is currently the target of any U.S. sanctions administered by OFAC.

(b) None of the Borrower or any other Loan Party will use the proceeds of the Loans or the Letters of Credit or otherwise make available such proceeds to any Person for use in any manner that will result in a material violation by any Lender of any U.S. sanctions administered by OFAC or the U.S. Department of State.

## ARTICLE VI

## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation (other than contingent indemnification obligations and other contingent obligations) hereunder which is accrued and payable shall remain unpaid or unsatisfied, the Borrower shall, and shall (except in the case of the covenants set forth in Section 6.01, Section 6.02 and Section 6.03) cause each Subsidiary to:

78

Section 6.01    Financial Statements. Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)  as soon as available, but in any event within one hundred fifty (150)days after the end of each fiscal year of the Borrower, an audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries, in each case as at the end of such fiscal year, and the related audited consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year (or, in lieu of such audited financial statements of the Borrower and its Subsidiaries, a detailed reconciliation, reflecting such financial information for the Borrower and its Subsidiaries, on the one hand, and the Borrower and its consolidated Subsidiaries, on the other hand), setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, and except with respect to any such reconciliation, audited and accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing, which report and opinion shall (i) be prepared in accordance with generally accepted auditing standards and (ii) not be subject to any "going concern" or like qualification or any qualification as to the scope of such audit;

(b)  as soon as available, but in any event, within forty five (45) days after the end of each of the first three (3) fiscal quarters of each fiscal year of the Borrower, a consolidated balance sheet of the Borrower and its consolidated Subsidiaries, in each case as at the end of such fiscal quarter, and the related (i) consolidated statements of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and (ii) consolidated statements of cash flows for the portion of the fiscal year then ended (or in lieu of such financial statements of the Borrower and its Subsidiaries, a detailed reconciliation, reflecting such financial information for the Borrower and its Subsidiaries, on the one hand, and the Borrower and its consolidated Subsidiaries on the other hand), setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Borrower and its consolidated Subsidiaries (or, in the case of any reconciliation, the Borrower and its Subsidiaries) in accordance with GAAP, subject to changes resulting from audit and normal year-end audit adjustments and to the absence of footnotes; and

(c)  on or before the date that is 30 days after the last calendar day of each month beginning with the first month after the Closing Date, monthly financial statements including an unaudited consolidated balance sheet and unaudited consolidated statements of operations and comprehensive income, stockholders' equity and cash flows as of the end of and for such preceding monthly period and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a financial officer as presenting fairly in all material respects the financial condition as of the end of and for such monthly period and such portion of the fiscal year and results of operations

NAI-1502591911v5

and cash flows of the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, year-end adjustments (which may be material, include restatements and take into account the status of the reporting systems of Holdings and its Subsidiaries), implementation of SOP 90-7 and the absence of footnotes.

Section 6.02    Certificates; Other Information. Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a) no later than five (5) days after the delivery of the financial statements referred to in Section 6.01(a) and (b), a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower, (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) setting forth reasonably detailed calculations demonstrating compliance with the covenants contained in Section 7.09, and (iii) setting forth a reasonably detailed calculation of the Net Proceeds received during the applicable period by or on behalf of Holdings, the Borrower or any of its Subsidiaries in respect of any event described in the definition of the term "Prepayment Event";

(b) promptly after the same are publicly available, copies of all annual, regular, periodic and special reports and registration statements which the Borrower files with the SEC or with any Governmental Authority that may be substituted therefor (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) and in any case not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(c) together with the delivery of the financial statements pursuant to Section 6.01(a) and each Compliance Certificate pursuant to Section 6.02(a), (i) a report setting forth the information required by Section 3.03 of the Security Agreement (or confirming that there has been no change in such information since the Closing Date or the date of the last Compliance Certificate), and (ii) such other information required by the Compliance Certificate;

(d) no later than one hundred five (105) days following the first day of each fiscal year of the Borrower (beginning with the fiscal year beginning January 1, 2018), an annual budget (on a quarterly basis) for such fiscal year in form customarily prepared by the Borrower;

(e) as promptly as reasonably practicable after delivery of the financial statements pursuant to Sections 6.01(a) and (b), hold a conference call with Lenders to discuss the results of operations for the relevant reporting period;

(f) not later than the seventh Business Day following the end of each calendar month, (i) monthly KPIs (the "Monthly KPI Reports") that provide detail on the

monthly operating trends for the preceding calendar month for ForeSee and Webcollage and Multiply and, as reasonably available, (x) new, upsell and renewal bookings and (y) ACV churn rate, account churn rate, annual recurring revenue and net new customers, <u>provided</u> that such KPIs shall be reported consistent with past practices, and (ii) a reasonably detailed calculation of the Multiply Margin Ratio for the preceding calendar month; and

(g) promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of Holdings, the Borrower or any of its Subsidiaries, or compliance with the terms of any Loan Document, as the Administrative Agent on its own behalf or on behalf of any Lender may reasonably request.

Documents required to be delivered pursuant to <u>Sections 6.01(a)</u> and <u>(b)</u> and <u>Sections 6.02(a)</u> and <u>(b)</u> may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which such documents are posted on the Borrower's behalf on any third-party website designated  by the Administrative Agent); <u>provided</u> that: (i) upon written request by the Administrative Agent, the Borrower shall deliver paper copies of such documents to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

Section 6.03    <u>Notices</u>. Promptly after a Responsible Officer obtains actual knowledge thereof, notify the Administrative Agent in writing:

(a) of the occurrence of any Default or Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto;

(b) any litigation or governmental proceeding (including, without limitation, pursuant to any applicable Environmental Laws) pending against the Borrower or any of the Subsidiaries that could reasonably be expected to be determined adversely and, if so determined, to result in a Material Adverse Effect;

(c) of the occurrence of any ERISA Event with respect to a Pension Plan or a Foreign Pension Event with respect to a Foreign Plan, in each case, that would reasonably be expected to have a Material Adverse Effect;

(d)    of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect; and

(e)    of any material change in accounting policies or financial reporting practices by any Loan Party.

81

Each notice delivered under this Section 6.03 shall be accompanied by a written statement of a Responsible Officer of Holdings or the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 6.04     Maintenance of Existence.  (a)  Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization and (b) take all reasonable action to maintain all rights, privileges (including its good standing), permits, licenses and franchises necessary or desirable in the normal conduct of its business, except in the case of clauses (a) and (b), (i) to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect (other than with respect to the Borrower in clause (a)) or (ii) pursuant to a transaction permitted by Section 7.04 or Section 7.05.

Section 6.05     Maintenance of Properties. Except if the failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted, and (b) make all necessary renewals, replacements, modifications, improvements, upgrades, extensions and additions thereof or thereto in accordance with prudent industry practice.

Section 6.06     Maintenance of Insurance. Maintain with financially sound and reputable insurance companies (in the good faith determination of the Borrower), insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and its Subsidiaries) as are customarily carried under similar circumstances by such other Persons (in the good faith determination of the Borrower). If any portion of any Mortgaged Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then, to the extent required by applicable Laws, the Borrower shall, or shall cause each Loan Party to, (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount reasonably satisfactory to the Administrative Agent and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent.

Section 6.07     Compliance with Laws. Comply in all respects with the requirements of all Laws and all orders, writs, injunctions, decrees and judgments applicable to it or to its business or property (including without limitation Environmental Laws, ERISA, FCPA, OFAC and the USA PATRIOT Act), except if the failure to comply therewith would not, individually or in the aggregate reasonably be expected to have a Material Adverse Effect.

82

Section 6.08    <u>Books and Records</u>. Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with GAAP consistently applied shall be made of all material financial transactions and matters involving the assets and business of the Borrower or such Subsidiary, as the case may be.

Section 6.09    <u>Inspection Rights</u>. Permit representatives and independent contractors of the Administrative Agent and each Lender to, at the Borrower's expense (subject to the limitations below) visit and inspect any of its properties and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; <u>provided</u> that excluding any such visits and inspections during the continuation of an Event of Default, then such rights shall not be exercised more often than one (1) time during any calendar year; <u>provided, further,</u> that when an Event of Default exists, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice.  The Administrative Agent and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants. Notwithstanding anything to the contrary in this <u>Section 6.09</u>, none of the Borrower or any Subsidiary will be required to disclose or permit the inspection or discussion of, any document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (iii) that is subject to attorney client or similar privilege or constitutes attorney work product.

Section 6.10    <u>Covenant to Guarantee Obligations and Give Security</u>. At the Borrower's expense, take all action necessary or reasonably requested by the Administrative Agent to ensure that the Collateral and Guarantee Requirement (subject to the limitations set forth therein and in the Collateral Documents) continues to be satisfied such that upon the formation or acquisition of any new direct or indirect Subsidiary by any Loan Party or any Subsidiary ceasing to be an Excluded Subsidiary:

(a)  within thirty (30) days after such formation, acquisition, designation or occurrence or such longer period as the Administrative Agent may agree in its reasonable discretion:

(i)    cause each such Subsidiary that is required to become a Guarantor under the Collateral and Guarantee Requirement to furnish to the Administrative Agent a description of the Material Real Properties owned by such Subsidiary in detail reasonably satisfactory to the Administrative Agent;

(ii)    cause each such Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to duly execute and deliver to the Administrative Agent or the Collateral Agent (as appropriate) Mortgages, pledges, assignments, the applicable Security Agreement Supplements, applicable Intellectual Property Security Agreement Supplements

and other security agreements and documents or joinders or supplements thereto (including without limitation, with respect to Mortgages, and the Exit L/C Guaranty the documents listed in <u>Section 6.12(b)</u>), as reasonably requested by and in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent (consistent with the Mortgages, the applicable Security Agreement and other Collateral Documents in effect on the Closing Date), in each case granting Liens required by the Collateral and Guarantee Requirement;

(iii)    cause each such Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to deliver any and all certificates representing Equity Interests (only to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank (or any other documents customary under local Law) and instruments evidencing the Indebtedness held by such Subsidiary and required to be pledged pursuant to the Collateral and Guarantee Requirement (including the execution of the Subordinated Intercompany Note), indorsed in blank to the Collateral Agent;

(iv)    take and cause such Subsidiary and each direct or indirect parent of such Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to take whatever action (including the recording of Mortgages, the filing of financing statements and delivery of share and membership interest certificates, if any) may be necessary in the reasonable opinion of the Collateral Agent to vest in the Collateral Agent (or in any representative of the Collateral Agent designated by it) valid and perfected Liens required by the Collateral and Guarantee Requirement, enforceable against all third parties in accordance with their terms; and

(v)    deliver to the Collateral Agent with respect to each Material Real Property, upon the Administrative Agent's reasonable request, existing surveys, existing title reports, existing title insurance policies and existing environmental assessments.

If any Lender determines, acting reasonably, that any applicable Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender to hold or benefit from a Lien over real property pursuant to any Law of the United States or any State thereof, such Lender may notify the Administrative Agent and disclaim any benefit of such security interest to the extent of such illegality; <u>provided</u>, that such determination or disclaimer shall not invalidate or render unenforceable such Lien for the benefit of any other Lender or Secured Party.

Section 6.11    <u>Use of Proceeds</u>. The Borrower will, and will cause each Loan Party to, use the proceeds of the Loans in accordance with <u>Section 5.16</u>.

Section 6.12        Further Assurances and Post-Closing Conditions.

(a)        Subject to the limitations set forth in the definition of Collateral and Guarantee Requirement and in the Collateral Documents, promptly upon reasonable request by the Administrative Agent or the Collateral Agent (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent or the Collateral Agent may reasonably request from time to time in order to carry out more effectively the purposes of this Agreement and the Collateral Documents.

(b)        In the case of any Material Real Property (other than leasehold interests), provide the Collateral Agent with Mortgages and otherwise satisfy the applicable Collateral and Guarantee Requirement with respect to such owned real property within sixty (60) days (or such longer period as the Collateral Agent may agree in its sole discretion) of the acquisition of such real property in each case together with:

(i)        evidence that counterparts of the Mortgages have been duly executed, acknowledged and delivered and are in form suitable for filing or recording in all filing or recording offices that the Collateral Agent may deem reasonably necessary or desirable in order to create a valid and subsisting perfected Lien on the property and/or rights described therein in favor of the Collateral Agent for the benefit of the Secured Parties and that all filing and recording taxes and fees have been paid or otherwise provided for in a manner reasonably satisfactory to the Collateral Agent;

(ii)        Mortgage Policies in form and substance, with endorsements and in amounts, reasonably acceptable to the Collateral Agent (not to exceed the value of the real properties covered thereby), issued, coinsured and reinsured by title insurers reasonably acceptable to the Collateral Agent, insuring the Mortgages to be valid subsisting Liens on the property described therein, free and clear of all defects and encumbrances, subject to Liens permitted by Section 7.01, and providing for such other affirmative insurance (including endorsements for future advances under the Loan Documents) and such coinsurance and direct access reinsurance as the Collateral Agent may reasonably request;

(iii)        opinions of local counsel for the Loan Parties in states or provinces in which the real properties are located, with respect to the enforceability and perfection of the Mortgages and any related fixture filings in form and substance reasonably satisfactory to the Collateral Agent; and

(iv)        execute and/or deliver the documents and/or complete the tasks set forth on Schedule 6.12, in each case within the time limits specified on such schedule (or such longer period as the Administrative Agent may agree in its sole discretion).

85

Section 6.13        [Reserved].

Section 6.14        <u>Payment of Taxes</u>.The Loan Parties will file, and will cause each of the Subsidiaries to file, all federal, state, local and foreign income and other material tax returns and reports required to be filed and will pay and discharge, and will cause each of the Subsidiaries to pay and discharge, all material Taxes,  in each case on a timely basis, and the Loan Parties will pay and discharge, and will cause each of the Subsidiaries to pay and discharge, all lawful Tax claims, which if unpaid, may reasonably be expected to become a lien or charge upon any properties of the Loan Parties or any of the Subsidiaries not otherwise permitted under this Agreement.

Section 6.15        <u>Nature of Business</u>. The Borrower and its Subsidiaries, taken as a whole, will not fundamentally and substantively alter the character of their business, taken as a whole, from the business conducted by the Borrower and its Subsidiaries, taken as a whole, on the Closing Date and other business activities incidental, related or ancillary to any of the foregoing.

Section 6.16        <u>End of Fiscal Years; Fiscal Quarters</u>.  The Borrower will not change its fiscal year from ending on December 31.

Section 6.17        <u>Credit Ratings</u>.  Use best efforts to obtain and maintain the Borrower's corporate family credit rating, first, from Moody's and if unsuccessful, S&P; <u>provided</u> that no specific rating shall be required.

Section 6.18        <u>Control Agreements; Cash Management</u>.  On or prior to the 45th day following the Closing Date (or such later date as may be specified by the Administrative Agent in its sole discretion), the Loan Parties will enter into, and will maintain in effect, Control Agreements with respect to each Deposit Account and lock box account maintained by the Loan Parties, other than Excluded Accounts.  Each Control Agreement shall be in form and substance reasonably satisfactory to the Administrative Agent.  The Borrower shall also maintain a cash collateral account Silicon Valley Bank, which account shall be subject to an account control agreement with the Administrative Agent.  No Loan Party shall open, maintain or permit to exist any bank account, unless such Loan Party shall have provided the Administrative Agent with five (5) Business Days' prior written notice thereof and, unless otherwise consented to in writing by the Administrative Agent, shall have provided a Control Agreement in form and substance satisfactory to the Administrative Agent over each such account.

## ARTICLE VII

## NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation (other than contingent indemnification obligations and other contingent obligations) hereunder which is accrued and payable shall remain unpaid or unsatisfied, the Borrower shall not, nor shall it permit any of its Subsidiaries to, directly or indirectly (and, in the case of <u>Section 7.10</u>, Holdings shall not):

Section 7.01    Liens. Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)  Liens created pursuant to the Loan Documents to secure the Obligations or permitted in respect of any Mortgaged Property by the terms of the applicable Mortgage;

(b)  Liens existing on the Closing Date and set forth on Schedule 7.01(b); provided that (i) any such Lien does not extend to any other property or asset of the Borrower or any Subsidiary other than (A) after acquired property that is affixed or incorporated into the property covered by any such Lien or financed with Indebtedness permitted by Section 7.03 and (B) the proceeds and products thereof and (ii) such Lien shall secure only those obligations that it secures on the Closing Date and any Permitted Refinancing Indebtedness incurred to Refinance such Indebtedness permitted by Section 7.03;

(c)  Liens for Taxes, assessments or governmental charges (i) not yet due and payable or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person to the extent required in accordance with GAAP or (ii) with respect to which the failure to make payment could not reasonably be expected to have a Material Adverse Effect;

(d)  inchoate, statutory or common law Liens of landlords, lessors, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens arising in the ordinary course of business (i) which secure amounts that are not overdue for a period of more than 30 days or if more than 30 days overdue, are unfiled (or if filed have been discharged or stayed) and no other action has been taken to enforce such Lien or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person to the extent required in accordance with GAAP or (ii) with respect to which the failure to make payment could not reasonably be expected to have a Material Adverse Effect;

(e)  (i) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any Subsidiary;

(f)  Liens incurred or deposits made to secure the performance of bids, trade contracts, governmental contracts and leases (other than Indebtedness for borrowed money and Capitalized Leases), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including

those to secure health, safety and environmental obligations) incurred in the ordinary course of business;

(g)  easements, rights-of-way, restrictions (including zoning restrictions), encroachments, protrusions and other similar encumbrances and minor title defects affecting real property which, in the aggregate, do not in any case materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries, taken as a whole, and any exception on the title polices issued in connection with any mortgaged property;

(h)  Liens securing judgments for the payment of money not constituting an Event of Default under Section 8.01(g);

(i)  Liens securing Indebtedness permitted under Section 7.03(f); provided that (i) such Liens attach concurrently with or within one hundred and eighty (180) days after the acquisition, construction, repair, replacement, lease or improvement (as applicable) of the property subject to such Liens, (ii) such Liens do not at any time encumber any property other than the property financed by such Indebtedness, replacements thereof and additions and accessions to such property and the proceeds and the products thereof and customary security deposits, and (iii) with respect to Capitalized Leases, such Liens do not at any time extend to or cover any assets (except for additions and accessions to such assets, replacements and products thereof and customary security deposits) other than the assets subject to such Capitalized Leases; provided that individual financings of equipment provided by one creditor may be cross-collateralized to other financings of equipment provided by such lender;

(j)  leases, licenses, subleases, ground leases, sublicenses or cross licenses and Liens on the property covered thereby (including Intellectual Property), in each case, granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of the Borrower and its Subsidiaries, taken as a whole, or (ii) secure any Indebtedness;

(k)  Liens in favor of customs and revenue authorities arising as a matter of Law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(l)  Liens (i) of a collection bank (including those arising under Section 4-210 of the Uniform Commercial Code) on the items in the course of collection, (ii) in favor of a banking or other financial institution arising as a matter of law encumbering deposits or other funds maintained with a financial institution (including the right of set off) and which are within the general parameters customary in the banking industry and (iii) attaching to commodity trading accounts, or other commodity brokerage accounts incurred in the ordinary course of business;

(m) Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 7.02 to be applied against the purchase price for such Investment and (ii) consisting of an agreement to Dispose of

88

any property in a Disposition permitted under Section 7.05, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(n) any interest or title of a lessor, licensor, sublessor or sublicensor under leases or subleases entered into by the Borrower or any of its Subsidiaries in the ordinary course of business;

(o) Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any of its Restricted Subsidiaries in the ordinary course of business;

(p) Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks or other financial institutions not given in connection with the Incurrence of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower or its Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any Subsidiary in the ordinary course of business;

(q) Liens arising from precautionary Uniform Commercial Code financing statement filings;

(r) Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(s) any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Borrower or any Subsidiary;

(t) Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit issued for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods; or

(u) the modification, replacement, renewal or extension of any Lien permitted by clauses (b) and (i) of this Section 7.01; provided that (i) the Lien does not extend to any additional property other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien or financed by Indebtedness permitted under Section 7.03, and (B) proceeds and products thereof; and (ii) the renewal, extension or refinancing of the obligations secured or benefited by such Liens is permitted by Section 7.03;

(v) ground leases in respect of real property on which facilities owned or leased by the Borrower or any of its Subsidiaries are located;

NAI-1502591911v5

(w) Liens solely on any cash earnest money deposits made by the Borrower or any of its Subsidiaries in connection with any letter of intent or purchase agreement permitted hereunder;

(x) Liens not otherwise permitted by this Section 7.01; provided that at the time of the incurrence thereof and after giving pro forma effect thereto securing amounts or obligations not in excess of $11,500,000 in the aggregate for all amounts so secured;

(y) Liens securing Swap Contracts submitted for clearing in accordance with applicable Law;

(z) Liens given to a public utility or any municipality or governmental or other public authority when required by such utility or other authority in connection with the ordinary conduct of the business of the Borrower or any Subsidiary; provided that such Liens do not materially interfere with the ordinary conduct of the business of the Borrower or any Subsidiary;

(aa)        Liens securing obligations under the Exit L/C Facility;

(bb)        Liens created pursuant to the First Lien Credit Agreement and the other "Loan Documents" as defined in the First Lien Credit Agreement;

(cc)        Liens securing Indebtedness permitted under Section 7.03(r); provided that to the extent any Liens are incurred under this clause (x) to secure any Indebtedness for borrowed money with any of the Collateral, such Indebtedness shall be subject to either an Equal Priority Intercreditor Agreement reasonably satisfactory to the Administrative Agent or execute a joinder to the Junior Priority Intercreditor Agreement, as applicable, providing for such Indebtedness to be secured with the applicable Obligations on, at the Borrower's option, (x) a pari passu (other than with respect to control of remedies) basis to the Liens securing such Obligations with Required Lender consent or (y) a junior basis to the Liens securing such Obligations; and

(dd)        the right reserved to or vested in any Governmental Authority by any statutory provision or by the terms of any lease, license, franchise, grant or permit of the Borrower or any Subsidiary, to terminate any such lease, license, franchise, grant or permit, or to require annual or other payments as a condition to the continuance thereof.

