James H.M. Sprayregen, P.C.
Jonathan S. Henes, P.C.
Christopher T. Greco
Anthony R. Grossi
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

- and -

Melissa N. Koss
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:     (415) 439-1400
Facsimile:     (415) 439-1500

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ANSWERS HOLDINGS, INC., *et al.*,[1] | ) Case No. 17-10496 (SMB) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**NOTICE OF FILING OF FIRST SUPPLEMENT TO THE PLAN SUPPLEMENT**

---

[1]    The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Answers Holdings, Inc. (4504); Answers Corporation (2855); Easy2 Technologies, Inc. (2839); ForeSee Results, Inc. (3125); ForeSee Session Replay, Inc. (2593); More Corn, LLC (6193); Multiply Media, LLC (8974); Redcan, LLC (7344); RSR Acquisition, LLC (2256); Upbolt, LLC (2839); and Webcollage Inc. (7771).  The location of Debtor Webcollage Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is:  11 Times Square, 11th Floor, New York, New York 10018.

**PLEASE TAKE NOTICE** that on April 2, 2017, the above-captioned debtors (collectively, the "Debtors") filed the *First Supplement to the Plan Supplement for the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization for Answers Holdings, Inc. and Its Debtor Affiliates* (the "First Supplement"). The documents contained in the First Supplement are integral to, part of, and incorporated by reference into the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization for Answers Holdings, Inc. and Its Debtor Affiliates* [Docket No. 17] (as may be supplemented, amended, or otherwise modified from time to time, the "Plan")[2] and, if the Plan is confirmed, shall be approved.

**PLEASE TAKE FURTHER NOTICE** that on March 28, 2017, the Debtors filed the *Plan Supplement for the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization for Answers Holdings, Inc. and Its Debtor Affiliates* [Docket No. 84] (the "Plan Supplement"). The documents contained in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan [Docket No. 17] and, if the Plan is confirmed, shall be approved.

**PLEASE TAKE FURTHER NOTICE** that the hearing to consider approval of the Disclosure Statement and confirmation of the Plan (the "Combined Hearing") will commence on **April 4, 2017, at 2:00 p.m. (prevailing Eastern Time)**, before the Honorable Stuart M. Bernstein, United States Bankruptcy Judge, in courtroom 723 of the United States Bankruptcy Court, located at One Bowling Green, New York, NY 10004. The Combined Hearing may be continued from time to time by the Court or the Debtors **without further notice** other than by such adjournment being announced in open court or by a notice of adjournment filed with the Court.

**PLEASE TAKE FURTHER NOTICE** that the Plan Supplement included the following documents, as may be modified, amended, or supplemented from time to time:

| | |
|---|---|
| **Exhibit A:** | First Lien Exit Credit Agreement |
| **Exhibit B:** | Second Lien Exit Credit Agreement |
| **Exhibit C:** | Exit L/C Facility Documents |
| **Exhibit F:** | List of Retained Causes of Action |
| **Exhibit G:** | Identities of the Members of the New Board, the New OpCo Boards, and the Officers of the Reorganized Debtors |
| **Exhibit I:** | Schedule of Rejected Executory Contracts and Unexpired Leases |
| **Exhibit J:** | Restructuring Transactions Exhibit |

**PLEASE TAKE FURTHER NOTICE** that the First Supplement includes the following documents, as may be modified, amended, or supplemented from time to time:

---

[2]    Capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Plan.

**Exhibit H:**        Warrant Agreement

**Exhibit K:**        Summary Terms of Management Incentive Plans

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to alter, amend, modify, or supplement any document in the Plan Supplement or the First Supplement; *provided* that if any document in the Plan Supplement or the First Supplement is altered, amended, modified or supplemented in any material respect prior to the hearing to consider confirmation of the Plan, the Debtors will file a blackline of such document with the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan, the Disclosure Statement, the Plan Supplement, and the First Supplement, as well as further information regarding the Chapter 11 Cases are available for inspection free of charge by visiting the website of Rust Consulting/Omni Bankruptcy at www.omnimgt.com/Answers or by calling (844) 580-9044.  You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

---

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **SECTION 8.3 CONTAINS A THIRD-PARTY RELEASE**. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.**

---

*[Remainder of page intentionally left blank.]*

New York, New York
Dated:  April 2, 2017

_/s/ Christopher T. Greco_
James H.M. Sprayregen, P.C.
Jonathan S. Henes, P.C.
Christopher T. Greco
Anthony R. Grossi
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*- and -*

Melissa N. Koss
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

James H.M. Sprayregen, P.C.
Jonathan S. Henes, P.C.
Christopher T. Greco
Anthony R. Grossi
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Melissa N. Koss
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ANSWERS HOLDINGS, INC., *et al.*,[1] | ) Case No. 17-10496 (SMB) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**FIRST SUPPLEMENT TO THE PLAN SUPPLEMENT FOR THE JOINT**
**PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION**
**FOR ANSWERS HOLDINGS, INC. AND ITS DEBTOR AFFILIATES**

---

[1]    The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Answers Holdings, Inc. (4504); Answers Corporation (2855); Easy2 Technologies, Inc. (2839); ForeSee Results, Inc. (3125); ForeSee Session Replay, Inc. (2593); More Corn, LLC (6193); Multiply Media, LLC (8974); Redcan, LLC (7344); RSR Acquisition, LLC (2256); Upbolt, LLC (2839); and Webcollage Inc. (7771).  The location of Debtor Webcollage Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is:  11 Times Square, 11th Floor, New York, New York 10018.

## TABLE OF CONTENTS

| **Exhibit** | **Description** |
| --- | --- |
| H | Warrant Agreement |
| K | Summary Terms of Management Incentive Plans |

## **Exhibit H**

### **Warrant Agreement**

Certain documents, or portions thereof, contained in this <u>Exhibit H</u> and the First Supplement to the Plan Supplement remains subject to continuing negotiations among the Debtors and interested parties with respect thereto.  The Debtors reserve all rights, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the First Supplement to the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

**FINAL FORM**

---

**WARRANT AGREEMENT**

**BETWEEN**

**ANSWERS HOLDINGS, INC.**

**AND**

**[WARRANT AGENT]**

**DATED [●], 2017**

---

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ................................................................ 2

    Section 1.1    Definition of Terms.................................................... 2
    Section 1.2    Accounting Terms and Determinations ...................... 6
    Section 1.3    Rules of Construction ............................................... 6
    Section 1.4    Stockholders Agreement............................................ 7

ARTICLE II APPOINTMENT OF WARRANT AGENT ...................... 7

    Section 2.1    Appointment ............................................................. 7
    Section 2.2    Resignation or Removal of Warrant Agent. ............... 7

ARTICLE III WARRANTS ................................................................ 8

    Section 3.1    Issuance of Warrants.................................................. 8
    Section 3.2    Form of Warrant ....................................................... 9
    Section 3.3    Execution of Warrant Certificates. ............................ 9
    Section 3.4    Registration and Countersignature............................ 9
    Section 3.5    Withholding and Reporting Requirements. ............... 10

ARTICLE IV EXERCISE OF WARRANT ........................................ 11

    Section 4.1    Method of Exercise. ................................................. 11
    Section 4.2    Fractional Shares..................................................... 13
    Section 4.3    Automatic Conversion into Warrant Shares.. ........... 13
    Section 4.4    Expenses ................................................................. 13
    Section 4.5    Reservation of Warrant Shares. ............................... 13
    Section 4.6    Valid Issuance ........................................................ 14

ARTICLE V ADJUSTMENT............................................................ 14

    Section 5.1    Adjustments Generally.............................................. 14
    Section 5.2    Stock Dividends, Splits and Combinations................ 14
    Section 5.3    Adjustment to the Number of Warrant Shares.......... 15
    Section 5.4    Reorganization, Reclassifications or Recapitalization of the
                 Company ................................................................. 15
    Section 5.5    Liquidity Event. ...................................................... 16
    Section 5.6    Independent Financial Expert. ................................. 17
    Section 5.7    Notice to the Registered Holders. ............................ 18
    Section 5.8    Certain Events ........................................................ 19

ARTICLE VI TRANSFERS............................................................... 19

    Section 6.1    Ownership of Warrant.............................................. 19
    Section 6.2    Transfers ................................................................. 19
    Section 6.3    Restrictions on Transfer........................................... 20
    Section 6.4    Obligations with Respect to Transfers and Exchanges of Warrants........ 20

ARTICLE VII MISCELLANEOUS..................................................... 21

    Section 7.1    Loss, Theft, Destruction or Mutilation of a Warrant Certificate ............ 21
    Section 7.2    Business Days. ........................................................ 21

i

Section 7.3     Fees and Expenses ................................................................................ 21
Section 7.4     Amendment; Modification; Waivers ...................................................... 21
Section 7.5     Notices .................................................................................................. 22
Section 7.6     Third-Party Beneficiaries ..................................................................... 22
Section 7.7     Governing Law; Submission to Jurisdiction ......................................... 22
Section 7.8     Waiver of Trial by Jury ......................................................................... 22
Section 7.9     Assignment; Successors ........................................................................ 23
Section 7.10    Headings ............................................................................................... 23
Section 7.11    Severability ........................................................................................... 23
Section 7.12    Specific Performance ............................................................................ 23
Section 7.13    Counterparts .......................................................................................... 24
Section 7.14    No Rights as Registered Holder ............................................................ 24
Section 7.15    Confidentiality. ..................................................................................... 24

Exhibit A          Form of Warrant Certificate
Exhibit B          Notice of Exercise
Exhibit C          Assignment

## WARRANT AGREEMENT

THIS WARRANT AGREEMENT (this "*Agreement*"), dated as of [●], is by and among Answers Holdings, Inc., a Delaware corporation (the "*Company*") and [NAME OF WARRANT AGENT] (the "*Warrant Agent*").

