**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| ANSWERS HOLDINGS, INC., *et al.*,[1] | ) Case No. 17-10496 (SMB) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## ORDER APPROVING THE DEBTORS'
## DISCLOSURE STATEMENT FOR, AND CONFIRMING,
## THE DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN

The Court having considered (a) (i) the *Joint Prepackaged Chapter 11 Plan of Reorganization for Answers Holdings, Inc. and Its Debtor Affiliates*, attached hereto as **Exhibit A** (the "*Plan*"),[2] (ii) the Disclosure Statement, attached hereto as **Exhibit B**, and (iii) the Ballots for voting on the Plan to holders of Claims in the Voting Classes (as defined below); and (b) the Debtors having filed[3] (i) the scheduling motion [Docket No. 18] (the "*Scheduling Motion*"), (ii) the declaration of Justin P. Schmaltz, dated March 3, 2017 [Docket No. 19] (the "*First Day Declaration*"), (iii) certification of Paul H. Deutch [Docket No. 31] (the "*Voting Report*"), (iv) the combined hearing notice [Docket No. 47] (the "*Confirmation Hearing Notice*"), (v) the affidavit of service of the Confirmation Hearing Notice [Docket No. 62] (the "*Confirmation Hearing Notice Affidavit*"), (vi) the Plan Supplement [Docket No. 84,

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, include: Answers Holdings, Inc. (4504); Answers Corporation (2855); Easy2 Technologies, Inc. (2839); ForeSee Results, Inc. (3125); ForeSee Session Replay, Inc. (2593); More Corn, LLC (6193); Multiply Media, LLC (8974); Redcan, LLC (7344); RSR Acquisition, LLC (2256); Upbolt, LLC (2839); and Webcollage Inc. (7771).  The location of Debtor Webcollage Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is:  11 Times Square, 11th Floor, New York, New York 10018.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan, the Disclosure Statement, or the Bankruptcy Code (each as defined below), as applicable.  The rules of interpretation set forth in Section 1.2 of the Plan, other than Section 1.2(e) of the Plan, apply to the interpretation of this Confirmation Order.

[3]    Unless otherwise indicated, use of the term "filed" in this Confirmation Order refers also to the service of the applicable document filed on the docket for Case No. 17-10496.

95, & 103]; (vii) the Debtors' confirmation brief [Docket No. 92] (the "***Confirmation Brief***"), (viii) the declarations of Justin P. Schmaltz and Stephen J. Antinelli in support of confirmation of the Plan [Docket Nos. 93 & 94] (together, the "***Declarations***"), and (ix) published the Confirmation Hearing Notice in *The New York Times* on March 13, 2017, as evidenced by the Affidavit of Publication [Docket No. 60] (together with the Confirmation Hearing Notice Affidavit, the "***Affidavits***"); and the Court having (a) entered the scheduling order [Docket No. 45] (the "***Scheduling Order***") after a hearing held with respect to the Scheduling Motion on March 9, 2017 (the "***Scheduling Hearing***"); (b) set April 4, 2017, at 2:00 p.m. (prevailing Eastern Time), as the date and time for the hearing on approval of the Disclosure Statement and Confirmation (the "***Confirmation Hearing***"); and (c) held the Scheduling Hearing and Confirmation Hearing; and upon the record made by the Debtors in the Plan, including the Plan Supplement, the Disclosure Statement, the Scheduling Motion, the First Day Declaration, the Declarations, the Affidavits, and at the Scheduling Hearing and Confirmation Hearing, and all other pleadings and documents filed, orders entered, and evidence and arguments presented in the Chapter 11 Cases; and after due deliberation and sufficient cause appearing therefor, the Court makes and issues the following findings of fact and conclusions of law, and orders:

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**[4]

1.    **Jurisdiction, Venue and Core Proceeding**.  The Court has core jurisdiction over the Chapter 11 Cases, approval of the Disclosure Statement, including the associated Solicitation Procedures, and Confirmation of the Plan pursuant to sections 157 and 1334 of title 28 of the United States Code.  The Court has exclusive jurisdiction to determine whether the Disclosure

---

[4]    The findings and conclusions set forth herein and in the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.  To the extent any of the following conclusions of law constitute findings of fact, or vice versa, they are adopted as such.

Statement and the Plan comply with the applicable provisions of the Bankruptcy Code and should be approved and confirmed, respectively.  Venue is proper in this District pursuant to sections 1408 and 1409 of title 28 of the United States Code.

2.    **Eligibility for Relief**.  The Debtors were and are entities eligible for relief under section 109 of the Bankruptcy Code.

3.    **Commencement and Joint Administration of the Chapter 11 Cases**.  On March 3, 2017 (the "*Petition Date*"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015. Since the Petition Date, the Debtors have operated their businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.  No committee has been appointed pursuant to section 1102 of the Bankruptcy Code in the Chapter 11 Cases.

4.    **Confirmation of the Plan**.  The Debtors, as proponents of the Plan, have met their burden of proving the applicable elements of sections 1129(a) and 1129(b) of the Bankruptcy Code.

5.    **Notice**.  As evidenced by the Affidavits, due, adequate, and sufficient notice of the Disclosure Statement, the Plan, and the Confirmation Hearing, together with all deadlines for voting to accept or reject the Plan as well as objecting to the Disclosure Statement and the Plan, has been provided to: (a) the U.S. Trustee, (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the First Lien Agent; (d) counsel to the Ad Hoc First Lien Group; (e) counsel to the Second Lien Agent; (f) counsel to the Ad Hoc Second Lien Group; (g) counsel to the

Sponsor Entities; (h) the United States Attorney for the Southern District of New York; (i) the United States Securities and Exchange Commission; (j) the state attorneys general for each state in which the Debtors conduct business; (k) the Internal Revenue Service; (l) any party that has requested notice pursuant to Bankruptcy Rule 2002 (the parties identified in clauses (a) through (l), collectively, the "***Core Notice Parties***"); and (m) all parties in interest listed on the Debtors' creditor matrix.[5]   Further, the Confirmation Hearing Notice was published in *The New York Times* on March 13, 2017 in compliance with the Scheduling Order and Bankruptcy Rule 2002(*l*).   Notice of the Confirmation Hearing was adequate and sufficient under the facts and circumstances of the Chapter 11 Cases and no other or further notice is or shall be required.

6.    **Disclosure Statement**.    The Disclosure Statement contains (a) sufficient information of a kind necessary to satisfy the disclosure requirements of all applicable nonbankruptcy laws, rules, and regulations, including the Securities Act (to the extent applicable), and (b) "adequate information" (as such term is defined in section 1125(a) of the Bankruptcy Code and used in section 1126(b)(2) of the Bankruptcy Code).   The filing of the Disclosure Statement with the clerk of the Court satisfied Bankruptcy Rule 3016(b).

7.    **Ballots**. The Ballots the Debtors used to solicit votes to accept or reject the Plan from holders of First Lien Claims in Class 3 and holders of Second Lien Claims in Class 4 (together, the "***Voting Classes***") complied with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules,[6] and any other applicable rules, laws, and regulations.

8.    **Solicitation**.    The solicitation of votes on the Plan (i) complied with the Solicitation Procedures, as described in the Voting Report, (ii) was appropriate and satisfactory

---

[5]   *See* Confirmation Hearing Notice Affidavit.
[6]   "***Local Bankruptcy Rules***" refers to the Local Bankruptcy Rules of the United States Bankruptcy Court for the Southern District of New York.

4

based upon the circumstances of the Chapter 11 Cases, and (iii) was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and any other applicable rules, laws, and regulations, including the Securities Act (to the extent applicable). Transmission and service of the Solicitation Packages and the Confirmation Hearing Notice were timely, adequate, and sufficient under the facts and circumstances of the Chapter 11 Cases.

9. The 14-day period during which the Debtors solicited acceptances or rejections to the Plan was a reasonable and sufficient period of time for holders in the Voting Classes to make an informed decision to accept or reject the Plan and complied with the Amended Procedural Guidelines for Prepackaged Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of New York, as amended, effective March 6, 2013 (as adopted by General Order M-387).

10. Under section 1126(f) of the Bankruptcy Code, holders of Claims in Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), Class 5 (General Unsecured Claims), and Class 7 (Intercompany Interests) (collectively, the "***Deemed Accepting Classes***") are Unimpaired and deemed to have accepted the Plan. Under section 1126(g) of the Bankruptcy Code, holders of Interests in Class 8 (Interests in Holdings) (the "***Deemed Rejecting Class***") are Impaired, are not entitled to receive or retain any property under the Plan on account of such Interests and are deemed to have rejected the Plan.

11. Holders of Claims in Class 6 (Intercompany Claims) are Unimpaired and conclusively presumed to have accepted the Plan (to the extent reinstated) or are Impaired and deemed to reject the Plan (to the extent cancelled), and, in either event, are not entitled to vote to

accept or reject the Plan (collectively with the Deemed Accepting Classes and the Deemed Rejecting Class, the "*Non-Voting Classes*").

12.    **Voting**.  As evidenced by the Voting Report, votes to accept or reject the Plan have been solicited and tabulated fairly, in good faith, and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules and the Solicitation Procedures.

13.    **Plan Supplement**.  The Plan Supplement complies with the Bankruptcy Code and the terms of the Plan.  All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan.  ~~Subject to the terms of the Plan and the Restructuring Support Agreement, and only consistent therewith,~~ **but only to the extent permitted by 11 U.S.C. § 1127,** ~~the Debtors reserve the right to alter, amend, update, or modify the Plan Supplement before the Effective Date.~~  The Core Notice Parties and holders of Claims and Interests were provided due, adequate, and sufficient notice of the Plan Supplement in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, and no further notice is required.[7]**[SMB: 4/10/17]**

14.    **Compliance with Bankruptcy Code Requirements—Section 1129(a)(1)**.  The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code.  In addition, the Plan is dated and identifies the Entities submitting it, thereby satisfying Bankruptcy Rule 3016(a).

(i)        *Proper Classification—Sections 1122 and 1123*

15.    The Plan satisfies the requirements of sections 1122(a) and 1123(a)(1) of the Bankruptcy Code.  Article III of the Plan provides for the separate classification of Claims and Interests into eight (8) classes.  Valid business, factual, and legal reasons exist for the separate

---

[7]    *See Certificate of Service* [Docket No. 89].

classification of such classes of Claims and Interests. The classifications reflect no improper purpose and do not unfairly discriminate between, or among, holders of Claims or Interests. Each class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that class.

(ii)   <strong><em>Specified Unimpaired Classes—Section 1123(a)(2)</em></strong>

16. The Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code. Article III of the Plan specifies that Claims and Interests, as applicable, in Classes 1 (Other Secured Claims), 2 (Other Priority Claims), 5 (General Unsecured Claims), 6 (Intercompany Claims, to the extent reinstated), and 7 (Intercompany Interests) (collectively, the "***Unimpaired Classes***") are not impaired under the Plan within the meaning of section 1124 of the Bankruptcy Code. Additionally, Article II of the Plan specifies that Allowed Administrative Claims, DIP Claims, Professional Claims, and Priority Tax Claims will be paid in full in accordance with the terms of the Plan, although these Claims are not classified under the Plan.

(iii)   <strong><em>Specified Treatment of Impaired Classes—Section 1123(a)(3)</em></strong>

17. The Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code. Article III of the Plan specifies that Claims and Interests, as applicable, in Classes 3 (First Lien Claims), 4 (Second Lien Claims), 6 (Intercompany Claims, to the extent cancelled), and 8 (Interests in Holdings) (collectively, the "***Impaired Classes***") are impaired under the Plan within the meaning of section 1124 of the Bankruptcy Code and describes the treatment of such classes.

(iv)   <strong><em>No Discrimination—Section 1123(a)(4)</em></strong>

18. The Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code. The Plan provides for the same treatment by the Debtors for each Claim or Interest in each

respective class unless the holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest.

### (v)    *Adequate Means for Plan Implementation—Section 1123(a)(5)*

19.    The Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code. The Plan provides adequate means for the Plan's implementation.

### (vi)    *Voting Power of Equity Securities—Section 1123(a)(6)*

20.    The Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code. Pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, Section 4.11 of the Plan and the New Organizational Documents prohibit the issuance of non-voting securities and provide for an appropriate distribution of voting power if additional classes of securities possessing such power are issued.

### (vii)    *Directors and Officers—Section 1123(a)(7)*

21.    The Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code. The members selected for the New Board and the New OpCo Boards have been identified as part of the Plan Supplement consistent with section 1129(a)(5) of the Bankruptcy Code. The selection of the members of the New Board and the New OpCo Boards is consistent with the interests of all holders of Claims and Interests and public policy.

### (viii)    *Impairment / Unimpairment of Classes—Section 1123(b)(1)*

22.    The Plan is consistent with section 1123(b)(1) of the Bankruptcy Code. Article III of the Plan impairs or leaves Unimpaired each class of Claims and Interests.

### (ix)    *Assumption—Section 1123(b)(2)*

23.    The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code. Article V of the Plan provides for the assumption of the Debtors' Executory Contracts and Unexpired Leases and the payment of Cures, if any, related thereto, unless such Executory Contract or

Unexpired Lease (a) was previously assumed or rejected; (b) was previously expired or terminated pursuant to its own terms; (c) is the subject of a motion or notice to assume or assume and assign Filed on or before the Confirmation Date; or (d) is designated specifically, or by category, as an Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases.  The assumption of Executory Contracts and Unexpired Leases may include the assignment of certain of such contracts to Affiliates.

### (x)    Settlement, Releases, Exculpation, Injunction, and Preservation of Claims and Causes of Action—Section 1123(b)(3)

24.    The Plan is consistent with section 1123(b)(3) of the Bankruptcy Code.  The Plan constitutes a good faith compromise of all Claims, Interests, and controversies relating to the contractual, subordination, and other legal rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The compromise and settlement of such Claims and Interests embodied in the Plan and reinstatement and unimpairment of other classes identified in the Plan are in the best interests of the Debtors, the Estates, and all holders of Claims and Interests, and are fair, equitable, and reasonable.

25.    The Debtors have satisfied the business judgment standard with respect to the propriety of the Debtor Release set forth in Section 8.2 of the Plan.  Such releases are a necessary and integral element of the Plan, and are fair, reasonable, and in the best interests of the Debtors, the Estates, and all holders of Claims and Interests.  Also, the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors,

the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

26.    The Third-Party Release set forth in Section 8.3 of the Plan provides finality for the Debtors, the Reorganized Debtors, and the Released Parties regarding the parties' respective obligations under the Plan and with respect to the Reorganized Debtors. Such release is a necessary and integral element of the Plan, and is fair, equitable, reasonable, and in the best interests of the Debtors, the Estates, and all holders of Claims and Interests. Also, the Third-Party Release provided by the Restructuring Support Parties and other Releasing Parties is: (a) essential to the confirmation of the Plan; (b) given in exchange for the good and valuable consideration provided by the Released Parties; (c) a good faith settlement and compromise of the Claims released by the Third-Party Release; (d) in the best interests of the Debtors and their Estates; (e) fair, equitable, and reasonable; (f) given and made after due notice and opportunity for hearing; and (g) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

27.    As to the Deemed Accepting Classes, the Released Parties have provided substantial consideration in exchange for the Third-Party Release. Furthermore, the Third-Party Release is an integral and necessary part of the Plan. Without the Third-Party Release (a) the Debtors would not have been able to obtain the substantial contributions and concessions made by the Released Parties, (b) the Debtors would not have had the ability to effectuate the value-maximizing prepackaged chapter 11 plan in a timely and cost-effective manner, and (c) there is a substantial likelihood that holders of General Unsecured Claims would not have received any recovery, as compared to such Claims' Unimpaired treatment under the Plan. As to the Deemed Accepting Classes, the Third-Party Release is: (a) in exchange for good and valuable

consideration provided by the Released Parties; (b) a good-faith compromise and settlement of the Claims and Causes of Actions released by the Debtors and third-parties; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Releasing Parties that would have been legally entitled to assert any Claim or Cause of Action released under the Third-Party Release.

28.     The exculpation, described in Section 8.4 of the Plan (the "*Exculpation*"), is appropriate under applicable law.  The Exculpation was proposed in good faith, was formulated following extensive good faith, arm's length negotiations with key constituents, and is appropriately limited in scope.  Without limiting anything in the Exculpation, each Exculpated Party has participated in the Chapter 11 Cases in good faith and is appropriately released and exculpated in accordance with the terms of the Plan.

29.     The injunction provision set forth in Section 8.5 of the Plan is necessary to implement, preserve, and enforce the Debtors' discharge, the Debtor Release, the Third-Party Release, and the Exculpation, and is narrowly tailored to achieve this purpose.

30.     The provisions regarding the preservation of Causes of Action in the Plan, including the Plan Supplement, are appropriate, fair, equitable, and reasonable and are in the best interests of the Debtors, the Estates, and holders of Claims and Interests.

31.     The release and discharge of all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates described in Section 8.7 of the Plan (the "*Lien Release*") is necessary to implement the Plan.  The provisions of the Lien Release are appropriate, fair, equitable, and reasonable and are in the best interests of the Debtors, the Estates, and holders of Claims and Interests.

11

(xi)        **Additional Plan Provisions—Section 1123(b)(6)**

32.    The other discretionary provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code and satisfy section 1123(b)(6) of the Bankruptcy Code.

33.    **Compliance with the Bankruptcy Code—Section 1129(a)(2)**.    The Plan satisfies the requirements of section 1129(a)(2) of the Bankruptcy Code.  The Debtors have complied with the applicable provisions of the Bankruptcy Code.

34.    **Good Faith—Section 1129(a)(3)**.  The Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code.  The Debtors have proposed the Plan in good faith and not by any means forbidden by law.  Payments to be made for services or for costs and expenses in or connected with the Chapter 11 Cases, or in connection with and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Court as reasonable.

35.    **Payment for Services or Costs and Expenses—Section 1129(a)(4)**.  The Plan satisfies the requirements of section 1124(a)(4) of the Bankruptcy Code.

36.    **Directors, Officers, and Insiders—Section 1129(a)(5)**.  The Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.  The proposed directors and officers for the Reorganized Debtors are qualified, and the appointments to, or continuance in, such offices by the proposed directors and officers is consistent with the interests of the holders of Claims and Interests and with public policy.

37.    **Best Interests of Creditors—Section 1129(a)(7)**.    The Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.  Holders of Allowed Claims and Interests in each class will recover at least as much under the Plan on account of such Claim or Interest, as of the Effective Date, as such holder would receive if the Debtors were liquidated, on the Effective Date, under chapter 7 of the Bankruptcy Code.

12

38.  **Acceptance by Certain Classes—Section 1129(a)(8)**.  Classes 1, 2, 5 and 7 constitute Unimpaired Classes, each of which is deemed to have accepted the Plan in accordance with section 1126(f) of the Bankruptcy Code.  The Voting Classes (Classes 3 and 4) have each voted to accept the Plan.  Class 6 is Unimpaired and deemed to have accepted the Plan (to the extent reinstated) or is Impaired and deemed to reject the Plan (to the extent cancelled). Notwithstanding that Holders of Interests in Class 8 are deemed to reject the Plan, the Plan is confirmable because it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code with respect to each classes of Claims or Interests

39.  **Claims Entitled to Priority—Section 1129(a)(9)**.  The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.

40.  **Acceptance by At Least One Impaired Class—Section 1129(a)(10)**.  The Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.  The Voting Classes voted to accept the Plan by the requisite numbers and amounts required by the Bankruptcy Code **without counting the votes of insiders, if any**. **[SMB: 4/10/17]**

41.  **Feasibility—Section 1129(a)(11)**.  The Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.  The Plan is feasible and Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Reorganized Debtors or any successor to the Reorganized Debtors under the Plan.  The Reorganized Debtors will have sufficient funds available to meet their obligations under the Plan.

42.  **Payment of Fees—Section 1129(a)(12)**.  The Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

43.    **Continuation of Employee Benefits—Section 1129(a)(13)**.  The Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.

44.    **Non-Applicability of Certain Sections of Section 1129**.  Sections 1129(a)(6), 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to the Chapter 11 Cases.

45.    **"Cram Down" Requirements—Section 1129(b)**.  Notwithstanding that the Deemed Rejecting Class has been deemed to reject the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code.  *First*, all of the requirements of section 1129(a) of the Bankruptcy Code other than section 1129(a)(8) have been met.  *Second*, the Plan satisfies section 1129(b) of the Bankruptcy Code because, with respect to all holders of Interests in Class 8, as applicable, **and those holders in Class 6 whose claims are cancelled,**  the Plan (a) is fair and equitable and (b) does not discriminate unfairly.   Thus, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. **[SMB: 4/10/17]**

46.    **Only One Plan—Section 1129(c)**.  The Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code.

47.    **Principal Purpose of the Plan—Section 1129(d)**.   The Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

48.    **Good Faith Solicitation—Section 1125(e)**.   To the extent permitted by section 1125(e) of the Bankruptcy Code, the Debtors and each of the Restructuring Support Parties, and each of their respective Affiliates, agents, representatives, members, principals, equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, employees, advisors, and attorneys have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code.

49.    **Satisfaction of Confirmation Requirements**.  Based on the foregoing, the Plan satisfies the requirements for Confirmation set forth in section 1129 of the Bankruptcy Code.

50.    ~~**Likelihood of Satisfaction of Conditions Precedent to the Effective Date**. Each of the conditions precedent to the Effective Date, as set forth in Section 9.1 of the Plan, has been or is reasonably likely to be satisfied or waived in accordance with Section 9.2 of the Plan.~~[SMB: 4/10/17]

51.    ~~**Implementation**.  All documents necessary to implement the Plan and all other relevant and necessary documents (the Definitive Documents) have been negotiated in good faith and at arm's length and shall, upon completion of documentation and execution, be valid, binding and enforceable agreements.~~ [SMB: 4/10/17]

52.    ~~**Good Faith**.  The Debtors, the Released Parties, and the Releasing Parties have been and are acting in good faith in their efforts to:  (a) consummate the Plan and the agreements, settlements, transactions, and transfers contemplated thereby; and (b) take the actions authorized and directed by this Confirmation Order.~~ [SMB: 4/10/17]

53.    **Essential Element of the Plan**.  The First Lien Exit Facility, Second Lien Exit Facility, and the Exit L/C Facility are essential elements of the Plan, and entry into the Exit Credit Facilities Documents is in the best interests of the Debtors, their Estates, and their creditors.  The Debtors have exercised sound business judgment in deciding to enter into the First Lien Exit Facility, Second Lien Exit Facility, and the Exit L/C Facility and have provided adequate notice thereof.  The First Lien Exit Facility, Second Lien Exit Facility, and Exit L/C Facility have been negotiated in good faith and at arm's length among the Debtors and the lenders thereto, and any credit extended and loans made to the Reorganized Debtors pursuant to

15

the First Lien Exit Facility, Second Lien Exit Facility, and the Exit L/C Facility, as applicable,

and any fees paid thereunder are deemed to have been extended, issued, and made in good faith.

## ORDER

IT IS ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:

54.    **Disclosure Statement.**  The Disclosure Statement, attached hereto as **Exhibit B**,

is approved.

55.    **Ballots.**  The Ballots are approved.

56.    **Solicitation Procedures.**  The Solicitation Procedures are approved.

57.    **Tabulation Procedures.**  The procedures used for tabulations of votes to accept

or reject the Plan as set forth in the Disclosure Statement, the Solicitation Procedures, the Voting

Report, and the Ballots are approved.

58.    **Confirmation of the Plan.**  The Plan, attached hereto as **Exhibit A**, including the

Plan Supplement is approved and CONFIRMED under section 1129 of the Bankruptcy Code.

59.    **No Action Required.**  Pursuant to the appropriate provisions of the New York

Business Corporation Law, the General Corporation Law of the State of Delaware (including

section 303 thereof and the comparable provisions of the Delaware Limited Liability Act),

section 1142(b) of the Bankruptcy Code, or other applicable law, this Confirmation Order shall

constitute authorization for the Debtors or the Reorganized Debtors to enter into, execute,

deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan, the

Definitive Documents, this Confirmation Order, the Restructuring Transactions (including the

transactions contemplated by the Restructuring Transactions Exhibit), and any contract,

instrument, or other document to be executed, delivered, adopted, or amended in connection with

the implementation of the Plan, and the appointment and election of the members of the New

Board and the officers, directors, and/or managers of each of the Reorganized Debtors; provided,

however, that modification of the Confirmation Order or the Plan shall (i) require further order of the Court to the extent required by the Bankruptcy Code or Bankruptcy Rules and (ii) be subject to the respective consent rights of the applicable Restructuring Support Parties as set forth in the Restructuring Support Agreement (notwithstanding its termination only to the extent it is terminated automatically due to the occurrence of the Effective Date).

60.    **Binding Effect.** Upon the occurrence of the Effective Date, the terms of the Plan are immediately effective and enforceable and deemed binding on the Debtors, the Reorganized Debtors, and any and all holders of Claims or Interests (regardless of whether such holders of Claims or Interests have, or are deemed to have, accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  The Plan and this Confirmation Order, and all prior orders of the Court in the Chapter 11 Cases shall be binding against and binding upon and shall not be subject to rejection or avoidance by any Chapter 7 or Chapter 11 trustee appointed in any of the Chapter 11 Cases.

61.    **Vesting of Assets in the Reorganized Debtors.** Except as otherwise provided in the Plan, including the Plan Supplement, the Restructuring Transactions (including the transactions contemplated by the Restructuring Transactions Exhibit) or this Confirmation Order, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan or this Confirmation Order, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or

17

settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

62. **Effectiveness of All Actions.** ~~All actions contemplated by the Plan are hereby effective and authorized to be taken under this Confirmation Order, without further application to, or order of the Court, or further action by the respective officers, directors, managers, members, or equity holders of the Debtors or the Reorganized Debtors and with the effect that such actions had been taken by unanimous action of such officers, directors, managers, members, or equity holders.~~**[SMB: 4/10/17]**

63. **Restructuring Transactions**. ~~The Debtors or Reorganized Debtors, as applicable, are authorized to enter into and effectuate the Restructuring Transactions (including the transactions contemplated by the Restructuring Transactions Exhibit) and may take any actions as may be necessary or appropriate to effect a corporate restructuring of their respective businesses or a corporate restructuring of the overall corporate structure of the Reorganized Debtors, as and to the extent provided in the Plan (including the transactions contemplated by the Restructuring Transactions Exhibit). Except as otherwise provided in the Plan (or the Restructuring Transactions Exhibit), each Reorganized Debtor, as applicable, shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, under the applicable law in the jurisdiction in which such applicable Debtor is incorporated or formed.~~**[SMB: 4/10/17]**

64. ~~In addition to, or instead of the Restructuring Transactions, the Debtors, prior to the Effective Date, and subject to the respective consent rights of the applicable Restructuring Support Parties as set forth in the Restructuring Support Agreement, may cause any of the~~

Debtors or the Reorganized Debtors to engage in additional corporate restructuring transactions necessary or appropriate for the purposes of implementing the Plan, including converting corporate entities into limited liability companies, forming new entities within the corporate organizational structure of the Debtors or Reorganized Debtors, cancelling the existing equity at another of the Debtor entities and issuing new equity therefrom, consolidating, reorganizing, restructuring, merging, dissolving, liquidating or transferring assets between or among the Debtors and the Reorganized Debtors, including Reorganized Holdings.  The actions to effect these transactions may include (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, reorganization, transfer, disposition, conversion, liquidation, or dissolution containing terms that are consistent with the terms of the Plan and such other terms to which the applicable Persons may agree; (b) on terms consistent with the terms of the Plan and having such other terms to which the applicable Persons may agree, the execution and delivery of appropriate instruments of transfer, conversion, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation; (c) pursuant to applicable state law, the filing of appropriate certificates of articles of merger, consolidation, conversion, dissolution, or change in corporate form; and (d) the taking of all other actions that the applicable Persons determine to be necessary or appropriate, including (i) making filings or recordings that may be required by applicable state law in connection with such transactions and (ii) any appropriate positions on one or more tax returns.  **[SMB: 4/10/17]**

65.    **Distributions**.  The procedures governing distributions contained in Article VI of the Plan shall be, and hereby are, approved in their entirety.**[SMB: 4/10/17]**

66.    **Cancellation of Instruments, Certificates, and Other Documents.**  On the Effective Date, except as otherwise provided herein or in the Plan, all notes, instruments,

19

Certificates, and other instruments or documents, directly or indirectly, evidencing any Claim or Interest shall be deemed cancelled and the obligations of the Debtors or Reorganized Debtors and any non-Debtor Affiliates thereunder or in any way related thereto shall be discharged; *provided*, *however*, that notwithstanding Confirmation or the occurrence of the Effective Date, any credit document or agreement that governs the rights of the holder of a Claim or Interest shall continue in effect solely for purposes of (a) allowing holders of Allowed Claims to receive distributions under the Plan and (b) allowing and preserving the rights of the applicable Servicer, to make distributions on account of Allowed Claims, as provided in the Plan or this Confirmation Order.

67.    **Release of Liens.** Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, including the Exit Credit Facilities Documents, or any other document executed in connection therewith, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Without limiting the foregoing, to the extent that any holder of a Secured Claim that has been satisfied or discharged pursuant to the Plan, or any agent for such holder, has filed or recorded any Liens and/or security interests to secure such holder's Secured Claim, then as soon as practicable on or after the Effective Date, such holder (or any such agent for such holder) shall be authorized to and shall execute such documents as may be reasonably requested by the Debtors or any of the Reorganized Debtors, at the sole expense of the Debtors or the

20

Reorganized Debtors, as applicable, that are necessary to cancel and/or extinguish such Liens and/or security interests.

68. **New Common Stock and Warrants**. All **Except as otherwise set forth in the Plan and Plan Supplement,** existing Interests in Holdings shall be cancelled as of the Effective Date and Reorganized Holdings (subject to the Restructuring Transactions, including as described in the Restructuring Transactions Exhibit) shall issue the New Common Stock (including the Exit Commitment Equity) and the Warrants for distribution to holders of Claims entitled to receive the New Common Stock (including the Exit Commitment Equity) and/or the Warrants, as applicable, pursuant to the Plan. The issuance of the New Common Stock (including the Exit Commitment Equity) and the Warrants shall be authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable, or any further notice to or action, order, or approval of the Court. The New Organizational Documents shall authorize the issuance and distribution on the Effective Date of New Common Stock (including the Exit Commitment Equity and the New Common Stock exchangeable for the Warrants (to the extent applicable)) for the benefit of holders of Allowed Claims in Class 3 and Class 4 (as applicable) in accordance with the terms of the Plan. All New Common Stock (including the Exit Commitment Equity) and the Warrants issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable, and the holders of the New Common Stock and the Warrants issued on the Effective Date shall be deemed to have accepted the terms of the New Stockholders' Agreement and the Warrant Agreement, respectively (solely in their capacity as shareholders and warrant holders of Reorganized Holdings, as applicable), and to be parties thereto without further action or signature. The New Stockholders' Agreement and the Warrant Agreement shall be effective as of the Effective Date

21

and, as of such date, shall be deemed to be valid, binding, and enforceable in accordance with its terms. **[SMB: 4/10/17]**

69.    **Exit Credit Facilities.**  On the Effective Date, **and to the extent permitted by the Plan and Plan Supplement** the Reorganized Debtors **are authorized to** ~~shall~~ enter into the Exit Credit Facilities, the terms of which will be set forth in the Exit Credit Facilities Documents, as applicable.  ~~Confirmation of the Plan shall be deemed approval of the Exit Credit Facilities and the Exit Credit Facilities Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Debtors or Reorganized Debtors, as applicable, in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, including issuance of the Exit Commitment Equity to the lenders under the First Lien Exit Facility, and authorization of the Reorganized Debtors to enter into and execute the Exit Credit Facilities Documents and such other documents as may be required to effectuate the treatment afforded by the Exit Credit Facilities, and no further corporate action or any further action by the Debtors, Reorganized Debtors, or Reorganized Holdings, as applicable, and no further notice to or action, order, or approval of the Court shall be required in connection therewith.  On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Credit Facilities Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Credit Facilities Documents, (c) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Credit Facilities Documents, and (d) shall not be subject to recharacterization or equitable subordination for any~~

~~purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances~~

~~under the Bankruptcy Code or any applicable nonbankruptcy law.~~ **[SMB: 4/10/17]**

70.     The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

71.     **New Organizational Documents, the New Stockholders' Agreement and the Warrant Agreement.**  The terms of the New Organizational Documents, the New Stockholders' Agreement, and the Warrant Agreement, each attached to the Plan Supplement, are approved~~. in all respects.  The obligations of the applicable Reorganized Debtors related thereto, will, upon execution, constitute legal, valid, binding, and authorized obligations of each of the Debtors or Reorganized Debtors, as applicable, enforceable in accordance with their terms and not in contravention of any state or federal law.  On the Effective Date, without any further action by the Court or the directors, officers, or equity holders of any of the Reorganized Debtors, each Reorganized Debtor, as applicable, will be and is authorized to enter into the New Organizational Documents, the New Stockholders' Agreement, and the Warrant Agreement, and all related documents, to which such Reorganized Debtor is contemplated to be a party on the Effective Date.  In addition, on the Effective Date, without any further action by the Court or the directors,~~

~~officers or equity holders of any of the Reorganized Debtors, each applicable Reorganized~~ ~~Debtor will be and is authorized to:  (a) execute, deliver, file, and record any other contracts,~~ ~~assignments, certificates, instruments, agreements, guaranties, or other documents executed or~~ ~~delivered in connection with the New Organizational Documents, the New Stockholders'~~ ~~Agreement, and the Warrant Agreement; (b) perform all of its obligations under the New~~ ~~Organizational Documents, the New Stockholders' Agreement, and the Warrant Agreement; and~~ ~~(c) take all such other actions as any of the responsible officers of such Reorganized Debtor may~~ ~~determine are necessary, appropriate or desirable in connection with the consummation of the~~ ~~transactions contemplated by the New Organizational Documents, the New Stockholders'~~ ~~Agreement, and the Warrant Agreement.   Notwithstanding anything to the contrary in this~~ ~~Confirmation Order or Article XI of the Plan, after the Effective Date, any disputes arising under~~ ~~the Exit Credit Facilities Documents, the New Organizational Documents, the New~~ ~~Stockholders' Agreement, and/or the Warrant Agreement will be governed by the jurisdictional~~ ~~provisions therein.~~ **[SMB: 4/10/17]**

72.    **Compromise of Controversies.**  All the compromises and settlements set forth in the Plan are approved under Bankruptcy Rule 9019.

73.    **Executory Contracts and Unexpired Leases.**    The assumption of each Executory Contract and Unexpired Lease and the payment of Cures, if any, pursuant to Article V of the Plan, upon the payment of any applicable Cures, is hereby approved, and the rejection of each Executory Contract and Unexpired Lease as set forth on the Schedule of Rejected Executory Contracts and Unexpired Leases is hereby approved.

74.    **SJP TS, LLC.**  Debtors Webcollage, Inc. ("*WCI*") and Answers Corporation ("*AC*"), on the one hand, and SJP TS, LLC ("*SJPTS*"), on the other hand, have consensually

24

resolved the issues related to the assumption and assignment of that certain Lease, dated as of June 30, 2014, between SJPTS, as landlord, and AC, as tenant (the "*Lease*"). This resolution is embodied in that certain First Amendment to Lease between WCI and SJPTS, dated as of March 31, 2017 (together with all accompanying and/or related agreements, schedules, exhibits, attachments, documents referenced and/or incorporated therein and any other related documents, collectively, the "*Lease Amendment*"), which contemplates AC's assumption of the Lease, assignment of the Lease to WCI, and then a subsequent assignment of the Lease from WCI to SJPTS, and SJPTS has consented to such assignment. Additionally, WCI will enter into a sublease with SJPTS (the "*Sublease*"). This Confirmation Order approves WCI's entry into the Sublease and the assignment of the Lease from WCI to SJPTS pursuant to section 365 of the Bankruptcy Code, subject to and conditioned upon the Debtors' agreement to timely comply with all of the obligations, terms, and conditions of the Lease (solely with respect to such obligations arising prior to April 1, 2017) and the Sublease and Lease Amendment.

75. **Indemnification.** On and as of the Effective Date, the Indemnification Provisions will be assumed and irrevocable and will survive the effectiveness of the Plan and notwithstanding anything in the Plan to the contrary, none of the Reorganized Debtors will amend and/or restate their respective governance documents before or after the Effective Date to terminate or adversely affect any of the Reorganized Debtors' obligations to provide indemnification rights consistent with the Indemnification Provisions.

76. **Directors' and Officers' Liability Insurance.** As set forth in the Plan, on the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto, including all D&O Liability Insurance Policies (including tail coverage liability

insurance).  Notwithstanding anything to the contrary contained in the Plan, the Plan shall not

discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing

assumption of insurance policies, including the D&O Liability Insurance Policies, and each such

indemnity obligation will be deemed and treated as an Executory Contract that has been assumed

by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed, and

shall survive the Effective Date.

77.     After the Effective Date, the Reorganized Debtors shall not terminate or otherwise

reduce, modify or restrict in any way, the coverage under any D&O Liability Insurance Policy

(including such tail coverage liability insurance) in effect as of the Effective Date, and all

members, managers, directors, and officers of the Debtors who served in such capacity at any

time prior to the Effective Date of the Plan shall be entitled to the full benefits of any such policy

for the full term of such policy regardless of whether such current and former members,

managers, directors, and/or officers remain in such positions after the Effective Date of the Plan.

78.     **Authorization to Consummate.**  The Debtors are authorized to consummate the

Plan after the entry of this Confirmation Order subject to satisfaction or waiver (by the required

parties) of the conditions precedent to Consummation set forth in Article IX of the Plan.**[SMB:**

**4/10/17]**

79.     **Release, Exculpation, Discharge, and Injunction Provisions.**  The release,

exculpation, discharge, and injunction provisions set forth in Article VIII of the Plan are

approved and authorized in their entirety, to the fullest extent allowed by applicable law, and

such provisions are effective and binding on all parties and Entities to the extent provided therein

and allowed by applicable law.  Nothing in this paragraph, however, shall be construed to

exculpate or release any entity from fraud, gross negligence, willful misconduct, malpractice,

~~criminal conduct, misuse of confidential information that causes damages, or ultra vires acts.  In~~
~~addition, nothing in the Plan shall limit the liability of the attorneys to their respective clients~~
~~pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009); provided,~~
~~however, that any party seeking to assert such a claim against any such attorney must first seek~~
~~relief, on proper notice, from the Bankruptcy Court.~~[SMB: 4/10/17]

80.    **Compliance with Tax Requirements.**  In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including at the Debtors', Reorganized Debtors' and/or the Distribution Agent's option, liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes and withholding distributions pending receipt of information necessary to facilitate such distributions.   The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

81.    **Exemption from Transfer Taxes.**  To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan shall not be subject to any stamp or similar tax.

82.     **Continued Effect of Stays and Injunction.**  Unless otherwise provided in the Plan or this Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or any order of the Court that is in existence on the Confirmation Date shall remain in full force and effect until the Effective Date.

83.     **Nonseverability of Plan Provisions Upon Confirmation.**  Each provision of the Plan is:  (a) valid and enforceable in accordance with its terms; (b) integral to the Plan and may be deleted or modified only prior to the Effective Date and with the Debtors' consent, consistent with the terms set forth in the Plan and the Restructuring Support Agreement; and (c) nonseverable and mutually dependent.