Section 7.02    Investments. Make any Investments, except:

(a) Investments by the Borrower or a Subsidiary in assets that were Cash Equivalents when such Investment was made;

(b) Investments in Swap Contracts permitted under Section 7.03(q);

(c)  Investments (i) by any Loan Party in any other Loan Party, (ii) by any Subsidiary in any Loan Party and (iii) by any Non-Loan Party in any other Non-Loan Party;

(d)  Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(e)  Investments consisting of Liens, Indebtedness, fundamental changes, Dispositions and Restricted Payments permitted under Section 7.01, Section 7.03, Section 7.04, Section 7.05 (other than Section 7.05(e)) and Section 7.06), respectively; provided, however, that no Investments may be made solely pursuant to this Section 7.02(e);

(f)   (i) Investments existing on the Closing Date and (ii) Investments consisting of any ordinary course modification, replacement, renewal, reinvestment or extension of any Investment existing on the Closing Date; provided that the aggregate amount of the Investments permitted pursuant to this Section 7.02(f) is not increased from the aggregate amount of such Investments on the Closing Date except pursuant to the terms of such Investment as of the Closing Date or as otherwise permitted by this Section 7.02;

(g)  Promissory notes and other noncash consideration received in connection with Dispositions permitted by Section 7.05;

(h)  Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers consistent with past practices;

(i)   Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(j)   advances of payroll payments to employees, directors, consultants, independent contractors or other service providers or other advances of salaries or compensation to employees, directors, consultants, independent contractors or other service providers, in each case in the ordinary course of business;

(k)  Guarantee Obligations of the Borrower or any Subsidiary in respect of leases (other than Capitalized Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

91

(l)  Investments to the extent that payment for such Investments is made solely with Qualified Equity Interests (other than any Cure Amount) of Holdings (or of the Borrower or any Parent Entity);

(m) Guarantee Obligations of the Borrower or any Subsidiary in connection with the provision of credit card payment processing services;

(n)  Investments in the ordinary course of business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Uniform Commercial Code Article 4 customary trade arrangements with customers consistent with past practices;

(o)  the purchase or other acquisition of property and assets or businesses of any Person or of assets constituting a business unit, a line of business or division of such Person, or Equity Interests in a Person that, upon the consummation thereof, will become a Subsidiary Guarantor of the Borrower (including as a result of a merger or consolidation) (each, a "Permitted Acquisition"); provided that (i) immediately before and immediately after giving pro forma effect to any such purchase or other acquisition, no Event of Default has occurred and is continuing, (ii) the after giving pro forma effect to any such purchase or other acquisition, the Borrower shall be in compliance with Section 6.15, (iii) that, at the time such Permitted Acquisition is consummated, the Borrower is in compliance with the applicable Secured Leverage Ratio covenant under Section 7.09 on a pro forma basis and (iv) that Investments in assets that are not owned by the Loan Parties or in Equity Interests in Persons that are not Loan Parties or do not become Loan Parties upon consummation of such acquisition shall not exceed $500,000 when combined with any amounts under Section 7.02(o)(iii);

(p)  additional Investments; provided that after giving pro forma effect thereto, (i) the Secured Leverage Ratio (calculated on a pro forma basis) would not exceed the ratio that is 0.50x below the applicable Secured Leverage Ratio covenant under Section 7.09 at the time of such Investment, (ii) no Event of Default has occurred and is continuing and (iii) that Investments in assets that are not owned by the Loan Parties or in Equity Interests in Persons that are not Loan Parties or do not become Loan Parties upon consummation of such acquisition shall not exceed $500,000 when combined with any amounts under Section 7.02(p)(iv);

(q)  any additional Investments (including Investments in minority investments, Investments in joint ventures or similar entities that do not constitute Subsidiaries, Investments constituting Permitted Acquisitions and Investments in Subsidiaries that are not, and do not become, Subsidiary Guarantors), as valued at the Fair Market Value of such Investment at the time each such Investment is made; provided that the aggregate amount of such Investment shall not cause the aggregate amount of all such Investments made pursuant to this Section 7.02(q) measured (as valued at the Fair Market Value at such time that the Investment is made) at the time such Investment is made, to exceed, after giving effect to such Investment, the Available Amount at such time; and

92

(r)  Investments in property and/or equipment for WebCollage Israel in an aggregate amount not to exceed $1,000,000.

Section 7.03      Indebtedness. Incur any Indebtedness, except:

(a)  Indebtedness of the Borrower and any of its Subsidiaries under the Loan Documents;

(b)  Indebtedness represented by the First Lien Term Facility and any guarantee thereof in an aggregate principal amount not to exceed $[       ] (together with any Permitted Refinancing Indebtedness in respect of the foregoing and all accrued interest, fees and expenses with respect thereto);

(c)  (i) Indebtedness outstanding on the date hereof and listed on Schedule 7.03(c); provided that all such Indebtedness constituting intercompany Indebtedness shall be subordinated to the Obligations (but only to the extent permitted by applicable law and not giving rise to adverse tax consequences) on terms (x) at least as favorable to the Lenders as those set forth in the form of subordinated intercompany note attached as Exhibit J or (y) otherwise satisfactory to the Administrative Agent and (ii) any Permitted Refinancing Indebtedness thereof;

(d)  Guarantee Obligations of the Borrower and its Subsidiaries in respect of Indebtedness of the Borrower or any Subsidiary otherwise permitted hereunder; provided that (i) if the Indebtedness being guaranteed is subordinated in right of payment to the Obligations, such Guarantee Obligation shall be subordinated in right of payment to the Guarantee of the Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness and (ii) no Guarantee by any Subsidiary of any Indebtedness of a Loan Party shall be permitted unless such Subsidiary shall have also provided a Guarantee of the Obligations;

(e)  Indebtedness of the Borrower or any Subsidiary owing to the Borrower or any other Subsidiary to the extent constituting an Investment permitted by Section 7.02; provided that all such Indebtedness of any Loan Party owed to any Person that is not a Loan Party shall be subject to the Subordinated Intercompany Note;

(f)  (i) Capitalized Lease Obligations and other Indebtedness (including Capitalized Leases) financing the acquisition, construction, repair, replacement, lease or improvement of fixed or capital assets; provided that (x) such Indebtedness is Incurred concurrently with or within one hundred and eighty (180) days after the applicable acquisition, construction, repair, replacement, lease or improvement, and (y) such Indebtedness is not Incurred to acquire the Equity Interests of any person, and (ii) Capitalized Lease Obligations arising out of Sale Leasebacks,  provided that, at the time of any such incurrence and after giving pro forma effect thereto and the use of the proceeds thereof, the aggregate principal amount of Indebtedness that is outstanding in reliance on either subclauses (i) or (ii) of this clause (f) shall not exceed $11,500,000 and (iii) any Permitted Refinancing Indebtedness set forth in the immediately preceding clauses (i) and (ii);

93

(g) Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections and similar arrangements in each case in connection with deposit accounts incurred in the ordinary course;

(h) Indebtedness consisting of (i) the financing of insurance premiums or (ii) take or pay obligations entered into in the ordinary course of business;

(i) Indebtedness Incurred by the Borrower or any of its Subsidiaries in respect of letters of credit, bank guarantees, banker's acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims;

(j) obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of its Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(k) Indebtedness (other than Indebtedness for borrowed money) supported by a letter of credit in a principal amount not to exceed the face amount of such letter of credit;

(l) unsecured Indebtedness in respect of obligations of the Borrower or any Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services; provided that such obligations are incurred in connection with open accounts extended by suppliers on customary trade terms in the ordinary course of business, consistent with past practices, and not in connection with the borrowing of money;

(m) additional Indebtedness in an aggregate principal amount, measured at the time of Incurrence and after giving pro forma effect thereto and the use of the proceeds thereof, not to exceed $11,500,000 so long as the Borrower is in compliance with the applicable Secured Leverage Ratio covenant under Section 7.09 on a pro forma basis;

(n) Guarantee Obligations of the Borrower or any Subsidiary in connection with the provision of credit card payment processing services;

(o) Indebtedness assumed in connection with any Permitted Acquisition (or similar Investment); provided that (A) the only obligors with respect to any Indebtedness Incurred pursuant to this clause (o) shall be those Persons who were obligors of such Indebtedness prior to such Permitted Acquisition (or in the case of a purchase of assets, the purchaser of such assets), (B) both immediately prior to and after giving effect thereto no Event of Default shall exist or result therefrom, (C) after giving pro forma effect to any such purchase or other acquisition, the Incurrence of

94

any Indebtedness and the use of the proceeds thereof, the Borrower is in compliance with the applicable Secured Leverage Ratio covenant under <u>Section 7.09</u> on a pro forma basis (D) the Borrower shall, and shall cause its Subsidiaries to, comply with the applicable Collateral and Guarantee Requirement and <u>Sections 6.10</u> and <u>6.12</u>, (E) such Indebtedness was not created in contemplation of such Permitted Acquisition, (F) such Indebtedness is only the obligation of the Person and/or Person's Subsidiaries that are acquired or that acquired the relevant assets and such Indebtedness and (G) to the extent such Indebtedness is secured by a Lien on any assets or property of the Borrower or any Subsidiary, it shall be subject to any applicable limitations set forth in <u>Section 7.01</u>;

(p) Indebtedness incurred under the Exit L/C Facility;

(q) Indebtedness in respect of Swap Contracts incurred in the ordinary course of business and not for speculative purposes;

(r) Indebtedness arising from agreements of the Borrower or any Subsidiary providing for indemnification, adjustment of purchase price or similar obligations (including earn-outs), in each case entered into in connection with Permitted Acquisitions, other Investments and the Disposition of any business, assets or Equity Interests permitted hereunder, other than Guarantee Obligations incurred by any Person acquiring all or any portion of such business, assets or Equity Interests for the purpose of financing such acquisition; and

(s) other Indebtedness of the Borrower and its Subsidiaries; provided that (A) both immediately prior to and after giving effect thereto no Event of Default shall exist or result therefrom, (B) after giving pro forma effect to such Incurrence of any Indebtedness and the use of the proceeds thereof, the Borrower is in compliance with the applicable Secured Leverage Ratio covenant under <u>Section 7.09</u> on a pro forma basis and (C) the aggregate principal amount of Indebtedness permitted by this <u>clause (s)</u> shall not exceed $115,000,000.

Notwithstanding the foregoing provisions of <u>Section 7.03</u>, the Borrower will not, and will not permit any Subsidiary or Loan Party to, issue any preferred Equity Interests or any Disqualified Equity Interests.

Section 7.04    <u>Fundamental Changes</u>.  Merge, dissolve, liquidate, consolidate, amalgamate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired), taken as a whole, to or in favor of any Person, except:

(a) any Non-Loan Party may Dispose of any or all of its assets (upon voluntary liquidation or otherwise) to the Borrower, a Guarantor or any other Subsidiary of the Borrower;

(b) any Subsidiary Guarantor may (i) merge, amalgamate or consolidate with or into any other Subsidiary Guarantor or the Borrower, (ii) merge, amalgamate or

95

consolidate with or into any Non-Loan Party; provided that if such Subsidiary Guarantor is not the surviving entity, such merger, amalgamation or consolidation shall be deemed to be an "Investment" and subject to the limitations set forth in Section 7.02 and (iii) Dispose of any or all of its assets (upon voluntary liquidation or otherwise) to the Borrower or any other Subsidiary Guarantor;

(c) any Subsidiary may liquidate or dissolve if (x) the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders and (y) to the extent such Subsidiary is a Subsidiary Guarantor, any assets or business not otherwise Disposed of or transferred in accordance with Section 7.02 or 7.05, or, in the case of any such business, discontinued, shall be transferred to, or otherwise owned or conducted by, the Borrower or another Guarantor after giving effect to such liquidation or dissolution;

(d) any Subsidiary may merge, consolidate or amalgamate with any other Person in order to effect an Investment permitted pursuant to Section 7.02; provided that the continuing or surviving Person shall be a Subsidiary;

(e) without limiting the foregoing in Section 7.04, the Pre-Petition Borrower may (i) convert to a limited liability company or (ii) merge, amalgamate or consolidate with or into the Borrower or a Subsidiary (other than an Excluded Subsidiary) of the Borrower; and

(f) the Borrower or any Subsidiary may Dispose of any assets or business permitted by Sections 7.05(n) or (o).

Section 7.05    Dispositions. Make any Disposition, except:

(a) Dispositions of obsolete, worn out or surplus property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful, or economically practicable to maintain, in the conduct of the business of the Borrower and its Subsidiaries;

(b) Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property that is promptly purchased or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property (which replacement property is actually promptly purchased);

(c) Dispositions of inventory and other assets in the ordinary course of business (including allowing any registrations or any applications for registration of any immaterial IP Rights to lapse or go abandoned in the ordinary course of business);

(d) Dispositions of property to the Borrower or a Subsidiary; provided that if the transferor of such property is a Loan Party, (i) the transferee must be a Loan Party

or (ii) to the extent such transaction constitutes an Investment, such transaction is permitted under <u>Section 7.02</u>;

(e)  Dispositions permitted by <u>Section 7.02</u> (other than <u>Section 7.02(e)</u>), <u>Section 7.04</u> and  <u>Section 7.06</u> and Liens permitted by <u>Section 7.01</u>;

(f)  leases, subleases, licenses or sublicenses, in each case in the ordinary course of business and which do not materially interfere with the business of the Borrower and its Subsidiaries, taken as a whole;

(g) transfers of property subject to Casualty Events upon receipt of the Net Proceeds of such Casualty Event;

(h) Dispositions of accounts receivable in the ordinary course of business in connection with the collection or compromise thereof;

(i)  dispositions of non-core assets acquired in connection with any Permitted Acquisition or Investment permitted hereunder;

(j)  Dispositions of Cash Equivalents for cash or other Cash Equivalents;

(k) The unwinding of any Swap Contract pursuant to its terms;

(l)  Dispositions of property to Persons other than Guarantors (including the sale or issuance of Equity Interests of a Guarantor) not otherwise permitted under this <u>Section 7.05</u> in an aggregate amount not to exceed $575,000; provided that (i) no Default shall exist at the time of, or would result from, such Disposition (other than any such Disposition made pursuant to a legally binding commitment entered into at a time when no Default existed or would have resulted from such Disposition) and (ii) with respect to any Disposition pursuant to this <u>clause (k)</u>, the Borrower or a Guarantor shall receive not less than 75% of such consideration in the form of cash;

(m) the Borrower and the Subsidiaries may (i) sell or discount without recourse accounts receivable arising in the ordinary course of business in connection with the compromise or collection thereof and (ii) sell or transfer accounts receivable so long as the Net Cash Proceeds of any sale or transfer pursuant to this clause (ii) are offered to prepay the Loans pursuant to <u>Section 2.05</u>;

(n) Disposition of, all or a portion of, the assets or equity interests that comprise (x) the online content publisher business commonly known as "Multiply" or (y) the platform for managing and publishing product information to e-commerce websites business commonly known as "Webcollage"; and

(o) Disposition of, all or a portion of, the assets or equity interests that comprise the customer experience analytics platform business commonly known as "Foresee".

97

Section 7.06    Restricted Payments. Make, directly or indirectly, any Restricted Payment, except:

(a) each Subsidiary may make Restricted Payments to the Borrower and to other Subsidiaries that are Loan Parties and each Subsidiary that is not a Loan Party may make Restricted Payments to any Subsidiary that is not a Loan Party;

(b) Restricted Payments made on or after the Closing Date to consummate the Transactions;

(c) to the extent constituting Restricted Payments, the Borrower and its Subsidiaries may enter into and consummate transactions expressly permitted by any provision of Section 7.02 or Section 7.04;

(d) the Borrower and its Subsidiaries may make Restricted Payments to Holdings:

(i)        the proceeds of which shall be used to pay any federal, state, local or foreign Taxes of a consolidated, combined or similar tax group of which Holdings is the common parent, to the extent such Taxes are attributable to the income of the Borrower or its Subsidiaries; provided that (x) no such payments shall exceed the income tax liability that would have been imposed on the Borrower and/or the applicable Subsidiaries had such entity(ies) filed on a stand-alone basis;

(ii)        the proceeds of which shall be used to pay Holdings' operating costs and expenses incurred in the ordinary course of business, other overhead costs and expenses and fees (including administrative, legal, accounting and similar expenses provided by third parties as well as trustee, directors and general partner fees) which are reasonable and customary and incurred in the ordinary course of business and attributable to the ownership or operations of the Borrower and its Subsidiaries (including any reasonable and customary indemnification claims made by directors or officers of Holdings attributable to the direct or indirect ownership or operations of the Borrower and its Subsidiaries) and fees and expenses otherwise due and payable by the Borrower or any Subsidiary and permitted to be paid by the Borrower or such Subsidiary under this Agreement not to exceed $1,725,000, in any fiscal year; and

(iii)        to the extent not duplicative of Section 7.06(d)(i) or (ii), the proceeds of which shall be used to pay franchise and excise taxes, and other similar fees, taxes and expenses, required to maintain Holdings' existence;

(e) the Borrower or any Subsidiary may pay any dividend or distribution within 60 days after the date of declaration thereof, if at the date of declaration such payment would have complied with the provisions of this Agreement;

(f) in addition to the foregoing Restricted Payments (i) so long as no Event of Default shall have occurred and be continuing or would result therefrom, the

NAI-1502591911v5

Borrower may make additional Restricted Payments, measured at the time made, in an aggregate amount not to exceed the greater of (x) $5,750,000 and (y) 5.75% of Consolidated EBITDA of the Borrower for the Test Period most recently ended on or prior to the date such Restricted Payment is made (measured as of such date) based upon the Section 6.01 Financials most recently delivered on or prior to such date, in any fiscal year; and (ii) the Borrower may make additional Restricted Payments so long as (x) no Event of Default shall have occurred and be continuing or would result therefrom and (y) the Secured Leverage Ratio (calculated on a pro forma basis) would not exceed the ratio that is 0.50x below the applicable Secured Leverage Ratio covenant under <u>Section 7.09</u> at the time of such Restricted Payment;

(g) so long as no Event of Default shall have occurred and be continuing or would result therefrom, the Borrower may make additional Restricted Payments in an aggregate amount not to exceed an amount equal to the Available Amount at the time such Restricted Payments are paid; and

(h) the Borrower may make additional Restricted Payments for any sale under <u>Section 7.05(n)</u> up to the amount not required to be prepaid under <u>Section 2.05(b)</u>.

Section 7.07    <u>Transactions with Affiliates</u>. Enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the ordinary course of business, other than:

(a) transactions between or among Holdings, the Borrower or any Subsidiary that is a Loan Party;

(b) transactions on terms substantially as favorable to the Borrower or such Subsidiary as would be obtainable by the Borrower or such Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate;

(c) the Transactions and the payment of fees and expenses related to the Transactions;

(d) Restricted Payments permitted under <u>Section 7.06</u>;

(e) loans and other transactions by and among the Borrower and/or one or more Subsidiaries to the extent permitted under this <u>Article VII</u>;

(f) any issuance of Equity Interests, or other payments, awards or grants in cash securities, Equity Interests or otherwise pursuant to, or the funding of, employment arrangements, stock options and stock ownership plans approved by the Board of Directors of any Parent Entity of the Borrower or the Borrower, as the case may be;

(g) transactions pursuant to permitted agreements in existence on the Closing Date and set forth on <u>Schedule 7.07</u> or any amendment thereto to the extent such an amendment, taken as a whole, is not adverse to the Lenders in any material respect; and

(h) transactions with Wholly-Owned Subsidiaries for the purchase or sale of goods, products, parts and services entered into in the ordinary course of business in a manner consistent with prudent business practice followed by companies in the industry of the Borrower and its Subsidiaries.

Section 7.08      Prepayments, Etc., of Indebtedness.

(a) Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Junior Debt (it being understood that any payments of regularly scheduled interest or mandatory prepayments under such Junior Debt Documents shall be permitted only in accordance with the terms of the Junior Priority Intercreditor Agreement), except for (i) the refinancing thereof with the Net Proceeds of any Indebtedness (to the extent such Indebtedness constitutes Permitted Refinancing Indebtedness) and (ii) the conversion thereof to Equity Interests (other than Disqualified Equity Interests) of Holdings or the Borrower or any Parent Entity;

(b) Assert any right of subrogation or contribution against any other Loan Party until all Obligations have been indefeasibly paid in full;

(c) Amend, modify or change in any manner adverse to the interests of the Lenders any term or condition of any Junior Debt Documents without the consent of the Required Lenders; and

(d) Notwithstanding the foregoing and for the avoidance of doubt, nothing in this Section 7.08 shall prohibit (i) the repayment or prepayment of intercompany subordinated Indebtedness owed among the Borrower and/or the Subsidiaries, in either case unless an Event of Default has occurred and is continuing and the Borrower has received a notice from the Collateral Agent instructing it not to make or permit the Borrower and/or the Subsidiaries to make any such repayment or prepayment or (ii) substantially concurrent transfers of credit positions in connection with intercompany debt restructurings so long as such Indebtedness is permitted by Section 7.03 after giving effect to such transfer.

Section 7.09      Financial Covenant.

The Borrower shall not permit the Secured Leverage Ratio for any Test Period set forth below to be greater than the ratio set forth opposite such Test Period below:

| Test Period Date | Secured Leverage Ratio |
| --- | --- |
| January 1, 2018 through and including March 31, 2018 | 8.05:1.00 |
| April 1, 2018 through and including June 30, 2018 | 8.05:1.00 |
| July 1, 2018 through and including September 30, 2018 | 8.05:1.00 |
| October 1, 2018 through and | 7.50:1.00 |

100

| Test Period Date | Secured Leverage Ratio |
|---|---|
| including December 31, 2018 | |
| January 1, 2019 through and including March 31, 2019 | 6.90:1.00 |
| April 1, 2019 and thereafter | 6.30:1.00 |

Notwithstanding the foregoing, this Section 7.09 shall be in effect (and shall only be in effect) on and after January 1, 2018. Any provision of this Agreement that contains a requirement for the Borrower to be in compliance with the Financial Covenant prior to the time that it is otherwise applicable shall be deemed to require that the Secured Leverage Ratio for the applicable Test Period be no greater than 8.70:1.00.

Section 7.10    Passive Activity Covenants.

(a) Holdings shall not conduct, transact or otherwise engage in any business or operations other than (i) the ownership and/or acquisition of the Equity Interests (other than Disqualified Equity Interests) of the Borrower, (ii) the maintenance of its legal existence, including the ability to incur fees, costs and expenses relating to such maintenance, (iii) to the extent applicable, participating in tax, accounting and other administrative matters as a member of the consolidated group of Holdings and the Borrower, (iv) the performance of its obligations under and in connection with the Loan Documents and any documents relating to other Indebtedness permitted under Section 7.03, (v) any transaction between Holdings and the Borrower or any Subsidiary permitted under this Article 7, (vi) incurring fees, costs and expenses relating to overhead and general operating including professional fees for legal, tax and accounting issues and paying Taxes, (vii) providing indemnification to officers and directors and as otherwise permitted in Section 7, (viii) activities incidental to the consummation of the Transactions, (ix) organizational activities incidental to Permitted Acquisitions or similar Investments consummated by the Borrower, including the formation of acquisition vehicle entities and intercompany loans and/or investments incidental to such Permitted Acquisitions or similar Investments in each case consummated substantially contemporaneously with the consummation of the applicable Permitted Acquisitions or similar Investments; provided that in no event shall any such activities include the incurrence of a Lien on any of the assets of Holdings, (x) the making of any loan to any officers or directors contemplated by Section 7.02, the making of any Investment in the Borrower or any Subsidiary Guarantor or, to the extent otherwise allowed under Section 7.02, a Subsidiary, (xi) activities incidental to the consummation of the Transactions, (xii) organizational activities incidental to Permitted Acquisitions or similar Investments consummated by the Borrower, including the formation of acquisition vehicle entities and intercompany loans and/or investments incidental to such Permitted Acquisitions or similar Investments in each case consummated substantially contemporaneously with the consummation of the applicable Permitted Acquisitions or similar Investments; provided that in no event shall any such activities include the incurrence of a Lien on any of the assets of Holdings, (xiii) activities required to comply with applicable Laws, (xiv) maintenance and administration of stock option and stock ownership

101

plans and activities incidental thereto, (xv) the obtainment of, and the payment of any fees and expenses for, management, consulting, investment banking and advisory services to the extent otherwise permitted by this Agreement, and (xvi) activities incidental to the businesses or activities described in clauses (i) to (xv) of this Section 7.10(a).