WHEREAS, on [●], the Company and its affiliated debtors and debtors in possession filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the for the Southern District of New York (the "*Bankruptcy Court*"), case number [●];

WHEREAS, on [●], the Company and its affiliated debtors and debtors in possession filed their Joint Pre-Packaged Chapter Plan of Reorganization Plan (as amended or supplemented from time to time, the "*Plan of Reorganization*");

WHEREAS, on [●], the Bankruptcy Court entered an order confirming the Plan of Reorganization, and the Company and its affiliated debtors and debtors in possession emerged from their chapter 11 cases on the date first written above (the "*Effective Date*");

WHEREAS, pursuant to the Plan of Reorganization, on or as soon as practicable after the Effective Date, (i) the Company will issue or cause to be issued, 1,111,111 warrants (the "*Warrants*") to acquire shares of the common stock of the Company, par value $[●] per share ("*Common Stock*"), with each such Warrant being exercisable for the Warrant Exercise Price (as defined below), to [NAME OF NEW LLC], a Delaware limited liability company ("*Answers LLC*") as a contribution to capital, (ii) Answers LLC will in turn contributed, or cause to be contributed, the Warrants to Answers Corporation, a Delaware corporation ("*Answers Corporation*"), as a contribution to capital, and (iii) Answers Corporation will Transfer the Warrants to the holders of Second Lien Claims (as defined in the Plan of Reorganization) in partial satisfaction of their claims against Answers Corporation;

WHEREAS, the Company desires to provide for the form and provisions of the Warrants, the terms upon which they shall be issued and exercised, and the respective rights, limitation of rights, and immunities of the Company, the Warrant Agent, and the holders of the Warrants;

WHEREAS, the Company desires the Warrant Agent to act on behalf of the Company, and the Warrant Agent is willing to so act, in connection with the issuance, registration, transfer, exchange, call, exercise and cancellation of the Warrants; and

WHEREAS, all acts and things have been done and performed which are necessary to make the Warrants, when issued, the valid, binding and legal obligations of the Company, and to authorize the execution and delivery of this Agreement.

NOW, THEREFORE, in consideration of the mutual agreements herein contained, the parties hereto agree as follows:

# ARTICLE I
# DEFINITIONS

Section 1.1    Definition of Terms.  As used in this Agreement, the following capitalized terms shall have the following respective meanings:

"*30th Month Date*" means ___ __, 20[19][1].

"*Affiliate*" means, with respect to any specified Person, any other Person directly or indirectly Controlling, Controlled by or under direct or indirect common Control with such specified Person.

"*Board of Directors*" means the Board of Directors of the Company.

"*Business Day*" means any day except Saturday, Sunday, any day which shall be a federal legal holiday in the United States or any day on which banking institutions in the State of Delaware are authorized or required by law or other governmental action to close.

"*Close of Business*" means 5:00 p.m. Eastern Time.

"*Control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and the policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"*Fair Market Value*" means, as of the date of determination:

(a)    with respect to any evidences of indebtedness or assumptions of liabilities or indebtedness, an amount equal to the face value (plus accrued interest, whether paid or unpaid, if applicable) of any such evidences of indebtedness or assumptions of liabilities or indebtedness;

(b)    with respect to any security listed or admitted to trading on any Trading Market in which the average daily weighted trading volume for such security over the prior 30 consecutive Trading Days from the date of determination is at least US$1,000,000, an amount equal to its five-day volume weighted average as of such date;

(c)    with respect to deposits and short-term money market instruments, an amount equal to its value at cost (together with accrued and unpaid interest) or market, depending on the type of investment; and

(d)    with respect to all other assets or liabilities, an amount determined by the Independent Financial Expert in accordance with Section 5.6(b) and (d).

"*First Lien Equity Share*" means, as of the date of determination, a fraction equal to (a) 9,600,000 shares of Common Stock (adjusted for all subsequent stock splits, stock dividends, consolidations, combinations, exchanges, redesignations, and reclassifications of shares of

---

[1]Date to be same numerical day as Effective Date in the 30th consecutive calendar month.

Common Stock) *divided by* (b) the aggregate number of shares of Common Stock issued and outstanding held by all holders of Common Stock as of such date.

"*GAAP*" means the United States generally accepted accounting principles as in effect from time to time.

"*Governmental Authority*" means any federal, state or local governmental authority or agency or any instrumentality thereof.

"*Independent Financial Expert*" means an independent, nationally recognized investment banking, accounting or valuation firm appointed in accordance with Section 5.6(a).

"*Liquidity Event*" means:

  (a) a merger, consolidation, amalgamation or other similar transaction or series of related transactions to which the Company is a party and pursuant to which the holders of shares of Common Stock immediately prior to such transaction hold less than 50% of the shares of common stock of the surviving entity immediately following such transaction; or

  (b) any sale , transfer or other disposition in a single transaction or series of related transactions of all or substantially all of the Company's and its subsidiaries' assets in one transaction or a series of related transactions; *provided, however*, that for these purposes a sale, transfer or disposition of ForeSee Results, Inc. prior to the Close of Business on the 30th Month Date will be deemed a sale, transfer or disposition of substantially all of  the Company's and its subsidiaries' assets even if not all of the Company's other assets are included in such sale, transfer or disposition.

"*Liquidity Event Proceeds*" means that portion of the aggregate consideration (including all cash, stock, assets, securities, warrants, options, subscription rights, evidences of indebtedness or assumptions of liabilities or indebtedness or other property) paid or payable to the Company and any holders of shares of Common Stock or other equity securities of the Company or their respective Affiliates, in connection with the Liquidity Event (after deducting expenses paid or payable by the Company in consummating such Liquidity Event).  For purposes of the foregoing, the consideration paid or payable in the Liquidity Event shall include the cash, stock, assets, securities, warrants, options, subscription rights, evidences of indebtedness or assumptions of liabilities or indebtedness or other property paid or payable to any holders of shares of Common Stock or other equity securities of the Company, or their respective Affiliates, in connection with the Liquidity Event, regardless of how such consideration is characterized in the definitive documents relating to such Liquidity Event (which consideration might include non-competition, consulting or other similar payments), but excluding any consideration received for employees' wages or for other *bona fide* services on no less favorable terms to the contracting third party than arm's length terms.

"*Open of Business*" means 9:00 a.m. Eastern Time.

"*Person*" means an individual, a trust, a corporation, a partnership, an association, a joint venture, a limited liability company, a joint stock company, an unincorporated organization and a Government Authority.

"*Pro Rata Liquidity Event Proceeds*" means (a) the Liquidity Event Proceeds *multiplied by* (b) the fraction equal to (x) the aggregate number of Warrant Shares issuable upon exercise of a Warrant *divided by* (y) the sum of the aggregate number of Warrant Shares issuable upon exercise of all issued and outstanding Warrants as of such date plus the aggregate number of shares of Common Stock issued and outstanding as of such date.

"*Pro Rata Warrant Value*" means an amount, expressed in U.S. dollars (rounded up to two decimal places), equal to (a) the Warrant Value of such Warrant *multiplied by* (b) the quotient of (x) the aggregate number of Warrant Shares issuable upon exercise of such Warrant and (y) the aggregate number of Warrant Shares issuable upon exercise of all Warrants issued and outstanding on such date.

"*Registered Holder*" means each Person in whose name Warrants are registered on the Warrant Register, including its successors and assigns.

"*Representatives*" of a Registered Holder means its partners, shareholders, members, directors, officers, employees, agents, counsel, accountants, consultants, investment advisers or other professionals or representatives, or its affiliates or wholly owned subsidiaries.

"*Required Holders*" means at any time Registered Holders of Warrants exercisable for a majority of the Warrant Shares issuable upon exercise of all Warrants then outstanding; *provided* that, for the avoidance of doubt, a Registered Holder may vote part of its holdings in favor of the matter presented for it, and part of its holdings against such matter, and such split voting shall be taken into account when determining whether the required majority threshold has been satisfied.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations promulgated from time to time thereunder.

"*Stockholders Agreement*" means that certain Stockholders Agreement, dated as of the Effective Date, by and among the Company and the holders of shares of Common Stock party thereto.

"*Termination Date*" means the Close of Business on the 5th anniversary of the Effective Date.

"*Total Exercise Price*" means, as of any Exercise Date, an amount, rounded up to two decimal places, equal to:

      (a)    during the period commencing on the Effective Date and ending at the Open of Business on the 180th day prior to the Termination Date, (i) the sum of (x) $[●][2] and (y) the amount equal to 5% per annum of $[●][3] compounded annually and accrued

---

[2] The amount of the Remaining First Lien Claims as of the Effective Date of the Plan.

[3] The amount of the Remaining First Lien Claims as of the Effective Date of the Plan.

through the Exercise Date, *minus* (ii) the First Lien Equity Share *multiplied by* the sum of, without duplication, (x) all cash dividends or distributions paid on the Common Stock, and the Fair Market Value of all stock, assets, securities, warrants, options, subscription rights, evidences of indebtedness or assumptions of liabilities or indebtedness or other property (other than Common Stock or securities convertible into shares of Common Stock) received by the holders of Common Stock from the Effective Date through such Exercise Date and (y) all Liquidity Event Proceeds received by the holders of shares of Common Stock at any time after the Close of Business on the 30th Month Date through the Exercise Date (it being acknowledged and agreed that, for the avoidance of doubt, any adjustment to the Total Exercise Price provided for under the immediately preceding subclause (ii)(y) of this definition shall not be applicable on the date of the Liquidity Event itself and is only applicable following such Liquidity Event); or

(b)    during the period commencing at the Open of Business on the 180th day prior to the Termination Date, 10% of the amount described in clause (a).

"***Total Warrant Shares***" means, as of the Effective Date, 1,111,111 shares of Common Stock, subject to adjustment pursuant to Section 5.2.

"***Trading Day***" means a day on which the applicable security is traded on a Trading Market.

"***Trading Market***" means the following markets or exchanges on which the applicable security is listed or quoted for trading on the date in question: OTC Bulletin Board, OTCQX Market, The NYSE MKT, The NASDAQ Capital Market, The NASDAQ Global Market, The NASDAQ Global Select Market, the New York Stock Exchange, the Toronto Stock Exchange and the London Stock Exchange.

"***Transfer***" means any sale, assignment or other disposition of ownership interests in a Warrant. The terms "***Transferred***" and "***Transferrable***" shall have correlative meanings.

"***Warrant Certificate***" means individually, and "***Warrant Certificates***" means collectively, any warrant certificate issued in connection with the Warrants in the form attached as Exhibit A hereto, and all modifications, amendments, supplements, and replacements thereof.

"***Warrant Exercise Price***" means, as of any Exercise Date, an amount, in cash, equal to the quotient of the amount of the Total Exercise Price as of such Exercise Date *divided by* a number equal to the Total Warrant Shares, rounded up to two decimal places.

"***Warrant Shares***" means the shares of Common Stock issued upon the exercise of a Warrant.

"***Warrant Value***" means, as of any date of determination, an amount, expressed in U.S. dollars (rounded up to two decimal places), equal to the fair market value of all of the Warrants outstanding as of such date, as determined by the Independent Financial Expert in accordance with Sections 5.6(c) and (d).