84.     **Post-Confirmation Modifications.  Except as otherwise provided in 11 U.S. C. § 1127, w**ithout the need for further order or authorization of the Court, the Debtors are authorized and empowered, prior to the Effective Date, to make any and all modifications to any and all documents that are necessary to effectuate the Plan that do not materially modify the terms of such documents and are consistent with the Plan (subject to any applicable consents or consultation rights set forth therein) and the Restructuring Support Agreement (subject to any applicable consents or consultation rights set forth therein). Subject to the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan and the Restructuring Support Agreement, the Debtors expressly reserve their respective rights to revoke or withdraw, or to alter, amend, or modify materially the Plan, one or more times after Confirmation and prior to the Effective Date, and, to the extent necessary, may, prior to the Effective Date, initiate proceedings in the Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or this Confirmation Order, in such manner

28

~~as may be necessary to carry out the purposes and intent of the Plan. Any such modification or~~ ~~supplement shall be considered a modification of the Plan and shall be made in accordance with~~ ~~Section 10.1 of the Plan and subject to the terms of the Restructuring Support Agreement.~~**[SMB: 4/10/17]**

85.     **Waiver of Filings.**  Any requirements under section 521 of the Bankruptcy Code or Bankruptcy Rule 1007 obligating the Debtors to file any list, schedule, or statement with the Court or the Office of the U.S. Trustee is permanently waived as to any such list, schedule or statement not filed as of the Confirmation Date.

86.     **Waiver of Section 341 Meeting of Creditors or Equity Holders**. Any requirement under section 341(e) for the U.S. Trustee to convene a meeting of creditors or equity holders is permanently waived as of the Confirmation Date.

87.     **Exemption from Registration Requirements.**  All shares of the New Common Stock and the Warrants issued pursuant to the terms of the Plan (including any other securities issuable upon the exercise of the Warrants) will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on Section 1145(a) of the Bankruptcy Code.  The Exit Commitment Equity will be issued without registration under the Securities Act pursuant to an exemption from the registration requirements provided by 4(a)(2) of the Securities Act, and as a result, will be "restricted securities" within the meaning of Rule 144 promulgated under the Securities Act.

88.     Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock, including the Exit Commitment Equity, the MIP Equity (to the extent applicable) and/or the Warrants or the New Common Stock (or other securities issuable upon exercise of the Warrants) issued upon the exercise of the Warrants through the

29

facilities of the DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Stock (including the Exit Commitment Equity), the MIP Equity (to the extent applicable), and/or the Warrants or the New Common Stock (including any other securities issuable upon exercise of the Warrants) issued upon the exercise of the Warrants under applicable securities laws.

89.    ~~Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock, including the Exit Commitment Equity, and the Warrants and the shares of the New Common Stock (including any other securities issuable upon exercise of the Warrants) issued upon the exercise of the Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. DTC shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock, including the Exit Commitment Equity, and/or the Warrants and/or shares of the New Common Stock (including any other securities issuable upon exercise of Warrants) issued upon the exercise of the Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.~~**[SMB: 4/10/17]**

90.    **Notices of Confirmation and Effective Date.**  The Reorganized Debtors shall serve a notice of the entry of this Order and the occurrence of the Effective Date, substantially in the form attached to this Confirmation Order as <u>**Exhibit C**</u> (the "***Effective Date Order Notice***"), in accordance with Bankruptcy Rules 2002 and 3020(c) on all holders of Claims and Interests and the Core Notice Parties within three (3) Business Days after the date of the occurrence of the Effective Date.  Notwithstanding the above, no notice of Confirmation or Consummation or

service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed notice of the Confirmation Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address.  As soon as practicable after entry of this Confirmation Order, the Debtors shall make copies of this Confirmation Order available on their reorganization website at www.omnimgt.com/Answers.  Service of the Effective Date Order Notice as provided herein shall constitute good and sufficient notice pursuant to Bankruptcy Rules 2002 and 3020(e) of entry of this Confirmation Order and the occurrence of the Effective Date and no other or further notice need be given.

91.    **Post-Effective Date Notices**.  Except as otherwise may be provided in the Plan or in this Confirmation Order, the only parties entitled to notice of any pleadings Filed in the Chapter 11 Cases of the Debtors after the Effective Date shall be:  (a) the Reorganized Debtors and their counsel, (b) the United States Trustee, (c) counsel to the Ad Hoc First Lien Group, (d) counsel to the Ad Hoc Second Lien Group, and (e) any party known to be directly affected by the relief sought in a given pleading.

92.    **Failure of Consummation.**  If the Effective Date does not occur, then: (a) the Plan will be null and void in all respects, and (b) nothing contained in the Plan, the Disclosure Statement, or the Restructuring Support Agreement shall: (i) constitute a waiver or release of any Claims, Interests, or Causes of Action by an Entity; (ii) prejudice in any manner the rights of any Debtor or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

93.     **Waiver of Stay.**   The Debtors' request for a waiver of the stay of this Confirmation Order imposed by Bankruptcy Rule 3020(e) is hereby granted, and this Confirmation Order shall be effective and enforceable immediately upon its entry.

94.     **References to and Omissions of Plan Provisions.**   References to articles, sections, and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.   The failure to specifically include or to refer to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Court that the Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by this reference.

95.     **Headings.**  Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

96.     **Effect of Conflict.**  This Confirmation Order supersedes any Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order.  If there is any inconsistency between the terms of the Plan or any Definitive Documents or other documents, schedules or exhibits contained in the Plan Supplement, on the one hand, and this Confirmation Order, on the other hand, this Confirmation Order shall control.

97.     **Final Order.**  This Confirmation Order is a final order and the period in which an appeal must be filed shall commence upon the entry of this Confirmation Order.

98.     **Retention of Jurisdiction.**   Notwithstanding the entry of this Confirmation Order, from and after the Effective Date, this Court shall, to the fullest extent legally permissible, retain exclusive jurisdiction over the Chapter 11 Cases and all matters arising under, arising out of, or related to, the Chapter 11 Cases, including all matters listed in Article XI of the Plan, as

well as for the purposes set forth in section 1142 of the Bankruptcy Code.  To the extent it is not

legally permissible for the Court to have exclusive jurisdiction over any of the foregoing matters,

the Court shall have non-exclusive jurisdiction over such matters to the fullest extent legally

permissible.


New York, New York                          ____/s/ STUART M. BERNSTEIN____
Dated: April 10th, 2017                          UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

### *Joint Prepackaged Chapter 11 Plan of Reorganization for Answers Holdings, Inc. and Its Debtor Affiliates*

James H.M. Sprayregen, P.C.
Jonathan S. Henes, P.C.
Christopher T. Greco
Anthony R. Grossi
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

- and -

Melissa N. Koss
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:        (415) 439-1400
Facsimile:        (415) 439-1500

*Counsel to the Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ANSWERS HOLDINGS, INC., *et al.*,[1] | ) | Case No. 17-10496 (SMB) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION
## FOR ANSWERS HOLDINGS, INC. AND ITS DEBTOR AFFILIATES

**THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126.  THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.**

---

[1]    The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Answers Holdings, Inc. (4504); Answers Corporation (2855); Easy2 Technologies, Inc. (2839); ForeSee Results, Inc. (3125); ForeSee Session Replay, Inc. (2593); More Corn, LLC (6193); Multiply Media, LLC (8974); Redcan, LLC (7344); RSR Acquisition, LLC (2256); Upbolt, LLC (2839); and Webcollage Inc. (7771).  The location of Debtor Webcollage Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is:  11 Times Square, 11th Floor, New York, New York 10018.

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..............................................................................................................................1

**ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME,
GOVERNING LAW, AND OTHER REFERENCES**................................................................1
    1.1     Defined Terms ...........................................................................................................1
    1.2     Rules of Interpretation ............................................................................................13
    1.3     Computation of Time ..............................................................................................13
    1.4     Governing Law .......................................................................................................13
    1.5     Reference to Monetary Figures ..............................................................................13
    1.6     Reference to the Debtors or the Reorganized Debtors ..........................................14
    1.7     Controlling Document ............................................................................................14

**ARTICLE II ADMINISTRATIVE AND PRIORITY CLAIMS**..............................................14
    2.1     Administrative Claims ............................................................................................14
    2.2     DIP Claims..............................................................................................................14
    2.3     Professional Claims................................................................................................14
    2.4     Priority Tax Claims ................................................................................................15
    2.5     Statutory Fees..........................................................................................................15

**ARTICLE III CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS**...........15
    3.1     Classification of Claims and Interests ...................................................................15
    3.2     Treatment of Classes of Claims and Interests .......................................................16
    3.3     Special Provision Governing Unimpaired Claims .................................................19
    3.4     Elimination of Vacant Classes ...............................................................................19
    3.5     Voting Classes; Presumed Acceptance by Non-Voting Classes ...........................19
    3.6     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code .................20
    3.7     Intercompany Interests ...........................................................................................20

**ARTICLE IV PROVISIONS FOR IMPLEMENTATION OF THE PLAN**.........................................20
    4.1     General Settlement of Claims and Interests ...........................................................20
    4.2     Restructuring Transactions......................................................................................20
    4.3     New Common Stock and Warrants .........................................................................21
    4.4     Exit Credit Facilities ..............................................................................................21
    4.5     Exemption from Registration Requirements ..........................................................22
    4.6     Subordination..........................................................................................................22
    4.7     Vesting of Assets in the Reorganized Debtors ......................................................22
    4.8     Cancellation of Instruments, Certificates, and Other Documents .........................23
    4.9     Corporate Action ....................................................................................................23
    4.10    Corporate Existence ...............................................................................................24
    4.11    Charter, Bylaws, and New Organizational Documents..........................................24
    4.12    Effectuating Documents; Further Transactions......................................................24
    4.13    Section 1146(a) Exemption ....................................................................................24
    4.14    Directors and Officers ............................................................................................25
    4.15    Employee Arrangements of the Reorganized Debtors ...........................................25
    4.16    Management Incentive Plan ....................................................................................25
    4.17    Preservation of Causes of Action ..........................................................................25
    4.18    Release of Avoidance Actions ...............................................................................26

**ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** .......................26
    5.1     Assumption of Executory Contracts and Unexpired Leases .................................26
    5.2     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ...................27

## TABLE OF CONTENTS (CONT'D)

**Page**

| | | |
|---|---|---|
| 5.3 | Rejection Damages Claims | 27 |
| 5.4 | Indemnification | 27 |
| 5.5 | Insurance Policies | 28 |
| 5.6 | Contracts and Leases After the Petition Date | 28 |
| 5.7 | Reservation of Rights | 28 |
| 5.8 | Nonoccurrence of Effective Date | 28 |

**ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS** .................................................. **29**
| | | |
|---|---|---|
| 6.1 | Distributions on Account of Claims and Interests Allowed as of the Effective Date | 29 |
| 6.2 | Rights and Powers of the Distribution Agent | 29 |
| 6.3 | Special Rules for Distributions to Holders of Disputed Claims and Interests | 29 |
| 6.4 | Delivery of Distributions | 29 |
| 6.5 | Claims Paid or Payable by Third Parties | 31 |
| 6.6 | Setoffs | 32 |
| 6.7 | Allocation Between Principal and Accrued Interest | 32 |

**ARTICLE VII PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS** ........ **32**
| | | |
|---|---|---|
| 7.1 | Proofs of Claim / Disputed Claims Process | 32 |
| 7.2 | Objections to Claims | 33 |
| 7.3 | No Distribution Pending Allowance | 33 |
| 7.4 | Distribution After Allowance | 33 |
| 7.5 | No Interest | 33 |
| 7.6 | Disallowance of Claims | 33 |

**ARTICLE VIII EFFECT OF CONFIRMATION OF THE PLAN** ............................................... **34**
| | | |
|---|---|---|
| 8.1 | Discharge of Claims and Termination of Interests | 34 |
| 8.2 | Releases by the Debtors | 34 |
| 8.3 | Releases by Holders of Claims and Interests | 35 |
| 8.4 | Exculpation | 35 |
| 8.5 | Injunction | 36 |
| 8.6 | Protection Against Discriminatory Treatment | 36 |
| 8.7 | Release of Liens | 36 |
| 8.8 | Reimbursement or Contribution | 37 |
| 8.9 | Recoupment | 37 |
| 8.10 | Subordination Rights | 37 |

**ARTICLE IX CONDITIONS PRECEDENT TO THE EFFECTIVE DATE** ................................... **37**
| | | |
|---|---|---|
| 9.1 | Conditions Precedent to the Effective Date | 37 |
| 9.2 | Waiver of Conditions Precedent | 39 |
| 9.3 | Effect of Non-Occurrence of Conditions to Consummation | 39 |
| 9.4 | Substantial Consummation | 39 |

**ARTICLE X MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ............... **39**
| | | |
|---|---|---|
| 10.1 | Modification of Plan | 39 |
| 10.2 | Effect of Confirmation on Modifications | 39 |
| 10.3 | Revocation or Withdrawal of Plan | 39 |

**ARTICLE XI RETENTION OF JURISDICTION** ................................................................... **40**

**ARTICLE XII MISCELLANEOUS PROVISIONS** ................................................................. **41**
| | | |
|---|---|---|
| 12.1 | Immediate Binding Effect | 41 |
| 12.2 | Additional Documents | 41 |
| 12.3 | Payment of Statutory Fees | 41 |
| 12.4 | Reservation of Rights | 42 |

TABLE OF CONTENTS (CONT'D)

**Page**

| | | |
|---|---|---|
| 12.5 | Successors and Assigns | 42 |
| 12.6 | Service of Documents | 42 |
| 12.7 | Term of Injunctions or Stays | 43 |
| 12.8 | Entire Agreement | 43 |
| 12.9 | Plan Supplement | 43 |
| 12.10 | Non-Severability | 43 |
| 12.11 | Closing of Chapter 11 Cases | 44 |
| 12.12 | Waiver or Estoppel | 44 |

## INTRODUCTION

Each of Answers Holdings, Inc., Answers Corporation, Easy2 Technologies, Inc., ForeSee Results, Inc., ForeSee Session Replay, Inc., More Corn, LLC, Multiply Media, LLC, Redcan, LLC, RSR Acquisition, LLC, Upbolt, LLC and Webcollage Inc. jointly propose this chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code. Although proposed jointly for administrative purposes, the Plan constitutes a separate plan for each of the foregoing entities and each of the foregoing entities is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the accompanying *Disclosure Statement for the Prepackaged Joint Chapter 11 Plan of Reorganization for Answers Holdings, Inc. and its Debtor Affiliates* for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of the Plan and the transactions contemplated thereby, and certain related matters.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

## ARTICLE I

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

**1.1    Defined Terms**

1.     "*Ad Hoc First Lien Group*" means the ad hoc group of certain unaffiliated holders of First Lien Claims represented by Jones Day.

2.     "*Ad Hoc Second Lien Group*" means the ad hoc group of certain unaffiliated holders of Second Lien Claims represented by Akin Gump Strauss Hauer & Feld LLP.

3.     "*Additional L/Cs*" means letters of credit issued under the DIP Orders and the DIP L/C Agreement during the pendency of the Chapter 11 Cases that are cash collateralized with the proceeds of the DIP Facility or Cash Collateral (as defined in the DIP Orders).

4.     "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Claims; (c) the DIP Claims and the DIP Payments; and (d) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

5.     "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

6.     "*Allowed*" means, with reference to any Claim or Interest, (a) any Claim or Interest arising on or before the Effective Date (i) as to which no objection to allowance, priority, or secured status, and no request for estimation or other challenge, including pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed prior to the Effective Date, or (ii) as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder, (b) any Claim or Interest that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors or Reorganized Debtors, (c) any Claim or Interest as to which the liability of the Debtors or Reorganized Debtors, as applicable, and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, or (d) any Claim or Interest expressly allowed hereunder; provided, however, that notwithstanding the foregoing, (x) unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations under or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the

Bankruptcy Code, to the extent applicable, and (y) the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan.

7.      "*Approved 363 Sale Adjustment*" has the meaning given to such term in the Restructuring Term Sheet, dated as of January 30, 2017, attached as **Exhibit A** to the Restructuring Support Agreement.

8.      "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other Claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

9.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as may be amended from time to time.

10.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York or such other court having jurisdiction over the Chapter 11 Cases.

11.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court.

12.     "*Business Day*" means any day, other than a Saturday, Sunday, or a legal holiday in New York, as defined in Bankruptcy Rule 9006(a).

13.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

14.     "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

15.     "*Certificate*" means any instrument evidencing a Claim or an Interest.

16.     "*Chapter 11 Cases*" means the procedurally consolidated chapter 11 cases filed or to be filed (as applicable) for the Debtors in the Bankruptcy Court.

17.     "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

18.     "*Class*" means a category of holders of Claims or Interests under section 1122(a) of the Bankruptcy Code.

19.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

20.     "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

21.     "*Confirmation Hearing*" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order.

22.    "*Confirmation Order*" means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the Disclosure Statement and Solicitation Materials, which order shall be in form and substance reasonably acceptable to the Debtors, the Consenting First Lien Secured Parties, the Required Second Lien Lenders, and the Sponsor Entities (pursuant to the Sponsor Entities Consent Right (as defined in the Restructuring Support Agreement), to the extent applicable).

23.    "*Consenting First Lien Lenders*" means, collectively, the First Lien Lenders that are parties to the Restructuring Support Agreement and are each designated as a "Consenting First Lien Lender" thereunder.

24.    "*Consenting First Lien Secured Parties*" means, collectively, the Consenting First Lien Lenders and the First Lien Agent.

25.    "*Consenting Second Lien Lenders*" means, collectively, the Second Lien Lenders that are party to the Restructuring Support Agreement and are each designated as a "Consenting Second Lien Lender" thereunder.

26.    "*Consenting Second Lien Secured Parties*" means, collectively, the Consenting Second Lien Lenders and the Second Lien Agent.

27.    "*Consenting Sponsor Lenders*" means, collectively, the Affiliated Debt Funds and Non-Debt Fund Affiliates (each as defined in the First Lien Credit Agreement) that are holders of First Lien Claims and/or Second Lien Claims, are parties to the Restructuring Support Agreement and are each designated as a "Consenting Sponsor Lender" thereunder.

28.    "*Consenting Sponsors*" means Clarity Holdco, L.P., a Delaware limited partnership, and Clarity GP, LLC, a Delaware limited liability company, in each case, solely in their respective capacities as holder of direct and indirect existing Interests in the Debtors.

29.    "*Consummation*" means the occurrence of the Effective Date.

30.    "*Converted DIP Loans*" means the outstanding DIP Loans (inclusive of any Converted L/Cs that have been drawn on or before the Effective Date or proceeds of the DIP Facility drawn to cash collateralize the Additional L/Cs) that shall be converted into First Lien Exit Loans on the Effective Date.

31.    "*Converted L/Cs*" means any issued and outstanding letter of credit obligations, including related fees, under the First Lien Loan Documents as of the Petition Date that upon entry of the DIP Orders shall be converted to letter of credit obligations issued and outstanding under the DIP Facility and incremental to the DIP Loans.

32.    "*Cure*" or "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

33.    "*D&O Liability Insurance Policies*" means all unexpired directors', managers', and officers' liability insurance policies (including any "tail policy") of any of the Debtors with respect to directors, managers, officers, and employees of the Debtors.

34.    "*Debtor Release*" means the releases set forth in <u>Section 8.2</u> of the Plan.

35.    "*Debtors*" means, collectively, each of the following:  Answers Holdings, Inc.; Answers Corporation; Easy2 Technologies, Inc.; ForeSee Results, Inc.; ForeSee Session Replay, Inc.; More Corn, LLC; Multiply Media, LLC; Redcan, LLC; RSR Acquisition, LLC; Upbolt, LLC; and Webcollage Inc.

36.    "*Definitive Documents*" means (a) the Plan, (b) the Plan Supplement, (c) the Confirmation Order, (d) the Disclosure Statement, (e) the Solicitation Materials, (f) the DIP Orders, (g) the DIP Loan Documents, (h) the

DIP L/C Facility Documents, (i) the Exit Credit Facilities Documents, (j) the New Stockholders' Agreement, (k) the New Organizational Documents; and (l) the Warrant Agreement.

37.    "*DIP Administrative Agent*" means Credit Suisse AG, Cayman Islands Branch in its capacity as administrative agent and collateral agent under the DIP Facility, or its successor thereunder.

38.    "*DIP Claims*" means any and all Claims held by any of the DIP Lenders, the DIP Administrative Agent, or the DIP L/C Issuer arising under or related to the DIP Loan Documents, the DIP L/C Facility Documents, or the DIP Orders (including on account of any Converted L/Cs that have been drawn on or before the Effective Date, or proceeds of the DIP Facility drawn to cash collateralize the Additional L/Cs), including Claims for payment of the DIP Payments.

39.    "*DIP Credit Agreement*" means that certain senior secured debtor-in-possession credit agreement, dated as of [___], 2017, as amended, restated, modified, supplemented, or replaced from time to time in accordance with its terms, by and among the Debtors, the DIP Lenders, and the DIP Administrative Agent.

40.    "*DIP L/C Agreement*" means that certain senior secured super priority debtor-in-possession letter of credit reimbursement and security agreement, dated as of [___], 2017, as amended, restated, modified, supplemented, or replaced from time to time in accordance with its terms, by and among the Debtors and the DIP L/C Issuer.

41.    "*DIP L/C Facility*" means that certain $2 million debtor-in-possession letter of credit facility provided by the DIP L/C Issuer on the terms of, and subject to the conditions set forth in, the DIP L/C Agreement.

42.    "*DIP L/C Facility Documents*" means the DIP L/C Agreement and any amendments, modifications, supplements thereto, as well as any related notes, certificates, agreements, security agreements, documents and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the DIP Credit Agreement.

43.    "*DIP L/C Issuer*" means Credit Suisse AG, Cayman Islands Branch, or any successor thereto, as L/C Issuer under the DIP L/C Reimbursement and Security Agreement or any other issuer of letters of credit to the Debtors that are cash collateralized by proceeds of the DIP Loans.

44.    "*DIP Loan Documents*" means the DIP Credit Agreement and any amendments, modifications, supplements thereto, as well as any related notes, certificates, agreements, security agreements, documents and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the DIP Credit Agreement.

45.    "*DIP Facility*" means that certain $25 million debtor-in-possession financing facility provided by the DIP Lenders on the terms of, and subject to the conditions set forth in, the DIP Credit Agreement.

46.    "*DIP Lenders*" means, collectively, the lenders under the DIP Facility, solely in their capacity as such.

47.    "*DIP Loans*" means amounts loaned by the DIP Lenders pursuant to the DIP Credit Agreement.

48.    "*DIP Orders*" means, collectively, the interim and final orders entered by the Bankruptcy Court authorizing the Debtors to enter into the DIP Credit Agreement and access the DIP Facility and the DIP L/C Facility.

49.    "*DIP Payments*" means any and all Claims held by any of the DIP Lenders, the DIP Administrative Agent, or the DIP L/C Issuer arising under or related to the DIP Loan Documents, the DIP L/C Facility Documents, or the DIP Orders comprising any fees, expenses, and other payments (other than payments due for principal of, or interest on, the DIP Loans) payable thereunder.

50.     "*Disclosure Statement*" means the *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization for Answers Holdings, Inc. and its Debtor Affiliates*, as the same may be amended, supplemented or modified from time to time, including all exhibits and schedules thereto, to be approved by the Confirmation Order.

51.     "*Disputed*" means, with respect to a Claim, (a) any such Claim to the extent neither Allowed or Disallowed under the Plan or a Final Order nor deemed Allowed under section 502, 503, or 1111 of the Bankruptcy Code, or (b) to the extent the Debtors or any party in interest has interposed a timely objection before the Confirmation Date in accordance with the Plan, which objection has not been withdrawn or determined by a Final Order.  To the extent the Debtors dispute only the Allowed amount of a Claim, such Claim shall be deemed Allowed in the amount the Debtors do not dispute, if any, and Disputed as to the balance of such Claims.

52.     "*DTC*" means The Depositary Trust Company, its nominee, Cede & Co., or any Affiliate thereof.

53.     "*Distribution Agent*" means, as applicable, the Reorganized Debtors or any Entity the Reorganized Debtors select to make or to facilitate distributions in accordance with the Plan.

54.     "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Reorganized Debtors, on or after the Effective Date, upon which the Distribution Agent shall make distributions to holders of Allowed Claims entitled to receive distributions under the Plan.

55.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date set forth in Section 9.1 of the Plan have been satisfied or waived in accordance with Section 9.2 of the Plan.

56.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

57.     "*Estate*" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

58.     "*Exculpated Parties*" means each of the following, solely in its capacity as such: (i)(a) the Debtors; (b) the Reorganized Debtors, and (c) with respect to each of the forgoing parties in clauses (i)(a) and (i)(b), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, and each of their current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; and (ii)(a) the Consenting First Lien Lenders; (b) the First Lien Agent; (c) the Ad Hoc First Lien Group; (d) the DIP Lenders; (e) the DIP Administrative Agent; (f) the Consenting Second Lien Lenders; (g) the Second Lien Agent; (h) the Ad Hoc Second Lien Group; (i) the Sponsor Entities; and (j) with respect to each of the forgoing parties in clauses (ii)(a) through (ii)(i), each of such Entity's current and former Affiliates, and each such entity's and its current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

59.     "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

60.     "*Exit Commitment Equity*" means an amount of New Common Stock equal in value to 3% of the amount of the First Lien Exit Facility, which shall be payable on the Effective Date and calculated after the

distribution of New Common Stock to holders of First Lien Claims and Second Lien Claims on account of such applicable Claims.

61.     "*Exit Credit Agreements*" means, collectively, the First Lien Exit Credit Agreement and the Second Lien Exit Credit Agreement.

62.     "*Exit Credit Facilities Administrative Agent*" means Credit Suisse AG, Cayman Islands Branch, or any successor thereto, as administrative agent and collateral agent under the Exit Credit Facilities.

63.     "*Exit Credit Facilities*" means, collectively, the First Lien Exit Facility, the Second Lien Exit Facility, and the Exit L/C Facility.

64.     "*Exit Credit Facilities Documents*" means, collectively, the First Lien Exit Facility Documents, the Second Lien Exit Facility Documents, the Exit Credit Facilities Intercreditor Agreement, and the Exit L/C Facility Documents.

65.     "*Exit Credit Facilities Term Sheet*" means the term sheet attached to the Restructuring Support Agreement as Exhibit C setting forth the material terms and conditions of the Exit Credit Facilities.

66.     "*Exit Credit Facilities Intercreditor Agreement*" means the intercreditor agreement by and among the agent under the First Lien Exit Facility, as senior priority representative, and the agent under the Second Lien Exit Facility, as second priority representative, and acknowledged and agreed to by the Reorganized Debtors.

67.     "*Exit L/C Facility*" means the letter of credit facility consisting of any Converted L/Cs that remain undrawn on the Effective Date (if any) which will be incremental to the amounts outstanding under the Exit Credit Facilities.

68.     "*Exit L/C Facility Documents*" means the agreements and related documents governing the Exit L/C Facility to be entered into by the Reorganized Debtors on terms consistent with those set forth in the Exit Credit Facilities Term Sheet, in each case in form and substance reasonably acceptable to the Exit L/C Issuer.

69.     "*Exit L/C Issuer*" means Credit Suisse AG, Cayman Islands Branch, or any successor thereto, as L/C Issuer under the Exit L/C Facility and/or the First Lien Exit Facility, as the context may require.

70.     "*Federal Judgment Rate*" means the federal judgment rate in effect pursuant to 28 U.S.C. § 1961 as of the Petition Date, compounded annually.

71.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Solicitation Agent.

72.     "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

73.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

74.     "*First Lien Agent*" means Credit Suisse AG, Cayman Islands Branch, or any successor thereto, as administrative agent and collateral agent under the First Lien Credit Agreement, in its capacity as such.

75.     "*First Lien Claims*" means all Claims against the Debtors arising under the First Lien Loan Documents; provided, however, that the First Lien Claims shall not include any Converted L/Cs.

76.    "*First Lien Credit Agreement*" means that certain Credit Agreement, dated as of October 3, 2014, among the Debtors, the First Lien Agent, and the First Lien Lenders.

77.    "*First Lien Exit Credit Agreement*" means the credit agreement evidencing the First Lien Exit Facility.

78.    "*First Lien Exit Facility*" means the new first lien term loan facility, consisting of the Converted DIP Loans, to be entered into by the Reorganized Debtors on the terms consistent with those set forth in the Exit Credit Facilities Term Sheet.

79.    "*First Lien Exit Facility Documents*" means the First Lien Exit Credit Agreement and any guarantee, security agreement, deed of trust, mortgage, and other relevant documentation entered into with respect to the First Lien Exit Facility.

80.    "*First Lien Exit Loans*" means the loans that shall be deemed on the Effective Date to be outstanding under the First Lien Exit Credit Agreement.

81.    "*First Lien Lenders*" means the lenders party to the First Lien Credit Agreement, in their capacities as such.

82.    "*First Lien Loan Documents*" means, collectively, the First Lien Credit Agreement, and any security documents, including the Prepetition Intercreditor Agreement, the letter of credit documentation, and any other collateral and ancillary documents, including any applicable forbearance agreement, executed in connection with the First Lien Credit Agreement.

83.    "*First Lien Secured Parties*" means, collectively, the First Lien Lenders and First Lien Agent.

84.    "*General Unsecured Claim*" means any Claim other than a DIP Claim, a First Lien Claim, a Second Lien Claim, an Administrative Claim, a Professional Claim, a Priority Tax Claim, an Other Secured Claim, an Intercompany Claim, or an Other Priority Claim.

85.    "*General Unsecured Creditor*" means the holder of a General Unsecured Claim.

86.    "*Governance Term Sheet*" means the term sheet, attached as **Exhibit H** to the Disclosure Statement, setting forth the material terms and conditions of the New Organizational Documents and the New Stockholders' Agreement.

87.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

88.    "*Holdings*" means Answers Holdings, Inc., a Delaware corporation, the ultimate parent of each of the Debtors.

89.    "*Impaired*" means, with respect to any Class of Claims or Interests, a Claim or an Interest that is not Unimpaired.

90.    "*Indemnification Provisions*" means each of the Debtors' indemnification provisions in place whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise, for the current and former directors, officers, managers, employees, attorneys, other professionals, and agents of the Debtors and such current and former directors', officers', and managers' respective Affiliates.

91.    "*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

92.    "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor or Non-Debtor Subsidiary.

93.    "*Intercompany Interest*" means, other than an Interest in Holdings, an Interest in one Debtor or Non-Debtor Subsidiary held by another Debtor.

94.    "*Interests*" means the common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor and options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement), including any claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

95.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

96.    "*Management Incentive Plan*" means a post-Effective Date management incentive plan, the material terms of which shall be consistent with Section 4.16 of the Plan.

97.    "*MIP Equity*" means any New Common Stock that may be issued pursuant to the Management Incentive Plan, to the extent provided for thereunder, which shall dilute all New Common Stock equally.

98.    "*New Board*" means Reorganized Holdings' initial board of directors as of the Effective Date.

99.    "*New Common Stock*" means the common stock of Reorganized Holdings.

100.    "*New OpCo Boards*" means the new board of directors, or similar governing body, of each respective OpCo.

101.    "*New Organizational Documents*" means the form of the certificates or articles of incorporation, bylaws, or such other applicable formation documents of each of the Reorganized Debtors, which shall be consistent in all material respects with the Governance Term Sheet, including the New Stockholders' Agreement.

102.    "*New Stockholders' Agreement*" means that certain shareholders' agreement, in substantially the form to be Filed as part of the Plan Supplement, effective as of the Effective Date, to which all parties receiving New Common Stock (and all persons to whom such parties may sell or transfer their New Common Stock in the future and all persons who purchase or acquire the New Common Stock from Reorganized Holdings in future transactions) shall be required to become or shall be deemed parties, which shall be consistent in all material respects with the Governance Term Sheet.

103.    "*Non-Debtor Subsidiaries*" means all of Holdings' wholly owned subsidiaries who are not Debtors in these Chapter 11 Cases.

104.    "*OpCo*" means each of the respective entities under which (a) the Multiply business, (b) the ForeSee business, and (c) the Webcollage business are respectively situated in the Reorganized Debtors corporate organizational structure.

105.    "*OpCo MIP Equity*" means equity interests in any of the OpCos that may be issued pursuant to the Management Incentive Plan, to the extent provided for thereunder.

106.    "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

107.    "*Other Secured Claim*" means any Secured Claim other than the following:  (a) a First Lien Claim; (b) a Second Lien Claim; or (c) a DIP Claim.  For the avoidance of doubt, a Secured Tax Claim constitutes an Other Secured Claim.

108.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

109.    "*Petition Date*" means the date on which each of the Debtors filed its respective petition for relief commencing the Chapter 11 Cases.

110.    "*Plan*" means this joint prepackaged chapter 11 plan, including all appendices, exhibits, schedules and supplements hereto (including any appendices, exhibits, schedules and supplements to the Plan that are contained in the Plan Supplement), as it may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and the Restructuring Support Agreement, subject to the RSA Definitive Document Requirements.

111.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement), to be Filed by the Debtors no later than 7 days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents or amendments to previously Filed documents, Filed before the Effective Date as amendments to the Plan Supplement, including the following, as applicable:  (a) the Exit Credit Agreements; (b) the New Organizational Documents; (c) a list of retained Causes of Action; (d) the New Stockholders' Agreement; (e) a disclosure of the members of the New Board and the New OpCo Boards; (f) the Warrant Agreement; (g) the Schedule of Rejected Executory Contracts and Unexpired Leases; and (h) the Restructuring Transactions Exhibit.  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date consistent with the Restructuring Support Agreement.

112.    "*Prepetition Collateral*" means the collateral securing the First Lien Claims and Second Lien Claims pursuant to the Prepetition Loan Documents.

113.    "*Prepetition Intercreditor Agreement*" means that certain Intercreditor Agreement, dated as of October 3, 2014, by and among the First Lien Agent, as senior priority representative, and the Second Lien Agent, as second priority representative, and acknowledged and agreed to by the Debtors.  The Prepetition Intercreditor Agreement shall be construed to be part of the First Lien Loan Documents and the Second Lien Loan Documents.

114.    "*Prepetition Loan Documents*" means, collectively, the First Lien Loan Documents and the Second Lien Loan Documents.

115.    "*Prepetition Secured Parties*" means, collectively, the First Lien Agent, the First Lien Lenders, the Second Lien Agent and the Second Lien Lenders.

116.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

117.    "*Pro Rata*" means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that respective Class, or the proportion that Allowed Claims or Allowed Interests in a particular Class bear to the aggregate amount of Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Allowed interests under the Plan.

118.    "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to (i) sections 327, 328, 329, 330, or 331 of the Bankruptcy Code or (ii) an order entered by the Bankruptcy Court authorizing such retention, or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

119.    "*Professional Claims*" means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.

9

120.    "*Professional Fee Amount*" means the aggregate amount of Professional Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Effective Date, which estimates Professionals shall deliver to the Debtors as set forth in Section 2.3 of the Plan.

121.    "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount as set forth in Section 2.3 of the Plan.

122.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

123.    "*Reinstate," "Reinstated,"* or "*Reinstatement*" means, leaving a Claim Unimpaired under the Plan.

124.    "*Released Parties*" means each of the following, solely in its capacity as such: (i)(a) the Debtors; (b) the Reorganized Debtors, and (c) with respect to each of the forgoing parties in clauses (i)(a) and (i)(b), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, and each of their respective current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; and (ii)(a) the Consenting First Lien Lenders; (b) the First Lien Agent; (c) the Ad Hoc First Lien Group; (d) the DIP Lenders; (e) the DIP Administrative Agent; (f) the Consenting Second Lien Lenders; (g) the Second Lien Agent; (h) the Ad Hoc Second Lien Group; (i) the Sponsor Entities; and (j) with respect to each of the forgoing parties in clauses (ii)(a) through (ii)(i), each of such Entity's current and former Affiliates, and each such entity's and its current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; provided, however, that any holder of a Claim or Interest that opts out of the releases contained in, or otherwise objects to, the Plan shall not be a "Released Party."

125.    "*Releasing Parties*" means collectively, and in each case solely in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting First Lien Lenders; (d) the First Lien Agent; (e) the Ad Hoc First Lien Group; (f) the DIP Lenders; (g) the DIP Administrative Agent; (h) the Consenting Second Lien Lenders; (i) the Second Lien Agent; (j) the Ad Hoc Second Lien Group; (k) the Sponsor Entities; (l) all holders of Claims and Interests that are deemed to accept the Plan; (m) all holders of Claims who either (1) vote to accept or (2) receive a ballot but abstain from voting on the Plan; (n) all holders of Claims entitled to vote who vote to reject the Plan that do not elect on their Ballot to opt-out of the Third-Party Release; (o) all other holders of Claims and Interests to the extent permitted by law; and (p) with respect to the foregoing clauses (a) through (o), each such Entity and its current and former Affiliates, and each such entity's and its their current and former Affiliates' current and former directors, managers, officers, principals, members, employees, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; provided, however, that the foregoing clauses (a) through (p) shall be subject, in all material respects, to the terms of the Restructuring Support Agreement.

126.    "*Reorganized Debtor*" means a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date.

127.    "*Reorganized Holdings*" means Holdings, or any successor or assignee thereto, by merger, consolidation, or otherwise, on and after the Effective Date.

10

128.    "*Required First Lien Lenders*" means the Consenting First Lien Lenders who hold, in the aggregate, at least 66.67% in principal amount outstanding of all First Lien Claims held by the Consenting First Lien Lenders (excluding, for the avoidance of doubt, all of the First Lien Claims held by the Sponsor Entities and the Consenting Second Lien Lenders).

129.    "*Required Second Lien Lenders*" means the Consenting Second Lien Lenders who hold, in the aggregate, at least 66.67% in principal amount outstanding of all Second Lien Claims held by the Consenting Second Lien Lenders (excluding, for the avoidance of doubt, all of the Second Lien Claims held by the Consenting First Lien Lenders and the Sponsor Entities).

130.    "*Restructuring Support Agreement*" means that certain Amended and Restated Restructuring Support Agreement, dated as of January 30, 2017, by and among the Debtors and the Restructuring Support Parties, including all exhibits thereto, as such agreement may be amended from time to time in accordance with the terms thereof, which shall be attached as **Exhibit B** to the Disclosure Statement.

131.    "*Restructuring Support Parties*" means, collectively, the Consenting First Lien Lenders, the First Lien Agent, the Consenting Second Lien Lenders, the Second Lien Agent, and the Sponsor Entities, in each case, that are party to the Restructuring Support Agreement.

132.    "*Restructuring Transactions*" shall have the meaning set forth in Section 4.2 of the Plan.

133.    "*Restructuring Transactions Exhibit*" means an exhibit, which shall be included in the Plan Supplement, that sets forth the Restructuring Transactions the Debtors intend to implement on the Effective Date.

134.    "*RSA Definitive Document Requirements*" means that the Definitive Documents shall be subject to the respective consent rights of the Debtors and the applicable Restructuring Support Parties as set forth in the Restructuring Support Agreement.