(b) The Borrower shall not conduct, transact or otherwise engage in any business or operations other than (i) the ownership and/or acquisition of the Equity Interests (other than Disqualified Equity Interests) of the Pre-Petition Borrower, (ii) the maintenance of its legal existence, including the ability to incur fees, costs and expenses relating to such maintenance, (iii) to the extent applicable, participating in tax, accounting and other administrative matters as a member of the consolidated group of Holdings and the Pre-Petition Borrower, (iv) the performance of its obligations under and in connection with the Loan Documents and any documents relating to other Indebtedness permitted under Section 7.03, (v) any transaction between Holdings and the Pre-Petition Borrower or any Subsidiary permitted under this Article 7, (vi) incurring fees, costs and expenses relating to overhead and general operating including professional fees for legal, tax and accounting issues and paying Taxes, (vii) providing indemnification to officers and directors and as otherwise permitted in Section 7, (viii) activities incidental to the consummation of the Transactions, (ix) organizational activities incidental to Permitted Acquisitions or similar Investments consummated by the Pre-Petition Borrower, including the formation of acquisition vehicle entities and intercompany loans and/or investments incidental to such Permitted Acquisitions or similar Investments in each case consummated substantially contemporaneously with the consummation of the applicable Permitted Acquisitions or similar Investments; provided that in no event shall any such activities include the incurrence of a Lien on any of the assets of the Borrower, (x) the making of any loan to any officers or directors contemplated by Section 7.02, the making of any Investment in the Pre-Petition Borrower or any Subsidiary Guarantor or, to the extent otherwise allowed under Section 7.02, a Subsidiary, (xi) activities incidental to the consummation of the Transactions, (xii) organizational activities incidental to Permitted Acquisitions or similar Investments consummated by the Pre-Petition Borrower, including the formation of acquisition vehicle entities and intercompany loans and/or investments incidental to such Permitted Acquisitions or similar Investments in each case consummated substantially contemporaneously with the consummation of the applicable Permitted Acquisitions or similar Investments; provided that in no event shall any such activities include the incurrence of a Lien on any of the assets of the Borrower, (xii) activities required to comply with applicable Laws, (xiv) maintenance and administration of stock option and stock ownership plans and activities incidental thereto, (xv) the obtainment of, and the payment of any fees and expenses for, management, consulting, investment banking and advisory services to the extent otherwise permitted by this Agreement, and (xvi) activities incidental to the businesses or activities described in clauses (i) to (xv) of this Section 7.10(b).

Section 7.11    Negative Pledge. Enter into any agreement, instrument, deed or lease that prohibits or limits the ability of any Loan Party to create, incur, assume or suffer to

102

exist any Lien upon any of their respective properties or revenues, whether now owned or hereafter acquired, for the benefit of the Secured Parties with respect to the Obligations or under the Loan Documents; provided that the foregoing shall not apply to:

(a) restrictions and conditions imposed by (A) Law, (B) any Loan Document, (C) the First Lien Term Facility and Permitted Refinancing Indebtedness thereof, and (D) any documentation governing any Permitted Refinancing Indebtedness incurred to Refinance any such Indebtedness referenced in clauses (B) through (D) above;

(b) customary restrictions and conditions existing on the Closing Date or to any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(c) restrictions and conditions contained in agreements relating to the sale of a Subsidiary or any assets pending such sale; provided that such restrictions and conditions apply only to the Subsidiary or assets that is or are to be sold and such sale is permitted hereunder;

(d) customary provisions in leases, licenses and other contracts restricting the assignment thereof;

(e) restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement to the extent such restriction applies only to the property securing such Indebtedness;

(f) any restrictions or conditions set forth in any agreement in effect at any time any Person becomes a Subsidiary (but not any modification or amendment expanding the scope of any such restriction or condition); provided that such agreement was not entered into in contemplation of such Person becoming a Subsidiary and the restriction or condition set forth in such agreement does not apply to the Borrower or any other Subsidiary;

(g) [Reserved];

(h) restrictions on cash or other deposits imposed by agreements entered into in the ordinary course of business (or other restrictions constituting Liens permitted hereunder);

(i) restrictions set forth on Schedule 7.11 and any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(j) [Reserved];

(k) negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under Sections 7.03(f) , but solely to the extent any negative pledge relates to the property financed by or the subject of such Indebtedness;

(l)  customary provisions restricting assignment of any agreement entered into in the ordinary course of business; and

(m)provisions restricting the granting of a security interest in intellectual property contained in licenses or sublicenses by the Borrower and its Subsidiaries of such intellectual property, which licenses and sublicenses were entered into in the ordinary course of business (in which case such restriction shall relate only to such intellectual property).

Section 7.12      Bank Accounts.  No Loan Party shall establish any new Deposit Accounts or Securities Accounts (as defined in the Security Agreement) unless the Administrative Agent and the depository institution at which the account is to be opened enter into a Control Agreement (except with respect to Excluded Accounts) pursuant to which such depository institution acknowledges the security interest of the Administrative Agent in such Deposit Account, agrees to comply with instructions originated by the Administrative Agent directing disposition of the funds in the Deposit Account without further consent from the Borrowers or such Loan Party, and agrees to subordinate and limit any security interest the bank may have in the Deposit Account and waive all rights of set-off with respect thereto (other than for customary fees and expenses) on terms satisfactory to the Administrative Agent.

## ARTICLE VIII

## EVENTS OF DEFAULT AND REMEDIES

Section 8.01      Events of Default. Any of the following events referred to in any of clauses (a) through (1) inclusive of this Section 8.01 shall constitute an "Event of Default":

(a)  Non-Payment. Any Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan or (ii) within five (5) Business Days after the same becomes due, any interest on any Loan or any other amount payable hereunder or with respect to any other Loan Document; or

(b)  Specific Covenants. The Borrower or any Subsidiary fails to perform or observe any term, covenant or agreement contained in (i) any of Section 6.03(a) or Section 6.04 or Article VII or (ii) Section 7.09; provided that in the case of this sub clause (ii), an Event of Default shall not occur until the Cure Deadline has occurred; or

(c)  Other Defaults. Any Loan Party or any Subsidiary thereof fails to perform or observe any other covenant or agreement (not specified in Section 8.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for five (5) days after the earlier of (i) any Loan Party obtaining knowledge of such failure and (ii) any Loan Party receiving notice of such failure from the Administrative Agent or the Required Lenders; or

104

(d) <u>Representations and Warranties</u>. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Loan Party herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith shall be untrue in any material respect when made or deemed made; or

(e) <u>Cross-Default</u>. Any Loan Party or any Subsidiary (A) fails to make any payment beyond the applicable grace period with respect thereto, if any (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness (other than Indebtedness hereunder) having an aggregate principal amount of not less than the Threshold Amount or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts), the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, all such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem all such Indebtedness to be made, prior to its stated maturity; or

(f) <u>Insolvency Proceedings, Etc</u>. Holdings, the Borrower or any of its Subsidiaries (other than any Immaterial Subsidiary) institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, interim receiver, receiver and manager, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, interim receiver, receiver and manager, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days; or an order for relief is entered in any such proceeding; or

(g) <u>Judgments</u>. There is entered against any Loan Party or any Subsidiary a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance or by an enforceable indemnity) and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of forty-five (45) consecutive days after the entry thereof; or

(h) <u>ERISA</u>. (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or would reasonably be expected to result in liability of any Loan Party under Title IV of ERISA in an aggregate amount which

would reasonably be expected to result in a Material Adverse Effect or (ii) a Foreign Pension Event occurs with respect to a Foreign Plan that would reasonably be expected to result in a Material Adverse Effect; or

(i)  Invalidity of Collateral Documents. (i) Any material provision of any Collateral Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under Section 7.04 or Section 7.05) or as a result of acts or omissions by the Administrative Agent, the Collateral Agent or any Lender or the satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of any material provision of any Collateral Document; or any Loan Party denies in writing that it has any or further liability or obligation under any Collateral Document (other than as a result of repayment in full of the Obligations and termination of the Aggregate Commitments), or purports in writing to revoke or rescind any Collateral Document or (ii) a material part of the Liens purported to be created by the Collateral Documents cease to be valid and perfected second  priority Liens in favor of the Collateral Agent on the Collateral covered thereby other than as a result of a release of Collateral permitted under Section 10.20; or

(j)  Invalidity of Loan Documents. Any Loan Document shall cease to be in full force and effect(other than pursuant to the terms hereof or thereof), or any Loan Party shall deny or disaffirm in writing the validity of any Loan Document or that it has any further liability under any such Loan Document (other than, in the case of a Guarantee, as a result of the discharge of a Guarantor in accordance with the terms of the Loan Documents) or otherwise attempt to invalidate or otherwise impair the Loans;

(k)  Non-Subordination of Junior Indebtedness and Liens. The Indebtedness under or the Lien priority of any Junior Debt Documents shall cease (or any Loan Party or an Affiliate of any Loan Party shall so assert), for any reason, to be validly subordinated to the Obligations or the Liens of the Collateral Documents, respectively, as provided in the documents governing such Junior Debt or the applicable subordination or intercreditor agreement;or

(l)  Change of Control. There occurs any Change of Control.

Section 8.02    Remedies Upon Event of Default.

(a) If any Event of Default occurs and is continuing, the Administrative Agent may and, at the request of the Required Lenders, shall, take any or all of the following actions:

(i)    declare the Commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligation shall be terminated;

(ii)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, any premium (including the Prepayment

Premium)and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

(iii)    exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law.

provided that upon the occurrence of an Event of Default under Section 8.01(f) with respect to the Borrower, the unpaid principal amount of all outstanding Loans and all interest, applicable premiums (including, if applicable, the Prepayment Premium) and other amounts as aforesaid shall automatically become due and payable without further act of the Administrative Agent or any Lender.

Section 8.03    [Reserved].

Section 8.04    Application of Funds. If the circumstances described in Section 2.12(g) have occurred, or after the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable), including in any bankruptcy or insolvency proceeding, any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.04 and amounts payable under Article III) payable to each Agent in its capacity as such, ratably among them in proportion to the amounts described in this clause First payable to them;

Second, to payment of that portion of the Obligations constituting fees, premiums (including the Prepayment Premium) indemnities and other amounts (other than principal and interest) payable to the Lenders (including Attorney Costs payable under Section 10.04 and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Second payable to them;

Third, to payment of that portion of the Obligations constituting accrued and unpaid interest (including, but not limited to, post-petition interest), ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to payment of that portion of the Obligations constituting unpaid principal, Unreimbursed Amounts or face amounts of the Loans, ratably among the Secured Parties in proportion to the respective amounts described in this clause Fourth held by them;

Fifth, to the payment of all other Obligations of the Loan Parties that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably

107

based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date;

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by Law.

Section 8.05     Permitted Holders' Right to Cure.

(a)     Notwithstanding anything to the contrary contained in Section 8.01(b), in the event that the Borrower fails to comply with the requirement of the Financial Covenant, any of the Permitted Holders, Holdings or any other Person designated by the Borrower shall have the right, during the period beginning at the start of the last fiscal quarter of the applicable Test Period and until on the tenth (10th) Business Day after the date on which financial statements with respect to the Test Period in which such covenant is being measured are required to be delivered pursuant to Section 6.01 (such date, the "Cure Deadline"), to make a direct or indirect equity investment in the Borrower in cash in the form of common Equity Interests (or other Qualified Equity Interests reasonably acceptable to the Administrative Agent) (the "Cure Right"), and upon the receipt by the Borrower of Net Proceeds pursuant to the exercise of the Cure Right (the "Cure Amount"), the Financial Covenant shall be recalculated, giving effect to a pro forma increase to Consolidated EBITDA for such Test Period in an amount equal to such Cure Amount; provided that such pro forma adjustment to Consolidated EBITDA shall be given solely for the purpose of determining the existence of a Default or an Event of Default under the Financial Covenant with respect to any Test Period that includes the fiscal quarter for which such Cure Right was exercised and not for any other purpose under any Loan Document.

(b)     If, after the exercise of the Cure Right and the recalculations pursuant to clause (a) above, the Borrower shall then be in compliance with the requirements of the Financial Covenant during such Test Period, the Borrower shall be deemed to have satisfied the requirements of the Financial Covenant as of the relevant date of determination with the same effect as though there had been no failure to comply therewith at such date, and the applicable Default or Event of Default under Section 8.01 that had occurred shall be deemed cured; provided that (i) the Cure Right may be exercised on no more than three (3) occasions, (ii) in each four fiscal quarter period, there shall be at least two fiscal quarters in respect of which no Cure Right is exercised, (iii) with respect to any exercise of the Cure Right, the Cure Amount shall be no greater than the amount required to cause the Borrower to be in compliance with the Financial Covenant (such amount, the "Necessary Cure Amount") (provided that if the Cure Right is exercised prior to the date financial statements are required to be delivered for such fiscal quarter then the Cure Amount shall be equal to the amount reasonably determined by the Borrower in good faith that is required for purposes of complying with the Financial Covenant for such fiscal quarter (such amount, the "Expected Cure Amount"), (iv) subject to clause (c) below, all Cure Amounts shall be disregarded for purposes of determining the Applicable Rate or used for the purposes of determining any baskets with respect to the covenants contained in the Loan Documents or the usage of the Available Amount and (v) the Net Proceeds from the Cure Right may not reduce the amount of Consolidated Total Debt (including, without limitation, by means of "cash netting") for purposes of calculating compliance with the Financial Covenant for the fiscal quarter for which such Cure Right is deemed applied; provided the amount of Consolidated Total Debt may be reduced for purposes (i) other than determining

108

compliance with the Financial Covenant and (ii) of determining compliance with the Financial Covenant in subsequent fiscal quarters, in each case, to the extent the Cure Amount is applied to prepay Indebtedness.

(c)    The parties hereby acknowledge that this Section 8.05 may not be relied on for purposes of calculating any financial ratios other than for determining actual compliance with the Financial Covenant; provided however, to the extent that the Expected Cure Amount is (i) greater than the Necessary Cure Amount, then such difference may be used for the purposes of determining any baskets (other than any previously contributed Cure Amounts), with respect to the covenants contained in the Loan Documents and the Available Amount and (ii) less than the Necessary Cure Amount, then not later than the applicable Cure Deadline, the Borrower must receive a direct or indirect equity investment in cash in the form of common Equity Interests (or other Qualified Equity Interests reasonably acceptable to the Administrative Agent), which cash proceeds received by Borrower shall be equal to the shortfall between such Expected Cure Amount and such Necessary Cure Amount.

## ARTICLE IX

### ADMINISTRATIVE AGENT AND OTHER AGENTS

Section 9.01    Appointment and Authorization of Agents.

(a) Each Lender hereby irrevocably appoints, designates and authorizes the Administrative Agent to take such action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary contained elsewhere herein or in any other Loan Document, the Administrative Agent shall have no duties or responsibilities, except those expressly set forth herein, nor shall the Administrative Agent have or be deemed to have any fiduciary relationship with any Lender or participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent. Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Loan Documents with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

(b) [Reserved]..

(c) The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders (in its capacities as a Lender) hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of (and to hold any security interest, charge or other Lien created by the Collateral

Documents for and on behalf of or on trust for) such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Administrative Agent, as "collateral agent" (and any co-agents, subagents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.02 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this Article IX (including Section 9.07, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

Section 9.02    Delegation of Duties. The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents or of exercising any rights and remedies thereunder) by or through Affiliates, agents, employees or attorneys-in-fact, such sub-agents as shall be deemed necessary by the Administrative Agent, and shall be entitled to advice of counsel, both internal and external, and other consultants or experts concerning all matters pertaining to such duties. The Administrative Agent shall not be responsible for the negligence or misconduct of any agent or sub-agent or attorney-in-fact that it selects in the absence of gross negligence, willful misconduct or bad faith.

Section 9.03    Liability of Agents. No Agent-Related Person shall (a) be liable to any Lender for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence, willful misconduct or bad faith, as determined by the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein), or (b) be responsible in any manner to any Lender or participant for any recital, statement, representation or warranty made by any Loan Party or any officer thereof, contained herein or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or the perfection or priority of any Lien or security interest created or purported to be created under the Collateral Documents, or for any failure of any Loan Party or any other party to any Loan Document to perform its obligations hereunder or thereunder. No Agent-Related Person shall be under any obligation to any Lender or participant to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party or any Affiliate thereof.

Section 9.04    Reliance by Agents.

(a) Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice,

consent, certificate, affidavit, letter, telegram, facsimile, telex or telephone message, electronic mail message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to any Loan Party), independent accountants and other experts selected by such Agent. Each Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders.

(b) For purposes of determining compliance with the conditions specified in Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 9.05    Notice of Default. The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default, except with respect to defaults in the payment of principal, interest and fees required to be paid to the Administrative Agent for the account of the Lenders, unless the Administrative Agent shall have received written notice from a Lender or the Borrower referring to this Agreement, describing such Default and stating that such notice is a "notice of default." The Administrative Agent will notify the Lenders of its receipt of any such notice. The Administrative Agent shall take such action with respect to any Event of Default as may be directed by the Required Lenders in accordance with Article VIII; provided that unless and until the Administrative Agent has received any such direction, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable or in the best interest of the Lenders.

Section 9.06    Credit Decision; Disclosure of Information by Agents. Each Lender acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by any Agent hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including whether Agent-Related Persons have disclosed material information in their possession. Each Lender represents to each Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and their respective Subsidiaries, and all applicable bank or other regulatory Laws relating to the

111

transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower and the other Loan Parties hereunder. Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and the other Loan Parties. Except for notices, reports and other documents expressly required to be furnished to the Lenders by any Agent herein, such Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of any Agent-Related Person.

Section 9.07     <u>Indemnification of Agents</u>. Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand each Agent-Related Person (to the extent not reimbursed by or on behalf of any Loan Party and without limiting the obligation of any Loan Party to do so), <u>pro rata</u>, and hold harmless each Agent-Related Person from and against any and all Indemnified Liabilities incurred by it; <u>provided</u> that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting from such Agent-Related Person's own gross negligence, willful misconduct or bad faith, as determined by the final judgment of a court of competent jurisdiction; <u>provided</u> that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Loan Documents) shall be deemed to constitute gross negligence, willful misconduct or bad faith for purposes of this <u>Section 9.07</u>. In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this <u>Section 9.07</u> applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent is not reimbursed for such expenses by or on behalf of the Borrower; <u>provided</u> that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto, if any. The undertaking in this <u>Section 9.07</u> shall survive termination of the Aggregate Commitments, the payment of all other Obligations and the resignation of the Administrative Agent.

Section 9.08     <u>Agents in their Individual Capacities</u>. CS and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire Equity Interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with each of the Loan Parties and their respective Affiliates as though CS were not the Administrative Agent hereunder and without notice to or consent of the Lenders. The Lenders acknowledge that, pursuant to such activities, CS or its Affiliates may receive information regarding any Loan Party or any Affiliate of a Loan Party (including information

112

that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that the Administrative Agent shall be under no obligation to provide such information to them. With respect to its Loans, CS shall have the same rights and powers under this Agreement as any other Lender and may exercise such rights and powers as though it were not the Administrative Agent, and the terms "Lender" and "Lenders" include CS in its individual capacity.

Section 9.09    Successor Agents. The Administrative Agent may resign as the Administrative Agent upon thirty (30) days' notice to the Lenders and the Borrower. If the Administrative Agent and/or Collateral Agent becomes a Defaulting Lender, then such Administrative Agent or Collateral Agent, as the case may be, may be removed as the Administrative Agent or Collateral Agent, as the case may be, at the reasonable request of the Borrower and the Required Lenders.  If the Administrative Agent resigns or is removed under this Agreement, the Required Lenders shall appoint a successor agent for the Lenders, which appointment of a successor agent shall require the consent of the Borrower at all times other than during the existence of an Event of Default under Section 8.01(f) (which consent of the Borrower shall not be unreasonably withheld or delayed). If no successor agent is appointed prior to the effective date of the resignation (but not removal) of the Administrative Agent, the Administrative Agent may appoint, after consulting with the Borrower, a successor agent. Upon the acceptance of its appointment as successor agent hereunder, the Person acting as such successor agent shall succeed to all the rights, powers and duties of the retiring Administrative Agent and the term "Administrative Agent" shall mean such successor administrative agent (and the term "Collateral Agent" shall mean such successor collateral agent and/or supplemental agent, as described in Section 9.01(c)), and the retiring or removed Administrative Agent's appointment, powers and duties as the Administrative Agent shall be terminated. After the retiring or removed Administrative Agent's resignation hereunder as the Administrative Agent, the provisions of this Article IX and Section 10.04 and Section 10.05 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent under this Agreement. If no successor agent has accepted appointment as the Administrative Agent by the date which is 30 days following the retiring (but not removed) Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above or, in the absence of such an appointment, as the Administrative Agent shall appoint at or after the expiration of the 30 days following the Administrative Agent's notice of resignation. Upon the acceptance of any appointment as the Administrative Agent hereunder by a successor and upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to the Mortgages, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may reasonably request, in order to (a) continue the perfection of the Liens granted or purported to be granted by the Collateral Documents or (b) otherwise ensure that the Collateral and Guarantee Requirement is satisfied, the Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, discretion, privileges, and duties of the retiring Administrative Agent, and the retiring or removed Administrative Agent shall be discharged from its duties and obligations under the Loan Documents.

Section 9.10     Administrative Agent May File Proofs of Claim. In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Section 2.09 and Section 10.04) allowed in such judicial proceeding; and

(b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and

(c) any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their respective agents and counsel, and any other amounts due to the Administrative Agent under Section 2.09 and Section 10.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Section 9.11     Collateral and Guaranty Matters. The Lenders irrevocably agree that any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document may be released or subordinated in accordance with the provisions of Section 10.20 or any Collateral Document.

Upon request by the Administrative Agent at any time, the Required Lenders (or such other percentage of the Lenders whose consent may be required in accordance with Section 10.01) will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 9.11 and Section 10.20.

Section 9.12    <u>No Fiduciary Relationship with Other Lenders</u>. None of the Lenders or other Persons so identified shall have or be deemed to have any fiduciary relationship with any Lender. Each Lender acknowledges that it has not relied, and will not rely, on any of the Lenders or other Persons so identified in deciding to enter into this Agreement or in taking or not taking action hereunder.

Section 9.13    <u>Withholding Tax</u>. To the extent required by any applicable Law, the Administrative Agent may deduct or withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the Internal Revenue Service or any other Governmental Authority asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender under any Loan Document (because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of, withholding Tax ineffective or for any other reason or any failure under any Loan Document by such Lender), such Lender shall indemnify and hold harmless the Administrative Agent fully for all amounts paid by the Administrative Agent as Tax together with all reasonable expenses incurred (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for any such Taxes or expenses incurred), whether or not such Tax was correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive, absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this <u>Section 9.13</u>. The agreements in this <u>Section 9.13</u> shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement and the repayment, satisfaction or discharge of all other obligations. For the avoidance of doubt, this <u>Section 9.13</u> shall not limit or expand the obligations of the Borrower or any Guarantor under <u>Section 3.01</u> or any other provision of this Agreement.

Section 9.14    <u>Intercreditor Agreements</u>. The Administrative Agent and the Collateral Agent are each hereby authorized to enter into any Customary Intercreditor Agreement to the extent contemplated by the terms hereof, and the parties hereto acknowledge that such Customary Intercreditor Agreement is binding upon them.  Each Lender (a) hereby agrees that it will be bound by the provisions of the Customary Intercreditor Agreement as if it were a signatory thereto and will take no actions contrary to the provisions of the Customary Intercreditor Agreement and (b) hereby authorizes and instructs the Administrative Agent and/or Collateral Agent to enter into the Customary Intercreditor Agreement and to subject the Liens on the Collateral securing the Obligations to the provisions thereof.  In addition, each Lender hereby authorizes the Administrative Agent and/or Collateral Agent to enter into (i) any amendments to any Customary Intercreditor Agreement, and (ii) any other intercreditor arrangements, in the case of <u>clauses (i)</u> and <u>(ii)</u> to the extent required to give effect to the establishment of intercreditor rights and privileges as contemplated and required by <u>Section 7.01</u> of this Agreement, in each case, and without any further consent, authorization or other action by such Lender. Each Lender hereby agrees that no Lender shall have any right of action whatsoever against any Agent as a result of any action taken by such Agent pursuant to this Section or in accordance with the terms of any Customary Intercreditor Agreement.  The foregoing provisions are intended as an

115

inducement to the Secured Parties to extend credit to the Borrower and such Secured Parties are intended third-party beneficiaries of such provisions and the provisions of any Customary Intercreditor Agreement.