In addition, the following terms are defined in the Sections indicated:

| Term | Section |
|------|---------|
| Answers Corporation | Recitals |
| Appropriate Officer | Section 3.2 |
| Bankruptcy Court | Recitals |
| Certificated Warrant | Section 3.1(b) |
| Chosen Courts | Section 7.7 |
| Common Stock | Recitals |
| Company | Preamble |
| Confidential Information | Section 7.15(a) |
| Direct Registration Warrant | Section 3.1(b) |
| DTC | Section 4.1(c) |
| Effective Date | Recitals |
| Exercise Date | Section 4.1(c) |
| Exercise Period | Section 4.1(a) |
| Notice Date | Section 5.6 |
| Notice of Exercise | Section 4.1(b)(i) |
| Plan of Reorganization | Recitals |
| Warrant | Preamble |
| Warrant Register | Section 3.4(c) |
| Warrant Exercise Documentation | Section 4.1(b)(ii) |
| Warrant Share Delivery Date | Section 4.1(c) |
| Warrant Statements | Section 3.1(b) |

Section 1.2    <u>Accounting Terms and Determinations</u>. Except as otherwise may be expressly provided herein, all accounting terms used herein shall be interpreted, and all financial statements and certificates and reports as to financial matters required to be delivered to any Registered Holder hereunder shall be prepared, in accordance with GAAP.   All calculations made for the purposes of determining compliance with the terms of this Agreement shall (except as otherwise may be expressly provided herein) be made by application of GAAP.

Section 1.3    <u>Rules of Construction</u>. The title of and the section and paragraph headings in this Agreement are for convenience of reference only and shall not govern or affect the interpretation of any of the terms or provisions of this Agreement. The use herein of the masculine, feminine or neuter forms shall also denote the other forms, as in each case the context may require. Where specific language is used to clarify by example a general statement contained herein, such specific language shall not be deemed to modify, limit or restrict in any manner the construction of the general statement to which it relates. The language used in this Agreement has been chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party. In the case of this Agreement, (a) the meanings of defined terms are equally applicable to the singular and plural forms of the defined terms; (b) Annex, Exhibit, Schedule and Section references are to this Agreement unless otherwise specified; (c) the term "including" is not limiting and means "including but not limited to"; (d) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including"; (e) unless otherwise expressly provided in this

Agreement, (i) references to agreements and other contractual instruments (or to specific provisions therein) shall be deemed to include all subsequent amendments and other modifications thereto, but only to the extent such amendments and other modifications are not prohibited by the terms of the Agreement, and (ii) references to any statute or regulation shall be construed as including all statutory and regulatory provisions amending, replacing, supplementing or interpreting such statute or regulation; (f) this Agreement may use several different limitations, tests or measurements to regulate the same or similar matters, all of which are cumulative and each shall be performed in accordance with its terms; and (g) this Agreement is the result of negotiations among and has been reviewed by counsel to the Company and the other parties hereto and is the product of all parties; accordingly, it shall not be construed against a Registered Holder merely because of such Registered Holder's involvement in its preparation.

Section 1.4        Stockholders Agreement.  Upon exercise of any Warrant or any issuance of Warrant Shares, the Registered Holder thereof will automatically be deemed to be a party to the Stockholders' Agreement without further action or signature.

## ARTICLE II
## APPOINTMENT OF WARRANT AGENT

Section 2.1        Appointment.  The Company hereby appoints the Warrant Agent to act as agent for the Company for the Warrants in accordance with the express terms and subject to the conditions set forth in this Agreement, and the Warrant Agent hereby accepts such appointment and agrees to perform the same in accordance with the express terms and conditions set forth in this Agreement.  The Company and the Warrant Agent have entered into a separate fee agreement and all of the costs and expenses of the Warrant Agent shall be paid by the Company.

Section 2.2        Resignation or Removal of Warrant Agent.

(a)        The Warrant Agent, or any successor to it hereafter appointed, may resign its duties and be discharged from all further duties and liabilities hereunder after giving sixty (60) days' notice in writing to the Company and the Registered Holders, which resignation shall only be effective upon the appointment of a successor Warrant Agent. In the event of any such resignation of the Warrant Agent or successor thereto, the Company shall promptly give notice of such resignation to Registered Holders in accordance with Section 7.5.  If the office of the Warrant Agent becomes vacant by resignation or incapacity to act or otherwise, the Company shall appoint in writing a successor Warrant Agent in place of the Warrant Agent.  If the Company shall fail to make such appointment within a period of sixty (60) days after it has been notified in writing of such resignation or incapacity by the Warrant Agent or by a Registered Holder, then the Required Holders may appoint a successor Warrant Agent.  The Company may, at any time and for any reason at no cost to the Registered Holders, remove the Warrant Agent and appoint a successor Warrant Agent by written instrument signed by the Company and specifying such removal and the date when it is intended to become effective, one copy of which shall be delivered to the Warrant Agent being removed and one copy to the successor Warrant Agent.  Any successor Warrant Agent, whether appointed by the Company or the Required Holders, shall be a Person organized and existing under the laws of the United States of America, or any state thereunder, in good

standing.  After appointment, any successor Warrant Agent shall be vested with all the authority, powers, rights, immunities, duties and obligations of its predecessor Warrant Agent with like effect as if originally named as Warrant Agent hereunder, without any further act or deed.  In the event it becomes necessary or appropriate for any reason, the predecessor Warrant Agent shall execute and deliver, at the expense of the Company, an instrument transferring to such successor Warrant Agent all the authority, powers, rights, immunities, duties and obligations of such predecessor Warrant Agent hereunder, and, upon the request of any successor Warrant Agent, the Company shall make, execute, acknowledge and deliver any and all instruments in writing necessary to fully vest in and confirm to such successor Warrant Agent all such authority, powers, rights, immunities, duties and obligations.

(b)     In the event a successor Warrant Agent shall be appointed, the Company shall (i) give notice thereof to the predecessor Warrant Agent and the transfer agent for the Common Stock not later than the effective date of any such appointment, and (ii) cause written notice thereof to be delivered to each Registered Holder at such Registered Holder's address appearing on the Warrant Register in accordance with Section 7.5. Failure to give any notice provided for in this Section 2.2(b) or any defect therein shall not affect the legality or validity of the removal of the Warrant Agent or the appointment of a successor Warrant Agent, as the case may be.

## ARTICLE III
## WARRANTS

Section 3.1    Issuance of Warrants.

(a)     On the terms and subject to the conditions of this Agreement and in accordance with the terms of the Plan of Reorganization, on or as soon as practicable after the Effective Date, (i) the Company will issue the Warrants to Answers LLC as a contribution to capital, (ii) Answers LLC in turn will issue the Warrants to Answers Corporation as a contribution to capital, and (iii) Answers Corporation will Transfer the Warrants to the holders of the Second Lien Claims; provided that, for administrative convenience only, the Company may issue the Warrants directly to the holders of the Second Lien Claims on behalf of, and at the direction of, Answers Corporation, as set forth in the Plan of Reorganization.

(b)     The Warrants shall either be (x) represented by Warrant Certificates ("***Certificated Warrant***") or (y) issued by electronic entry registration on the books of the Warrant Agent ("***Direct Registration Warrants***") and shall be reflected on statements issued by the Warrant Agent from time to time to the holders thereof (the "***Warrant Statements***").

Section 3.2    Form of Warrant.  The Certificated Warrants, with the forms of election to exercise and of assignment printed on the reverse thereof, shall be in substantially the form set forth in Exhibit A attached hereto. The Warrant Certificates may bear such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Agreement, and may have such letters, numbers or other marks of identification or designation

and such legends, summaries, or endorsements placed thereon as may be required by the Warrant Agent or to comply with any law or with any rules or regulations made pursuant thereto or with any rules of any securities exchange or as may, consistently herewith, or, be determined by the Chief Executive Officer, President, Chief Financial Officer or Chief Restructuring Officer of the Company, or such other officer as may be authorized and designated from time to time by the Company, (each, an "*Appropriate Officer*") executing such Warrant Certificates, as evidenced by their execution of the Warrant Certificates, *provided* any such insertions, omissions, substitutions or variations shall be reasonably acceptable to the Warrant Agent; and *provided further*, in each case, that they do not affect the rights, duties, obligations, responsibilities, liabilities or indemnities of the Warrant Agent or the Registered Holders.

Section 3.3    Execution of Warrant Certificates.

(a)    The Warrant Certificates shall be signed on behalf of the Company by an Appropriate Officer.  Each such signature upon the Warrant Certificates may be in the form of a facsimile signature of any such Appropriate Officer and may be imprinted or otherwise reproduced on the Warrant Certificates and for that purpose the Company may adopt and use the facsimile signature of any Appropriate Officer.

(b)    If any Appropriate Officer who shall have signed any of the Warrant Certificates shall cease to be such Appropriate Officer before the Warrant Certificates so signed shall have been countersigned, either by manual or facsimile signature, by the Warrant Agent or delivered or disposed of by or on behalf of the Company, such Warrant Certificates nevertheless may be countersigned and delivered or disposed of with the same force and effect as though such Appropriate Officer had not ceased to be such Appropriate Officer of the Company, and any Warrant Certificate may be signed on behalf of the Company by any person who, on the date of the execution of such Warrant Certificate, is an Appropriate Officer.

(c)    A Warrant Certificate shall be, and shall remain, subject to the provisions of this Agreement until such time as all of the Warrants evidenced thereby shall have been duly exercised or shall have expired or been canceled in accordance with the terms hereof.

Section 3.4    Registration and Countersignature.

(a)    Upon receipt of a written order of the Company signed by an Appropriate Officer instructing the Warrant Agent to do so, the Warrant Agent (i) shall upon receipt of Warrant Certificates, duly executed on behalf of the Company, countersign, either by manual or facsimile signature, such Warrant Certificates evidencing Warrants, and record such Warrant Certificates, including the Registered Holders thereof, in the Warrant Register, and (ii) shall register in the Warrant Register any Direct Registration Warrants in the names of the initial Registered Holders thereof.  Such written order of the Company shall specifically state the number of Warrants that are to be issued as Certificated Warrants or Direct Registration Warrants and the name of the Registered Holders thereof and the Warrant Agent may rely conclusively on such written order. Notwithstanding the foregoing or anything else in this Agreement to the contrary, the

Company shall not instruct the Warrant Agent to register any Direct Registration Warrants unless and until the Warrant Agent shall notify the Company in writing that it has the capabilities to accommodate Direct Registration Warrants.