135.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means a schedule that will be Filed as part of the Plan Supplement at the Debtors' option and will include a list of all Executory Contracts and Unexpired Leases that the Debtors intend to reject as of the Effective Date.

136.    "*Second Lien Agent*" means Wilmington Trust, National Association, or any successor thereto, as successor administrative agent and collateral agent under the Second Lien Credit Agreement, in its capacity as such.

137.    "*Second Lien Claims*" means all Claims against the Debtors arising under the Second Lien Loan Documents.

138.    "*Second Lien Credit Agreement*" means that certain Second Lien Credit Agreement, dated as of October 3, 2014 among certain of the Debtors, the Second Lien Agent, and the Second Lien Lenders.

139.    "*Second Lien Exit Credit Agreement*" means the credit agreement evidencing the Second Lien Exit Facility.

140.    "*Second Lien Exit Facility*" means the new second lien term loan facility, in an amount of $75 million less the amount of the First Lien Exit Facility, to be entered into by the Reorganized Debtors on terms consistent with those set forth in the Exit Credit Facilities Term Sheet.

141.    "*Second Lien Exit Facility Documents*" means the Second Lien Exit Credit Agreement and any guarantee, security agreement, deed of trust, mortgage, and other relevant documentation entered into with respect to the Second Lien Exit Facility.

142.    "*Second Lien Exit Loans*" means the loans that shall be deemed on the Effective Date to be outstanding under the Second Lien Exit Credit Agreement.

11

143.    "*Second Lien Lenders*" means the lenders and their Affiliates party to the Second Lien Credit Agreement, in their capacities as such.

144.    "*Second Lien Loan Documents*" means, collectively, the Second Lien Credit Agreement, and any security documents, including the Prepetition Intercreditor Agreement, the letter of credit documentation, and any other collateral and ancillary documents, including any applicable forbearance agreement, executed in connection with the Second Lien Credit Agreement.

145.    "*Second Lien Secured Parties*" means, collectively, the Second Lien Lenders and Second Lien Agent.

146.    "*Secured Claim*" means a Claim: (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

147.    "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

148.    "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law.

149.    "*Security*" shall have the meaning set forth in section 101(49) of the Bankruptcy Code.

150.    "*Servicer*" means an agent or other authorized representative of holders of Claims or Interests.

151.    "*Solicitation Agent*" means Rust Consulting/Omni Bankruptcy, the notice, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases by Bankruptcy Court order.

152.    "*Solicitation Materials*" means, collectively, the solicitation materials with respect to the Plan.

153.    "*Sponsor Entities*" means, collectively, the Consenting Sponsors, the Consenting Sponsor Lenders, and Apax Partners, L.P.

154.    "*Third-Party Release*" means the releases set forth in Section 8.3 of the Plan.

155.    "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of New York.

156.    "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim to a holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

157.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

158.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class consisting of Claims or Interest that are not impaired within the meaning of section 1124 of the Bankruptcy Code.

159.    "*Warrant Agreement*" means the Definitive Document governing the Warrants, the form of which is attached to the Disclosure Statement as **Exhibit G**, and as further amended, modified or supplemented, shall be Filed as part of the Plan Supplement.

160.    "*Warrant Equity*" means the New Common Stock issuable upon the exercise of the Warrants.

161.    "*Warrants*" means 5-year warrants for 10% of the New Common Stock at the exercise price and on the terms and conditions set forth in the Warrant Agreement.

## 1.2    Rules of Interpretation

For purposes of the Plan:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (e) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (i) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (j)  references to "Proofs of Claim," "holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "Disputed Interests," and the like as applicable; (k) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (l) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation."

## 1.3    Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## 1.4    Governing Law

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles.

## 1.5    Reference to Monetary Figures

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

**1.6**    <u>Reference to the Debtors or the Reorganized Debtors</u>

       Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

**1.7**    <u>Controlling Document</u>

       In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control.  In the event of an inconsistency between the Plan and any Definitive Documents or other documents, schedules or exhibits contained in the Plan Supplement, subject to the RSA Definitive Document Requirements, such Definitive Document or other document, schedule or exhibit shall control.  In the event of an inconsistency between the Plan or any Definitive Documents or other documents, schedules or exhibits contained in the Plan Supplement, on the one hand, and the Confirmation Order, on the other hand, the Confirmation Order shall control.

ARTICLE II

ADMINISTRATIVE AND PRIORITY CLAIMS

       In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in <u>Article III</u> of the Plan.

**2.1**    <u>Administrative Claims</u>

       Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors, or the Reorganized Debtors, as applicable, each holder of an Allowed Administrative Claim (other than holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

**2.2**    <u>DIP Claims</u>

       Subject to the DIP Orders, on the Effective Date, the DIP Claims and DIP Payments shall be deemed to be Allowed in the full amount due and owing under the DIP Facility as of the Effective Date.

       On the Effective Date, (i) the DIP Payments shall be paid in full in Cash and (ii) the remaining DIP Claims shall be converted into First Lien Exit Loans.

**2.3**    <u>Professional Claims</u>

       All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than 45 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.  The Reorganized Debtors shall pay Professional Claims

14

in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date. Professionals shall deliver to the Debtors their estimates for purposes of the Reorganized Debtors computing the Professional Fee Amount no later than three (3) Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be deemed to limit the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Claims filed with the Bankruptcy Court. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. No funds in the Professional Fee Escrow Account shall be property of the Estates, and the Professional Fee Escrow Account shall be maintained in trust solely for the benefit of holders of Professional Claims. Any funds remaining in the Professional Fee Escrow Account after all Allowed Professional Claims have been paid shall be turned over to the Reorganized Debtors.

From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

**2.4**      **Priority Tax Claims**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the Debtors and the holder of such Claim, or as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business.

**2.5**      **Statutory Fees**

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

**ARTICLE III**

**CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS**

**3.1**      **Classification of Claims and Interests**

The Plan constitutes a separate plan proposed by each Debtor within the meaning of section 1121 of the Bankruptcy Code. Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied or disallowed by Final Order prior to the Effective Date. For all purposes under the Plan, each Class will contain sub-Classes for each of the Debtors (*i.e.*, there will be eight (8) Classes for each Debtor other than, for the avoidance of doubt, Class 8, which shall exist solely at Holdings); provided that any Class that does not contain any Allowed Claims or Allowed Interests with respect to a particular Debtor will be treated in accordance with Section 3.4 below.

Below is a chart assigning each Class a number for purposes of identifying each separate Class.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3 | First Lien Claims | Impaired | **Entitled to Vote** |
| 4 | Second Lien Claims | Impaired | **Entitled to Vote** |
| 5 | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 6 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote |
| 7 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 8 | Interests in Holdings | Impaired | Deemed to Reject |

## 3.2    Treatment of Classes of Claims and Interests

Except to the extent that the Debtors and a holder of an Allowed Claim or Allowed Interest, as applicable, agree to less favorable treatment, such holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such holder's Allowed Claim or Allowed Interest. Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

(a)    **Class 1 — Other Secured Claims**

(1)    *Classification*: Class 1 consists of any Other Secured Claims against any Debtor.

(2)    *Treatment*: Each holder of an Allowed Other Secured Claim shall receive, as the Debtors or the Reorganized Debtors, as applicable, determine either:

(A)    payment in full, in Cash, of the unpaid portion of its Allowed Other Secured Claim, including any interest thereon required to be paid under section 506(b) of the Bankruptcy Code (or if payment is not then due, in accordance with the terms of such allowed Other Secured Claim) on the latest of: (i) on or as soon as reasonably practicable after the Effective Date if such Allowed Other Secured Claim is Allowed as of the Effective Date; (ii) on or as soon as reasonably practicable after the date such Other Secured Claim is Allowed; and (iii) the date such Allowed Other Secured Claim becomes due and payable, or as soon thereafter as is reasonably practicable;

(B)    reinstatement pursuant to section 1124 of the Bankruptcy Code; or

(C)    such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

(3)    *Voting*: Class 1 is Unimpaired. Holders of Allowed Other Secured Claims in Class 1 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Secured Claims in Class 1 are not entitled to vote to accept or reject the Plan.

(b)    **Class 2 — Other Priority Claims**

    (1)    *Classification*: Class 2 consists of any Other Priority Claims against any Debtor.

    (2)    *Treatment*: Each holder of an Allowed Other Priority Claim shall receive payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim on the latest of: (i) on or as soon as reasonably practicable after the Effective Date if such Allowed Other Priority Claim is Allowed as of the Effective Date; (ii) on or as soon as reasonably practicable after the date such Other Priority Claim is Allowed; and (iii) the date such Allowed Other Priority Claim becomes due and payable, or as soon thereafter as is reasonably practicable.

    (3)    *Voting*: Class 2 is Unimpaired. Holders of Allowed Other Priority Claims in Class 2 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Priority Claims in Class 2 are not entitled to vote to accept or reject the Plan.

(c)    **Class 3 — First Lien Claims**

    (1)    *Classification*: Class 3 consists of all First Lien Claims against any Debtor.

    (2)    *Allowance:* On the Effective Date the First Lien Claims shall be Allowed in the aggregate principal amount of not less than $366.2 million, plus (i) any prepetition letter of credit obligations that do not constitute Converted L/Cs, and (ii) any accrued but unpaid interest thereon payable as of the Petition Date at the applicable default interest rate and any accrued but unpaid fees and expenses payable in accordance with the First Lien Loan Documents. For the avoidance of doubt, the First Lien Claims shall not include any Converted L/Cs. The First Lien Claims shall not be subject to avoidance, subordination, setoff, offset, deduction, objection, challenge, recharacterization, surcharge under section 506(c) of the Bankruptcy Code or any other claim or defense.

    (3)    *Treatment*: On the Effective Date, each holder of an Allowed First Lien Claim shall receive on account of such Claim its Pro Rata share of (i) 96% of the New Common Stock (subject to dilution on account of, to the extent applicable, the MIP Equity, the Exit Commitment Equity, and the Warrant Equity), and (ii) the Second Lien Exit Loans; <u>provided</u> that the foregoing treatment, and distributions to holders, of Allowed First Lien Claims shall take into account an Approved 363 Sale Adjustment and applicable Restructuring Transactions, in each case, to the extent applicable.

    (4)    *Voting*: Class 3 is Impaired. Holders of Allowed First Lien Claims in Class 3 are entitled to vote to accept or reject the Plan.

(d)    **Class 4 — Second Lien Claims**

    (1)    *Classification*: Class 4 consists of all Second Lien Claims against any Debtor.

    (2)    *Allowance:* On the Effective Date, the Second Lien Claims shall be Allowed in the aggregate principal amount of not less than $180.2 million, plus any accrued but unpaid interest thereon payable as of the Petition Date at the applicable default interest rate and any accrued but unpaid fees and expenses payable in accordance with the Second Lien Loan Documents. The Second Lien Claims shall not be subject to avoidance, subordination, setoff, offset, deduction, objection, challenge, recharacterization, surcharge under section 506(c) of the Bankruptcy Code or any other claim or defense.

(3)    *Treatment*:  On the Effective Date, each holder of an Allowed Second Lien Claim shall receive its Pro Rata share of (i) 4% of the New Common Stock (subject to dilution on account of, to the extent applicable, the MIP Equity, the Exit Commitment Equity, and the Warrant Equity), and (ii) the Warrants; provided that the foregoing treatment, and distributions to holders, of Allowed Second Lien Claims shall take into account an Approved 363 Sale Adjustment and applicable Restructuring Transactions, in each case, to the extent applicable.

(4)    *Voting*:  Class 4 is Impaired.  Holders of Allowed Second Lien Claims in Class 4 are entitled to vote to accept or reject the Plan.

(e)    **Class 5 — General Unsecured Claims**

(1)    *Classification*:  Class 5 consists of any General Unsecured Claims against any Debtor.

(2)    *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of such Claim or has been paid or disallowed by Final Order prior to the Effective Date, on and after the Effective Date, the Reorganized Debtors shall continue to pay or treat each Allowed General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced, subject to all claims, defenses or disputes the Debtors and Reorganized Debtors may have with respect to such Claims, including as provided in Section 4.17 of the Plan.

(3)    *Voting*:  Class 5 is Unimpaired.  Holders of Allowed General Unsecured Claims in Class 5 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed General Unsecured Claims in Class 5 are not entitled to vote to accept or reject the Plan.

(f)    **Class 6 — Intercompany Claims**

(1)    *Classification*:  Class 6 consists of any Intercompany Claims against any Debtor.

(2)    *Treatment*:  Each Allowed Intercompany Claim shall be Reinstated or cancelled (by way of contribution to capital or otherwise) as of the Effective Date, at the Debtors' or the Reorganized Debtors' option, subject to (A) the Restructuring Transactions, (B) the consent of the Required First Lien Lenders, which consent shall not be unreasonably withheld, conditioned or delayed, and (C) the consent of the Required Second Lien Lenders solely to the extent required by the Second Lien Lender Consent Right (as defined in the Restructuring Support Agreement), which consent shall not be unreasonably withheld, conditioned or delayed.  No distribution shall be made on account of any Allowed Intercompany Claim.

(3)    *Voting*:  Class 6 is either Unimpaired, in which case the holders of Allowed Intercompany Claims in Class 6 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired, and not receiving any distribution under the Plan, in which case the holders of such Allowed Intercompany Claims in Class 6 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each holder of an Allowed Intercompany Claim in Class 6 will not be entitled to vote to accept or reject the Plan.

18

(g)    **Class 7 — Intercompany Interests**

(1)    *Classification*:  Class 7 consists of any Intercompany Interests in any Debtor.

(2)    *Treatment*:  Each Allowed Intercompany Interest shall be Reinstated as of the Effective Date, subject to (A) the Restructuring Transactions, (B) the consent of the Required First Lien Lenders, which consent shall not be unreasonably withheld, conditioned or delayed, and (C) the consent of the Required Second Lien Lenders solely to the extent required by the Second Lien Lender Consent Right, which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, that for the avoidance of doubt, Holdings' Interests in Debtor Answers Corporation shall either be Reinstated or, at the Reorganized Debtors' option, subject to (A) the Restructuring Transactions, (B) the consent of the Required First Lien Lenders, which consent shall not be unreasonably withheld, conditioned or delayed, and (C) the consent of the Required Second Lien Lenders solely to the extent required by the Second Lien Lender Consent Right, which consent shall not be unreasonably withheld, conditioned or delayed, contributed by Holdings to a newly-formed subsidiary of Holdings that shall be disregarded from Holdings for U.S. federal income tax purposes.

(3)    *Voting*:  Class 7 is Unimpaired. Holders of Allowed Intercompany Interests in Class 7 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Intercompany Interests in Class 7 are not entitled to vote to accept or reject the Plan.

(h)    **Class 8 — Interests in Holdings**

(1)    *Classification*:  Class 8 consists of all Interests in Holdings.

(2)    *Treatment*:  On the Effective Date, all Interests in Holdings will be cancelled and the holders of Interests in Holdings shall not receive or retain any distribution, property, or other value on account of their Interests in Holdings.

(3)    *Voting*:  Class 8 is Impaired.  Holders of Interests in Class 8 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

## 3.3    Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

## 3.4    Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest, or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## 3.5    Voting Classes; Presumed Acceptance by Non-Voting Classes

If a Class contains Claims or Interests eligible to vote and no holder of Claims or Interests eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims or Interests in such Class.

19

**3.6**        **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan (subject to the Restructuring Support Agreement) to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by (a) modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules and (b) withdrawing the Plan as to an individual Debtor at any time before the Confirmation Date.

**3.7**        **Intercompany Interests**

To the extent Reinstated under the Plan, the Intercompany Interests shall be Reinstated for the ultimate benefit of the holders of the New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims.  For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date.

## ARTICLE IV

## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

**4.1**        **General Settlement of Claims and Interests**

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and is within the range of reasonableness.  Subject to Article VI of the Plan, all distributions made to holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final.

**4.2**        **Restructuring Transactions**

On or about the Effective Date, the Debtors or the Reorganized Debtors, in each case, with the consent of the Required First Lien Lenders and, subject to the Second Lien Lender Consent Right and the Sponsor Entities Consent Right (in each case, as defined in, and solely to the extent applicable under, the Restructuring Support Agreement), the Required Second Lien Lenders and the Sponsor Entities, which consent shall not be unreasonably withheld, conditioned or delayed, shall take all actions as may be necessary or appropriate to effectuate the transactions described in, approved by, contemplated by, or necessary to effectuate the Restructuring Support Agreement and the Plan (collectively, the "Restructuring Transactions"), including:  (a) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including, but not limited to the documents comprising the Plan Supplement; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (d) such other transactions that are required to effectuate the Restructuring Transactions, including, but not limited to those described in the Restructuring Transactions Exhibit,  in the most tax efficient manner, including the mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions or liquidations; (e) the execution, delivery, and filing, if applicable, of the Exit Credit Facilities Documents, the New Stockholders'

Agreement, and the Warrant Agreement; and (f) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law. The Restructuring Transactions may include a taxable transfer of certain of the Debtors' assets or entities to a newly-formed entity (or an affiliate or subsidiary of such entity) formed and controlled by certain holders of Claims against the Debtors and, in such case, the New Common Stock (and/or other interests) issued to holders of Claims pursuant to the Plan may comprise stock (and/or other interests) of more than one entity. In such event, (i) equivalent percentages of the common stock (and/or other interests) of such separated entity as those percentages of New Common Stock to be granted to holders of Allowed Class 3 Claims and Allowed Claim 4 Claims shall be granted to holders of Allowed Class 3 Claims and Allowed Claim 4 Claims and (ii) the indebtedness underlying the New Exit Credit Facilities may be allocated among such separated entity and the other Reorganized Debtors in a manner agreed upon by the Debtors and the Required First Lien Lenders, and subject to the the Second Lien Lender Consent Right and the Sponsor Entities Consent Right (in each case, as defined in, and solely to the extent applicable under, the Restructuring Support Agreement).

**4.3**    **New Common Stock and Warrants**

All existing Interests in Holdings shall be cancelled as of the Effective Date and, subject to the Restructuring Transactions, Reorganized Holdings shall issue and contribute the New Common Stock, including the Exit Commitment Equity, and Warrants to Reorganized Debtor Answers Corporation, which shall distribute the New Common Stock, including the Exit Commitment Equity, and Warrants to holders of Claims entitled to receive New Common Stock, including the Exit Commitment Equity, and/or Warrants pursuant to the Plan. The issuance of the New Common Stock and Warrants, including the Exit Commitment Equity and any MIP Equity (to the extent applicable), shall be authorized without the need for any further corporate action and without any further action by the Debtors, Reorganized Debtors, or Reorganized Holdings, as applicable. Reorganized Holdings' New Organizational Documents shall authorize the issuance and distribution on the Effective Date of New Common Stock, including the Exit Commitment Equity, and Warrants to the Distribution Agent for the benefit of holders of Allowed Claims in Class 3 and Class 4 (as applicable) in accordance with the terms of Article III of the Plan. All New Common Stock, including the Exit Commitment Equity, and Warrants issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable, and the holders of New Common Stock and Warrants shall be deemed to have accepted the terms of the New Stockholders' Agreement (solely in their capacity as shareholders and warrants holders of Reorganized Holdings) and to be parties thereto without further action or signature. The New Stockholders' Agreement shall be effective as of the Effective Date and, as of such date, shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of New Common Stock, including the Exit Commitment Equity, and Warrants shall be bound thereby.

**4.4**    **Exit Credit Facilities**

On the Effective Date the Reorganized Debtors shall enter into the Exit Credit Facilities, the terms of which will be set forth in the Exit Credit Facilities Documents, as applicable. Confirmation of the Plan shall be deemed approval of the Exit Credit Facilities and the Exit Credit Facilities Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, including issuance of the Exit Commitment Equity to the lenders under the First Lien Exit Facility, and authorization of the Reorganized Debtors to enter into and execute the Exit Credit Facilities Documents and such other documents as may be required to effectuate the treatment afforded by the Exit Credit Facilities. On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Credit Facilities Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Credit Facilities Documents, (c) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Credit Facilities Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the

21

Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

**4.5    Exemption from Registration Requirements**

All shares of the New Common Stock and the Warrants issued to (a) holders of First Lien Claims and (b) holders of Second Lien Claims, as applicable, on account of their Claims and all shares of New Common Stock (including any other securities issuable upon exercise of the Warrants) issued upon the exercise of the Warrants, will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on Section 1145(a) of the Bankruptcy Code.  The Exit Commitment Equity will be issued without registration under the Securities Act pursuant to an exemption from the registration requirements provided by 4(a)(2) of the Securities Act, and as a result, will be "restricted securities" within the meaning of Rule 144 promulgated under the Securities Act. Recipients of the New Common Stock and the Warrants are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state Blue Sky Law.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock, including the Exit Commitment Equity, and/or the Warrants or the New Common Stock (or other securities issuable upon exercise of the Warrants) issued upon the exercise of the Warrants through the facilities of the DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Stock, including the Exit Commitment Equity (or other securities issuable upon exercise of the Warrants) and Warrants under applicable securities laws.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock, including the Exit Commitment Equity, and Warrants and the shares of New Common Stock (including any other securities issuable upon exercise of the Warrants) issued upon the exercise of the Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.  DTC shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock, including the Exit Commitment Equity, and/or Warrants and/or shares of New Common Stock (including any other securities issuable upon exercise of Warrants) issued upon the exercise of the Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

**4.6    Subordination**

The allowance, classification, and treatment of satisfying all Claims and Interests under the Plan takes into consideration any and all subordination rights, whether arising by contract or under general principles of equitable subordination, section 510(b) or 510(c) of the Bankruptcy Code, or otherwise, including for the avoidance of doubt the Prepetition Intercreditor Agreement.  On the Effective Date, any and all subordination rights or obligations that a holder of a Claim or Interest may have with respect to any distribution to be made under the Plan will be discharged and terminated, and all actions related to the enforcement of such subordination rights will be enjoined permanently. Accordingly, distributions under the Plan to holders of Allowed Claims (including, for the avoidance of doubt, distributions to holders of Allowed Claims in Class 4) will not be subject to turnover or payment to a beneficiary of such terminated subordination rights, or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.

**4.7    Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided herein, or in any agreement, instrument, or other document incorporated in the Plan (including the Restructuring Transactions), on the Effective Date, all property in each Debtor's Estate, all Causes of Action, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and pursue, compromise or settle any Claims, Interests, or Causes of Action without

supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**4.8**    **Cancellation of Instruments, Certificates, and Other Documents**

On the Effective Date, except as otherwise provided in the Plan: (a) the obligations of the Debtors under the DIP Facility, the DIP L/C Facility, the First Lien Loan Documents, the Second Lien Loan Documents, and any Interest in Holdings, certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors giving rise to any Claim or Interest shall be cancelled and the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder; and (b) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation, or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be released and discharged; provided that notwithstanding Confirmation or the occurrence of the Effective Date, any such agreement that governs the rights of the holder of an Allowed Claim shall continue in effect solely for purposes of enabling such holder to receive distributions under the Plan on account of such Allowed Claim as provided herein, further, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under the Plan; provided, further, that nothing in this section shall effect a cancellation of any New Common Stock, Warrants, Intercompany Interests, or Intercompany Claims.

Notwithstanding Confirmation, the occurrence of the Effective Date or anything to the contrary herein, only such matters which by their express terms survive the termination of the First Lien Credit Agreement and the Second Lien Credit Agreement shall survive the occurrence of the Effective Date, including the rights of the First Lien Agent and the Second Lien Agent to expense reimbursement, indemnification and similar amounts.

**4.9**    **Corporate Action**

On the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (a) the adoption and/or filing of the New Organizational Documents and the New Stockholders' Agreement; (b) the selection of the directors, managers, and officers for the Reorganized Debtors, including the appointment of the New Board and New OpCo Boards; (c) the authorization, issuance, and distribution of New Common Stock and Warrants and the shares of New Common Stock (including any other securities issuable upon exercise of the Warrants) issued upon the exercise of the Warrants; (d) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (e) the entry into the Exit Credit Facilities and the execution, delivery, and filing of the Exit Credit Facilities Documents, as applicable; (f) implementation of the Restructuring Transactions; and (g) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of Reorganized Debtors, and any corporate action required by the Debtors or the other Reorganized Debtors in connection with the Plan shall be deemed to have occurred and be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors or Reorganized Debtors. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors, Reorganized Holdings, or the other Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the Restructuring Transactions) in the name of and on behalf of Reorganized Holdings and the other Reorganized Debtors, including the Exit Credit Facilities Documents and any and all other agreements, documents, Securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Section 4.9 shall be effective notwithstanding any requirements under non-bankruptcy law.

**4.10**    **Corporate Existence**

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including the Restructuring Transactions), on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation or bylaws (or other analogous formation documents) is amended by the Plan or otherwise, and to the extent any such document is amended, such document is deemed to be amended pursuant to the Plan and requires no further action or approval (other than any requisite filings required under applicable state or federal law).

**4.11**    **Charter, Bylaws, and New Organizational Documents**

On the Effective Date, or as soon thereafter as is reasonably practicable, the Reorganized Debtors' respective certificates of incorporation and bylaws (and other formation and constituent documents relating to limited liability companies) shall be amended as may be required to be consistent with the provisions of the Plan, the New Stockholders' Agreement, the Warrant Agreement, the Governance Term Sheet, and the Exit Credit Facilities Documents, as applicable, and the Bankruptcy Code. The New Organizational Documents shall, among other things:  (a) authorize the issuance of the New Common Stock and the Warrants and the shares of New Common Stock (including any other securities issuable upon exercise of the Warrants) issued upon the exercise of the Warrants; and (b) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity Securities. After the Effective Date, each Reorganized Debtor may amend and restate its certificate of incorporation and other formation and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of the New Organizational Documents, the New Stockholders Agreement, the Warrant Agreement, and the Governance Term Sheet.

**4.12**    **Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors and managers thereof, shall be authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Exit Credit Facilities Documents, as applicable, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

**4.13**    **Section 1146(a) Exemption**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan (including the Restructuring Transactions) or pursuant to:  (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (b) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; (d) the grant of collateral as security for any or all of the Exit Credit Facilities, as applicable; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Restructuring Transactions), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or

24

recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**4.14    Directors and Officers**

The New Board shall consist of seven (7) members, the initial members of which shall consist of (a) the current Chief Executive Officers of Foresee and Webcollage and (b) the remaining members shall be appointed by (i) any Consenting First Lien Lender that holds an amount of First Lien Claims that would result in such Consenting First Lien Lender becoming on the Effective Date (before accounting for dilution by the Exit Commitment Equity) a holder of greater than 15% of the New Common Stock, which holder shall be entitled to appoint one member and (ii) the Ad Hoc First Lien Group shall be entitled to appoint the remaining members. The members of the New Board and the New OpCo Boards will be identified as part of the Plan Supplement at or prior to the Confirmation Hearing consistent with section 1129(a)(5) of the Bankruptcy Code. On the Effective Date, except as otherwise provided in the Plan Supplement or announced on the record at the Confirmation Hearing, the existing officers of the Debtors (other than the Chief Restructuring Officer) shall serve in their current capacities for the Reorganized Debtors. From and after the Effective Date, each director, officer, or manager of the Reorganized Debtors shall serve pursuant to the terms of the respective Reorganized Debtor's charters and bylaws or other formation and constituent documents, and applicable laws of the respective Reorganized Debtor's jurisdiction of formation.

**4.15    Employee Arrangements of the Reorganized Debtors**

As of the Effective Date, the Reorganized Debtors shall be authorized to: (a) maintain, amend, or revise employment, indemnification, and other arrangements with their directors, officers, and employees, that were employed by, or serving on the board of directors of, any of the Debtors as of the Petition Date that have not been rejected before or as of the Effective Date, subject to the terms and conditions of any such agreement; and (b) enter into new employment, indemnification, and other arrangements with directors, officers, and employees, in the case of this clause (b), as determined by the board of directors of the applicable Reorganized Debtor. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

**4.16    Management Incentive Plan**

Prior to the Effective Date, the Debtors and the Ad Hoc First Lien Group shall negotiate in good faith to determine a mutually agreed upon Management Incentive Plan, and the Debtors and the Ad Hoc First Lien Group shall consult with the Ad Hoc Second Lien Group regarding the foregoing to the extent such Management Incentive Plan proposes to grant participants therein MIP Equity or other securities of Reorganized Holdings. On or after the Effective Date, except as otherwise set forth in any employment agreement, the members of the management teams of the divisions of the Reorganized Debtors will be eligible to participate in the Management Incentive Plan. The New Board shall adopt and implement the Management Incentive Plan as soon as practicable after the Effective Date, which may be an equity incentive program pursuant to which the MIP Equity and/or OpCo MIP Equity will be reserved for issuance. To the extent applicable, any MIP Equity issued in connection with the Management Incentive Plan shall dilute all of the New Common Stock equally, including the Exit Commitment Equity and the New Common Stock issuable upon the exercise of the Warrants. Additionally, the New Board shall approve an annual cash bonus program for the management teams of the Reorganized Debtors as soon as practicable after the Effective Date. Confirmation shall be deemed approval of the Management Incentive Plan, without any further action or approval required by the Bankruptcy Court.

**4.17    Preservation of Causes of Action**

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of the Plan, the DIP Orders, or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date,

including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. **The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of the Plan, the DIP Orders, or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Section 4.17 include any claim or Cause of Action with respect to, or against, a Released Party.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action preserved pursuant to the first paragraph of this Section 4.17 that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

**4.18    Release of Avoidance Actions**

On the Effective Date, the Debtors, on behalf of themselves and their estates, shall release any and all Avoidance Actions and the Debtors and the Reorganized Debtors, and any of their successors or assigns, and any Entity acting on behalf of the Debtors or the Reorganized Debtors, shall be deemed to have waived the right to pursue any and all Avoidance Actions, except for Avoidance Actions brought as counterclaims or defenses to claims asserted against the Debtors.

**ARTICLE V**

**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**5.1    Assumption of Executory Contracts and Unexpired Leases**

Each Executory Contract and Unexpired Lease shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease (a) was previously assumed or rejected; (b) was previously expired or terminated pursuant to its own terms; (c) is the subject of a motion or notice to assume or assume and assign Filed on or before the Confirmation Date; or (d) is designated specifically, or by category, as an Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions and assignments.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

**5.2**    **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be filed with the Solicitation Agent on or before 30 days after the Effective Date.  Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; *provided*, *however*, that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure.  The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.  In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be filed with the Bankruptcy Court on or before 30 days after the Effective Date.  Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to this Section 5.2 shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Section 5.2, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

**5.3**    **Rejection Damages Claims**

In the event that the rejection of an Executory Contract or Unexpired Lease by any of the Debtors results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors or their respective properties or interests in property as agents, successors, or assigns, unless a Proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtors and the Reorganized Debtors no later than thirty (30) days after the later of (i) the Effective Date or (ii) the effective date of such executory contract or unexpired lease.  Any such Claims, to the extent Allowed, shall be classified in Class 5 (General Unsecured Claims).

**5.4**    **Indemnification**

On and as of the Effective Date, the Indemnification Provisions will be assumed and irrevocable and will survive the effectiveness of the Plan, and the New Organizational Documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' directors, officers, employees, or agents that were employed by, or serving on the board of directors of, any of the Debtors as of the Petition Date, to the fullest extent permitted by law and at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date,

against any Claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and, notwithstanding anything in the Plan to the contrary, none of the Reorganized Debtors will amend and/or restate the New Organizational Documents before or after the Effective Date to terminate or adversely affect any of the Reorganized Debtors' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights.

## 5.5    Insurance Policies

Notwithstanding anything in the Plan to the contrary, all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan.  On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto, including all D&O Liability Insurance Policies (including tail coverage liability insurance).  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed, and shall survive the Effective Date.

After the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce, modify or restrict in any way, the coverage under any D&O Liability Insurance Policy (including such tail coverage liability insurance) in effect as of the Effective Date, and all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date of the Plan shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date of the Plan.

## 5.6    Contracts and Leases After the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.  Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

## 5.7    Reservation of Rights

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## 5.8    Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

# ARTICLE VI

# PROVISIONS GOVERNING DISTRIBUTIONS

**6.1**    **Distributions on Account of Claims and Interests Allowed as of the Effective Date**

Except as otherwise provided herein, a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the holder of the applicable Claim, on the first Distribution Date, the Distribution Agent shall make initial distributions under the Plan on account of Claims Allowed on or before the Effective Date; provided, however, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims and Allowed Secured Tax Claims shall be paid in accordance with Sections 2.4 and 3.2(a), respectively. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.  A Distribution Date shall occur no more frequently than once in every 90 day period after the Effective Date, as necessary, in the Reorganized Debtors' sole discretion.

**6.2**    **Rights and Powers of the Distribution Agent**

(a)    **Powers of Distribution Agent**

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

(b)    **Expenses Incurred On or After the Effective Date**

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors.

**6.3**    **Special Rules for Distributions to Holders of Disputed Claims and Interests**

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim or Interest have been resolved by settlement or Final Order or the Claims have been Allowed or expunged.

**6.4**    **Delivery of Distributions**

(a)    **Record Date for Distributions**

On the Effective Date, the various transfer registers for each class of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record holders of any Claims or Interests.  The Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Effective Date.  In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or

unexpired lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.

        (b)        **Distribution Process**

The Distribution Agent shall make all distributions required under the Plan, except that with respect to distributions to holders of Allowed Claims governed by a separate agreement, which shall include the DIP Facility, the DIP L/C Facility, the First Lien Credit Agreement, and the Second Lien Credit Agreement, and administered by a Servicer, including the DIP Administrative Agent, the First Lien Agent, and the Second Lien Agent, the Distribution Agent, the Debtor, and the applicable Servicer and the Ad Hoc First Lien Group and Ad Hoc Second Lien Group, as applicable, shall exercise commercially reasonable efforts to implement appropriate mechanics governing such distributions in accordance with the Plan and the terms of the governing agreement. Except as otherwise provided herein, and notwithstanding any authority to the contrary, distributions to holders of Allowed Claims, including Claims that become Allowed after the Effective Date, shall be made to holders of record or their respective designees as of the Effective Date: (1) to the address of such holder or designee as set forth in the applicable register (or if the appropriate notice has been provided pursuant to the governing agreement in writing, on or before the date that is 10 days before the Effective Date, of a change of address or an identification of designee, to the changed address or to such designee, as applicable); or (2) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, if no address exists in the applicable register, no Proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address on or before the date that is 10 days before the Effective Date. The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan. Except as otherwise provided in the Plan, holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

        (c)        **Compliance Matters**

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

        (d)        **Foreign Currency Exchange Rate**

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Effective Date.

        (e)        **Fractional, Undeliverable, and Unclaimed Distributions**

                (1)        *Fractional Distributions*. Whenever any distribution of fractional shares of New Common Stock would otherwise be required pursuant to the Plan, the actual distribution shall reflect a rounding of such fraction to the nearest share (up or down), with half shares or less being rounded down. Solely for purposes of calculating the number of shares of New Common Stock on account of the Exit Commitment Equity in connection with the First Lien Exit Facility, the per share price utilized in such calculation will be rounded to the fourth decimal.

(2)     *Undeliverable Distributions*.  If any distribution to a holder of an Allowed Claim is returned to the Distribution Agent as undeliverable, no further distributions shall be made to such holder unless and until the Distribution Agent is notified in writing of such holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such holder on the next Distribution Date.  Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is cancelled pursuant to Section 6.4(e)(3) below, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

(3)     *Reversion*.  Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the applicable Reorganized Debtor and, to the extent such Unclaimed Distribution is New Common Stock or Warrants, shall be deemed cancelled.  Upon such revesting, the Claim of the holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

(f)     **Surrender of Cancelled Instruments or Securities**

On the Effective Date, each holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim is governed by an agreement and administered by a Servicer).  Such Certificate shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate.  Notwithstanding the foregoing paragraph, this Section 6.4(f) shall not apply to any Claims and Interests Reinstated pursuant to the terms of the Plan.

**6.5     Claims Paid or Payable by Third Parties**

(a)     **Claims Paid by Third Parties**

A Claim shall be correspondingly reduced, and the applicable portion of such Claim shall be Disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or Reorganized Debtor; *provided* that the Debtors shall provide 21 days' notice to the holder prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.  Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within fourteen days of receipt thereof, repay or return the distribution to the Reorganized Debtors to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen-day grace period specified above until the amount is repaid.

(b)     **Claims Payable by Insurance Carriers**

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be

Filed and without any further notice to or action, order, or approval of the Bankruptcy Court; provided that the Debtors shall provide 21 days' notice to the holder of such Claim prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

(c)     **Applicability of Insurance Policies**

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary contained (including Article VIII), nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**6.6     Setoffs**

Except as otherwise expressly provided for herein, each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such holder. In no event shall any holder of Claims be entitled to set off any such Claim against any Claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless such holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

**6.7     Allocation Between Principal and Accrued Interest**

Except as otherwise provided herein, the aggregate consideration paid to holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to interest, if any, on such Allowed Claim accrued through the Effective Date.

**ARTICLE VII**

**PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS**

**7.1     Proofs of Claim / Disputed Claims Process**

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all General Unsecured Claims under the Plan, except as required by Section 5.3 of the Plan, holders of Claims need not file Proofs of Claim, and the Reorganized Debtors and the holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced except that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable. Notwithstanding anything in this Section 7.1, (a) all Claims against the Debtors that result from the Debtors' rejection of an executory contract or unexpired lease, (b) disputes regarding the amount of any Cure pursuant to section 365 of the Bankruptcy Code, and (c) Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the

Bankruptcy Court. From and after the Effective Date, the Reorganized Debtors may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court.

**7.2      Objections to Claims**

Except insofar as a Claim is Allowed under the Plan, the Debtors, the Reorganized Debtors, or any other party in interest shall be entitled to object to Claims. Any objections to Claims shall be served and filed (a) on or before the ninetieth (90th) day following the later of (i) the Effective Date and (ii) the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (b) such later date as ordered by the Bankruptcy Court upon motion filed by the Debtors or Reorganized Debtors. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Section 4.17 of the Plan.

**7.3      No Distribution Pending Allowance**

If an objection to a Claim is deemed, as set forth in Section 7.1, or filed, as set forth in Section 7.2, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

**7.4      Distribution After Allowance**

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Distribution Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of the such Claim unless required under applicable bankruptcy law.