## ARTICLE X
## MISCELLANEOUS

Section 10.01    Amendments, Etc. Except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders (or the Administrative Agent on behalf of, and acting at the direction of, the Required Lenders) and the Borrower or the applicable Loan Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided that no such amendment, waiver or consent shall:

(a)  extend or increase the Commitment of any Lender without the written consent of each Lender directly and adversely affected thereby (it being understood that a waiver of any condition precedent set forth in Section 4.01 or the waiver of any Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments or Loans shall not constitute an extension or increase of any Commitment of any Lender) (provided that any Lender, upon the request of the Borrower, may extend the maturity date of any of such Lender's Commitments without the consent of any other Lender, including the Required Lenders);

(b)  postpone any date scheduled for, or reduce the amount of, any payment of principal or interest under Section 2.07 or Section 2.08 without the written consent of each Lender directly and adversely affected thereby (it being understood that a waiver of any condition precedent set forth in Section 4.01 or the waiver of any Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments or Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest (provided that any Lender, upon the request of the Borrower, may extend the maturity date of any Loans owing to such Lender without the consent of any other Lender, including the Required Lenders));

(c)  reduce the principal of, or the rate of interest specified herein on, any Loan (it being understood that a waiver of any condition precedent set forth in Section 4.01 or waiver of any Default, Event of Default or mandatory prepayment shall not constitute a reduction or forgiveness of principal), or (subject to clause (ii) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender directly and adversely affected thereby (it being understood that any change to the definition of the Secured Leverage Ratio or in the component definitions thereof shall not constitute a reduction in the rate of interest; provided that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate);

116

(d) (i) amend, modify or waive any provision of this <u>Section 10.01</u> that has the effect of lowering the number of Lenders that must approve any amendment, modification or waiver, in each case without the written consent of each Lender or (ii) reduce the percentages specified in the definition of the term "Required Lenders",

(e) other than in a transaction permitted under <u>Section 7.04</u> or <u>Section 7.05</u>, release all or substantially all of the Collateral in any transaction or series of related transactions (except as expressly permitted by the Collateral Documents or this Agreement), without the written consent of each Lender; or

(f) other than in a transaction permitted under <u>Section 7.04</u> or <u>Section 7.05</u>, release all or substantially all of the Guarantees in any transaction or series of related transactions (except as expressly permitted by the Collateral Documents or this Agreement), without the written consent of each Lender;

and <u>provided, further</u>, that (i) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, adversely affect the rights or duties of, or any fees or other amounts payable to, the Administrative Agent under this Agreement or any other Loan Document and (ii) no amendment, waiver or consent shall, unless in writing and signed by the Collateral Agent in addition to the Lenders required above, adversely affect the rights or duties of, or any fees or other amounts payable to, the Collateral Agent under this Agreement or any other Loan Document.  Notwithstanding the foregoing, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Loans and the accrued interest and fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders and other definitions related to such new Loans.

Notwithstanding anything in this Agreement or any Collateral Document to the contrary, the Administrative Agent may, in its sole discretion, grant extensions of time for the satisfaction of any of the requirements under <u>Sections 6.10</u> and <u>Section 6.12</u> or any Collateral Documents in respect of any particular Collateral or any particular Subsidiary if it determines that the satisfaction thereof with respect to such Collateral or such Subsidiary cannot be accomplished without undue expense or unreasonable effort or due to factors beyond the control of the Borrower and its Subsidiaries by the time or times at which it would otherwise be required to be satisfied under this Agreement or any Collateral Document.

Notwithstanding anything herein to the contrary, any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by the Borrower and the Administrative Agent to (x) cure any ambiguity, omission, mistake, defect or inconsistency (as reasonably determined by the Administrative Agent and the Borrower) and (y) effect administrative changes of a technical or immaterial nature (and such amendment shall be deemed approved by the Lenders if the Lenders shall have received at least five (5) Business Days' prior written notice of such change and the Administrative Agent shall not have received, within five (5) Business Days of the date of such notice to the Lenders, a written notice from the

117

Required Lenders stating that the Required Lenders object to such amendment.

Notwithstanding anything to the contrary contained in this Section 10.01, any guarantees, collateral security documents (including Customary Intercreditor Agreements) and related documents executed by Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended, supplemented and waived with the consent of the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment, supplement or waiver is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to cure ambiguities, omissions, mistakes or defects, (iii) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents or (iv) add syndication or documentation agents and make customary changes and references related thereto.

Upon notice thereof by the Borrower to the Administrative Agent with respect to the inclusion of any Previously Absent Financial Maintenance Covenant, this Agreement shall be amended by an agreement in writing entered into by the Borrower and the Administrative Agent without the need to obtain the consent of any Lender to include such Previously Absent Financial Maintenance Covenant on the date of the incurrence of the applicable Indebtedness to the extent required by the terms of such definition or section.

Section 10.02    Notices and Other Communications; Facsimile Copies.

(a) General. Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Loan Document shall be in writing (including by facsimile transmission). All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)        if to the Borrower or the Administrative Agent, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 10.02 or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties; and

(ii)        if to any other Lender, to the address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a written notice to the Borrower or the Administrative Agent.

All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, four (4) Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail (which form of delivery is subject to the provisions of Section

118

10.02(c)), when delivered; provided that notices and other communications to the Administrative Agent pursuant to Article II shall not be effective until actually received by such Person during the person's normal business hours. In no event shall a voice mail message be effective as a notice, communication or confirmation hereunder.

    (b) Platform.

      (i)    The Borrower hereby acknowledges that (x) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, the "Borrower Materials") by posting the Borrower Materials on an electronic system designated by the Administrative Agent (the "Platform") and (y) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to Holdings (or any parent thereof) or the Borrower or any of their respective securities) (each, a "Public Lender").  The Borrower hereby agrees that (A) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to Holdings (or any parent thereof) or the Borrower or any of their respective securities for purposes of United States federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.08); (B) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Investor"; and (C) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "Public Investor."  Notwithstanding the foregoing, the following Borrower Materials shall be deemed to be marked "PUBLIC" unless the Borrower notifies the Administrative Agent promptly that any such document contains material non-public information:  (1) the Loan Documents, (2) notification of changes in the terms of the Credit Facilities and (3) all information delivered pursuant to Sections 6.01.

      (ii)    Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and Applicable Law, including United States Federal and state securities laws, to make reference to Communications that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to Holdings (or any parent thereof) or the Borrower or any of their respective securities for purposes of United States Federal or state securities laws.

      (iii)    THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF

119

ITS RELATED PARTIES WARRANTS THE ACCURACY OR
COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF
THE PLATFORM AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR
ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY
OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY
WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR
PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR
FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY
THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES IN
CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN
NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS
RELATED PARTIES HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY
LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND,
WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING
DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL
DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT
OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE
ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS
THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY
OF ANY SUCH PERSON IS FOUND IN A FINAL RULING BY A COURT OF
COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM
SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(c)  <u>Effectiveness of Facsimile Documents and Signatures</u>. Loan Documents
may be transmitted and/or signed by facsimile or other electronic communication.
The effectiveness of any such documents and signatures shall, subject to applicable
Law, have the same force and effect as manually signed originals and shall be binding
on all Loan Parties, the Agents and the Lenders.  The words "execution," "signed,"
"signature," and words of like import in any Assignment and Assumption shall be
deemed to include electronic signatures or the keeping of records in electronic form,
each of which shall be of the same legal effect, validity or enforceability as a
manually executed signature or the use of a paper-based recordkeeping system, as the
case may be, to the extent and as provided for in any applicable law, including the
Federal Electronic Signatures in Global and National Commerce Act, the New York
State Electronic Signatures and Records Act, or any other similar state laws based on
the Uniform Electronic Transactions Act.

(d)  <u>Reliance by Agents and Lenders</u>. The Administrative Agent and the
Lenders shall be entitled to rely and act upon any notices (including telephonic
Committed Loan Notices) purportedly given by or on behalf of the Borrower even if
(i) such notices were not made in a manner specified herein, were incomplete or were
not preceded or followed by any other form of notice specified herein, or (ii) the
terms thereof, as understood by the recipient, varied from any confirmation thereof.
All telephonic notices to the Administrative Agent may be recorded by the
Administrative Agent, and each of the parties hereto hereby consents to such
recording.

(e) <u>Notice to other Loan Parties</u>. The Borrower agrees that notices to be given to any other Loan Party under this Agreement or any other Loan Document may be given to the Borrower in accordance with the provisions of this <u>Section 10.02</u> with the same effect as if given to such other Loan Party in accordance with the terms hereunder or thereunder.

Section 10.03    <u>No Waiver; Cumulative Remedies</u>. No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Section 10.04    <u>Attorney Costs and Expenses</u>. The Borrower agrees (a) to pay or reimburse the Administrative Agent, the Collateral Agent and the Lenders for all reasonable and documented or invoiced out-of-pocket costs and expenses associated with the syndication of the Loans and the preparation, execution and delivery of this Agreement and the other Loan Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), including all Financial Advisor Costs of Houlihan Lokey and all Attorney Costs of Gibson, Dunn & Crutcher LLP and Jones Day (and local counsel in each relevant jurisdiction or otherwise retained with the Borrower's consent (such consent not to be unreasonably withheld, conditioned or delayed)) and (b) to pay or reimburse (x) the Administrative Agent and the Collateral Agent for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the [administration], amendment, modification, waiver and/or enforcement of any rights or remedies under this Agreement or the other Loan Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), including Attorney Costs of one firm or counsel to the Administrative Agent and the Collateral Agent (and, to the extent required, one firm or local counsel in each relevant local jurisdiction or otherwise retained with the Borrower's consent (such consent not to be unreasonably withheld, conditioned or delayed), which may include a single special counsel acting in multiple jurisdictions) and (y) the Lenders, as a group, for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the amendment, modification, waiver and/or enforcement of any rights or remedies under this Agreement or the other Loan Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), including Attorney Costs of one firm or counsel to the Lenders, as a group, (and, to the extent required, one firm or local counsel in each relevant local jurisdiction or otherwise retained with the Borrower's consent (such consent not to be unreasonably withheld, conditioned or delayed), which may include a single special counsel acting in multiple jurisdictions). Subject to the limitations above, the foregoing costs and expenses shall include all reasonable search, filing, recording and title insurance charges and fees related thereto, and other reasonable and documented or invoiced out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent or the Lenders. The agreements in this <u>Section 10.04</u> shall survive the termination of the Aggregate Commitments and repayment of all other Obligations. All

121

amounts due under this Section 10.04 shall be paid within ten (10) Business Days of receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail.

Section 10.05    Indemnification by the Borrower. The Borrower shall indemnify and hold harmless each Agent, each Lender (without duplication) and their respective Affiliates, directors, officers, employees, agents, advisors, and other representatives (collectively, the "Indemnitees") and hold them harmless from and against any and all losses, claims, damages and liabilities of any kind or nature and documented or invoiced out-of-pocket fees and expenses (and, in the case of Attorney Costs, reasonable Attorney Costs of one firm of counsel for all Indemnitees and, if necessary, one firm of local counsel in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for all Indemnitees taken as a whole (and, in the case of an actual or perceived conflict of interest, where the Indemnitee affected by such conflict informs the Borrower of such conflict and thereafter retains its own counsel, of such other firm of counsel for such affected Indemnitee)) (collectively, the "Losses") of any such Indemnitee arising out of or relating to any claim or any litigation or other proceeding (including any inquiry or investigation of the foregoing) (regardless of whether such Indemnitees is a party thereto and whether or not such proceedings are brought by the Borrower, its equity holders, its Affiliates, creditors or any other third person) that relates to the Transactions, including the financing contemplated hereby (collectively, the "Indemnified Liabilities") and any Losses that relate to any actual or alleged presence or Release or threatened Release of Hazardous Materials on or from any property currently or formerly owned or operated by the Borrower or any Subsidiary or any other liability arising under Environmental Law, in each case arising out of the activities or operations of the Borrower or any Subsidiary; provided that no Indemnitee will be indemnified for any Losses or related expenses to the extent it has resulted from (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or any of its Affiliates or any of the officers, directors, employees, advisors, agents or other representatives of any of the foregoing (as determined by a court of competent jurisdiction in a final and non-appealable decision; (y) a material breach of the obligations under the Loan Documents of such Indemnitee or any of such Indemnitee's Affiliates or any of the officers, directors, employees, advisors, agents or other representatives of any of the foregoing (as determined by a court of competent jurisdiction in a final and non-appealable decision), or (z) any claim, litigation, investigation or other proceeding (other than a claim, litigation, investigation or other proceeding against any Agent or any Lead Arranger or any Person acting in a similar capacity, in each case, acting pursuant to the Loan Documents or in its capacity as such or of any of its Affiliates or its or their respective officers, directors, employees, agents, advisors and other representatives and the successors of each of the foregoing) solely between or among Indemnities that does not arise from any act or omission by the Borrower or any of its Affiliates; provided, further, that the Administrative Agent and the Collateral Agent to the extent fulfilling their respective roles as an agent under the Facilities and in their capacities as such, shall remain indemnified in respect of such claim, litigation, investigation or other proceeding, to the extent that none of the exceptions set forth in clauses (x) , (y) or (z) of the immediately preceding proviso apply to such person at such time. No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through information transmission systems designated by the Administrative Agent in connection with this Agreement except to the extent that such damages have resulted from the willful misconduct, bad faith or gross negligence of such Indemnitee or any of such Indemnitee's Affiliates or any of its or their respective officers, directors, employees, agents, advisors or other

NAI-1502591911v5

representatives (as determined by a court of competent jurisdiction in a final and non-appealable decision).  No Indemnitee and no Loan Party shall have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date); <u>provided</u> that nothing in this sentence shall limit the indemnification obligations of the Loan Parties set forth herein or in any other Loan Document.  All amounts due under this Section 10.05 shall be paid within ten (10) Business Days after demand therefor; provided, however, that such Indemnitee shall promptly refund such amount to the extent that there is a final judicial or arbitral determination that such Indemnitee was not entitled to indemnification or contribution rights with respect to such payment pursuant to the express terms of this Section 10.05.  The agreements in this Section 10.05 shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations. For the avoidance of doubt, this Section 10.05 shall not apply to Taxes other than Taxes that represent liabilities, obligations, losses, damages, etc., with respect to a non-Tax claim.

Section 10.06    Payments Set Aside. To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate.

Section 10.07    Successors and Assigns.

(a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that, except as otherwise provided herein (including without limitation as permitted under Section 7.04 and Section 7.10), neither Holdings nor the Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee, (ii) by way of participation in accordance with the provisions of Section 10.07(e), (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.07(g) or (iv) to an SPC in accordance with the provisions of Section 10.07(h) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 10.07(e) and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

123

(b)   (i)   Subject to the conditions set forth in paragraph (b)(ii) below and acceptance and recording by the Administrative Agent pursuant to paragraph (d) of this Section 10.07, any Lender may assign to one or more assignees ("Assignees") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of the Administrative Agent; provided that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Loan to another Lender, an Affiliate of a Lender or an Approved Fund.

(ii)        Assignments shall be subject to the following additional conditions:

(A)       except in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 unless the Borrower and the Administrative Agent otherwise consents; provided that (1) no such consent of the Borrower shall be required if an Event of Default under Section 8.01(a) has occurred and is continuing and (2) such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

(B)       the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption;

(C)       the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent any documentation required by Section 3.01(f) and (g); and

(D)       the Assignee shall not be a Disqualified Lender.

This paragraph (b) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Facilities on a non-pro rata basis.

(c)   Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 10.07(d) and receipt by the Administrative Agent from the parties to each assignment of a processing and recordation fee of $3,500, which fee may be waived only by the Administrative Agent in its sole discretion (provided that it is understood and agreed that such fee shall not apply to assignments by Administrative Agent or any of its Affiliates), from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement

(including the obligation to provide documentation pursuant to Section 3.01(f) and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment). Upon request, and the surrender by the assigning Lender of its Note (if any), the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this clause (c) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.07(e). For greater certainty, any assignment by a Lender pursuant to this Section 10.07 shall not in any way constitute or be deemed to constitute a novation, discharge, recession, extinguishment or substitution of the existing Indebtedness and any Indebtedness so assigned shall continue to be the same obligation and not a new obligation.

(d) The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and related stated interest amounts) of the Loans and amounts due under Section 2.10, owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  No assignment shall be effective unless recorded in the Register.  The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, any Agent and any Lender with respect to its own Loans and/or Commitments only, at any reasonable time and from time to time upon reasonable prior notice.  The parties hereto agree and intend that the Obligations shall be treated as being in "registered form" for the purposes of the Code (including Code Sections 163(f), 871(h)(2), and 881(c)(2)), and the Register shall be maintained in accordance with such intention.

(e) Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person or a Disqualified Lender) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans  owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (iv) any agreement or instrument pursuant to which a Lender sells such a participation shall provide that the Participant shall

provide the documentation required under Section 3.01(f) as if it were a Lender.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or the other Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in Section 10.01(a), (b), (c), (e) or (f) that directly and adversely affects such Participant. Subject to Section 10.07(f), the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 (through the applicable Lender), subject to the requirements and limitations of such Sections (including Section 3.01(f)) and Sections 3.06 and 3.07, to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.07(b). To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.09 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.13 as though it were a Lender. Any Lender that sells participations shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and the address of each Participant and the principal amounts (and related stated interest amounts) of each Participant's participation interest in the Commitments and/or Loans (or other rights or obligations) held by it (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans, Letters of Credit or its other obligations under any Loan Document), except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive, absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation interest as the owner thereof for all purposes notwithstanding any notice to the contrary. Notwithstanding anything to the contrary, no Lender, by maintaining the Participant Register, undertakes any duty, responsibility or obligation to the Borrower (including, without limitation, that in no event shall any such Lender be a fiduciary of the Borrower for any purpose, except that such Lender shall maintain the Participant Register).

(f)  A Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent or except to the extent such entitlement to a greater payment results from a Change in Law after the Participant became a Participant.

(g) Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any other central bank , and this Section

shall not apply to any such pledge or assignment of a security interest; <u>provided</u> that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.  In order to facilitate such pledge or assignment, the Borrower hereby agrees that, upon the request of any Lender at any time and from time to time after the Borrower has made its initial borrowing hereunder, the Borrower shall provide to such Lender, at the Borrower's own expense, a Note evidencing the Loan owing to such Lender.

(h) Notwithstanding anything to the contrary contained herein, any Lender (a "<u>Granting Lender</u>") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "<u>SPC</u>") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; <u>provided</u> that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. Each party hereto hereby agrees that (i) an SPC shall be entitled to the benefit of <u>Sections 3.01</u>, <u>3.04</u> and <u>3.05</u>, subject to the requirements and limitations of such <u>Sections</u> (including <u>Section 3.01(f)</u>) and <u>Sections 3.06</u> and <u>3.07</u>, to the same extent as if such SPC were a Lender, but neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under <u>Section 3.01</u>, <u>3.04</u> or <u>3.05</u>) except to the extent any entitlement to greater amounts results from a Change in Law after the grant to the SPC occurred, (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable and such liability shall remain with the Granting Lender, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder. The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent, assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee Obligation or credit or liquidity enhancement to such SPC.

(i)  Notwithstanding anything to the contrary contained herein, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it and (2) any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; <u>provided</u> that unless and until such trustee actually becomes a Lender in compliance with the other

127

provisions of this Section 10.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

Section 10.08    Confidentiality. Each of the Agent and the Lenders agrees to maintain the confidentiality of the Information and to not disclose such information, except that Information may be disclosed (a) to its Affiliates and its and its Affiliates' directors, officers, employees, trustees, investment advisors and agents, including accountants, legal counsel and other advisors and any numbering, administration or settlement service providers (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); (b) to the extent requested by any Governmental Authority (in which case the Agents and the Lenders agree (except with respect to any audit or examination conducted by bank accountants or regulatory authority exercising examination or regulatory authority), to the extent practicable and not prohibited by applicable Law, to inform the Borrower promptly thereof prior to disclosure); (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process (in which case the Agents and the Lenders agree (except with respect to any subpoena issued by bank accountants or regulatory authority exercising examination or regulatory authority), to the extent practicable and not prohibited by applicable Law, to inform the Borrower promptly thereof prior to disclosure); (d) to any other party to this Agreement; (e) subject to an agreement containing provisions substantially the same as those of this Section 10.08 (or as may otherwise be reasonably acceptable to the Borrower), to any pledgee referred to in Section 10.07(g) or Section 10.07(i), Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or Participant in, any of its rights or obligations under this Agreement; (f) with the written consent of the Borrower; (g) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section 10.08 or similar obligation of confidentiality or (ii) becomes available to any Agent, any Lender, or any of their respective Affiliates on a nonconfidential basis from a source other than Holdings, the Borrower or any Subsidiary thereof, and which source is not known by such Agent or Lender to be subject to a confidentiality restriction in respect thereof in favor of the Borrower, any Permitted Holder or any of their respective Affiliates; and (h) to any Governmental Authority or examiner regulating any Lender (in which case the Agents and the Lenders agree (except with respect to any audit or examination conducted by bank accountants or regulatory authority exercising examination or regulatory authority), to the extent practicable and not prohibited by applicable Law, to inform the Borrower promptly thereof prior to disclosure).  For the purposes of this Section 10.08, "Information" means all information received from any Loan Party or its Affiliates or its Affiliates' directors, officers, employees, trustees, investment advisors or agents, relating to Holdings, the Borrower or any of their subsidiaries or their business, other than any such information that is publicly available to any Agent or any Lender prior to disclosure by any Loan Party other than as a result of a breach of this Section 10.08 or similar obligation of confidentiality, including, without limitation, information delivered pursuant to Section 6.01, 6.02 or 6.03 hereof.

Section 10.09    Setoff. In addition to any rights and remedies of the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, each

128

Lender is authorized at any time and from time to time, without prior notice to the Borrower or any other Loan Party, any such notice being waived by the Borrower (on its own behalf and on behalf of each Loan Party and its Subsidiaries) to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (other than deposits held in accounts established as escrow, payroll, trust or Tax accounts) at any time held by, and other Indebtedness at any time then due and owing by, such Lender, to or for the credit or the account of the respective Loan Parties and their Subsidiaries against any and all Obligations then due and owing to such Lender hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not such Agent or such Lender shall have made demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit or Indebtedness; provided that in the event that any Defaulting Lender shall exercise any such right of set-off, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 8.04 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations then due and owing to such Defaulting Lender as to which it exercised such right of set-off.  Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such set off and application made by such Lender; provided that the failure to give such notice shall not affect the validity of such setoff and application. The rights of the Administrative Agent, each Lender under this Section 10.09 are in addition to other rights and remedies (including other rights of setoff) that the Administrative Agent, such Lender may have.

        Section 10.10    Counterparts. This Agreement and each other Loan Document may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Delivery by telecopier or other electronic means of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document. The Agents may also require that any such documents and signatures delivered by telecopier or other electronic means be confirmed by a manually signed original thereof; provided that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by telecopier or such other electronic means.

        Section 10.11    Integration. This Agreement, together with the other Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter. In the event of any conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control; provided that the inclusion of supplemental rights or remedies in favor of the Agents or the Lenders in any other Loan Document shall not be deemed a conflict with this Agreement. Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

        Section 10.12    Survival of Representations and Warranties. All representations and warranties made hereunder and in any other Loan Document or other document delivered

pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by each Agent and each Lender, regardless of any investigation made by any Agent or any Lender or on their behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

Section 10.13   Severability. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 10.14   GOVERNING LAW.