(b)      No Warrant Certificate shall be valid for any purpose, and no Warrant evidenced thereby shall be exercisable, until such Warrant Certificate has been countersigned by the manual or facsimile signature of the Warrant Agent.  Such signature by the Warrant Agent upon any Warrant Certificate executed by the Company shall be conclusive evidence that such Warrant Certificate so countersigned has been duly issued hereunder.

(c)      The Warrant Agent shall keep or cause to be kept, at an office designated for such purpose, books (the "*Warrant Register*") in which, subject to such reasonable regulations as it may prescribe, it shall register the Certificated Warrants or Direct Registration Warrants, and exchanges, cancellations and Transfers of outstanding Warrants in accordance with the procedures set forth in Article VI of this Agreement, all in a form satisfactory to the Company and the Warrant Agent.  No service charge shall be made for any exchange or registration of Transfer of the Warrants, but the Company may require payment of a sum sufficient to cover any stamp or other tax or other charge that may be imposed on any Registered Holder in connection with any such exchange or registration of Transfer.  The Warrant Agent shall have no obligation to effect an exchange or register a Transfer unless and until it is satisfied that any payments required by the immediately preceding sentence have been made.

(d)      Prior to due presentment for registration of Transfer or exchange of any Warrants in accordance with the procedures set forth in this Agreement, the Company and the Warrant Agent may deem and treat the person in whose name such Warrants are registered upon the Warrant Register as the absolute owner of such Warrants, for all purposes, including for the purpose of any exercise thereof, any distribution to the holder thereof and for all other purposes, and neither the Warrant Agent nor the Company shall be affected by notice to the contrary. Neither the Company nor the Warrant Agent will be liable or responsible for any registration or Transfer of any Warrants that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary.

Section 3.5      Withholding and Reporting Requirements. The Company shall comply with all applicable tax withholding and reporting requirements imposed by any governmental unit, and all distributions, including deemed distributions, pursuant to the Warrants will be subject to applicable withholding and reporting requirements. Notwithstanding any provision to the contrary, the Company will be authorized to (i) take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements, (ii) apply a portion of any cash distribution to be made under the Warrants to pay applicable withholding taxes, (iii) liquidate a portion of any non-cash distribution to be made under the Warrants to generate sufficient funds to pay applicable withholding taxes or (iv) establish any other mechanisms the Company believes are reasonable and appropriate, including requiring holders to submit appropriate tax and withholding certifications (such as IRS Forms W-9 and the appropriate IRS Forms W-8, as applicable) as a condition of receiving the benefit of any adjustment provided pursuant to Article V.

**ARTICLE IV**
**EXERCISE OF WARRANT**

Section 4.1    Method of Exercise.

(a)    A Warrant may be exercised, in whole or in part, by the Registered Holder thereof at any time, and from time to time, during the following periods (each, an "**Exercise Period**"): (i) the period commencing 180 days prior to the Close of Business on the Termination Date; (ii) the period commencing on that date which is 90 days following the initial public offering of the Common Stock of the Company that is registered with the Securities and Exchange Commission pursuant to the Securities Act and ending on the Close of Business on the Termination Date;  and (iii) the 60-day period following that date on which the Company issues in a single transaction or series of related transactions, additional shares of its Common Stock representing more than 50% of the number of shares of issued and outstanding shares of Common Stock immediately prior to such issuance (or in the case of a series of related transactions, immediately prior to the first such issuance), unless such transaction or series of related transactions constitutes a Liquidity Event, in which case Section 5.5 shall control.

(b)    Subject to the terms and conditions of the Warrants and this Agreement, the Registered Holder of any Warrants may exercise, in whole or in part, such Holder's right to acquire the Warrant Shares issuable upon exercise of such Warrants by:

(i)    (x) in the case of Certificated Warrants, properly completing and duly executing the exercise form for the election to exercise such Warrants (including the exercise forms referred to in clauses (y) below, a "**Notice of Exercise**") appearing on the reverse side of the Warrant Certificates or (y) in the case of Direct Registration Warrants, providing a Notice of Exercise substantially in the form of Exhibit B hereto, properly completed and duly executed by the Registered Holder thereof, to the Warrant Agent; and

(ii)    paying the Warrant Exercise Price to the Company for the portion of such Warrant exercised in cash or by certified check or wire transfer for all Warrant Shares purchased pursuant to the such Notice of Exercise (such payment, together with the Warrant Certificate and such Notice of Exercise, the "**Warrant Exercise Documentation**").

For purposes of clarification, the Registered Holders are not required to exercise the Warrants (x) to effect the automatic conversion of the Warrants into Warrant Shares as provided for in Section 4.3, (y) to be entitled to the Pro Rata Warrant Value of the Warrants as provided for in Section 5.5(a) or (z) to be entitled to the Pro Rata Liquidity Event Proceeds as provided for in Section 5.5(b).

(c)    As promptly as practicable, and in any event within five Business Days after receipt of all Warrant Exercise Documentation (the "**Warrant Share Delivery Date**"), the Company shall: (i) to the extent that the Warrant Agent is participating in The Depositary Trust Company ("**DTC**") Fast Automated Securities Transfer Program, upon the request of the applicable Registered Holder, credit such aggregate number of Warrant

Shares to which the applicable Registered Holder is entitled pursuant to such exercise to the Registered Holder's or its designee's balance account with DTC through its Deposit Withdrawal Agent Commission System, or (ii) if the Warrant Agent is not participating in the DTC Fast Automated Securities Transfer Program, deliver, or cause to be delivered, certificates representing the Warrant Shares (whether through its transfer agent or otherwise) to the applicable Registered Holder or its designee(s) at the address(es) specified by the applicable Registered Holder in the Notice of Exercise. The Warrant Shares shall be issued free of all legends, unless, in the reasonable opinion of the Company (after taking into account advice of outside counsel and any representations of the applicable Registered Holder), the securities laws require a legend(s) to be affixed to the certificate(s) representing the Warrants Shares. The Warrant Certificate shall be deemed to have been exercised, and the Warrant Shares shall be deemed to have been issued, and the applicable Registered Holder or its designee(s) shall be deemed to have become a holder of record of such Warrant Shares, on the first date on which all Warrant Exercise Documentation has been delivered to the Company, which date is referred to herein as, the "***Exercise Date***".

(d)      If a Warrant shall have been exercised in part, the Company shall, at the time of delivery of Warrant Shares if the Warrant Agent is not participating the DTC Fast Automated Securities Transfer Program or by the Warrant Share Delivery Date if the Warrant Agent is participating the DTC Fast Automated Securities Transfer Program, deliver to the Registered Holder a new Warrant Certificate (if such partially exercised Warrant was evidenced by a Warrant Certificate) evidencing the rights of the Registered Holder to purchase the unpurchased Warrant Shares underlying such Warrant, which new Warrant Certificate shall be dated as of the Effective Date and, in all other respects, be identical with the original Warrant Certificate.

(e)      Any exercise of a Warrant may be conditioned by the Registered Holder on any event or the consummation of any transaction, including any Liquidity Event. Any exercise so conditioned shall not be deemed to have occurred except concurrently with the consummation of such event or transaction, except that, for purposes of determining whether such exercise is timely, it shall be deemed to have occurred as of the date all Warrant Exercise Documentation was delivered to the Company. The Registered Holder may rescind the exercise of this Warrant at any time prior to the consummation of such event or transaction.

(f)      The Company will not close its shareholder books or records in any manner that prevents the timely exercise of a Warrant, pursuant to, and in accordance with, the terms of this Agreement.

Section 4.2      <u>Fractional Shares</u>.      Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to issue any fraction of a share of its capital stock in connection with the exercise of any Warrants, and in any case where a Registered Holder would, except for the provisions of this <u>Section 4.2</u>, be entitled under the terms thereof to receive a fraction of a share upon the exercise of such Warrants, the Company shall, upon the exercise of such Warrants, issue or cause to be issued only the largest whole number of Warrant Shares issuable upon such exercise after a rounding of such fraction to the

nearest share (up or down), with half shares or less being rounded down (and such fraction of a share will be disregarded, and the Registered Holder shall not have any rights or be entitled to any payment with respect to such fraction of a share); provided that the number of whole Warrant Shares which shall be issuable upon the contemporaneous exercise of any Warrants shall be computed on the basis of the aggregate number of Warrant Shares issuable upon exercise of all such Warrants.

Section 4.3    <u>Automatic Conversion into Warrant Shares</u>.    The Warrants will automatically convert, without any action on the part of the Company or the Registered Holder, into the Warrant Shares at such time that the Total Exercise Price equals zero.  Such conversion shall be effective at such time and the Registered Holders will be deemed to be holders of the Warrant Shares as of such time and entitled to any distributions on the Common Stock from and after such time notwithstanding that the Registered Holders were not holders of the Warrant Shares on any record date for such distribution.

Section 4.4    <u>Expenses</u>.    The Company shall pay all reasonable expenses and taxes (including all documentary, stamp, transfer, and other transactional taxes) other than income taxes, attributable to the preparation, issuance, or delivery of this Agreement, the Warrants, and the Warrant Shares.

Section 4.5    <u>Reservation of Warrant Shares</u>.

(a)    The Company agrees that it shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock solely for the purpose of issuance upon the exercise of the Warrants, a number of shares of Common Stock equal to the aggregate Warrant Shares issuable upon the exercise of all outstanding Warrants.  The Company shall take all such actions as may be necessary to assure that all such shares of Common Stock may be so issued without violating the Company's governing documents, any agreements to which the Company is a party, any requirements of any national securities exchange upon which shares of Common Stock may be listed or any applicable laws.  The Company shall not take any action which would cause the number of authorized but unissued shares of Common Stock to be less than the number of such shares required to be reserved hereunder for issuance upon exercise of the Warrants.

(b)    The Company covenants that it will take such actions as may be necessary or appropriate in order that all Warrant Shares issued upon exercise of the Warrants will, upon issuance in accordance with the terms of this Agreement, be fully paid and non-assessable and free from any and all (i) security interests created by or imposed upon the Company and (ii) taxes, liens and charges with respect to the issuance thereof.  If at any time prior to the Termination Date the number and kind of authorized but unissued shares of the Company's capital stock shall not be sufficient to permit exercise in full of the Warrants, the Company will promptly take such corporate action as may, in the opinion of its counsel, be reasonably necessary (including seeking stockholder approval, if required) to increase its authorized but unissued shares to such number of shares as shall be sufficient for such purposes.  The Company agrees that its issuance of Warrants shall constitute full authority to its officers who are charged with the issuance of Warrant Shares to issue Warrant Shares upon the exercise of Warrants.