**7.5      No Interest**

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

**7.6      Disallowance of Claims**

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

## ARTICLE VIII

## EFFECT OF CONFIRMATION OF THE PLAN

**8.1**     **Discharge of Claims and Termination of Interests**

Except as otherwise provided for herein, effective as of the Effective Date:  (a) the rights afforded in the Plan and the treatment of Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (b) the Plan shall bind all holders of Claims and Interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, their successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

**8.2**     **Releases by the Debtors**

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, and to the extent permitted by applicable law, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Action brought as counterclaims or defenses to Claims asserted against the Debtors), the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the DIP L/C Facility, the DIP Loan Documents, the DIP L/C Facility Documents, the Exit Credit Facilities, the Exit Credit Facilities Documents, the Chapter 11 Cases, the prepetition negotiation and settlement of Claims, the filing of the Chapter 11 Cases, solicitation of the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Confirmation Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Confirmation Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (b) any individual from any claim related to an act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, gross negligence or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made

after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

**8.3      Releases by Holders of Claims and Interests**

Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, and to the extent permitted by applicable law, each Releasing Party, to the fullest extent allowed by applicable law, is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the DIP L/C Facility, the DIP Loan Documents, the DIP L/C Facility Documents, the Exit Credit Facilities, the Exit Credit Facilities Documents, the Chapter 11 Cases, the prepetition negotiation and settlement of Claims, the filing of the Chapter 11 Cases, solicitation of the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Confirmation Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Confirmation Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any individual from any claim related to an act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, gross negligence or willful misconduct, or (c) obligations under the First Lien Credit Agreement and the Second Lien Credit Agreement which by their express terms survive the termination of the First Lien Credit Agreement and the Second Lien Credit Agreement, including the rights of the First Lien Agent and the Second Lien Agent to expense reimbursement, indemnification and similar amounts.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

**8.4      Exculpation**

Notwithstanding anything contained herein to the contrary, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the

Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the DIP L/C Facility, the DIP Loan Documents, the DIP L/C Facility Documents, the Exit Credit Facilities, the Exit Credit Facilities Documents, the Chapter 11 Cases, the prepetition negotiation and settlement of Claims, the filing of the Chapter 11 Cases, solicitation of the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Confirmation Date related or relating to the foregoing, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, gross negligence or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

**8.5**    **Injunction**

Except as otherwise provided herein or for obligations created or issued pursuant hereto, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to <u>Section 8.2</u> or <u>Section 8.3</u> of the Plan, discharged pursuant to <u>Section 8.1</u> of the Plan, or are subject to exculpation pursuant to <u>Section 8.4</u> of the Plan shall be permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests discharged, released, exculpated, or settled pursuant to the Plan.

**8.6**    **Protection Against Discriminatory Treatment**

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**8.7**    **Release of Liens**

Except as otherwise specifically provided in the Plan, the Exit Credit Facilities Documents (including in connection with any express written amendment of any mortgage, deed of trust, Lien, pledge, or other security interest under the Exit Credit Facilities Documents), or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors, the DIP Administrative Agent, the First Lien Agent, the Second Lien Agent or any other holder of a Secured Claim.  In

addition, at the sole expense of the Debtors or the Reorganized Debtors, the DIP Administrative Agent, the First Lien Agent, and the Second Lien Agent shall execute and deliver all documents reasonably requested by the Debtors, Reorganized Debtors or administrative agent(s) for the Exit Credit Facilities to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto.

**8.8    Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent, or (b) the relevant holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

**8.9    Recoupment**

In no event shall any holder of a Claim be entitled to recoup such Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

**8.10    Subordination Rights**

Any distributions under the Plan to holders of Claims or Interests shall be received and retained free from any obligations to hold or transfer the same to any other holder and shall not be subject to levy, garnishment, attachment, or other legal process by any holder by reason of claimed contractual subordination rights. On the Effective Date, any such subordination rights shall be deemed waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan; provided, that any such subordination rights shall be preserved in the event the Confirmation Order is vacated, the Effective Date does not occur in accordance with the terms hereunder or the Plan is revoked or withdrawn.

**ARTICLE IX**

**CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**

**9.1    Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Section 9.2 of the Plan:

(a)    the Professional Fee Escrow Account shall have been established and funded with the Professional Fee Amount;

(b)    the DIP Orders shall have been entered by the Bankruptcy Court, and shall not have been stayed or modified or vacated;

(c)    (i) the Confirmation Order shall have been entered by the Bankruptcy Court and (ii) such order shall have become a Final Order that has not been stayed or modified or vacated;

(d)    the Debtors shall not be in default under the DIP Facility, the DIP L/C Facility or the DIP Orders (or, to the extent that the Debtors are in default on the proposed Effective Date, such default shall have been waived

by the DIP Lenders or cured by the Debtors in a manner consistent with the DIP Facility, the DIP L/C Facility and the DIP Orders);

   (e)  the Exit Credit Facilities Documents shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the Exit Credit Facilities shall have been waived or satisfied in accordance with the terms thereof, and the closing of the Exit Credit Facilities shall be deemed to occur concurrently with the occurrence of the Effective Date;

   (f)  (i) the Definitive Documents shall have satisfied the RSA Definitive Document Requirements; (ii) in addition to the RSA Definitive Document Requirements applicable to the Exit Credit Facilities Documents, the Exit Credit Facilities Documents also shall be in form and substance reasonably satisfactory to the Exit Credit Facilities Administrative Agent and Exit L/C Issuer (in each case solely with respect to the provisions thereof that affect the rights and duties of the Exit Credit Facilities Administrative Agent or Exit L/C Issuer, as applicable), and (iii) the Exit L/C Facility Documents shall be in form and substance reasonably satisfactory to the Exit L/C Issuer and the Required First Lien Lenders;

   (g)  all conditions precedent to the issuance of the New Common Stock, including the Exit Commitment Equity, and the Warrants (and the automatic issuance of the New Common Stock, including the Exit Commitment Equity, and the Warrants on the Effective Date), other than any conditions related to the occurrence of the Effective Date, shall have occurred;

   (h)  all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the New Stockholders' Agreement and the Warrant Agreement shall have been waived or satisfied in accordance with the terms thereof, and the closing of the New Stockholders' Agreement and the Warrant Agreement shall be deemed to occur concurrently with the occurrence of the Effective Date;

   (i)  to the extent required under applicable non-bankruptcy law, the New Organizational Documents shall have been duly filed with the applicable authorities in the relevant jurisdictions;

   (j)  all governmental and material third party approvals and consents, including Bankruptcy Court approval, that are necessary to implement the Restructuring Transactions shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

   (k)  the Restructuring Support Agreement shall not have terminated as to all parties thereto and shall be in full force and effect and the Debtors and the applicable Restructuring Support Parties then party thereto shall be in compliance therewith;

   (l)  all amounts payable by the Debtors pursuant to section 16 of the Restructuring Support Agreement and the DIP Orders have been satisfied in full; and

   (m)  with respect to all documents and agreements necessary to implement the Plan: (1) all conditions precedent to such documents and agreements (other than any conditions precedent related to the occurrence of the Effective Date) shall have been satisfied or waived pursuant to the terms of such documents or agreements; (2) such documents and agreements shall have been tendered for delivery to the required parties and been approved by any required parties and, to the extent required, filed with and approved by any applicable Governmental Units in accordance with applicable laws; and (3) such documents and agreements shall have been effected or executed.

## 9.2  <u>Waiver of Conditions Precedent</u>

   The Debtors, with the prior written consent of the Required First Lien Lenders, Required Second Lien Lenders or Sponsor Entities, as applicable, may waive any of the conditions to the Effective Date set forth in <u>Section 9.1</u> of the Plan (except for <u>9.1(c)(i)</u>) at any time without any notice to any other parties in interest and

without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan; provided, however, the condition in Section 9.1(f) of the Plan may be waived with respect to a particular Definitive Document only to the extent that every party that maintains a consent right over the subject Definitive Document as set forth in the Restructuring Support Agreement agrees to waive such condition with respect to the subject Definitive Document.

**9.3     Effect of Non-Occurrence of Conditions to Consummation**

If prior to Consummation, the Confirmation Order is vacated pursuant to a Final Order, then, except as provided in such Final Order, the Plan will be null and void in all respects, and nothing contained in the Plan, Disclosure Statement, or the Restructuring Support Agreement shall:  (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by an Entity; (b) prejudice in any manner the rights of any Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

**9.4     Substantial Consummation**

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE X

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

**10.1     Modification of Plan**

Effective as of the date hereof:  (a) the Debtors reserve the right (subject to the Restructuring Support Agreement) in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order consistent with the terms set forth herein; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.  Notwithstanding anything to the contrary herein, the Debtors or the Reorganized Debtors, as applicable, shall not amend or modify the Plan in a manner inconsistent with the Restructuring Support Agreement.

**10.2     Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation of votes thereon pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**10.3     Revocation or Withdrawal of Plan**

The Debtors reserve the right (subject to the Restructuring Support Agreement) to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then:  (a) the Plan will be null and void in all respects; (b) the Restructuring Support Agreement will be null and void in all respects; (c) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (d) nothing contained in the Plan shall (1) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (2) prejudice in any manner the rights of any Debtor or any other Entity, or (3) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XI

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim against a Debtor, including the resolution of any request for payment of any Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to Executory Contracts or Unexpired Leases, including:  (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

7.      enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.     hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including:  (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid pursuant to Section 6.5(a) of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

40

11.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

13.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

14.     enter an order or Final Decree concluding or closing the Chapter 11 Cases;

15.     enforce all orders previously entered by the Bankruptcy Court; and

16.     hear any other matter not inconsistent with the Bankruptcy Code;

provided, that, on and after the Effective Date and after the consummation of the following agreements or documents, the Bankruptcy Court shall not retain jurisdiction over matters arising out of or related to each of the Exit Credit Facilities Documents, the New Stockholders' Agreement, the New Organizational Documents, and the Warrant Agreement, and the Exit Credit Facilities Documents, the New Stockholders' Agreement, the New Organizational Documents, and the Warrant Agreement shall be governed by the respective jurisdictional provisions therein.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

### 12.1    Immediate Binding Effect

Subject to Section 9.1 hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

### 12.2    Additional Documents

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 12.3    Payment of Statutory Fees

All fees payable pursuant to 28 U.S.C. § 1930(a) shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

### 12.4    Reservation of Rights

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be

an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

**12.5**     **Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

**12.6**     **Service of Documents**

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

| | |
|---|---|
| **Reorganized Debtors** | **Answers Holdings, Inc.**<br>6665 Delmar Boulevard, Suite 3000<br>St. Louis, Missouri 63130<br>Attn:     Justin P. Schmaltz |
| **Proposed Counsel to Debtors** | **Kirkland & Ellis LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Attn:     James H.M. Sprayregen, P.C.<br>                Jonathan S. Henes, P.C.<br>                Christopher T. Greco<br>                Anthony R. Grossi<br><br>**Kirkland & Ellis LLP**<br>555 California Street<br>San Francisco, California 94104<br>Attn:     Melissa N. Koss |
| **United States Trustee** | **Office of the United States Trustee<br>for the Southern District of New York**<br>201 Varick Street, Suite 1006<br>New York, New York 10014<br>Attn.:  Richard Morrissey |
| **Counsel to the Consenting First Lien Lenders** | **Jones Day**<br>250 Vesey Street<br>New York, New York 10281<br>Attn:     Scott J. Greenberg<br>                Michael J. Cohen |
| **Counsel to the First Lien Agent** | **Gibson, Dunn & Crutcher LLP**<br>200 Park Avenue<br>New York, New York 10166<br>Attn:     David M. Feldman<br>                J. Eric Wise |
| **Counsel to the Consenting Second Lien** | **Akin, Gump, Strauss, Hauer & Feld LLP**<br>1 Bryant Park |

| | |
|---|---|
| **Lenders** | New York, New York 10036 |
| | Attn:    David Botter |
| | David Simonds |
| | |
| **Counsel to the Second Lien Agent** | **Alston & Bird LLP** |
| | 101 South Tryon Street, Suite 4000 |
| | Charlotte, North Carolina 28280 |
| | Attn:    Jason Solomon |
| | David Wender |
| | |
| **Counsel to the Sponsor Entities** | **Simpson Thacher & Bartlett LLP** |
| | 425 Lexington Avenue |
| | New York, New York 10017 |
| | Attn:    Elisha D. Graff |
| | Edward R. Linden |

**12.7**    **Term of Injunctions or Stays**

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**12.8**    **Entire Agreement**

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**12.9**    **Plan Supplement**

After any of such documents included in the Plan Supplement are filed, copies of such documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Solicitation Agent's website at www.omnimgt.com/answers or the Bankruptcy Court's website at https://www.pacer.gov/.

**12.10**    **Non-Severability**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' consent, consistent with the terms set forth herein; and (c) nonseverable and mutually dependent.

**12.11**   **Closing of Chapter 11 Cases**

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

**12.12**   **Waiver or Estoppel**

Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, the Restructuring Support Agreement, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

Dated:  As of February 16, 2017                     ANSWERS HOLDINGS, INC.
                                                     on behalf of itself and each of its Debtor affiliates


                                                     */s/ Justin P. Schmaltz*
                                                     Justin P. Schmaltz
                                                     Chief Restructuring Officer

## Exhibit B

***Disclosure Statement for the Joint Prepackaged Chapter 11 Plan
of Reorganization for Answers Holdings, Inc. and Its Debtor Affiliates***

James H.M. Sprayregen, P.C.
Jonathan S. Henes, P.C.
Christopher T. Greco
Anthony R. Grossi
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Melissa N. Koss
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ANSWERS HOLDINGS, INC., *et al.*,[1] | ) | Case No. 17-10496 (SMB) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DISCLOSURE STATEMENT FOR THE JOINT PREPACKAGED**
**CHAPTER 11 PLAN OF REORGANIZATION FOR**
**ANSWERS HOLDINGS, INC. AND ITS DEBTOR AFFILIATES**

---

[1]    The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Answers Holdings, Inc. (4504); Answers Corporation (2855); Easy2 Technologies, Inc. (2839); ForeSee Results, Inc. (3125); ForeSee Session Replay, Inc. (2593); More Corn, LLC (6193); Multiply Media, LLC (8974); Redcan, LLC (7344); RSR Acquisition, LLC (2256); Upbolt, LLC (2839); and Webcollage Inc. (7771).  The location of Debtor Webcollage Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is:  11 Times Square, 11th Floor, New York, New York 10018.

17-10496-smb   Doc 120   Filed 04/10/17   Entered 04/10/17 11:42:39   Main Document
Pg 85 of 175


THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126, 11 U.S.C. §§ 1125, 1126. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS INTEND TO SUBMIT THIS DISCLOSURE STATEMENT TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING COMMENCEMENT OF SOLICITATION AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE, SUBJECT TO THE RESTRUCTURING SUPPORT AGREEMENT. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT**

**DISCLOSURE STATEMENT, DATED FEBRUARY 16, 2017**

**SOLICITATION OF VOTES ON THE JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION FOR ANSWERS HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**FROM THE HOLDERS OF OUTSTANDING:**

| VOTING CLASS | NAME OF CLASS UNDER THE PLAN |
|---|---|
| CLASS 3 | FIRST LIEN CLAIMS |
| CLASS 4 | SECOND LIEN CLAIMS |

**IF YOU ARE IN CLASS 3 OR CLASS 4 YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN**

**DELIVERY OF BALLOTS**

BALLOTS MUST BE **ACTUALLY RECEIVED** BY THE SOLICITATION AGENT BY THE VOTING DEADLINE, WHICH IS 5:00 P.M. (PREVAILING EASTERN TIME) ON MARCH 2, 2017 VIA THE ENCLOSED PRE-PAID, PRE-ADDRESSED RETURN ENVELOPE

OR

AT THE FOLLOWING ADDRESSES:

**VIA FIRST-CLASS MAIL, OVERNIGHT COURIER, OR HAND DELIVERY TO:**

**ANSWERS HOLDINGS, INC., ET AL.
C/O RUST CONSULTING/OMNI BANKRUPTCY
5955 DESOTO AVENUE, SUITE 100
WOODLAND HILLS, CA 91367**

OR

**VIA E-MAIL TO:**

**ANSWERS@OMNIMGT.COM**

ii

---

**PLEASE CHOOSE ONLY ONE METHOD TO RETURN YOUR BALLOT**

**BALLOTS RECEIVED VIA FACSIMILE WILL NOT BE COUNTED**

**IF YOU HAVE ANY QUESTIONS ON THE PROCEDURE FOR VOTING ON THE PLAN, PLEASE CALL THE DEBTORS' RESTRUCTURING HOTLINE AT:**

**(844) 580-9044**

---

This disclosure statement (this "<u>Disclosure Statement</u>") provides information regarding the *Joint Prepackaged Chapter 11 Plan of Reorganization for Answers Holdings, Inc. and its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "<u>Plan</u>"),[2] which the Debtors are seeking to have confirmed by the Bankruptcy Court.  A copy of the Plan is attached hereto as <u>Exhibit A</u>.  The Debtors are providing the information in this Disclosure Statement to certain holders of Claims for purposes of soliciting votes to accept or reject the Plan.

Pursuant to the Restructuring Support Agreement, the Plan is currently supported by the Debtors, holders of approximately 89.9% of the amount of First Lien Claims, the holders of approximately 91.6% of the amount of Second Lien Claims, and the Consenting Sponsors.

The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in <u>Article IX</u> of the Plan.  There is no assurance that the Bankruptcy Court will confirm the Plan or, if the Bankruptcy Court does confirm the Plan, that the conditions necessary for the Plan to become effective will be satisfied or in the alternative waived.

You are encouraged to read this Disclosure Statement (including the Factors to be Considered described in <u>ARTICLE VI</u> hereof) and the Plan in their entirety before submitting your Ballot to vote on the Plan.

The Debtors urge each holder of a Claim or Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each proposed transaction contemplated by the Plan.

The Debtors strongly encourage holders of Claims and Interests in Class 3 and Class 4 to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan.  Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

---

**<u>RECOMMENDATION BY THE DEBTORS</u>**

**EACH DEBTOR'S BOARD OF DIRECTORS, GENERAL PARTNER, MEMBER, OR MANAGER, AS APPLICABLE, HAS APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND EACH DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH OF THE DEBTOR'S ESTATES, AND PROVIDE THE BEST RECOVERY TO CLAIM HOLDERS.  AT THIS TIME, EACH DEBTOR BELIEVES THAT THE PLAN AND RELATED TRANSACTIONS REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES.  EACH OF THE DEBTORS THEREFORE STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT NO LATER THAN <u>MARCH 2, 2017 AT 5:00 P.M. (PREVAILING EASTERN TIME)</u> PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND ON THE BALLOTS.**

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

The Bankruptcy Court has not reviewed this Disclosure Statement or the Plan, and the securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the United States Securities and Exchange Commission (the "<u>SEC</u>") under the United States Securities Act of 1933 (as amended, the "<u>Securities Act</u>") or any securities regulatory authority of any state under any state securities law ("<u>Blue Sky Laws</u>").  The Plan has not been approved or disapproved by the SEC or any state regulatory authority and neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan.  Any representation to the contrary is a criminal offense.  The Debtors are relying on section 4(a)(2) of the Securities Act, and similar Blue Sky Laws provisions, to exempt from registration under the Securities Act and Blue Sky Laws the offer to certain holders of First Lien Claims and Second Lien Claims of new securities prior to the Petition Date, including in connection with the solicitation of votes to accept or reject the Plan (the "<u>Solicitation</u>").

After the Petition Date, the Debtors will rely on section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue Sky Laws the offer, issuance, and distribution of New Common Stock and Warrants under the Plan and the shares of New Common Stock (including any other securities issuable upon exercise of the Warrants) issued upon exercise of the Warrants.  Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

Except to the extent publicly available, this Disclosure Statement, the Plan, and the information set forth herein and therein are confidential.  This Disclosure Statement and the Plan contain material non-public information concerning the Debtors, their subsidiaries, and their respective debt and Securities.  Each recipient hereby acknowledges that it (a) is aware that the federal securities laws of the United States prohibit any person who has material non-public information about a company, which is obtained from the company or its representatives, from purchasing or selling Securities of such company or from communicating the information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such Securities and (b) is familiar with the United States Securities Exchange Act of 1934 (as amended, the "<u>Securities Exchange Act</u>") and the rules and regulations promulgated thereunder, and agrees that it will not use or communicate to any Person or Entity, under circumstances where it is reasonably likely that such Person or Entity is likely to use or cause any Person or Entity to use, any confidential information in contravention of the Securities Exchange Act or any of its rules and regulations, including Rule 10b-5.

## DISCLAIMER

This Disclosure Statement contains summaries of certain provisions of the Plan and certain other documents and financial information. The information included in this Disclosure Statement is provided solely for the purpose of soliciting acceptances of the Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Plan. All holders of Claims entitled to vote are advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting. The Debtors believe that these summaries are fair and accurate. The summaries of the financial information and the documents that are attached to, or incorporated by reference in, this Disclosure Statement are qualified in their entirety by reference to such information and documents. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement, on the one hand, and the terms and provisions of the Plan or the financial information and documents incorporated in this Disclosure Statement by reference, on the other hand, the Plan or the financial information and documents, as applicable, shall govern for all purposes.

Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement. The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's endorsement of the merits of the Plan. The statements and financial information contained in this Disclosure Statement have been made as of the date hereof unless otherwise specified. Holders of Claims reviewing the Disclosure Statement should not assume at the time of such review that there have been no changes in the facts set forth in this Disclosure Statement since the date of this Disclosure Statement. No holder of a Claim or Interest should rely on any information, representations, or inducements that are not contained in or are inconsistent with the information contained in this Disclosure Statement, the documents attached to this Disclosure Statement, and the Plan. This Disclosure Statement does not constitute legal, business, financial, or tax advice. Any Person or Entity desiring any such advice should consult with their own advisors. Additionally, this Disclosure Statement has not been approved or disapproved by the Bankruptcy Court, the SEC, or any securities regulatory authority of any state under Blue Sky Laws. The Debtors are soliciting acceptances to the Plan prior to commencing any cases under chapter 11 of the Bankruptcy Code.

The financial information contained in or incorporated by reference into this Disclosure Statement has not been audited, except as specifically indicated otherwise. The Debtors' management, in consultation with their advisors, has prepared the financial projections attached hereto as **Exhibit E** and described in this Disclosure Statement. The financial projections, while presented with numerical specificity, necessarily were based on a variety of estimates and assumptions that are inherently uncertain and may be beyond the control of the Debtors' management. Important factors that may affect actual results and cause the management forecasts not to be achieved include, but are not limited to, risks and uncertainties relating to the Debtors' businesses (including their ability to achieve strategic goals, objectives, and targets over applicable periods), industry performance, the regulatory environment, general business and economic conditions and other factors. The Debtors caution that no representations can be made as to the accuracy of these projections or to their ultimate performance compared to the information contained in the forecasts or that the forecasted results will be achieved. Therefore, the financial projections may not be relied upon as a guarantee or other assurance that the actual results will occur.

Regarding contested matters, adversary proceedings, and other pending, threatened, or potential litigation or other actions, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather as a statement made in the context of settlement negotiations in accordance with Rule 408 of the Federal Rules of Evidence and any analogous state or foreign laws or rules. As such, this Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtors or any other party in interest, nor shall it be construed to be conclusive advice on the tax, securities, financial or other effects of the Plan to holders of Claims against or Interests in, the Debtors or any other party in interest. Please refer to ARTICLE VI of this Disclosure Statement, entitled "Factors to be Considered" for a discussion of certain risk factors that holders of Claims voting on the Plan should consider.

Except as otherwise expressly set forth herein, all information, representations, or statements contained herein have been provided by the Debtors. No person is authorized by the Debtors in connection with this Disclosure Statement, the Plan or the Solicitation to give any information or to make any representation or statement regarding this Disclosure Statement, the Plan, or the Solicitation, in each case, other than as contained in this

Disclosure Statement and the exhibits attached hereto or as otherwise incorporated herein by reference or referred to herein.  If any such information, representation, or statement is given or made, it may not be relied upon as having been authorized by the Debtors.

This Disclosure Statement contains certain forward-looking statements, all of which are based on various estimates and assumptions.  Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including, but not limited to, those summarized herein.  When used in this Disclosure Statement, the words "anticipate," "believe," "estimate," "will," "may," "intend," and "expect" and similar expressions generally identify forward-looking statements.  Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved.  These statements are only predictions and are not guarantees of future performance or results.  Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement.  All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in this Disclosure Statement.  Forward-looking statements speak only as of the date on which they are made.  Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether as a result of new information, future events, or otherwise.

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

**ARTICLE I THE PLAN** ....................................................................................................3
    1.1      Treatment of Claims and Interests ..................................................................3
    1.2      New Capital Structure .....................................................................................4
    1.3      Unclassified Claims .........................................................................................5
    1.4      Classified Claims and Interests .......................................................................6
    1.5      Liquidation Analysis ......................................................................................11
    1.6      Valuation Analysis .........................................................................................12
    1.7      Financial Information and Projections ...........................................................12

**ARTICLE II VOTING PROCEDURES AND REQUIREMENTS** ...............................13
    2.1      Class Entitled to Vote on the Plan .................................................................13
    2.2      Votes Required for Acceptance by a Class .....................................................13
    2.3      Certain Factors to Be Considered Prior to Voting .........................................13
    2.4      Classes Not Entitled To Vote on the Plan ......................................................14
    2.5      Solicitation Procedures ...................................................................................14
    2.6      Voting Procedures ...........................................................................................15

**ARTICLE III BUSINESS DESCRIPTIONS** ...............................................................16
    3.1      The Company Overview ..................................................................................16
    3.2      Organization and Capital Structure ................................................................20

**ARTICLE IV EVENTS LEADING TO THE CHAPTER 11 CASES**............................22
    4.1      Algorithm Adjustments ..................................................................................22
    4.2      A Pivot for Multiply........................................................................................23
    4.3      Reinvestment in the ForeSee and Webcollage Businesses.............................23
    4.4      Changes in Management and the Board of Directors and Other Recent Developments .....24
    4.5      The Revolver Draw..........................................................................................25
    4.6      The September Payment, Forbearance Negotiations and the Restructuring Support Agreement....................................................................................................25
    4.7      Importance of Deleveraging............................................................................26

**ARTICLE V OTHER KEY ASPECTS OF THE PLAN**..................................................26
    5.1      Distributions....................................................................................................26
    5.2      General Settlement of Claims and Interests ...................................................28
    5.3      Restructuring Transactions..............................................................................28
    5.4      Management Incentive Plan ............................................................................29
    5.5      Treatment of Executory Contracts and Unexpired Leases .............................29
    5.6      Release, Injunction, and Related Provisions ..................................................31
    5.7      Protection Against Discriminatory Treatment ...............................................34
    5.8      Indemnification ...............................................................................................35
    5.9      Recoupment ....................................................................................................35
    5.10    Release of Liens ..............................................................................................35
    5.11    Reimbursement or Contribution .....................................................................35
    5.12    Employee Arrangements of the Reorganized Debtors ...................................36
    5.13    Vesting of Assets in the Reorganized Debtors ...............................................36
    5.14    Cancellation of Notes, Instruments, Certificates, and Other Documents ......36
    5.15    Charter, Bylaws, and New Organizational Documents ..................................36
    5.16    Modification of Plan .......................................................................................37
    5.17    Effect of Confirmation on Modifications .......................................................37
    5.18    Revocation or Withdrawal of Plan .................................................................37
    5.19    Reservation of Rights .....................................................................................37
    5.20    Plan Supplement Exhibits ..............................................................................37

5.21    Conditions Precedent to the Effective Date ...........................................................38
5.22    Waiver of Conditions Precedent ...........................................................................39
5.23    Effect of Non-Occurrence of Conditions to Consummation .................................39

**ARTICLE VI CERTAIN FACTORS TO BE CONSIDERED**..........................................................**39**
6.1    General ...............................................................................................................39
6.2    Risks Relating to the Plan and Other Bankruptcy Law Considerations ...................40
6.3    Risks Relating to the Restructuring Transactions ..................................................45
6.4    Risks Relating to the New Common Stock and Warrants.........................................47
6.5    Risks Relating to the Debtors' Business ..................................................................48
6.6    Certain Tax Implications of the Chapter 11 Cases ..................................................51
6.7    Disclosure Statement Disclaimer ..........................................................................51

**ARTICLE VII CONFIRMATION PROCEDURES** ...............................................................**53**
7.1    The Confirmation Hearing ...................................................................................53
7.2    Confirmation Standards ......................................................................................53
7.3    Best Interests Test / Liquidation Analysis..............................................................55
7.4    Feasibility...........................................................................................................55
7.5    Confirmation Without Acceptance by All Impaired Classes ...................................55
7.6    Alternatives to Confirmation and Consummation of the Plan ................................56

**ARTICLE VIII IMPORTANT SECURITIES LAW DISCLOSURE** ....................................**56**
8.1    New Common Stock and Warrants........................................................................56
8.2    Issuance and Resale of New Common Stock and Warrants......................................57
8.3    Resales of New Common Stock and Warrants; Definition of Underwriter ...............57
8.4    New Common Stock & Management Incentive Plan................................................58
8.5    Issuance of Exit Commitment Equity ....................................................................58
8.6    Subsequent Transfers of Exit Commitment Equity.................................................58

**ARTICLE IX CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES** ...................**59**
9.1    Introduction........................................................................................................59
9.2    Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized
        Debtors...............................................................................................................60
9.3    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed First Lien
        Claims and Allowed Second Lien Claims................................................................63
9.4    Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed First
        Lien Claims and Allowed Second Lien Claims ........................................................67
9.5    Information Reporting and Back-up Withholding ...................................................70

**ARTICLE X CONCLUSION AND RECOMMENDATION** .................................................**71**

**<u>EXHIBITS</u>**

<u>Exhibit A</u>          Joint Prepackaged Chapter 11 Plan of Reorganization for Answers Holdings, Inc. and its
                        Debtor Affiliates

<u>Exhibit B</u>          Restructuring Support Agreement

<u>Exhibit C</u>          Liquidation Analysis

<u>Exhibit D</u>          Valuation Analysis

<u>Exhibit E</u>          Financial Projections

<u>Exhibit F</u>          Corporate Organizational Chart

<u>Exhibit G</u>          Warrant Agreement

<u>Exhibit H</u>          Governance Term Sheet

## INTRODUCTION

The Debtors are leading global providers of internet content and high-quality cloud-based customer solutions, operating in three divisions: (a) "*Multiply*;" (b) "*ForeSee*;" and (c) "*Webcollage*."[3] The Debtors together with their non-debtor affiliates (the "*Company*") also have shared services departments supporting all of the Company's operating units. Multiply is an online content publisher that leverages relationships with Facebook, Inc. ("*Facebook*"), Yahoo, celebrities and other partners to acquire traffic to owned and partner websites and generate advertising revenue from Google, Inc. ("*Google*") and other partners. ForeSee applies its technology across sales channels and customer touch points to measure customer satisfaction and deliver insights on where organizations should prioritize improvements. Webcollage is the leading cloud-based platform for managing and publishing rich product information. Webcollage's products are used worldwide by over 650 manufacturers, large and small, to publish rich product information including videos, interactive tours, and enhanced product descriptions to the manufactures' retailer channels.

The Debtors started their businesses in February 2006 as a portfolio of e-commerce technologies and launched their initial question and answer internet services platform in June 2009. In April 2011, the Debtors acquired the "Answers.com" domain name, which has since become their most trafficked website. In an effort to augment their businesses and provide a full suite of solutions, the Debtors acquired Webcollage and ForeSee in May and December, 2013, respectively. In or around the fourth quarter of 2014, Apax Partners, L.P. ("*Apax*"), a global private equity firm, acquired the Debtors and invested approximately $388 million of new equity into the Company. A more comprehensive discussion of each of the Debtors' businesses is set forth in ARTICLE III hereof.

The Debtors have outstanding funded debt obligations in the aggregate principal amount of approximately $546 million, consisting of the following:

(a)     approximately $366.2 million[4] in principal amount outstanding under the First Lien Loan Documents, including approximately $7.4 million on account of the termination of the Swaps (discussed in greater detail below) (the "*First Lien Credit Facility*"), and

(b)     approximately $180.2 million in principal amount outstanding under the Second Lien Loan Documents (the "*Second Lien Credit Facility*," and together with the First Lien Credit Facility, the "*Prepetition Credit Facilities*").

As of December 31, 2016, the Debtors reported approximately $492 million in book value in total assets and approximately $604 million in book value in total liabilities.

As described in greater detail in ARTICLE III below, historically, the Debtors' primary revenue driver was their Multiply business, which is a traditional web-publishing business with a revenue model built around "click-through" advertising in partnership with Google, Facebook, and other similar platforms. Multiply's revenues largely are dependent on where its websites are "indexed"—*i.e.*, how far down the list of results they appear on a Google search, or how often Facebook pushes Multiply's content to its users. In contrast, the ForeSee and Webcollage businesses are subscription-based, customer solutions businesses with contracted-for costs and revenues.

In the months and years leading up to their decision to seek relief under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*"), the Debtors faced a number of operational hurdles. In particular, the Debtors' businesses struggled as the result of certain Google and Facebook search algorithm adjustments made in March 2015 and May 2016. These algorithm adjustments severely reduced traffic to the Debtors' websites and substantially decreased their revenues. Those adjustments also induced the Debtors to expend funds to diversify their businesses and increase investment in the ForeSee and Webcollage businesses, thereby becoming less

---

3     The Debtors commenced these chapter 11 cases in the Southern District of New York, which is the location of Debtor Webcollage, Inc.'s offices, and the principal place of business of Debtor Webcollage, Inc.

4     This amount excludes approximately $1.3 million in undrawn letter of credit obligations under the First Lien Credit Facility. It is contemplated that in the event prepetition outstanding letter of credit obligations are drawn on postpetition, such obligations will constitute Converted L/Cs under the Plan.

dependent on the actions of Google and Facebook and, ultimately, less reliant on the revenues from their Multiply website business.  However, this resulted in the Debtors' experiencing declining revenues, incurring additional debt, and increasing capital expenditures, and, ultimately led to the Debtors' severe liquidity shortage.

Between June and September 2016, to assist with their restructuring, the Debtors retained Rothschild, Inc. ("***Rothschild***") as their financial advisors, Kirkland & Ellis LLP ("***K&E***") as their legal advisors, and Alvarez & Marsal North America, LLC ("***A&M***") as their restructuring advisors, to advise management and the Debtors' Board of Directors regarding potential strategic alternatives to enhance the Debtors' liquidity and address their capital structure.[5]   In September 2016, the Debtors appointed two independent directors to oversee their restructuring efforts.  Thereafter, in October 2016, the Debtors' Board of Directors appointed Mr. Justin Schmaltz from A&M to the position of Chief Restructuring Officer.

The Debtors did not immediately seek to file a chapter 11 proceeding after experiencing the liquidity crunch caused by, among other things, the algorithm adjustments discussed in greater detail above.  Instead, the Company took measures to preserve their liquidity, including implementing cost-cutting measures, drawing on their debt facilities, and foregoing principal and interest payments due on September 30, 2016 under the Prepetition Credit Facilities (which caused the Debtors to default under the Prepetition Credit Facilities).  Upon the Debtors' default under the Prepetition Credit Facilities and in the following months, the Debtors and their advisors worked constructively with the Prepetition Secured Parties to negotiate a series of forbearance agreements under which the Prepetition Secured Parties agreed to forbear from enforcing remedies against the Debtors during the agreed-to forbearance period.  This forbearance provided the Debtors with much needed time and breathing space to assess their strategic options, negotiate a consensual restructuring with the Prepetition Secured Parties, and, eventually, execute the Restructuring Support Agreement (attached hereto as **Exhibit B**) with the Restructuring Support Parties—*i.e.*, the Consenting First Lien Lenders, First Lien Agent, Consenting Second Lien Lenders, Second Lien Agent, and Sponsor Entities.

Pursuant to the Restructuring Support Agreement, the Debtors' proposed restructuring enjoys the overwhelming support of First Lien Lenders (holding more than approximately 89.9% in amount of First Lien Claims) and Second Lien Lenders (holding more than approximately 91.6% in amount of Second Lien Claims), as well as the support of the Consenting Sponsors.  The transactions contemplated by the Restructuring Support Agreement will be implemented through the Plan, including an expeditious balance sheet restructuring that will eliminate approximately $471.4 million of the Debtors' funded-debt obligations and minimize the time and expense associated with the Chapter 11 Cases.  Furthermore, under the Restructuring Support Agreement, the Consenting First Lien Lenders committed to finance the DIP Facility, a $25 million new money debtor-in-possession credit facility, to provide much needed liquidity to fund the Debtors' working capital and operational needs as well as fund the administrative and transaction costs of the Chapter 11 Cases.

Given the overwhelming support for the Debtors' restructuring by the Restructuring Support Parties, the Debtors elected to pursue a prepackaged restructuring in the weeks leading up to the solicitation period after working hard to consensually resolve many of their significant unsecured claims because the Debtors believed a prepackaged plan would maximize value by minimizing both the costs of restructuring and the impact on the Debtors' businesses.  Among other things, the Debtors plan to file motions to avoid the need for schedules of assets and liabilities or statements of financial affairs, which will provide them with significant cost savings.  In addition, the restructuring contemplated by the Plan in a "prepackaged" manner, will obviate the need for an unsecured creditors' committee and the expenses associated therewith that would otherwise be paid by the Debtors' estates.  The Debtors believe that the Plan represents the most efficient route to effectuate their restructuring and will leave the Debtors, their trade partners and other stakeholders in an optimal position going forward.

Unless otherwise set forth in the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims against and Interests in the Debtors.

---

[5]    The Debtors' former chief financial officer resigned in May 2016, and the Debtors' former chief executive officer and chief strategy officer each voluntarily resigned in August 2016.

If confirmed and consummated, the Plan will: (i) significantly de-leverage the Debtors' balance sheet; (ii) provide the Debtors with working capital to fund ongoing operations during the Chapter 11 Cases and post-emergence; (iii) distribute the New Common Stock and Warrants to the holders of First Lien Claims and Second Lien Claims, as applicable; (iv) allow holders of General Unsecured Claims to remain Unimpaired; and (v) maximize recoveries for all key stakeholders.

The formulation of the Restructuring Support Agreement and Plan contemplated thereunder is a significant achievement for the Debtors in the face of their liquidity issues and depressed operating environment. Each of the Debtors strongly believes that the Plan is in the best interests of each of their estates and represents the best available alternative for all of their stakeholders. Given the Debtors' core strengths, including their experienced management team and strategic business plan going-forward, the Debtors are confident that they can implement the Plan's balance sheet restructuring to ensure the Debtors' long-term viability. To effectuate the Plan, the Debtors will pursue a prepackaged chapter 11 plan of reorganization, and intend to emerge from chapter 11 pursuant to the Plan on an expedited timeline within approximately 45 days following the Petition Date on a schedule to be established by the Bankruptcy Court. [6]

# ARTICLE I

# THE PLAN

## 1.1    Treatment of Claims and Interests

The Plan provides for the treatment of Claims against and Interests in the Debtors through, among other things: (a) the issuance of New Common Stock and the Warrants; (b) the Unimpaired treatment of certain Claims and Interests; and (c) conversion of certain Claims into loans under the Exit Credit Facilities. As more fully described herein and in the Plan:

- holders of Allowed DIP Claims will receive their Pro Rata share of First Lien Loans;

- holders of Allowed First Lien Claims will receive their Pro Rata share of (i) Second Lien Exit Loans and (ii) 96% of the New Common Stock (subject to dilution on account of, to the extent applicable, the MIP Equity, the Exit Commitment Equity, and the Warrant Equity);

- holders of Allowed Second Lien Claims will receive their Pro Rata share of (i) 4% of the New Common Stock (subject to dilution on account of, to the extent applicable, the MIP Equity, the Exit Commitment Equity, and the Warrant Equity) and (ii) the Warrants;

- holders of Allowed General Unsecured Claims shall remain Unimpaired and paid in the ordinary course of business;

- the Interests in Holdings will be canceled;

- Intercompany Claims and Interests will be Reinstated or canceled, as applicable; and

- holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, Allowed Other Priority Claims, and Allowed Professional Claims will be (a) paid in full in Cash, (b) Reinstated, or (c) otherwise rendered Unimpaired, as applicable.