(a) THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b) ANY LEGAL ACTION OR PROCEEDING ARISING UNDER THIS AGREEMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, SHALL BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK (PROVIDED THAT IF NONE OF SUCH COURTS CAN AND WILL EXERCISE SUCH JURISDICTION, SUCH EXCLUSIVITY SHALL NOT APPLY), AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, THE BORROWER, HOLDINGS, EACH AGENT AND EACH LENDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THOSE COURTS. THE BORROWER, HOLDINGS, EACH AGENT AND EACH LENDER IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(c) THE BORROWER IRREVOCABLY CONSENTS TO THE SERVICE OF ANY AND ALL PROCESS IN ANY SUCH ACTION OR PROCEEDING TO THE BORROWER AT THE ADDRESS PROVIDED FOR IT ON SCHEDULE

10.02. NOTHING IN THIS SECTION LIMITS THE RIGHT OF THE ADMINISTRATIVE AGENT OR ANY LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 10.15    WAIVER OF RIGHT TO TRIAL BY JURY. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 10.15 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

Section 10.16    Binding Effect. This Agreement shall become effective when it shall have been executed by the Borrower and Holdings and the Administrative Agent shall have been notified by each Lender that each such Lender have executed it and thereafter shall be binding upon and inure to the benefit of the Borrower, each Agent and each Lender and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lenders except as permitted by Section 7.04.

Section 10.17    Judgment Currency. If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given. The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "Judgment Currency") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "Agreement Currency"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable Law).

131

Section 10.18    Lender Action. Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, without the prior written consent of the Administrative Agent. The provisions of this Section 10.18 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

Section 10.19    USA PATRIOT Act. Each Lender hereby notifies the Borrower that, pursuant to the requirements of the USA PATRIOT Act, it is or may be required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the USA PATRIOT Act.

Section 10.20    Release of Collateral and Guarantee Obligations.

(a) The Lenders hereby irrevocably agree that the Liens granted to the Secured Parties by the Loan Parties on any Collateral shall be automatically released (i) in full, as set forth in clause (b) below, (ii) upon the Disposition of such Collateral to any Person other than another Loan Party, to the extent such Disposition is permitted hereunder (and the Administrative Agent and the Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Loan Party upon its reasonable request without further inquiry), (iii) to the extent such Collateral is comprised of property leased to a Loan Party by a Person that is not a Loan Party, upon termination or expiration of such lease, (iv) if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders (or such other percentage of the Lenders whose consent may be required in accordance with Section 10.01), (v) to the extent the property constituting such Collateral is owned by any Guarantor, upon the release of such Guarantor from its obligations under the Guarantee (in accordance with the second succeeding sentence and Section 4.13 of the Guarantee), (vi) as required by the Administrative Agent or the Collateral Agent to effect any sale, transfer or other disposition of Collateral in connection with any exercise of remedies of the Administrative Agent or Collateral Agent pursuant to the Collateral Documents and (vii) to the extent such Collateral otherwise becomes an Excluded Equity Interest or an Excluded Asset.  Any such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those being released) upon (or obligations (other than those being released) of the Loan Parties in respect of) all interests retained by the Loan Parties, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral except to the extent otherwise released in accordance with the provisions of the Loan Documents.  Additionally, the Lenders hereby irrevocably agree that the Guarantors shall be released from the Guarantees upon consummation of any transaction permitted hereunder resulting in such Subsidiary ceasing to constitute a Subsidiary, or otherwise becoming an Excluded Subsidiary, in each case, solely to the extent such Subsidiary ceasing to constitute a Subsidiary or otherwise becoming an Excluded

132

Subsidiary is not prohibited by this Agreement.  The Lenders hereby authorize the Administrative Agent and the Collateral Agent, as applicable, to execute and deliver any instruments, documents, and agreements necessary or desirable to evidence and confirm the release of any Guarantor or Collateral pursuant to the foregoing provisions of this paragraph, all without the further consent or joinder of any Lender. Any representation, warranty or covenant contained in any Loan Document relating to any such Collateral or Guarantor shall no longer be deemed to be repeated solely with respect to such Collateral or Guarantor.

(b) Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Obligations (other than contingent indemnification obligations and other contingent obligations) have been paid in full, all Commitments have terminated or expired, upon request of the Borrower, the Administrative Agent and/or Collateral Agent, as applicable, shall (without notice to, or vote or consent of, any Secured Party) take such actions as shall be required to release its security interest in all Collateral, and to release all obligations under any Loan Document, whether or not on the date of such release there may be any contingent indemnification obligations and other contingent obligations.  Any such release of Obligations shall be deemed subject to the provision that such Obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

(c)  Notwithstanding the foregoing or anything in the Loan Documents to the contrary, at the direction of the Required Lenders, the Administrative Agent may, in exercising remedies, take any and all necessary and appropriate action to effectuate a credit bid of all Loans (or any lesser amount thereof) for the Borrower's assets in a bankruptcy, foreclosure or other similar proceeding, forbear from exercising remedies upon an Event of Default, or in a bankruptcy proceeding, enter into a settlement agreement on behalf of all Lenders.

Section 10.21    Conflicts with Other Loan Documents. In the event there is a conflict or inconsistency between this Agreement and any other Loan Document, the terms of this Agreement shall control; provided that any provision of the Collateral Documents which imposes additional burdens on the Loan Parties or further restricts the rights of the Loan Parties or gives the Administrative Agent or Lenders additional rights, in each case, with respect to the Collateral, shall not be deemed to be in conflict or inconsistent with this Agreement and shall be given full force and effect.

Section 10.22    ORIGINAL ISSUE DISCOUNT LEGEND. THE LOANS ARE ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR U.S. FEDERAL INCOME TAX PURPOSES. THE ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, ISSUE DATE AND YIELD TO MATURITY FOR SUCH LOANS MAY BE OBTAINED BY

133

SUBMITTING A WRITTEN REQUEST FOR SUCH INFORMATION TO
ADMINISTRATIVE AGENT AT THE ADDRESS SET FORTH IN THIS
AGREEMENT.


[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]

NAI-1502591911v5

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

[ANSWERS FINANCE, LLC],
  as the Borrower


By:    _____
       Name:
       Title:

ANSWERS HOLDINGS, INC.
as Holdings


By: _____
Name:
Title:

NAI-1502591911v5

CREDIT SUISSE AG, CAYMAN ISLANDS
BRANCH,
as Administrative Agent and Collateral Agent

By:    _____
       Name:
       Title:


By:    _____
       Name:
       Title:

CREDIT SUISSE AG, CAYMAN ISLANDS
BRANCH,
as a Lender

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

## **Exhibit C**

### **Exit L/C Facility Documents**

Certain documents, or portions thereof, contained in this Exhibit C and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto. The Debtors reserve all rights, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

## LETTER OF CREDIT REIMBURSEMENT AND SECURITY AGREEMENT

This Letter of Credit Reimbursement and Security Agreement (the "Agreement") is entered into as of April [_], 2017, among ANSWERS CORPORATION, a Delaware corporation ("Applicant", as applicable), ANSWERS HOLDINGS, INC., a Delaware corporation ("Holdings" or "Holdings", as applicable), CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH ("Credit Suisse", and, in such capacity and together with its successors and assigns, "Issuer"), and Credit Suisse in its capacity as Collateral Agent (in such capacity, the "Collateral Agent").

## RECITALS

WHEREAS, on March 3, 2017, Holdings, the Applicant and each of the Guarantors (collectively, the "Debtors" or "Reorganized Debtors", as applicable) commenced chapter 11 cases administratively consolidated as Chapter 11 Case No. 17-10496 (collectively, the "Chapter 11 Cases") by filing separate voluntary petitions for reorganization pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, on April [_], 2017, the Bankruptcy Court entered an order (the "Confirmation Order") confirming the Debtors' [_____] (the "Plan");

WHEREAS, upon the terms and subject to the conditions set forth herein, the Applicant has requested and the Issuer has agreed from time to time to issue one or more standby letters of credit in an aggregate principal amount of up to $2,000,000.00, which letters of credit shall be in a form satisfactory in all respects to Issuer in its sole discretion (each, as amended or otherwise modified from time to time, a "Letter of Credit"), for the account of Applicant and for the benefit of one or more Persons (as defined below) (each, a "Beneficiary") for the purpose of supporting leasehold obligations related to the Applicant's business;

WHEREAS, Issuer has established, and is the owner of, the non-segregated, non-interest bearing Account No. 8900492627 (the "Collateral Account"), with Bank of New York (the "Deposit Bank");

WHEREAS, Applicant has agreed, pursuant to the terms and conditions set forth herein, to provide Issuer certain cash sums from time to time to be deposited in the Collateral Account as collateral for the obligations of Applicant incurred under, arising out of or in connection with this Agreement;

WHEREAS, Holdings and its Subsidiaries (as defined in the Exit Facility Credit Agreement) (other than Excluded Subsidiaries, as defined in the Exit Facility Credit Agreement) are willing to guarantee all of the Obligations of Applicant under this Agreement;

WHEREAS, each Subsidiary will receive substantial direct and indirect benefits by reason of the financial accommodations to Applicant as provided in this Agreement; and

WHEREAS, Applicant and Issuer desire to set forth the terms and conditions that shall apply to the Letters of Credit and certain related matters in connection therewith.

NOW, THEREFORE, Applicant and Issuer hereby agree as follows:

1.    Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Agreement" means this Letter of Credit Reimbursement and Security Agreement, as amended or otherwise modified from time to time in accordance with the terms hereof.

"Amendment" has the meaning specified in Section 3.

"Amendment Request" has the meaning specified in Section 3.

"Applicant" has the meaning specified in the preamble hereof.

"Authorized Act" has the meaning specified in Section 3(d).

"Authorized Officer" has the meaning specified in Section 3(d).

"Bankruptcy Code" has the meaning specified in the recitals hereof.

"Base Rate" means, with respect to any amount payable hereunder, a fluctuating interest rate per annum in effect from time to time, which rate per annum shall at all times be equal to the higher of:

(i)    the rate of interest per annum most recently announced or established by Issuer in New York, New York, from time to time, as Issuer's "prime rate for dollars loaned in the United States"; and

(ii)    ½ of 1% per annum above the Federal Funds Rate in effect from time to time.

The Base Rate is an index rate and is not necessarily intended to be the lowest or best rate of interest charged to other customers in connection with extensions of credit to customers or to other banks.

"Beneficiary" has the meaning specified in the recitals hereof.

"Business Day" means a day other than a Saturday, a Sunday or any other day on which banks are authorized or required by law to close in New York City.

"Certificate" has the meaning specified in Section 3(c).

"Change in Control" shall be deemed to have occurred if any change in control (or similar event, however denominated), as defined under any material post-petition Indebtedness of Applicant, shall have occurred.

"Collateral" has the meaning specified in Section 11(a).

"Collateral Account" has the meaning specified in the recitals hereof.

"<u>Deposit Bank</u>" has the meaning specified in the recitals hereof.

"<u>Effective Date</u>" has the meaning specified in Section 3.

"<u>Event of Default</u>" has the meaning specified in Section 15(a).

"<u>Existing Credit Agreement</u>" means the Senior Secured Super Priority Debtor in Possession Credit Agreement, dated as of March 3, 2017, among Holdings, the Applicant, Credit Suisse, as administrative agent and collateral agent, and the other lenders from time to time party thereto, as amended or otherwise modified from time to time.

"<u>Existing L/C Agreement</u>" means that certain Senior Secured Super Priority Debtor in Possession Letter of Credit Reimbursement and Security Agreement, dated as of March 3, 2017, among Holdings, the Applicant, and Credit Suisse as issuer.

"<u>Exit Facility Credit Agreement</u>" means the Credit Agreement, dated as of [_____], 2017, among Holdings, Applicant, Credit Suisse, as administrative agent and collateral agent, and the other lenders from time to time party thereto, as amended or otherwise modified from time to time.

"<u>Exit Financing Order</u>" means an order entered by the Bankruptcy Court in the Chapter 11 Cases, in form and substance satisfactory to the Issuer, approving and authorizing this Agreement, which order may be the Confirmation Order.

"<u>Federal Funds Rate</u>" means, for any day, a fluctuating interest rate per annum equal for such day to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by Issuer from three Federal funds brokers of recognized standing selected by it.

"<u>Guarantors</u>" shall mean those Subsidiaries of Applicant party to the Guaranty Agreement dated as of the date hereof.

"<u>Guaranty Agreement</u>" shall mean that certain guaranty dated as of the date hereof between Applicant, Holdings, certain subsidiaries identified therein, and the Issuer, as the same may be amended, modified or supplemented from time to time.

"<u>Governing Body</u>" has the meaning specified in Section 3(a).

"<u>Holdings</u>" has the meaning specified in the preamble hereof.

"<u>Indebtedness</u>" means all loans, all obligations for money borrowed, any other obligations evidenced by notes, bonds, debentures or other similar instruments, and any guaranties by Applicant of any of the foregoing.

"<u>Indemnified Parties</u>" has the meaning specified in Section 10.

"Issuance Period" means the period commencing on the Effective Date and ending on the Termination Date.

"Issuer" has the meaning specified in the preamble hereof.

"Issuer Costs" has the meaning specified in Section 8(b).

"L/C Outstandings" means, at any time, an aggregate amount equal to the sum of (a) the Undrawn Amount of all outstanding Letters of Credit and (b) the aggregate amount of all unpaid L/C Reimbursement Amounts, in each case, at such time.

"L/C Reimbursement Amount" has the meaning specified in Section 4(a).

"Letter of Credit" has the meaning specified in the recitals hereof.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

"Maximum Undrawn Amount" means, at any time from and after the Effective Date, $2,000,000.00.

"Minimum Collateral Base" means, on any date as of which it is determined hereunder, the product of (a) the L/C Outstandings on such date and any accrued interest thereon multiplied by (b) 1.05.

"Net Asset Value" has the meaning specified in Section 6(a).

"Non-Excluded Taxes" has the meaning specified in Section 9.

"Notice Date" has the meaning specified in Section 6(b).

"Obligations" has the meaning specified in Section 11(a).

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56 (signed into law on December 26, 2001), as amended from time to time.

"Person" means an individual, partnership, corporation (including a business trust), joint stock company, trust, unincorporated association, joint venture, limited liability company or other entity, or a government or any political subdivision or agency thereof.

"Permitted Use" means, with respect to any Letter of Credit, (i) replacing any expiring letters of credit that are issued and outstanding under the Existing Credit Agreement or Existing L/C Agreement, (ii) supporting lease obligations related to the Applicant's business[, or (iii) any other general corporate purposes of the Applicant].

"Prime Brokerage Cash Rate" means a rate per annum equal to 30-day LIBOR (as determined by Issuer in a commercially reasonable manner) minus fifteen (15) basis points.

"Proceeding" has the meaning specified in Section 25.

"Reorganized Debtors" has the meaning specified in the preamble hereof.

"Request" has the meaning specified in Section 3.

"Second Lien Credit Agreement" means the Second Lien Credit Agreement, dated as of April __, 2017 among Holdings, Applicant, the lenders party thereto, and _____, as administrative agent thereunder

"Shortfall Amount" has the meaning specified in Section 6(b).

"Shortfall Date" has the meaning specified in Section 6(b).

"Shortfall Notice" has the meaning specified in Section 6(b).

"Undrawn Amount" means, at any time, with respect to any Letter of Credit or Letters of Credit, the total amount then available to be drawn under such Letter of Credit or Letters of Credit.

"Termination Date" means [_____], 20[21] unless earlier terminated pursuant to Section 29 hereof.

"UCC" has the meaning specified in Section 13.

2.    Applicability of Agreement.  This Agreement shall apply to each Letter of Credit (and any Amendments thereto) requested by Applicant and issued pursuant to the terms and conditions hereof.

3.    Issuance of Letters of Credit.  During the Issuance Period, within five (5) Business Days after receipt by Issuer of (i) Applicant's written request, submitted substantially in the form of Exhibit A attached hereto (a "Request"), that Issuer issue a Letter of Credit or Letters of Credit to one or more Beneficiaries, or (ii) Applicant's written request, submitted substantially in the form of Exhibit B attached hereto (an "Amendment Request"), for an amendment to an existing Letter of Credit (in a form satisfactory in all respects to Issuer in its sole discretion) (an "Amendment"), Issuer shall issue such Letter of Credit or Amendment subject to the following conditions (the date on which each of such conditions has been satisfied, the "Effective Date"):

(a)    prior satisfaction by Applicant of its obligations set forth in Section 5(a);

(b)    payment in full of the fees and expenses described in Section 8 hereof and due and payable on the Effective Date;

(c)    delivery of a certificate (a "Certificate") executed by an Authorized Officer, in substantially the form attached hereto as Exhibit C, certifying, *inter alia*, that the representations and warranties set forth in this Agreement are true and correct in all respects as of such date and no Event of Default has occurred and is continuing and that no portion of the proceeds of such Letter of Credit shall be used for any purpose other than a Permitted Use;

(d)    prior receipt by Issuer of the following items:

(i)    a certified copy of the resolutions of the Board of Directors (or equivalent governing body) of Applicant (the "Governing Body") with respect to this Agreement, including, without limitation, (A) approving this Agreement, all matters contemplated hereby, the legal documentation relating to each transaction for which such Letter of Credit or Letters of Credit are to be issued, the issuance of Letters of Credit pursuant to this Agreement with an aggregate Undrawn Amount of up to the Maximum Undrawn Amount and all other matters contemplated in connection herewith and of all other documents evidencing any other necessary corporate action and (B) authorizing each applicable officer of Applicant (each, an "Authorized Officer") to take all such actions, to arrange for, execute and deliver any Request or Amendment Request with respect to Letters of Credit in an aggregate amount of up to the Maximum Undrawn Amount, supplemental agreements, instruments, amendments, extensions or other modifications in the name and on behalf of Applicant, which the applicable Authorized Officer determines in his/her sole judgment to be necessary, proper or advisable in connection with or in order to perform Applicant's obligations hereunder or in connection with this Agreement (each such act, an "Authorized Act"), with the performance of any Authorized Act by any Authorized Officer to be conclusive evidence that the same has been authorized and approved by Applicant and the Governing Body in every respect;

(ii)    a true and complete copy of any legal documentation relating to each transaction for which each Letter of Credit is to be issued (or an Amendment to be effected) that Issuer may request in its sole discretion;

(iii)    all documentation and other information requested by Issuer under applicable "know your customer" and anti-money-laundering rules and regulations, including without limitation, the Patriot Act; and

(iv)    evidence satisfactory to Issuer that the Exit Facility Credit Agreement and the related Loan Documents (as defined in the Exit Facility Credit Agreement) have been executed and delivered by all parties thereto and are in full force and effect as of the Effective Date; and

(e)    the Bankruptcy Court shall have entered the Exit Financing Order in form and substance satisfactory to Issuer.

Issuer, in its sole discretion, may issue any Letter of Credit through one or more of its branches or affiliates.

Notwithstanding anything to the contrary contained herein, (i) in no event may a Request or Amendment Request be submitted to Issuer, and no Letter of Credit (or Amendment thereto) shall be issued, after the Issuance Period unless expressly consented to in writing by Issuer, (ii) no Letter of Credit shall have an expiration date later than one (1) year after the date of issuance thereof (provided, that any Letter of Credit may, upon the request of Applicant, include a provision whereby such Letter of Credit shall be renewed automatically for additional consecutive periods of one year or less unless Issuer notifies the beneficiary thereof within the time period specified in such Letter of Credit or, if no such time period is specified, at least 30 days prior to the then-applicable expiration date, that such Letter of Credit will not be renewed) and (iii) no Letter of Credit (or Amendment thereto) shall be issued if after giving effect thereto, the aggregate Undrawn Amount of the Letters of Credit hereunder would exceed the Maximum Undrawn Amount.

4.    Reimbursement.

(a)    Applicant shall reimburse Issuer for the amount of any drawing honored under a Letter of Credit and paid by Issuer (and any taxes, fees, charges or other costs reasonably incurred by Issuer in connection with such payment) (the "L/C Reimbursement Amount"). Applicant shall reimburse Issuer under this Section 4(a) in immediately available funds (i) no later than 3 p.m. on the day (which shall be a Business Day) on which payment is made by Issuer under a Letter of Credit; provided that Issuer notifies Applicant by noon on such date that Issuer has made such payment under such Letter of Credit or (ii) if Issuer notifies Applicant after noon on the date of such payment, then by 11 a.m. on the next Business Day following receipt of such notice by Applicant, provided that the failure of Issuer to so notify Applicant, and any delay in so notifying Applicant, shall not relieve, limit or otherwise affect any obligation of Applicant under this Agreement or any related document.

(b)    Applicant shall pay to Issuer the full L/C Reimbursement Amount plus any accrued and unpaid interest thereon in cash on demand.

(c)    Applicant shall pay to Issuer, on demand, all Issuer Costs as more specifically set forth in Section 8.

(d)    Applicant authorizes Issuer to charge the Collateral Account at any time (i) upon and after the drawing of any Letter of Credit for the full amount of the L/C Reimbursement Amount and (ii) from time to time for any other Obligations.

5.    Covenants.

(a)    Prior to the issuance by Issuer of any Letter of Credit (or any Amendment thereto) hereunder and as a condition precedent thereto, Applicant shall provide Issuer a cash sum for deposit in the Collateral Account so that, when combined with the aggregate Net Asset Value of all cash from Applicant already on deposit in the Collateral Account, the Collateral Account, with respect to Applicant, contains assets with an aggregate Net Asset Value equal to or greater than the Minimum Collateral Base.

(b)      In the event that there is a decline or reduction in the Net Asset Value as determined in accordance with Section 6(a), Applicant shall provide Issuer additional amounts in cash to be deposited in the Collateral Account in such amounts and in the manner required pursuant to Section 6(c).

(c)      Applicant hereby agrees that it will (i) comply in all material respects with all U.S. and foreign laws, regulations and rules now or later applicable to any Letter of Credit or this Agreement and the transactions contemplated thereunder and hereunder, or Applicant's execution, delivery and performance under this Agreement, (ii) inform Issuer promptly upon Applicant becoming aware of the occurrence of an Event of Default, (iii) preserve and maintain in full force and effect its corporate existence and good standing under the laws of its jurisdiction of organization, and (iv) pay and discharge as the same shall become due and payable, all of its material obligations and liabilities, except any obligation and liabilities that are being contested in good faith by appropriate proceedings and for which adequate reserves are being maintained in accordance with U.S. generally accepted accounting principles.

(d)      Applicant hereby agrees that it will furnish to Issuer information relating to the business, operations, assets, liabilities or condition, financial or otherwise, of Applicant as Issuer may from time to time reasonably request.

(e)      Applicant shall use each Letter of Credit solely for the Permitted Uses.

6.      <u>Collateral Account Monitoring and Shortfalls</u>.

(a)      Applicant agrees that the value of assets on deposit in the Collateral Account will be monitored by Issuer according to Issuer's standard operating procedures, and that the value of assets in the Collateral Account, net of any applicable banking or brokerage fees and commissions (the "<u>Net Asset Value</u>"), will be calculated by Issuer on a quarterly basis (or, at Issuer's sole discretion, monthly, semi-annually, or annually) in a commercially reasonable manner.