Section 4.6    <u>Valid Issuance</u>. All Warrant Shares issued upon exercise of a Warrant will, upon payment of the Warrant Exercise Price and issuance by the Company, be duly authorized, validly and legally issued, fully paid, and nonassessable and free and clear of all taxes, liens, security interests, charges, and other encumbrances or restrictions with respect to the issuance thereof and, without limiting the generality of the foregoing, the Company shall use its best efforts, and take all actions necessary or convenient, to ensure such result and shall not take any action that could cause a contrary result.

**ARTICLE V**
**ADJUSTMENT**

Section 5.1    <u>Adjustments Generally</u>.   In order to prevent dilution of the acquisition rights granted under the Warrants, the Total Warrant Shares and the number of Warrant Shares shall be subject to adjustment from time to time as provided in this <u>Article V</u> (in each case, after taking into consideration any prior adjustments pursuant to this <u>Article V</u>).

Section 5.2    <u>Stock Dividends, Splits and Combinations</u>.  If the Company at any time distributes shares of its Common Stock to holders of Common Stock (in the form of a stock dividend or otherwise), subdivides its outstanding shares of Common Stock into a greater number of shares of Common Stock or if the outstanding shares of Common Stock are combined into a smaller number of shares of Common Stock, the Total Warrant Shares shall be adjusted pursuant to the following formula:

$$W = W_0 \ x \ \frac{N_1}{N_0}$$

where:

$W$       =       the as-adjusted number of Total Warrant Shares, rounded up to the nearest whole share, immediately following the Open of Business on the effective date for such distribution, subdivision or combination, as the case may be;

$W_0$      =       the number of Total Warrant Shares as of the time immediately prior to the Open of Business on the effective date for such distribution, subdivision or combination, as the case may be;

$N_0$      =       the number of shares of Common Stock outstanding immediately prior to the Open of Business on the effective date for such distribution, subdivision or  combination, as the case may be (excluding, for the avoidance of doubt, any treasury shares and any shares of Common Stock underlying any other securities of the Company (including the Warrants) convertible into, or exchangeable or exercisable for, shares of Common Stock); and

$N_1$      =       the number of shares of Common Stock outstanding immediately after the effectiveness of such distribution, subdivision or combination excluding, for the avoidance of doubt, any treasury shares and any shares of Common

Stock underlying any other securities of the Company convertible into, or exchangeable or exercisable for, shares of Common Stock).

Such adjustment shall become effective immediately after the Open of Business on the effective date for such subdivision or combination. If any distribution, subdivision or combination of the type described in this <u>Section 5.2</u> is declared or announced but not made, the number of Total Warrant Shares shall again be adjusted to the number of Total Warrant Shares that then would be in effect if such distribution, subdivision or combination had not been declared or announced, as the case may be.

Section 5.3    <u>Adjustment to the Number of Warrant Shares</u>.  Concurrently with any adjustment to the number of Total Warrant Shares under <u>Section 5.2</u>, the number of Warrant Shares issuable upon the exercise of any Warrant also will be adjusted such that the number of Warrant Shares issuable upon the exercise of any Warrant immediately following the effectiveness of such adjustment, rounded to the nearest whole Warrant Share, will be equal to the number of Warrant Shares issuable upon the exercise of any Warrant immediately prior to such adjustment *multiplied by* a fraction, (a) the numerator of which is the Total Warrant Shares in effect immediately following such adjustment and (b) the denominator of which is the Total Warrant Shares in effect immediately prior to such adjustment.  If the number of Warrant Shares are adjusted pursuant to this <u>Section 5.3</u>, the Company, within 5 Business Days of a Registered Holder surrendering a Warrant Certificate to the Company at its registered office, a new Warrant Certificate evidencing the rights of the Registered Holder to purchase the Warrant Shares then-underlying the Warrants represented by such Warrant Certificate (as adjusted in accordance with this <u>Section 5.3</u>), which new Warrant Certificate shall be dated as of the Effective Date and, in all other respects, be identical with the Warrant Certificate so surrendered.

Section 5.4    <u>Reorganization, Reclassifications or Recapitalization of the Company</u>. Subject to <u>Section 5.5</u>, in the event of any (i) capital reorganization of the Company, (ii) reclassification of the Common Stock of the Company (other than a change in par value or from par value to no par value or from no par value to par value or as a result of a stock dividend or distribution or a subdivision, split-up or combination of shares), (iii) consolidation or merger of the Company with or into another Person, or (iv) other similar transaction, in each case which entitles the holders of Common Stock to receive (either directly or upon subsequent liquidation) cash, stock, assets, securities, warrants, options, subscription rights, evidences of indebtedness or assumptions of liabilities or indebtedness or other property, as of the date of determination with respect to or in exchange for Common Stock but is not a Liquidity Event, the Warrants shall, immediately after such reorganization, reclassification, consolidation, merger, sale or similar transaction, subject to <u>Section 5.5</u>, remain outstanding and shall thereafter, in lieu of or in addition to (as the case may be) the number of Warrant Shares then exercisable under the Warrants, be exercisable for the kind and number of shares of stock or other securities or assets of the Company or of the successor Person resulting from such transaction to which the Registered Holders would have been entitled upon such reorganization, reclassification, consolidation, merger, sale or similar transaction if the Registered Holders had exercised the Warrants in full immediately prior to the time of such reorganization, reclassification, consolidation, merger, sale or similar transaction and acquired the applicable number of Warrant Shares then issuable upon exercise of the Warrants as a result of such exercise (without taking into account any limitations or restrictions on the exercisability of the Warrants), and, in such

case, appropriate adjustment (in form and substance satisfactory to the Required Holders) shall be made with respect to the Registered Holders' rights under the Warrants to insure that the provisions of this Article V shall thereafter be applicable, as nearly as possible, to the Warrants in relation to any cash, stock, assets, securities, warrants, options, subscription rights, evidences of indebtedness or assumptions of liabilities or indebtedness or other property thereafter acquirable upon exercise of the Warrants. The provisions of this <u>Section 5.4</u> shall similarly apply to successive reorganizations, reclassifications, consolidations, mergers, sales or similar transactions.

Section 5.5    <u>Liquidity Event</u>.

(a)    If, at any time after the Effective Date but before the Close of Business on the 30th Month Date, a Liquidity Event occurs, each Warrant outstanding immediately prior to the effectiveness of such Liquidity Event shall be terminated and cancelled and converted into the right to receive the Pro Rata Warrant Value for the Warrant Shares issuable upon exercise of such Warrant in full as of the effectiveness of such Liquidity Event.  Promptly following the effectiveness of such Liquidity Event, but in any event prior to or concurrently with any distribution to the holders of the Common Stock, the Company shall pay (or cause, or arrange for, the acquirer or surviving Person in such Liquidity Event or the holders of the Common Stock, to pay) to each Registered Holder of outstanding Warrants the Pro Rata Warrant Value of the Warrants held by such Registered Holder.

(b)    If, at any time after the Close of Business on the 30th Month Date, a Liquidity Event occurs, each Warrant outstanding immediately prior to the effectiveness of such Liquidity Event shall be terminated and cancelled and converted into the right to receive the Pro Rata Liquidity Event Proceeds in excess of the Warrant Exercise Price. Promptly following the effectiveness of such Liquidity Event, but in any event prior to or concurrently with any distribution to the holders of the Common Stock the Company shall pay (or cause, or arrange for, the acquirer or surviving Person in such Liquidity Event or the holders of the Common Stock, to pay) to each Registered Holder of outstanding Warrants the amount of the Pro Rata Liquidity Event Proceeds calculated in accordance with the preceding sentence.

(c)    At least 10 Business Days prior to the effectiveness of a Liquidity Event (occurring before or after the 30th Month Date), the Company shall notify each Registered Holder of such Liquidity Event in accordance with <u>Section 5.5</u>, which notice shall include (x) a detailed summary of the terms of such Liquidity Event, (y) in the case of a Liquidity Event occurring prior to the Close of Business on the 30th Month Date, the Warrant Value and the Pro Rata Warrant Value of the Warrants held by such Registered Holder, and (z) in the case of a Liquidity Event occurring at any time after the Close of Business on the 30th Month Date, the estimated Liquidity Event Proceeds and Pro Rata Liquidity Event Proceeds payable to such Registered Holder, if any, resulting from such Liquidity Event.

(d)    The Company shall include provisions in the definitive documents entered into by the Company with respect to a Liquidity Event, which provide for (i) the

conversion of the Warrants into the right to receive the Pro Rata Warrant Value or Pro Rata Liquidity Event Proceeds, as applicable, as provided for in Section 5.5(a) and Section 5.5(b), and (ii) the allocation and payment of the Pro Rata Warrant Value and Pro Rata Liquidity Event Proceeds to each of the Registered Holders (as applicable) based on the determination of the Warrant Value and the Fair Market Value of any assets or liabilities (other than evidences of indebtedness or assumptions of liabilities or indebtedness, securities listed or admitted to trading or deposits and short-term money market instruments) included as part of the Liquidity Event Proceeds in accordance with Section 5.6. The Company shall not distribute or permit any portion of the Liquidity Event Proceeds to be distributed to the holders of equity securities of the Company (including the Registered Holders) until the Liquidity Event Proceeds or Warrant Value (as applicable) resulting from such Liquidity Event are finally determined as provided for herein. If the Liquidity Event Proceeds consist of items of consideration other than cash (or cash in part and other securities or other assets in part), the Pro Rata Warrant Value and the Pro Rata Liquidity Event Proceeds (as applicable) payable to the Registered Holders will be paid part in cash, other securities and other assets in the same proportion as is paid to the holders of Common Stock.

Section 5.6      Independent Financial Expert.