---

[6]    The core terms of the Restructuring Support Agreement will be implemented through the Plan (described more fully in ARTICLE I of this Disclosure Statement, entitled "The Plan").

1.2      **New Capital Structure**

On the Effective Date, the Debtors will effectuate the Restructuring Transactions by, among other things: (a) entering into the Exit Credit Facilities, pursuant to which (i) the DIP Claims (other than the DIP Payments) will be converted into First Lien Exit Loans and (ii) a portion of the First Lien Claims will be converted into Second Lien Exit Loans; (b) issuing the New Common Stock and Warrants to the holders of First Lien Claims and Second Lien Claims, as applicable, in accordance with Article III of the Plan; and (c) entering into all related documents to which the Reorganized Debtors are contemplated to be a party on the Effective Date.  All such documents shall become effective in accordance with their terms and the Plan.

(a)      **Exit Credit Facilities**

On the Effective Date the Reorganized Debtors shall enter into the Exit Credit Facilities, the terms of which will be set forth in the Exit Credit Facilities Documents, as applicable.  Confirmation of the Plan shall be deemed approval of the Exit Credit Facilities and the Exit Credit Facilities Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, including issuance of the Exit Commitment Equity to the lenders under the First Lien Exit Facility, and authorization of the Reorganized Debtors to enter into and execute the Exit Credit Facilities Documents and such other documents as may be required to effectuate the treatment afforded by the Exit Credit Facilities.  On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Credit Facilities Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Credit Facilities Documents, (c) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Credit Facilities Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

Confirmation shall be deemed approval of the Exit Credit Facilities (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors in connection therewith), to the extent not approved by the Court previously, and the Reorganized Debtors will be authorized to execute and deliver those documents necessary or appropriate to obtain the Exit Credit Facilities, including the Exit Credit Facilities Documents, without further notice to or order of the Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Reorganized Debtors may deem to be necessary to consummate the Exit Credit Facilities.

(b)      **New Common Stock and Warrants**

All existing Interests in Holdings shall be cancelled as of the Effective Date and, subject to the Restructuring Transactions, Reorganized Holdings shall issue and contribute the New Common Stock, including the Exit Commitment Equity, and Warrants to Reorganized Debtor Answers Corporation, which shall distribute the New Common Stock, including the Exit Commitment Equity, and Warrants to holders of Claims entitled to receive New Common Stock, including the Exit Commitment Equity, and/or Warrants pursuant to the Plan.  The issuance of the New Common Stock and Warrants, including the Exit Commitment Equity and any MIP Equity (to the extent applicable), shall be authorized without the need for any further corporate action and without any further action by the Debtors, Reorganized Debtors, or Reorganized Holdings, as applicable.  Reorganized Holdings' New Organizational Documents shall authorize the issuance and distribution on the Effective Date of New Common Stock, including the Exit Commitment Equity, and Warrants to the Distribution Agent for the benefit of holders of

Allowed Claims in Class 3 and Class 4 (as applicable) in accordance with the terms of Article III of the Plan.  All New Common Stock, including the Exit Commitment Equity, and Warrants issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable, and the holders of New Common Stock and Warrants shall be deemed to have accepted the terms of the New Stockholders' Agreement (solely in their capacity as shareholders and warrants holders of Reorganized Holdings) and to be parties thereto without further action or signature.  The New Stockholders' Agreement shall be effective as of the Effective Date and, as of such date, shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of New Common Stock, including the Exit Commitment Equity, and Warrants shall be bound thereby.

**1.3**     **Unclassified Claims**

(a)     **Unclassified Claims Summary**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan.  The Claim recoveries for such unclassified Claims are set forth below:

| Claim | Plan Treatment | Projected Plan Recovery |
|---|---|---|
| Administrative Claims | Paid in Full in Cash | 100% |
| DIP Claims | Pro Rata Share of First Lien Exit Facility | 100% |
| Professional Claims | Paid in Full in Cash | 100% |
| Priority Tax Claims | Paid in Full in Cash | 100% |

(b)     **Unclassified Claims**

(1)     **Administrative Claims**

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors, or the Reorganized Debtors, as applicable, each holder of an Allowed Administrative Claim (other than holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

(2)     **DIP Claims**

Subject to the DIP Orders, on the Effective Date, the DIP Claims and DIP Payments shall be deemed to be Allowed in the full amount due and owing under the DIP Facility as of the Effective Date.

On the Effective Date, (i) the DIP Payments shall be paid in full in Cash and (ii) the remaining DIP Claims shall be converted into First Lien Exit Loans.

(3)    **Professional Claims**

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date. Professionals shall deliver to the Debtors their estimates for purposes of the Reorganized Debtors computing the Professional Fee Amount no later than three (3) Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be deemed to limit the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Claims filed with the Bankruptcy Court. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. No funds in the Professional Fee Escrow Account shall be property of the Estates, and the Professional Fee Escrow Account shall be maintained in trust solely for the benefit of holders of Professional Claims. Any funds remaining in the Professional Fee Escrow Account after all Allowed Professional Claims have been paid shall be turned over to the Reorganized Debtors.

From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

(4)    **Priority Tax Claims**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the Debtors and the holder of such Claim, or as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business.

(5)    **Statutory Fees**

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

## 1.4    Classified Claims and Interests

(a)    **Classified Claims and Interests Summary**

The Plan establishes a comprehensive classification of Claims and Interests. The table below summarizes the classification, treatment, voting rights, and estimated recoveries, estimated as of February 16, 2017, of the Claims and Interests, by Class, under the Plan. Amounts in the far right column under the heading "Liquidation Recovery" are estimates only and are based on certain assumptions described herein and set forth in greater detail in the Liquidation Analysis (as defined below) attached hereto as **Exhibit C**. Accordingly, recoveries actually received by holders of Claims and Interests in a liquidation scenario may differ materially from the projected liquidation recoveries listed in the table below.

6

| Class | Claim or Interest | Voting Rights | Treatment | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| 1 | Other Secured Claims | Not Entitled to Vote / Presumed to Accept | Paid in Full in Cash | 100% | 100% |
| 2 | Other Priority Claims | Not Entitled to Vote / Presumed to Accept | Paid in Full in Cash | 100% | 0% |
| 3 | First Lien Claims | **Entitled to Vote** | Pro Rata Share of (i) Second Lien Exit Facility and (ii) 96% of the New Common Stock | 68.3% | 6% |
| 4 | Second Lien Claims | **Entitled to Vote** | Pro Rata Share of (i) 4% of the New Common Stock and (ii) the Warrants | 5.9% | 0% |
| 5 | General Unsecured Claims | Not Entitled to Vote / Presumed to Accept | Unimpaired/Paid in the Ordinary Course of Business | 100% | 0% |
| 6 | Intercompany Claims | Not Entitled to Vote / Presumed to Accept or Deemed to Reject | Reinstated or Canceled | 0% / 100% | 0% |
| 7 | Intercompany Interests | Not Entitled to Vote / Presumed to Accept | Reinstated | 100% | 0% |
| 8 | Interests in Holdings | Not Entitled to Vote / Deemed to Reject | Canceled | 0% | 0% |

(b)       <u>**Classified Claims and Interests Details**</u>

Except to the extent that the Debtors and a holder of an Allowed Claim or Allowed Interest, as applicable, agree to less favorable treatment, such holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such holder's Allowed Claim or Allowed Interest.  Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

(1)       **Class 1 — Other Secured Claims**

A.      *Classification*:   Class 1 consists of any Other Secured Claims against any Debtor.

B.      *Treatment*:   Each holder of an Allowed Other Secured Claim shall receive, as the Debtors or the Reorganized Debtors, as applicable, determine either:

i.       payment in full, in Cash, of the unpaid portion of its Allowed Other Secured Claim, including any interest thereon required to be paid under section 506(b) of the Bankruptcy Code (or if payment is not then due, in accordance with the terms of such allowed Other Secured Claim) on the latest of:  (i) on or as soon as reasonably practicable after the Effective Date if such Allowed Other Secured Claim is Allowed as of the Effective

7

Date; (ii) on or as soon as reasonably practicable after the date such Other Secured Claim is Allowed; and (iii) the date such Allowed Other Secured Claim becomes due and payable, or as soon thereafter as is reasonably practicable;

ii.      reinstatement pursuant to section 1124 of the Bankruptcy Code; or

iii.      such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

C.      *Voting*:  Class 1 is Unimpaired.  Holders of Allowed Other Secured Claims in Class 1 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Secured Claims in Class 1 are not entitled to vote to accept or reject the Plan.

(2)      **Class 2 — Other Priority Claims**

A.      *Classification*:  Class 2 consists of any Other Priority Claims against any Debtor.

B.      *Treatment*:  Each holder of an Allowed Other Priority Claim shall receive payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim on the latest of:  (i) on or as soon as reasonably practicable after the Effective Date if such Allowed Other Priority Claim is Allowed as of the Effective Date; (ii) on or as soon as reasonably practicable after the date such Other Priority Claim is Allowed; and (iii) the date such Allowed Other Priority Claim becomes due and payable, or as soon thereafter as is reasonably practicable.

C.      *Voting*:  Class 2 is Unimpaired. Holders of Allowed Other Priority Claims in Class 2 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Priority Claims in Class 2 are not entitled to vote to accept or reject the Plan.

(3)      **Class 3 — First Lien Claims**

A.      *Classification*:  Class 3 consists of all First Lien Claims.

B.      *Allowance:*  On the Effective Date the First Lien Claims shall be Allowed in the aggregate principal amount of not less than $366.2 million, plus (i) any prepetition letter of credit obligations that do not constitute Converted L/Cs, and (ii) any accrued but unpaid interest thereon payable as of the Petition Date at the applicable default interest rate and any accrued but unpaid fees and expenses payable in accordance with the First Lien Loan Documents.  For the avoidance of doubt, the First Lien Claims shall not include any Converted L/Cs.  The First Lien Claims shall not be subject to avoidance, subordination, setoff, offset, deduction, objection, challenge, recharacterization, surcharge under section 506(c) of the Bankruptcy Code or any other claim or defense.

C.      *Treatment*:  On the Effective Date, each holder of an Allowed First Lien Claim shall receive on account of such Claim its Pro Rata share of (i) 96% of the New Common Stock (subject to dilution on account of, to the extent applicable, the MIP Equity, the Exit Commitment Equity, and the Warrant Equity), and (ii) the Second Lien Exit Loans; provided that the foregoing treatment, and distributions

8

to holders, of Allowed First Lien Claims shall take into account an Approved 363 Sale Adjustment and applicable Restructuring Transactions, in each case, to the extent applicable.

D.    *Voting*:  Class 3 is Impaired.  Holders of Allowed First Lien Claims in Class 3 are entitled to vote to accept or reject the Plan.

(4)    **Class 4 — Second Lien Claims**

A.    *Classification*:  Class 4 consists of all Second Lien Claims.

B.    *Allowance:*  On the Effective Date, the Second Lien Claims shall be Allowed in the aggregate principal amount of not less than $180.2 million, plus any accrued but unpaid interest thereon payable as of the Petition Date at the applicable default interest rate and any accrued but unpaid fees and expenses payable in accordance with the Second Lien Loan Documents. The Second Lien Claims shall not be subject to avoidance, subordination, setoff, offset, deduction, objection, challenge, recharacterization, surcharge under section 506(c) of the Bankruptcy Code or any other claim or defense.

C.    *Treatment*:  On the Effective Date, each holder of an Allowed Second Lien Claim shall receive its Pro Rata share of (i) 4% of the New Common Stock (subject to dilution on account of, to the extent applicable, the MIP Equity, the Exit Commitment Equity, and the Warrant Equity), and (ii) the Warrants; <u>provided</u> that the foregoing treatment, and distributions to holders, of Allowed Second Lien Claims shall take into account an Approved 363 Sale Adjustment and applicable Restructuring Transactions, in each case, to the extent applicable.

D.    *Voting*:  Class 4 is Impaired.  Holders of Allowed Second Lien Claims in Class 4 are entitled to vote to accept or reject the Plan.

(5)    **Class 5 — General Unsecured Claims**

A.    *Classification*:  Class 5 consists of any General Unsecured Claims against any Debtor.

B.    *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of such Claim or has been paid or disallowed by Final Order prior to the Effective Date, on and after the Effective Date, the Reorganized Debtors shall continue to pay or treat each Allowed General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced, subject to all claims, defenses or disputes the Debtors and Reorganized Debtors may have with respect to such Claims, including as provided in <u>Section 4.17</u> of the Plan.

C.    *Voting*:  Class 5 is Unimpaired.  Holders of Allowed General Unsecured Claims in Class 5 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed General Unsecured Claims in Class 5 are not entitled to vote to accept or reject the Plan.

(6)    **Class 6 — Intercompany Claims**

A.    *Classification*:  Class 6 consists of any Intercompany Claims.

B.    *Treatment*: Each Allowed Intercompany Claim shall be Reinstated or cancelled (by way of contribution to capital or otherwise) as of the Effective Date, at the Debtors' or the Reorganized Debtors' option, subject to (A) the Restructuring Transactions, (B) the consent of the Required First Lien Lenders, which consent shall not be unreasonably withheld, conditioned or delayed, and (C) the consent of the Required Second Lien Lenders solely to the extent required by the Second Lien Lender Consent Right (as defined in the Restructuring Support Agreement), which consent shall not be unreasonably withheld, conditioned or delayed.    No distribution shall be made on account of any Allowed Intercompany Claim.

C.    *Voting*: Class 6 is either Unimpaired, in which case the holders of Allowed Intercompany Claims in Class 6 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired, and not receiving any distribution under the Plan, in which case the holders of such Allowed Intercompany Claims in Class 6 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each holder of an Allowed Intercompany Claim in Class 6 will not be entitled to vote to accept or reject the Plan.

(7)    **Class 7 — Intercompany Interests**

A.    *Classification*:  Class 7 consists of any Intercompany Interests.

B.    *Treatment*:  Each Allowed Intercompany Interest shall be Reinstated as of the Effective Date, subject to (A) the Restructuring Transactions, (B) the consent of the Required First Lien Lenders, which consent shall not be unreasonably withheld, conditioned or delayed, and (C) the consent of the Required Second Lien Lenders solely to the extent required by the Second Lien Lender Consent Right, which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, that for the avoidance of doubt, Holdings' Interests in Debtor Answers Corporation shall either be Reinstated or, at the Reorganized Debtors' option, subject to (A) the Restructuring Transactions, (B) the consent of the Required First Lien Lenders, which consent shall not be unreasonably withheld, conditioned or delayed, and (C) the consent of the Required Second Lien Lenders solely to the extent required by the Second Lien Lender Consent Right, which consent shall not be unreasonably withheld, conditioned or delayed, contributed by Holdings to a newly-formed subsidiary of Holdings that shall be disregarded from Holdings for U.S. federal income tax purposes.

C.    *Voting*: Class 7 is Unimpaired. Holders of Allowed Intercompany Interests in Class 7 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Intercompany Interests in Class 7 are not entitled to vote to accept or reject the Plan.

(8)    **Class 8 — Interests in Holdings**

A.    *Classification*:  Class 8 consists of all Interests in Holdings.

B.    *Treatment*:  On the Effective Date, all Interests in Holdings will be cancelled and the holders of Interests in Holdings shall not receive or retain any distribution, property, or other value on account of their Interests in Holdings.

10

C.      *Voting*:  Class 8 is Impaired.  Holders of Interests in Class 8 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

(c)      **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

(d)      **Intercompany Interests**

To the extent Reinstated under the Plan, the Intercompany Interests shall be Reinstated for the ultimate benefit of the holders of the New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims.  For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date.

(e)      **Subordination Rights and Related Claims**

The allowance, classification, and treatment of satisfying all Claims and Interests under the Plan takes into consideration any and all subordination rights, whether arising by contract or under general principles of equitable subordination, section 510(b) or 510(c) of the Bankruptcy Code, or otherwise, including for the avoidance of doubt the Prepetition Intercreditor Agreement.  On the Effective Date, any and all subordination rights or obligations that a holder of a Claim or Interest may have with respect to any distribution to be made under the Plan will be discharged and terminated, and all actions related to the enforcement of such subordination rights will be enjoined permanently.  Accordingly, distributions under the Plan to holders of Allowed Claims (including, for the avoidance of doubt, distributions to holders of Allowed Claims in Class 4) will not be subject to turnover or payment to a beneficiary of such terminated subordination rights, or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.

(f)      **Confirmation Pursuant to Section 1129(a)(10) and 1129(b) of the Bankruptcy Code**

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan (subject to the Restructuring Support Agreement) to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by (a) modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules and (b) withdrawing the Plan as to an individual Debtor at any time before the Confirmation Date.

**1.5      Liquidation Analysis**

The Debtors believe that the Plan provides a greater recovery for holders of Allowed Claims and Interests as would be achieved in the Debtors' liquidation under chapter 7 of the Bankruptcy Code.  This belief is based on a number of considerations, including:  (a) the Debtors' primary assets are intangible and include goodwill and customer relationships, which would have little to no value in a chapter 7 liquidation; (b) the additional Administrative Claims generated by conversion to a chapter 7 case and any related costs in connection with a chapter 7 liquidation; and (c) the absence of a robust market for the liquidation of the Debtors' assets and services.

The Debtors, with the assistance of A&M, have prepared an unaudited liquidation analysis, which is attached hereto as **Exhibit C** (the "*Liquidation Analysis*"), to assist holders of Claims and Interests in evaluating the Plan.  The Liquidation Analysis compares the projected recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to holders of Allowed Claims and Interests under the Plan.  The Liquidation Analysis is based on the value of the Debtors' assets

11

and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date.  Further, the Liquidation Analysis is subject to potentially material changes, including with respect to economic and business conditions and legal rulings.  Therefore, the actual liquidation value of the Debtors could vary materially from the estimate provided in the Liquidation Analysis.

## 1.6     Valuation Analysis

The Plan provides for the distribution of the New Common Stock and Warrants to holders of Allowed First Lien Claims and holders of Allowed Second Lien Claims, as applicable, upon consummation of certain of the Restructuring Transactions set forth in the Plan.  Accordingly, Rothschild, at the request of the Debtors, has performed an analysis, which is attached hereto as **Exhibit D**, of the estimated implied value of the Debtors on a going-concern basis as of December 6, 2016 (the "*Valuation Analysis*").  The Valuation Analysis, including the procedures followed, assumptions made, qualifications, and limitations on review undertaken described therein, should be read in conjunction with ARTICLE VI of this Disclosure Statement, entitled "Certain Factors To Be Considered."  The Valuation Analysis is based on data and information as of December 6, 2016.  Rothschild makes no representations as to changes to such data and information that may have occurred since the date of the Valuation Analysis.

THE VALUATION ANALYSIS REPRESENTS A HYPOTHETICAL VALUATION OF THE REORGANIZED DEBTORS AND THEIR ASSETS AND BUSINESSES, WHICH ASSUMES THAT SUCH REORGANIZED DEBTORS CONTINUE AS AN OPERATING BUSINESS IN SUBSTANTIALLY THE SAME CORPORATE STRUCTURE.  THE ESTIMATED VALUE SET FORTH IN THE VALUATION ANALYSIS DOES NOT PURPORT TO CONSTITUTE AN APPRAISAL OR NECESSARILY REFLECT THE ACTUAL MARKET VALUE THAT MIGHT BE REALIZED THROUGH A SALE OR LIQUIDATION OF THE REORGANIZED DEBTORS, THEIR SECURITIES OR THEIR ASSETS, WHICH MAY BE MATERIALLY DIFFERENT THAN THE ESTIMATES SET FORTH IN THE VALUATION ANALYSIS.  ACCORDINGLY, SUCH ESTIMATED VALUE IS NOT NECESSARILY INDICATIVE OF THE PRICES AT WHICH ANY SECURITIES OF THE REORGANIZED DEBTORS MAY TRADE AFTER GIVING EFFECT TO THE RESTRUCTURING TRANSACTIONS SET FORTH IN THE PLAN.  ANY SUCH PRICES MAY BE MATERIALLY DIFFERENT THAN INDICATED BY THE VALUATION ANALYSIS.

## 1.7     Financial Information and Projections

In connection with the planning and development of the Plan, the Debtors, with the assistance of their advisors, prepared projections for the fiscal years 2016 through 2019, which are attached hereto as **Exhibit E** (the "*Financial Projections*"), including management's assumptions related thereto.  For purposes of the Financial Projections, the Debtors have assumed an Effective Date of March 31, 2017.  The Financial Projections assume that the Plan will be implemented in accordance with its stated terms.  The Debtors are unaware of any circumstances as of the date of this Disclosure Statement that would require the re-forecasting of the Financial Projections due to a material change in the Debtors' prospects.

The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, commodity prices, regulatory changes, and/or a variety of other factors, including the factors listed in this Disclosure Statement.  Accordingly, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to significant business, economic, and competitive uncertainties.  Therefore, such projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.  The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement and other financial information.

# ARTICLE II

## VOTING PROCEDURES AND REQUIREMENTS

### 2.1    Class Entitled to Vote on the Plan

The following Classes are entitled to vote to accept or reject the Plan (collectively, the "***Voting Classes***"):

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 3 | First Lien Claims | Impaired |
| 4 | Second Lien Claims | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined below), including a ballot setting forth detailed voting instructions. If you are a holder of a Claim in one or more of the Voting Classes, you should read your ballot(s) and carefully follow the instructions included in the ballot(s). Please use only the ballot(s) that accompanies this Disclosure Statement or the ballot(s) that the Debtors, or the Solicitation Agent on behalf of the Debtors, otherwise provided to you. If you are a holder of a Claim in more than one of the Voting Classes, you will receive a ballot for each such Claim.

### 2.2    Votes Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted. Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted. Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

### 2.3    Certain Factors to Be Considered Prior to Voting

There are a variety of factors that all holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Claims.

While these factors could affect distributions available to holders of Allowed Claims and Interests under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a re-solicitation of the votes of holders of Claims in the Voting Classes.

For a further discussion of risk factors, please refer to "Certain Factors to Be Considered" described in ARTICLE VI of this Disclosure Statement.

**2.4     Classes Not Entitled To Vote on the Plan**

Under the Bankruptcy Code, holders of claims and interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan. Accordingly, the following Classes of Claims against and Interests in the Debtors are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 5 | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 6 | Intercompany Claims | Unimpaired / Impaired | Presumed to Accept / Deemed to Reject |
| 7 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 8 | Interests in Holdings | Impaired | Deemed to Reject |

**2.5     Solicitation Procedures**

(a)     **Solicitation Agent**

The Debtors have retained Rust Consulting/Omni Bankruptcy to act, among other things, as the Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

(b)     **Solicitation Package**

The following materials constitute the solicitation package (the "*Solicitation Package*") distributed to holders of Claims in the Voting Classes:

- the Debtors' cover letter in support of the Plan;

- a ballot and applicable voting instructions, together with a pre-paid, pre-addressed return envelope; and

- this Disclosure Statement and all exhibits hereto, including the Plan and all exhibits thereto; provided that the Plan Supplement documents shall not be part of the Solicitation Package and, pursuant to the Plan, will be filed with the Bankruptcy Court no later than seven (7) days prior to the Confirmation Hearing.

(c)     **Distribution of the Solicitation Package and Plan Supplement**

The Debtors will cause the Solicitation Agent to distribute the Solicitation Package to holders of Claims in the Voting Classes on February 16, 2017, which is 14 days before the Voting Deadline (*i.e.*, 5:00 p.m. (prevailing Eastern Time) on March 2, 2017).

The Solicitation Package (except the ballots) may also be obtained from the Solicitation Agent by: (1) calling the Debtors' restructuring hotline at (844) 580-9044, (2) emailing Answers@omnimgt.com and referencing "ANSWERS" in the subject line, and/or (3) writing to the Solicitation Agent at 5955 DeSoto Avenue, Suite 100, Woodland Hills, CA 91367. After the Debtors file the Chapter 11 Cases, you may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, www.omnimgt.com/Answers, or for a fee via PACER at https://www.pacer.gov/.

At least seven (7) days before the Confirmation Hearing, the Debtors intend to file the Plan Supplement. If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website. The Debtors will not serve copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Solicitation Agent by: (1) calling the Debtors' restructuring hotline at the telephone number set forth above; (2) visiting the Debtors' restructuring website, www.omnimgt.com/Answers; or (3) writing to the Solicitation Agent at 5955 DeSoto Avenue, Suite 100, Woodland Hills, CA 91367.

## 2.6    Voting Procedures

February 7, 2017 (the "***Voting Record Date***") is the date that was used for determining which holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures. Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

In order for the holder of a Claim in the Voting Classes to have its ballot counted as a vote to accept or reject the Plan, such holder's ballot must be properly completed, executed, and delivered by (a) using the enclosed pre-paid, pre-addressed return envelope, (b) via first class mail, overnight courier, or hand delivery to 5955 DeSoto Avenue, Suite 100, Woodland Hills, CA 91367, or (c) via email (attaching a scanned PDF of the fully executed ballot) to Answers@omnimgt.com and referencing "ANSWERS" in the subject line, so that such holder's ballot is actually received by the Solicitation Agent on or before the Voting Deadline, *i.e.* March 2, 2017 at 5:00 p.m. (prevailing Eastern Time).

If a holder of a Claim in a Voting Class transfers all of such Claim or Interest to one or more parties on or after the Voting Record Date and before the holder has cast its vote on the Plan, such Claim holder is automatically deemed to have provided a voting proxy to the purchaser(s) of the holder's Claim, and such purchaser(s) shall be deemed to be the holder(s) thereof as of the Voting Record Date for purposes of voting on the Plan, provided that the transfer complies with the applicable requirements under the Restructuring Support Agreement, if applicable.

If you hold Claims in more than one Voting Class under the Plan, you should receive a separate Ballot for each Class of Claims, coded by Class number, and a set of solicitation materials. You may also receive more than one Ballot if you hold Claims through one or more affiliated funds, in which case the vote cast by each such affiliated fund will be counted separately. Separate Claims held by affiliated funds in a particular Class shall not be aggregated, and the vote of each such affiliated fund related to its Claims shall be treated as a separate vote to accept or reject the Plan (as applicable). If you hold any portion of a single Claim, you and all other holders of any portion of such Claim will be (a) treated as a single creditor for voting purposes and (b) required to vote every portion of such Claim collectively to either accept or reject the Plan.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS OR INTERESTS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM OR INTEREST WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS OR INTERESTS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN. IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLAIM AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS. SUBJECT TO THE TERMS OF THE RESTRUCTURING SUPPORT AGREEMENT, NO BALLOT MAY BE WITHDRAWN OR MODIFIED AFTER THE VOTING DEADLINE WITHOUT THE COMPANY'S PRIOR CONSENT OR PERMISSION OF THE BANKRUPTCY COURT.  FOR THE AVOIDANCE OF DOUBT, EXCEPT FOR THE AUTOMATIC TERMINATION OF THE RESTRUCTURING SUPPORT AGREEMENT DUE TO THE OCCURRENCE OF THE EFFECTIVE DATE, (I) UPON THE OCCURRENCE OF A TERMINATION DATE (AS DEFINED IN THE RESTRUCTURING SUPPORT AGREEMENT) (A) ALL BALLOTS TENDERED BY THE CONSENTING FIRST LIEN SECURED PARTIES, BY THE CONSENTING SECOND LIEN SECURED PARTIES (AS APPLICABLE), OR BY THE SPONSOR ENTITIES (AS APPLICABLE) TO ACCEPT THE PLAN SHALL BE IMMEDIATELY REVOKED AND DEEMED VOID AB INITIO AND (B) NOTWITHSTANDING THE PASSAGE OF THE VOTING DEADLINE, THE CONSENTING FIRST LIEN SECURED PARTIES, THE CONSENTING SECOND LIEN SECURED PARTIES (AS APPLICABLE), OR THE SPONSOR ENTITIES (AS APPLICABLE) MAY VOTE TO REJECT THE PLAN AND ELECT TO OPT OUT OF THE THIRD-PARTY RELEASE, (II) UPON THE OCCURRENCE OF A REQUIRED CONSENTING SECOND LIEN LENDER TERMINATION DATE (AS DEFINED IN THE RESTRUCTURING SUPPORT AGREEMENT), (A) ALL BALLOTS TENDERED BY THE CONSENTING SECOND LIEN SECURED PARTIES (AS APPLICABLE) TO ACCEPT THE PLAN SHALL BE IMMEDIATELY REVOKED AND DEEMED VOID AB INITIO, IN EACH CASE, WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND (B) NOTWITHSTANDING THE PASSAGE OF THE VOTING DEADLINE, THE CONSENTING SECOND LIEN LENDERS MAY VOTE TO REJECT THE PLAN AND ELECT TO OPT OUT OF THE THIRD-PARTY RELEASE, OR (III) UPON THE OCCURRENCE OF A SPONSOR TERMINATION DATE (AS DEFINED IN THE RESTRUCTURING SUPPORT AGREEMENT), (A) ALL BALLOTS TENDERED BY THE SPONSOR ENTITIES (AS APPLICABLE) TO ACCEPT THE PLAN SHALL BE IMMEDIATELY REVOKED AND DEEMED VOID AB INITIO, AND (B) NOTWITHSTANDING THE PASSAGE OF THE VOTING DEADLINE, THE SPONSOR ENTITIES MAY VOTE TO REJECT THE PLAN AND ELECT TO OPT OUT OF THE THIRD-PARTY RELEASE, IN EACH CASE, WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.

## ARTICLE III

## BUSINESS DESCRIPTIONS

### 3.1    The Company Overview

The Company is a leading global provider of high-quality internet content and customer solutions.  The Company manages its operations from various locations throughout the United States and internationally.  As of the date hereof, the Company employs approximately 495 employees in the United States, and approximately 562 employees worldwide.

The Debtors are leading global providers of high quality internet content and cloud-based customer solutions, operating in three divisions: (a) Multiply; (b) ForeSee; and (c) Webcollage.  The Company also has shared services departments, which perform certain finance, legal, human resource, and administrative support functions for all of the Company's operating units.  Multiply is an online content publisher that leverages relationships with Facebook, Yahoo, celebrities, and other partners to acquire traffic to owned and partner websites and generate advertising revenue from Google and other partners.  ForeSee measures end customer/user satisfaction for its customers, which allows it to deliver insights on where its customers should prioritize improvements in their own customers' experience.  Webcollage is the leading cloud-based platform for managing and publishing rich product information for syndication to retail partners' e-commerce websites.  For the fiscal year ended December 31, 2016, the Company generated revenue of approximately $177.4 million, of which approximately $73.8 million, $83.9 million, and $19.7 million were attributable to Multiply, ForeSee, and Webcollage, respectively.  For the same period, the Company generated $(0.7) million in operating cash flow on a consolidated basis.

The Company began in February 2006 as AFCV, a portfolio of e-commerce technologies, and launched its initial question and answer platform in June 2009. In April 2011, the Company acquired the www.answers.com domain, which has since become its most trafficked website. In an effort to provide a full suite of solutions that span the customer life cycle, the Company acquired Webcollage and ForeSee in May and December, 2013, respectively. In October 2014, an investment fund managed by Apax, a global private equity firm, acquired the Company through a merger. The purchase price consideration was $914 million, of which approximately $388 million was in the form of an equity contribution by an investment fund managed by Apax.

The Multiply business is a traditional web-publishing business with a revenue model built around "click-through" advertising in partnership with Google, Facebook, and other similar platforms. Multiply's revenues are largely dependent on where its websites are "indexed"—*i.e.*, how far down the list of results they appear on a Google search, or how often Facebook pushes Multiply's content to its users. Google and Facebook use complex algorithms to index websites and periodically adjust those algorithms. These algorithm adjustments can have serious impacts on the Company's revenues if they result in a lower indexing of Multiply's websites.

In contrast, the ForeSee and Webcollage businesses are subscription-based software-as-a-service businesses with generally more predictable and less seasonal revenue and costs than the Multiply business. Prior to the fiscal year ended December 31, 2016, Multiply accounted for a majority of the Company's consolidated revenue, but since that time, its revenue has declined to less than ForeSee's revenue. During the same period, Webcollage's revenue has increased overall and as a proportion of the Company's total revenue.

(a)    **Multiply Business**

Multiply owns and publishes a portfolio of approximately 25 websites that generate billions of page views annually. The four largest sites, Answers.com, FashionBeans.com, Healthyway.com, and Ridiculously.com account for over 85% of total traffic.

Multiply's original business, internally referred to as "***Wiki***," began as a purely informational service offered through the "www.Answers.com" domain. This service derives its revenues from advertising on the "www.Answers.com" domain and has minimal variable costs. Although Wiki is the Company's original business, visits to its site, and, accordingly, revenue, have declined, as the site generated only 9.5% of the Company's revenue in the fiscal year ended December 31, 2016.

Departing from its origins, the Multiply business created a new model starting in 2013, internally referred to as "***O&O***." O&O provides web content, which users identify through key partners such as Google and Facebook.[7] Specifically, the Company pays partners such as Google for the right to host ads on the Company's websites and then earns revenues as visitors "click through" to its sites. Accordingly, the Company's revenue is highly dependent on how many users visit O&O's sites, which is in turn dependent on the favorability of those sites' "indexing." Algorithm adjustments by Google and Facebook can result in significantly less favorable indexing for O&O's sites, with a severe impact to the Company's profitability. Prior to March 2015, the Company derived the majority of its web traffic through visitors who found O&O's web pages through Google searches. Since then, Facebook has become the dominant driver of content to O&O's web pages, driving approximately 59% of traffic as of August 31, 2016.

The latest evolution in the Multiply business model is the "***Partner Organic Platform***." This evolved business model was created by the Company to drive revenue without relying on Google's and Facebook's indexing algorithms. Under this initiative, the Company pays an "influencer," such as a musician, star athlete, actor, or other celebrity, for the use of their Facebook "fan page." The Company can then use that fan page to drive traffic to the Company's and partners' websites. Multiply as a whole accounted for approximately 40% of the Company's revenues for the fiscal year ended December 31, 2016.

---

[7]    In addition to Google and Facebook, the Company acquires traffic from, among others: (i) Yahoo, Inc.; (ii) Taboola Inc.; and (iii) Outbrain, Inc.

(b)    **ForeSee Business**

ForeSee is a customer experience analytics ("*CX*") platform that offers its clients, including some of the world's largest brands, information on how end consumers/users perceive and interact with their customer journey touch points.  Clients typically contract with ForeSee on an annual or multi-year basis, during which ForeSee collects and analyzes information on how the client's customers perceive the client's products or their experiences with the client.  ForeSee applies its technology across sales channels and customer touch points, including websites, contact centers, retail stores, mobile and tablet sites, apps, and social media initiatives.  ForeSee continuously collects data in order to measure customer satisfaction and deliver insights on where organizations should prioritize improvements in the customer journey to maximize end consumer/user satisfaction.

Perhaps the most ubiquitous marker of ForeSee's business is the kind of survey pop-up pictured below, which represents a key customer touch point driving ForeSee's deeper analytics.



ForeSee's CX platform is a proven predictor of revenue, market share, and stock price performance.  ForeSee pioneered the CX analytics market in 2001 and since then the industry has grown into an estimated $2-3 billion market, crowded with many competitors.  The Debtors expect that the CX market will continue to grow in the future, as surveys show that 89% of companies plan to compete primarily on the basis of CX and 88% of companies plan to increase their CX investments in the near future.  Accordingly, the Debtors are committed to ensuring that ForeSee remains a market leader, and in November 2016, ForeSee launched its newest CX suite, offering an improved range of products designed to keep ForeSee competitive well into the future.

The Company also operates a smaller business, "*Reseller Ratings*," under the ForeSee business unit.  Reseller Ratings typically contracts with both online and brick-and-mortar retailers on an annual or month-to-month basis to gather and publicize end consumers'/users' feedback on their sales experiences.  ForeSee, including Reseller Ratings, accounted for approximately 47% of the Company's revenue for the fiscal year ended December 31, 2016.

(c)    **Webcollage Business**

Webcollage is a content-related product platform that clients use to publish interactive web pages and to provide them with analytics regarding customer interactions with their products.  Webcollage typically contracts with clients on an annual basis.  Webcollage's products are used worldwide by over 650 manufacturers, large and small, to publish rich product information on retail partners' e-commerce sites.  Rich product information includes videos, interactive tours, and enhanced product descriptions, as shown below:

18



Webcollage operates in the approximately $3.6 trillion global ecommerce market, where recent progress has seen the barriers between online and brick-and-mortar retail dissolve. According to Webcollage's own research, approximately 82% of consumers check their phone before entering a store and two-thirds of all in-store purchases are a result of online product research.

Webcollage is the only solution in the marketplace that offers automated real-time publishing to a large number of retailers, a broad set of tools for assembling rich product information, prominent responsive display of the information across the retail channel, and end-to-end shopper analytics. Webcollage's analytics provide data on key content engagement metrics and predictive analysis opportunities in an easily understood visual format, complete with 24-7, password protected access.

Due to the size of Webcollage's market, and the market's projected future growth, the Debtors believe that the Webcollage business is critical to their future success. Webcollage accounted for approximately 13% of the Company's revenue for the fiscal year ended December 31, 2016.

(d)    **Shared Services**

The Company's shared services departments handle day-to-day business support and reporting functions across all of its business platforms. The functions provided by these departments include finance and accounting, legal services, human resources, information technology operations, facilities management, and general administrative support.

## 3.2    Organization and Capital Structure

(a)    **Organizational Structure**

An organizational chart illustrating the corporate structure of the Debtors is annexed hereto as **Exhibit F**.

(b)    **The Debtors' Capital Structure**

As of December 31, 2016, the Company reported approximately $492 million book value in total assets and approximately $604 million book value in total liabilities. As of the date hereof, the Debtors have outstanding funded debt obligations in the aggregate principal amount of approximately $546 million, including the following:

- approximately $366.2 million[8] in principal amount outstanding under the First Lien Credit Facility, including approximately $7.4 million on account of the termination of the Swaps (discussed in greater detail below); and

- approximately $180.2 million in principal amount outstanding under the Second Lien Credit Facility.

(1)    **First Lien Indebtedness**

The First Lien Credit Facility consists of the First Lien Revolving Credit Facility and First Lien Term Loan Facility, which rank *pari passu*. The First Lien Agent, the First Lien Lenders and Debtor Answers Corporation (the "***Borrower***") are parties to the First Lien Credit Agreement. Each of the Debtors guaranteed the obligations of the Borrower pursuant to various guaranty agreements executed prior to the date hereof (the "***First Lien Guaranty Agreements***").

Pursuant to, among other things, (a) that certain First Lien Security Agreement, dated as of October 3, 2014, and (b) that certain First Lien Intellectual Property Security Agreement, dated as of October 3, 2014 (together with all other pledge agreements or similar security documents entered into by any Debtor and the First Lien Agent in respect of the Debtors' assets and all other documentation executed in connection with any of the foregoing, each as amended, restated, supplemented, or otherwise modified from time to time, the "***First Lien Security Documents***"), the Debtors have granted a first-priority lien and security interest (the "***Prepetition First Liens***") in, to, and against substantially all of the Debtors' assets described in the First Lien Security Documents, including, without limitation, the cash and noncash proceeds thereof (collectively, the "***Prepetition Collateral***"), to the First Lien Agent for the benefit of the First Lien Lenders (the First Lien Credit Agreement, the First Lien Guaranty Agreements, the First Lien Security Documents, including, without limitation, the Prepetition Intercreditor Agreement (as defined below), the letter of credit documentation, and any other collateral and ancillary documents executed in connection therewith, collectively, the "***First Lien Loan Documents***").