(b)      Issuer will, in the event that the aggregate Net Asset Value of the Collateral Account with respect to Applicant, as calculated on any day, is less than the Minimum Collateral Base, on such day (a "<u>Notice Date</u>"), notify Applicant of such shortfall by facsimile transmission with telephone confirmation (a "<u>Shortfall Notice</u>").  If a Shortfall Notice is given prior to 10:00 am on a Business Day, then such Business Day shall be the "<u>Shortfall Date</u>", <u>provided</u> that if such notice is given after 10:00 am on a Business Day or on a day that is not a Business Day, then the subsequent Business Day shall be the "Shortfall Date".  The Shortfall Notice shall include (i) the aggregate Net Asset Value of the Collateral Account with respect to Applicant as of the Notice Date, (ii) the amount of the L/C Outstandings (and any accrued interest thereon) on the Notice Date, and (iii) a calculation showing the amount that Applicant is required to provide Issuer for contribution to the Collateral Account, as set forth in Section 6(c) (the "<u>Shortfall Amount</u>").

(c)      The Shortfall Amount shall be the greater of (i) zero and (ii) an amount equal to (A) the Minimum Collateral Base on the applicable Notice Date <u>minus</u> (B) the aggregate Net Asset Value of the Collateral Account with respect to Applicant on such Notice Date.

Applicant agrees to provide Issuer for contribution to the Collateral Account additional amounts in cash equal to the Shortfall Amount prior to 4:00 pm on the relevant Shortfall Date.

       7.    <u>Representations and Warranties</u>.  Applicant represents and warrants as follows on the date hereof and as of the date of issuance of each Letter of Credit (or as of the date of any Amendment thereto):

       (a)    It is a corporation duly organized, validly existing and in good standing under the laws of Delaware and has all the requisite powers and all material government licenses, authorizations, consents and approvals required to carry on its business as now conducted.  Issuer has received from Applicant certified copies of each of its constituent documents, as in full force and effect.

       (b)    The (i) execution, delivery and performance by it of this Agreement, (ii) the granting of the Liens granted by it (including the first priority nature thereof) pursuant to Section 11 hereof, (iii) the perfection or maintenance of the Liens created by Section 11 hereof, and (iv) the granting of authority to Issuer with respect to the exercise of its rights hereunder or under any other related document or remedies in respect of the Collateral Account, are within its corporate powers, have been duly authorized by all necessary corporate action (including all Governing Body resolutions, true and correct copies of which have been or will have been delivered to Issuer on the date of the initial Request), require no action by or in respect of, or filing with, any governmental body, agency or official and do not contravene, or constitute a default under, any provision of applicable law or regulation or of constituent documents of Applicant, as the case may be, or of any agreement, judgment, injunction, order, decree or other instrument binding upon Applicant, as the case may be, or any of its subsidiaries, or result in the creation or imposition of any Lien on any asset of Applicant or any of its subsidiaries, except the Liens created by Section 11 hereof.

       (c)    This Agreement has been duly executed and delivered by Applicant.  This Agreement constitutes a legal, valid and binding agreement of Applicant, enforceable against it in accordance with its terms.

       (d)    Issuer has a valid, perfected security interest in and lien on all of the Collateral, subject to no other Lien (except as provided in Section 11 hereof) securing all Obligations hereunder and all filings and other actions necessary or desirable to perfect and protect such security interests have been duly taken.  All funds provided by Applicant to Issuer hereunder are free and clear of any Lien, except for the liens and security interests created hereunder, and Applicant was the legal and beneficial owner thereof at the time provided to Issuer.

       (e)    Both before and after the issuance of each Letter of Credit (or Amendment thereto), no Event of Default shall have occurred and be continuing.

       (f)    Applicant is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended.  Neither the issuance of the Letters of Credit (or any Amendment thereto) nor the transactions contemplated hereunder will violate any provision

of such Act or any rule, regulation or order of the Securities and Exchange Commission thereunder.

(g)     There is no action, suit, investigation, litigation or proceeding (other than the Chapter 11 Cases) against Applicant pending or, to the knowledge of Applicant, threatened, before any court, tribunal, arbitrator or any other governmental authority, or any industry regulatory organization (including the National Association of Securities Dealers, Inc.) or national securities exchange, that purports to affect the legality, validity or enforceability of this Agreement or that has a reasonable likelihood of having a material adverse effect on Applicant's business, operations, assets, liabilities or condition, whether financial or otherwise or prospects.

(h)     There is no Shortfall Amount.

All representations and warranties made or deemed made in this Agreement shall survive the execution and delivery of this Agreement and the issuance of any Letter of Credit (or any Amendment thereto).

8.     Issuance Fee/Issuer Costs.

(a)     So long as any Letter of Credit then remains undrawn, an issuance fee shall be deemed to accrue upon the total outstanding principal amount of such Letter of Credit at a rate per annum equal to 0.50% (or such other percentage subsequently agreed to by Issuer and Applicant), payable quarterly (i.e., every 90 days) in advance, it being understood that the first such quarterly period shall commence on the date of the first issuance of a Letter of Credit hereunder.  Fees shall be calculated on the basis of the actual number of days in a year containing 360 days.

(b)     Applicant agrees to pay to Issuer, on demand, all reasonable costs and expenses (including attorney's fees) (collectively, the "Issuer Costs") that Issuer may pay or incur, or has already paid or incurred on or prior to the date hereof, in connection with the issuance of any Letter of Credit (or any Amendment thereto) and the negotiation, preparation, execution, performance and delivery of this Agreement and the transactions contemplated hereby and thereby, as well as in connection with the enforcement of, and preservation of Issuer's rights hereunder and thereunder, including, without limitation:

(i)     increased costs to Issuer or any entity controlling Issuer arising from the imposition or modification or effectiveness after the date hereof of any reserve, special deposit, insurance, or similar requirement or from a change in the basis of taxation (other than by a change in taxation of the overall net income of Issuer or such entity) including fees or charges with respect to any Letters of Credit issued by Issuer;

(ii)     directly or indirectly increased costs to Issuer or any entity controlling Issuer for issuing or maintaining any Letter of Credit, arising from any change in any applicable law, rule, regulation or request or directive (whether or not having the force of law) imposed or becoming effective after the date hereof by any governmental authority or agency imposing on Issuer or such entity or any

other condition affecting this Agreement or any Letter of Credit (or any Amendment thereto) or its issuance (including as to capital adequacy); and

(iii)    all sums expended by Issuer, including, without limitation, reasonable attorney's fees, disbursements and court costs, in connection with the exercise of any right or remedy provided for herein, the preservation of the Collateral and Issuer's interest therein and the defense or prosecution of any actions, suits or proceedings arising out of or relating to the Collateral.

(c)    Applicant also agrees to pay Issuer, on demand, an amount equal to any and all costs (including breakage costs) and expenses related to investments in the Collateral Account, including by reason of the early liquidation or realization of investments therein, incurred in connection with this Agreement.

(d)    If Issuer becomes entitled to claim any additional amount pursuant to Sections 8(b) or (c), it shall promptly notify Applicant of the event by reason of which it has become so entitled. A certificate as to any additional amount payable pursuant to Section 8(b) or (c), showing in reasonable detail the determination of the additional amount claimed, submitted by Issuer to Applicant shall be conclusive in the absence of manifest error. The agreements in this Section 8 shall survive the termination of this Agreement and the payment of all other amounts payable hereunder.

9.    Taxes.  All payments made by Applicant under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any governmental authority, excluding net income taxes and franchise taxes (imposed in lieu of net income taxes) imposed on Issuer as a result of a present or former connection between Issuer and the jurisdiction of the governmental authority imposing such tax or political subdivision or taxing authority thereof or therein (other than any such connection arising solely from Issuer having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or a Letter of Credit). If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings ("Non-Excluded Taxes") are required to be withheld from any amounts payable to Issuer hereunder, the amounts so payable to Issuer shall be increased to the extent necessary to yield to Issuer (after payment of all Non-Excluded Taxes) amounts payable hereunder at the rates or in the amounts specified in this Agreement. Whenever any Non-Excluded Taxes are payable by Applicant, as promptly as possible Applicant shall send to Issuer a certified copy of an original official receipt received by Applicant showing payment thereof (or if such document is not reasonably available to Applicant, other documentary evidence of payment). If Applicant fails to pay any Non-Excluded Taxes when due to the appropriate taxing authority or fails to remit to Issuer the required receipts or other required documentary evidence, Applicant shall indemnify Issuer for any incremental taxes, interest or penalties that may become payable by it as a result of any such failure. The agreements in this Section 9 shall survive the termination of this Agreement and the payment of all other amounts payable hereunder.

10.    Indemnity.  Applicant hereby agrees to indemnify and hold harmless Issuer and its affiliates and their respective directors, officers, employees, agents and advisors ("Indemnified Parties"), on demand and to the fullest extent legally permissible, and hold each of them harmless from and in respect of any and all losses, damages, liabilities, expenses (including, without limitation, expenses of investigation and defense and reasonable fees and disbursements of counsel), claims, liens or other obligations of any nature whatsoever (including, without limitation, the costs of enforcing this provision) that may arise out of any claim in any connection whatsoever with this Agreement or a Letter of Credit, whether or not Issuer or such other Indemnified Parties are party to any such action and whether or not brought by third parties or Applicant or its affiliates, other than losses, damages, liabilities, expenses, claims, liens or other obligations that may arise out of Issuer's gross negligence, bad faith or willful misconduct, as determined by a court of competent jurisdiction in a non-appealable final judgment.  The agreements in this Section 10 shall survive the termination of this Agreement and the payment of all other amounts payable hereunder.

11.    Security Interest; Guaranty.

To secure all of Applicant's contingent and absolute obligations to Issuer under, arising out of or in connection with this Agreement (the "Obligations"), Applicant pledges to Issuer, and grants to Issuer a first priority continuing security interest in, all of Applicant's or such Guarantor's right, title and interest (whether now owned or hereafter acquired) in, under and to the funds provided by Applicant to Issuer hereunder and deposited or held (or to be deposited or held) in the Collateral Account, all security entitlements with respect to all financial assets from time to time credited to the Collateral Account, all cash from time to time deposited or held in or credited to the Collateral Account, and all financial assets, dividends, distributions, return of capital, interest, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such security entitlements or financial assets and all warrants, rights or options issued thereon or with respect thereto, and all proceeds thereof (including any interest earned on funds on deposit in the Collateral Account, which shall be credited to, and retained in the Collateral Account) in respect of such funds (the "Collateral"), provided that Issuer's Liens with respect to the Collateral shall be senior to any Liens securing the obligations under the Exit Facility Credit Agreement and the Second Lien Credit Agreement. Applicant agrees that the Collateral shall be released from the Liens created hereby only upon (A) the expiration or termination of all Letters of Credit in accordance with their respective terms, (B) payment in full in cash of all Obligations, and (C) so long as no Event of Default is continuing, in the event the amount of the funds in the Collateral Account exceeds the Minimum Collateral Base and there is no Shortfall Amount, the funds equal to such excess shall be paid to Applicant upon its request to Issuer, provided that Applicant shall bear any and all costs (including breakage costs) and expenses related to investments in the Collateral Account, including by reason of the early liquidation or realization of investments therein, incurred in connection with such lien release.

(a)    This Agreement secures the payment of all Obligations of Applicant now or hereafter existing hereunder, under any Letter of Credit and under any other related documents, whether direct or indirect, absolute or contingent.

(b)      Until each Letter of Credit has expired or has been terminated and returned to the L/C Issuer in accordance with its terms and all Obligations have been paid in full in cash, it is agreed that: (i) some or all of the funds, assets and property in the Collateral Account may be invested or reinvested from time to time at the sole direction or instruction of Issuer to the Deposit Bank, and in any form or manner designated by Issuer in its sole discretion; provided that interest shall accrue on cash provided by Applicant for deposit in the Collateral Account at a rate per annum equal to the Federal Funds Rate minus the Prime Brokerage Cash Rate; (ii) Applicant shall not, and shall have no right to, deliver or make any entitlement orders or other directions concerning the Collateral or the Collateral Account; (iii) Issuer shall have exclusive control over the Collateral Account and the funds, assets and properties therein; provided that amounts shall be withdrawn from the Collateral Account solely to satisfy the Obligations of Applicant in accordance with the terms of this Agreement; and (iv) Applicant will not create, incur, assume or suffer to exist any Lien on or with respect to the Collateral (except the Liens created by this Section 11 and any liens that are junior in priority to the Liens created hereunder securing obligations under the Exit Facility Credit Agreement or the Second Lien Credit Agreement).

(c)      Applicant shall do all such acts, and shall execute and deliver to Issuer, as applicable, all such financing statements, certificates, instruments and other documents and shall do and perform or cause to be done all matters and such other things necessary or expedient to be done as Issuer may reasonably request from time to time for the purpose of effectively perfecting, maintaining and preserving Issuer's security interest and the benefits intended to be granted to Issuer hereunder.

(d)      Applicant warrants and shall defend the right, title and interest of Issuer in and to all Collateral against all adverse claims and demands.

(e)      Applicant shall not sell, assign, transfer or otherwise dispose of, or grant any option with respect to, pledge or otherwise encumber any of the Collateral or any interest therein without the prior written consent of Issuer.

(f)      Anything herein to the contrary notwithstanding, (i) Applicant shall remain liable under any contracts and agreements related to the Collateral to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (ii) the exercise by Issuer of any of the rights hereunder shall not release Applicant from any of its duties or obligations under the contracts and agreements relating to the Collateral, and (iii) Issuer shall not have any obligation or liability under the contracts and agreements relating to the Collateral by reason of this Agreement or any Letter of Credit, nor shall Issuer be obligated to perform any of the obligations or duties of Applicant thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

(g)      Applicant agrees that at any time and from time to time, at the expense of Applicant, Applicant will, as applicable, promptly execute and deliver all further instruments and documents, and take all further action that Issuer may reasonably request, in order to perfect and protect the security interest granted or purported to be granted hereby or to enable Issuer to exercise and enforce its rights and remedies hereunder with respect to any Collateral.  Without limiting the generality of the foregoing, Applicant will, upon the reasonable request of Issuer

execute any instruments or notices, as may be necessary or desirable, or as Issuer may request, in order to perfect and preserve the security interest granted or purported to be granted by Applicant hereunder.

(h)    Applicant hereby authorizes Issuer to file one or more UCC-1 or UCC-3 or other financing or continuation statements, and amendments thereto, relating to all or any part of the Collateral without the signature of Applicant where permitted by law.  A photocopy or other reproduction of this Agreement, or any financing statement covering the Collateral or any part thereof, shall be sufficient as a financing statement where permitted by law.

(i)    Expenses incurred by Issuer in connection with the taking of any action permitted by this Section 11 to enforce, protect or perfect its security interest and Lien in the Collateral shall be payable by Applicant on demand and shall constitute Obligations secured hereby.

(j)    Applicant hereby irrevocably appoints Issuer as Applicant's attorney-in-fact, with full authority in the place and stead of Applicant and in the name of Applicant or otherwise,  to take any action and to execute any instrument that Issuer may deem necessary or reasonably advisable to accomplish the purposes of this Agreement or to continue or enforce its security interest in the Collateral, including, without limitation, (i) to receive, endorse and collect all instruments made payable to Applicant representing any payment or other distribution in respect of the Collateral or any part thereof and to give full discharge for the same, (ii) to invest and reinvest the Collateral (including any proceeds from Collateral that matures) as it may deem appropriate, all of such investments, reinvestments and proceeds to remain in the Collateral Account until a release is authorized in accordance with the last sentence of Section 11(a) above, and (iii) to file any claims or take any action or institute any proceedings that Issuer may deem necessary or reasonably desirable for the collection of any of the Collateral or otherwise to enforce compliance with the rights of Issuer with respect to any of the Collateral.

(k)    The powers conferred on Issuer hereunder are solely to secure the payment and performance of the Obligations, and shall not impose any duty upon it to exercise any such powers.  Issuer shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which an ordinary person accords its own property, it being understood that Issuer shall not have any responsibility for taking any necessary steps to preserve rights against any parties with respect to any Collateral other than (i) the safe custody of any Collateral under its control or dominion, (ii) the accounting for monies actually received by it hereunder, and (iii) the application of monies in accordance with this Agreement.

(l)    The obligations of the Applicant under this Agreement shall be guaranteed as provided in that certain Guaranty entered into by the Applicant, Holdings, and certain of its Subsidiaries dated as of the date hereof, as the same may be amended, modified or supplemented from time to time.

12.    <u>Obligation Absolute</u>.  To the fullest extent permitted by applicable law, the obligations of Applicant under this Agreement shall be absolute, unconditional and irrevocable, and shall be paid or performed strictly in accordance with the terms of this

Agreement under any and all circumstances, including, without limitation, the following circumstances:

(a)      any lack of validity or enforceability of any Letter of Credit;

(b)      any amendment or waiver of or any consent to depart from the terms of this Agreement or any Letter of Credit (except to the extent of such amendment, waiver, consent or departure);

(c)      the existence of any claim, set-off, defense or other right which Applicant may have at any time against any Beneficiary or any transferee of any Letter of Credit (or any Persons for whom such Beneficiary or any such transferee may be acting), Issuer, or any other Person, whether in connection with this Agreement or otherwise;

(d)      any statement or any other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(e)      payment by Issuer under any Letter of Credit against presentation of a draft or certificate which does not conform to the terms of such Letter of Credit;

(f)      the failure by Issuer to honor any drawing under any Letter of Credit, or to make any payment demanded under such Letter of Credit, on the ground that the demand for such payment does not conform to the terms and conditions of such Letter of Credit, provided that such failure shall not have constituted the gross negligence or willful misconduct of Issuer;

(g)      any error, omission, interruption or delay in transmission, dispatch or delivery of any message or advice, however transmitted, in connection with any Letter of Credit or a related draft or documents, except for errors or omissions caused by Issuer's gross negligence or willful misconduct;

(h)      any dispute or claim between or involving Applicant and any Beneficiary;

(i)      any lack of validity or enforceability of the obligation of Applicant to any Beneficiary for which a Letter of Credit has been provided as security; or

(j)      any other circumstances or happening whatsoever, whether or not similar to any of the foregoing, provided that such circumstances or happening shall not have constituted the gross negligence or willful misconduct of Issuer;

provided that any determination of Issuer's gross negligence or willful misconduct shall have been made by a court of competent jurisdiction in a non-appealable final judgment.

13.      Standard of Care.  Notwithstanding other provisions of this Agreement or applicable law, Issuer shall not be liable to Applicant for any action taken or omitted by Issuer under or in connection with this Agreement, any Letter of Credit (or any Amendment thereto) or a related draft or documents, if done in the absence of gross negligence and willful misconduct and in accordance with any mandatory standard of care applicable under the Uniform

Commercial Code of the State of New York (the "UCC") and the Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500 (provided that in the event of a conflict, the applicable provisions of the UCC shall govern to the extent of such conflict), as in effect from time to time, and, in any event, Issuer shall under no circumstances be liable for any special, exemplary, punitive or consequential damages.

14.    Payments.

(a)    Any payments not made by Applicant when due under this Agreement shall bear interest for each day until paid at a rate per annum equal to the sum of (i) the Base Rate plus (ii) 2.00% (two percent) per annum.

(b)    All amounts due from Applicant hereunder to Issuer shall be paid to Issuer by wire transfer to the following account (or such other account notified to Applicant by Issuer in writing) in U.S. Dollars and in same day funds:

> The Bank of New York, New York
> ABA Number 021000018
> Credit Suisse AG, Cayman Islands Branch
> Account Number 8900492627

(c)    All amounts due from Issuer hereunder to Applicant shall be paid to Applicant by wire transfer to the following account (or such other account notified to Issuer by Applicant in writing) in U.S. Dollars and in same day funds:

> Account Name: Answers Corporation
> Account #: 3301173843
> Routing #: 121140399
> Silicon Valley Bank
> 3003 Tasman Drive
> Santa Clara, CA 95054

15.    Events of Default.

(a)    Each of the following shall be an "Event of Default" hereunder:

(i)    Applicant shall fail to pay, or cause to be paid, any amount payable under Section 4(a) in full when due, or shall fail to pay, or cause to be paid, within three (3) Business Days after the due date thereof any other amount payable hereunder;

(ii)    Applicant shall fail to observe or perform any term of any of its covenants or agreements contained in this Agreement (other than those covered by Section 15(a)(i) above);

(iii)         any representation, warranty, certification or statement made (or deemed made) by Applicant in this Agreement shall prove to have been incorrect or misleading in any material respect when made (or deemed made);

(iv)         any Lien created by Section 11 shall at any time for any reason not constitute a valid and perfected Lien, subject to no other Lien, or Applicant shall so assert in writing;

(v)         a Change in Control shall occur, or Applicant shall sell, convey, transfer, dispose of, suffer to occur or exist, or otherwise alienate, substantially all of its assets, whether voluntarily, by operation of law, or otherwise, or executes a contract to do any of the foregoing;

(vi)         Applicant shall fail to contribute funds to the Collateral Account in an amount equal to the Shortfall Amount on any Shortfall Date, in accordance with Section 6 hereof;

(vii)         Applicant shall fail to maintain and preserve all material rights, permits, licenses, approvals, privileges and franchises necessary in the maintenance of its operations and corporate existence;

(viii)         any provision of this Agreement shall at any time for any reason cease to be valid and binding on Applicant, or shall be declared to be null and void, or the validity or enforceability thereof shall be contested by Applicant, or a proceeding shall be commenced by any governmental agency or authority having jurisdiction over Applicant seeking to establish the invalidity or unenforceability thereof, or Applicant shall deny that it has any or further liability or obligation under this Agreement; and

(ix)         the occurrence of an "Event of Default" under, and as such term is defined in, the Exit Facility Credit Agreement.

(b)        Upon the occurrence of an Event of Default, and upon every such occurrence, in addition to all rights and remedies set forth in this Agreement and/or otherwise available under applicable law:

(i)         Issuer may declare all amounts (whether direct or contingent) payable hereunder to be, and such amounts shall thereupon become, immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by Applicant.

(ii)         Issuer shall be entitled to apply, sell or otherwise liquidate and realize upon any and all funds, assets or property in the Collateral Account in satisfaction of the Obligations.

- 18 -

(iii)    Issuer shall be entitled to set off against any or all the Obligations any amounts then owing by Issuer to Applicant (whether or not matured, whether or not contingent, and regardless of the currency, place of payment and booking office), including, without limitation, any and all deposits then held by Issuer to or for the credit or the account of Applicant.

(iv)    Issuer may do any acts which it deems proper to protect the Collateral as security hereunder, and collect and sue upon the Collateral and receive any payments due thereon or any damages thereunder, and apply all sums received in connection with the Collateral to the payment of the Obligations in such order as Issuer shall determine.

(v)    Issuer shall be entitled to require Applicant to deliver to Issuer all documents in the possession of Applicant relating to the Collateral, and Applicant shall promptly take such actions and furnish to Issuer such documents as Issuer deems necessary or appropriate, in its sole discretion, to enforce its rights with respect to the Collateral.

(vi)    Issuer shall be entitled to direct the Deposit Bank to make all payments and deliveries under the Collateral directly to Issuer or its designee, and Applicant shall, upon request by Issuer and as applicable, execute and consent to all notices and directions given by Issuer to the Deposit Bank, including transferring all Collateral to accounts maintained solely in the name of Issuer.

(vii)    Issuer shall be entitled to exercise, or cause the exercise of, Applicant's rights under or in respect of any Collateral.

(viii)    Issuer shall be entitled to exercise or cause the exercise of any other rights or remedies provided herein, in any document or instrument delivered pursuant hereto, under any other agreement or under applicable law (including, without limitation, any rights or remedies under the UCC).