(a)      The Company shall select the Independent Financial Expert by delivering, or causing to be delivered, in accordance with Section 7.5 to each Registered Holder at its address as it shall appear upon the Warrant Register of the Company (the date on which such notice is delivered, the "**Notice Date**"), a notice of such selected Independent Financial Expert. If the Required Holders object to the selected Independent Financial Expert and deliver written notice of such objection to the Company in accordance with Section 7.5 within seven calendar days following the Notice Date, the Company and the Required Holders will jointly select the Independent Financial Expert within 10 calendar days following the Notice Date (it being acknowledged and agreed that the Company, on the one hand, and the Required Holders, on the other hand, shall use their respective reasonable efforts to negotiate in good faith to select an Independent Financial Expert during such period). If the Company and the Required Holders are unable to agree upon the selection of an Independent Financial Expert within such 10 day period, the Required Holders shall select promptly, but no later than the 14th day following the Notice Date, a separate Independent Financial Expert, and such Independent Financial Expert and the Independent Financial Expert selected by the Company shall select promptly, but no later than 21 calendar days following the Notice Date, a third Independent Financial Expert, which will be the Independent Financial Expert for purposes of this Agreement. The fees, costs, expenses and disbursements of the Independent Financial Expert shall be paid by the Company.

(b)      The Independent Financial Expert shall determine the Fair Market Value of all assets or liabilities (other than evidences of indebtedness or assumptions of liabilities or indebtedness, securities listed or admitted to trading or deposits and short-term money market instruments). The Company will provide such information regarding the assets to be valued as is reasonably requested by the Independent Financial Expert. Notice of the assets referred to the Independent Financial Expert for valuation shall be

given to the Registered Holders, along with a summary of the information provided to the Independent Financial Expert.  The Registered Holders shall have twenty (20) Business Days to provide information to the Independent Financial Expert with respect to the Fair Market Value thereof.

(c)    The Independent Financial Expert shall determine the Warrant Value using the Black-Scholes method for valuing options, subject to the following assumptions: (a) the value of a share of Common Stock used in applying the model shall be determined by reference to the per share value of the consideration distributed or paid in or with respect to the Liquidity Event (assuming that all contingent consideration and the present value of all payments to be made over time are paid at the consummation of the Liquidity Event) plus, in the case of a Liquidity Event that does not include substantially all of the businesses and assets of the Company on the date of determination, the Fair Market Value of any businesses retained by the Company following the Liquidity Event, in each case with no discount for illiquidity or minority interests, (b) the maturity date used in applying the model, will be the Termination Date, (c) the strike price used in applying the model will be the Warrant Exercise Price on the date of determination (after giving effect to any adjustments resulting from such Liquidity Event) and (d) the volatility factor used in applying the model shall be determined based on historical and implied future volatility of comparable businesses over the then-remaining period from the date of determination to the Termination Date.

(d)    The Independent Financial Expert shall be acting solely as a valuation professional, and not as an arbitrator.  The determination of the Independent Financial Expert shall, absent manifest error, be final and binding with respect to the calculation of Fair Market Value and Warrant Value, and the fees and expenses of the Independent Financial Expert shall be borne solely by the Company.

Section 5.7    Notice to the Registered Holders.  In addition to any notice required by Section 5.5(c), the Company shall give prompt written notice to Registered Holders and the Warrant Agent, if at any time prior to the expiration or exercise in full of the Warrants, any of the following events shall occur:

(i)    the occurrence of any event that would result in any adjustment to the Total Warrant Shares, Warrant Shares, Total Exercise Price or Warrant Exercise Price under Article V, setting forth in reasonable detail the method of calculation of each such amount;

(ii)    the occurrence of an event that requires the Independent Financial Expert to determine the Fair Market Value of any assets or liabilities in accordance with Section 5.15(b); and

(iii)    the commencement of any Exercise Period, such notice to be accompanied by the most recent annual and quarterly financial statements of the Company delivered to the holders of the Common Stock pursuant to the Stockholders Agreement but only if the Registered Holder receiving such financial information has certified pursuant to Section 9 of the Stockholders Agreement that it (x) is not directly engaged in any business that is

competitive with the Company and (y) if it owns (directly or through affiliates) more than 10% of any business that is competitive with the Company, it has implemented internal controls to prevent the sharing of the financial information within the organization. Any Registered Holder receiving the financial information referred to in the immediately preceding sentence will be deemed to have agreed by virtue of this Agreement to keep such information confidential and not disclose such information to any third party without the prior written consent of the Company (in its sole discretion).

(b)      The Company shall, upon the written request of a Registered Holder, which may be given once at any time in each year, furnish or cause to be furnished to such Registered Holder a certificate setting forth (i) the number of Total Warrant Shares at the time in effect (as Total Warrant Shares may have been adjusted from time to time), (ii) the Total Exercise Price at the time in effect, (iii) the Warrant Exercise at the time in effect and (iv) the number of Warrant Shares or other property that at the time would be received upon exercise of a Warrant.

Section 5.8    Certain Events. If any event of the type contemplated by the provisions of this Article V but not expressly provided for by such provisions (including the granting of stock appreciation rights, phantom stock rights or other rights with equity features) occurs, then the Board of Directors shall make an appropriate adjustment in the number of Warrant Shares issuable upon exercise of the Warrants or the Warrant Exercise Price so as to protect the rights of the Registered Holders in a manner consistent with the provisions of this Article V; *provided*, that no such adjustment pursuant to this Section 5.3 shall decrease the number of Warrant Shares issuable or increase the Warrant Exercise Price as otherwise determined pursuant to this Article V.

## ARTICLE VI
## TRANSFERS

Section 6.1    Ownership of Warrant. The Company may deem and treat the Person in whose name a Warrant is registered as the Registered Holder and owner thereof until provided with notice by such Person to the contrary.

Section 6.2    Transfers. When Certificated Warrants or Direct Registration Warrants are presented to the Warrant Agent with a written request:

(a)      to register the Transfer of such Certificated Warrants or Direct Registration Warrants; or

(b)      to exchange such Certificated Warrants or Direct Registration Warrants for an equal number of Certificated Warrants or Direct Registration Warrants, respectively, of other authorized denominations,

the Warrant Agent shall register the Transfer or make the exchange, and in the case of Certificated Warrants shall issue such new Warrant Certificates, as requested if its customary requirements for such transactions are met, *provided*, that the Warrant Agent shall have received (w) a written instruction of Transfer in form satisfactory to the Warrant Agent, duly executed by the Registered Holder thereof or by his attorney, duly authorized in writing, (x) a written

certification by the Transferee that it (i) is not directly engaged in any business that is competitive with the Company and (ii) if it owns (directly or through Affiliates) more than 10% of any business that is competitive with the Company, it has implemented internal controls to prevent the sharing of the confidential information within the organization, (y) a written order of the Company signed by an Appropriate Officer authorizing such exchange and (z) in the case of Certificated Warrants, surrender of the Warrant Certificate or Warrant Certificates representing same duly endorsed for Transfer or exchange.

Section 6.3    Restrictions on Transfer.    The Warrants shall be freely transferable; *provided, however*, no Warrants or Warrant Shares shall be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws and no Warrant shall be transferred to a competitor of the Company.

Section 6.4    Obligations with Respect to Transfers and Exchanges of Warrants.

(a)    All Certificated Warrants or Direct Registration Warrants issued upon any registration of Transfer or exchange of Certificated Warrants or Direct Registration Warrants, respectively, shall be the valid obligations of the Company, entitled to the same benefits under this Agreement as the Certificated Warrants or Direct Registration Warrants surrendered upon such registration of Transfer or exchange. No service charge shall be made to a Registered Holder for any registration, Transfer or exchange of any Certificated Warrants or Direct Registration Warrants, but the Company or the Warrant Agent may require payment of a sum sufficient to cover any stamp or other tax or other charge that may be imposed on the Registered Holder in connection with any such exchange or registration of Transfer. The Warrant Agent shall forward any such sum collected by it to the Company or to such persons as the Company shall specify by written notice.  The Warrant Agent shall have no obligation to effect an exchange or register a Transfer unless and until it is satisfied that all such taxes and/or charges have been paid.

(b)    Subject to Section 6.3 and this Section 6.4, the Warrant Agent shall,

(i)    in the case of Certificated Warrants, upon receipt of all information required to be delivered hereunder, from time to time register the Transfer of any outstanding Certificated Warrants in the Warrant Register, upon delivery by the Registered Holder thereof, at the Warrant Agent's office designated for such purpose, of the Warrant Certificate representing such Certificated Warrants, properly completed and duly endorsed for Transfer, by the Registered Holder thereof or by the duly appointed legal representative thereof or by a duly authorized attorney, and upon any such registration of Transfer, a new Warrant Certificate shall be issued to the transferee; and

(ii)    in the case of Direct Registration Warrants, upon receipt of all information required to be delivered hereunder, from time to time register the Transfer of any outstanding Direct Registration Warrants in the Warrant Register, upon delivery by the Registered Holder thereof, at the Warrant Agent's office designated for such purpose, of a form of assignment substantially in the form of Exhibit C hereto, properly completed and duly executed by the Registered Holder thereof or by the duly appointed legal

representative thereof or by a duly authorized attorney, and upon any such registration of Transfer, new Direct Registration Warrants shall be issued to the transferee.

## ARTICLE VII
## MISCELLANEOUS.

Section 7.1    <u>Loss, Theft, Destruction or Mutilation of a Warrant Certificate</u>.  The Company covenants that upon receipt by the Company of evidence reasonably satisfactory to it of the loss, theft, destruction or mutilation of a Warrant Certificate, and in case of loss, theft or destruction, of indemnity or security reasonably satisfactory to it (which shall not include the posting of any bond), and upon surrender and cancellation of such Warrant Certificate, if mutilated, the Company will make and deliver a new Warrant Certificate of like tenor and dated as of such cancellation, in lieu of such Warrant Certificate.

Section 7.2    <u>Business Days</u>.If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall be a day other than a Business Day, then such action may be taken or such right may be exercised on the next succeeding Business Day.

Section 7.3    <u>Fees and Expenses</u>.  Except as otherwise provided herein, all fees and expenses incurred in connection with or related to this Agreement shall be paid by the Person incurring such fees or expenses.

Section 7.4    <u>Amendment; Modification; Waivers</u>.  A provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed by the Company and the Required Holders, which writing shall specifically reference this Agreement, specify the provision(s) hereof that it is intended to amend or waive and further specify that it is intended to amend or waive such provision(s).  No failure or delay by any Person in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

Section 7.5    <u>Notices</u>.  All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) upon delivery, if served by personal delivery upon the Person for whom it is intended, (b) on the third Business Day after the date mailed if delivered by registered or certified mail, return receipt requested, postage prepaid, (c) on the following Business Day if delivered by a nationally-recognized, overnight, air courier or (d) when delivered or, if sent after the Close of Business, on the following Business Day if sent by facsimile transmission or email with electronic confirmation, in each case, to the address set forth on the signature pages hereto opposite the signature block of the Person to receive such notice (which, in the Registered Holder's case, shall be the initial address for the Registered Holder included in the Warrant Register) or to such other address as may be designated in writing, in the same manner, by such Person (provided that the Company shall update the Warrant Register to reflect any change in the Registered Holder's contact information made pursuant to this <u>Section 7.5</u>).