As of the date hereof, the Debtors were jointly and severally liable to the First Lien Agent and the First Lien Secured Parties for all loans under the First Lien Revolving Credit Facility, the First Lien Term Loan Facility, letter of credit obligations, swap obligations and other obligations described therein and payable thereunder (the "***First Lien Indebtedness***") in the aggregate principal amount of approximately $367.5 million, consisting of (a)

---

[8]    This amount excludes approximately $1.3 million in undrawn letter of credit obligations under the First Lien Credit Facility. It is contemplated that in the event prepetition outstanding letter of credit obligations are drawn on postpetition, such obligations will constitute Converted L/Cs under the Plan.

approximately $38.7 million under the First Lien Revolving Credit Facility, (b) approximately $320.1 million under the First Lien Term Loan Facility, (c) approximately $7.4 million on account of termination of the Swaps, and (d) $1.3 million in undrawn letter of credit obligations.

       (2)       **Second Lien Indebtedness**

The Second Lien Agent, the Second Lien Lenders, and the Borrower are parties to the Second Lien Credit Agreement. Each of the Debtors guaranteed the obligations of the Borrower under the Second Lien Credit Agreement pursuant to various guaranty agreements executed prior to the date hereof (the "***Second Lien Guaranty Agreements***").

Pursuant to, among other things, (a) that certain Second Lien Security Agreement, dated as of October 3, 2014, and (b) that certain Second Lien Intellectual Property Security Agreement, dated as of October 3, 2014 (together with all other pledge agreements or similar security documents entered into by any Debtor and the Second Lien Agent in respect of the Debtors' assets and all other documentation executed in connection with any of the foregoing, each as amended, restated, supplemented, or otherwise modified from time to time, the "***Second Lien Security Documents***"), the Debtors have granted a second-priority lien and security interest (the "***Prepetition Second Liens***," and together with the Prepetition First Liens, the "***Prepetition Liens***") in, to, and against the Prepetition Collateral, to the Second Lien Agent for the benefit of the Second Lien Lenders (the Second Lien Credit Agreement, the Second Lien Guaranty Agreements, the Second Lien Security Documents, including, without limitation, the Prepetition Intercreditor Agreement, and any other collateral and ancillary documents executed in connection therewith, collectively, the "***Second Lien Loan Documents***," and collectively with the First Lien Loan Documents, the "***Prepetition Loan Documents***").

As of the date hereof, the Debtors were jointly and severally liable to the Second Lien Agent and the Second Lien Secured Parties for all loans under the Second Lien Term Loan Facility, and other obligations described therein and payable thereunder (the "***Second Lien Indebtedness***") in the aggregate principal amount of approximately $180.2 million.

       (3)       **Prepetition Intercreditor Agreement**

The Debtors and the Prepetition Agents, as representatives of the Prepetition Secured Parties, are parties to that certain Intercreditor Agreement, dated as of October 3, 2014 (the "***Prepetition Intercreditor Agreement***"). The Prepetition Intercreditor Agreement is a "subordination agreement" within the meaning of section 510(a) of the Bankruptcy Code and is, therefore, enforceable in the Chapter 11 Cases. The Prepetition Intercreditor Agreement governs certain of the respective rights and interests of the First Lien Lenders and Second Lien Lenders relating to, among other things, their rights and their ability to exercise remedies in connection with an Event of Default (as defined in the Prepetition Intercreditor Agreement) and in the event of a bankruptcy filing, including related enforcement and turnover provisions. As more particularly stated in the Prepetition Intercreditor Agreement, the Prepetition First Liens have priority over, and are senior in all respects, to the Prepetition Second Liens.

Importantly, section 6.01 of the Prepetition Intercreditor Agreement generally provides that, in the event of a chapter 11 filing, if the First Lien Lenders consent to the use of cash collateral or the Debtors' obtaining of debtor in possession financing, the Second Lien Lenders agree not to raise any objection or request adequate protection. In addition, the same section of the Prepetition Intercreditor Agreement requires the Second Lien Lenders to subordinate the Prepetition Second Liens to the Prepetition First Liens of the First Lien Secured Parties and the lenders under any debtor in possession financing facility as well as any "carve-out" for professional or United States Trustee fees. Section 6.03 of the Prepetition Intercreditor Agreement provides that if the First Lien Lenders receive adequate protection, then the Second Lien Lenders shall have the right to seek their own adequate protection, provided that such adequate protection is subordinate to any adequate protection provided to the First Lien Lenders.

       (4)       **Swap Agreements**

The Company is party to two swaps (the "***Swaps***"), both of which are interest rate swaps that help the Company manage interest rate exposure by achieving a desirable proportion of variable and fixed rate debt. The counterparties to the Swaps are collateralized under the First Lien Credit Agreement, but are unable to exercise remedies to collateral independently. As of September 30, 2016, approximately $106 million notional amount was

subject to a Swap between Answers Corp. and Bank of America N.A., dated as of December 9, 2014 (the "***Bank of America Swap***").  Additionally, as of September 30, 2016, approximately $247 million notional amount was subject to a Swap between Answers Corp. and Credit Suisse International, dated as of December 5, 2014 (the "***Credit Suisse Swap***").

On October 6, 2016, Credit Suisse International informed the Company that due to an existing default, it would be terminating the Credit Suisse Swap, effective on October 11, 2016.[9]  Similarly, on October 11, 2016, Bank of America N.A. declared an event of default under the Bank of America Swap.[10]  The termination of the Swaps has given rise to an aggregate amount of $7.4 million of First Lien Claims.

## ARTICLE IV

## EVENTS LEADING TO THE CHAPTER 11 CASES

As stated above, the Debtors intend to file the Chapter 11 Cases to implement a prepackaged chapter 11 plan of reorganization that provides for a comprehensive balance sheet restructuring of their funded debt obligations with the consent of the majority of the Prepetition Secured Parties and the Consenting Sponsors.  Given the events described in greater detail below and other considerations, the Debtors have concluded in the exercise of their business judgment and as fiduciaries for all of the Debtors' stakeholders that the best path to maximize the value of their businesses is a strategic prepackaged chapter 11 filing to implement the Plan in accordance with the terms of the Restructuring Support Agreement.

### 4.1    Algorithm Adjustments

In addition to the substantial debt service obligations required under the Prepetition Loan Documents, the Company faced a number of operational hurdles in the months and years leading up to their decision to commence the Chapter 11 Cases.  In particular, in March 2015, Google adjusted its search algorithm (the "***March 2015 Adjustment***") and, in May 2016, both Google and Facebook adjusted their respective algorithms (the "***May 2016 Adjustment***" and, together with the March 2015 Adjustment, the "***Algorithm Adjustments***").  The Algorithm Adjustments resulted in severely reduced traffic to the Company's websites.  In response, the Company sought to insulate itself from the effects of future Algorithm Adjustments by diversifying its revenue stream—namely by implementing the Partner Organic Platform and investing in the ForeSee and Webcollage businesses.  The Company, however, could not sustain its capital structure while simultaneously addressing the adverse operational consequences that resulted from the Algorithm Adjustments.  In order to remain a viable, competitive enterprise, the Company decided that it needs to substantially lower its debt load and increase its access to liquidity.

As explained above, the Multiply business is largely dependent on how websites published by the Company are "indexed" or promulgated by search engines and social media platforms like Google and Facebook.  The March 2015 Adjustment resulted in a much lower index for the Company's web content.  Although the Company had been able to adjust its content to reduce the impact of previous similar algorithm changes, the sweeping nature of the March 2015 Adjustment was such that the Company was unable to mitigate meaningfully the consequences to its operations, resulting in a strain on the Company's revenues.  The May 2016 Adjustment had a similar detrimental effect on the Company's web traffic.  Collectively, the Algorithm Adjustments roughly coincided with an approximately 52% decline in Multiply revenue between the fiscal year ended December 31, 2014

---

[9]    The Termination Payment Amount (as defined in the 1992 ISDA Master Agreement (Multicurrency-Cross Border), dated as of December 5, 2014, by and between Answers Corporation and Credit Suisse International (as amended, supplemented or otherwise modified)) was approximately $5.2 million, which will be added to the aggregate amount of First Lien Indebtedness.

[10]    The Termination Payment Amount (as defined in the 1992 ISDA Master Agreement (Multicurrency-Cross Border), dated as of December 9, 2014, by and between Answers Corporation and Bank of America, N.A. (as amended, supplemented or otherwise modified)) was approximately $2.2 million, which will be added to the aggregate amount of First Lien Indebtedness.

and the fiscal year ended December 31, 2016, as well as a nearly 82% drop in Multiply's gross profit during the same periods.

In the wake of the May 2016 Adjustment, the Multiply business was further impacted when Google threatened to drop Multiply as a partner, absent meaningful changes to the Company's mobile content. Google's threat was predicated on alleged low "conversion rate," which measures the rate of "click throughs" from the Company's content to actual sales.

Then, on November 11, 2016, Facebook informed the Company that it was suspending Multiply's master account through December 31, 2016, which eliminated Multiply's ability to direct traffic towards the Company's sites through paid traffic acquisition (the "*Facebook Suspension*"). As previously highlighted, Facebook is the most important source of the Company's web traffic, and the Facebook Suspension occurred during the holiday season, which is the Multiply business's peak revenue season. Accordingly, the Facebook Suspension further accelerated the Company's liquidity troubles. On January 1, 2017, due to the Company's efforts to quickly remedy Facebook's concerns, the Facebook Suspension was reversed and Multiply resumed its paid traffic acquisition activity with Facebook. Despite this fix, however, paid traffic resumed to a much lesser extent than it existed prior to the Facebook Suspension due to seasonally lower advertising rates that typically occur in January each year and the necessity that the Company promote higher quality content and user experiences than it had historically promoted.

The Algorithm Adjustments, Google's actions, and the Facebook Suspension all contributed to the Company's current liquidity crisis.

## 4.2    A Pivot for Multiply

Following the March 2015 Adjustment, the Company began implementing plans to diversify the Multiply business away from its reliance on advertising revenues. The Company's new initiative, the Partner Organic Platform, was designed to more directly drive traffic to the Company's websites and, consequently, ad revenue derived therefrom.

Under the Partner Organic Platform, the Company pays an up-front fee or a variable revenue share to certain celebrities for the rights to control or post content on those celebrities' Facebook "fan pages" in order to direct traffic towards the Company's websites and, in turn, generate advertising revenue. The Company believed that the Partner Organic Platform represented a path to a new source of traffic and mitigate the impact of the Algorithm Adjustments by opening a new revenue stream independent of the Google or Facebook indexing algorithms.

The Company's initial launch of the Partner Organic Platform was less profitable than originally projected. In addition, the Company's ability to scale up the Partner Organic Platform after its initial launch was impacted negatively by the May 2016 Adjustment. Since then, the Company has scaled back the Partner Organic Platform and shifted its focus from fixed monthly payments to influencers to a higher proportion of variable revenue share deals in order to preserve liquidity and mitigate downside risk. The Company continues to believe that the Partner Organic Platform represents a viable revenue stream in the near future. However, absent a restructuring, the Company lacks the necessary liquidity to build out the Partner Organic Platform to meaningfully impact Multiply's profitability in the near term. Thus, the Company's restructuring contemplated by the Plan is a key step towards enhancing the value of the Multiply business.

## 4.3    Reinvestment in the ForeSee and Webcollage Businesses

As discussed in greater detail above, for much of the Company's history, Multiply was the primary source of revenue. However, beginning in late 2015, the Company made a strategic decision to reinvest in its ForeSee and Webcollage businesses in order to supplement the Company's revenue streams and diversify its portfolio of products.

ForeSee and Webcollage derive their revenues from customer contracts of varying durations. Because the ForeSee and Webcollage businesses' revenues and costs are determined by these contracts, these businesses historically have been more stable and predictable than the revenues and costs associated with the Multiply business.

However, after their acquisitions in 2013, both the ForeSee and Webcollage businesses experienced challenges to varying degrees, including leadership issues, increased competition, and a lack of product innovation. This situation persisted in part because of the Company's prior focus on the Multiply business.

Following the March 2015 Adjustment, the Company began to reorganize and reinvest in the ForeSee and Webcollage businesses. The first step in this shift was a reduction in force in July 2015 of approximately 89, mostly high-level employees (the "**2015 RIF**"), in an attempt to right-size these segments. Following the 2015 RIF, the Company hired new leadership for ForeSee and Webcollage in November and December 2015. This change in leadership was accompanied by an increase in investment in the ForeSee and Webcollage businesses. These efforts and other measures resulted in an approximately 16% year-over-year decrease in adjusted EBITDA from these businesses for the fiscal year ended December 31, 2016. Going forward, the Company expects to see stabilization of profitability of the ForeSee and Webcollage businesses in 2017 and growth in 2018. However, the Algorithm Adjustments, Facebook Suspension, and overall decline in adjusted EBITDA have put a severe strain on the Company's liquidity, adversely affecting its ability to continue the necessary investment in the ForeSee and Webcollage businesses under its current capital constraints.

### 4.4    Changes in Management and the Board of Directors and Other Recent Developments

The decline in the Company's financial performance coincided with certain changes in the Company's management structure. The Company's former chief financial officer voluntarily resigned in May 2016 and the former chief executive officer and chief strategy officer of Debtor Answers Corporation both voluntarily resigned in August 2016.[11] In August 2016, the Company hired Brian Mulligan as chief financial officer.

Anticipating the need for a potential restructuring in the near future given the Company's liquidity troubles, the Company's board of directors decided to appoint two independent directors to oversee any restructuring efforts. Accordingly, on September 15, 2016, Neal Goldman and Eugene Davis were appointed to the board of directors of the Debtors' ultimate parent company, Clarity GP, LLC and to the boards of directors of each of the Debtors. Concurrently with the appointments of Messrs. Goldman and Davis, Mr. Mulligan was also appointed as a director of each of the Debtors' boards of directors.

To assist with a potential restructuring, the Company retained Rothschild, K&E, and A&M in June 2016, August 2016, and September 2016, respectively. On October 24, 2016, pursuant to the requirements of the Forbearance Agreements (as defined herein), Mr. Schmaltz of A&M was appointed by each of the Debtors' respective boards of directors or members, as applicable, as Chief Restructuring Officer ("**CRO**") of the Debtors.

Since their respective engagements, Rothschild and K&E have assisted the Company's management with organizing the Company's lender groups and negotiating the terms of Forbearance Agreements and assessing the Company's strategic restructuring options. At the same time, the CRO and additional personnel from A&M, and the Company undertook a number of steps to preserve liquidity, including: (a) the development of a 13-week cash flow forecast; (b) a hiring freeze on open positions with limited exceptions subject to the CRO's approval; (c) a daily review of disbursements by the CRO and A&M; (d) tighter enforcement of contractual language regarding returns, pushing process for timely renewals, and implementing heightened past due receivable collection efforts; (e) the deferral of non-critical disbursements; (f) the review and suspension of certain Company-issued credit cards and automatic debits and charges; (g) the utilization of traffic acquisition credit lines with Facebook, Yahoo, and others to combat the loss of credit line capacity; (h) the utilization of accrued airline award miles and hotel points for essential travel; (i) the deferral of payments to non-critical vendors; and (j) a further reduction in force in November 2016 of approximately 63 positions. Ultimately, however, the implementation of these measures was not, by itself, sufficient to solve the Company's liquidity problems without the need for a more extensive balance sheet restructuring of its funded debt obligations.

---

[11]    Each of the Company's businesses is led by its own chief executive officer. Accordingly, the Company has not replaced the chief executive officer of Answers Corporation since the former chief executive officer's departure.

**4.5**      **The Revolver Draw**

By September 2016 the Company's liquidity problems had become severe.  As of August 31, 2016, the Company estimated that it had only approximately $2.3 million of cash on hand, and the Company's advisors expected that it would run out of cash before the end of September.

The Company did, however, have approximately $21.2 million available under its First Lien Revolving Credit Facility, which it determined in consultation with its advisors, to fully draw on September 7, 2016 (the "*Revolver Draw*").  The purpose of the Revolver Draw was to give the Company much-needed liquidity relief and allow it to pursue the negotiation of a potential consensual restructuring.  However, absent agreements with the Prepetition Secured Parties, the Revolver Draw only was a temporary solution to the Company's problems.  Indeed, the Company projected that it would run out of cash by early December 2016 if it continued to make debt service payments.

**4.6**      **The September Payment, Forbearance Negotiations and the Restructuring Support Agreement**

On September 30, 2016, the Company was scheduled to pay approximately $4.6 million in debt service obligations (the "*September 30 Debt Payment*"), consisting of:  (a) an approximately $1.7 million interest payment on the First Lien Term Loan Facility; (b) an approximately $0.8 million amortization payment on the First Lien Term Loan Facility; (c) an approximately $0.4 million interest payment on the First Lien Revolving Credit Facility; (d) an approximately $1.5 million interest payment on the Second Lien Term Loan Facility; and (e) an approximately $0.3 million interest swap payment.  The September 30 Debt Payment left the Company with the dilemma of either (a) making a payment to avoid defaulting under the Prepetition Credit Facilities, but sacrificing nearly 20% of the proceeds of the Revolver Draw, liquidity that was critical to maintaining operations and implementing the Company's new business plan or (b) not making such payment and defaulting under the Prepetition Credit Facilities.

Accordingly, at a meeting held on September 26, 2016, the Company's board of directors authorized K&E and Rothschild engage with the Prepetition Secured Parties on the terms of potential forbearance agreements and begin the first steps in furtherance of a restructuring framework.  Thereafter, on September 27, 2016, K&E and Rothschild sent a forbearance proposal to the First Lien Secured Parties.  On September 30, 2016, the Company and the First Lien Secured Parties reached an agreement for an initial forbearance period of two weeks with an eye toward continuing negotiations with respect to a longer forbearance period if the parties agreed on a viable timeline for evaluating and analyzing restructuring options while allowing the Company to continue to operate in the ordinary course and strategize on its business plan.  On October 5, 2016, the Company and the Second Lien Secured Parties entered into a substantially similar initial short-term forbearance agreement as the one agreed to by the Company with the First Lien Secured Parties.

On October 14, 2016, the Debtors and the First Lien Secured Parties entered into a long-term forbearance agreement that contained the structure necessary for continued negotiations around the Company's consensual restructuring of its businesses and balance sheet, and on October 25, 2016, the Debtors and the Second Lien Secured Parties reached a substantially similar forbearance agreement as the one agreed to between the Company and the First Lien Secured Parties (together, each as amended, the "*Forbearance Agreements*").  The applicable forbearance period was later extended by agreement of the parties through February 2, 2017, which enabled the Company and the First Lien Secured Parties and Second Lien Secured Parties to negotiate the prepackaged restructuring contemplated under that certain Amended and Restated Restructuring Support Agreement, dated as of January 30, 2017 (attached hereto **Exhibit B**).  To facilitate the negotiation and preparation of the prepackaged restructuring completed under the Restructuring Support Agreement, the agreed-to forbearance period has been further extended while the Restructuring Support Agreement remains in effect.

The Restructuring Support Agreement, which has the support of the overwhelming majority of the holders of the Debtors' funded indebtedness, contemplates the Company's restructuring through (a) a debt-to-equity conversion of the vast majority of the Debtors' funded debt obligations to 100% of the New Common Stock and 100% of the Warrants, as applicable, (b) conversion of the DIP Claims into First Lien Exit Loans and (c) the conversion of a certain amount of First Lien Claims into Second Lien Exit Loans.  Such restructuring pursuant to the Restructuring Support Agreement will enable the Debtors to de-lever their balance sheet by more than $471.4

million—*over 86%* of their funded debt obligations—and position their businesses for stability and success after emergence from bankruptcy.

**4.7    Importance of Deleveraging**

As the Debtors' financial performance has deteriorated, their capital structure has become increasingly unsustainable, and debt-service obligations have consumed an increasing percentage of the Debtors' free cash flow. Given recent performance, business plan projections, and the lack of free cash flow needed to make critical investments in their businesses, the Debtors have determined that deleveraging their capital structure is an absolute necessity. Accordingly, the Debtors commenced these Chapter 11 Cases primarily to implement the balance sheet restructuring contemplated under the Restructuring Support Agreement and to put themselves in a position to execute on their new business plan and capitalize on their growth opportunities.

Significantly, this reorganization carries the support of each class of the Debtors' secured creditors, as the First Lien Agent, approximately 89.9% of its First Lien Lenders, the Second Lien Agent, approximately 91.6% of its Second Lien Lenders, and the Consenting Sponsors are signatories to the Restructuring Support Agreement, which requires the parties to support a reorganization contemplated under the Plan. This level of consensus for a comprehensive reorganization reflects not only the enormous efforts undertaken by the Debtors and the Prepetition Secured Parties over recent months, but also the parties' belief in the Debtors prospects as a reorganized enterprise.

## ARTICLE V

## OTHER KEY ASPECTS OF THE PLAN

**5.1    Distributions**

One of the key concepts under the Bankruptcy Code is that only claims and interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below. In general, an Allowed Claim or Interest means that the Debtors agree, or if there is a dispute, the Bankruptcy Court determines, that the Claim or Interest, and the amount thereof, is in fact a valid obligation of or Interest in the Debtors.

(a)    **Distributions on Account of Claims and Interests Allowed as of the Effective Date**

Except as otherwise provided herein, a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the holder of the applicable Claim, on the first Distribution Date, the Distribution Agent shall make initial distributions under the Plan on account of Claims Allowed on or before the Effective Date; provided, however, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims and Allowed Secured Tax Claims shall be paid in accordance with Sections 2.4 and 3.2(a) of the Plan, respectively. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business. A Distribution Date shall occur no more frequently than once in every 90 day period after the Effective Date, as necessary, in the Reorganized Debtors' sole discretion.

(b)    **Rights and Powers of Distribution Agent**

(1)    **Powers of the Distribution Agent**

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

(2)        **Expenses Incurred on or after the Effective Date**

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors.

(c)        **Record Date for Distributions to Holders of Non-Publicly Traded Securities**

On the Effective Date, the various transfer registers for each class of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record holders of any Claims or Interests. The Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Effective Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.

(d)        **Proofs of Claim / Disputed Claims Process**

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all General Unsecured Claims under the Plan, except as required by Section 5.3 of the Plan, holders of Claims need not file Proofs of Claim, and the Reorganized Debtors and the holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced except that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable. Notwithstanding anything in Section 7.1 of the Plan, (a) all Claims against the Debtors that result from the Debtors' rejection of an executory contract or unexpired lease, (b) disputes regarding the amount of any Cure pursuant to section 365 of the Bankruptcy Code, and (c) Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court. From and after the Effective Date, the Reorganized Debtors may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court.

(e)        **Objections to Claims**

Except insofar as a Claim is Allowed under the Plan, the Debtors, the Reorganized Debtors, or any other party in interest shall be entitled to object to Claims. Any objections to Claims shall be served and filed (a) on or before the ninetieth (90th) day following the later of (i) the Effective Date and (ii) the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (b) such later date as ordered by the Bankruptcy Court upon motion filed by the Debtors or Reorganized Debtors. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Section 4.17 of the Plan.

(f)        **No Distribution Pending Allowance**

If an objection to a Claim is deemed, as set forth in Section 7.1 of the Plan, or filed, as set forth in Section 7.2 of the Plan, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

(g)        **Distributions After Allowance**

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Distribution Agent shall provide to the holder of such Claim the distribution (if any) to which such holder

27

is entitled under the Plan as of the Effective Date, without any interest to be paid on account of the such Claim unless required under applicable bankruptcy law.

        (h)      **Special Rules for Distributions to Holders of Disputed Claims**

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim or Interest have been resolved by settlement or Final Order or the Claims have been Allowed or expunged.

        (i)      **No Interest**

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

        (j)      **Disallowance of Claims and Interests**

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if:  (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**5.2**      **General Settlement of Claims and Interests**

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and is within the range of reasonableness.  Subject to Article VI of the Plan, all distributions made to holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final.

**5.3**      **Restructuring Transactions**

On or about the Effective Date, the Debtors or the Reorganized Debtors, in each case, with the consent of the Required First Lien Lenders and, subject to the Second Lien Lender Consent Right and the Sponsor Entities Consent Right (in each case, as defined in, and solely to the extent applicable under, the Restructuring Support Agreement), the Required Second Lien Lenders and the Sponsor Entities, which consent shall not be unreasonably withheld, conditioned or delayed, shall take all actions as may be necessary or appropriate to effectuate the transactions described in, approved by, contemplated by, or necessary to effectuate the Restructuring Support Agreement and the Plan (collectively, the "Restructuring Transactions"), including:  (a) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including, but not limited to the documents comprising the Plan Supplement; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability,

debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (d) such other transactions that are required to effectuate the Restructuring Transactions, including, but not limited to those described in the Restructuring Transactions Exhibit, in the most tax efficient manner, including the mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions or liquidations; (e) the execution, delivery, and filing, if applicable, of the Exit Credit Facilities Documents, the New Stockholders' Agreement, and the Warrant Agreement; and (f) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law. The Restructuring Transactions may include a taxable transfer of certain of the Debtors' assets or entities to a newly-formed entity (or an affiliate or subsidiary of such entity) formed and controlled by certain holders of Claims against the Debtors and, in such case, the New Common Stock (and/or other interests) issued to holders of Claims pursuant to the Plan may comprise stock (and/or other interests) of more than one entity. In such event, (i) equivalent percentages of the common stock (and/or other interests) of such separated entity as those percentages of New Common Stock to be granted to holders of Allowed Class 3 Claims and Allowed Class 4 Claims shall be granted to holders of Allowed Class 3 Claims and Allowed Claim 4 Claims and (ii) the indebtedness underlying the New Exit Credit Facilities may be allocated among such separated entity and the other Reorganized Debtors in a manner agreed upon by the Debtors and the Required First Lien Lenders, and subject to the the Second Lien Lender Consent Right and the Sponsor Entities Consent Right (in each case, as defined in, and solely to the extent applicable under, the Restructuring Support Agreement).

Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtors, whether taken prior to or as of the Effective Date, shall be deemed authorized and approved in all respects without the need for any further corporate action and without any further action by the Debtors or the Reorganized Debtors, as applicable. Such actions may include the following: (a) the adoption and filing of the New Organizational Documents; (b) the selection of the New Board and New OpCo Boards; (c) the authorization, issuance, and distribution of the New Common Stock and Warrants; (d) the adoption or assumption, as applicable, of Executory Contracts or Unexpired Leases; (e) the entry into the Exit Credit Facilities and the execution and delivery of the New Credit Facilities Documents, the New Stockholders' Agreement, and the Warrant Agreement, as applicable; and (f) the adoption of the Management Incentive Plan in accordance with Section 4.16 of the Plan.

**5.4**    **Management Incentive Plan**

Prior to the Effective Date, the Debtors and the Ad Hoc First Lien Group shall negotiate in good faith to determine a mutually agreed upon Management Incentive Plan, and the Debtors and the Ad Hoc First Lien Group shall consult with the Ad Hoc Second Lien Group regarding the foregoing to the extent such Management Incentive Plan proposes to grant participants therein MIP Equity or other securities of Reorganized Holdings. On or after the Effective Date, except as otherwise set forth in any employment agreement, the members of the management teams of the divisions of the Reorganized Debtors will be eligible to participate in the Management Incentive Plan. The New Board shall adopt and implement the Management Incentive Plan as soon as practicable after the Effective Date, which may be an equity incentive program pursuant to which the MIP Equity and/or OpCo MIP Equity will be reserved for issuance. To the extent applicable, any MIP Equity issued in connection with the Management Incentive Plan shall dilute all of the New Common Stock equally, including the Exit Commitment Equity and the New Common Stock issuable upon the exercise of the Warrants. Additionally, the New Board shall approve an annual cash bonus program for the management teams of the Reorganized Debtors as soon as practicable after the Effective Date. Confirmation shall be deemed approval of the Management Incentive Plan, without any further action or approval required by the Bankruptcy Court.

**5.5**    **Treatment of Executory Contracts and Unexpired Leases**

(a)    **Assumption of Executory Contracts and Unexpired Leases**

Each Executory Contract and Unexpired Lease shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease (a) was previously assumed or rejected; (b)

was previously expired or terminated pursuant to its own terms; (c) is the subject of a motion or notice to assume or assume and assign Filed on or before the Confirmation Date; or (d) is designated specifically, or by category, as an Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates.  The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions and assignments.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

(b)    **Cure of Defaults and Objections to Cure and Assumption**

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be filed with the Solicitation Agent on or before 30 days after the Effective Date.  Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; provided, however, that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure.  The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.  In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be filed with the Bankruptcy Court on or before 30 days after the Effective Date.  Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to Section 5.2 of the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to Section 5.2 of the Plan, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

(c)      **Rejection Damages Claims**

In the event that the rejection of an executory contract or unexpired lease by any of the Debtors results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors or their respective properties or interests in property as agents, successors, or assigns, unless a Proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtors and the Reorganized Debtors no later than thirty (30) days after the later of (i) the Effective Date or (ii) the effective date of such executory contract or unexpired lease. Any such Claims, to the extent Allowed, shall be classified as Class 5 (General Unsecured Claims).

(d)      **Insurance Policies**

Notwithstanding anything in the Plan to the contrary, all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto, including all D&O Liability Insurance Policies (including tail coverage liability insurance). Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed, and shall survive the Effective Date.

After the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce, modify or restrict in any way, the coverage under any D&O Liability Insurance Policy (including such tail coverage liability insurance) in effect as of the Effective Date, and all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date of the Plan shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date of the Plan.

(e)      **Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

(f)      **Reservation of Rights**

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**5.6      Release, Injunction, and Related Provisions**

(a)      **Discharge of Claims and Termination of Interests**

**Except as otherwise provided for herein, effective as of the Effective Date: (a) the rights afforded in the Plan and the treatment of Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (b) the Plan shall bind all holders of Claims and Interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied,**

discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, their successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

(b)    **Releases by the Debtors**

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, and to the extent permitted by applicable law, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Action brought as counterclaims or defenses to Claims asserted against the Debtors), the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the DIP L/C Facility, the DIP Loan Documents, the DIP L/C Facility Documents, the Exit Credit Facilities, the Exit Credit Facilities Documents, the Chapter 11 Cases, the prepetition negotiation and settlement of Claims, the filing of the Chapter 11 Cases, solicitation of the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Confirmation Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Confirmation Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (b) any individual from any claim related to an act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, gross negligence or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

(c)    **Releases by Holders of Claims and Interests**

Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, and to the extent permitted by applicable law, each Releasing Party, to the fullest extent allowed by applicable law, is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the Debtors' in- or out-of-court restructuring

efforts, any Avoidance Actions, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the DIP L/C Facility, the DIP Loan Documents, the DIP L/C Facility Documents, the Exit Credit Facilities, the Exit Credit Facilities Documents, the Chapter 11 Cases, the prepetition negotiation and settlement of Claims, the filing of the Chapter 11 Cases, solicitation of the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Confirmation Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Confirmation Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any individual from any claim related to an act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, gross negligence or willful misconduct, or (c) obligations under the First Lien Credit Agreement and the Second Lien Credit Agreement which by their express terms survive the termination of the First Lien Credit Agreement and the Second Lien Credit Agreement, including the rights of the First Lien Agent and the Second Lien Agent to expense reimbursement, indemnification and similar amounts.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good-faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

(d)    **Exculpation**

Notwithstanding anything contained herein to the contrary, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the DIP L/C Facility, the DIP Loan Documents, the DIP L/C Facility Documents, the Exit Credit Facilities, the Exit Credit Facilities Documents, the Chapter 11 Cases, the prepetition negotiation and settlement of Claims, the filing of the Chapter 11 Cases, solicitation of the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Confirmation Date related or relating to the foregoing, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, gross negligence or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

(e)      **Preservation of Rights of Action**

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of the Plan, the DIP Orders, or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. **The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article VIII of the Plan, the DIP Orders, or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to Section 4.17 of the Plan include any claim or Cause of Action with respect to, or against, a Released Party.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action preserved pursuant to the first paragraph of Section 4.17 of the Plan that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

(f)      **Injunction**

**Except as otherwise provided herein or for obligations created or issued pursuant hereto, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to Section 8.2 or Section 8.3 of the Plan, discharged pursuant to Section 8.1 of the Plan, or are subject to exculpation pursuant to Section 8.4 of the Plan shall be permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests discharged, released, exculpated, or settled pursuant to the Plan.**

**5.7**      **Protection Against Discriminatory Treatment**

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a

Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**5.8**    **Indemnification**

On and as of the Effective Date, the Indemnification Provisions will be assumed and irrevocable and will survive the effectiveness of the Plan, and the New Organizational Documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' directors, officers, employees, or agents that were employed by, or serving on the board of directors of, any of the Debtors as of the Petition Date, to the fullest extent permitted by law and at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date, against any Claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and, notwithstanding anything in the Plan to the contrary, none of the Reorganized Debtors will amend and/or restate the New Organizational Documents before or after the Effective Date to terminate or adversely affect any of the Reorganized Debtors' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights.

**5.9**    **Recoupment**

In no event shall any holder of a Claim be entitled to recoup such Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

**5.10**    **Release of Liens**

Except as otherwise specifically provided in the Plan, the Exit Credit Facilities Documents (including in connection with any express written amendment of any mortgage, deed of trust, Lien, pledge, or other security interest under the Exit Credit Facilities Documents), or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors, the DIP Administrative Agent, the First Lien Agent, the Second Lien Agent or any other holder of a Secured Claim. In addition, at the sole expense of the Debtors or the Reorganized Debtors, the DIP Administrative Agent, the First Lien Agent, and the Second Lien Agent shall execute and deliver all documents reasonably requested by the Debtors, Reorganized Debtors or administrative agent(s) for the Exit Credit Facilities to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto.

**5.11**    **Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent, or (b) the relevant holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

**5.12**    **Employee Arrangements of the Reorganized Debtors**

As of the Effective Date, the Reorganized Debtors shall be authorized to: (a) maintain, amend, or revise employment, indemnification, and other arrangements with their directors, officers, and employees, that were employed by, or serving on the board of directors of, any of the Debtors as of the Petition Date that have not been rejected before or as of the Effective Date, subject to the terms and conditions of any such agreement; and (b) enter into new employment, indemnification, and other arrangements with directors, officers, and employees, in the case of this clause (b), as determined by the board of directors of the applicable Reorganized Debtor.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

**5.13**    **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided herein, or in any agreement, instrument, or other document incorporated in the Plan (including the Restructuring Transactions), on the Effective Date, all property in each Debtor's Estate, all Causes of Action, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and pursue, compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**5.14**    **Cancellation of Notes, Instruments, Certificates, and Other Documents**

On the Effective Date, except as otherwise provided in the Plan:  (a) the obligations of the Debtors under the DIP Facility, the DIP L/C Facility, the First Lien Loan Documents, the Second Lien Loan Documents, and any Interest in Holdings, certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors giving rise to any Claim or Interest shall be cancelled and the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder; and (b) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation, or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be released and discharged; provided that notwithstanding Confirmation or the occurrence of the Effective Date, any such agreement that governs the rights of the holder of an Allowed Claim shall continue in effect solely for purposes of (i) enabling such holder to receive distributions under the Plan on account of such Allowed Claim as provided herein, provided, further, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under the Plan; provided, further, that nothing in this section shall effect a cancellation of any New Common Stock, Warrants, Intercompany Interests, or Intercompany Claims.

Notwithstanding Confirmation, the occurrence of the Effective Date or anything to the contrary herein, only such matters which by their express terms survive the termination of the First Lien Credit Agreement and the Second Lien Credit Agreement shall survive the occurrence of the Effective Date, including the rights of the First Lien Agent and the Second Lien Agent to expense reimbursement, indemnification and similar amounts.

**5.15**    **Charter, Bylaws, and New Organizational Documents**

On the Effective Date, or as soon thereafter as is reasonably practicable, the Reorganized Debtors' respective certificates of incorporation and bylaws (and other formation and constituent documents relating to limited liability companies) shall be amended as may be required to be consistent with the provisions of the Plan, the New Stockholders' Agreement, the Warrant Agreement, the Governance Term Sheet, and the Exit Credit Facilities Documents, as applicable, and the Bankruptcy Code.  The New Organizational Documents shall, among other things:  (a) authorize the issuance of the New Common Stock and the Warrants and the shares of New Common

Stock (including any other securities issuable upon exercise of the Warrants) issued upon the exercise of the Warrants; and (b) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity Securities.  After the Effective Date, each Reorganized Debtor may amend and restate its certificate of incorporation and other formation and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of the New Organizational Documents, the New Stockholders Agreement, the Warrant Agreement, and the Governance Term Sheet.

**5.16**    **Modification of Plan**

Effective as of the date hereof:  (a) the Debtors reserve the right (subject to the Restructuring Support Agreement) in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order consistent with the terms set forth herein; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.  Notwithstanding anything to the contrary herein, the Debtors or the Reorganized Debtors, as applicable, shall not amend or modify the Plan in a manner inconsistent with the Restructuring Support Agreement.

**5.17**    **Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation of votes thereon pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**5.18**    **Revocation or Withdrawal of Plan**

The Debtors reserve the right (subject to the Restructuring Support Agreement) to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then:  (a) the Plan will be null and void in all respects; (b) the Restructuring Support Agreement will be null and void in all respects; (c) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (d) nothing contained in the Plan shall (1) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (2) prejudice in any manner the rights of any Debtor or any other Entity, or (3) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

**5.19**    **Reservation of Rights**

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

**5.20**    **Plan Supplement Exhibits**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After any of such documents included in the Plan Supplement are filed, copies of such documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Solicitation Agent's website at www.omnimgt/com/answers or the Bankruptcy Court's website at https://www.pacer.gov/.