(c)    Except as set forth in Section 16(b), Issuer may enforce its rights and remedies hereunder without prior judicial process or hearing, and Applicant hereby expressly waives, to the fullest extent permitted by law, any right Applicant might otherwise have to require Issuer to enforce its rights by judicial process. Applicant also waives, to the fullest extent permitted by law, any defense Applicant might otherwise have to the Obligations secured hereby arising from use of nonjudicial process, enforcement and sale of all or any portion of the Collateral or from any other election of remedies.

(d)    If the Collateral is insufficient to cover the payment in full of all Obligations, Applicant shall remain liable for any deficiency.

(e)    The powers conferred on Issuer hereunder are solely for its benefit and do not impose any duty on Issuer to exercise any such powers.  Following an Event of Default, Issuer shall have no duty of care as a secured party hereunder to Applicant as to any Collateral or with respect to the taking of any necessary steps to preserve rights against other parties or any other obligations pertaining to the Collateral, other than as may be expressly required by the UCC.  Applicant waives all rights whatsoever against Issuer for any loss, expense, liability or damage suffered by Applicant as a result of actions taken by Issuer as secured party pursuant to this Agreement, except to the extent caused by the gross negligence or willful misconduct of Issuer, as determined by a court of competent jurisdiction in a non-appealable final judgment.

(f)    Applicant hereby expressly waives, to the fullest extent permitted by law, every statute of limitation, right of redemption, any moratorium or redemption period, any limitation on a deficiency judgment, and any right which it may have to direct the order in which any of the Collateral shall be disposed of in the event of any disposition pursuant hereto.

16.    <u>Amendments; Waivers</u>.  Any provision of this Agreement may be amended, supplemented or waived if, but only if, such amendment, supplement or waiver is in writing and signed by each of Applicant and Issuer.  In the case of any waiver, Applicant and Issuer shall be restored to their former positions and rights hereunder and any Event of Default waived shall be deemed to be cured and not continuing, but no such waiver shall extend to any subsequent or other Event of Default or impair any right consequent thereon.

17.    <u>Notices</u>.  All notices, requests and demands to or upon the respective parties hereto shall be in writing (including by facsimile transmission) and shall be deemed to have been duly given or made (a) in the case of delivery by hand, when delivered or (b) in the case of delivery by facsimile transmission, when sent and receipt has been confirmed, addressed as follows, or to such other address as may be hereafter notified by the respective parties hereto:

(i)    Address for communications to Applicant:

Answers Holdings, Inc.
6665 Delmar Boulevard, Suite 3000
St. Louis, Missouri 63130
Attn:   Brian Mulligan
Facsimile No.:  (646) 502-4778
Email:  brian.mulligan@answers.com

(ii)    Address for communications to Issuer:

Credit Suisse AG, Cayman Islands Branch
Eleven Madison Avenue, 9th Floor
New York, New York 10010
Attention:   Trade Finance/Services Dept.
Facsimile No.:  212-325-8315
E-Mail: list.ib-lettersofcredit-ny@credit-suisse.com

provided, however, that Applicant shall also deliver to Issuer all original Requests or
Amendment Requests by mail following the delivery of such Requests or Amendment Requests
by facsimile transmissions.

18.    No Waiver; Remedies Cumulative.  No failure to exercise, and no delay in
exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any
single or partial exercise of any right, power or remedy hereunder preclude any other or further
exercise thereof or the exercise of any other right, power or remedy.  The rights, remedies,
powers and privileges provided under this Agreement are cumulative and not exclusive of any
rights, remedies, powers and privileges provided by law or in equity.

19.    Successors and Assigns.  This Agreement shall be binding upon each party
and its successors and permitted assigns and shall inure to the benefit of and be enforceable by
each party, its successors and permitted assigns.  Applicant shall not transfer or otherwise assign
any of its obligations under this Agreement and any assignment in violation of this Section 20
shall be null and void.  Issuer may transfer or otherwise assign its rights and obligations under
this Agreement to any affiliate of Issuer, any assignee or successor pursuant to operation of law
or any assignee or successor pursuant to a merger, consolidation or amalgamation with or into, or
transfer of all or substantially all of Issuer's assets to, another entity.

20.    Severability.  Any provision of this Agreement that is prohibited or
unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such
prohibition or unenforceability without invalidating the remaining provisions hereof, and any
such prohibition or unenforceability in any jurisdiction shall not invalidate or render
unenforceable such provision in any other jurisdiction.

21.    Right of Set-off.  Issuer is hereby authorized at any time and from time to
time, to the fullest extent permitted by law, to set-off and apply any and all deposits (general or
special, time or demand, provisional or final, including, without limitation, any amount held by
Issuer pursuant to this Agreement or otherwise) at any time held and other indebtedness at any
time owing by Issuer to or for the credit or the account of Applicant against any and all of the
Obligations (now or hereafter existing) that are due and payable hereunder or under any related
document.  The rights of Issuer under this Section 22 are in addition to other rights and remedies
(including, without limitation, other rights of set-off) that Issuer may have.

22.    Counterparts.  This Agreement may be executed by one or more of the
parties to this Agreement on any number of separate counterparts (including by facsimile
transmission), and all of said counterparts taken together shall be deemed to constitute one and
the same instrument.

23.    GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED
BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW
YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

(a)    ANY LEGAL ACTION OR PROCEEDING ARISING UNDER THIS
AGREEMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR
INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM

WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING (ANY SUCH ACTION OR PROCEEDING, A "PROCEEDING"), SHALL BE BROUGHT IN THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF SUCH STATE (PROVIDED THAT IF NONE OF SUCH COURTS CAN AND WILL EXERCISE SUCH JURISDICTION, SUCH EXCLUSIVITY SHALL NOT APPLY), AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, THE APPLICANT, HOLDINGS, AND THE ISSUER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THOSE COURTS. THE APPLICANT, HOLDINGS, AND THE ISSUER IRREVOCABLY WAIVE ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO.  EACH OF THE PARTIES HERETO AGREES THAT, AFTER ALL APPEALS HAVE BEEN EXHAUSTED, A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(b)    THE APPLICANT IRREVOCABLY CONSENTS TO THE SERVICE OF ANY AND ALL PROCESS IN ANY SUCH ACTION OR PROCEEDING TO THE APPLICANT AT THE ADDRESS PROVIDED FOR IT ON SCHEDULE 10.02. NOTHING IN THIS SECTION LIMITS THE RIGHT OF THE COLLATERAL AGENT OR ANY ISSUER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

24.    WAIVER OF RIGHT TO TRIAL BY JURY. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 25 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

25.    <u>Waiver of Special, Punitive or Exemplary Damages</u>.  Each party waives, to the maximum extent not prohibited by law, any right it may have to claim or recover any special, exemplary, punitive or consequential damages in any proceeding relating to this Agreement or any Letter of Credit.

26.    <u>Patriot Act</u>.  Issuer hereby notifies Applicant that pursuant to the requirements of the Patriot Act, Issuer is required to obtain, verify and record information that identifies Applicant and any applicable Beneficiary, which information includes the name and address of Applicant and such Beneficiary and other information that will allow Issuer to identify Applicant and such Beneficiary in accordance with the Patriot Act.  Applicant shall, and shall cause each of its subsidiaries to, provide to the extent commercially reasonable, such information and take such actions as are reasonably requested by Issuer in order to assist Issuer in maintaining compliance with the Patriot Act.

27.    <u>Time</u>.  All references in this Agreement to a time of day refer to the time in New York City.

28.    <u>Termination</u>.  Issuer may terminate this Agreement on fifteen (15) days' prior notice to Applicant and Applicant may terminate this Agreement on fifteen (15) days' prior notice to Issuer if there are no L/C Outstandings, <u>provided</u> that in any event, sections 8, 9, 10, 11, 13, 14, 15(c)-(f), 16, 17, 18, 19, 21, 24, 25, 26 and 27 shall survive the termination of this Agreement.  Upon termination of this Agreement, an amount equal to the excess of (a) cash provided by Applicant on deposit in the Collateral Account on the date of such termination, over (b) any outstanding Obligations of Applicant, including, without limitation, L/C Outstandings and outstanding fees and expenses, shall be promptly returned to Applicant.

29.    <u>Entire Agreement</u>.  This Agreement, together with the exhibits hereto and all documents delivered pursuant to Section 3, as the case may be, represents the agreement of the parties hereto with respect to the subject matter hereof, and there are no promises, undertakings, representations or warranties by Issuer or Applicant relative to subject matter hereof not expressly set forth or referred to herein.

IN WITNESS WHEREOF, the parties hereto have each caused this Agreement to be duly executed, all as of the day and year first above written.

**CREDIT SUISSE, CAYMAN ISLANDS BRANCH**, as Issuer and Collateral Agent

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

**ANSWERS CORPORATION**, as Applicant

By:_____
    Name:
    Title:

## EXHIBIT A

## FORM OF REQUEST FOR LETTER OF CREDIT

Credit Suisse AG, Cayman Islands Branch
One Madison Avenue, 2nd Floor
New York, New York 10010
Attention:  Trade Finance/Services Department
Facsimile No.:  212-325-8315

[INSERT DATE]

Ladies and Gentlemen:

Reference is hereby made to the Senior Secured Super Priority Letter of Credit Reimbursement and Security Agreement (as amended or otherwise modified from time to time, the "Agreement"), dated as of [_____], 2017, by and between Credit Suisse AG, Cayman Islands Branch ("Issuer"), and Answers Corporation, a Delaware corporation ("Applicant").  All capitalized terms used but not defined herein have the respective meaning assigned thereto in the Agreement.

Pursuant to Section 3 of the Agreement, the undersigned hereby requests that Issuer (or any of Issuer's affiliates or branches) issue for the account of Applicant **[__]**[1] Letter(s) of Credit, in the aggregate principal amount of $**[_____]** and in the form(s) attached hereto, for the benefit of the Beneficiary(ies) and in the amount set forth in such form(s).

Applicant hereby agrees and acknowledges that Issuer may elect to issue such Letter(s) of Credit in a form satisfactory in all respects to Issuer in its sole discretion, and that Issuer's obligation to effect such issuance shall be subject in all events to satisfaction of the conditions precedent set forth in Section 3 of the Agreement, including without limitation, satisfaction of Applicant's obligation set forth in Section 5(a) of the Agreement.

This notice shall be deemed part of the Agreement and shall be subject to all the terms and conditions set forth therein.

[signature page follows]

---

[1] Insert number of Letters of Credit being requested.

**ANSWERS CORPORATION**,
as Applicant

By:_____
    Name:
    Title:

**EXHIBIT B**

**FORM OF REQUEST FOR AMENDMENT
TO EXISTING LETTER OF CREDIT**

Credit Suisse AG, Cayman Islands Branch
One Madison Avenue, 2nd Floor
New York, New York 10010
Attention:  Trade Finance/Services Department
Facsimile No.:  212-325-8315

[INSERT DATE]

Ladies and Gentlemen:

Reference is hereby made to:

(a)    the Senior Secured Super Priority Letter of Credit Reimbursement and Security Agreement (as amended or otherwise modified from time to time, the "Agreement"), dated as of [_____], 2017 by and between Credit Suisse AG, Cayman Islands Branch ("Issuer"), and Answers Corporation, a Delaware corporation ("Applicant"); and

(b)    Letter of Credit No. [_____], issued on [_____] in the aggregate principal amount of $[_____] for the benefit of [ADD BENEFICIARY INFORMATION] [, as amended on [_____]]$^{2}$ (the "Letter of Credit").

Pursuant to Section 3 of the Agreement, the undersigned hereby requests that Issuer (or any of Issuer's affiliates or branches) amend the Letter of Credit as follows:

[INSERT REQUESTED AMENDMENTS]

Applicant hereby agrees and acknowledges that such amendment shall be in a form satisfactory in all respects to Issuer in its sole discretion, and that Issuer's obligation to effect such amendment shall be subject in all events to satisfaction of the conditions precedent set forth in Section 3 of the Agreement, including without limitation, satisfaction of Applicant's obligation set forth in Section 5(a) of the Agreement.

All capitalized terms used but not defined herein have the meaning assigned thereto in the Agreement.

This notice shall be deemed part of the Agreement and shall be subject to all the terms and conditions set forth therein.

[signature page follows]

---

[2] Include this information if the referenced Letter of Credit has been previously amended.

**ANSWERS CORPORATION**,
as Applicant

By:_____
    Name:
    Title:

**EXHIBIT C**

**FORM OF CERTIFICATE**

Dated: **[INSERT DATE]**[3]

The undersigned hereby certifies that:

1.      He is a duly authorized _____ of Answers Corporation, a Delaware corporation ("**Applicant**").

2.      This certificate (this "**Certificate**") is being furnished pursuant to Section 3(b)(ii) of the Letter of Credit Agreement (as defined below) to CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as Issuer (in such capacity, "**Issuer**") under the Senior Secured Super Priority Letter of Credit Reimbursement and Security Agreement (as amended or otherwise modified from time to time, the "Agreement"), dated as of _____, 2017, between Applicant and Issuer (as amended or otherwise modified from time to time, the "**Letter of Credit Agreement**").

3.      [Since the Effective Date there have been no amendments made to the [INSERT NAME OF CONSTITUENT DOCUMENT] of Applicant, certified by the Secretary of State of _____ as of [INSERT DATE].]  [Attached hereto as Annex A is a true, complete and correct copy of the [INSERT NAME OF CONSTITUENT DOCUMENT] of Applicant, certified by the Secretary of State of _____ as of [INSERT DATE] and in full force and effect as of and on the date hereof.][4]

4.      [INSERT NAME] is authorized to act on behalf of Applicant with respect to the Letter of Credit Agreement and any other document delivered by Applicant in connection with the Letter of Credit Agreement to be executed by Applicant, and the signature of such person appearing on the Letter of Credit Agreement and any other document delivered by Applicant in connection with the Letter of Credit Agreement to be executed by Applicant is his genuine signature.

6.      Each of the representations and warranties of Applicant set forth in the Letter of Credit Agreement (both before and after giving effect to the issuance of or Amendment to the Letter of Credit or Letters of Credit proposed to be issued or amended in connection with the submission of this Certificate) is true and correct in all respects on and as of the date hereof.

7.      Applicant has complied with all of its covenants and fulfilled all of its obligations in the Letter of Credit Agreement required to be complied with or fulfilled prior to the date hereof.

---

[3]  Insert the date on which the Letter of Credit is to be issued.

[4]  Use this option for the initial Request.

8.    Both before and after giving effect to the issuance of or Amendment to the Letter of Credit or Letters of Credit proposed to be issued or amended in connection with the submission of this Certificate, no event has occurred and is continuing which constitutes an Event of Default.

9.    [Other, as may be required by Issuer.]

10.    Capitalized terms used herein but not defined herein shall have the meanings assigned to them in the Letter of Credit Agreement.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, I have signed this Certificate as of the date first above written.

**ANSWERS CORPORATION**,
as Applicant


By:_____
    Name:
    Title:

## Exhibit D

### New Organizational Documents[1]

This Exhibit D includes the following organizational documents for Reorganized Holdings:

- Exhibit D-1: Amended and Restated Certificate of Incorporation of Answers Holdings, Inc.

- Exhibit D-2: Amended and Restated By-Laws of Answers Holdings, Inc.

Certain documents, or portions thereof, contained in this Exhibit D and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto.  The Debtors reserve all rights, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

---

[1]    The organizational documents for each of the Reorganized Debtors that are direct and indirect subsidiaries of Reorganized Holdings will be consistent in form and substance to the Exhibit D-1 and Exhibit D-2 hereof, subject to modifications required to facilitate the operations, management and corporate formalities of each respective Reorganized Debtor.

## **Exhibit D-1**

**Amended and Restated Certificate of Incorporation of Answers Holdings, Inc.**

[To Come]

## **Exhibit D-2**

**Amended and Restated By-Laws of Answers Holdings, Inc.**

[To Come]

## **Exhibit E**

### **New Stockholders' Agreement**

Certain documents, or portions thereof, contained in this <u>Exhibit E</u> and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto.  The Debtors reserve all rights, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

[To Come]

**Exhibit F**

**List of Retained Causes of Action**

Section 4.17 of the Plan provides as follows:

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of the Plan, the DIP Orders, or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of the Plan, the DIP Orders, or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Section 4.17 include any claim or Cause of Action with respect to, or against, a Released Party.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action preserved pursuant to the first paragraph of this Section 4.17 that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

Notwithstanding and without limiting the generality of Section 4.17 of the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve their rights with respect to

all Causes of Action that are not expressly released under the Plan, including the following types of claims:

### A.    Claims Related to Contracts and Leases

Unless otherwise released by the Plan, the Debtors and Reorganized Debtors, as applicable, expressly reserve their rights with respect to Causes of Action based in whole or in part upon any and all contracts and leases, including without limitation all licenses and similar instruments, to which any of the Debtors or Reorganized Debtors is a party or pursuant to which any of the Debtors or Reorganized Debtors has any rights whatsoever, regardless of whether such contract or lease is specifically identified herein, including, without limitation, all contracts and leases that are assumed pursuant to the Plan or were previously assumed by the Debtors. The claims and Causes of Action reserved include Causes of Action against vendors, suppliers of goods and services, employees or any other parties: (a) for overpayments, back charges, duplicate payments, improper holdbacks, deductions owing or improper deductions taken, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) for wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) for failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts; (d) for payments, deposits, holdbacks, reserves or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, lessor or other party; (e) for any liens, including mechanics', artisans', materialmens', possessory or statutory liens held by any one or more of the Debtors; (f) arising out of environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies or suppliers of environmental services or goods; (g) for counter-claims and defenses related to any contractual obligations; (h) for any turnover actions arising under section 542 or 543 of the Bankruptcy Code; (i) for recovery of commissions or retention payments made to employees that are required to be returned to the Debtors or Reorganized Debtors (as applicable) under the relevant arrangements or agreements between the Debtors or Reorganized Debtors (as applicable) and the subject employees, and (j) for unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property or any business tort claims. Without limiting the generality of the foregoing, the Debtors' expressly reserve all of their rights with respect to Causes of Action against the Entities identified in **Exhibit F-1** attached hereto.

### B.    Claims Related to Insurance Policies

Unless otherwise released by the Plan, the Debtors expressly reserve all of their rights with respect to Causes of Action based in whole or in part upon any and all insurance contracts and insurance policies to which any Debtor or Reorganized Debtor is a party or pursuant to which any Debtor or Reorganized Debtor has any rights whatsoever, regardless of whether such contract or policy is specifically identified herein, including Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters. Without limiting the generality of the foregoing, the Debtors' expressly reserve all of their rights with respect to Causes of Action related to those insurance policies identified in **Exhibit F-2** attached hereto.

2

C.      **Claims Related to Liens**

Unless otherwise released by the Plan or the DIP Orders, the Debtors expressly reserve all of their rights with respect to Causes of Action based in whole or in part upon any and all liens regardless of whether such lien is specifically identified herein.

D.      **Claims, Defenses, Cross-Claims and Counter-Claims Related to Litigation and Potential Litigation**

Unless otherwise released by the Plan, the Debtors expressly reserve all of their rights with respect to Causes of Action against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal or judicial or non-judicial, regardless of whether such Entity is specifically identified in the Plan, this Plan Supplement, or any amendments thereto. Without limiting the generality of the foregoing, the Debtors' expressly reserve all of their rights with respect to Causes of Action against the Entities identified in **Exhibit F-3** attached hereto.

E.      **Claims Related to Accounts Receivable and Accounts Payable**

Unless otherwise released by the Plan, the Debtors expressly reserve all of their rights with respect to Causes of Action against or related to all Entities that owe or that may in the future owe money to the Debtors or Reorganized Debtors, regardless of whether such Entity is expressly identified in the Plan, this Plan Supplement, or any amendments thereto. Furthermore, the Debtors expressly reserve all of their rights with respect to Causes of Action against or related to all Entities who assert or may assert that the Debtors or Reorganized Debtors, as applicable, owe money to them. Without limiting the generality of the foregoing, the Debtors' expressly reserve all of their rights with respect to Causes of Action against the Entities identified in **Exhibit F-4** attached hereto.

F.      **Claims Related to Deposits, Adequate Assurance Postings, and Other Collateral Postings**

Unless otherwise released by the Plan, the Debtors expressly reserve all of their rights with respect to Causes of Action based in whole or in part upon any and all postings of a security deposits, adequate assurance payment, or any other type of deposit or collateral, regardless of whether such posting of security deposit, adequate assurance payment, or any other type of deposit or collateral is specifically identified herein.  Without limiting the generality of the foregoing, the Debtors' expressly reserve all of their rights with respect to Causes of Action against the Entities identified in **Exhibit F-5** attached hereto.

G.      **Claims Related to Tax Refunds**

Unless otherwise released by the Plan, the Debtors expressly reserve all of their rights with respect to Causes of Action against or related to all Entities that owe or that may in the future owe money related to tax refunds to the Debtors or Reorganized Debtors, regardless of

whether such Entity is specifically identified herein. Furthermore, the Debtors expressly reserve all of their rights with respect to Causes of Action against or related to all Entities who assert or may assert that the Debtors or Reorganized Debtors owe taxes to them. Without limiting the generality of the foregoing, the Debtors' expressly reserve all of their rights with respect to Causes of Action against the Entities identified in **Exhibit F-6** attached hereto.