Section 7.6   <u>Third-Party Beneficiaries</u>.  Nothing in this Agreement, express or implied, is intended to confer upon any Person other than the Company and the Registered Holders and their respective successors and permitted assigns any rights, benefits or remedies of any nature whatsoever.

Section 7.7   <u>Governing Law; Submission to Jurisdiction</u>.  This Agreement and all disputes or controversies arising out of or relating to this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without regard to principals of conflicts of laws.  Each of the Company and each Registered Holder agrees that it shall bring any litigation with respect to any claim arising out of or related to this Agreement, exclusively in the Delaware Court of Chancery (and if jurisdiction in the Delaware Court of Chancery shall be unavailable, the Federal courts of the United States of America sitting in the State of Delaware) (together with the appellate courts thereof, the "***Chosen Courts***"), and solely in connection with claims arising under this Agreement (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts, (c) waives any objection that the Chosen Courts are an inconvenient forum or as not having jurisdiction over either the Company or the Registered Holder, (d) agrees that service of process in any such action or proceeding shall be effective if notice is given in accordance with <u>Section 7.5</u> of this Agreement, although nothing contained in this Agreement shall affect the right to serve process in any other manner permitted by law and (e) agrees not to seek a transfer of venue on the basis that another forum is more convenient. Notwithstanding anything herein to the contrary, (i) nothing in this <u>Section 7.7</u> shall prohibit any party from seeking or obtaining orders for conservatory or interim relief from any court of competent jurisdiction and (ii) each of the Company and each Registered Holder agrees that any judgment issued by a Chosen Court may be recognized, recorded, registered or enforced in any jurisdiction in the world and waives any and all objections or defenses to the recognition, recording, registration or enforcement of such judgment in any such jurisdiction.

Section 7.8   <u>Waiver of Trial by Jury</u>.  EACH OF THE COMPANY AND EACH REGISTERED HOLDER ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS WARRANT OR IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PERSON HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PERSON MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT. EACH OF THE COMPANY AND EACH REGISTERED HOLDER CERTIFIES AND ACKNOWLEDGES THAT (a) NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) SUCH PERSON UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (c) SUCH PERSON MAKES THIS WAIVER VOLUNTARILY, AND (d) SUCH PERSON HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND EACH ANCILLARY AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 7.9   <u>Assignment; Successors</u>.  Subject to applicable securities laws, this Agreement and the rights and obligations evidenced hereby shall inure to the benefit of and be

binding upon the successors of the Company and the successors of each Registered Holder.  The provisions of this Agreement are intended to be for the benefit of all Registered Holders of the Warrants from time to time and shall be enforceable by any such Registered Holder or holder of Warrant Shares.

Section 7.10   Headings.   All heading references contained in this Agreement are for convenience purposes only and shall not be deemed to limit or affect any of the provisions of this Agreement.

Section 7.11   Severability.  The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision hereof shall not affect the validity or enforceability of any other provision.   Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction; *provided*, that, if any one or more of the provisions contained in this Agreement shall be determined to be excessively broad as to activity, subject, duration or geographic scope, it shall be reformed by limiting and reducing it to the minimum extent necessary, so as to be enforceable under applicable law.

Section 7.12   Specific Performance.  Each of the Company and the Registered Holders hereby acknowledges and agrees that its respective failure to perform its agreements and covenants hereunder will cause irreparable injury to the other party or parties hereto for which damages, even if available, will not be an adequate remedy.  Accordingly, each of the Company and the Registered Holders hereby consents to the issuance of injunctive relief by the Chosen Courts to compel performance of their respective obligations and to the granting by the Chosen Courts of the remedy of specific performance of their respective obligations hereunder.

Section 7.13   Counterparts.   This Agreement may be executed in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed will be deemed to be an original but all of which taken together will constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by telecopy or by electronic delivery in Adobe Portable Document Format will be effective as delivery of a manually executed counterpart of this Agreement.

Section 7.14   No Rights as Registered Holder.   The Warrants do not entitle the Registered Holders to any voting rights or other rights as holder of Common Stock of the Company prior to the date of exercise hereof.

Section 7.15   Confidentiality.

(a)    Each Registered Holder acknowledges that any notices or information furnished pursuant to this Agreement (the "***Confidential Information***") is confidential and competitively sensitive.  Each Registered Holder shall use, and shall cause any Person to whom Confidential Information is disclosed pursuant to clause (i) below to use, the Confidential Information only in connection with its investment in the Warrants or Warrant Shares and not for any other purpose (including to disadvantage competitively the Company or any other Registered Holder).  Each Registered Holder shall not disclose any Confidential Information to any Person, except that Confidential Information may be disclosed:

(i)    to the Registered Holder's Representatives in the normal course of the performance of their duties for such Registered Holder (it being understood that such Representatives shall be informed by the Registered Holder of the confidential nature of such information and shall be directed to treat such information in accordance with this Section 7.15);

(ii)    to the extent requested or required by applicable law, rule or regulation; *provided*, that the Registered Holder shall give the Company prompt written notice of such request(s), to the extent practicable, and to the extent permitted by law so that the Company may, at its sole expense, seek an appropriate protective order or similar relief (and the Registered Holder shall cooperate with such efforts by the Company, and shall in any event make only the minimum disclosure required by such law, rule or regulation and shall use best efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such information);

(iii)    to any Person to whom the Registered Holder is contemplating a transfer of its Warrants permitted in accordance with the terms hereof; *provided*, that such Person is not prohibited from receiving such information pursuant to Article VI and, prior to such disclosure, such potential transferee is advised of the confidential nature of such information and agrees in a writing to be bound by the confidentiality provisions hereof and which agreement is independently enforceable by the Company;

(iv)    to any regulatory authority or rating agency to which the Registered Holder or any of its affiliates is subject or with which it has regular dealings, as long as such authority or agency is advised of the confidential nature of such information;

(v)    in connection with the Registered Holder's or the Registered Holder's affiliates' normal fund raising, marketing, informational or reporting activities or to any bona fide prospective purchaser of the equity or assets of the Registered Holder or the Registered Holder's affiliates, or prospective merger partner of the Registered Holder or the Registered Holder's affiliates; *provided*, that prior to such disclosure the Persons to whom such information is disclosed are advised of the confidential nature of such information and agree in a writing to be bound by the confidentiality provisions hereof and which agreement is independently enforceable by the Company; or

(vi)    if the prior written consent of the Company shall have been obtained.

(b)    Nothing contained herein shall prevent the use (subject, to the extent possible, to a protective order) of Confidential Information in connection with the assertion or defense of any claim by or against the Company or the Registered Holder. The restrictions contained in this Section 7.15 shall terminate one (1) year following the date on which the Registered Holder ceases to own any Warrants.

(c)    Confidential Information does not include information that: (i) is or becomes generally available to the public (including as a result of any information filed or submitted by the Company with the Securities and Exchange Commission) other than as a result of a disclosure by the Registered Holder or its Representatives in violation of any confidentiality provision of this Agreement or any other applicable agreement, (ii) is or was available to the Registered Holder or its Representatives on a non-confidential basis prior to its disclosure to the Registered Holder or its Representatives by the Company, or (iii) was or becomes available to the Registered Holder or its Representatives on a non-confidential basis from a source other than the Company, which source is or was (at the time of receipt of the relevant information) not, to the best of the Registered Holder's or its Representative's knowledge, bound by a confidentiality agreement with (or other confidentiality obligation to) the Company or another Person.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Company has caused this Warrant Agreement to be executed by its officer thereunto duly authorized.

ANSWERS HOLDINGS, INC.                    Address for Notices:


By: _____
      Name:
      Title:



[WARRANT AGENT]                            Address for Notices:


By: _____
      Name:
      Title:

FACE OF WARRANT CERTIFICATE

VOID AFTER 5:00 P.M., EASTERN TIME, ON [  ], 2022

THE SECURITIES REPRESENTED BY THIS WARRANT CERTIFICATE (INCLUDING THE SECURITIES ISSUABLE UPON EXERCISE OF THE WARRANT) ARE SUBJECT TO ADDITIONAL AGREEMENTS SET FORTH IN THE WARRANT AGREEMENT DATED AS OF [  ], 2017, BY AND BETWEEN THE COMPANY AND THE WARRANT AGENT (THE "WARRANT AGREEMENT").

Certificate Number _____                                    Warrants _____
                                                                                                        CUSIP     [  ]

This certifies that


is the holder of


WARRANTS TO ACQUIRE COMMON STOCK OF

ANSWERS HOLDINGS, INC.


transferable on the books of the Corporation by the holder hereof in person or by duly authorized attorney upon surrender of the certificate properly endorsed.  Each Warrant entitles the holder and its registered assigns (collectively, the "Registered Holder") to acquire from Answers Holdings, Inc., a Delaware corporation (the "Company"), subject to the terms and conditions hereof, at any time before 5:00 p.m., Eastern Time, on [  ], 2022, for each Warrant the number of fully paid and non-assessable share of Common Stock of the Company set forth above at the per share Warrant Exercise Price (as defined in the Warrant Agreement) as of the applicable Exercise Date (each as defined in the Warrant Agreement).  The number and kind of shares purchasable hereunder and the Warrant Exercise Price are subject to adjustment from time to time as provided in the Warrant Agreement.

This certificate is not valid unless countersigned and registered by the Warrant Agent.

**WITNESS** the facsimile seal of the Corporation and the facsimile signatures of its duly authorized officers.

DATED


_____
Authorized Officer

Attest:                                                    [Corporate seal]     COUNTERSIGNED AND REGISTERED
                                                                                              [●],
_____                                    WARRANT AGENT.