**5.21    Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Section 9.2 of the Plan:

(a)        the Professional Fee Escrow Account shall have been established and funded with the Professional Fee Amount;

(b)        the DIP Orders shall have been entered by the Bankruptcy Court, and shall not have been stayed or modified or vacated;

(c)        (i) the Confirmation Order shall have been entered by the Bankruptcy Court and (ii) such order shall have become a Final Order that has not been stayed or modified or vacated;

(d)        the Debtors shall not be in default under the DIP Facility, the DIP L/C Facility or the DIP Orders (or, to the extent that the Debtors are in default on the proposed Effective Date, such default shall have been waived by the DIP Lenders or cured by the Debtors in a manner consistent with the DIP Facility, the DIP L/C Facility and the DIP Orders);

(e)        the Exit Credit Facilities Documents shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the Exit Credit Facilities shall have been waived or satisfied in accordance with the terms thereof, and the closing of the Exit Credit Facilities shall be deemed to occur concurrently with the occurrence of the Effective Date;

(f)        (i) the Definitive Documents shall have satisfied the RSA Definitive Document Requirements; (ii) in addition to the RSA Definitive Document Requirements applicable to the Exit Credit Facilities Documents, the Exit Credit Facilities Documents also shall be in form and substance reasonably satisfactory to the Exit Credit Facilities Administrative Agent and Exit L/C Issuer (in each case solely with respect to the provisions thereof that affect the rights and duties of the Exit Credit Facilities Administrative Agent or Exit L/C Issuer, as applicable), and (iii) the Exit L/C Facility Documents shall be in form and substance reasonably satisfactory to the Exit L/C Issuer and the Required First Lien Lenders;

(g)        all conditions precedent to the issuance of the New Common Stock, including the Exit Commitment Equity, and the Warrants (and the automatic issuance of the New Common Stock, including the Exit Commitment Equity, and the Warrants on the Effective Date), other than any conditions related to the occurrence of the Effective Date, shall have occurred;

(h)        all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the New Stockholders' Agreement and the Warrant Agreement shall have been waived or satisfied in accordance with the terms thereof, and the closing of the New Stockholders' Agreement and the Warrant Agreement shall be deemed to occur concurrently with the occurrence of the Effective Date;

(i)        to the extent required under applicable non-bankruptcy law, the New Organizational Documents shall have been duly filed with the applicable authorities in the relevant jurisdictions;

(j)        all governmental and material third party approvals and consents, including Bankruptcy Court approval, that are necessary to implement the Restructuring Transactions shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

(k)        the Restructuring Support Agreement shall not have terminated as to all parties thereto and shall be in full force and effect and the Debtors and the applicable Restructuring Support Parties then party thereto shall be in compliance therewith;

(l)      all amounts payable by the Debtors pursuant to section 16 of the Restructuring Support Agreement and the DIP Orders have been satisfied in full; and

(m)      with respect to all documents and agreements necessary to implement the Plan:  (1) all conditions precedent to such documents and agreements (other than any conditions precedent related to the occurrence of the Effective Date) shall have been satisfied or waived pursuant to the terms of such documents or agreements; (2) such documents and agreements shall have been tendered for delivery to the required parties and been approved by any required parties and, to the extent required, filed with and approved by any applicable Governmental Units in accordance with applicable laws; and (3) such documents and agreements shall have been effected or executed.

## 5.22     Waiver of Conditions Precedent

The Debtors, with the prior written consent of the Required First Lien Lenders, Required Second Lien Lenders or Sponsor Entities, as applicable, may waive any of the conditions to the Effective Date set forth in Section 9.1 of the Plan (except for Section 9.1(c)(i) of the Plan) at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan; provided, however, the condition in Section 9.1(f) of the Plan may be waived with respect to a particular Definitive Document only to the extent that every party that maintains a consent right over the subject Definitive Document as set forth in the Restructuring Support Agreement agrees to waive such condition with respect to the subject Definitive Document.

## 5.23     Effect of Non-Occurrence of Conditions to Consummation

If prior to Consummation, the Confirmation Order is vacated pursuant to a Final Order, then, except as provided in such Final Order, the Plan will be null and void in all respects, and nothing contained in the Plan, the Disclosure Statement, or the Restructuring Support Agreement shall:  (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by an Entity; (b) prejudice in any manner the rights of any Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE VI

## CERTAIN FACTORS TO BE CONSIDERED

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

**ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE PLAN AND ITS IMPLEMENTATION.**

## 6.1     General

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive.  In considering whether to vote to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

**6.2**      **Risks Relating to the Plan and Other Bankruptcy Law Considerations**

(a)      **A Claim or Interest Holder May Object to, and the Bankruptcy Court May Disagree with, the Debtors' Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created eight Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. However, a Claim or Interest holder could challenge the Debtors' classification. In such an event, the cost of the Chapter 11 Cases and the time needed to confirm the Plan may increase, and there can be no assurance that the Bankruptcy Court will agree with the Debtors' classification. If the Bankruptcy Court concludes that the classifications of Claims and Interests under the Plan do not comply with the requirements of the Bankruptcy Code, the Debtors may need to modify the Plan. Such modification could require re-solicitation of votes on the Plan. The Plan may not be confirmed if the Bankruptcy Court determines that the Debtors' classification of Claims and Interests is not appropriate.

(b)      **The Debtors May Not Be Able to Satisfy the Voting Requirements for Confirmation of the Plan.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors may seek, as promptly as practicable thereafter, Confirmation. If the Plan does not receive the required support from Class 3 and Class 4, the Debtors may elect, subject to the terms of the Restructuring Support Agreement, to amend the Plan, seek to sell their assets pursuant to section 363 of the Bankruptcy Code, or proceed with liquidation. There can be no assurance that the terms of any such alternative chapter 11 plan or sale pursuant to section 363 of the Bankruptcy Code would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan.

(c)      **The Bankruptcy Court May Not Confirm the Plan or May Require the Debtors to Re-Solicit Votes with Respect to the Plan.**

The Debtors cannot assure you that the Plan will be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a plan of reorganization, requires, among other things, a finding by the Bankruptcy Court that the plan of reorganization is "feasible," that all claims and interests have been classified in compliance with the provisions of section 1122 of the Bankruptcy Code, and that, under the plan of reorganization, each holder of a claim or interest within each impaired class either accepts the plan of reorganization or receives or retains cash or property of a value, as of the date the plan of reorganization becomes effective, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. With respect to impaired classes of claims or interests that do not accept the plan, section 1129(b) requires that the plan be fair and equitable (including, without limitation the "absolute priority rule") and not discriminate unfairly with respect to such classes. There can be no assurance that the Bankruptcy Court will conclude that the feasibility test and other requirements of section 1129 of the Bankruptcy Code (including, without limitation, finding that the Plan satisfies the "new value" exception to the absolute priority rule, if applicable) have been met with respect to the Plan. If and when the Plan is filed, there can be no assurance that modifications to the Plan would not be required for Confirmation, or that such modifications would not require a re-solicitation of votes on the Plan.

The Bankruptcy Court could fail to approve this Disclosure Statement and determine that the votes in favor of the Plan should be disregarded. The Debtors then would be required to recommence the solicitation process, which would include re-filing a plan of reorganization and disclosure statement. Typically, this process involves a 60- to 90-day period and includes a Bankruptcy Court hearing with respect to the required approval of a disclosure statement, followed (after Bankruptcy Court approval) by solicitation of claim and interest holder votes for the plan of reorganization, followed by a confirmation hearing at which the Bankruptcy Court will determine whether the requirements for confirmation have been satisfied, including the requisite claim and interest holder acceptances.

If the Plan is not confirmed, the Chapter 11 Cases may be converted into cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of claims and interests and the Debtors' liquidation analysis are set forth under the unaudited Liquidation Analysis, attached hereto as **Exhibit C**. The Debtors believe that liquidation under chapter 7 of the Bankruptcy Code would result in, among other things, smaller distributions being made to creditors and interest holders than those provided for in the Plan because of:

- the potential absence of a market for the Debtors' assets on a going concern basis;

- additional administrative expenses involved in the appointment of a trustee; and

- additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other Executory Contracts in connection with a cessation of the Debtors' operations.

    (d)    **The Debtors May Object to the Amount or Classification of a Claim or Interest.**

Except as otherwise provided in the Plan, the Debtors and other parties in interest reserve the right to object to the amount or classification of any Claim or Interest under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim or Interest where such Claim or Interest is subject to an objection. Any holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

    (e)    **Even if the Debtors Receive All Necessary Acceptances for the Plan to Become Effective, the Debtors May Fail to Meet All Conditions Precedent to Effectiveness of the Plan.**

Although the Debtors believe that the Effective Date would occur very shortly after the Confirmation Date, there can be no assurance as to such timing.

The Confirmation and effectiveness of the Plan are subject to certain conditions that may or may not be satisfied. The Debtors cannot assure you that all requirements for Confirmation and effectiveness required under the Plan will be satisfied. If each condition precedent to Confirmation is not met or waived, the Plan will not be Confirmed, and if each condition precedent to Consummation is not met or waived, the Effective Date will not take place. In the event that the Plan is not Confirmed or is not Consummated, the Debtors may seek Confirmation of a new plan.

    (f)    **Contingencies May Affect Distributions to Holders of Allowed Claims and Interests.**

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

    (g)    **The Bankruptcy Court May Find the Solicitation of Acceptances Inadequate.**

Usually, votes to accept or reject a plan of reorganization are solicited after the filing of a petition commencing a chapter 11 case. Nevertheless, a debtor may solicit votes prior to the commencement of a chapter 11 case in accordance with sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b). Sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) require that:

- solicitation comply with applicable nonbankruptcy law;

- the plan of reorganization be transmitted to substantially all creditors and other interest holders entitled to vote; and

- the time prescribed for voting is not unreasonably short.

In addition, Bankruptcy Rule 3018(b) provides that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted in accordance with reasonable solicitation procedures. Section 1126(b) of the Bankruptcy Code provides that a holder of a claim or interest that has accepted or rejected a plan before the commencement of a case under the Bankruptcy Code is deemed to have accepted or rejected the plan if (i) the solicitation of such acceptance or rejection was in compliance with applicable nonbankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation or (ii) there is no such law, rule, or regulation, and such acceptance or rejection was solicited after disclosure to such holder of adequate information (as defined by section 1125(a) of the Bankruptcy Code). While the Debtors believe that the requirements of sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) will be met, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(h)     **There is a Risk of Termination of the Restructuring Support Agreement.**

To the extent that events giving rise to termination of the Restructuring Support Agreement occur, the Restructuring Support Agreement may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important creditor constituencies and could result in the loss of use of cash collateral by the Debtors under certain circumstances. Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

(i)     **The Bankruptcy Court May Dismiss Some or All of the Chapter 11 Cases.**

Certain parties in interest may contest the Debtors' authority to commence and/or prosecute the Chapter 11 Cases. If, pursuant to any such proceeding, the Bankruptcy Court finds that some or all of the Debtors could not commence the Chapter 11 Cases for any reason (including for cause or any grounds supporting abstention), the Debtors may be unable to consummate the transactions contemplated by the Restructuring Support Agreement and the Plan, and the Consenting First Lien Lenders, in their capacity as DIP Lenders, may be unwilling to proceed with their $25 million new money investment, and the Consenting First Lien Lenders acceptance of the New Credit Facilities in exchange for their respective DIP Claims and First Lien Claims. If some or all of the Chapter 11 Cases are dismissed, the Debtors may be forced to cease operations due to insufficient funding and/or liquidate their businesses in another forum to the detriment of all parties in interest.

(j)     **The United States Trustee or Other Parties May Object to the Plan on Account of the Third-Party Release Provisions.**

Any party in interest, including the United States Trustee (the "*U.S. Trustee*"), could object to the Plan on the grounds that the third-party release contained in Section 8.3 of the Plan is not given consensually or in a permissible non-consensual manner. In response to such an objection, the Bankruptcy Court could determine that the third-party release is not valid under the Bankruptcy Code. If the Bankruptcy Court makes such a determination, the Plan could not be confirmed without modifying the Plan to alter or remove the third-party release. This could result in substantial delay in Confirmation of the Plan or the Plan not being confirmed at all.

(k)     **The Debtors May Seek To Amend, Waive, Modify, or Withdraw the Plan at Any Time Prior to Confirmation.**

The Debtors, reserve the right, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement, and consistent with the terms of the Plan, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are consistent with the terms of the Restructuring Support Agreement and necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the holders of Claims and Interests cannot presently be foreseen but may include a

42

change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. All holders of Claims and Interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court. If, after receiving sufficient acceptances, but prior to Confirmation of the Plan, the Debtors seek to modify the Plan, the previously solicited acceptances will be valid only if (1) all classes of adversely affected creditors and interest holders accept the modification in writing, or (2) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of holders of accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code.

(l)    **The Plan May Have Material Adverse Effects on the Debtors' Operations.**

The solicitation of acceptances of the Plan and commencement of the Chapter 11 Cases could adversely affect the relationships between the Debtors and their respective users, employees, partners, and other parties. Such adverse effects could materially impair the Debtors' operations.

(m)    **The Debtors Cannot Predict the Amount of Time Spent in Bankruptcy for the Purpose of Implementing the Plan, and a Lengthy Bankruptcy Proceeding Could Disrupt the Debtors' Businesses, as Well as Impair the Prospect for Reorganization on the Terms Contained in the Plan.**

The Debtors estimate that the process of obtaining Confirmation of the Plan by the Bankruptcy Court will last approximately 45 days from the Petition Date, but it could last considerably longer if, for example, Confirmation is contested or the conditions to Confirmation or Consummation are not satisfied or waived.

Although the Plan is designed to minimize the length of the bankruptcy proceedings, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan will be confirmed. Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could itself have an adverse effect on the Debtors' businesses. There is a risk, due to uncertainty about the Debtors' futures that, among other things:

- customers could move to the Debtors' competitors;

- employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

- suppliers, vendors, or other business partners could terminate their relationship with the Debtors or demand financial assurances or enhanced performance, any of which could impair the Debtors' prospects.

A lengthy bankruptcy proceeding also would involve additional expenses and divert the attention of management from the operation of the Debtors' businesses.

The disruption that the bankruptcy process would have on the Debtors' businesses could increase with the length of time it takes to complete the Chapter 11 Cases. If the Debtors are unable to obtain Confirmation of the Plan on a timely basis, because of a challenge to the Plan or otherwise, the Debtors may be forced to operate in bankruptcy for an extended period of time while they try to develop a different plan of reorganization that can be confirmed. A protracted bankruptcy case could increase both the probability and the magnitude of the adverse effects described above.

(n)    **Other Parties in Interest Might Be Permitted to Propose Alternative Plans of Reorganization That May Be Less Favorable to Certain of the Debtors' Constituencies Than the Plan.**

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization to the Plan. Under the Bankruptcy Code, a debtor in possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization for a period of 120 days from the Petition Date. However, such exclusivity period can be reduced or terminated upon order of the Bankruptcy Court. If such an

43

order were to be entered, parties in interest other than the Debtors would then have the opportunity to propose alternative plans of reorganization.

If another party in interest were to propose an alternative plan of reorganization following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to existing holders of Claims and Interests and may seek to exclude such holders from retaining any equity under their proposed plan. An alternative plan of reorganization also may not be predicated on the $25 million new money investment from the Consenting First Lien Lenders, in their capacity as DIP Lenders, and the Consenting First Lien Lenders acceptance of the New Credit Facilities in exchange for their respective DIP Claims and First Lien Claims, which may result in less favorable treatment for a number of other constituencies, including the holders of Claims in Classes 3, 4, and 5.

The Debtors consider maintaining relationships with their stakeholders, customers, and other partners as critical to maintaining the value of their enterprise following the Effective Date and have sought to treat those constituencies accordingly. However, proponents of alternative plans of reorganization may not share the Debtors' assessments and may seek to impair the Claims or Interests of such constituencies to a greater degree. If there were competing plans of reorganization, the Chapter 11 Cases likely would become longer, more complicated, more litigious, and much more expensive. If this were to occur, or if the Debtors' stakeholders or other constituencies important to the Debtors' business were to react adversely to an alternative plan of reorganization, the adverse consequences discussed in the foregoing sections also could occur.

(o)    **The Debtors' Business May Be Negatively Affected if the Debtors Are Unable to Assume Their Executory Contracts.**

An executory contract is a contract on which performance remains due to some extent by both parties to the contract. The Plan provides for the assumption of all Executory Contracts and Unexpired Leases. The Debtors intend to preserve as much of the benefit of their existing Executory Contracts and Unexpired Leases as possible. However, with respect to some limited classes of Executory Contracts, including licenses with respect to patents or trademarks, the Debtors may need to obtain the consent of the counterparty to maintain the benefit of the contract. There is no guarantee that such consent either would be forthcoming or that conditions would not be attached to any such consent that makes assuming the contracts unattractive. The Debtors then would be required to either forego the benefits offered by such contracts or to find alternative arrangements to replace them.

(p)    **Material Transactions Could Be Set Aside as Fraudulent Conveyances or Preferential Transfers.**

Certain payments received by stakeholders prior to the bankruptcy filing could be challenged under applicable debtor/creditor or bankruptcy laws as either a "fraudulent conveyance" or a "preferential transfer." A fraudulent conveyance occurs when a transfer of a debtor's assets is made with the intent to defraud creditors or in exchange for consideration that does not represent reasonably equivalent value to the property transferred. A preferential transfer occurs upon a transfer of property of the debtor while the debtor is insolvent for the benefit of a creditor on account of an antecedent debt owed by the debtor that was made on or within 90 days before the petition date or one year before the petition date, if the creditor, at the time of such transfer, was an insider. If any transfer were challenged in the Bankruptcy Court and found to have occurred with regard to any of the Debtors' material transactions, the Bankruptcy Court could order the recovery of all amounts received by the recipient of the transfer.

(q)    **The Debtors May Be Unsuccessful in Obtaining First Day Orders To Permit Them to Pay Their Vendors or Continue Operating Their Businesses in the Ordinary Course of Business.**

The Debtors have attempted to address potential concerns of their customers, vendors, and other key parties in interest that might arise from the filing of the Plan through a variety of provisions incorporated into or contemplated by the Plan, including the Debtors' intention to seek appropriate Bankruptcy Court orders to permit the Debtors to pay their prepetition and postpetition accounts payable to parties in interest in the ordinary course. However, there can be no guarantee that the Debtors will be successful in obtaining the necessary approvals of the Bankruptcy Court for such arrangements or for every party in interest the Debtors may seek to treat in this manner, and, as a result, the Debtors' businesses might suffer.

44

(r)    **The Bankruptcy Court May Not Approve the Debtors' Use of Cash Collateral or the DIP Facility.**

Upon commencing the Chapter 11 Cases, the Debtors will ask the Bankruptcy Court to authorize the Debtors to enter into postpetition financing arrangements and use cash collateral to fund the Chapter 11 Cases and to provide customary adequate protection to the Prepetition Secured Parties under the Prepetition Debt Documents, which requests will be in accordance with the terms of the Restructuring Support Agreement. Such access to postpetition financing and cash collateral will provide liquidity during the pendency of the Chapter 11 Cases. There can be no assurance that the Bankruptcy Court will approve the DIP Facility and/or such use of cash collateral on the terms requested. Moreover, if the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust their available cash collateral. There is no assurance that the Debtors will be able to obtain an extension of the right to obtain further postpetition financing or use cash collateral, in which case, the liquidity necessary for the orderly functioning of the Debtors' businesses may be impaired materially.

(s)    **Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations.**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations on a post-reorganization basis.

**6.3    Risks Relating to the Restructuring Transactions**

(a)    **The Debtors Will Be Subject to Business Uncertainties and Contractual Restrictions Prior to the Effective Date.**

Uncertainty about the effects of the Plan on employees may have an adverse effect on the Debtors. These uncertainties may impair the Debtors' ability to retain and motivate key personnel and could cause users and others that deal with the Debtors to defer entering into contracts with the Debtors or making other decisions concerning the Debtors or seek to change existing business relationships with the Debtors. In addition, the Debtors are highly dependent on the efforts and performance of their senior management team. If key employees depart because of uncertainty about their future roles and potential complexities of the Restructuring Transactions, the Debtors' business, financial condition, liquidity, and results of operations could be adversely affected.

(b)    **The Support of the Restructuring Support Parties Is Subject to the Terms of the Restructuring Support Agreement Which Is Subject to Termination in Certain Circumstances.**

Pursuant to the Restructuring Support Agreement, the Restructuring Support Parties are obligated to support the restructuring transaction discussed above and the Plan. Nevertheless, the Restructuring Support Agreement is subject to termination upon the occurrence of certain termination events. Accordingly, the Restructuring Support Agreement may be terminated after the date of this Disclosure Statement, and such a termination would present a material risk to Confirmation and/or Consummation of the Plan because the Plan may no longer have the support of the Restructuring Support Parties.

(c)    **There Is Inherent Uncertainty in the Debtors' Financial Projections Such that the Reorganized Debtors May Not Be Able to Meet the Projections.**

The Financial Projections attached hereto as **Exhibit E** includes projections covering the Debtors' operations through 2019. These projections are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.

45

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations. These variations may be material and may adversely affect the value of the New Common Stock and Warrants and the ability of the Debtors to make payments with respect to their indebtedness. Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur.

Further, during the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date. In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

Lastly, the business plan was developed by the Debtors with the assistance of their advisors. There can be no assurances that the Debtors' business plan will not change, perhaps materially, as a result of decisions that the board of directors may make after fully evaluating the strategic direction of the Debtors and their business plan. Any deviations from the Debtors' existing business plan would necessarily cause a deviation from the Financial Projections, and could result in materially different outcomes from those projected.

(d)     **The Debtors Must Continue to Retain, Motivate, and Recruit Executives and Other Key Employees, Which May Be Difficult in Light of Uncertainty Regarding the Plan, and Failure To Do So Could Negatively Affect the Debtors' Businesses.**

For the Restructuring Transactions to be successful, during the period before the Effective Date, the Debtors must continue to retain, motivate, and recruit executives and other key employees and maintain employee morale. Moreover, the Debtors must be successful at retaining and motivating key employees following the Effective Date. Employees of the Debtors may feel uncertainty about their future roles with the Debtors until, or even after, future strategies are announced or executed. The potential distractions of the Restructuring Transactions may adversely affect the ability of the Debtors to retain, motivate, and recruit executives and other key employees and keep them focused on applicable strategies and goals. Additionally, the Debtors' employees could seek employment with one of the Debtors' competitors, which, in light of the Chapter 11 Cases, may seek to lure the employees at a time when such employees may be fearful about the Debtors' future. To be sure, a failure by the Debtors to attract, retain, and motivate executives and other employees during the period prior to or after the Effective Date could have a negative impact on the Debtors' businesses.

(e)     **Failure to Implement the Restructuring Transactions and Confirm and Consummate the Plan Could Negatively Impact the Debtors.**

If the Restructuring Transactions are not implemented, the Debtors may consider other restructuring alternatives available at that time, subject to the Restructuring Support Agreement, which may include the filing of an alternative chapter 11 plan, conversion to chapter 7, commencement of section 363 sales of the Debtors' assets, or any other transaction that would maximize value of the Debtors' estates. Any alternative restructuring proposal may be on terms less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described herein.

Any material delay in Confirmation of the Plan, or the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

If the Plan is not Confirmed and Consummated, the ongoing businesses of the Debtors may be adversely affected and there may be various consequences, including:

- the adverse impact to the Debtors' businesses caused by the failure to pursue other beneficial opportunities due to the focus on the Restructuring Transactions, without realizing any of the anticipated benefits of the Restructuring Transactions;

- the incurrence of substantial costs by the Debtors in connection with the Restructuring Transactions, without realizing any of the anticipated benefits of the Restructuring Transactions;

- the possibility, for the Debtors, of being unable to repay indebtedness when due and payable; and

- the Debtors pursuing traditional chapter 11 or chapter 7 proceedings, resulting in recoveries for creditors and  interest holders that are less than contemplated under the Plan, or resulting in no recovery for certain creditors and interest holders.

(f)      **Even if the Restructuring Transactions are Successful, the Debtors Will Continue to Face Risks.**

The Restructuring Transactions are generally designed to reduce the amount of the Debtors 'cash interest expense and improve the Debtors' liquidity and financial and operational flexibility to generate long-term growth. Even if the Restructuring Transactions are implemented, the Debtors will continue to face a number of risks, including certain risks that are beyond the Debtors' control, such as changes in economic conditions, changes in the Debtors' industry, and changes in commodity prices.  As a result of these risks and others, there is no guarantee that the Restructuring Transactions will achieve the Debtors' stated goals.

## 6.4      Risks Relating to the New Common Stock and Warrants

(a)      **The Debtors May Not Be Able to Achieve Their Projected Financial Results.**

The Debtors may not be able to meet their projected financial results or achieve the revenue or cash flow that the Debtors have assumed in projecting their future business prospects.  If the Debtors do not achieve these projected revenue or cash flow levels, the Debtors may lack sufficient liquidity to continue operating as planned after emergence.  The financial projections represent management's view based on currently known facts and hypothetical assumptions about their future operations.  They do not, however, guarantee the Debtors' future financial performance.

(b)      **The Plan Exchanges Senior Indebtedness for Junior Securities.**

If the Plan is confirmed and consummated, certain holders of First Lien Claims and Second Lien Claims will receive the New Common Stock and the Warrants, as applicable.  Thus, in agreeing to the Plan, certain of such holders will be consenting to the exchange of their interests in senior debt, which has, among other things, a stated interest rate, a maturity date, and a liquidation preference over equity securities, for the New Common Stock and the Warrants, which will be subordinate to all future creditor claims.

(c)    **A Liquid Trading Market for the New Common Stock and the Warrants May Not Develop.**

The Debtors make no assurance that liquid trading markets for the New Common Stock and the Warrants will develop. The liquidity of any market for the New Common Stock and the Warrants will depend, among other things, upon the number of holders of New Common Stock and Warrants, the Reorganized Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted. Therefore, the Debtors cannot assure that an active trading market will develop or, if a market develops, what the liquidity or pricing characteristics of that market will be.

(d)    **The Debtors May Be Controlled by Significant Holders.**

Under the Plan, certain holders of Allowed Claims may receive New Common Stock and Warrants. If holders of a significant portion of the New Common Stock were to act as a group, such holders might be in a position to control the outcome of actions requiring shareholder approval, including the election of directors. In addition, the New Board shall be appointed by the Consenting First Lien Lenders.

(e)    **The Debtors' Financial Projections Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based.**

The Debtors' financial projections are based on numerous assumptions including: timely Confirmation and Consummation pursuant to the terms of the Plan; the anticipated future performance of the Debtors; industry performance; general business and economic conditions; and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date that the Disclosure Statement is approved by the Bankruptcy Court may affect the actual financial results of the Debtors' operations. These variations may be material and may adversely affect the ability of the Debtors to make payments with respect to indebtedness following Consummation. Because the actual results achieved throughout the periods covered by the projections may vary from the projected results, the projections should not be relied upon as an assurance of the actual results that will occur. Except with respect to the projections and except as otherwise specifically and expressly stated, the Disclosure Statement does not reflect any events that may occur subsequent to the date of the Disclosure Statement. Such events may have a material impact on the information contained in the Disclosure Statement. The Debtors do not intend to update the projections and therefore the projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the projections.

**6.5    Risks Relating to the Debtors' Business**

(a)    **The Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness.**

The Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Debtors' control. Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, borrowings in connection with emergence.

(b)    **The Debtors' Substantial Liquidity Needs May Impact Revenue.**

The Debtors' principal sources of liquidity historically have been cash flow from operations, sales generated through traffic to their websites, borrowings under their Prepetition Credit Facilities, and issuances of equity securities. If the Debtors' cash flow from operations remains depressed or continues to decrease, the Debtors' ability to expend the capital necessary to diversify their businesses and continue to provide innovative product and service offerings will be severely strained.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources and have extremely limited, if any, access to additional financing. In addition to the cash necessary to fund ongoing

operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases. The Debtors cannot guarantee that cash on hand, cash flow from operations, and cash provided by the DIP Facility will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) their ability to comply with the terms and condition of any debtor-in-possession financing and/or cash collateral order entered by the Bankruptcy Court in connection with the Chapter 11 Cases; (b) their ability to maintain adequate cash on hand; (c) their ability to generate cash flow from operations; (d) their ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; (e) the availability of incremental draws under the DIP Facility; and (f) the cost, duration, and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that cash on hand, cash flow from operations, and cash provided under the DIP Facility are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all. In addition, the Debtors' ability to consummate the Plan is dependent on their ability to satisfy the conditions precedent to the Exit Credit Facilities. The Debtors can provide no assurance that such conditions will be satisfied. The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

(c)     **The Debtors' Business Depends on Their Ability to Keep Pace with Rapid Technological Changes That Impact Their Industry.**

The market in which the Debtors operate is characterized by rapid, and sometimes disruptive, technological developments, evolving industry standards, frequent new product introductions and enhancements, changes in customer requirements and a limited ability to accurately forecast future customer orders. Their future success depends in part on their ability to continue to develop technology solutions that keep pace with evolving industry standards and changing customer demands. The process of developing new technology is complex and uncertain, and if the Debtors fail to accurately predict customers' changing needs and emerging technological trends, their business could be harmed. The Debtors are required to commit significant resources to developing new products before knowing whether the investments will result in products the market will accept. If the industry does not evolve as the Debtors believe it will, or if their strategy for addressing this evolution is not successful, many of their strategic initiatives and investments may be of no or limited value. Furthermore, the Debtors may not execute successfully on their strategic plan because of errors in product planning or timing, technical hurdles that they fail to overcome in a timely fashion, or a lack of appropriate resources. This could result in competitors providing those solutions before the Debtors do, in which case the Debtors could lose market share, reducing net revenues and earnings.

Furthermore, the migration away from the Debtors' Multiply business to their ForeSee and Webcollage businesses involves significant resources and is subject to significant risks. Although this migration has already begun, the process will continue for a number of years. In addition, such a change in the Debtors' business vision will require substantial capital expenditures when the Debtors are at their most vulnerable. There can be no assurance that the Debtors' ForeSee and Webcollage businesses will succeed at the levels the Debtors anticipate. Accordingly, this migration could result in increased expenses, harm to the Debtors' reputation, and a loss of future revenues.

(d)     **Recent Global Economic Trends Could Adversely Affect the Debtors' Business, Results of Operations and Financial Condition, Primarily Through Disruption to the Debtors' Customers' Businesses.**

An economic decline in future reporting periods could negatively affect the Debtors' businesses and results of operations. The volatility of the current economic climate makes it difficult for the Debtors to predict their results

49

of operations. Recent global economic conditions, including disruption of financial markets, could adversely affect the Debtors' business, results of operations and financial condition, primarily through disrupting their customers' businesses. Higher rates of unemployment and lower levels of business activity generally adversely affect the level of demand for certain of the Debtors' products and services. In addition, continuation or worsening of general market conditions in the U.S. economy or other national economies important to our businesses may adversely affect the Debtors' customers' level of spending, ability to obtain financing for purchases and ability to make timely payments to the Debtors for their products and services, which could require the Debtors to increase the Debtors' allowance for doubtful accounts, negatively impact their sales outstanding and adversely affect their results of operations.

Consumer hesitancy or limited availability of credit may constrict the business operations of their end user customers and their channel, development, and implementation partners, and consequently impede their own operations. The consequences may include restrained or delayed investments, late payments, bad debts, and even insolvency among customers and business partners. These have had an effect on the Debtors' revenue growth and incoming payments, and the impact may continue. In addition, the Debtors' prices could come under more pressure due to more intense competition or deflation. If current economic conditions persist or worsen, the Debtors expect that their revenue growth and results of operations will continue to be negatively impacted. Finally, an extended period of further economic deterioration could exacerbate the other risks described herein. If these or other conditions limit the Debtors' ability to grow revenue or cause the Debtors' revenue to decline and the Debtors cannot reduce costs on a timely basis or at all, the Debtors' operating results may be materially and adversely affected.

      (e)      **Acquisitions of Companies, Products, or Technologies, or Internal Restructuring and Cost Savings Initiatives May Disrupt the Debtors' Ongoing Businesses.**

The Debtors have acquired and may continue to acquire companies, products and technologies that complement their strategic direction. Acquisitions involve significant risks and uncertainties, including:

- inability to successfully integrate the acquired technology and operations into the Debtors' business and maintain uniform standards, controls, policies, and procedures;

- inability to realize synergies expected to result from an acquisition;

- challenges retaining the key employees, customers, resellers and other business partners of the acquired operation; and

- the internal control environment of an acquired entity may not be consistent with the Debtors' standards and may require significant time and resources to improve.

Acquisitions and divestitures are inherently risky. The Debtors' transactions may not be successful and may, in some cases, harm operating results or their financial condition. In addition, if the Debtors use debt to fund acquisitions or for other purposes, their interest expense and leverage may significantly increase. If the Debtors issue equity securities as consideration in an acquisition, current shareholders' percentage ownership and earnings per share may be diluted.

In addition, from time to time, the Debtors may undertake internal restructurings and other initiatives intended to reduce expenses. These initiatives may not lead to the benefits the Debtors expect, may be disruptive to the Debtors' personnel and operations, and may require substantial management time and attention. Moreover, the Debtors could encounter delays in executing their plans, which could entail further disruption and associated costs. If these disruptions result in a decline in productivity of the Debtors' personnel, negative impacts on operations, or if they experience unanticipated expenses associated with these initiatives, the Debtors' business and operating results may be harmed.

    (f)    **The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.**

In the future, the Debtors may become a party to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

**6.6    Certain Tax Implications of the Chapter 11 Cases**

Holders of Allowed First Lien Claims and Allowed Second Lien Claims should carefully review <u>ARTICLE IX</u> herein, "Certain U.S. Federal Income Tax Consequences," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and holders of such Claims.

**6.7    Disclosure Statement Disclaimer**

    (a)    **Information Contained Herein Is Solely for Soliciting Votes .**

The information contained in this Disclosure Statement is for the purpose of soliciting acceptances of the Plan and may not be relied upon for any other purpose. Specifically, this Disclosure Statement is not legal advice to any Person or Entity. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each reader should consult its own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan and whether to object to Confirmation.

    (b)    **Disclosure Statement May Contain Forward-Looking Statements.**

This Disclosure Statement may contain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, as amended. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," the negative thereof, or other variations thereon or comparable terminology.

The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the filing or pendency of the Chapter 11 Cases;
- financing plans;
- competitive position;
- business strategy;
- budgets;
- projected cost reductions;
- projected dividends;
- projected price increases;

- growth opportunities for existing products and services;
- results of litigation;
- disruption of operations;
- contractual obligations;
- projected general market conditions;
- plans and objectives of management for future operations;
- off-balance sheet arrangements; and
- the Debtors' expected future financial position, liquidity, results of operations, profitability, and cash flows.

51

- effect of changes in accounting due to recently issued accounting standards;

- projected and estimated liability costs, including tort, and environmental costs and costs of environmental remediation;

Statements concerning these and other matters are not guarantees of the Debtors' future performance. The reader is cautioned that all forward-looking statements are necessarily speculative. The Valuation Analysis, the Liquidation Analysis, the recovery projections, and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to holders of Allowed Claims and Interests may be affected by many factors that cannot be predicted. Forward-looking statements represent the Debtors' estimates and assumptions only as of the date such statements were made. There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement.

(c)     **No Legal, Business, or Tax Advice Is Provided to You by This Disclosure Statement.**

**THIS DISCLOSURE STATEMENT IS NOT LEGAL, BUSINESS, OR TAX ADVICE TO YOU.** The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation.

(d)     **No Admissions Made**

The information and statements contained in this Disclosure Statement will neither (1) constitute an admission of any fact or liability by any entity (including the Debtors) nor (2) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, holders of Allowed Claims or Interests, or any other parties-in-interest.

(e)     **Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. All Parties, including the Debtors, reserve the right to continue to investigate Claims and Interests and file and prosecute objections to Claims and Interests.

(f)     **No Waiver of Right to Object or Right to Recover Transfers and Assets**

The vote by a holder of an Allowed Claim or Interest for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors to object to that holder's Allowed Claim or Interest, or to bring Causes of Action or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

(g)     **Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

(h)     **The Potential Exists for Inaccuracies and the Debtors Have No Duty to Update**

The Debtors make the statements contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since such date. Although the Debtors have used their

52

reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.    Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered by the Bankruptcy Court.

        (i)      **No Representations Outside of the Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.    In deciding whether to vote to accept or reject the Plan, you should not rely upon any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, unless otherwise indicated herein.    You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

## ARTICLE VII

## CONFIRMATION PROCEDURES

The following is a brief summary of the Confirmation process.    Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult with their own advisors.

## 7.1    The Confirmation Hearing

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization.    On the Petition Date, the Debtors will file a motion requesting that the Bankruptcy Court set a date and time approximately 30 days after the Petition Date for the Confirmation Hearing.    In this case, the Debtors will also request that the Bankruptcy Court approve this Disclosure Statement at the Confirmation Hearing.    The Confirmation Hearing, once set, may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules, without further notice to parties in interest.    The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.    Subject to section 1127 of the Bankruptcy Code and the Restructuring Support Agreement, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation.    The Debtors, in the same motion requesting a date for the Confirmation Hearing, will request that the Bankruptcy Court set a date and time for parties in interest to file objections to Confirmation of the Plan.    An objection to Confirmation of the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that it is actually received on or before the deadline to file such objections as set forth therein.

## 7.2    Confirmation Standards

Among the requirements for Confirmation are that the Plan (a) is accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (b) is feasible; and (c) is in the "best interests" of holders of Claims and Interests that are Impaired under the Plan.

The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before a bankruptcy court may confirm a plan of reorganization.    The Debtors believe that the Plan fully complies with all the applicable requirements of section 1129 of the Bankruptcy Code set forth below, other than those pertaining to voting, which has not yet taken place.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors (or any other proponent of the Plan) have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the Debtors (or any other proponent of the Plan) or by a Person issuing Securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, in connection with the Plan and incident to the Chapter 11 Cases is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtors (or any other proponent of the Plan) have disclosed the identity and affiliations of any individual proposed to serve, after Confirmation, as a director, or officer, the Reorganized Debtors, any Affiliate of the Debtors reorganized under the Plan, or any successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policy.

- The Debtors (or any other proponent of the Plan) have disclosed the identity of any Insider that will be employed or retained the Reorganized Debtors and the nature of any compensation for such Insider.

- With respect to each holder within an Impaired Class of Claims or Interests, as applicable, each such holder (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

- With respect to each Class of Claims or Interests, such Class (a) has accepted the Plan or (b) is Unimpaired under the Plan (subject to the "cram-down" provisions discussed below); see Section 7.5 hereof ("Confirmation Without Acceptance by All Impaired Classes").

- The Plan provides for treatment of Claims, as applicable, in accordance with the provisions of section 507(a) of the Bankruptcy Code.

- If a Class of Claims is Impaired under the Plan, at least one Class of Claims that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any Insider.

- Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtors, or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

- All fees payable under 28 U.S.C. § 1930 have been paid or the Plan provides for the payment of all such fees on the Effective Date.

- The Plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to Confirmation, for the duration of the period the applicable Debtor has obligated itself to provide such benefits.

54

**7.3**    **Best Interests Test / Liquidation Analysis**

As described above, section 1129(a)(7) of the Bankruptcy Code requires that each holder of an Impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Based on the unaudited Liquidation Analysis attached hereto as **Exhibit C**, the Debtors believe that the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would be no greater than the value of distributions under the Plan.  As a result, the Debtors believe holders of Claims and Interests in all Impaired Classes will recover at least as much as a result of Confirmation of the Plan as they would recover through a hypothetical chapter 7 liquidation.

THE LIQUIDATION ANALYSIS HAS BEEN PREPARED SOLELY FOR USE IN THIS DISCLOSURE STATEMENT AND DOES NOT REPRESENT VALUES THAT ARE APPROPRIATE FOR ANY OTHER PURPOSE.  NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION BY OR ADMISSION OF ANY DEBTOR FOR ANY PURPOSE.