**Exhibit F-1**

**Claims Related to Contracts and Leases**

| Debtor | Third-Party | Address | Description |
|---|---|---|---|
| Answers Corporation | comScore, Inc. | 11465 Sunset Hills Road, Suite 200, Reston, VA 20190 | Service Order |
| Answers Corporation | comScore, Inc. | 11465 Sunset Hills Road, Suite 200, Reston, VA 20190 | Service Agreement |
| Answers Corporation | XO Communications | 13865 Sunrise Valley Dr., Herndon, VA 20171 | Telecom Agreement |
| ForeSee Results, Inc. | Level 3 Communications | 1025 Eldorado Boulevard., Broomfield, CO 80021 | Telecom Agreement |
| Answers Corporation | Cogent | 2450 N Street, NW, Washington, D.C. 20037 | Telecom Agreement |
| Webcollage Inc. | Techmarq Consultancy | Reduitlaan 33, 4814 DC, Breda, The Netherlands | Agency Agreement |
| Answers Corporation | SJP Properties, Inc. | Morris Corporate Center IV, 379 Interpace Parkway, Parsippany, NJ 07054 | Lease |
| Answers Corporation | 989 Sixth Realty LLC | c/o AB & Sons Group, LLC, 25 West 36th Street, 2nd Floor, New York, NY 10018 | Lease |
| Webcollage Inc. | S.I.K. Associates | 450 Seventh Avenue, New York, NY 10123 | Lease |
| Answers Corporation | River Place II, LLC | c/o Silverstein Properties, Inc., 250 Greenwich Street, New York, NY 10007 | Lease |
| Answers Corporation | TAC Partners, Inc. | 75 State Street, Suite 2500 Boston, MA 02109 | Lease |
| ForeSee Results, Inc. | Wescomm Technologies, Inc. | 15091 Champaign Road, Allen Park, MI 48101 | Lease Tenant Improvement Agreement |
| Answers Corporation | Treats Inc. | 8 10th Street, #3501, San Francisco, CA 94103 | Service Agreement |
| Answers Corporation | Seduka, LLC | 462 Seventh Avenue, New York, NY 10018 | Sublease/Subtenant |
| Answers Corporation | Intercontinental Capital Group, Inc. | 780 Third Avenue, New York, NY 10017 | Sublease/Subtenant |

**Exhibit F-2**

**Claims Related to Insurance Policies**

| Coverage Type | Carrier | Policy Number |
|---|---|---|
| General Liability | Chubb Group of Insurance Companies | 3603-07-21 DTO |
| D&O Liability | AIG - National Union Fire Insurance of Pittsburgh, PA | 19323490 |
| | Endurance American Insurance Company | ADX10009960600 |
| | Starr Indemnity & Liability Company | 1000056970161 |
| | XL Specialty Insurance Company | ELU146620-16 |
| Commercial Auto Insurance | Federal Insurance Company | (15) 7358-62-79 |
| Commercial Excess and Umbrella Coverage. | Chubb Group of Insurance Companies | 7988-92-52 |

**Exhibit F-3**

**Claims, Defenses, Cross-Claims and Counterclaims Related to Litigation and Potential Litigation**

| Litigation | | | |
|---|---|---|---|
| **Debtor(s)** | **Litigation Party** | **Caption of Suit, Case Number and Jurisdiction (If Applicable)** | **Description and Nature of Proceeding** |
| Answers Corporation | Kudelski SA | N/A | Threatened patent litigation. |
| Answers Corporation | ImageProtect | N/A | Threatened litigation for unauthorized use of an image on Answers.com. |
| Answers Corporation | Osaro Osagie | Answers Corporation v. Osaro Osagie and First East Circular, LLC, 01-16-0001-9565, Los Angles | Arbitration proceeding via which Answers is seeking to recover over $4 million in funds misappropriated by a partner. |
| Answers Corporation | First East Circular, LLC | Answers Corporation v. Osaro Osagie and First East Circular, LLC, 01-16-0001-9565, Los Angles | Arbitration proceeding via which Answers is seeking to recover over $4 million in funds misappropriated by a partner. |
| Answers Corporation | Osaro Osagie | Answers Corporation v. First East Circular, LLC and Osaro Osagie, 4:16-cv-01252, St. Louis | Arbitration proceeding via which Answers is seeking to recover over $4 million in funds misappropriated by a partner. |
| Answers Corporation | First East Circular, LLC | Answers Corporation v. First East Circular, LLC and Osaro Osagie, 4:16-cv-01253, St. Louis | Arbitration proceeding via which Answers is seeking to recover over $4 million in funds misappropriated by a partner. |

**Exhibit F-4**

**Claims Related to Receivables**

| Debtor | Third-Party | Address | Description |
|---|---|---|---|
| ForeSee Results, Inc. | Nestle Canada | 25 Sheppard Ave. West Toronto, ON M2N 6S8 | Accounts receivable related to service agreement |
| Webcollage Inc. | Duracell, Inc. | 14 Research Dr. Bethel, CT 06801-1040 | Accounts receivable related to service agreement |
| Webcollage Inc. | Microsoft Corporation | 1 Microsoft Way Redmond, WA 98052 | Accounts receivable related to service agreement |
| ForeSee Results, Inc. | Matalan Retail Ltd. | Perimeter Road Knowsley Industrial Park Liverpool, ZZ L33 7SZ | Accounts receivable related to service agreement |
| Webcollage Inc. | Dell Software Inc. | 1 Dell Way Round Rock, TX 78682 | Accounts receivable related to service agreement |
| ForeSee Results, Inc. | Wal-Mart Canada Corp. | 1940 Argentia Rd. Mississauga, ON L5N 1P9 | Accounts receivable related to service agreement |
| Redcan, LLC | CPX Interactive LLC | 1441 Broadway, 18th Floor New York, NY 10018 | Accounts receivable related to service agreement |
| Redcan, LLC | RevContent | 5901 N. Honore Avenue Sarasota, FL 34243 | Accounts receivable related to service agreement |

**Exhibit F-5**

**Claims Related to Deposits, Adequate Assurance Postings, and Other Collateral Postings**

| Deposits | | | |
|---|---|---|---|
| **Debtor** | **Third-Party** | **Address** | **Description** |
| ForeSee Results, Inc. | NECC Property LLC | c/o Oxford Property Management<br>Attn.: Emily Hammond<br>210 South Fifth Avenue<br>P.O. Box 8200<br>Ann Arbor, MI 48107 | Security Deposit |
| ForeSee Results, Inc. | U.S. REIF Lakeside Commons Georgia, LLC | c/o Intercontinental Real Estate Corporation<br>1270 Soldiers Field Rd.<br>Boston, MA 02135 | Security Deposit |
| ForeSee Results, Inc. | Regus Management Group, LLC | 1200 G. Street, NW, Suite 800<br>Washington, DC 20005 | Security Deposit |
| ForeSee Results, Inc. | WW 995 Market LLC | 995 Market St.<br>San Francisco, CA 94103 | Security Deposit |
| Easy2 Technologies, Inc. | Walnut Reality Holding Company | 1801 East Ninth Street<br>Cleveland, OH 44114 | Security Deposit |
| Answers Corporation | U City Lions, L.L.C. | 100 South Brentwood Blvd., Suite 240<br>Clayton, Missouri 63105 | Security Deposit |
| Answers Corporation | 989 Sixth Realty LLC | c/o AB & Sons Group, LLC<br>25 West 36th St., 2nd Floor<br>New York, NY 10018 | Security Deposit |
| Webcollage, Inc. | Consolidated Electric Meter Co., Inc. | 450 7th Avenue<br>New York, NY 10123 | Security Deposit |
| Answers Corporation | SJP TS, LLC | 379 Interpace Parkway<br>Parsippany, NY 07054 | Letter of Credit |

**Exhibit F-6**

**Claims Related to Tax Refunds**

| TAX REFUNDS | | |
|---|---|---|
| **DEBTOR** | **TAXING AUTHORITY** | **ADDRESS** |
| ANSWERS HOLDINGS, INC. | FLORIDA DEPARTMENT OF REVENUE | 5050 W. TENNESSEE ST. TALLAHASSEE, FL 32399-0135 |
| ANSWERS HOLDINGS, INC. | FLORIDA DEPARTMENT OF REVENUE | 5050 W. TENNESSEE ST. TALLAHASSEE, FL 32399-0135 |
| ANSWERS HOLDINGS, INC. | ILLINOIS DEPARTMENT OF REVENUE | PO BOX 19045 SPRINGFIELD, IL 62794-9045 |
| ANSWERS HOLDINGS, INC. | KENTUCKY DEPARTMENT OF REVENUE | 501 HIGH STREET FRANKFORT, KY 40601 |
| ANSWERS HOLDINGS, INC. | STATE OF ALABAMA DEPARTMENT OF REVENUE | CORPORATE TAX SECTION PO BOX 327435 MONTGOMERY, AL 36132-7435 |
| ANSWERS HOLDINGS, INC. | STATE OF MINNESOTA DEPARTMENT OF REVENUE | MAIL STATION 1250 ST. PAUL, MN 55145-1250 |
| ANSWERS HOLDINGS, INC. | STATE OF NEBRASKA DEPARTMENT OF REVENUE | PO BOX 94818 LINCOLN, NE 68509-4818 |
| ANSWERS HOLDINGS, INC. | STATE OF RHODE ISLAND DIVISION OF TAXATION | ONE CAPITOL HILL PROVIDENCE, RI 02908 |
| ANSWERS HOLDINGS, INC. | STATE OF WISCONSIN DEPARTMENT OF REVENUE | PO BOX 8908 MILWAUKEE, WI 52708-8908 |
| EASY2 TECHNOLOGIES, INC. | GEORGIA DEPARTMENT OF REVENUE | PROCESSING CENTER PO BOX 105136 ATLANTA, GA 30348-5136 |
| FORESEE RESULTS, INC. | GEORGIA DEPARTMENT OF REVENUE | PROCESSING CENTER PO BOX 105136 ATLANTA, GA 30348-5136 |

| TAX REFUNDS | | |
|---|---|---|
| **DEBTOR** | **TAXING AUTHORITY** | **ADDRESS** |
| FORESEE RESULTS, INC. | STATE OF NEW JERSEY, DIVISION OF TAXATION | REVENUE PROCESSING CENTER PO BOX 193 TRENTON, NJ 08646-0193 |
| FORESEE RESULTS, INC. | STATE OF PENNSYLVANIA BUREAU OF CORPORATION TAXES | PO BOX 280422 HARRISBURG, PA 17128-0422 |
| WEBCOLLAGE INC. | CITY OF CLEVELAND CENTRAL COLLECTION AGENCY | PO BOX 94723 CLEVELAND, OH 44101-4723 |
| WEBCOLLAGE INC. | STATE OF NEW JERSEY, DIVISION OF TAXATION | REVENUE PROCESSING CENTER PO BOX 193 TRENTON, NJ 08646-0193 |

## Exhibit G

### Identities of the Members of the New Board, the
### New OpCo Boards and Officers of the Reorganized Debtors

In accordance with Section 4.14 of the Plan and section 1129(a)(5) of the Bankruptcy Code, the Debtors hereby disclose the identities and affiliations of the individuals proposed to serve after confirmation of the Plan as a director or officer of Reorganized Holdings and the officers, directors and other executives of the Reorganized Debtors who will serve on and after the Effective Date and the identity of any insider that will be employed or retained by the Reorganized Debtors and the nature of any compensation for such insider.

**List of Members of the New Board, the New OpCo Boards and Nature of Compensation.**

- ***William J. Ruckelshaus.*** Mr. Ruckelshaus currently serves as the Chairman of the board of directors of TableSafe, Inc. Previously, Mr. Ruckelshaus was the President and Chief Executive Officer of Blucora, Inc. from 2010 to 2016, and a board member from 2007 to 2016. During his board tenure, Mr. Ruckelshaus served on the Compensation, Nominating & Governance and Audit Committees of Blucora. Prior to Bluecora, Mr. Ruckelshaus worked in various roles at AudioScience, Inc., Expedia, Inc., GroupCredit Suisse First Boston in their Technology M&A group, Pacific Telesis Enhanced Service, PepsiCo and Booz-Allen Hamilton, Inc. Mr. Ruckelshaus previously served on the board of directors of two Seattle-based organizations; the Epiphany School and ACT Theatre. Mr. Ruckelshaus received his bachelor's degree from Princeton University and an M.B.A. from the University of Virginia Darden Graduate School of Business.

- ***Eric R. Ball.*** Dr. Ball is currently the General Partner of Impact Venture Capital. Previously, Dr. Ball was the Chief Financial Officer of C3 IoT from 2015 to 2016 and the Senior Vice President Finance of Oracle Corporation from 2005 to 2015. Prior to Oracle, Dr. Ball held several management level roles at Flextronics International USA, Inc., Cisco Systems, Inc., Avery Dennison Corporation and AT&T. Dr. Ball is currently the chair of the audit committee of Glu Mobile, Inc., and previously served on the board of directors of Oracle Japan. Dr. Ball is a frequent keynote speaker at finance forums. Dr. Ball received his bachelor's degree from the University of Michigan, Master of Arts and M.B.A. degrees from the University of Rochester and a Ph.D. in Management from Claremont Graduate University – Peter F. Drucker Graduate School of Management.

- ***Peter M. Daffern.*** Peter Daffern is the current CEO of the Debtors' ForeSee business. Mr. Daffern is a veteran enterprise software executive. Prior to joining ForeSee, Mr. Daffern served as (i) President of EMEA and vertical markets at NetSuite, (ii) the CEO of ClairMail prior to and during its acquisition by Monitise in 2012, and (iii) Chairman and CEO of Purisma (acquired by Dun & Bradstreet). Mr. Daffern has also held various leadership positions at Vitria Technology and Crystal Decisions, and serves as chairman of the board at SynchHR. Finally, Mr. Daffern is also a board member at Amplience and ReeVoo as well as a Venture Partner for Octopus Ventures, and an Operating Partner for HG Capital.

- ***Eugene I. Davis.***  Mr. Davis is is Chairman and Chief Executive Officer of PIRINATE Consulting Group, LLC, or PIRINATE, a privately held consulting firm specializing in turnaround management, merger and acquisition consulting, and hostile and friendly takeovers, proxy contests, and strategic planning advisory services for domestic and international public and private business entities. Since forming PIRINATE in 1997, Mr. Davis has advised, managed, sold, liquidated and served as a chief executive officer, chief restructuring officer, director, committee chairman or chairman of a number of businesses operating in diverse sectors.  From 1990 to 1997, Mr. Davis served as President, Vice Chairman, and Director of Emerson Radio Corporation and from 1996 to 1997 he served as Chief Executive Officer and Vice Chairman of Sport Supply Group, Inc.  He began his career as an attorney and international negotiator with Exxon Corporation and Standard Oil Company (Indiana) and was in private practice from 1984 to 1998.  Mr. Davis holds a bachelor's degree from Columbia College, a master of international affairs degree (MIA) in international law and organization from the School of International Affairs of Columbia University, and a Juris Doctorate from Columbia University School of Law.  Mr. Davis is currently an existing independent director of Answers Holdings, Inc. and its domestic subsidiaries and currently serves as Chairman of the Board of Atlas Iron Limited (ASX: AGO), U.S. Concrete, Inc. (Nasdaq: USCR), and WMIH Corp. (Nasdaq: WMIH), and also serves as a director of Verso Corporation (NYSE: VRS), Genco Shipping & Trading Limited (NYSE:GNK) and Titan Energy, LLC (OTC: TTEN), as well as certain non-SEC reporting companies.  During the past five years, Mr. Davis has also been a director of the following SEC registrants:  Atlas Air Worldwide Holdings, Inc., The Cash Store Financial Services, Inc., Dex One Corp., Global Power Equipment Group, Inc., Goodrich Petroleum Corp., Great Elm Capital Corporation, GSI Group, Inc., Hercules Offshore, Inc., HRG Group, Inc., Knology, Inc., SeraCare Life Sciences, Inc., Spansion, Inc. and Spectrum Brands Holdings, Inc.  Mr. Davis' prior experience also includes having served on the board of directors of each of ALST Casino Holdco, LLC and Trump Entertainment Resorts, Inc.

- ***John H. Federman.*** John Federman is the current CEO of the Company's Webcollage business.  John is an online media and e-commerce executive with more than 25 years of experience driving revenue and profit through innovative media platforms designed to connect buyers and sellers. Previous experience includes:  CEO of: Dailybreak, a consumer engagement platform; Searchandise Commerce, creators of paid search for retail sites (sold to RichRelevance); eStara, creators of the Click to Call technology powering the majority of the Internet Retailer 500 (ATG and then to Oracle); Dotomi, which introduced retargeting with personalized media to the marketplace (sold to ValueClick); and AdSmart.  Mr. Federman received his bachelor's degree in Business and Art from the University of Massachusetts.

- ***Lonne A. Jaffe.***  Mr. Jaffe is currently a Senior Advisor at Foros Group, LLC, as well as a Senior Advisor to the Board of Directors for Syncsort, Inc.  Previously, Mr. Jaffe was the Chief Executive Officer for Syncsort, Inc. from 2013 to 2016, Senior Vice President of Corporate Strategy at CA Technologies, Inc. from 2012 to 2013, and held numerous senior management roles at IBM Corporation from 1999 to 2012.  Mr. Jaffe is currently a board member of Vision Solutions, Inc. and previously served on the board of directors of Syncsort, Inc.  Mr. Jaffe received his bachelor's degree and a master's degree in the history of science from Harvard University.

2

- ***Brian Mulligan.*** Mr. Mulligan is a global finance executive with expertise in building and leading highly effective teams. Mr. Mulligan is an innovative leader and trusted business partner. Mr. Mulligan excels at developing creative solutions to overcome complex challenges and consistently generates added value. Mr. Mulligan comes to Answers most recently from Cengage Learning, a $2 billion entrepreneurial private equity owned education technology and services company. Cengage had a complex and challenging capital structure with over $6 billion of debt. Mr. Mulligan led the efforts to restructure the company's debt and place the business on a sound financial footing. Mr. Mulligan has a strong foundation in all aspects of finance, with in-depth knowledge and experience in M&A, capital markets, cost reduction initiatives, debt restructurings and bankruptcy proceedings. Prior to joining Cengage Learning, Brian had a long and successful career at two premier fast moving consumer goods companies – Kraft Foods and Philip Morris where he developed and honed his leadership and finance skills.

The above listed individuals, other than Mr. Mulligan, will be members of the New Board. The members of the New OpCo Boards will consist of Mr. Mulligan and the Chief Executive Officer of the subject OpCo. Director compensation will be determined by the applicable New Board. The Reorganized Debtors reserve the right to select different or additional board members and set compensation according to policies to be adopted on or after the Effective Date.

**List of Officers of the Reorganized Debtors and Nature of Compensation.**

The existing officers of the Debtors as of the Petition Date shall remain in their current capacities as officers of the Reorganized Debtors, subject to the ordinary rights and powers of the New Board to remove or replace them in accordance with the New Organizational Documents and any applicable agreements; *provided*, *however*, that (i) the Chief Financial Officer (Mr. Brian Mulligan) shall solely remain as an officer of Reorganized Holdings in the capacity of Acting Chief Financial Officer, and (ii) the Chief Restructuring Officer (Mr. Justin P. Schmaltz) will not be an officer of any of the Reorganized Debtors from and after the Effective Date. The nature of compensation for the continuing officers shall continue in such form as existed as of the Petition Date, except with respect to such officers' participation in the incentive compensation programs summarized in the Summary Terms of Management Incentive Plans attached to the Plan Supplement as Exhibit K and with respect to any other agreed terms or terms that will be determined by the New Board. For the avoidance of doubt, upon the Effective Date, (i) Mr. Justin P. Schmaltz shall be deemed to resign from the position of Chief Restructuring Officer of each of the Debtors and their affiliates and shall no longer be an officer of the Debtors or Reorganized Debtors (or their affiliates), as applicable and (ii) Mr. Brian Mulligan shall resign from the position of Chief Financial Officer and shall be the Acting Chief Financial Officer of Reorganized Holdings and retained by Reorganized Holdings pursuant to a consulting agreement providing for compensation of a similar nature and amount as existed as of the Petition Date.

**<u>Exhibit H</u>**

**Warrant Agreement**

Certain documents, or portions thereof, contained in this <u>Exhibit H</u> and the Plan Supplement remains subject to continuing negotiations among the Debtors and interested parties with respect thereto.  The Debtors reserve all rights, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

[To Come]

## Exhibit I

**Schedule of Rejected Executory Contracts and Unexpired Leases**

The Debtors reserve all rights, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

Nothing herein shall be construed as a concession or evidence that any of the contracts or leases identified herein: (i) constitutes an "executory contract" or "unexpired lease" within the meaning of 11 U.S.C. § 365 and other applicable law; or (ii) has not expired, been terminated or otherwise currently is in full force and effect.  Rather, the Debtors expressly reserve all of their rights with respect thereto, including their right to seek a later determination of these issues and their right to dispute the validity, status, characterization or enforceability of any contracts, agreements or leases set forth herein.

| Contract Counterparty | Contract/Lease | Notice Address |
|---|---|---|
| comScore, Inc. | Service Order, dated Aug. 5, 2016 | 14140 Collections Center Dr. Chicago, IL 10018 |
| comScore, Inc. | Services Agreement, dated Sept. 27, 2016 | 14140 Collections Center Dr. Chicago, IL 10018 |
| XO Communications | Contracts for services related to Accounts Nos.:<br>• 004000000199972<br>• 004000000358246<br>• 004000000187245<br>• 004000000386339 | 13865 Sunrise Valley Dr. Herndon, VA 20171 |
| Level 3 Communications | Contracts for services related to Accounts Nos. (BAN):<br>• 0205273274-GC<br>• 1-JCF9EX-A | P.O. Box 910182 Denver, CO 80274-0182 |
| Cogent | Dedicated Internet Access Customer Order, dated December 3, 2015 | 2450 N Street, NW Washington, DC 20037 |
| Brian Mulligan | Employment Agreement, dated August 4, 2016 (as amended, supplemented, or otherwise modified). | 10 North Sasco Common Westport, CT 06880-4181 |

**JD DRAFT DATED 3/22/2017**
**Privileged & Confidential**
**Attorney Work Product**

<u>**Exhibit J**</u>

**Restructuring Transactions Exhibit**

In accordance with the *Joint Prepackaged Chapter 11 Plan of Reorganization for Answers Holdings, Inc. and Its Debtor Affiliates* [Docket No. 17] (the "Plan"),[1] the Debtors will engage in a series of Restructuring Transactions to effect a corporate restructuring of their respective businesses.  The Debtors' restructuring is intended to better align the Debtors' businesses and optimize the overall corporate organizational structure of the Reorganized Debtors.

Notwithstanding anything to the contrary in the Plan, the Disclosure Statement, or any other document (including any Plan Supplement document, any document related to indebtedness, and any document indicating the timing, payor, or recipient of any wire transfer), this Restructuring Transactions Exhibit shall serve as the definitive document regarding the implementation of certain of the Restructuring Transactions, including for U.S. federal income tax and state tax purposes.[2]

1.      On or before the Effective Date of the Plan, Answers Holdings, Inc. ("Answers Holdings") shall form a new Delaware limited liability company ("Answers Finance, LLC").

2.      On the Effective Date of the Plan, Answers Holding Corporation, Redcan LLC, Upbolt, LLC, and More Corn, LLC shall be dissolved, and Answers Corporation shall contribute 100% of the Interests in Beans Publishing LTD to Multiply Media, LLC as a capital contribution.

3.      On the Effective Date of the Plan, Answers Holdings shall contribute 100% of the Interests in Answers Corporation to Answers Finance, LLC as a capital contribution.

4.      Immediately following the contribution of the Interests in Answers Corporation to Answers Finance, LLC, (a) Answers Holdings shall issue the New Common Stock (including the Exit Commitment Equity) and the Warrants to be issued to holders of Allowed First Lien Claims, Allowed Second Lien Claims, and Allowed DIP Claims pursuant to the Plan to Answers Finance, LLC as a capital contribution, and (b) Answers

---

[1]    Capitalized terms used but not defined herein shall have the meanings given them in the Plan.

[2]    While this Restructuring Transactions Exhibit reflects the Debtors' current intentions with respect to their proposed restructuring and organizational structure on and after the Effective Date, the Restructuring Transactions set forth herein may, subject to the consent of the Required First Lien Lenders and the Required Second Lien Lenders and the Sponsor Entities (subject to the Second Lien Lender Consent Right and the Sponsor Entities Consent Right, in each case, as defined in, and solely to the extent applicable under, the Restructuring Support Agreement), which consent shall not be unreasonably withheld, conditioned, or delayed, be amended, modified, or supplemented, with or without notice, prior to the Effective Date of the Plan pursuant to Section 4.2 of the Plan.

Finance, LLC in turn shall contribute such stock and warrants to Answers Corporation as a capital contribution (the "Equity Contribution").

5.      Contemporaneously with the Equity Contribution, Answers Finance, LLC shall issue the First Lien Exit Loans and the Second Lien Exit Loans to Answers Corporation as a capital contribution (the "Exit Financing Contribution").

6.      Immediately following the Equity Contribution and the Exit Financing Contribution, (a) Answers Corporation shall distribute (i) the New Common Stock (including the Exit Commitment Equity) and the Second Lien Exit Loans to the holders of Allowed First Lien Claims, (ii) the New Common Stock and the Warrants to holders of Allowed Second Lien Claims, and (iii) the First Lien Exit Loans to holders of Allowed DIP Claims, in each case, in accordance with the Plan (provided that, for administrative convenience only, Answers Finance, LLC may issue the First Lien Exit Loans and the Second Lien Exit Loans directly to the applicable holders of Allowed DIP Claims and Allowed First Lien Claims), and (b) the existing prepetition Interests in Answers Holdings (which exclude, for the avoidance of doubt, the New Common Stock (including the Exit Commitment Equity), the Warrants, and any other Interests issued pursuant to the Plan) shall be cancelled.

## **Exhibit K**

**Summary Terms of Management Incentive Plans**

[To Come]