_____                                    By _____
Secretary                                                                                  AUTHORIZED SIGNATURE

REVERSE OF WARRANT CERTIFICATE

## ANSWERS HOLDINGS, INC.

The Warrants evidenced by this Warrant Certificate are a part of a duly authorized issue of 1,111,111 Warrants, with each such Warrant exercisable for the number of shares of Common Stock of the Company as provided for in the Warrant Agreement), issued pursuant to the Warrant Agreement, as dated [   ] (the "Warrant Agreement"), by and among Answers Holdings, Inc. (the "Company"), and [●] (the "Warrant Agent").  A copy of the Warrant Agreement may be inspected at the office of the Warrant Agent designated for such purpose.  The Warrant Agreement is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the Registered Holders of the Warrants.  All capitalized terms used in this Warrant Certificate that are not defined herein but are defined in the Warrant Agreement shall have the meanings given to them in the Warrant Agreement.

The Company shall not be required to issue fractions of Common Stock or any certificates that evidence fractional Common Stock.  No Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws.  The Company and Warrant Agent may deem and treat the Registered Holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise hereof and for all other purposes, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

| | | |
|---|---|---|
| The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations. | | |
| Ten COM – as tenants in common | UNIF GIFT MIN ACT - | _____ Custodian _____ (Cust)               (Minor) |
| TEN ENT – as tenants by the entireties | | under Uniform Gifts to Minor Act _____ (State) |
| JT TEN –     as joint tenants with right of survivorship and not as tenants in common | UNIF GIFT MIN ACT - | Custodian (until age) _____ (Cust) |
| | | _____ under Uniform Transfers to Minors Act _____ (Minor)                              (State) |

## FORM OF ASSIGNMENT

For value received, _____ hereby sells, assigns and transfers the Warrants to acquire shares of Answers Holdings, Inc. Social Security or Other Taxpayer Identification Number represented by this Warrant Certificate to:

_____
Print name and address

and does hereby irrevocably constitute and appoint _____ attorney, to transfer said Warrants on the Warrant Register maintained for the purpose of registration thereof, with full power of substitution in the premises:

Dated:     _____ , 20__          Signature: _____

                                   Name: _____

Note: The above signature and name should correspond exactly with the name of the holder as it appears on the face of the certificate, in every particular without alteration or enlargement or any change whatsoever.

EXERCISE FORM

The undersigned Registered Holder of this Warrant Certificate hereby irrevocably elects to exercise the number of Warrants indicated below:

Number of Warrants: _____

Number of Warrants Exercised _____

(Total number of Warrants being exercised – may be expressed as a percentage)

The undersigned requests that the Warrant Shares be issued in the name of the undersigned Registered Holder or as otherwise indicated below:

Name _____     Social Security or Other Taxpayer Identification Number

Address _____

_____

If such Warrants shall not constitute all of the Warrants represented hereby, the undersigned requests that a new Warrant Certificate of like tenor and date for the balance of the Warrants represented hereby be issued and delivered in the name of the undersigned Holder or as otherwise indicated as follows:

Name _____     Social Security or Other Taxpayer Identification Number

Address _____

_____

Dated: _____ , 20__          Signature: _____

Name: _____

In addition, this form is accompanied by the transferee certification  required by Section 6.2.

Note: The above signature and name should correspond exactly with the name of the holder as it appears on the face of the certificate, in every particular without alteration or enlargement or any change whatsoever.

EXERCISE FORM FOR REGISTERED HOLDERS
OF DIRECT REGISTRATION WARRANTS
(To be executed upon exercise of Warrants)

NOTE:  THIS NOTICE OF EXERCISE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO 5:00 P.M., EASTERN TIME, ON [  ], 2022.

The undersigned Registered Holder, being the holder of Direct Registration Warrants of Answers Holdings, Inc., issued pursuant to that certain Warrant Agreement, as dated [●] (the "Warrant Agreement"), by and among Answers Holdings, Inc. (the "Company"), and [●] (the "Warrant Agent"), hereby irrevocably elects to exercise the number of Direct Registration Warrants indicated below, to acquire the number of shares of Common Stock indicated below. All capitalized terms used in this Exercise Form that are not defined herein but are defined in the Warrant Agreement shall have the meanings given to them in the Warrant Agreement.

Number of Warrants:    _____

Number of Warrants Exercised    _____

(Total number of Warrants being exercised – may be expressed as a percentage)

The undersigned requests that the Warrant Shares be issued in the name of the undersigned Registered Holder or as otherwise indicated below:

Name    _____

Address    _____

_____

Social Security or Other Taxpayer Identification Number

If said number of Warrant Shares shall not be all the Warrant Shares issuable upon exercise of the Warrant, the undersigned requests that a new Warrant representing the balance of such Warrant shall be issued in the name of the undersigned Registered Holder or as otherwise indicated below and that a Warrant Statement reflecting such balance be delivered to the address indicated below:

Name    _____

Address    _____

_____

Social Security or Other Taxpayer Identification Number

Dated:    _____ , 20__        Signature: _____

Name: _____

In addition, this form is accompanied by the transferee certification  required by Section 6.2 of the Warrant Agreement.

Note: The above signature and name should correspond exactly with the name of the holder as it appears on the face of the certificate, in every particular without alteration or enlargement or any change whatsoever.

FORM OF ASSIGNMENT

FOR REGISTERED HOLDERS
HOLDING DIRECT REGISTRATION WARRANTS
(To be executed only upon assignment of Warrants)

For value received, the undersigned Registered Holder of Direct Registration Warrants issued pursuant to that certain Warrant Agreement, as dated [  ], 2017, by and among Answers Holdings, Inc. (the "Company"), and [●] (the "Warrant Agent"), hereby sells, assigns and transfers unto the Assignee(s) named below the number of Direct Registration Warrants listed opposite the respective name(s) of the Assignee(s) named below, and all other rights of the Registered Holder under said Direct Registration Warrants, and does hereby irrevocably constitute and appoint _____ attorney, to transfer said Direct Registration Warrants, as and to the extent set forth below, on the Warrant Register maintained for the purpose of registration thereof, with full power of substitution in the premises:

| Name(s) of Assignee(s) | Address of Assignee(s) | Number of Warrants |
|---|---|---|
| | | |

Dated: _____ , 20__          Signature: _____

                                 Name: _____

Note: The above signature and name should correspond exactly with the name of the Registered Holder of the Direct Registration Warrants as it appears on the Warrant Register.

## Exhibit K

**Summary Terms of Management Incentive Plans**

**General.**  The New Board intends to adopt management incentive plans (the "MIPs") for each of ForeSee Results, Inc., Webcollage, Inc. and Multiply Media, LLC, which will be administered by the New Board.  Each MIP will provide for the grant to employee participants of rights (each such right, an "Option Right") to receive a cash payment with respect to each such Option Right in an amount equal to the positive difference, if any, between the fair market value on the date of a Change of Control (as defined below) of one equity interest in the applicable operating company, minus the option price that is specified in a participant's award agreement.  Grants of Option Rights will not entitle participants to any rights in, or to acquire or own any, shares, units or other equity interests in the Debtors but shall only entitle the participant to receive cash payment(s) as described herein.  For purposes of the MIPs, a "Change of Control" shall mean the consummation of (a) a sale or other disposition of all of the assets of the applicable operating company or (b) a sale, merger or other transaction that results in the transfer of a majority of the outstanding equity interests of such company.

**Option Agreement.**  Each grant of Option Rights will be evidenced by an award agreement between the participant and the applicable operating company (an "Option Agreement").  The option price for an Option Right will be set forth in a participant's Option Agreement and will be an amount equal to 50% of the fair market value of one equity interest in the applicable operating company on the date of grant, without allocation of corporate debt not directly applicable to such operating company, as determined by the applicable New Board.  Each grant of Options Rights will have a 10-year term and will include the grant of both time-based Option Rights ("Retention Options") and performance-based Option Rights ("Performance Options").  Additional tranches shall be reserved for new hires and refresh grants, subject to New Board approval.

**Retention Options.**  Retention Options will relate to between 10.7% and 12.0% of the initial equity of the applicable operating company.  Retention Options will vest over four years, generally with one-quarter of the Retention Options vesting one year following the applicable date of grant (with some exceptions) and the remaining three-quarters of the Retention Options vesting monthly over the subsequent thirty-six month period, in any case, subject to a participant's continued employment as of each vesting date.  In the event a participant's employment terminates prior to a Change of Control as a result of such participant's death, disability, termination by the company without cause or termination by the participant for good reason (any such termination, a "Qualifying Termination"), any Retention Options that have vested as of the date of such Qualifying Termination may be retained for the term of the Option Right.  If a participant's employment terminates for any reason as a result of a voluntary termination or a termination for cause, any outstanding Option Rights will be forfeited without the payment of consideration.

Generally, the Option Agreements will provide participants with the protection of a "double-trigger" following a Change of Control, which will provide that all of a participant's outstanding unvested Retention Options will vest upon a Qualifying Termination that occurs on or following the Change of Control; provided, that certain Option Agreements will provide certain

participants with the protection of a "modified single-trigger" following a Change of Control, which will provide that all or half of such participant's outstanding unvested Retention Options will vest upon the earlier of the six-month anniversary of a Change of Control or a Qualifying Termination that occurs on or following the Change of Control.

**Performance Options.**  Performance Options will relate to between 1.9% and 6.5% of the initial equity of the applicable operating company in each tranche.  Performance Options will vest upon a Change of Control based on the achievement of designated multiples of the applicable operating company's enterprise value as of the Effective Date, with such multiples ranging in each tranche from 1.17x to 4.0x, subject to a participant's continued employment until the date of such Change of Control.  In addition, certain Option Agreements will include time-based incentives for a Change of Control that occurs or is agreed-upon during 2017.

**Payment With Respect to Vested Option Rights.**  No payment with respect to any Option Right will be made prior to a Change of Control.  On the date of a Change of Control, any Retention Options that are vested as of, and any Performance Options that vest in connection with, the Change of Control shall be deemed to be exercised as of the Change of Control and immediately cancelled, and, subject to the participant executing (and not revoking) an effective release of claims, the company shall, following the date of such Change of Control, make a cash payment to the participant with respect to such vested Option Rights.  In addition, following a Change of Control, a participant will generally receive payment(s) with respect to any Retention Options that vest following the Change of Control as such Retention Options vest in accordance with the vesting schedule set forth in the participant's Option Agreement.

Certain documents, or portions thereof, contained in this Exhibit K and the Plan Supplement remain subject to continuing review and negotiations among the Debtors and interested parties with respect thereto. The Debtors reserve all rights to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

The entry of the Confirmation Order shall constitute approval of the Management Incentive Plans and the authorization for the New Boards to adopt such plans, which shall be implemented after the Effective Date and be effective without further action or approval required by the Bankruptcy Court.

2