**7.4**    **Feasibility**

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan of reorganization is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared the Financial Projections, which, together with the assumptions on which they are based, are attached hereto as **Exhibit E**.  Based on such Financial Projections, the Debtors believe that they will be able to make all payments required under the Plan while conducting ongoing business operations.  Therefore, Confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

**7.5**    **Confirmation Without Acceptance by All Impaired Classes**

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as (a) the plan otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted the plan without taking into consideration the votes of any insiders in such class and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan.  These so-called "cram down" provisions are set forth in section 1129(b) of the Bankruptcy Code.

(a)    **No Unfair Discrimination**

The no "unfair discrimination" test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  The Debtors believe the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation.

(b)    **Fair and Equitable Test**

This test applies to Classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no Class of Claims or Interests receive more than 100% of the amount of the allowed Claims or Interests in such Class.  As to the dissenting Class, the test sets different standards depending on the type of Claims or Interests in such Class.  In order to demonstrate that a plan is fair and equitable, the plan proponent must demonstrate:

- Secured Creditors: Each holder of a secured claim:  (1) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the chapter 11 plan, of at least the allowed amount of such claim; (2) has the right to credit bid the amount of its claim if its property is sold and

retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof); or (3) receives the "indubitable equivalent" of its allowed secured claim.

- Unsecured Creditors: Either (1) each holder of an impaired unsecured claim receives or retains under the chapter 11 plan property of a value equal to the amount of its allowed claim or (2) the holders of claims and interests that are junior to the claims of the non-accepting class will not receive any property under the chapter 11 plan.

- Holders of Interests: Either (1) each holder of an impaired interest will receive or retain under the chapter 11 plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest or (2) the holders of interests that are junior to the non-accepting class will not receive or retain any property under the chapter 11 plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement notwithstanding that Class 8 (the Interests in Holdings) are deemed to reject the Plan, because, as to such Class, there is no Class of equal priority receiving more favorable treatment and no Class that is junior to such Classes will receive or retain any property on account of the Claims or Interests in such Class.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for "cram down" (or non-consensual Confirmation of the Plan) pursuant to section 1129(b) of the Bankruptcy Code.

## 7.6 **Alternatives to Confirmation and Consummation of the Plan**

If the Plan cannot be confirmed, subject to the requirements of the Restructuring Support Agreement, the Debtors may seek to (1) prepare and present to the Bankruptcy Court an alternative chapter 11 plan for confirmation, (2) effect a merger or sale transaction, including, potentially, a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (3) liquidate their assets and businesses under chapter 7 of the Bankruptcy Code. If the Debtors were to pursue a liquidation of their assets and businesses in chapter 7, the Debtors would convert these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, and a trustee would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on creditors' recoveries and the Debtors is described in the unaudited Liquidation Analysis attached hereto as **Exhibit C**.

## ARTICLE VIII

## IMPORTANT SECURITIES LAW DISCLOSURE

## 8.1 **New Common Stock and Warrants**

As discussed herein, the Plan provides for the Reorganized Debtors to distribute the New Common Stock and the Warrants to holders of First Lien Claims and Second Lien Claims in accordance with Article III of the Plan. The MIP Equity will also be distributed under the Management Incentive Plan after the Effective Date.

The Debtors believe that the class of New Common Stock and the Warrants will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable Blue Sky Law. The Debtors further believe that the offer and sale of the New Common Stock and/or the Warrants pursuant to the Plan is, and subsequent transfers of the New Common Stock and/or Warrants by the holders thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) will be, exempt from federal and state securities registration requirements under the Bankruptcy Code and any applicable state Blue Sky Law as described in more detail below.

**8.2**      **Issuance and Resale of New Common Stock and Warrants**

All shares of the New Common Stock and the Warrants issued (a) to holders of First Lien Claims and (b) holders of Second Lien Claims, as applicable, on account of their Claims and all shares of New Common Stock (including any other securities issuable upon exercise of the Warrants) issued upon the exercise of the Warrants, will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on Section 1145(a) of the Bankruptcy Code.  Section 1145 of the Bankruptcy Code provides that Section 5 of the Securities Act and any state law requirements for the offer and sale of a security do not apply to the offer or sale of stock, options, warrants or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization, (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor, and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange or partly for cash and property. The Debtors believe that the offer and sale of the New Common Stock and Warrants in exchange for the Claims described above satisfy the requirements of section 1145 (a) of the Bankruptcy Code. Accordingly, no registration statement will be filed under the Securities Act or any state securities laws. Recipients of the New Common Stock and the Warrants are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state Blue Sky Law. As discussed below, the exemptions provided for in section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

**8.3**      **Resales of New Common Stock and Warrants; Definition of Underwriter**

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the New Common Stock and/or the Warrants by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Under certain circumstances, holders of New Common Stock and/or Warrants who are deemed to be "underwriters" may be entitled to resell their New Common Stock pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.  Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met.  Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New

Common Stock and Warrants would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Common Stock and/or Warrants and, in turn, whether any Person may freely resell New Common Stock and/or Warrants.  However, the Debtors do not intend to make publicly available the requisite information regarding the Company, and, as a result, after the holding period, Rule 144 will not be available for resales of the New Common Stock or Warrants by Persons deemed to be underwriters or otherwise.

**Accordingly, the Debtors recommend that potential recipients of the New Common Stock and the Warrants consult their own counsel concerning their ability to freely trade such securities without compliance with the federal law and any applicable state Blue Sky Law. In addition, these securities will not be registered under the Exchange Act or listed on any national securities exchange.  The Debtors make no representation concerning the ability of a person to dispose of the New Common Stock or the Warrants**

### 8.4    New Common Stock & Management Incentive Plan

The terms of the Management Incentive Plan shall be determined by the Consenting First Lien Lenders prior to the Confirmation Hearing.  The Confirmation Order shall authorize the New Board to adopt and enter into the Management Incentive Plan.  In the event the Management Incentive Plan provides for the issuance of MIP Equity, such MIP Equity would dilute all of the New Common Stock outstanding at the time of such issuance.

### 8.5    Issuance of Exit Commitment Equity

The Exit Commitment Equity is being issued pursuant to an exemption from the registration requirements provided by Section 4(a)(2) of the Securities Act.  As a result, these securities are not subject to federal securities registration.

### 8.6    Subsequent Transfers of Exit Commitment Equity

The Exit Commitment Equity has not been registered under the Securities Act or any other applicable securities law.  Accordingly, such securities will be "restricted securities" within the meaning of Rule 144 promulgated under the Securities Act and may not be offered, sold or otherwise transferred except in compliance with the registration requirements of the Securities Act or any other applicable securities law, or pursuant to an exemption therefrom or in a transaction not subject thereto.

As these shares have not been registered under the Securities Act, each holder of Exit Commitment Equity should proceed on the assumption that the economic risk of the investment must be borne for an for an indefinite period, since the securities may not be resold unless they are subsequently registered under the Securities Act or an exemption from such registration is available.

Certificates evidencing Exit Commitment Equity will bear a legend substantially in the form below:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR OTHER APPLICABLE LAW EXCEPT FOR TRANSFERS THAT ARE EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OR OTHER APPLICABLE LAW."

**The Debtors recommend that potential recipients of Exit Commitment Equity consult their own counsel concerning how they may freely trade such securities in compliance with the federal and state securities laws or an exemption therefrom.**

## ARTICLE IX

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

### 9.1    Introduction

The following discussion summarizes certain United States ("*U.S.*") federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and holders of Claims entitled to vote on the Plan (*i.e.*, holders of Allowed First Lien Claims and Allowed Second Lien Claims). It does not address the U.S. federal income tax consequences to holders of Claims not entitled to vote on the Plan or to holders of Interests. This summary is based on the Internal Revenue Code of 1986, as amended (the "*Tax Code*"), the U.S. Treasury Regulations promulgated thereunder (the "*Treasury Regulations*"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "*IRS*"), all as in effect on the date hereof (collectively, "*Applicable Tax Law*"). Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, local or non-income tax consequences of the Plan (including such consequences with respect to the Debtors or the Reorganized Debtors), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, persons liable for alternative minimum tax, U.S. holders whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, controlled foreign corporations, passive foreign investment companies, partnerships (or other entities treated as partnerships or other pass-through entities), beneficial owners of partnerships (or other entities treated as partnerships or other pass-through entities), subchapter S corporations, persons who hold Claims or who will hold the New Common Stock, Warrants, and/or the Second Lien Exit Loans as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and holders of Claims who are themselves in bankruptcy). Furthermore, this summary assumes that a holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the First Lien Claims, the Second Lien Claims, and the Second Lien Exit Loans will be respected as debt for U.S. federal income tax purposes in accordance with their form. The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors and holders of Allowed First Lien Claims and Allowed Second Lien Claims described below also may vary depending on the nature of any Restructuring Transactions that the Debtors and/or Reorganized Debtors engaged in.

This summary does not address the receipt, if any, of property by holders of Claims other than in their capacity as such (*e.g.*, this summary does not discuss the treatment of any commitment fee or similar arrangement), and the treatment of the receipt of any such property may vary significantly from the treatment described herein.

For purposes of this discussion, a "U.S. holder" is a holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "non-U.S. holder" is any holder of a Claim that is neither a U.S. holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity. Partners (or other beneficial owners) of partnerships (or other entities treated as partnerships or other pass-through entities) that are holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, NON-U.S., NON-INCOME, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**9.2    Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors**

(a)    **Characterization of Restructuring Transactions**

The Debtors intend to cause the New Common Stock and Warrants (and, if issued by Reorganized Holdings or a newly-formed subsidiary thereof that is disregarded for U.S. federal income tax purposes, the Second Lien Exit Loans) that will be received by the holders of Claims entitled to New Common Stock or Warrants (and, if applicable, the Second Lien Exit Loans) in exchange for their Claims pursuant to the Plan to first be issued and contributed by Reorganized Holdings to Reorganized Debtor Answers Corporation, and then exchanged (in addition to the other consideration, if applicable) by Reorganized Debtor Answers Corporation with such holders pursuant to the Plan, and to treat such transactions as occurring in the same order (issuance, contribution, and exchange) for U.S. federal income tax purposes. The Debtors believe, and intend to take the position that, this treatment applies for U.S. federal income tax purposes, and the remainder of the discussion assumes this to be the case. The tax consequences to the Debtors, the Reorganized Debtors, and holders of Claims described herein could be materially different in the event this characterization was not respected for U.S. federal income tax purposes.

The Debtors do not currently anticipate that the Restructuring Transactions will result in any immediate material U.S. federal income tax liability to the Debtors or the Reorganized Debtors. As discussed immediately below, however, the Debtors do expect the Restructuring Transactions to result in material decreases in certain of the Reorganized Debtors' tax attributes.

(b)    **Cancellation of Debt Income and Reduction of Tax Attributes**

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("***COD Income***"), for U.S. federal income tax purposes, upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the debtor issued, and (iii) the fair market value of any other consideration (including stock or warrants of the debtor or another entity) given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a debtor is not required to include COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to the rule discussed in the preceding sentence. In general, tax attributes will be reduced in the following order: (a) net operating losses ("***NOLs***") and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not in an amount greater than the excess of the aggregate tax bases of the property held by the debtor immediately after the discharge over the aggregate amount of the debtor's liabilities immediately after the discharge); (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. Any excess COD Income over the amount of available tax attributes is

60

not subject to U.S. federal income tax and generally has no other U.S. federal income tax impact, except in certain circumstances in which such excess COD Income triggers negative stock basis (or an "excess loss account" (or "***ELA***")) into income.

The Treasury Regulations address the method and order for applying tax attribute reduction to an affiliated group of corporations. Under these Treasury Regulations, the tax attributes of the group member, the debt of which is being discharged, is first subject to reduction. To the extent a debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member. If a debtor member's excluded COD Income exceeds its tax attributes, the excess COD Income is applied to reduce certain remaining consolidated tax attributes of the affiliated group. Although not free from doubt, the Debtors currently do not anticipate excess COD Income having any further U.S. federal income tax impact as described in the preceding paragraph.

As a result of the Restructuring Transactions, the Debtors expect to realize significant COD Income, which is expected to result in material reductions in NOLs, NOL carryforwards, tax basis in assets, and other tax attributes. The Debtors currently believe that there is an ELA within the affiliated group which could be triggered into income of the Reorganized Debtors under certain circumstances in the future if not eliminated.

(c)     **Limitation of NOL Carryforward and Other Tax Attributes**

The Debtors estimate that the Debtors' NOL carryforwards as of the end of 2016 total approximately $157 million. Following the Effective Date, the Debtors anticipate that any surviving NOL carryovers, capital loss carryovers, tax credit carryovers, and certain other tax attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change) of the Reorganized Debtors allocable to periods before the Effective Date (collectively, the "***Pre-Change Losses***") may be subject to limitation under sections 382 and 383 of the Tax Code as a result of an "ownership change" of the Reorganized Debtors by reason of the transactions consummated pursuant to the Plan.

Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation. The rules of section 382 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the distribution of the New Common Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

(1)     **General Section 382 Annual Limitation**

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs: 2.09% for ownership changes occurring in February 2017).

If a corporation (or affiliated group) has a net unrealized built-in gain at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then the section 382 limitation may be increased to the extent that the debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. If a corporation (or affiliated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or affiliated group's) net unrealized built-in gain or net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.

Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

Notwithstanding the rules described above, if post-ownership change, a debtor corporation and its subsidiaries do not continue the debtor corporation's historic business or use a significant portion of its historic business assets in a new business for two years after the ownership change (the "***Business Continuity Requirement***"), the annual limitation resulting from the ownership change is zero.

As discussed below, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

    (2)    **Special Bankruptcy Exceptions**

An exception to the foregoing annual limitation rules generally applies when shareholders or so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "***382(l)(5) Exception***"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, NOL carryforwards will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies, the Business Continuity Requirement does not apply, although a different business continuation requirement may apply under the Treasury Regulations. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "***382(l)(6) Exception***"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception because under the 382(l)(6) Exception, the debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo an ownership change within two years without automatically triggering the elimination of its Pre-Change Losses. If the 382(l)(6) Exception applies, the Business Continuity Requirement discussed above also applies.

The Debtors have not yet determined whether that the Restructuring Transactions will qualify for the 382(l)(5) Exception, but even if the Restructuring Transactions qualify for the 382(l)(5) Exception, the Debtors or the Reorganized Debtors may decide to elect out of the 382(l)(5) Exception, particularly if it appears likely that another ownership change will occur within two years after emergence. Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the Tax Code were to occur after the Effective Date.

    (d)    **Alternative Minimum Tax**

In general, an alternative minimum tax ("***AMT***") is imposed on a corporation's alternative minimum taxable income ("***AMTI***") at a 20% rate to the extent such tax exceeds the corporation's regular U.S. federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, except for alternative tax NOLs generated in certain years, which can offset 100% of a corporation's AMTI, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards. The effect of this rule could cause the Debtors or the Reorganized Debtors to owe some U.S. federal income tax on taxable income in current or future years even if NOL carryforwards are available to offset that taxable income. Additionally, under

section 56(g)(4)(G) of the Tax Code, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under section 382(h) of the Tax Code, immediately before the ownership change, the effect of which may increase the amount of AMT owed by the Reorganized Debtors.

## 9.3    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed First Lien Claims and Allowed Second Lien Claims

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan.  Holders of First Lien Claims and Second Lien Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

As an initial matter, the tax treatment of holders of Claims may depend, in part, on whether the debt underlying the surrendered Claim is a "security" of the Debtor that is issuing the consideration being received by a holder of such Claim, and whether any debt being received by such holder in exchange for such Claim constitutes a "security."  Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.  Generally speaking, borrowings under revolving facilities are not considered "securities" unless such borrowings are drawn under circumstances that indicate the draw will remain outstanding for more than five years, and the Debtors intend to take the position that the First Lien Claims that constitute borrowings under the revolving facility do not constitute "securities."  Because the First Lien Claims and Second Lien Claims that constitute term loans had original terms of seven and eight years, respectively, although not free from doubt, the Debtors expect to take the position that such Claims constitute "securities."  However, because the Second Lien Exit Facility is expected to have an original term of less than five years, the Debtors expect to take the position that the debt underlying the Second Lien Exit Facility does not constitute a "security."

(a)    **U.S. Federal Income Tax Consequences to U.S. Holders of Allowed First Lien Claims**

Pursuant to the Plan, except to the extent that a U.S. holder of a First Lien Claim agrees to a less favorable treatment in exchange for full and final satisfaction, settlement, release and discharge of such Claims, the U.S. holder of such Claims shall receive a Pro Rata distribution of (a) the New Common Stock; and (b) the Second Lien Exit Loans.

The Debtors expect to take the position that (a) the First Lien Claims constitute debt of Answers Corporation, but the New Common Stock constitutes stock in Reorganized Holdings; and (b) the Second Lien Exit Loans does not constitute a "security."  Accordingly, holders of First Lien Claims are not receiving any stock or securities of Answers Corporation in exchange for their First Lien Claims, and a U.S. holder of such Claim will be treated as receiving its distributions under the Plan in a taxable exchange under section 1001 of the Tax Code.  Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount ("*OID*"), if any), each U.S. holder of such Claim should recognize gain or loss equal to the difference between:  (i) the sum of the issue price of the Second Lien Exit Loans and the fair market value of the New Common Stock received in exchange for the Claim; and (ii) such U.S. holder's adjusted basis, if any, in such Claim.  Subject to the rules regarding market discount and accrued interest discussed below, any gain or loss recognized will generally be capital gain or loss and will generally be long-term capital gain or loss if the U.S. holder has held the Claim for more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations.

63

U.S. holders of such Claims should obtain a tax basis in the non-cash consideration received, other than any such amounts treated as received in satisfaction of accrued but untaxed interest (or OID, if any), equal to, in the case of the New Common Stock, such stock's fair market value, and in the case of the Second Lien Exit Loans, such debt's issue price (as discussed below), in each case,  as of the date of the exchange.  The holding period for any such non-cash consideration should begin on the day following the Effective Date.

The tax basis of any non-cash consideration determined to be received in satisfaction of accrued but untaxed interest (or OID, if any) should equal the amount of such accrued but untaxed interest (or OID, if any), but in no event should such basis exceed the fair market value of the non-cash consideration received in satisfaction of accrued but untaxed interest (or OID, if any).  The holding period for any such non-cash consideration should begin on the day following the Effective Date.

(1)        <b>Determination of Issue Price and OID with Respect to Second Lien Exit Loans</b>

As noted above, holders of First Lien Claims will receive their Pro Rata share of the Second Lien Exit Loans.  The amount of gain or loss recognized by U.S. holders of such Claims will be determined, in part, by the issue price of a U.S. holder's Pro Rata share of the Second Lien Exit Loans received.  The determination of "issue price" for purposes of this analysis will depend, in part, on whether the First Lien Claims are traded on an established market for U.S. federal income tax purposes (or "publicly traded").    Under applicable Treasury Regulations, a debt instrument will not be treated as publicly traded if the outstanding stated principal amount of the issue that includes the debt instrument is $100 million or less on the relevant determination date.  Accordingly, the Second Lien Exit Loans will not be treated as publicly traded for these purposes.

The issue price of a debt instrument that is not traded on an established market,  but that is issued in exchange for Claims against the Debtors that are publicly traded, would be the fair market value of the Claims that are publicly traded.  The issue price of a debt instrument that is neither publicly traded nor issued for Claims that are publicly traded would generally be its stated redemption price at maturity (provided that the interest rate on the debt instrument is equal to or exceeds the applicable federal rate published by the IRS).  Claims against the Debtors may be traded on an established market for these purposes even if no trades actually occur and there are merely firm or indicative quotes with respect to such Claims.  As of the date hereof, the Debtors believe such quotes exist and, as a result, the Claims against the Debtors would be treated as publicly traded.

In the event the issue price of the Second Lien Exit Loans is lower than its "stated redemption price at maturity" (*i.e.*, the sum of all payments to be made on the debt instrument (other than "qualified stated interest"), including payments as a result of any interest that is "payable in kind") by more than a statutory de minimis amount, it would be treated as issued with OID.  Where debt instruments are treated as being issued with OID, a U.S. holder of any such debt instrument will generally be required to include any OID in income over the term of such debt instrument in accordance with a constant yield-to-maturity method, regardless of whether the U.S. holder is a cash or accrual method taxpayer, and regardless of whether and when such U.S. holder received cash payments of interest on such debt instrument (other than cash attributable to qualified stated interest, which is includible in income in accordance with the U.S. holder's normal method of tax accounting).  Accordingly, a U.S. holder could be treated as receiving income in advance of a corresponding receipt of cash.  Any OID that a U.S. holder includes in income will increase the tax basis of the U.S. holder in its interest in such debt instrument.  A U.S. holder of an interest in such new debt instruments will not be separately taxable on any cash payments that have already been taxed under the OID rules, but will reduce its tax basis in the pro rata shares of such debt instruments by the amount of such payments.

In general, interest (including OID, if any) received or accrued by U.S. holders should be treated as ordinary income.

(2)        <b>Bond Premium</b>

If a U.S. holder's initial tax basis in the Second Lien Exit Loans exceeds the stated redemption price at maturity of the Second Lien Exit Loans, such U.S. holder will be treated as acquiring the Second Lien Exit Loans with "bond premium."  Such U.S. holder generally may elect to amortize the premium over the remaining term of the Second Lien Exit Facility on a constant yield method as an offset to interest when includible in income under

such U.S. holder's regular accounting method. If a U.S. holder does not elect to amortize the premium, that premium will decrease the gain or increase the loss such U.S. holder would otherwise recognize on disposition of the Second Lien Exit Loans.

    (b)     **U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Second Lien Claims**

        (1)      **In General**

Except to the extent that a U.S. holder of a Second Lien Claim agrees to a less favorable treatment in exchange for full and final satisfaction, settlement, release and discharge of such Claims, the U.S. holder of such Claims shall receive a Pro Rata distribution of (a) the New Common Stock, and (b) the Warrants.

The Debtors expect to take the position that the Second Lien Claims constitute debt of Answers Corporation, but the New Common Stock and Warrants constitute stock or securities of Reorganized Holdings. Accordingly, holders of Second Lien Claims are not receiving any stock or securities of Answers Corporation in exchange for their Second Lien Claims, and a U.S. holder of such Claim will be treated as receiving its distributions under the Plan in a taxable exchange under section 1001 of the Tax Code. Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or OID, if any), each U.S. holder of such Claim should recognize gain or loss equal to the difference between (i) the fair market value of the New Common Stock and Warrants received in exchange for such Claim; and (ii) such U.S. holder's adjusted basis, if any, in such Claim. Subject to the rules regarding market discount and accrued interest discussed below, any gain or loss recognized will generally be capital gain or loss and will generally be long-term capital gain or loss if the U.S. holder has held the Claim for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations.

U.S. holders of such Claims should obtain a tax basis in the non-cash consideration received, other than any such amounts treated as received in satisfaction of accrued but untaxed interest (or OID, if any), equal to such property's fair market value as of the date such property is distributed to the U.S. holder. The holding period for any such non-cash consideration should begin on the day following the Effective Date.

The tax basis of any non-cash consideration determined to be received in satisfaction of accrued but untaxed interest (or OID, if any) should equal the amount of such accrued but untaxed interest (or OID, if any), but in no event should such basis exceed the fair market value of the non-cash consideration received in satisfaction of accrued but untaxed interest (or OID, if any). The holding period for any such non-cash consideration should begin on the day following the Effective Date.

        (2)      **Treatment of Warrants**

A U.S. holder that elects to exercise the Warrants should be treated as purchasing Warrant Equity in exchange for its participation right and the amount of cash funded by the U.S. holder to exercise such Warrants. Such a purchase should general be treated as the exercise of an option under general tax principles, and such U.S. holder should not recognize income, gain, or loss for U.S. federal income tax purposes when it exercises the Warrants. A U.S. holder's aggregate tax basis in the Warrant Equity should equal the sum of (i) the amount of cash paid by the U.S. holder to exercise the Warrants plus (ii) such U.S. holder's tax basis in the Warrants immediately before the Warrants are exercised. A U.S. holder's holding period for the Warrant Equity received pursuant to such exercise should begin on the day following such exercise.

If a U.S. holder sells the Warrants, the holder should recognize gain or loss, as discussed below. A U.S. holder that elects not to exercise the Warrants generally should be entitled to claim a capital loss equal to the amount of tax basis allocated to such Warrants, subject to any limitation on such U.S. holder's ability to utilize capital losses. U.S. holders electing not to exercise their Warrants should consult with their own tax advisors as to the tax consequences of electing not to exercise the Warrants.

In certain circumstances, the Warrants may be exercised on a cashless basis. A cashless exercise may be treated as the exercise of an option to receive a variable number of shares of New Common Stock with an exercise price of zero or as a recapitalization. However, the IRS could take the position that the U.S. holder is treated as selling a portion of the Warrants or underlying shares of New Common Stock for cash that is used to pay the

exercise price for the Warrant, in which case a U.S. holder would recognize gain or loss with respect to such deemed sale (and the tax basis of the New Common Stock received would also be affected). U.S. holders should consult with their own tax advisors as to the tax consequences of a cashless exercise of the Warrants.

The Warrant Agreement provides for adjustments to the number of shares of New Common Stock for which the Warrants may be exercised or to the exercise price of the Warrants. Under certain circumstances, such adjustments could cause the holders of Warrants to be treated as receiving a constructive dividend, which would be subject to the rules discussed below regarding dividends.

    (c)    **Accrued Interest**

To the extent that any amount received by a U.S. holder of a Claim is attributable to accrued but unpaid interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. holder as ordinary interest income (to the extent not already taken into income by the U.S. holder). Conversely, a U.S. holder of a Claim may be able to recognize a deductible loss to the extent that any accrued interest previously was included in the U.S. holder's gross income but was not paid in full by the Debtors.

If the fair market value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest. However, certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the holder should be allocated in some way other than as provided in the Plan.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

    (d)    **Market Discount**

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its holder's initial tax basis in the debt instrument is less than (a) the stated redemption price at maturity or (b) in the case of a debt instrument issued with OID, its adjusted issue price, by at least a *de minimis* amount (equal to 0.25% of the stated redemption price at maturity multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. holder (unless the U.S. holder elected to include market discount in income as it accrued).

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.**

    (e)    **Limitation on Use of Capital Losses**

A U.S. holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses. For a non-corporate U.S. holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of

(a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. holders, capital losses may only be used to offset capital gains. A corporate U.S. holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

(f)     **Ownership and Disposition of New Common Stock, Warrants, and Second Lien Exit Loans**

Any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Holdings, as determined under U.S. federal income tax principles. To the extent that a U.S. holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. holder's basis in its shares. Any such distributions in excess of the U.S. holder's basis in its shares (determined on a share-by-share basis) generally should be treated as capital gain.

Distributions on account of the New Common Stock treated as dividends generally should be eligible (i) for the dividends-received deduction if paid to U.S. holders that are corporations and (ii) for the reduced tax rates that apply to "qualified dividend income" if paid to non-corporate U.S. holders. However, the dividends-received deduction and reduced tax rates that apply to qualified dividend income are only available if certain holding period requirements are satisfied. The length of time that a U.S. holder has held its stock is reduced for any period during which the holder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

As noted above, in general, interest (including OID, if any) received or accrued by U.S. holders with respect to the Second Lien Exit Loans should be treated as ordinary income.

Unless a non-recognition provision applies, U.S. holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Stock, Warrants, and/or Second Lien Exit Loans. Such capital gain will be long-term capital gain if at the time of the sale, redemption, or other taxable disposition, the U.S. holder held the stock for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations.

(g)     **Medicare Tax**

Certain U.S. holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, interest, dividends and gains from the sale or other disposition of capital assets. U.S. holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of consideration received pursuant to the Plan.

**9.4     Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed First Lien Claims and Allowed Second Lien Claims**

(a)     **In General**

This following discussion includes only certain U.S. federal income tax consequences of the Restructuring Transactions to non-U.S. holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to non-U.S. holders are complex. Non-U.S. holders should consult their own tax advisors regarding the U.S. federal, state, and local and the foreign tax consequences of the consummation of the Plan to such non-U.S. holders and the ownership and disposition of the New Common Stock, Warrants, and Second Lien Exit Loans, as applicable.

Whether a non-U.S. holder realizes gain or loss on the exchange of Claims pursuant to the Plan, or upon a subsequent disposition of the consideration received under the Plan, and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. holders.

(1) **Gain Recognition in Connection with the Plan or upon Disposition of Consideration Received under the Plan**

Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or OID, if any), any gain realized by a non-U.S. holder on the exchange of its Claim, or on the disposition of the New Common Stock, Warrants, or Second Lien Exit Loans, generally will not be subject to U.S. federal income taxation unless (i) the non-U.S. holder is an individual who was present in the United States for 183 days or more during the taxable year in which the gain is realized and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such non-U.S. holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment or fixed base maintained by such non-U.S. holder in the United States).

If the first exception applies, the non-U.S. holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year. If the second exception applies, the non-U.S. holder generally will be subject to U.S. federal income tax in the same manner as a U.S. holder with respect to such gain. In addition, if such a non-U.S. holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

Notwithstanding the general rule stated above, non-U.S. holders could be subject to tax upon the disposition of the New Common Stock or Warrants if Holdings or Reorganized Holdings was determined to be a U.S. real property holding company (a "*USRPHC*") under the Foreign Investment in Real Property Tax Act ("*FIRPTA*"). However, the Debtors do not believe that Holdings or Reorganized Holdings, as applicable, is a USRPHC, has been a USRPHC in the past 5 years, or will be a USRPHC in the future.

(2) **Accrued Interest and Interest and OID with Respect to the Second Lien Exit Facility**

Subject to the discussions below on FATCA and backup withholding, payments to a non-U.S. holder that are attributable to accrued but untaxed interest or OID, whether in respect of their Claims against the Debtors, or in respect of the Second Lien Exit Facility, generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E (or successor form)) establishing that the non-U.S. holder is not a U.S. person, unless:

(i) the non-U.S. holder actually or constructively owns 10% or more of the total combined voting power of all classes of stock of Holdings entitled to vote (or, in the case of the Second Lien Exit Facility, stock of the issuing Reorganized Debtor);

(ii) the non-U.S. holder is a "controlled foreign corporation" that is a "related person" with respect to Holdings (or, in the case of the Second Lien Exit Facility, with respect to the issuing Reorganized Debtor) (each, within the meaning of the Tax Code);

(iii) the non-U.S. holder is a bank receiving interest described in section 881(c)(3)(A) of the Tax Code; or

(iv) such interest or OID is effectively connected with the conduct by the non-U.S. holder of a trade or business within the United States, in

which case the non-U.S. holder (x) generally will not be subject to withholding tax if it provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. holder (unless an applicable income tax treaty provides otherwise), and a non-U.S. holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. holder's effectively connected earnings and profits, subject to certain adjustments, at a rate of 30% (or such lower rate provided by an applicable income tax treaty)).

A non-U.S. holder that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest (including OID, if any) that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest (including OID, if any). For purposes of providing a properly executed IRS Form W-8BEN or W-BEN-E (or successor form), special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

(3)    **Distributions with Respect to New Common Stock**

Any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Holdings, as determined under U.S. federal income tax principles. To the extent that a non-U.S. holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the non-U.S. holder's basis in its shares. Any such distributions in excess of the non-U.S. holder's basis in its shares (determined on a share-by-share basis) generally should be treated as gain (which is subject to tax only in the circumstances described above).

Except as described below, dividends paid with respect to New Common Stock held by a non-U.S. holder that are not effectively connected with the non-U.S. holder's conduct of a U.S. trade or business will be subject to U.S. federal withholding tax at a rate of 30% (or lower, if there is an applicable treaty rate or exemption from tax). A non-U.S. holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by providing the applicable withholding agent with a properly executed IRS Form W-8BEN or W-8BEN-E (or a successor form). Dividends paid with respect to stock held by a non-U.S. holder that are effectively connected with the non-U.S. holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment or fixed base maintained by such non-U.S. holder in the United States) generally will not be subject to withholding tax if the non-U.S. holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent. Instead, such dividends would be subject to U.S. federal income tax in the same manner as a U.S. holder, and a non-U.S. holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

(4)    **FATCA**

Under the Foreign Account Tax Compliance Act ("*FATCA*"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding on the receipt of "withholdable payments," including U.S.-source interest and dividends and, beginning January 1, 2019, gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends. Foreign financial institutions that are located in a jurisdiction that has an intergovernmental agreement with the United States governing FATCA may be subject to different rules. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

Each non-U.S. holder should consult its own tax advisor regarding the possible impact of these rules on such non-U.S. holder's ownership of the consideration being received under the Plan.

**9.5**    **Information Reporting and Back-up Withholding**

The Debtors and Reorganized Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends.  The Debtors and Reorganized Debtors will also comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a holder of a Claim under the Plan, as well as future payments made with respect to consideration received under the Plan.  In addition, backup withholding of taxes will generally apply to payments in respect of an Allowed Claim under the Plan, as well as future payments with respect to the consideration received under the Plan, unless, in the case of a U.S. holder, such U.S. holder provides a properly executed IRS Form W-9 and, in the case of a non-U.S. holder, such non-U.S. holder provides a properly executed applicable IRS Form W-8 (or, in each case, such holder otherwise establishes eligibility for an exemption).

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-U.S., OR NON-INCOME TAX LAW, AND OF ANY CHANGE IN APPLICABLE TAX LAW.**

*[Remainder of Page Intentionally Left Blank]*

## ARTICLE X

### CONCLUSION AND RECOMMENDATION

The Debtors believe that Confirmation and Consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors urge all holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their ballots so they will be received by the Solicitation Agent no later than 5:00 p.m. (prevailing Eastern Time) on March 2, 2017.

Dated:  As of February 16, 2017

Respectfully submitted,

ANSWERS HOLDINGS, INC.
on behalf of itself and each of its Debtor affiliates

By:      /s/ Justin P. Schmaltz
Name:    Justin P. Schmaltz
Title:     Chief Restructuring Officer

Prepared by:

James H.M. Sprayregen, P.C.
Jonathan Henes, P.C.
Christopher T. Greco
Anthony R. Grossi
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          james.sprayregen@kirkland.com
                jhenes@kirkland.com
                cgreco@kirkland.com
                anthony.grossi@kirkland.com
                john.weber@kirkland.com

- and -

Melissa N. Koss
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          melissa.koss@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

71

**<u>EXHIBIT A TO THE DISCLOSURE STATEMENT</u>**

<u>JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION</u>
<u>FOR ANSWERS HOLDINGS, INC. AND ITS DEBTOR AFFILIATES</u>

**EXHIBIT B TO THE DISCLOSURE STATEMENT**

RESTRUCTURING SUPPORT AGREEMENT

**EXHIBIT C TO THE DISCLOSURE STATEMENT**

LIQUIDATION ANALYSIS

**EXHIBIT D TO THE DISCLOSURE STATEMENT**

<u>VALUATION ANALYSIS</u>

**EXHIBIT E TO THE DISCLOSURE STATEMENT**

FINANCIAL PROJECTIONS

**EXHIBIT F TO THE DISCLOSURE STATEMENT**

CORPORATE ORGANIZATIONAL CHART

**EXHIBIT G TO THE DISCLOSURE STATEMENT**

WARRANT AGREEMENT[1]

---

[1]    Subject to modification, including in order to reflect or address the terms of the New Organizational Documents and the New Stockholders' Agreement, each of which have not yet been prepared.

**<u>EXHIBIT H TO THE DISCLOSURE STATEMENT</u>**

<u>GOVERNANCE TERM SHEET</u>

**<u>Exhibit C</u>**

**Proposed Confirmation Order Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ANSWERS HOLDINGS, INC., *et al.*,[1] | ) Case No. 17-10496 (SMB) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

———————————————————————

**NOTICE OF (I) ENTRY OF ORDER APPROVING DISCLOSURE
STATEMENT FOR AND CONFIRMING DEBTORS' JOINT PREPACKAGED
CHAPTER 11 PLAN AND (II) OCCURRENCE OF EFFECTIVE DATE**

**PLEASE TAKE NOTICE** that on April __, 2017, the Honorable Stuart M. Bernstein, United States Bankruptcy Judge for the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***")[2], entered the *Order Approving the Debtors' Disclosure Statement for, and Confirming, the Debtors' Joint Prepackaged Chapter 11 Plan* [Docket No. [__] (the "***Confirmation Order***") confirming the *Joint Prepackaged Chapter 11 Plan of Reorganization for Answers Holdings, Inc. and Its Debtor Affiliates* (as modified, amended, and including all supplements, the "***Plan***")[2] [Docket No. 17] and approving the Disclosure Statement [Docket No. 16] of the above-captioned debtors (the "***Debtors***").

**PLEASE TAKE FURTHER NOTICE** that the Effective Date of the Plan occurred on **April [__], 2017**.

**PLEASE TAKE FURTHER NOTICE** that the Confirmation Order and the Plan are available for inspection.  If you would like to obtain a copy of the Confirmation Order or the Plan, you may contact Rust Consulting/Omni Bankruptcy, the notice, claims, and solicitations agent retained by the Debtors in the Chapter 11 Cases, by:  (a) calling the Debtors' restructuring hotline at (800) 580-9044; or (b) visiting the Debtors' restructuring website at: www.omnimgt.com/Answers.  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at:  www.pacer.gov.

**PLEASE TAKE FURTHER NOTICE** that the Bankruptcy Court has approved certain discharge, release, exculpation, injunction, and related provisions in Article VIII of the Plan.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Article V of the Plan, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the

---

[1]    The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Answers Holdings, Inc. (4504); Answers Corporation (2855); Easy2 Technologies, Inc. (2839); ForeSee Results, Inc. (3125); ForeSee Session Replay, Inc. (2593); More Corn, LLC (6193); Multiply Media, LLC (8974); Redcan, LLC (7344); RSR Acquisition, LLC (2256); Upbolt, LLC (2839); and Webcollage Inc. (7771).  The location of Debtor Webcollage Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is:  11 Times Square, 11th Floor, New York, New York 10018.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

Debtors or the Reorganized Debtors to a counterparty must be filed with the Bankruptcy Court on or before 30 days after the Effective Date. Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that in the event that the rejection of an Executory Contract or Unexpired Lease by any of the Debtors results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors or their respective properties or interests in property as agents, successors, or assigns, unless a Proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtors and the Reorganized Debtors no later than thirty (30) days after the later of (i) the Effective Date or (ii) the effective date of the rejection of such Executory Contract or Unexpired Lease.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Section 2.1 of the Plan, unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors, or the Reorganized Debtors, as applicable, each holder of an Allowed Administrative Claim (other than holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that the Plan and its provisions are binding on the Debtors, the Reorganized Debtors, the Distribution Agent, and any holder of a Claim or an Interest and such holder's respective successors and assigns, whether or not the Claim or the Interest of such holder is Impaired under the Plan, and whether or not such holder voted to accept the Plan.

**PLEASE TAKE FURTHER NOTICE** that the Plan and the Confirmation Order contain other provisions that may affect your rights. You are encouraged to review the Plan and the Confirmation Order in their entirety.

38

New York, New York
Dated:  April __, 2017

/s/
_____

James H.M. Sprayregen, P.C.
Jonathan S. Henes, P.C.
Christopher T. Greco
Anthony R. Grossi
John T. Weber
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Melissa N. Koss
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500

*Counsel to the Debtors*
*and Debtors in Possession*